IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ANGELICA HOLLOWAY, | ) |
|                 Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. |
| | ) |
| FAMILY FIRST HEALTH CORPORATION | ) |
| | ) |
|                 Defendant. | ) |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

The Plaintiff, Angelica Holloway, (hereinafter, Plaintiff) complains of Defendant Family First Health Corporation ("FFH" or "Defendant") as follows.

## I. JURISDICTION AND VENUE

1. This is an employment discrimination case, brought pursuant to the provisions of the Civil Rights Act of 1866, 42 U.S.C. §1981, as amended by the Civil Rights Act of 1991 ("Section 1981"). Plaintiff alleges that defendant FFH has engaged in intentional discrimination on the basis of race against herself as alleged below in this Complaint.

2. Plaintiff also has state law claims as noted below.

3. This Court has subject-matter jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 & 1343.

4. This Court has supplemental jurisdiction over Plaintiff's state-law claim pursuant to 28 U.S.C. § 1367, because that claim forms part of the same case or controversy as Plaintiff's federal claims.

5. Venue is proper in the Middle District of Pennsylvania pursuant to 28 U.S.C. § 1391(b) because Defendants reside in this District and because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred within this District.

## II. PARTIES

6. Plaintiff is an adult individual residing in York County, Pennsylvania.

7. Defendant is a Pennsylvania entity engaged in the provision of healthcare services and doing business within the Middle District of Pennsylvania.

8. At all relevant times, Defendant acted through its officers, managers, supervisors, and employees, whose acts and omissions were taken within the course and scope of their employment.

9. At all relevant times, Defendant was Plaintiff's employer within the meaning of applicable federal and state law.

## III. FACTUAL ALLEGATIONS

### A. Plaintiff's Employment and Qualifications

10. Plaintiff, an African American woman, was employed by Defendant in a management-level position.

11. Plaintiff was qualified for her position and possessed the education, experience, and skills necessary to perform her job duties.

12. Throughout her employment, Plaintiff performed her job in a satisfactory manner and met Defendant's legitimate expectations.

13. Prior to the events giving rise to this action, Plaintiff had not been disciplined for performance-related reasons.

### B. Racial Context and Disparate Treatment

14. During Plaintiff's employment, she was one of a small number of African American employees in management-level roles.

15. Plaintiff was subjected to heightened scrutiny and treated differently than similarly situated white employees.

16. White employees who were subject to the same policies, supervision, and workplace standards were not scrutinized or disciplined as was the Plaintiff.

17. Plaintiff was singled out for criticism and investigation under circumstances where white employees were treated more leniently or not disciplined at all.

18. At least one similarly situated white employee involved in or connected to the same or similar circumstances relied upon by Defendant to justify Plaintiff's termination was not terminated and was treated more favorably.

19. Further, a Caucasian employee, Kimberly Grove would comment saying such things as "Crack the whip" and if they were having meetings on DEI.

20. On January 12, 2024, at about 6:15 pm, Michelle Jordan (Plaintiff's previous manager) reached out to her to apologize for Grove's comment regarding "cracking the whip" during the practice manager meeting. The call lasted for almost 10 minutes. However, Jordan would say in DEI meetings things like, "we are not just doing this because of Angelica."

21. A few months later, the practice managers were informed about a Racial Justice training that they were asked to complete before rolling it out to additional staff. Plaintiff's team was considered the 1st cohort.

22. During the next several meetings, about 4, Ms. Jordan would always mention that the training was not happening because of the Plaintiff being at the practice. However, Plaintiff asked that they not keep mentioning her when bringing up the racial justice course because it was offensive as she felt she was personally be singled out.

23. Plaintiff also stated that she didn't appreciate racial slurs and how those comments in general affected her when it came to race.

24. However, no investigation into the matter occurred and nothing changed and the Plaintiff still felt as if she was singled out.

25. These meeting were typically supposed to be about finances of the organization and staffing. The manager meetings were happening about once a week when racial justice would be mentioned.

26. During another meeting, Grove stated that she did not see color, so she didn't understand the problem.

27. Further, Grove compared a racial slur to her being called pregnant when she was not, which was also offensive to the Plaintiff as she minimized the racial issues when she made these comments. However, no one took action to prevent Grove from making racial motivated statement such as this.

28. At the end of the cohort, the person who led the course (Anika Jackson-VP of Diversity, Equity, and Inclusion- and another black woman) asked who would be willing to help make a change and become more responsible for holding ourselves and each other accountable and the Plaintiff was the only one who stated yes. She brought this fact up to Ms. Jackson who stated she was not surprised at all.

29. This title that Anika was given in the past no longer existed when the Plaintiff was terminated as she became the VP, Mission Integration and/or Director of New Initiatives.

30. While Plaintiff was being terminated, she asked HR how she could be terminated when she followed all appropriate steps and did as she was told but she was not given an answer. Then she asked why Grove, who made racial slurs in front of the supervisors, was still employed. Plaintiff was told by the HR Manager named Holly just because she was not terminated, it did not mean they were not addressing her.

### C. Patient-Safety and Compliance Concerns

31. On March 27, 2024, the Plaintiff received an email from an unknown individual at the end of the day. On March 28, 2024, she noticed the email was referring to a patient. The Plaintiff turned around while in the supervisors office and asked the clinical supervisor Rebecca Crouse if she knew who the patient was. This is because Crouse had been there for years prior to the Plaintiff. Crouse stated that this was indeed a patient of FFH that was being referred to in the email, and they then began a joint review of the email.

32. Plaintiff asked Crouse if she could assist her through navigating the patient's chart as she was more familiar with this patient and the electronic medical record as Plaintiff was still learning.

33. Crouse assisted the Plaintiff and while comparing the information sent the email to the patient's chart where they noticed that a lot of details matched the accusations in the email.

6

34. The Plaintiff then reached out to Jordan by MS Teams to see if she could call her regarding a possible legal matter.

35. Jordan did not respond for hours and so the Plaintiff reached out to Jennifer Strayer for assistance. This matter was concerning because if the patient was truly sending letters to her employer with Family First as the provider, it could be unsafe for the provider to lose her license as well as prescribing herself medications and changing hospital or doctor's office documentation.

36. Furthermore, with the patient possibly forging the providers name, writing documents or scripts, the Plaintiff's concern was that the patient could try to prescribe something for herself which could lead to a serious medical condition, or even death, or it could have also resulted in the providers license revoked. As such, the Plaintiff had a duty to review and report this information to the appropriate channels internally and if necessary, other entities such as law enforcement. Additionally, at to the patient, they could have changed their health history, which could affect them negatively if they required medication or if any medications had any contraindications.

37. Thus, during her employment, Plaintiff became aware of conduct that she reasonably believed implicated patient safety, regulatory compliance, and the integrity of medical records.

38. Plaintiff reasonably believed that the conduct she identified could endanger patients and violate healthcare standards and applicable regulations.

39. Acting in good faith, Plaintiff raised her concerns internally through appropriate workplace channels.

40. Plaintiff sought guidance from management and did not act unilaterally or outside the scope of her role.

41. Plaintiff's actions were undertaken to protect patients, ensure compliance, and prevent unsafe or improper practices.

**D. Retaliatory and Discriminatory Response**

42. After Plaintiff raised patient-safety and compliance concerns, Defendant's treatment of Plaintiff materially changed.

43. Plaintiff was subjected to increased scrutiny, criticism, and adverse treatment.

44. Defendant attributed vague, shifting, or inconsistently applied "policy violations" to Plaintiff.

45. White employees, such as her colleagues and co-workers, who engaged in comparable conduct were not subjected to similar scrutiny or discipline.

**E. Termination**

46. Plaintiff was terminated from her employment shortly after raising patient-safety and compliance concerns and after being subjected to race-based disparate treatment.

47. Defendant's stated reasons for Plaintiff's termination were false, inconsistent, and pretextual. Furthermore, Plaintiff was terminated while similarly situated white employees were retained.

48. Following Plaintiff's termination, her job duties were reassigned to, or her position was filled by, one or more employees outside her protected class.

49. Plaintiff's race and her opposition to race-based disparate treatment were motivating factors in Defendant's decision to terminate her employment.

50. Plaintiff was also terminated because she raised and refused to ignore concerns implicating patient safety and healthcare compliance.

**F. Harm to Plaintiff**

51. As a result of Defendant's conduct, Plaintiff suffered loss of employment, loss of income and benefits, emotional distress, humiliation, and other compensable damages.

52. Defendant's actions were intentional, willful, and taken with reckless indifference to Plaintiff's federally protected rights.

## COUNT I

## Race Discrimination in Violation of 42 U.S.C. § 1981

53. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

54. Plaintiff is a member of a racial minority protected by 42 U.S.C. § 1981.

55. Plaintiff had a contractual employment relationship with Defendant within the meaning of § 1981.

56. Plaintiff was qualified for her position and performed her job satisfactorily.

57. Defendant intentionally discriminated against Plaintiff on the basis of race by subjecting her to disparate treatment and terminating her employment.

58. Plaintiff was treated less favorably than similarly situated white employees and was replaced by, or her duties were reassigned to, individuals outside her protected class.

59. Defendant's stated reasons for Plaintiff's termination were pretextual.

60. Defendant interfered with Plaintiff's right to make and enforce contracts on equal terms with white employees.

61. Race was a motivating factor in Defendant's decision to terminate Plaintiff's employment.

62. As a direct and proximate result, Plaintiff suffered compensable damages.

## COUNT II

### Retaliation in Violation of 42 U.S.C. § 1981

63. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

64. Plaintiff engaged in protected activity by opposing and complaining about race-based disparate treatment and discriminatory conduct.

65. Defendant was aware of Plaintiff's protected activity.

66. After Plaintiff engaged in protected activity, Defendant subjected her to heightened scrutiny and adverse treatment.

67. Plaintiff was terminated shortly thereafter, establishing a close temporal connection.

68. Plaintiff's protected activity was a motivating factor in Defendant's decision to terminate her employment.

69. Defendant's stated reasons for termination were pretextual.

70. Plaintiff suffered damages as a direct and proximate result of Defendant's retaliatory conduct.

## COUNT III

### Wrongful Discharge in Violation of Pennsylvania Public Policy

71. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

72. Pennsylvania recognizes a common-law cause of action for wrongful discharge where termination violates a clear mandate of public policy, and no adequate statutory remedy exists.

73. Pennsylvania has a clear public policy favoring patient safety, the integrity of medical records, and compliance with healthcare laws and regulations.

74. Plaintiff identified and reported conduct she reasonably believed endangered patient safety and violated healthcare standards.

75. Plaintiff raised these concerns in good faith through appropriate channels.

76. Defendant terminated Plaintiff because she raised and refused to ignore patient-safety and compliance concerns.

77. Plaintiff's termination undermines Pennsylvania's public policy by discouraging healthcare employees from reporting unsafe or unlawful practices.

78. Defendant's conduct constitutes wrongful discharge under Pennsylvania common law.

79. Plaintiff suffered damages as a direct and proximate result.

## IV. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendant and award:

A. Compensatory damages, including lost wages, lost benefits, and emotional distress damages;

B. Punitive damages under 42 U.S.C. § 1981 and her state claim;

C. Pre-judgment and post-judgment interest as allowed by law;

D. Costs of suit and reasonable attorneys' fees as permitted by law;

E. Such other and further relief as the Court deems just and proper.

## V. JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Date: January 31, 2026					Respectfully submitted,

							**DONHAM LAW**

							<u>*By: /s/ Jeremy A. Donham, Esquire*</u>
							Jeremy Donham, Esquire
							Attorney I.D. 206980
							714 Venture Dr. Suite 144
							Morgantown, WV 26508
							PH: 717.881.7855
							FAX: 888.370.5177
							J.Donham@Donhamlaw.com