# EXHIBIT A

**Case No. 2023-0-1668**

**David Irvin v. Cabela's LLC et al.**

**Table of Exhibits**

| Tab | Document | Date |
|-----|----------|------|
| A-1 | Case Information Civil Cover Sheet | December 21, 2023 |
| A-2 | Complaint in Civil Action Law Filed | December 21, 2023 |
| A-3 | Praecipe to Enter Appearance | December 21, 2023 |
| A-4 | Acceptance of Service Filed | February 12, 2024 |
| A-5 | Praecipe to Enter Appearance | February 12, 2024 |
| A-6 | Preliminary Objections Filed | March 1, 2024 |
| A-7 | Order re Case Designation and Scheduling Case Management Conference | March 21, 2024 |
| A-8 | Amended Complaint | March 22, 2024 |
| A-9 | Preliminary Objections Filed | April 12, 2024 |
| A-10 | Praecipe for Disposition | April 23, 2024 |
| A-11 | Order Listing Case for Argument | April 26, 2024 |
| A-12 | Response Filed by Plaintiff in Opposition to Defendants' Preliminary Objections | May 1, 2024 |
| A-13 | Motion for Stipulated Protective Order | May 3, 2024 |

| Tab | Document | Date |
|-----|----------|------|
| A-14 | Notice of Appearance | May 6, 2024 |
| A-15 | Stipulated Protective Order | May 7, 2024 |
| A-16 | Motion for *Pro Hac Vice* | May 13, 2024 |
| A-17 | Order Re Motion for Admission *Pro Hac Vice* Granted | May 15, 2024 |
| A-18 | Motion to Consolidate Hearings | May 28, 2024 |
| A-19 | Plaintiff's Response to Defendants' Preliminary Objections | May 28, 2024 |
| A-20 | Order Re Motion to Consolidate Hearings | June 7, 2024 |
| A-21 | Notice of Supplemental Authority | June 10, 2024 |
| A-22 | Notice of Appearance | June 14, 2024 |
| A-23 | *Pro Hac Vice* Motion | July 19, 2024 |
| A-24 | Order Re Motion for Admission *Pro Hac Vice* Granted | July 23, 2024 |
| A-25 | *Pro Hac Vice* Motion | August 1, 2024 |
| A-26 | Status Order Setting Filing Deadlines | August 5, 2024 |
| A-27 | Order Re Motion for *Pro Hac Vice* | August 6, 2024 |
| A-28 | Notice of Supplemental Authority | September 27, 2024 |

| Tab | Document | Date |
|-----|----------|------|
| A-29 | Motion to Classify as Complex and Set Briefing Schedule | November 25, 2024 |
| A-30 | Order Re Motion to Designate Complex and Set Briefing Schedule | November 27, 2024 |
| A-31 | Opinion and Order Re Preliminary Objections | February 10, 2025 |
| A-32 | Order of the Court Re Pretrial Conference | March 6, 2025 |
| A-33 | Joint Stipulation to Stay Pending Mediation | March 24, 2025 |
| A-34 | Order Granting Stay | March 27, 2025 |
| A-35 | Joint Status Update | July 23, 2025 |
| A-36 | Joint Status Update | September 24, 2025 |
| A-37 | Joint Status Update | November 4, 2025 |
| A-38 | Motion for Continuance | December 24, 2025 |
| A-39 | Praecipe to Substitute Skadden as Counsel | December 26, 2025 |
| A-40 | Order for Continuance | December 31, 2025 |
| A-41 | Second Amended Complaint | February 18, 2026 |
| B-1 | Docket | March 2, 2026 |

# EXHIBIT 1

ORIGINAL

# Supreme Court of Pennsylvania
## Court of Common Pleas
## Civil Cover Sheet

_____ Lebanon _____ County

| For Prothonotary Use Only: | ENTERED & FILED PROTHONOTARY OFFICE LEBANON, PA |
|---|---|
| Docket No: **2023-01668** | 2023 DEC 21 P 3:06 |

*The information collected on this form is used solely for court administration purposes. This form does not supplement or replace the filing and service of pleadings or other papers as required by law or rules of court.*

**SECTION A**

| **Commencement of Action:** | | |
|---|---|---|
| ☒ Complaint | ☐ Writ of Summons | ☐ Petition |
| ☐ Transfer from Another Jurisdiction | | ☐ Declaration of Taking |

| Lead Plaintiff's Name: David Irvin | Lead Defendant's Name: Cabela's L.L.C. |
|---|---|

| **Are money damages requested?** ☒ Yes  ☐ No | Dollar Amount Requested: (check one) | ☐ within arbitration limits ☒ outside arbitration limits |
|---|---|---|

| Is this a *Class Action Suit?* ☒ Yes  ☐ No | Is this an *MDJ Appeal?* ☐ Yes  ☒ No |
|---|---|

Name of Plaintiff/Appellant's Attorney: _Steven A. Schwartz_

☐ Check here if you have no attorney (are a Self-Represented [Pro Se] Litigant)

**SECTION B**

**Nature of the Case:** Place an "X" to the left of the **ONE** case category that most accurately describes your **PRIMARY CASE.** If you are making more than one type of claim, check the one that you consider most important.

**TORT** *(do not include Mass Tort)*
- ☐ Intentional
- ☐ Malicious Prosecution
- ☐ Motor Vehicle
- ☐ Nuisance
- ☐ Premises Liability
- ☐ Product Liability *(does not include mass tort)*
- ☐ Slander/Libel/ Defamation
- ☒ Other: Data Privacy

**MASS TORT**
- ☐ Asbestos
- ☐ Tobacco
- ☐ Toxic Tort - DES
- ☐ Toxic Tort - Implant
- ☐ Toxic Waste
- ☐ Other: _____

**PROFESSIONAL LIABLITY**
- ☐ Dental
- ☐ Legal
- ☐ Medical
- ☐ Other Professional: _____

**CONTRACT** *(do not include Judgments)*
- ☐ Buyer Plaintiff
- ☐ Debt Collection: Credit Card
- ☐ Debt Collection: Other
- _____
- _____
- ☐ Employment Dispute: Discrimination
- ☐ Employment Dispute: Other
- _____
- _____
- ☐ Other: _____

**REAL PROPERTY**
- ☐ Ejectment
- ☐ Eminent Domain/Condemnation
- ☐ Ground Rent
- ☐ Landlord/Tenant Dispute
- ☐ Mortgage Foreclosure: Residential
- ☐ Mortgage Foreclosure: Commercial
- ☐ Partition
- ☐ Quiet Title
- ☐ Other: _____

**CIVIL APPEALS**
Administrative Agencies
- ☐ Board of Assessment
- ☐ Board of Elections
- ☐ Dept. of Transportation
- ☐ Statutory Appeal: Other
- _____
- _____
- ☐ Zoning Board
- ☐ Other: _____

**MISCELLANEOUS**
- ☐ Common Law/Statutory Arbitration
- ☐ Declaratory Judgment
- ☐ Mandamus
- ☐ Non-Domestic Relations Restraining Order
- ☐ Quo Warranto
- ☐ Replevin
- ☐ Other: _____

*Updated 1/1/2011*

# EXHIBIT 2

Exhibit A-2

ORIGINAL

## Supreme Court of Pennsylvania
### Court of Common Pleas
### Civil Cover Sheet

_____ Lebanon _____ County

| For Prothonotary Use Only: | ENTERED & FILED PROTHONOTARY OFFICE LEBANON, PA |
|---|---|
| Docket No: **2023-01668** | 2023 DEC 21 P 3: 06 |

_The information collected on this form is used solely for court administration purposes. This form does not supplement or replace the filing and service of pleadings or other papers as required by law or rules of court._

**SECTION A**

**Commencement of Action:**
- [X] Complaint
- [ ] Writ of Summons
- [ ] Transfer from Another Jurisdiction
- [ ] Petition
- [ ] Declaration of Taking

Lead Plaintiff's Name:
David Irvin

Lead Defendant's Name:
Cabela's L.L.C.

**Are money damages requested?** [X] Yes  [ ] No

Dollar Amount Requested:
(check one)
- [ ] within arbitration limits
- [X] outside arbitration limits

**Is this a _Class Action Suit_?** [X] Yes  [ ] No

**Is this an _MDJ Appeal_?** [ ] Yes  [X] No

Name of Plaintiff/Appellant's Attorney: Steven A. Schwartz

[ ] Check here if you have no attorney (are a Self-Represented [Pro Se] Litigant)

**SECTION B**

**Nature of the Case:** Place an "X" to the left of the **ONE** case category that most accurately describes your **PRIMARY CASE.** If you are making more than one type of claim, check the one that you consider most important.

**TORT** _(do not include Mass Tort)_
- [ ] Intentional
- [ ] Malicious Prosecution
- [ ] Motor Vehicle
- [ ] Nuisance
- [ ] Premises Liability
- [ ] Product Liability _(does not include mass tort)_
- [ ] Slander/Libel/ Defamation
- [X] Other:
  Data Privacy

**MASS TORT**
- [ ] Asbestos
- [ ] Tobacco
- [ ] Toxic Tort - DES
- [ ] Toxic Tort - Implant
- [ ] Toxic Waste
- [ ] Other:
  _____

**PROFESSIONAL LIABLITY**
- [ ] Dental
- [ ] Legal
- [ ] Medical
- [ ] Other Professional:
  _____

**CONTRACT** _(do not include Judgments)_
- [ ] Buyer Plaintiff
- [ ] Debt Collection: Credit Card
- [ ] Debt Collection: Other
  _____
  _____
- [ ] Employment Dispute: Discrimination
- [ ] Employment Dispute: Other
  _____
  _____
- [ ] Other:
  _____
  _____

**REAL PROPERTY**
- [ ] Ejectment
- [ ] Eminent Domain/Condemnation
- [ ] Ground Rent
- [ ] Landlord/Tenant Dispute
- [ ] Mortgage Foreclosure: Residential
- [ ] Mortgage Foreclosure: Commercial
- [ ] Partition
- [ ] Quiet Title
- [ ] Other:
  _____
  _____

**CIVIL APPEALS**
Administrative Agencies
- [ ] Board of Assessment
- [ ] Board of Elections
- [ ] Dept. of Transportation
- [ ] Statutory Appeal: Other
  _____
  _____
- [ ] Zoning Board
- [ ] Other:
  _____
  _____

**MISCELLANEOUS**
- [ ] Common Law/Statutory Arbitration
- [ ] Declaratory Judgment
- [ ] Mandamus
- [ ] Non-Domestic Relations Restraining Order
- [ ] Quo Warranto
- [ ] Replevin
- [ ] Other:
  _____
  _____

_Updated 1/1/2011_

ORIGINAL

ENTERED & FILED
PROTHONOTARY OFFICE
LEBANON, PA

| | |
|---|---|
| DAVID IRVIN, on behalf of himself and all others similarly situated,<br><br>  Plaintiff,<br><br>v.<br><br>CABELA'S L.L.C. and BPS DIRECT, L.L.C.,<br><br>  Defendants. | IN THE COURT OF COMMON PLEAS OF LEBANON COUNTY, PA<br>CIVIL DIVISION<br><br>Case No. 2023- 01668<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

2023 DEC 21  P 3: 06

Plaintiff David Irvin ("Plaintiff"), on behalf of himself and all other similarly situated (the "Class members") bring this case against Cabela's L.L.C. ("Cabela's") and BPS Direct, L.L.C. ("BPS") (collectively, "Defendants"), which operate, control and manage the websites cabelas.com and basspro.com, respectively. Plaintiff brings this action based upon personal knowledge of the facts pertaining to himself, and on information and belief as to all other matters, by and through the investigation of undersigned counsel.

## NATURE OF THE ACTION

1.      This is a class action lawsuit brought on behalf of all Pennsylvania residents who have visited and/or purchased firearms from cabelas.com and/or basspro.com.

2.      Defendants aid, employ, agree, and conspire with Meta Platforms, Inc. ("Facebook") to intercept communications sent and received by Plaintiff and Class Members, including communications containing protected information about firearms purchases. Plaintiff brings this action for legal and equitable remedies resulting from these illegal actions.

## JURISDICTION AND VENUE

3.     The Court has subject matter jurisdiction over this action pursuant to Pa. Cons. Art. 5, §5(b) and 42 Pa. C.S.A. § 931(b).

4.     The Court has personal jurisdiction over Defendant pursuant to 42 Pa. C.S.A. 5301(a)(2).

5.     Venue is proper pursuant to Pa. R. Civ. P. 2179(a)(2)-(4) because Defendant regularly conducts business in this county, the causes of action arose out of conduct in this county, and the transaction or occurrence out of which the causes of action arose took place in this county.

## THE PARTIES

6.     Plaintiff David Irvin is an adult citizen of the Commonwealth and is domiciled in Fredericksburg, Pennsylvania.  On December 2, 2021, Plaintiff Irvin purchased a Henry Big Boy Classic Centerfire Lever-Action Rifle - .45 Colt from cabelas.com.  When accessing the website and completing the purchase, Plaintiff Irvin was located in Pennsylvania.  Plaintiff Irvin also has an active Facebook account which he has maintained since approximately 2007.  Plaintiff Irvin accesses his Facebook account from multiple devices, including his laptop and smartphone.

7.     Defendant Cabela's L.L.C. is a Pennsylvania company headquartered in Springfield, Missouri.  Cabela's owns and operates cabelas.com, through which it sells sporting goods, including firearms.  Cabela's is a wholly-owned subsidiary of BPS Direct, L.L.C.

8.     Defendant BPS Direct, L.L.C., doing business as Bass Pro Shops, is a Delaware corporation headquartered in Springfield, Missouri.  BPS owns and operates basspro.com, through which it sells sporting goods, including firearms.  BPS is the parent company of Cabela's.

9.     Pursuant to the systematic process described herein, Defendants, through cabela's.com and basspro.com, assisted Facebook with intercepting Plaintiff's communications,

2

including those that contained personally identifiable information and protected information about their firearms purchases. Defendants assisted these interceptions without Plaintiff's knowledge, consent or express written authorization. By failing to receive the requisite consent, Defendants breached confidentiality and unlawfully disclosed Plaintiff's personally identifiable information and protected information about his firearms purchases.

## FACTUAL ALLEGATIONS

### A. Facebook and the Facebook Tracking Pixel

10.     Facebook is the largest social networking site on the planet, touting 2.9 billion monthly active users.[1] Facebook describes itself as a "real identity platform,"[2] meaning users are allowed only one account and must share "the name they go by in everyday life."[3] To that end, when creating an account, users must provide their first and last name, along with their birthday and gender.[4]

11.     Facebook generates revenue by selling advertising space on its website.[5]

12.     Facebook sells advertising space by highlighting its ability to target users.[6] Facebook can target users so effectively because it surveils user activity both on and off its site.[7]

---

[1] Sean Burch, *Facebook Climbs to 2.9 Billion Users, Report 29.1 Billion in Q2 Sales*, YAHOO (July 28, 2021), https://www.yahoo.com/now/facebook-climbs-2-9-billion-202044267.html

[2] Sam Schechner and Jeff Horwitz, *How Many Users Does Facebook Have? The Company Struggles to Figure It Out*, WALL. ST. J. (Oct. 21, 2021).

[3] FACEBOOK, COMMUNITY STANDARDS, PART IV INTEGRITY AND AUTHENTICITY, https://www.facebook.com/communitystandards/integrity_authenticity.

[4] FACEBOOK, SIGN UP, https://www.facebook.com/

[5] Mike Isaac, *Facebook's profit surges 101 percent on strong ad sales.*, N.Y. TIMES (July 28, 2021), https://www.nytimes.com/2021/07/28/business/facebook-q2-earnings.html.

[6] FACEBOOK, WHY ADVERTISE ON FACEBOOK, https://www.facebook.com/business/help/205029060038706.

[7] FACEBOOK, ABOUT FACEBOOK PIXEL, https://www.facebook.com/business/help/742478679120153?id=1205376682832142.

This allows Facebook to make inferences about users beyond what they explicitly disclose, like their "interests," "behavior," and "connections."[8]  Facebook compiles this information into a generalized dataset called "Core Audiences," which advertisers use to apply highly specific filters and parameters for their targeted advertisements.[9]

13.    Advertisers can also build "Custom Audiences."[10]  Custom Audiences enable advertisers to reach "people who have already shown interest in [their] business, whether they're loyal customers or people who have used [their] app or visited [their] website."[11] Advertisers can use a Custom Audience to target existing customers directly, or they can use it to build a "Lookalike Audiences," which "leverages information such as demographics, interests, and behavior from your source audience to find new people who share similar qualities."[12]  Unlike Core Audiences, Custom Audiences require an advertiser to supply the underlying data to Facebook.  They can do so through two mechanisms: by manually uploading contact information for customers, or by utilizing Facebook's "Business Tools," which collect and transmit the data automatically.[13] One such Business Tool is the Facebook Tracking Pixel.

---

[8] FACEBOOK, AD TARGETING: HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.

[9] FACEBOOK, EASIER, MORE EFFECTIVE WAYS TO REACH THE RIGHT PEOPLE ON FACEBOOK, https://www.facebook.com/business/news/Core-Audiences.

[10] FACEBOOK, ABOUT CUSTOM AUDIENCES, https://www.facebook.com/business/help/744354708981227?id=2469097953376494.

[11] FACEBOOK, ABOUT EVENTS CUSTOM AUDIENCE, https://www.facebook.com/business/help/366151833804507?id=300360584271273.

[12] FACEBOOK, ABOUT LOOKALIKE AUDIENCES, https://www.facebook.com/business/help/164749007013531?id=401668390442328.

[13] FACEBOOK, CREATE A CUSTOMER LIST CUSTOM AUDIENCE, https://www.facebook.com/business/help/170456843145568?id=2469097953376494; FACEBOOK, CREATE A WEBSITE CUSTOM AUDIENCE, https://www.facebook.com/business/help/1474662202748341?id=2469097953376494.

14.     The Facebook Tracking Pixel is a piece of code that advertisers, like Defendant, can integrate into their website. Once activated, the Facebook Tracking Pixel "tracks the people and type of actions they take."[14] When the Facebook Tracking Pixel captures an action, it sends a record to Facebook. Once this record is received, Facebook processes it, analyzes it, and assimilates it into datasets like the Core Audiences and Custom Audiences.

15.     Advertisers control what actions—or, as Facebook calls it, "events"—the Facebook Tracking Pixel will collect, including the website's metadata, along with what pages a visitor views and what buttons a visitor clicks.[15] Advertisers can also configure the Facebook Tracking Pixel to track other events. Facebook offers a menu of "standard events" from which advertisers can choose, including what content a visitor views or purchases.[16] An advertiser can also create their own tracking parameters by building a "custom event."[17]

16.     Advertisers control how the Facebook Tracking Pixel identifies visitors. The Facebook Tracking Pixel is configured to automatically collect "HTTP Headers" and "Pixel-specific Data."[18] HTTP Headers collect "IP addresses, information about the web browser, page location, document, referrer and persons using the website."[19] Pixel-specific Data includes "the Pixel ID and cookie."[20]

---

[14] FACEBOOK, RETARGETING, https://www.facebook.com/business/goals/retargeting.

[15] *See* FACEBOOK, FACEBOOK PIXEL, ACCURATE EVENT TRACKING, ADVANCED, https://developers.facebook.com/docs/facebook-pixel/advanced/; *see also* FACEBOOK, BEST PRACTICES FOR FACEBOOK PIXEL SETUP, https://www.facebook.com/business/help/218844828315224?id=1205376682832142.

[16] FACEBOOK, SPECIFICATIONS FOR FACEBOOK PIXEL STANDARD EVENTS, https://www.facebook.com/business/help/402791146561655?id=1205376682832142.

[17] FACEBOOK, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS, https://www.facebook.com/business/help/964258670337005?id=1205376682832142.

[18] FACEBOOK, FACEBOOK PIXEL, https://developers.facebook.com/docs/facebook-pixel/.

[19] *Id.*

[20] *Id.*

## B. Defendants' Websites and the Facebook Pixel

17. Defendants' websites cabelas.com and basspro.com are largely mirror images of one another. Both host code for the Facebook Tracking Pixel and are configured to transmit three distinct events to Facebook:[21]



18. PageView transmits the Uniform Resource Locator ("URL") accessed, which shows what webpage the visitor visited:



19. Defendants' URLs contain detailed information disclosing what products users have browsed. For example, if a user searches for "Vortex scope," the URL displayed is "basspro.com/SearchDisplay#q=Vortex%20scope," and if that user then clicks on the "Vortext

---

[21] This data derives from a tool created and offered by Facebook.

Diamondback Rifle Scope," the URL changes to "basspro.com/shop/en/vortex-diamondback-rifle-scope."

20.    ViewContent shows similar information to PageView, but specifically tracks when users access pages for particular products.

21.    Microdata transmits the title and description of the webpage:



22.    Another event titled "Button Click Automatically Detected" registers when users add a product, such as a firearm, to their online shopping cart and when they checkout:



23. This event registers, for example, when a purchaser clicks "ORDER ONLINE," "ADD TO CART," "CHECKOUT," "CONTINUE," "REVIEW ORDER," and "PLACE ORDER."

24.    The Button Click event also transmits content that purchasers enter into form fields:



25.    This includes form fields that must be completed prior to purchase:



26.    This event data, jointly and independently, permit an ordinary person to identify what a consumer has viewed and/or purchased on Defendants' websites.

27.    The Facebook Tracking Pixel uses both first- and third-party cookies. A first-party cookie is "created by the website the user is visiting"—*i.e.*, cabelas.com or basspro.com.[22] A third-

---

[22] PC MAG, FIRST-PARTY COOKIES, https://www.pcmag.com/encyclopedia/term/first-party-cookie. This is confirmable by using developer tools to inspect a website's cookies and track network activity.

party cookie is "created by a website with a domain name other than the one the user is currently visiting"—*i.e.*, Facebook.[23]

28.    When viewing Defendants' websites, the Facebook Tracking Pixel compels the user's browser to send nine cookies to Facebook:

| Name | Value | Domain |
|---|---|---|
| xs | 156%3AKGXBbut-SjxSCw%3A2%3A1639601808%... | .facebook.com |
| wd | 1313x646 | .facebook.com |
| usida | eyJ2ZXliOjEslmlkljoiQXJvZndreDE1OTA1ZmsiLCJ0... | .facebook.com |
| c_user | 679395441 | .facebook.com |
| datr | jVa6YcoeBSLOAo0a9bvz1mtE | .facebook.com |
| presence | C%7B%22t3%22%3A%5B%5D%2C%22utc3%22%... | .facebook.com |
| dpr | 1.4630000591278076 | .facebook.com |
| sb | jVa6YaHou2Nev98LSBnWYOo7 | .facebook.com |
| fr | 0ZzdZn9Ygh60Xbk36.AWVC5uksSXTsGC3302SbE... | .facebook.com |

29.    The c_user cookie contains that visitor's unencrypted Facebook ID.  A Facebook ID is personally identifiable information.  Anyone can identify a Facebook profile—and all personal information publicly listed on that profile—by appending the Facebook ID to the end of Facebook.com.

30.    The fr cookie contains, at least, an encrypted Facebook ID and browser identifier.[24] The datr cookies also identifies a browser.[25]  Facebook, at a minimum, uses the fr and c_user cookies to identify users by their Facebook IDs and corresponding Facebook profiles.[26]

---

[23] PC MAG, THIRD-PARTY COOKIES, https://www.pcmag.com/encyclopedia/term/third-party-cookie. This is also confirmable by tracking network activity.
[24] DATA PROTECTION COMMISSIONER, FACEBOOK IRELAND LTD, REPORT OF RE-AUDIT (Sept. 21, 2012), http://www.europe-v-facebook.org/ODPC_Review.pdf.
[25] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.
[26] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.

31.    Through the Facebook Tracking Pixel's code, these cookies combine the identifiers with the event data, allowing Facebook to know, among other things, what webpages visitors to Defendants' websites are visiting and what products they are purchasing.[27]

32.    Defendants also use "Advanced Matching."    With Advanced Matching, Defendants' Pixels "look[s] for recognizable form field and other sources on your website that contain information such as first name, last name and email." [28]  That information is recorded, "along with the event, or action, that took place."[29]  This information is also "hashed,"[30] meaning it is "[a] computed summary of digital data that is a one-way process."  In other words, it "cannot be reversed back into the original data."[31]

---

You can use Advanced Matching to help:

- Increase the number of attributed conversions. We can match more of the conversions that happen on your website to people on Meta. This helps you understand the impact of your ads on website conversions.

- Increase your Custom Audience size. We're able to better match your website visitors to people on Meta and increase the size of your Custom Audience.

- Decrease the cost per conversion. Conversion-optimized campaigns become more efficient because we can better identify and deliver ads to the types of people likely to take the actions you care about.

---

33.    Defendants disclose this information to Facebook so it can better match visitors to their Facebook profiles.

34.    As part of Advanced Matching, Defendants enabled "Automatic Advanced Matching."  That means Defendants configured the pixel to scan form fields containing a user's

---

[27] FACEBOOK, GET STARTED, https://developers.facebook.com/docs/meta-pixel/get-started.
[28] https://www.facebook.com/business/help/611774685654668?id=1205376682832142
[29] FACEBOOK,    ABOUT    ADVANCED    MATCHING    FOR    WEB, https://www.facebook.com/business/help/611774685654668?id=1205376682832142.
[30] DEFINITION OF HASH, https://www.pcmag.com/encyclopedia/term/hash
[31] *Id.*

email address, first name, last name, phone number, gender, zip code, city and state.[32]   The

highlighted line, along with the line three below it, shows that Defendants enabled Automatic

Matching.

```
33 fbq.registerPlugin("841232062592664", {__fbEventsPlugin: 1, plugin: function(fbq, instance, config) { fbq.loadPlugin(
34 fbq.loadPlugin("identity");
35 instance.optIn("841232062592664", "InferredEvents", true);
36 fbq.loadPlugin("jsonld_microdata");
37 instance.optIn("841232062592664", "MicrodataJsonLd", true);
38 config.set("841232062592664", "automaticMatching", {"selectedMatchKeys":["em","fn","ln","ph","ge","zp","ct","st"]});
39 fbq.loadPlugin("inferredevents");
40 fbq.loadPlugin("identity");
41 instance.optIn("841232062592664", "AutomaticMatching", true);
42 fbq.loadPlugin("iwlbootstrapper");
43 instance.optIn("841232062592664", "INLBootstrapper", true);
44 fbq.loadPlugin("iwlparameters");
45 fbq.loadPlugin("estruleengine");
46 instance.optIn("841232062592664", "IWLParameters", true);
```

35.    Defendants know that Facebook will match the Advanced Matching parameters

with a customer's subsequent activity, thereby helping them "[i]ncrease the number of attributed

conversions," "[i]ncrease [their] Custom Audience size," and "[d]ecrease the cost per

conversion."[33]

36.    By compelling a visitor's browser to disclose the Advanced Matching parameters

and event data for videos, Defendants knowingly disclose information sufficiently permitting an

ordinary person to identify a specific individual's website activity, including what webpages they

visit and what products they purchase.

### C.    Defendants Never Received Consent from Plaintiff and Class Members to Assist Facebook with Intercepting Their Communications

37.    Defendants never received consent from users to intercept their electronic

communications.

---

[32] Facebook provides a corresponding look-up table: FACEBOOK, ADVANCED MATCHING, https://developers.facebook.com/docs/meta-pixel/advanced/advanced-matching.
[33]    FACEBOOK,    ABOUT    ADVANCED    MATCHING    FOR    WEB, https://www.facebook.com/business/help/611774685654668?id=1205376682832142.

38.     Plaintiff and Class members did not consent to Defendants' privacy policies prior to Facebook intercepting their electronic communications. Even if applicable, that privacy policy fails to disclose that Defendants assist Facebook with intercepting communications that contain sensitive information.

39.     Likewise, Facebook never receives consent from users to intercept and collect electronic communications containing their sensitive and unlawfully disclosed information. In fact, Facebook expressly warrants the opposite.

40.     When first signing up, a user assents to three agreements: the Terms of Service,[34] the Cookies Policy,[35] and the Data Policy.[36]

41.     Facebook's Terms of Service begins by stating that "[p]rotecting people's privacy is central to how we've designed our ad system."[37] The Terms of Service then prohibits anyone from using Facebook's Products in a manner that is "unlawful, misleading, discriminatory or fraudulent."[38]

42.     Facebook's Data Policy recognizes that there may be "[d]ata with special protections," meaning information that "could be subject to special protections under the laws of your country."[39] The Data Policy goes on to describe how Facebook collects information from its "Meta Business Tools," including "our social plug-ins (such as the Like button), Facebook Login,

---

[34] FACEBOOK, TERMS OF SERVICE, https://www.facebook.com/legal/terms/update.
[35] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policies/cookies/.
[36] FACEBOOK, DATA POLICY, https://www.facebook.com/about/privacy/update.
[37] FACEBOOK, TERMS OF SERVICE, https://www.facebook.com/legal/terms/update..
[38] *Id.*
[39] FACEBOOK, DATA POLICY, https://www.facebook.com/about/privacy/update.

our APIs and SDKs, or the Meta pixel."[40]  Specifically, Facebook acknowledges that "[p]artners receive your data when you visit or use their services or through third parties they work with."[41]

43.    Facebook then offers an express representation: **"We require each of these partners to have lawful rights to collect, use and share your data before providing any data to us.**"[42]  Facebook does acknowledge collecting "data with special protections" to personalize ads, but critically, only sensitive information that users "choose to provide."[43]

44.    Facebook's Cookies Policy ratifies those representations, stating "the Data Policy will apply to our processing of the data that we collect via cookies."[44]

45.    Facebook's other representations reinforce these warranties.  In its Advertising Policy, Facebook states "[w]e do not use sensitive personal data for ad targeting."[45]  And in a blog post titled "About Restricted Meta Business Tools Data," Facebook asserts it has "policies around the kinds of information businesses can share with us."[46]  Facebook does not "want websites or apps sending us sensitive information about people."[47]  Sensitive information includes, among other things, "any information defined as sensitive under applicable laws, regulations and applicable industry guidelines."[48]

---

[40] FACEBOOK, DATA POLICY, https://www.facebook.com/about/privacy/update.
[41] *Id.*
[42] *Id.*
[43] *Id.*
[44]    FACEBOOK,    COOKIES    &    OTHER    STORAGE    TECHNOLOGIES, https://www.facebook.com/policies/cookies/.
[45] FACEBOOK, ADVERTISING POLICY, https://www.facebook.com/policies/ads/.
[46]    FACEBOOK,    ABOUT    RESTRICTED    META    BUSINESS    TOOLS    DATA, https://www.facebook.com/business/help/1057016521436966?id=188852726110565
[47] *Id.*
[48] *Id.*

46.     These representations are repeated frequently. Facebook created a "Help Center" to better explain its practices to users. In an article titled, "How does Facebook receive information from other businesses and organizations?," Facebook reiterates its promise to "prohibit businesses or organizations from sharing sensitive information with us," and if Facebook "determine[s] that a business or an organization is violating our terms, we'll take action against that business or organization."[49] In another article, titled, "How does Meta work with data providers?," Facebook repeats this promise, stating "[b]usinesses that advertise on Facebook are required to have any necessary rights and permissions to use this information, as outlined in our Custom Audience Terms that businesses must agree to."[50]

47.     Based on these representations, Facebook never receives consent from users to intentionally intercept and monetize electronic communications disclosing sensitive information that the law protects.

48.     Moreover, upon information and belief, Defendants have never entered into an agreement with Facebook that would obligate Facebook to keep disclosed information confidential.

## CLASS ALLEGATIONS

49.     Plaintiff, pursuant to Rules 1702, 1708 and 1709 of the Pennsylvania Rules of Civil Procedure, asserts this action individually and on behalf of the following Class: All persons in Pennsylvania who have a Facebook account and who visited either cabelas.com, basspro.com or both (the "Class"). Plaintiff also seeks to represent a subclass of similarly situated individuals

---

[49] FACEBOOK, HOW DOES FACEBOOK RECEIVE INFORMATION FROM OTHER BUSINESSES AND ORGANIZATIONS, https://www.facebook.com/help/2230503797265156.
[50] HOW DOES META WORK WITH DATA PROVIDERS?, https://www.facebook.com/help/494750870625830?ref=dp.

defined as all persons in Pennsylvania who have a Facebook account and who purchased a firearm from either cabelas.com, basspro.com or both (the "Subclass").

50.     Subject to additional information obtained through further investigation and discovery, the above-described Class and Subclass may be modified or narrowed as appropriate, including through the use of multi-state subclasses.

51.     **Numerosity.**  Consistent with Pennsylvania Rule of Civil Procedure 1702(1), the Class is so numerous that joinder of all members is impracticable.  While Plaintiff does not know the exact number of members of the Class, Plaintiff believes the Class contains at least hundreds of thousands of individuals, and the members can be identified through Defendant's records.  Class Members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, internet postings, social media and/or published notice.

52.     **Commonality.**  Consistent with Pennsylvania Rule of Civil Procedure 1702(2), common questions of law and fact exist as to all Class Members.  These common questions of law or fact predominate over any questions affecting only individual members of the Class.  Common questions include, but are not limited to the following:

    a.  whether Defendants collected users' PII, website activities and firearms purchases;

    b.  whether Defendants unlawfully disclosed and continue to disclose their users' PII, website activities and firearms purchases in violation of Pennsylvania Wiretapping Act, 8 Pa. Cons. Stat. § 5701, *et seq.*;

    c.  whether Defendants unlawfully disclosed and continue to disclose its users' PII, website activities and firearms purchases in violation of Uniform Firearms Act, 18 Pa.C.S. § 6111(i); and

    d.  whether Defendants disclosed its users PII, website activities and firearms purchases without consent.

53.   **Typicality.**   Consistent with Pennsylvania Rule of Civil Procedure 1702(3), Plaintiff's claims are typical of the claims of the Class he seeks to represent because Plaintiff and all Class Members have suffered similar injuries as a result of the same practices alleged herein. Plaintiff has no interests to advance adverse to the interests of the other Class Members, and Defendant has no defenses unique to any Plaintiff.

54.   **Adequate Representation.**   Consistent with Pennsylvania Rule of Civil Procedure 1702(4) and 1709, Plaintiff has and will continue to fairly and adequately represent and protect the interests of the Class and has retained as his counsel attorneys competent and experienced in class actions and complex litigation, including litigation to remedy privacy violations.  Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of Class Members, and they have the resources to do so.

55.   **Predominance.**   Consistent with Pennsylvania Rule of Civil Procedure 1708(a)(1), common questions of law and fact predominate over any questions affecting only individual class members.  For example, Defendant's liability and the fact of damages is common to all members of the Class.

56.   **Superiority and Manageability.**   Consistent with Pennsylvania Rule of Civil Procedure 1708(a)(2), a class action is superior to other available means for the fair and efficient adjudication of this dispute.  The injury suffered by each Class Member, while meaningful on an individual basis, may not be of such magnitude as to make the prosecution of individual actions against Defendant economically feasible.   Even if Class Members could afford individual litigation, those actions would put immeasurable strain on the court system.  Moreover, individual litigation of the legal and factual issues of the case would increase the delay and expense to all parties and the court system.  A class action, however, presents far fewer management difficulties

and provides the benefit of single adjudication, economy of scale and comprehensive supervision by a single court.

57.     **Risk of Inconsistent, Varying, or Prejudicial Adjudications.**  Consistent with Pennsylvania Rule of Civil Procedure 1708(a)(3), a class action will minimize the risk of inconsistent, varying or prejudicial adjudications.  If Plaintiff's and Class members' claims were tried separately, Defendant would be confronted with incompatible standards of conduct and divergent court decisions.

58.     **Litigation Already Commenced.**  Consistent with Pennsylvania Rule of Civil Procedure 1708(a)(4), to Plaintiff's knowledge, there are no other cases that have been brought against Defendant, or that are currently pending against Defendant, where Pennsylvania consumers seek to represent a class of Pennsylvania residents based on conduct alleged in this Complaint.

59.     **Appropriateness of Forum.**  Consistent with Pennsylvania Rule of Civil Procedure 1708(a)(5), the most appropriate forum to concentrate the litigation is this County because Defendant conducts business in this county, the conduct at issue took place in part in this county and a substantial number of Class members were injured in this County.

60.     **Support for Class Certification.**  Consistent with Pennsylvania Rule of Civil Procedure 1708(a)(6) and (7), there is support for a class to be certified because of the relatively low amount recoverable by each Class member and the expenses of individual litigation.

61.     **The General Applicability of Defendant's Conduct.**  Consistent with Pennsylvania Rule of Civil Procedure 1708(b)(2), Defendant's conduct is generally applicable to the class as a whole, making relief appropriate with respect to each Class member.

## CLAIMS FOR RELIEF

### COUNT I
### Violation of the Pennsylvania Wiretapping Act

19

**18 Pa. Cons. Stat. § 5701,** *et seq.*

62. Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein.

63. Plaintiff brings this Count individually and on behalf of the members of the Class.

64. The Pennsylvania Wiretapping Act prohibits (1) the interception or procurement of another to intercept any wire, electronic, or oral communication; (2) the intentional disclosure of the contents of any wire, electronic, or oral communication that the discloser knew or should have known was obtained through the interception of a wire, electronic, or oral communication; and (3) the intentional use of the contents of any wire, electronic, or oral communication that the discloser knew or should have known was obtained through the interception of a wire, electronic, or oral communication. 18 Pa. Cons. Stat. § 5703.

65. Any person who intercepts, discloses, or uses or procures any other person to intercept, disclose, or use, a wire, electronic, or oral communication in violation of the Act is subject to a civil action for (1) actual damages, not less than liquidated damages computed at a rate of $100 per day for each violation or $1,000, whichever is higher; (2) punitive damages; and (3) reasonable attorneys' fees and other litigation costs incurred. 18 Pa. Cons. Stat. § 5725(a).

66. "Intercept" is defined as the "[a]ural or other acquisition of the contents of any wire, electronic or oral communication through the use of any electronic, mechanical or other device." 18 Pa. Cons. Stat. § 5702. "Electronic, mechanical or other device," in turn, means "[a]ny device or apparatus ... that can be used to intercept a wire, electronic or oral communication[.]" *Id.*

67. The following constitutes a device within the meaning of 18 Pa. Cons. Stat. § 5702:

    a. The computer codes and programs that Defendants used to track Plaintiff and Class members' communications while navigating the websites;

b.  Plaintiff's and Class members' web browsers;

c.  Plaintiff's and Class members' computing devices;

d.  Defendants' web servers;

e.  The web servers from which Facebook received the Plaintiff's and Class members' communications while they were using a web browser to access Defendants' websites;

f.  The plan Defendants carried out to effectuate their tracking of Plaintiff's and Class members' communications while using a web browser to access the websites.

68.     At all relevant times, Defendants procured Facebook to track and intercept Plaintiff's and other Class and Subclass members' internet communications while navigating their websites.  Defendants sent these communications to Facebook without authorization or consent from Plaintiff or Class members.

69.     Defendants, when procuring Facebook to intercept Plaintiff' communications, intended Facebook to learn the meaning of the content the visitor requested.

70.     Plaintiff and Class members had a justified expectation under the circumstances that their electronic communications would not be intercepted.

71.     Plaintiff and Class members were not aware that their electronic communications were being intercepted by Facebook.

## COUNT II
### Violation of the Uniform Firearms Act
### 18 Pa.C.S. § 6111(i)

72.     Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein.

73.     Plaintiff brings this Count individually and on behalf of the members of the Subclass.

74.     Section 6111(i) of the Uniform Firearms Act ("UFA") provides the following:

> **(i) Confidentiality.**--All information provided by the potential purchaser, transferee or applicant, including, but not limited to, the potential purchaser, transferee or applicant's name or identity, furnished by a potential purchaser or transferee under this section or any applicant for a license to carry a firearm as provided by section 6109 shall be confidential and not subject to public disclosure. In addition to any other sanction or penalty imposed by this chapter, any person, licensed dealer, State or local governmental agency or department that violates this subsection shall be liable in civil damages in the amount of $1,000 per occurrence or three times the actual damages incurred as a result of the violation, whichever is greater, as well as reasonable attorney fees.

75.     Plaintiff is a "purchaser" under the UFA because he purchased a firearm from Defendants.  On December 2, 2021, Plaintiff Irvin purchased a Henry Big Boy Classic Centerfire Lever-Action Rifle - .45 Colt form cabelas.com.

76.     Defendants disclosed to Facebook information that Plaintiff provided to them in connection with his purchase of these firearms.  Specifically, Defendants disclosed Plaintiff's name, address, his Facebook ID, the type of gun that he purchased, among other items.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendants, as follows:

a.      Determining that this action is a proper class action;

b.      For an order certifying the Class and Subclass, naming Plaintiff as representative of the Class and Subclass, and naming Plaintiff's attorneys as Class Counsel to represent the Class and Subclass;

22

c.    For an order declaring that Defendants' conduct violates the statute referenced herein;

d.    For an order finding in favor of Plaintiff and the Class and Subclass on the counts asserted herein;

e.    Awarding compensatory damages, including statutory damages where available, to Plaintiff and the Class and Subclass members against Defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial;

f.    For punitive damages, as warranted, in an amount to be determined at trial;

g.    Ordering Defendants to disgorge revenues and profits wrongfully obtained;

h.    For prejudgment interest on all amounts awarded;

i.    For injunctive relief as pleaded or as the Court may deem proper;

j.    For an order awarding Plaintiff and the Class and Subclass their reasonable attorneys' fees and expenses and costs of suit; and

k.    Granting Plaintiff and the Class and Subclass members such further relief as the Court deems appropriate.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury on all claims so triable in this action.


Dated:  December 19, 2023                    Respectfully submitted,

                                             By:   *Steven A. Schwartz*
                                             Steven A. Schwartz
                                             **CHIMICLES SCHWARTZ KRINER**
                                             **& DONALDSON-SMITH LLP**
                                             Steven A. Schwartz (PA I.D. No. 50579)
                                             361 W. Lancaster Avenue
                                             Haverford, PA 19041
                                             Tel: (610) 642-8500
                                             Fax: (610) 649-3633
                                             E-Mail: sas@chimicles.com

**BURSOR & FISHER, P.A.**
Joshua D. Arisohn*
Philip L. Fraietta*
1330 Avenue of the Americas, 32 Fl.
New York, NY 10019
Tel: (646) 837-7150
Fax: (212) 989-9163
E-Mail: jarisohn@bursor.com
         pfraietta@bursor.com

**BURSOR & FISHER, P.A.**
Christopher R. Reilly*
701 Brickell Ave., Suite 1420
Miami, FL 33131-2800
Telephone: (305) 330-5512
Facsimile: (305) 676-9006
E-Mail: creilly@bursor.com

*Pro Hac Vice Application Forthcoming*

*Attorneys for Plaintiff and the Putative Class*

# EXHIBIT 3

ORIGINAL

DAVID IRVIN, on behalf of himself and all others similarly situated,

     Plaintiff,

v.

CABELA'S L.L.C. and BPS DIRECT, L.L.C.,

     Defendants.

IN THE COURT OF COMMON PLEAS OF LEBANON COUNTY, PA

CIVIL DIVISION

Case No. 2023-01668

**PRAECIPE FOR ENTRY OF APPEARANCE**

TO: PROTHONOTARY

     Please enter the appearance of Steven A. Schwartz of Chimicles Schwartz Kriner & Donaldson-Smith LLP, whose address is 361 West Lancaster Avenue, Haverford, PA 19041 as Attorney for Plaintiff David Irvin in the above captioned case.

Dated: December 19, 2023

Respectfully submitted,

By: *Steven A. Schwartz*
Steven A. Schwartz
**CHIMICLES SCHWARTZ KRINER & DONALDSON-SMITH LLP**
Steven A. Schwartz (PA I.D. No. 50579)
361 W. Lancaster Avenue
Haverford, PA 19041
Tel: (610) 642-8500
Fax: (610) 649-3633
E-Mail: sas@chimicles.com

# EXHIBIT 4

# ORIGINAL

Erin L. Leffler
(PA ID No. 204507)
SHOOK, HARDY & BACON L.L.P.
2001 Market Street, Suite 3000
Philadelphia, PA 19103
Tel: (215) 278-2555
Fax: (215) 278-2594
eleffler@shb.com
*Attorneys for Defendants*
*Cabela's LLC and BPS Direct, LLC*

Jennifer A. McLoone
(*pro hac vice* forthcoming)
SHOOK, HARDY & BACON L.L.P.
201 South Biscayne Blvd., Suite 3200
Miami, FL 33131
Tel: (305) 358-5171
Fax: (305) 358-7470
jmcloone@shb.com

---

DAVID IRVIN, on behalf of himself and all others similarly situated,

        Plaintiff,

        v.

CABELA'S L.L.C. and
BPS DIRECT, L.L.C.,

        Defendants.

COURT OF COMMON PLEAS
LEBANON COUNTY, PENNSYLVANIA
CIVIL DIVISION

Case No. 2023-01668

ENTERED & FILED
PROTHONOTARY OFFICE
LEBANON, PA
2024 FEB 12 P 12: 43

## ACCEPTANCE OF SERVICE AND
## STIPULATION TO EXTEND TIME FOR DEFENDANTS TO
## RESPOND TO PLAINTIFF'S CLASS ACTION COMPLAINT

Plaintiff David Irvin, on behalf of himself and all others similarly situated, and Defendants Cabela's LLC and BPS Direct, LLC, by and through their undersigned counsel, hereby stipulate as follows:

1.    Pursuant to Pa. R. Civ. P. 402(b), Erin Leffler, counsel for Defendants, accepts service of the Plaintiff's Class Action Complaint on behalf of Defendants and certifies that she is authorized to do so; and

2.    Plaintiff and Defendants agree that the deadline for Defendants to respond to Plaintiff's Class Action Complaint shall be thirty (30) days from the date of this Stipulation.

Dated:  January 31, 2024

**STIPULATED AND AGREED TO BY:**

By: */s/ Steven A. Schwartz*
Steven A. Schwartz (PA ID No. 50579)
Chimicles Schwartz Kriner &
Donaldson-Smith LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Tel: 610-642-8500
sas@chimicles.com

Joshua D. Arisohn*
Philip L. Fraietta*
Bursor & Fisher, P.A.
1330 Avenue of the Americas
New York, NY 10019
Tel: 646-837-7103
Fax:  212-989-9163
jarisohn@bursor.com
pfraietta@bursor.com

Stephen A. Beck*
Bursor & Fisher, P.A.
701 Brickell Avenue, Suite 1420
Miami, FL 33131-2800
Tel: 305-330-5512
Fax:  305-676-9006
sbeck@bursor.com

*Pro Hac Vice Application Forthcoming*

*Attorneys for Plaintiff*

By:___ */s/ Erin L. Leffler*
Erin L. Leffler (PA ID No. 204507)
SHOOK, HARDY & BACON L.L.P.
Two Commerce Square
2001 Market St., Suite 3000
Philadelphia, PA 19103
Tel: (215) 278-2555
Fax: (215) 278-2594
eleffler@shb.com

Jennifer A. McLoone
(*pro hac vice* forthcoming)
SHOOK, HARDY & BACON L.L.P.
201 South Biscayne Blvd., Suite 3200
Miami, FL 33131
Tel: (305) 358-5171
Fax: (305) 358-7470
asaikali@shb.com
jmcloone@shb.com

*Attorneys for Defendants Cabela's L.L.C.
and BPS Direct, L.L.C.*

## CERTIFICATE OF SERVICE

I, Erin L. Leffler, hereby certify that on February 9, 2024, I filed the foregoing Acceptance of Service and Stipulation of Extension to Respond to Plaintiff's Complaint on behalf of Defendants Cabela's L.L.C. and BPS Direct, L.L.C. and served a true and correct copy of the same by e-mail on the following counsel of record:

> Steven A. Schwartz
> Chimicles Schwartz Krinner & Donaldson-Smith LLP
> 361 W. Lancaster Avenue
> Haverford, PA 19041
> sas@chimicles.com
>
> Joshua D. Arisohn
> Philip L. Fraietta
> Bursor & Fisher, P.A.
> 1330 Avenue of the Americas
> New York, NY 10019
> jarisohn@bursor.com
> pfraietta@bursor.com
>
> Stephen A. Beck
> Bursor & Fisher, P.A.
> 701 Brickell Avenue, Suite 1420
> Miami, FL 33131-2800
> sbeck@bursor.com
>
> *Attorneys for Plaintiff*

Erin L. Leffler

*Attorneys for Defendants Cabela's LLC and
BPS Direct, LLC*

# EXHIBIT 5



ORIGINAL

**SHOOK, HARDY & BACON L.L.P.**
Erin L. Leffler (Attorney I.D. No. 204507)
Two Commerce Square
2001 Market Street, Suite 3000
Philadelphia, PA 19103
(215) 278-2555
Eleffler@shb.com

ENTERED & FILED
PROTHONOTARY OFFICE
LEBANON, PA

2024 FEB 12 P 12: 43

| | |
|---|---|
| DAVID IRVIN, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CABELA'S L.L.C. and BPS DIRECT, L.L.C.,<br><br>Defendants. | COURT OF COMMON PLEAS LEBANON COUNTY, PENNSYLVANIA CIVIL DIVISION<br><br>Case No. 2023-01668 |

## ENTRY OF APPEARANCE

**TO THE PROTHONOTARY:**

Kindly enter the appearance of Erin L. Leffler (PA Bar No. 204507) on behalf of Defendants Cabela's LLC and BPS Direct, LLC, in the above-captioned action.

Respectfully submitted,

SHOOK, HARDY & BACON L.L.P.

Dated: February 9, 2024

By: _____
　　 Erin L. Leffler

*Attorneys for Defendants Cabela's LLC and BPS Direct, LLC*

## CERTIFICATE OF SERVICE

I, Erin L. Leffler, hereby certify that on February 9, 2024, I filed the foregoing Entry of

Appearance on behalf of Defendants Cabela's L.L.C. and BPS Direct, L.L.C. and served a true

and correct copy of the same by e-mail on the following counsel of record:

> Steven A. Schwartz
> Chimicles Schwartz Krinner & Donaldson-Smith LLP
> 361 W. Lancaster Avenue
> Haverford, PA 19041
> sas@chimicles.com
>
> Joshua D. Arisohn
> Philip L. Fraietta
> Bursor & Fisher, P.A.
> 1330 Avenue of the Americas
> New York, NY 10019
> jarisohn@bursor.com
> pfraietta@bursor.com
>
> Stephen A. Beck
> Bursor & Fisher, P.A.
> 701 Brickell Avenue, Suite 1420
> Miami, FL 33131-2800
> sbeck@bursor.com
>
> *Attorneys for Plaintiff*

By: _____
      Erin L. Leffler

*Attorneys for Defendants Cabela's LLC and BPS Direct, LLC*

# EXHIBIT 6

Exhibit A-6

# ORIGINAL

**NOTICE TO PLEAD TO PLAINTIFF:**
**You must plead in response to these**
**preliminary objections within twenty (20)**
**days of service thereof, or risk a judgment**
**against you.**

**SHOOK, HARDY & BACON L.L.P.**
Erin L. Leffler (PA ID No. 204507)
Two Commerce Square
2001 Market St., Suite 3000
Philadelphia, PA 19103
Telephone: (215) 278-2555
Facsimile: (215) 278-2594
eleffler@shb.com

*Attorneys for Defendants Cabela's L.L.C.*
*and BPS Direct, L.L.C.*

| | |
|---|---|
| DAVID IRVIN, on behalf of himself and all others similarly situated, | : |
| | : |
| Plaintiff, | : COURT OF COMMON PLEAS |
| | : LEBANON COUNTY |
| v. | : |
| | : NO. 2023-01668 |
| CABELA'S L.L.C. and BPS DIRECT, L.L.C., | : |
| | : |
| Defendants. | : |

## DEFENDANTS' CABELA'S L.L.C.'S AND BPS DIRECT, LLC'S
## PRELIMINARY OBJECTIONS TO PLAINTIFF'S COMPLAINT

Defendants, Cabela's L.L.C. and BPS Direct, LLC (together, "BPS" or "Defendants"), by

and through their undersigned counsel, preliminarily object to Plaintiff's Complaint and seek

dismissal of all claims against them for lack of standing.

In this action, Plaintiff alleges that when he purchased a firearm from cabelas.com,

information about his website visit was disclosed to Facebook, including his name, address,

Facebook ID, and the type of gun he purchased. Plaintiff alleges this information was disclosed

because Facebook's pixel was implemented on cabelas.com. Plaintiff does not allege that he visited or made a purchase on basspro.com. Yet, Plaintiff seeks to represent a class of "[a]ll persons in Pennsylvania who have a Facebook account and who visited either cabelas.com, basspro.com or both," and asserts claims under the Pennsylvania Wiretapping Act and the Uniform Firearms Act. (*See* Complaint ¶¶ 49, 62–76 attached as **Exhibit A**). However, there are no allegations demonstrating that Plaintiff has standing to pursue either of his claims. For this reason, Plaintiff's claims should be dismissed with prejudice.

In further support of these Preliminary Objections, BPS states as follows:

1.    BPS is a nationwide retailer of outdoor products, including camping, hunting, and other outdoor equipment. (*See* **Exhibit A**: Compl. ¶¶ 7, 8).

2.    Plaintiff David Irvin alleges he is a Pennsylvania citizen who purchased a Henry Big Boy Classic Centerfire Lever-Action Rifle - .45 from cabelas.com on December 2, 2021. (*Id.* ¶ 6). Plaintiff claims that Defendants "assisted Facebook" with "intercepting" his communications with Cabela's through its website by use of the Facebook pixel. (*Id.* ¶ 9). Plaintiff further alleges that the Facebook pixel transmits "three distinct events to Facebook," including (1) URLs of webpages visited, (2) information "similar" to URLs, but which supposedly "tracks when users access pages for particular products," and (3) the title and description of the webpage visited. (*Id.* ¶¶ 17–20). The Complaint also alleges that the pixel captures certain button clicks, such as "when users add a product . . . to their online shopping cart and when they checkout." (*Id.* ¶ 21). As a result, Plaintiff alleges that when he visited cabelas.com to purchase a firearm, his name, address, Facebook ID, and the type of gun he purchased were disclosed to Facebook. (*Id.* ¶ 76).

3.    Based on these allegations, Plaintiff asserts this putative class action, claiming BPS's use of Facebook pixel helped Facebook "wiretap" his communications with BPS's website in violation of the Pennsylvania Wiretapping Act, and violated Pennsylvania's Uniform Firearms

2

Act by disclosing "information [Plaintiff] provided to [BPS] in connection with his purchase of these firearms." (*Id.*).

4.    Plaintiff lacks standing to proceed with this lawsuit. First, Plaintiff lacks standing to assert claims against BPS Direct, LLC because Plaintiff does not allege that he has been aggrieved by BPS Direct, LLC's conduct. Second, Plaintiff lacks standing entirely to pursue his claims because he has not alleged facts demonstrating that he has been adversely affected in any way from Defendants' conduct. Third, Plaintiff's claim for injunctive relief is barred.

5.    This Court would not be the first to conclude that Plaintiff lacks standing under these circumstances. On December 5, 2023, the United States District Court for the District of Pennsylvania held that Plaintiff Irvin lacked Article III standing with respect to both causes of action alleged. *In re BPS Direct, LLC*, No. 22-CV-4709, 2023 WL 8458245, at *1 (E.D. Pa. Dec. 5, 2023), attached as **Exhibit B**.

6.    Specifically, the District Court held that Plaintiff failed to show he suffered a concrete harm under the Pennsylvania Wiretapping Act because he did not allege that BPS captured his "highly sensitive personal information such as medical diagnosis information or financial data from banks or credit cards." *Id.* at *15–*16. And the District Court also held that Plaintiff lacked standing under the Uniform Firearms Act because "the information Bass and Cabela's allegedly disclosed to Facebook—name, address, Facebook ID, and gun purchase—is not sufficiently private to confer standing." *Id.* at *19.

7.    Plaintiff has not (and cannot) allege adequate facts to establish standing. Therefore, Defendants now seek an order dismissing all claims against them with prejudice.

### PRELIMINARY OBJECTION #1
#### Lack of Standing to Counts I (Pennsylvania Wiretapping Act) and II (Uniform Firearms Act) Pursuant to Pa. R.C.P. 1028(a)(1)

1.    BPS incorporates the prior paragraphs of these objections as if set forth fully herein.

2.     Under Rule 1028(a)(1), a defendant may file preliminary objections for  lack of jurisdiction over the subject matter of the action. Pa. R.C.P. No. 1028(a)(1).

3.     As argued in the attached Memorandum of Law, which is incorporated herein by reference, Plaintiff lacks standing to represent a class of individuals who made a purchase on the basspro.com website because Plaintiff himself did not do so. Plaintiff also lacks standing entirely to pursue his claims because he has not alleged facts demonstrating that he has been adversely affected in any way from Defendants' conduct. Moreover, Plaintiff lacks standing to pursue injunctive relief.

4.     Accordingly, Count One (Pennsylvania Wiretapping Act) and Count Two (Uniform Firearms Act) should be dismissed with prejudice.

WHEREFORE, BPS respectfully requests that this Honorable Court sustain these Preliminary Objections in accordance with the proposed order attached hereto.

### PRELIMINARY OBJECTION #2
### Motion to Strike Complaint for Improper Attorney Verification
### Pursuant to Pa. R.C.P. No. 1028(a)(2)

1.     BPS incorporates the prior paragraphs of these objections as if set forth fully herein.

2.     Under Rule 1028(a)(2), a defendant may file preliminary objections in the nature of a motion to strike a pleading that does not conform to a rule of court. Pa. R.C.P. No. 1028(a)(2).

3.     Under Rule 1024, "[e]very pleading containing an averment of fact not appearing of record in the action or containing a denial of fact shall state that the averment or denial is true upon the signer's personal knowledge or information and belief and shall be verified." Pa. R.C.P. No. 1024(a).

4.     Rule 1024 further requires that a verification be made by one or more of the parties, unless certain exceptions apply which are not applicable here. *See* Pa. R.C.P. No. 1024(b).

5.    Plaintiff's Complaint in this matter is not properly verified and is, instead, signed by Plaintiff's attorney.

6.    Accordingly, and as argued in the attached Memorandum of Law, which is incorporated herein by reference, Plaintiff's Complaint should be stricken.

WHEREFORE, BPS respectfully requests that this Honorable Court sustain these Preliminary Objections in accordance with the proposed order attached hereto.

Respectfully submitted,

SHOOK, HARDY & BACON L.L.P.

Dated:  March 1, 2024

By:_____
Erin L. Leffler (PA ID No. 204507)
SHOOK, HARDY & BACON L.L.P.
Two Commerce Square
2001 Market St., Suite 3000
Philadelphia, PA 19103
Tel: (215) 278-2555
eleffler@shb.com

Jennifer A. McLoone (*pro hac vice forthcoming*)
SHOOK, HARDY & BACON L.L.P.
201 South Biscayne Blvd., Suite 3200
Miami, FL 33131
Tel: (305) 358-5171
jmcloone@shb.com

Anna A. Gadberry (*pro hac vice forthcoming*)
SHOOK, HARDY & BACON L.L.P.
2555 Grand Boulevard
Kansas City, MO 64108
Tel: (816) 474-6550
agadberry@shb.com

Maveric R. Searle, (*pro hac vice forthcoming*)
SHOOK, HARDY & BACON L.L.P.
111 South Wacker Drive, Suite 4700
Chicago, IL 60606
Tel: (312) 704-7700
msearle@shb.com

*Attorneys for Defendants Cabela's L.L.C. and BPS Direct, LLC*

5

**SHOOK, HARDY & BACON L.L.P.**
Erin L. Leffler (PA ID No. 204507)
Two Commerce Square
2001 Market St., Suite 3000
Philadelphia, PA 19103
Telephone: (215) 278-2555
Facsimile: (215) 278-2594
eleffler@shb.com

*Attorneys for Defendants Cabela's L.L.C.*
*and BPS Direct, L.L.C.*

ENTERED & FILED
PROTHONOTARY OFFICE
LEBANON, PA

2024 MAR -1  P 2: 51

|  |  |
|---|---|
| DAVID IRVIN, on behalf of himself and all others similarly situated, | |
| Plaintiff, | COURT OF COMMON PLEAS LEBANON COUNTY |
| v. | NO. 2023-01668 |
| CABELA'S L.L.C. and BPS DIRECT, L.L.C., | |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'**
**CABELA'S L.L.C.'S AND BPS DIRECT, LLC'S**
**PRELIMINARY OBJECTIONS TO PLAINTIFF'S COMPLAINT**

## I.     MATTER BEFORE THE COURT

Before the Court are the Preliminary Objections of Defendants, Cabela's L.L.C. and BPS

Direct, LLC (collectively "Defendants"), to Plaintiff's Complaint. As discussed below, Plaintiff

lacks standing in at least three ways: (1) he does not have standing to represent a class of

individuals who made a purchase on basspro.com, because Plaintiff himself did not do so; (2)

Plaintiff lacks standing to pursue either of his claims because he has not alleged facts

demonstrating that he was adversely affected in any way from Defendants' conduct; and (3),

Plaintiff lacks standing to pursue injunctive relief. Thus, all of Plaintiff's claims should be

dismissed with prejudice. But if the Court rules that Plaintiff has stated (or may be able to state) a

proper claim against Defendants, the Court should hold that Plaintiff's Complaint contains an improper attorney verification.

## II.    QUESTIONS PRESENTED

(1)    Does Plaintiff have standing to assert claims against BPS Direct, LLC, when he makes no allegations indicating that he was aggrieved by BPS Direct LLC, including zero allegations that he made a purchase on basspro.com or even visited the website?

Suggested Answer:    No.

(2)    Does Plaintiff have standing to assert claims under the Pennsylvania Wiretapping Act (Count One) and the Uniform Firearms Act (Count Two), when the only harm alleged was a bare statutory violation and no actual harm, or a substantial risk of harm, was alleged?

Suggested Answer:    No.

(3)    Does Plaintiff have standing to pursue injunctive relief, when he has not, and cannot, allege that he will visit cabelas.com without knowledge that the site employs pixel technology?

Suggested Answer:    No.

*Alternatively:*

(4)    Should the Complaint be stricken due to its attorney verification given that applicable Pennsylvania rules require that the Plaintiff verify his Complaint?

Suggested Answer:    Yes.

## III.    FACTUAL AND PROCEDURAL BACKGROUND

This is Plaintiff's second bite at the apple after his claims were dismissed in federal court for lack of standing. Plaintiff originally filed suit against Defendants on March 28, 2023, in the Middle District of Pennsylvania. *See Irvin v. Cabela's L.L.C. et al.*, Case No. 1:23-cv-00530-CCC

(M.D. Pa.). On October 2, 2023, the action was transferred to the MDL No. 304, *In re: BPS Direct, LLC and Cabela's LLC, Wiretapping Litigation*, pending in front of Judge Kearney in the Eastern District of Pennsylvania, where it was subsequently dismissed for lack of standing. Specifically, Judge Kearney held that Plaintiff failed to show he suffered a concrete harm under the Pennsylvania Wiretapping Act because he did not allege that BPS captured his "highly sensitive personal information such as medical diagnosis information or financial data from banks or credit cards." *In re BPS Direct, LLC*, No. 22-CV-4709, 2023 WL 8458245, at *15–*16 (E.D. Pa. Dec. 5, 2023). He also found that Plaintiff lacked standing under the Uniform Firearms Act because "the information Bass and Cabela's allegedly disclosed to Facebook—name, address, Facebook ID, and gun purchase—is not sufficiently private to confer standing." *Id.* at *19.

Two weeks after dismissal of his federal court action, Plaintiff filed this nearly identical Complaint. Of note, this is one of 5 cases filed by Plaintiff's counsel alleging similar violations against various defendants. *See Petris v. Sportsman's Warehouse, Inc. and Sportsman's Warehouse Holdings, Inc.*, Case No. 2:23-cv-1867 (W.D. Pa.); *Delong v. Sportsman's Guide, Inc.*, Case No. 2:23-cv-04356 (E.D. Pa.); *Digregorio v. Brownells, Inc.*, Case No. 2:23-cv-4557-JMY (E.D. Pa.); *Mcqueen v. Primary Arms LLC*, Case No. 2:24-cv-725 (E.D. Pa.).

## IV.    LEGAL ARGUMENT

### A.    Standard of Review.

Any party may file preliminary objections to any pleading for a variety of reasons, including failure of a pleading to conform to law or rule of court; insufficient specificity in a pleading; and/or legal insufficiency of a pleading (demurrer). Pa. R.C.P. 1028(a). The Court should sustain preliminary objections if it "lack[s] . . . jurisdiction over the subject matter of the action[.]" Pa. R.C.P. 1028(a)(1). In ruling on preliminary objections, courts "accept as true all well-pleaded

material allegations in the petition for review and any reasonable inferences that we may draw from the averments." *Armstrong Cnty. Mem'l Hosp. v. Dep't of Pub. Welfare*, 67 A.3d 160, 170 (Pa. Commw. Ct. 2013) (citing *Meier v. Maleski*, 167 Pa. Commw. 458, 648 A.2d 595, 600 (1994)). However, courts "[are] not bound by legal conclusions, unwarranted inferences from facts, argumentative allegations, or expressions of opinion encompassed in the petition for review." *Id.*

Based on these standards, Defendants' objections should be sustained, and all claims asserted against Defendants should be dismissed with prejudice.

**B.    Plaintiff Lacks Standing to Bring Claims On Behalf of Class Members Who Visited basspro.com.**

In Pennsylvania, it is well established that "a plaintiff in a class action who has not suffered an injury from the challenged conduct of a defendant cannot maintain a class action against that defendant." *Nye v. Erie Ins. Exch.*, 504 Pa. 3, 6 (1983) (citing *McMonagle v. Allstate Insurance Co.*, 460 Pa. 159, 331 A.2d 467 (1975)). "For a petitioner in a class action to maintain an action against multiple respondents, the petitioner must allege that he has been aggrieved by each respondent; and where the petitioner alleges that he has been aggrieved by only one respondent—and not by any of the others—he fails to establish the standing necessary to maintain the action against those other respondents." *Chester Upland Sch. Dist. v. Rossi*, 275 A.3d 1117, 1125–26 (Pa. Commw. Ct. 2022) (citing *Nye*).

Here, Plaintiff clearly lacks standing to assert claims against BPS Direct, LLC arising out of the use of basspro.com, a website that Plaintiff does not allege he visited. Plaintiff acknowledges that Cabela's L.L.C. and BPS Direct, LLC are separate entities—and that cabelas.com and basspro.com are separate websites. Compl. ¶¶ 7, 8. Yet, Plaintiff does not allege that he has visited the basspro.com website, nor does he allege that he purchased a firearm through basspro.com. As

4

a result, Plaintiff lacks standing to assert claims arising out of visits to basspro.com and his attempt to represent a class of website visitors to basspro.com must be denied. *Id.* ¶ 49; *see also Nye*, 504 Pa. at 6 ("In the present case, [plaintiff's] complaint fails to allege that he has been aggrieved by the conduct of any of the defendant insurance companies except Erie. Consequently, appellee lacks standing to maintain an action against these defendants."); *Chester Upland Sch. Dist.*, 275 A.3d at 1126 ("Petitioners lack standing to maintain an action against any Respondents other than the Delaware County OJS because Petitioners fail to allege that they have been aggrieved by the conduct of those other Respondents.").[1]

For these reasons, this Court should conclude that Plaintiff lacks standing to represent a class of website visitors to basspro.com.

### C. Plaintiff Lacks Standing To Assert Either of His Claims Arising Out of His Visit to cabelas.com.

A party filing suit in a Pennsylvania court "must establish as a threshold matter that he has standing to maintain the action." *Johnson v. Am. Standard*, 8 A.3d 318, 329 (Pa. 2010). "Unlike the federal courts, which derive their standing requirements from Article III of the United States Constitution, standing for Pennsylvania litigants has been created judicially." *Id.*

In Pennsylvania, there are two types of standing: statutory standing and traditional standing. To have statutory standing, the statute must "expressly prescribe[] the individuals who have standing to pursue a particular action thereunder." *Gennock v. Kirkland's Inc.*, 299 A.3d 900, *2 (Pa. Super. Ct. 2023), *appeal denied*, 2023 WL 7545980 (Pa. Nov. 14, 2023). "[T]he answer to

---

[1] Federal authority is in accord. *Cf. LaSpina v. SEIU Pennsylvania State Council*, 2019 WL 4081900, *4–*6 (M.D. Pa. Aug. 29, 2019) ("Standing cannot be predicated on an injury which the plaintiff has not suffered, nor can it be acquired through the back door of a class action." (cleaned up)); *Hemy v. Perdue Farms*, 2011 WL 6002463, at *11 (D.N.J. Nov. 30, 2011) ("[Plaintiffs' failure to allege that they purchased the 'Perdue' brand chicken products is a critical omission because, without [that allegation], Plaintiffs have failed to sufficiently allege an injury-in-fact with respect to those products. . . . [A] plaintiff in a class action must show that she has personally been injured; the class plaintiff cannot rely on 'injuries suffered by other, unidentified members of the class.'").

any question concerning statutory standing involves a careful analysis of the relevant statutory scheme. For example, the Child Custody Act expressly prescribes who may pursue an action thereunder. *See* 23 Pa.C.S. §§ 5324 ("Standing for any form of physical custody or legal custody"), 5325 ("Standing for partial physical custody and supervised physical custody")." Moreover, "[a] statute setting forth a private right of action does not automatically confer standing." *Gennock*, 299 A.3d at *3 (Pa. Super. Ct. 2023); *Budai v. Country Fair, Inc.*, 2023 PA Super 85, 296 A.3d 20, 26 (2023), *appeal denied*, 2023 WL 7517160 (Pa. Nov. 14, 2023) (same). Unless a statute has an *express* provision stating who has standing to pursue an action, there is no statutory standing. *Gennock*, 299 A.3d at *3 (refusing to find statutory standing under the FACTA because "[n]otably absent from FACTA is a provision, like those in the Child Custody Act, delineating who has standing to pursue an action thereunder. . . . As FACTA contains no standing provision, Plaintiffs may not invoke statutory standing to pursue their action in state court.").

To establish traditional standing, the litigant must be "adversely affected" in some way. *Id.* "[I]t is not sufficient for the person claiming to be 'aggrieved' to assert the common interest of all citizens in procuring obedience to the law." *Id.* (citing *Wm. Penn Parking Garage, Inc. v. City of Pittsburgh*, 346 A.2d 269, 280–81 (Pa. 1975)). "[T]he doctrine of standing stems from the principle that judicial intervention is appropriate only where the underlying controversy is real and concrete, rather than abstract." *Id.*

Plaintiff has no standing under either theory. First, Plaintiff does not have statutory standing because neither the Pennsylvania Wiretapping Act nor the Uniform Firearms Act contain an express provision prescribing the parties who may sue in Pennsylvania courts. *See* 18 Pa. Cons. Stat. § 5703 *et seq.*; 18 Pa. Cons. Stat. § 6111; *see also Gennock*, 299 A.3d at *2 (to have statutory standing, the statute must "expressly prescribe[] the individuals who have standing to pursue a

particular action thereunder."); *id.* at *3 ("[a] statute setting forth a private right of action does not automatically confer standing.").

Second, Plaintiff does not have traditional standing. The touchstone of traditional standing is that "the person must be negatively impacted in some **real** and **direct** fashion." *Young v. Wetzel*, 260 A.3d 281, 287 (Pa. Commw. Ct. 2021) (emphasis supplied), *publication ordered* (July 8, 2021) (quoting *Markham v. Wolf*, 635 Pa. 288, 136 A.3d 134, 140 (2016)). In determining whether a plaintiff has traditional standing, courts consider "whether the litigant has a substantial, direct, and immediate interest in the matter." *Young*, 260 A.3d at 287. "To have a substantial interest, the concern in the outcome of the challenge must surpass the common interest of all citizens in procuring obedience to the law." *Id.* A direct interest "is an interest that mandates demonstration that the matter caused harm to the party's interest." *Id.* Lastly, an immediate interest is one in which the "causal connection is not remote or speculative." *Id.*

Plaintiff does not allege any of the factors necessary to establish traditional standing. Assuming Plaintiff's version of facts is true and Plaintiff's name, address, Facebook user ID, and type of firearm purchased were actually disclosed to Facebook, Plaintiff does not explain how he was negatively impacted by the alleged conduct *at all*, let alone in a "real and direct fashion." *Young*, 260 A.3d at 287. Plaintiff does not even make conclusory allegations to this effect. Indeed, Plaintiff alleges no harm whatsoever much less that he was "adversely affected in any way by the matter he seeks to challenge[.]" *Young*, 260 A.3d at 287. As a result, Plaintiff has failed to satisfy the "core concept" of standing. *Id.* (quoting *Wm. Penn Parking*, 464 Pa. 168); *see also Atiyeh v. Com.*, 2013 WL 3156585, at *5 (Pa. Commw. Ct. May 28, 2013) (sustaining Preliminary Objections based on lack of standing because "[t]he allegations do not show how Petitioners are

negatively impacted in a real and direct fashion" and "they do not describe any substantial, direct, or immediate interest. Instead, the allegations are conclusory and speculative[.]").

This would not be the first time Plaintiff's claims were dismissed for lack of standing. Judge Kearney in the Eastern District of Pennsylvania recently dismissed Plaintiff's identical wiretapping claim because he alleged only that he "entered basic personal information, which is not sufficiently private to confer standing." *In re BPS Direct, LLC*, 2023 WL 8458245, at *14 (E.D. Pa. Dec. 5, 2023). The court further suggested that to establish standing for Plaintiff's wiretapping claim, he would need to "truthfully allege Bass and Cabela's captured [his] highly sensitive personal information such as medical diagnosis information or financial data from banks or credit cards." *Id.* Plaintiff has not alleged any such facts here.

Likewise, Judge Kearney dismissed Plaintiff's identical claim under the Uniform Firearms Act, finding that Plaintiff's allegations did not share a "close relationship" with the tort of public disclosure of private facts, because there was no "publicity" (*i.e.*, the information was only shared with one entity, Facebook). Nor did Plaintiff's allegations share a "close relationship" with the tort of intrusion upon seclusion. As the court noted, "[a]fter [] Irvin made his online gun purchase, he needed to pick up the firearm at a store. Other shoppers and employees of Cabela's would identify Facebook Website User Irvin and observe his gun purchase." *In re BPS Direct, LLC*, 2023 WL 8458245, at *19. Moreover, "the information Bass and Cabela's allegedly disclosed to Facebook— name, address, Facebook ID, and gun purchase—is not sufficiently private to confer standing." *Id.* The court ultimately held that "disclosing a gun purchase is not the type of highly offensive or objectionable conduct to which liability can attach." *Id.*

The Pennsylvania Superior Court's recent decision in *Gennock* is another helpful example. There, the court held that the plaintiffs' allegations of a bare statutory violation of the Fair and

8

Accurate Credit Transactions Act ("FACTA") were not enough to confer standing. *Gennock*, 299 A.3d at *2–*6. The Court recognized that "Plaintiffs' speculative chain of events that the receipts [improperly listing their credit card information] placed them at heightened risk for identity theft solely based on their existence simply does not amount to an interest that is substantial, direct, and immediate, which our Supreme Court identified as the foundational components of standing." *Id.* at *5.

Notably, the allegations in Plaintiff's Complaint here are even more bare-bones than those in *Gennock*. The *Gennock* plaintiffs alleged that the defendant violated the FACTA by listing their full credit card number on printed receipts, and as a result they were at a greater risk of identity theft. *Gennock*, 299 A.3d at *4. Those allegations were not enough to confer standing because the plaintiffs' claims of increased risk of identity theft were speculative. *Id.* at *6. Here, Plaintiff identifies *no* potential harm—not even a speculative one. He offers *only* allegations of a bare statutory violation. As the Court in *Gennock* held, that is simply not enough to confer standing. *Id.* at *5 (dismissing plaintiffs' complaint because "[s]tated simply, [the defendant's] conduct has not adversely affected them."); *see also Young*, 260 A.3d at 287–88 ("Having failed to establish that he was adversely affected in any way by the data breach, Young lacks standing to pursue his negligence claim.")

For all these reasons, this Court should conclude that Plaintiff lacks standing to assert either of his claims and dismiss the case with prejudice. *Young*, 260 A.3d at 287 ("[j]udicial intervention is appropriate only where the underlying controversy is real and concrete, rather than abstract.").

### D.    Plaintiff Lacks Standing to Pursue Injunctive Relief.

Plaintiff lacks standing to seek an injunction. An injunction is only appropriate to protect against future harm. Here, Plaintiff does not, *and cannot*, allege that he will visit cabelas.com

without knowledge that the site employs pixel technology. Indeed, Judge Kearney concluded as much:

> We find our Website Users are not likely to suffer future injury from Bass or Cabela's conduct. Website Users allege Bass and Cabela's used a third party to track their movements on the websites without their knowledge. Website Users brought this lawsuit and are presumably now aware of the alleged risks associated with browsing Cabela's and Bass's websites. Website Users' activity on Bass and Cabela's websites is entirely voluntary and we assume Website Users will act rationally in light of the information they possess. 234 They may visit Cabela's or Bass's website again, but they will do so with the knowledge session replay is capturing their movements. "Pleading a lack of self-restraint may elicit sympathy but it will not typically invoke the jurisdiction of a federal court." Website Users will not be deceived again in the future.

*In re BPS Direct, LLC*, 2023 WL 8458245, at \*32–\*33. Plaintiff's claim for injunctive relief should therefore be dismissed for lack of standing. *See, e.g.*, *Logan v. Lillie*, 728 A.2d 995, 1000 (Pa. Commw. Ct. 1999) (sustaining preliminary objections related to equitable relief because the plaintiff could "not establish that there is a real and immediate threat that he will be wronged in the future."); *Seidman v. Snack Factory, LLC*, 2015 WL 1411878 at \*5 (S.D. Fla. Mar. 26, 2015) (dismissing for lack of standing).

### E.    Plaintiff's Complaint Lacks Proper Verification.

Under Rule 1024, "[e]very pleading containing an averment of fact not appearing of record in the action or containing a denial of fact shall state that the averment or denial is true upon the signer's personal knowledge or information and belief and shall be verified." Pa. R.C.P. No. 1024(a). This verification must be made by one or more of the parties, unless certain exceptions apply which are not applicable here. *See* Pa. R.C.P. No. 1024(b). Here, however, Plaintiff's Complaint is signed by Plaintiff's attorney and therefore not properly verified. Accordingly, Plaintiff's Complaint should be stricken.

## V.    REQUESTED RELIEF

Defendants respectfully requests that this Court sustain these Preliminary Objections in accordance with the proposed order attached hereto.

Respectfully submitted,

SHOOK, HARDY & BACON L.L.P.

Dated:  March 1, 2024                    By:_____

Erin L. Leffler (PA ID No. 204507)
SHOOK, HARDY & BACON L.L.P.
Two Commerce Square
2001 Market St., Suite 3000
Philadelphia, PA 19103
Tel: (215) 278-2555
eleffler@shb.com

Jennifer A. McLoone (*pro hac vice forthcoming*)
SHOOK, HARDY & BACON L.L.P.
201 South Biscayne Blvd., Suite 3200
Miami, FL 33131
Tel: (305) 358-5171
jmcloone@shb.com

Anna A. Gadberry (*pro hac vice forthcoming*)
SHOOK, HARDY & BACON L.L.P.
2555 Grand Boulevard
Kansas City, MO 64108
Tel: (816) 474-6550
agadberry@shb.com

Maveric R. Searle, (*pro hac vice forthcoming*)
SHOOK, HARDY & BACON L.L.P.
111 South Wacker Drive, Suite 4700
Chicago, IL 60606
Tel: (312) 704-7700
msearle@shb.com

*Attorneys for Defendants Cabela's L.L.C. and BPS Direct, LLC*

11

## CERTIFICATE OF SERVICE

I, Erin L. Leffler, hereby certify that on March 1, 2024, I filed the foregoing Preliminary

Objections to Plaintiff's Complaint and served a true and correct copy by electronic mail on the

following counsel of record:

Steven A. Schwartz
Chimicles Schwartz Krinner & Donaldson-Smith LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Tel: 610-642-8500
sas@chimicles.com

Joshua D. Arisohn
Philip L. Fraietta
Burson & Fisher, P.A.
1330 Avenue of the Americas
New York, NY 10019
Tel: 646-837-7103
jarisohn@bursor.com
pfraietta@bursor.com

Christopher R. Reilly
701 Brickell Ave., Suite 1420
Miami, FL 33131
Tel: 305-330-5512
creilly@bursor.com

*Attorneys for Plaintiff*

By:_____
    Erin L. Leffler

*Attorney for Defendant Cabela's L.L.C. and BPS
Direct, LLP*

# EXHIBIT A

# ORIGINAL

## Supreme Court of Pennsylvania
### Court of Common Pleas
### Civil Cover Sheet

Lebanon _____ County

| For Prothonotary Use Only: | ENTERED & FILED PROTHONOTARY OFFICE LEBANON, PA |
|---|---|
| Docket No: **2023-01668** | 2023 DEC 21 P 3: 06 |

*The information collected on this form is used solely for court administration purposes. This form does not supplement or replace the filing and service of pleadings or other papers as required by law or rules of court.*

**SECTION A**

**Commencement of Action:**
- ☒ Complaint
- ☐ Writ of Summons
- ☐ Petition
- ☐ Transfer from Another Jurisdiction
- ☐ Declaration of Taking

| Lead Plaintiff's Name: | Lead Defendant's Name: |
|---|---|
| David Irvin | Cabela's L.L.C. |

**Are money damages requested?** ☒ Yes ☐ No

Dollar Amount Requested: (check one)
- ☐ within arbitration limits
- ☒ outside arbitration limits

**Is this a *Class Action Suit*?** ☒ Yes ☐ No

**Is this an *MDJ Appeal*?** ☐ Yes ☒ No

Name of Plaintiff/Appellant's Attorney: Steven A. Schwartz

☐ Check here if you have no attorney (are a Self-Represented [Pro Se] Litigant)

**SECTION B**

**Nature of the Case:** Place an "X" to the left of the **ONE** case category that most accurately describes your **PRIMARY CASE.** If you are making more than one type of claim, check the one that you consider most important.

**TORT** *(do not include Mass Tort)*
- ☐ Intentional
- ☐ Malicious Prosecution
- ☐ Motor Vehicle
- ☐ Nuisance
- ☐ Premises Liability
- ☐ Product Liability *(does not include mass tort)*
- ☐ Slander/Libel/ Defamation
- ☒ Other:
  Data Privacy

**MASS TORT**
- ☐ Asbestos
- ☐ Tobacco
- ☐ Toxic Tort - DES
- ☐ Toxic Tort - Implant
- ☐ Toxic Waste
- ☐ Other: _____

**PROFESSIONAL LIABLITY**
- ☐ Dental
- ☐ Legal
- ☐ Medical
- ☐ Other Professional: _____

**CONTRACT** *(do not include Judgments)*
- ☐ Buyer Plaintiff
- ☐ Debt Collection: Credit Card
- ☐ Debt Collection: Other
  _____
- ☐ Employment Dispute: Discrimination
- ☐ Employment Dispute: Other
  _____
- ☐ Other: _____

**REAL PROPERTY**
- ☐ Ejectment
- ☐ Eminent Domain/Condemnation
- ☐ Ground Rent
- ☐ Landlord/Tenant Dispute
- ☐ Mortgage Foreclosure: Residential
- ☐ Mortgage Foreclosure: Commercial
- ☐ Partition
- ☐ Quiet Title
- ☐ Other: _____

**CIVIL APPEALS**
Administrative Agencies
- ☐ Board of Assessment
- ☐ Board of Elections
- ☐ Dept. of Transportation
- ☐ Statutory Appeal: Other
  _____
- ☐ Zoning Board
- ☐ Other: _____

**MISCELLANEOUS**
- ☐ Common Law/Statutory Arbitration
- ☐ Declaratory Judgment
- ☐ Mandamus
- ☐ Non-Domestic Relations Restraining Order
- ☐ Quo Warranto
- ☐ Replevin
- ☐ Other: _____

*Updated 1/1/2011*

# ORIGINAL

ENTERED & FILED
PROTHONOTARY OFFICE
LEBANON, PA

DAVID IRVIN, on behalf of himself and all others similarly situated,

      Plaintiff,

v.

CABELA'S L.L.C. and BPS DIRECT, L.L.C.,

      Defendants.

IN THE COURT OF COMMON PLEAS OF LEBANON COUNTY, PA

CIVIL DIVISION

Case No. 2023-01668

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

      Plaintiff David Irvin ("Plaintiff"), on behalf of himself and all other similarly situated (the "Class members") bring this case against Cabela's L.L.C. ("Cabela's") and BPS Direct, L.L.C. ("BPS") (collectively, "Defendants"), which operate, control and manage the websites cabelas.com and basspro.com, respectively. Plaintiff brings this action based upon personal knowledge of the facts pertaining to himself, and on information and belief as to all other matters, by and through the investigation of undersigned counsel.

## NATURE OF THE ACTION

      1.    This is a class action lawsuit brought on behalf of all Pennsylvania residents who have visited and/or purchased firearms from cabelas.com and/or basspro.com.

      2.    Defendants aid, employ, agree, and conspire with Meta Platforms, Inc. ("Facebook") to intercept communications sent and received by Plaintiff and Class Members, including communications containing protected information about firearms purchases. Plaintiff brings this action for legal and equitable remedies resulting from these illegal actions.

## JURISDICTION AND VENUE

3.      The Court has subject matter jurisdiction over this action pursuant to Pa. Cons. Art. 5, §5(b) and 42 Pa. C.S.A. § 931(b).

4.      The Court has personal jurisdiction over Defendant pursuant to 42 Pa. C.S.A. 5301(a)(2).

5.      Venue is proper pursuant to Pa. R. Civ. P. 2179(a)(2)-(4) because Defendant regularly conducts business in this county, the causes of action arose out of conduct in this county, and the transaction or occurrence out of which the causes of action arose took place in this county.

## THE PARTIES

6.      Plaintiff David Irvin is an adult citizen of the Commonwealth and is domiciled in Fredericksburg, Pennsylvania. On December 2, 2021, Plaintiff Irvin purchased a Henry Big Boy Classic Centerfire Lever-Action Rifle - .45 Colt from cabelas.com. When accessing the website and completing the purchase, Plaintiff Irvin was located in Pennsylvania. Plaintiff Irvin also has an active Facebook account which he has maintained since approximately 2007. Plaintiff Irvin accesses his Facebook account from multiple devices, including his laptop and smartphone.

7.      Defendant Cabela's L.L.C. is a Pennsylvania company headquartered in Springfield, Missouri. Cabela's owns and operates cabelas.com, through which it sells sporting goods, including firearms. Cabela's is a wholly-owned subsidiary of BPS Direct, L.L.C.

8.      Defendant BPS Direct, L.L.C., doing business as Bass Pro Shops, is a Delaware corporation headquartered in Springfield, Missouri. BPS owns and operates basspro.com, through which it sells sporting goods, including firearms. BPS is the parent company of Cabela's.

9.      Pursuant to the systematic process described herein, Defendants, through cabela's.com and basspro.com, assisted Facebook with intercepting Plaintiff's communications,

2

including those that contained personally identifiable information and protected information about their firearms purchases. Defendants assisted these interceptions without Plaintiff's knowledge, consent or express written authorization. By failing to receive the requisite consent, Defendants breached confidentiality and unlawfully disclosed Plaintiff's personally identifiable information and protected information about his firearms purchases.

## FACTUAL ALLEGATIONS

### A.     Facebook and the Facebook Tracking Pixel

10.     Facebook is the largest social networking site on the planet, touting 2.9 billion monthly active users.[1] Facebook describes itself as a "real identity platform,"[2] meaning users are allowed only one account and must share "the name they go by in everyday life."[3] To that end, when creating an account, users must provide their first and last name, along with their birthday and gender.[4]

11.     Facebook generates revenue by selling advertising space on its website.[5]

12.     Facebook sells advertising space by highlighting its ability to target users.[6] Facebook can target users so effectively because it surveils user activity both on and off its site.[7]

---

[1] Sean Burch, *Facebook Climbs to 2.9 Billion Users, Report 29.1 Billion in Q2 Sales*, YAHOO (July 28, 2021), https://www.yahoo.com/now/facebook-climbs-2-9-billion-202044267.html
[2] Sam Schechner and Jeff Horwitz, *How Many Users Does Facebook Have? The Company Struggles to Figure It Out*, WALL. ST. J. (Oct. 21, 2021).
[3] FACEBOOK, COMMUNITY STANDARDS, PART IV INTEGRITY AND AUTHENTICITY, https://www.facebook.com/communitystandards/integrity_authenticity.
[4] FACEBOOK, SIGN UP, https://www.facebook.com/
[5] Mike Isaac, *Facebook's profit surges 101 percent on strong ad sales.*, N.Y. TIMES (July 28, 2021), https://www.nytimes.com/2021/07/28/business/facebook-q2-earnings.html.
[6] FACEBOOK, WHY ADVERTISE ON FACEBOOK, https://www.facebook.com/business/help/205029060038706.
[7] FACEBOOK, ABOUT FACEBOOK PIXEL, https://www.facebook.com/business/help/742478679120153?id=1205376682832142.

3

This allows Facebook to make inferences about users beyond what they explicitly disclose, like their "interests," "behavior," and "connections."[8]  Facebook compiles this information into a generalized dataset called "Core Audiences," which advertisers use to apply highly specific filters and parameters for their targeted advertisements.[9]

13.     Advertisers can also build "Custom Audiences."[10]  Custom Audiences enable advertisers to reach "people who have already shown interest in [their] business, whether they're loyal customers or people who have used [their] app or visited [their] website."[11] Advertisers can use a Custom Audience to target existing customers directly, or they can use it to build a "Lookalike Audiences," which "leverages information such as demographics, interests, and behavior from your source audience to find new people who share similar qualities."[12]   Unlike Core Audiences, Custom Audiences require an advertiser to supply the underlying data to Facebook.  They can do so through two mechanisms: by manually uploading contact information for customers, or by utilizing Facebook's "Business Tools," which collect and transmit the data automatically.[13] One such Business Tool is the Facebook Tracking Pixel.

---

[8] FACEBOOK, AD TARGETING: HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.

[9] FACEBOOK, EASIER, MORE EFFECTIVE WAYS TO REACH THE RIGHT PEOPLE ON FACEBOOK, https://www.facebook.com/business/news/Core-Audiences.

[10] FACEBOOK, ABOUT CUSTOM AUDIENCES, https://www.facebook.com/business/help/744354708981227?id=2469097953376494.

[11] FACEBOOK, ABOUT EVENTS CUSTOM AUDIENCE, https://www.facebook.com/business/help/366151833804507?id=300360584271273.

[12] FACEBOOK, ABOUT LOOKALIKE AUDIENCES, https://www.facebook.com/business/help/164749007013531?id=401668390442328.

[13] FACEBOOK, CREATE A CUSTOMER LIST CUSTOM AUDIENCE, https://www.facebook.com/business/help/170456843145568?id=2469097953376494; FACEBOOK, CREATE A WEBSITE CUSTOM AUDIENCE, https://www.facebook.com/business/help/1474662202748341?id=2469097953376494.

14.     The Facebook Tracking Pixel is a piece of code that advertisers, like Defendant, can integrate into their website.  Once activated, the Facebook Tracking Pixel "tracks the people and type of actions they take."[14]  When the Facebook Tracking Pixel captures an action, it sends a record to Facebook.  Once this record is received, Facebook processes it, analyzes it, and assimilates it into datasets like the Core Audiences and Custom Audiences.

15.     Advertisers control what actions—or, as Facebook calls it, "events"—the Facebook Tracking Pixel will collect, including the website's metadata, along with what pages a visitor views and what buttons a visitor clicks.[15]  Advertisers can also configure the Facebook Tracking Pixel to track other events.  Facebook offers a menu of "standard events" from which advertisers can choose, including what content a visitor views or purchases.[16]  An advertiser can also create their own tracking parameters by building a "custom event."[17]

16.     Advertisers control how the Facebook Tracking Pixel identifies visitors.  The Facebook Tracking Pixel is configured to automatically collect "HTTP Headers" and "Pixel-specific Data."[18]  HTTP Headers collect "IP addresses, information about the web browser, page location, document, referrer and persons using the website."[19]  Pixel-specific Data includes "the Pixel ID and cookie."[20]

---

[14] FACEBOOK, RETARGETING, https://www.facebook.com/business/goals/retargeting.
[15] *See* FACEBOOK, FACEBOOK PIXEL, ACCURATE EVENT TRACKING, ADVANCED, https://developers.facebook.com/docs/facebook-pixel/advanced/; *see also* FACEBOOK, BEST PRACTICES FOR FACEBOOK PIXEL SETUP, https://www.facebook.com/business/help/218844828315224?id=1205376682832142.
[16] FACEBOOK, SPECIFICATIONS FOR FACEBOOK PIXEL STANDARD EVENTS, https://www.facebook.com/business/help/402791146561655?id=1205376682832142.
[17] FACEBOOK, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS, https://www.facebook.com/business/help/964258670337005?id=1205376682832142.
[18] FACEBOOK, FACEBOOK PIXEL, https://developers.facebook.com/docs/facebook-pixel/.
[19] *Id.*
[20] *Id.*

**B.    Defendants' Websites and the Facebook Pixel**

17.    Defendants' websites cabelas.com and basspro.com are largely mirror images of one another. Both host code for the Facebook Tracking Pixel and are configured to transmit three distinct events to Facebook:[21]



18.    PageView transmits the Uniform Resource Locator ("URL") accessed, which shows what webpage the visitor visited:



19.    Defendants' URLs contain detailed information disclosing what products users have browsed. For example, if a user searches for "Vortex scope," the URL displayed is "basspro.com/SearchDisplay#q=Vortex%20scope," and if that user then clicks on the "Vortext

---

[21] This data derives from a tool created and offered by Facebook.

Diamondback Rifle Scope," the URL changes to "basspro.com/shop/en/vortex-diamondback-rifle-scope."

20.    ViewContent shows similar information to PageView, but specifically tracks when users access pages for particular products.

21.    Microdata transmits the title and description of the webpage:



22.    Another event titled "Button Click Automatically Detected" registers when users add a product, such as a firearm, to their online shopping cart and when they checkout:

One pixel found on www.cabelas.com

**Facebook Pixel**                    Troubleshoot Pixel
Pixel ID 841232062592604 click to copy    View Analytics

▼ ✿ Button Click Automatically Detected

**CUSTOM PARAMETERS SENT**

formFeatures: []
buttonText: ORDER ONLINE
buttonFeatures: Hide

{"classList":"btn primary chartcomposerprimary left pdp_ch
art_addtocart_button","destination":"javascript: if (typeo
f onsehalfutilitiesJS == 'undefined') {setcurrentId('SKU_L
ist_widget_Add2CartButton_30744573456233266621_table');Fire
armsDisplayJS.orderFirearmsOnlinewrapper('30744573456233266
621', '3074457345623326621_quantity_input','https://www.ca
belas.com/shop/en/firearmsResidencyCheckview','307445734562
3326120');} else if (onsehalfutilitiesJS.csrProceedCheck:
()) {setcurrentId('sku_list_widget_Add2CartButton_307445734
5623326621_table');FirearmsDisplayJS.orderFirearmsOnlinew
rapper('3074457345623326621', '3074457345623326621_quancit
y_input','https://www.cabelas.com/shop/en/firearmsResidency
Checkview','3074457345623326120');} else {messageHelper.di
splayErrorMessage(MessageHelper.messages['ERROR_CSR_USER_P
ROCEED'])};}","id":"SKU_List_widget_Add2CartButton_30744573
45623326621_table","imageUrl":"","innerText":"ORDER ONLIN
E","numchildButtons":0,"tag":"a","type":null,"name":""}

pageFeatures: Hide

{"title":"Savage Arms AXIS II XP TrueTimber VSX Bolt-Actio
n Rifle | Cabela's"}

One pixel found on www.basspro.com

**Facebook Pixel**                    Troubleshoot Pixel
Pixel ID: 1923168964632693 click to copy    View Analytics

▼ ✿ Button Click Automatically Detected

**CUSTOM PARAMETERS SENT**

formFeatures: []
buttonText: ORDER ONLINE
buttonFeatures: Hide

{"classList":"btn primary chartcomposerprimary left pdp_ch
art_addtocart_button","destination":"javascript: if (typeo
f onsehalfutilitiesJS == 'undefined') {setcurrentId('SKU_L
ist_widget_Add2CartButton_30744573456233266620_table');Fire
armsDisplayJS.orderFirearmsOnlinewrapper('30744573456233266
620', '3074457345623326620_quantity_input','https://www.ba
sspro.com/shop/en/firearmsResidencyCheckview','307445734562
3324136');} else if (onsehalfutilitiesJS.csrProceedCheck
()) {setcurrentId('sku_list_widget_Add2CartButton_307445734
5623326620_table');FirearmsDisplayJS.orderFirearmsOnlinew
rapper('3074457345623326620', '3074457345623326620_quancit
y_input','https://www.basspro.com/shop/en/firearmsResidency
Checkview','3074457345623324136');} else {messageHelper.di
splayErrorMessage(MessageHelper.messages['ERROR_CSR_USER_P
ROCEED'])};}","id":"SKU_List_widget_Add2CartButton_30744573
45623326620_table","imageUrl":"","innerText":"ORDER ONLIN
E","numchildButtons":0,"tag":"a","type":null,"name":""}

pageFeatures: Hide

{"title":"Savage Arms AXIS II XP TrueTimber VSX Bolt-Actio
n Rifle with Threaded Barrel | Bass Pro Shops"}

23.    This event registers, for example, when a purchaser clicks "ORDER ONLINE," "ADD TO CART," "CHECKOUT," "CONTINUE," "REVIEW ORDER," and "PLACE ORDER."

24.    The Button Click event also transmits content that purchasers enter into form fields:



25.     This includes form fields that must be completed prior to purchase:



26.     This event data, jointly and independently, permit an ordinary person to identify

what a consumer has viewed and/or purchased on Defendants' websites.

27.     The Facebook Tracking Pixel uses both first- and third-party cookies.  A first-party

cookie is "created by the website the user is visiting"—*i.e.*, cabelas.com or basspro.com.[22]  A third-

---

[22] PC MAG, FIRST-PARTY COOKIES, https://www.pcmag.com/encyclopedia/term/first-party-cookie.
This is confirmable by using developer tools to inspect a website's cookies and track network
activity.

party cookie is "created by a website with a domain name other than the one the user is currently visiting"—*i.e.*, Facebook.[23]

28.    When viewing Defendants' websites, the Facebook Tracking Pixel compels the user's browser to send nine cookies to Facebook:

| Name | Value | Domain |
|------|-------|--------|
| xs | 156%3AKGXBbut-SjxSCv%3A2%3A1639601808%... | .facebook.com |
| wd | 1313x646 | .facebook.com |
| usida | eyJ2ZXIiOjEsImIkIjoiQXJvZndreDE1OTA1ZmsiLCJ0... | .facebook.com |
| c_user | 679395441 | .facebook.com |
| datr | jVa6YcoeBSLOAo0a9bvz1mtE | .facebook.com |
| presence | C%7B%22t3%22%3A%5B%5D%2C%22utc3%22%... | .facebook.com |
| dpr | 1.4630000591278076 | .facebook.com |
| sb | jVa6YaHou2Nev98LSBnWYOo7 | .facebook.com |
| fr | 0ZzdZn9Ygh60Xbk36.AWVC5uksSXTsGC3302SbE... | .facebook.com |

29.    The c_user cookie contains that visitor's unencrypted Facebook ID.  A Facebook ID is personally identifiable information.  Anyone can identify a Facebook profile—and all personal information publicly listed on that profile—by appending the Facebook ID to the end of Facebook.com.

30.    The fr cookie contains, at least, an encrypted Facebook ID and browser identifier.[24] The datr cookies also identifies a browser.[25]  Facebook, at a minimum, uses the fr and c_user cookies to identify users by their Facebook IDs and corresponding Facebook profiles.[26]

---

[23] PC MAG, THIRD-PARTY COOKIES, https://www.pcmag.com/encyclopedia/term/third-party-cookie. This is also confirmable by tracking network activity.
[24] DATA PROTECTION COMMISSIONER, FACEBOOK IRELAND LTD, REPORT OF RE-AUDIT (Sept. 21, 2012), http://www.europe-v-facebook.org/ODPC_Review.pdf.
[25] FACEBOOK,    COOKIES    &    OTHER    STORAGE    TECHNOLOGIES, https://www.facebook.com/policy/cookies/.
[26] FACEBOOK,    COOKIES    &    OTHER    STORAGE    TECHNOLOGIES, https://www.facebook.com/policy/cookies/.

31.    Through the Facebook Tracking Pixel's code, these cookies combine the identifiers with the event data, allowing Facebook to know, among other things, what webpages visitors to Defendants' websites are visiting and what products they are purchasing.[27]

32.    Defendants also use "Advanced Matching."    With Advanced Matching, Defendants' Pixels "look[s] for recognizable form field and other sources on your website that contain information such as first name, last name and email."[28]    That information is recorded, "along with the event, or action, that took place."[29]  This information is also "hashed,"[30] meaning it is "[a] computed summary of digital data that is a one-way process."  In other words, it "cannot be reversed back into the original data."[31]

> You can use Advanced Matching to help:
>
> - Increase the number of attributed conversions. We can match more of the conversions that happen on your website to people on Meta. This helps you understand the impact of your ads on website conversions.
>
> - Increase your Custom Audience size. We're able to better match your website visitors to people on Meta and increase the size of your Custom Audience.
>
> - Decrease the cost per conversion. Conversion-optimized campaigns become more efficient because we can better identify and deliver ads to the types of people likely to take the actions you care about.

33.    Defendants disclose this information to Facebook so it can better match visitors to their Facebook profiles.

34.    As part of Advanced Matching, Defendants enabled "Automatic Advanced Matching."  That means Defendants configured the pixel to scan form fields containing a user's

---

[27] FACEBOOK, GET STARTED, https://developers.facebook.com/docs/meta-pixel/get-started.
[28] https://www.facebook.com/business/help/611774685654668?id=1205376682832142
[29]    FACEBOOK,    ABOUT    ADVANCED    MATCHING    FOR    WEB, https://www.facebook.com/business/help/611774685654668?id=1205376682832142.
[30] DEFINITION OF HASH, https://www.pcmag.com/encyclopedia/term/hash
[31] *Id.*

email address, first name, last name, phone number, gender, zip code, city and state.[32]   The

highlighted line, along with the line three below it, shows that Defendants enabled Automatic

Matching.

```
33 fbq.registerPlugin("841232062592664", {__fbEventsPlugin: 1, plugin: function(fbq, instance, config) { fbq.loadPlugin(
34 fbq.loadPlugin("identity");
35 instance.optIn("841232062592664", "InferredEvents", true);
36 fbq.loadPlugin("jsonld_microdata");
37 instance.optIn("841232062592664", "MicrodataJsonLd", true);
38 config.set("841232062592664", "automaticMatching", {"selectedMatchKeys":["em","fn","ln","ph","ge","zp","ct","st"]});
39 fbq.loadPlugin("inferredevents");
40 fbq.loadPlugin("identity");
41 instance.optIn("841232062592664", "AutomaticMatching", true);
42 fbq.loadPlugin("iwlbootstrapper");
43 instance.optIn("841232062592664", "IWLBootstrapper", true);
44 fbq.loadPlugin("iwlparameters");
45 fbq.loadPlugin("estruleengine");
46 instance.optIn("841232062592664", "IWLParameters", true);
```

35.    Defendants know that Facebook will match the Advanced Matching parameters

with a customer's subsequent activity, thereby helping them "[i]ncrease the number of attributed

conversions," "[i]ncrease [their] Custom Audience size," and "[d]ecrease the cost per

conversion."[33]

36.    By compelling a visitor's browser to disclose the Advanced Matching parameters

and event data for videos, Defendants knowingly disclose information sufficiently permitting an

ordinary person to identify a specific individual's website activity, including what webpages they

visit and what products they purchase.

## C.    Defendants Never Received Consent from Plaintiff and Class Members to Assist Facebook with Intercepting Their Communications

37.    Defendants never received consent from users to intercept their electronic

communications.

---

[32] Facebook provides a corresponding look-up table: FACEBOOK, ADVANCED MATCHING, https://developers.facebook.com/docs/meta-pixel/advanced/advanced-matching.

[33]    FACEBOOK,    ABOUT    ADVANCED    MATCHING    FOR    WEB, https://www.facebook.com/business/help/611774685654668?id=1205376682832142.

38.    Plaintiff and Class members did not consent to Defendants' privacy policies prior to Facebook intercepting their electronic communications.  Even if applicable, that privacy policy fails to disclose that Defendants assist Facebook with intercepting communications that contain sensitive information.

39.    Likewise, Facebook never receives consent from users to intercept and collect electronic communications containing their sensitive and unlawfully disclosed information.  In fact, Facebook expressly warrants the opposite.

40.    When first signing up, a user assents to three agreements: the Terms of Service,[34] the Cookies Policy,[35] and the Data Policy.[36]

41.    Facebook's Terms of Service begins by stating that "[p]rotecting people's privacy is central to how we've designed our ad system."[37]  The Terms of Service then prohibits anyone from using Facebook's Products in a manner that is "unlawful, misleading, discriminatory or fraudulent."[38]

42.    Facebook's Data Policy recognizes that there may be "[d]ata with special protections," meaning information that "could be subject to special protections under the laws of your country."[39]  The Data Policy goes on to describe how Facebook collects information from its "Meta Business Tools," including "our social plug-ins (such as the Like button), Facebook Login,

---

[34] FACEBOOK, TERMS OF SERVICE, https://www.facebook.com/legal/terms/update.
[35] FACEBOOK,    COOKIES    &    OTHER    STORAGE    TECHNOLOGIES, https://www.facebook.com/policies/cookies/.
[36] FACEBOOK, DATA POLICY, https://www.facebook.com/about/privacy/update.
[37]FACEBOOK, TERMS OF SERVICE, https://www.facebook.com/legal/terms/update..
[38] Id.
[39] FACEBOOK, DATA POLICY, https://www.facebook.com/about/privacy/update.

14

our APIs and SDKs, or the Meta pixel."[40]  Specifically, Facebook acknowledges that "[p]artners receive your data when you visit or use their services or through third parties they work with."[41]

43.    Facebook then offers an express representation: **"We require each of these partners to have lawful rights to collect, use and share your data before providing any data to us."**[42]  Facebook does acknowledge collecting "data with special protections" to personalize ads, but critically, only sensitive information that users "choose to provide."[43]

44.    Facebook's Cookies Policy ratifies those representations, stating "the Data Policy will apply to our processing of the data that we collect via cookies."[44]

45.    Facebook's other representations reinforce these warranties.  In its Advertising Policy, Facebook states "[w]e do not use sensitive personal data for ad targeting."[45]  And in a blog post titled "About Restricted Meta Business Tools Data," Facebook asserts it has "policies around the kinds of information businesses can share with us."[46]  Facebook does not "want websites or apps sending us sensitive information about people."[47]  Sensitive information includes, among other things, "any information defined as sensitive under applicable laws, regulations and applicable industry guidelines."[48]

---

[40] FACEBOOK, DATA POLICY, https://www.facebook.com/about/privacy/update.
[41] *Id.*
[42] *Id.*
[43] *Id.*
[44]    FACEBOOK,    COOKIES    &    OTHER    STORAGE    TECHNOLOGIES, https://www.facebook.com/policies/cookies/.
[45] FACEBOOK, ADVERTISING POLICY, https://www.facebook.com/policies/ads/.
[46]    FACEBOOK,    ABOUT    RESTRICTED    META    BUSINESS    TOOLS    DATA, https://www.facebook.com/business/help/1057016521436966?id=188852726110565
[47] *Id.*
[48] *Id.*

46.     These representations are repeated frequently. Facebook created a "Help Center" to better explain its practices to users. In an article titled, "How does Facebook receive information from other businesses and organizations?," Facebook reiterates its promise to "prohibit businesses or organizations from sharing sensitive information with us," and if Facebook "determine[s] that a business or an organization is violating our terms, we'll take action against that business or organization."[49] In another article, titled, "How does Meta work with data providers?," Facebook repeats this promise, stating "[b]usinesses that advertise on Facebook are required to have any necessary rights and permissions to use this information, as outlined in our Custom Audience Terms that businesses must agree to."[50]

47.     Based on these representations, Facebook never receives consent from users to intentionally intercept and monetize electronic communications disclosing sensitive information that the law protects.

48.     Moreover, upon information and belief, Defendants have never entered into an agreement with Facebook that would obligate Facebook to keep disclosed information confidential.

## CLASS ALLEGATIONS

49.     Plaintiff, pursuant to Rules 1702, 1708 and 1709 of the Pennsylvania Rules of Civil Procedure, asserts this action individually and on behalf of the following Class: All persons in Pennsylvania who have a Facebook account and who visited either cabelas.com, basspro.com or both (the "Class"). Plaintiff also seeks to represent a subclass of similarly situated individuals

---

[49] FACEBOOK, HOW DOES FACEBOOK RECEIVE INFORMATION FROM OTHER BUSINESSES AND ORGANIZATIONS, https://www.facebook.com/help/2230503797265156.
[50] HOW DOES META WORK WITH DATA PROVIDERS?, https://www.facebook.com/help/494750870625830?ref=dp.

defined as all persons in Pennsylvania who have a Facebook account and who purchased a firearm from either cabelas.com, basspro.com or both (the "Subclass").

50.     Subject to additional information obtained through further investigation and discovery, the above-described Class and Subclass may be modified or narrowed as appropriate, including through the use of multi-state subclasses.

51.     **Numerosity.** Consistent with Pennsylvania Rule of Civil Procedure 1702(1), the Class is so numerous that joinder of all members is impracticable. While Plaintiff does not know the exact number of members of the Class, Plaintiff believes the Class contains at least hundreds of thousands of individuals, and the members can be identified through Defendant's records. Class Members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, internet postings, social media and/or published notice.

52.     **Commonality.** Consistent with Pennsylvania Rule of Civil Procedure 1702(2), common questions of law and fact exist as to all Class Members. These common questions of law or fact predominate over any questions affecting only individual members of the Class. Common questions include, but are not limited to the following:

   a. whether Defendants collected users' PII, website activities and firearms purchases;

   b. whether Defendants unlawfully disclosed and continue to disclose their users' PII, website activities and firearms purchases in violation of Pennsylvania Wiretapping Act, 8 Pa. Cons. Stat. § 5701, *et seq.*;

   c. whether Defendants unlawfully disclosed and continue to disclose its users' PII, website activities and firearms purchases in violation of Uniform Firearms Act, 18 Pa.C.S. § 6111(i); and

   d. whether Defendants disclosed its users PII, website activities and firearms purchases without consent.

17

53.    **Typicality.**  Consistent with Pennsylvania Rule of Civil Procedure 1702(3), Plaintiff's claims are typical of the claims of the Class he seeks to represent because Plaintiff and all Class Members have suffered similar injuries as a result of the same practices alleged herein. Plaintiff has no interests to advance adverse to the interests of the other Class Members, and Defendant has no defenses unique to any Plaintiff.

54.    **Adequate Representation.**  Consistent with Pennsylvania Rule of Civil Procedure 1702(4) and 1709, Plaintiff has and will continue to fairly and adequately represent and protect the interests of the Class and has retained as his counsel attorneys competent and experienced in class actions and complex litigation, including litigation to remedy privacy violations.  Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of Class Members, and they have the resources to do so.

55.    **Predominance.**  Consistent with Pennsylvania Rule of Civil Procedure 1708(a)(1), common questions of law and fact predominate over any questions affecting only individual class members.  For example, Defendant's liability and the fact of damages is common to all members of the Class.

56.    **Superiority and Manageability.**  Consistent with Pennsylvania Rule of Civil Procedure 1708(a)(2), a class action is superior to other available means for the fair and efficient adjudication of this dispute.  The injury suffered by each Class Member, while meaningful on an individual basis, may not be of such magnitude as to make the prosecution of individual actions against Defendant economically feasible.  Even if Class Members could afford individual litigation, those actions would put immeasurable strain on the court system.  Moreover, individual litigation of the legal and factual issues of the case would increase the delay and expense to all parties and the court system.  A class action, however, presents far fewer management difficulties

and provides the benefit of single adjudication, economy of scale and comprehensive supervision by a single court.

57.    **Risk of Inconsistent, Varying, or Prejudicial Adjudications.**  Consistent with Pennsylvania Rule of Civil Procedure 1708(a)(3), a class action will minimize the risk of inconsistent, varying or prejudicial adjudications.  If Plaintiff's and Class members' claims were tried separately, Defendant would be confronted with incompatible standards of conduct and divergent court decisions.

58.    **Litigation Already Commenced.**  Consistent with Pennsylvania Rule of Civil Procedure 1708(a)(4), to Plaintiff's knowledge, there are no other cases that have been brought against Defendant, or that are currently pending against Defendant, where Pennsylvania consumers seek to represent a class of Pennsylvania residents based on conduct alleged in this Complaint.

59.    **Appropriateness of Forum.**  Consistent with Pennsylvania Rule of Civil Procedure 1708(a)(5), the most appropriate forum to concentrate the litigation is this County because Defendant conducts business in this county, the conduct at issue took place in part in this county and a substantial number of Class members were injured in this County.

60.    **Support for Class Certification.**  Consistent with Pennsylvania Rule of Civil Procedure 1708(a)(6) and (7), there is support for a class to be certified because of the relatively low amount recoverable by each Class member and the expenses of individual litigation.

61.    **The General Applicability of Defendant's Conduct.**  Consistent with Pennsylvania Rule of Civil Procedure 1708(b)(2), Defendant's conduct is generally applicable to the class as a whole, making relief appropriate with respect to each Class member.

<u>**CLAIMS FOR RELIEF**</u>

<u>**COUNT I**</u>
**Violation of the Pennsylvania Wiretapping Act**

19

**18 Pa. Cons. Stat. § 5701, *et seq.***

62.     Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein.

63.     Plaintiff brings this Count individually and on behalf of the members of the Class.

64.     The Pennsylvania Wiretapping Act prohibits (1) the interception or procurement of another to intercept any wire, electronic, or oral communication; (2) the intentional disclosure of the contents of any wire, electronic, or oral communication that the discloser knew or should have known was obtained through the interception of a wire, electronic, or oral communication; and (3) the intentional use of the contents of any wire, electronic, or oral communication that the discloser knew or should have known was obtained through the interception of a wire, electronic, or oral communication.  18 Pa. Cons. Stat. § 5703.

65.     Any person who intercepts, discloses, or uses or procures any other person to intercept, disclose, or use, a wire, electronic, or oral communication in violation of the Act is subject to a civil action for (1) actual damages, not less than liquidated damages computed at a rate of $100 per day for each violation or $1,000, whichever is higher; (2) punitive damages; and (3) reasonable attorneys' fees and other litigation costs incurred.  18 Pa. Cons. Stat. § 5725(a).

66.     "Intercept" is defined as the "[a]ural or other acquisition of the contents of any wire, electronic or oral communication through the use of any electronic, mechanical or other device." 18 Pa. Cons. Stat. § 5702. "Electronic, mechanical or other device," in turn, means "[a]ny device or apparatus … that can be used to intercept a wire, electronic or oral communication[.]" *Id.*

67.     The following constitutes a device within the meaning of 18 Pa. Cons. Stat. § 5702:

    a.  The computer codes and programs that Defendants used to track Plaintiff and Class members' communications while navigating the websites;

b.  Plaintiff's and Class members' web browsers;

c.  Plaintiff's and Class members' computing devices;

d.  Defendants' web servers;

e.  The web servers from which Facebook received the Plaintiff's and Class members' communications while they were using a web browser to access Defendants' websites;

f.  The plan Defendants carried out to effectuate their tracking of Plaintiff's and Class members' communications while using a web browser to access the websites.

68.    At all relevant times, Defendants procured Facebook to track and intercept Plaintiff's and other Class and Subclass members' internet communications while navigating their websites.  Defendants sent these communications to Facebook without authorization or consent from Plaintiff or Class members.

69.    Defendants, when procuring Facebook to intercept Plaintiff' communications, intended Facebook to learn the meaning of the content the visitor requested.

70.    Plaintiff and Class members had a justified expectation under the circumstances that their electronic communications would not be intercepted.

71.    Plaintiff and Class members were not aware that their electronic communications were being intercepted by Facebook.

**COUNT II**
**Violation of the Uniform Firearms Act**
**18 Pa.C.S. § 6111(i)**

72.    Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein.

21

73.    Plaintiff brings this Count individually and on behalf of the members of the Subclass.

74.    Section 6111(i) of the Uniform Firearms Act ("UFA") provides the following:

> **(i) Confidentiality.**--All information provided by the potential purchaser, transferee or applicant, including, but not limited to, the potential purchaser, transferee or applicant's name or identity, furnished by a potential purchaser or transferee under this section or any applicant for a license to carry a firearm as provided by section 6109 shall be confidential and not subject to public disclosure. In addition to any other sanction or penalty imposed by this chapter, any person, licensed dealer, State or local governmental agency or department that violates this subsection shall be liable in civil damages in the amount of $1,000 per occurrence or three times the actual damages incurred as a result of the violation, whichever is greater, as well as reasonable attorney fees.

75.    Plaintiff is a "purchaser" under the UFA because he purchased a firearm from Defendants. On December 2, 2021, Plaintiff Irvin purchased a Henry Big Boy Classic Centerfire Lever-Action Rifle - .45 Colt form cabelas.com.

76.    Defendants disclosed to Facebook information that Plaintiff provided to them in connection with his purchase of these firearms. Specifically, Defendants disclosed Plaintiff's name, address, his Facebook ID, the type of gun that he purchased, among other items.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendants, as follows:

a.    Determining that this action is a proper class action;

b.    For an order certifying the Class and Subclass, naming Plaintiff as representative of the Class and Subclass, and naming Plaintiff's attorneys as Class Counsel to represent the Class and Subclass;

c.  For an order declaring that Defendants' conduct violates the statute referenced herein;

d.  For an order finding in favor of Plaintiff and the Class and Subclass on the counts asserted herein;

e.  Awarding compensatory damages, including statutory damages where available, to Plaintiff and the Class and Subclass members against Defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial;

f.  For punitive damages, as warranted, in an amount to be determined at trial;

g.  Ordering Defendants to disgorge revenues and profits wrongfully obtained;

h.  For prejudgment interest on all amounts awarded;

i.  For injunctive relief as pleaded or as the Court may deem proper;

j.  For an order awarding Plaintiff and the Class and Subclass their reasonable attorneys' fees and expenses and costs of suit; and

k.  Granting Plaintiff and the Class and Subclass members such further relief as the Court deems appropriate.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all claims so triable in this action.

Dated:  December 19, 2023                  Respectfully submitted,

By: *Steven A. Schwartz*
Steven A. Schwartz
**CHIMICLES SCHWARTZ KRINER
& DONALDSON-SMITH LLP**
Steven A. Schwartz (PA I.D. No. 50579)
361 W. Lancaster Avenue
Haverford, PA 19041
Tel: (610) 642-8500
Fax: (610) 649-3633
E-Mail: sas@chimicles.com

**BURSOR & FISHER, P.A.**
Joshua D. Arisohn*
Philip L. Fraietta*
1330 Avenue of the Americas, 32 Fl.
New York, NY 10019
Tel: (646) 837-7150
Fax: (212) 989-9163
E-Mail: jarisohn@bursor.com
         pfraietta@bursor.com

**BURSOR & FISHER, P.A.**
Christopher R. Reilly*
701 Brickell Ave., Suite 1420
Miami, FL 33131-2800
Telephone: (305) 330-5512
Facsimile: (305) 676-9006
E-Mail: creilly@bursor.com

*Pro Hac Vice Application Forthcoming*

*Attorneys for Plaintiff and the Putative Class*

# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE: BPS DIRECT, LLC, AND | : | **MDL 3074** |
| CABELA'S, LLC, WIRETAPPING | : | |
| | : | |
| | : | **E.D.Pa. ACTION NOS.:** |
| | : | **23-md-3074** |
| | : | **22-cv-4709** |
| | : | **23-cv-2282** |
| | : | **23-cv-2287** |
| | : | **23-cv-2293** |
| | : | **23-cv-2294** |
| | : | **23-cv-2295** |
| | : | **23-cv-2306** |
| | : | **23-cv-2338** |
| | : | **23-cv-4008** |

## <u>ORDER</u>

**AND NOW**, this 5th day of December 2023, upon considering the Motions to dismiss (ECF No. 54 and ECF Nos. 38-39 in No. 23-4008), lead Plaintiffs' and David Irvin's Oppositions (ECF No. 56 and ECF No. 47 in No. 23-4008), Replies (ECF No. 57 and ECF No. 52 in No. 23-4008), following oral argument, and for reasons in today's accompanying Memorandum, it is **ORDERED** Defendants' Motions (ECF No. 54 and ECF No. 38 in No. 23-4008) are **GRANTED** requiring:

      1.    We **dismiss** Brittany Vonbergen, Gregory Moore, Jr., Brian Calvert, Arlie Tucker, Timothy Durham, and Marilyn Hernandez's claims for damages with prejudice;

      2.    We **dismiss** all plead claims for injunctive relief with prejudice;

      3.    We **dismiss** Heather Cornell, Peter Montecalvo, and David Irvin's claims for damages without prejudice to their filing amended Complaints on or before **January 5, 2024** if they can specifically plead standing based on the sharing of highly sensitive personal information such as a medical diagnosis or financial data from banks or credit cards;

4.     We **stay** until further Order the parties' prospective obligations regarding discovery including in our October 23, 2023 (ECF No. 67), November 17, 2023 Order (ECF No. 81), and November 27, 2023 Order (ECF No. 82), as well as fee and costs reporting, expert disclosure, and class certification obligations in our July 26, 2023 Order (ECF No. 52), but counsel remain obligated to follow our Policies and Procedures as to conferring before moving for relief, maintaining and preserving records including billing records (ECF No. 52 at ¶ 4), and addressing a Rule 408 demand and response and timely moving for summary judgment (*Id.* at ¶¶ 10, 21) should Plaintiffs file an amended Complaint.

KEARNEY, J.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE: BPS DIRECT, LLC, AND | : | **MDL 3074** |
| CABELA'S, LLC, WIRETAPPING | : | |
| | : | |
| | : | **E.D.Pa. ACTION NOS.:** |
| | : | **23-md-3074** |
| | : | **22-cv-4709** |
| | : | **23-cv-2282** |
| | : | **23-cv-2287** |
| | : | **23-cv-2293** |
| | : | **23-cv-2294** |
| | : | **23-cv-2295** |
| | : | **23-cv-2306** |
| | : | **23-cv-2338** |
| | : | **23-cv-4008** |

## MEMORANDUM

**KEARNEY, J.**                                                     **December 5, 2023**

We today address website users' challenges to retailers secretly tracking consumers' keystrokes and chosen webpages while browsing the retailers' websites. We put aside the rhetoric surrounding retailer marketing efforts versus surveillance. We must focus on the legal questions of whether website users suffer concrete injury from hidden tracking depending on what the retailer learns and, if so, whether the retailers' conduct in tracking their website users' conduct violates federal and state law.

The website users' first filed challenge through a Multi-District Litigation is to the use of session replay software embedded into two retailers' websites by third party vendors who then track the website user's conduct on the retailers' webpages as violating federal and several differing state wiretapping acts and a variety of common law torts grounded in privacy concepts. The second challenge arises closer to home with a Pennsylvania Facebook website user purchasing a gun from the same retailer who automatically discloses his purchase to Facebook which he claims

violates Pennsylvania's wiretapping act and the nondisclosure mandates in the Pennsylvania Uniform Firearms Act.   Neither the session replay website users nor the Facebook website user allege either retailer accessed or shared their credit card, financial, or bank account data. They do not allege the retailers accessed or shared their private medical information.  No website user alleges concrete specific injury arising from the retailers' use of software to track their browsing on the retailers' websites.  Two website users focusing on session replay software and the Pennsylvania Facebook user generally plead they purchased products from a retailer's website. But even these three website users do not plead the retailers shared highly sensitive personal information such as medical diagnosis information or financial data from banks or credit cards.

The website users do not plead facts allowing us to find Article III standing. We grant the retailers' motions to dismiss with prejudice as to website users who cannot plead after two attempts disclosing personal credit card, financial, bank account or medical information possibly arising from a purchase from their websites.  We grant the retailers' motions to dismiss without prejudice as to the two website users challenging session replay software and the Pennsylvania Facebook website user who allege they purchased a product from the websites but do not plead concrete injury through third party access to their highly sensitive personal information such as medical diagnosis information or financial data from banks or credit cards. We also dismiss without prejudice the Facebook website user's alternative claim of improper disclosure under the Pennsylvania Uniform Firearms Act.

## II.    Alleged facts

BPS Direct, LLC and Cabela's, LLC own, manage, and operate physical retail stores known as Bass Pro Shops and Cabela's along with online websites which sell outdoor products, such as hunting gear and apparel, firearms, and camping equipment.[1] Bass and Cabela's maintain

a "Privacy Policy" and "Terms of Use and Community Guidelines" across their websites.[2] They place the Privacy Policy and Terms of Use on the homepages of their websites in smaller low-contrasting font at the bottom of the webpages.[3] Bass and Cabela's do not prompt website visitors to agree to or view the Privacy Policy or Terms of Use during their website visit.[4]

### Session replay code's function and scope.

Third-party vendors including Microsoft, Quantum Metric, and Mouseflow, created session replay code computer software allowing website operators to record and playback an individual website visitor's browsing session and to view a website visitor's interactions on their websites in real-time.[5] Session replay code provides online marketers, advertisers, and website designers with specific insights into website visitor behavior which they can use to target website visitors with marketing and advertising content.[6]

Bass and Cabela's hire third-party vendors, called session replay providers, to create and deploy session replay code on their websites to track and analyze website visitors' activities.[7] The third party session replay providers embed snippets of JavaScript computer code in www.basspro.com and www.cabelas.com.[8] The embedded JavaScript computer code, or session replay code, then deploys on each website user's internet browser.[9] When a website visitor interacts with one of these two websites, for example by clicking on a button or scrolling down a web page, their browsers transmit electronic messages in the form of instructions to Cabela's and Bass's computer servers operating the website.[10] These messages instruct Bass and Cabela's what content is being viewed, clicked on, requested, and imputed by the user.[11] The website user's browser will "follow the code's instructions" by contemporaneously sending duplicate messages of the user's communications to the third party session replay provider.[12] This session replay code operates continuously during a user's visit to the Bass or Cabela's websites.[13]

Bass and Cabela's use session replay code to capture users' mouse movements, clicks, scrolls, zooms, window resizes, keystrokes, text entries, and other forms of a user's navigation and interaction through their websites.[14] Session replay code can capture these events at hyper-frequent intervals, often just milliseconds apart.[15] Session replay code accumulates and transmits these events in blocks periodically throughout the visitor's website session.[16] The third party session replay providers store and control the data and can then interpret and replay the data.[17] Session replay providers use large swaths of data to visually recreate a website user's visit to a particular website, often through a video replay showing the website user's computer screen and the actions they took on the website.[18] Bass and Cabela's then use the data for commercial gain.[19]

Session replay code is capable of capturing nearly every action taken by a website visitor while they are on the website, including a visitor's personal or private sensitive data depending on what the visitor does while on the site.[20] Visible contents of website communications are transmitted to the third party session replay provider as Bass and Cabela's do not use masking configuration settings and their websites transmit all captured data to their session replay providers.[21]

Session replay code may capture information the visitor does not intend to submit to the website (for example, a user enters information in a text field and chooses not to click "submit") or information they intend to keep private using a private browser such as "Incognito Mode."[22] Session replay code may also permit Bass and Cabela's to view the interactions of visitors on their websites in real-time.[23] The data captured by session replay code will become known and visible to both the session replay provider and Bass and Cabela's.[24] But session replay code is not visible to a user who is navigating a webpage.[25]

Session replay providers aggregate and store website users' data under unique identifiers

called "fingerprints."[26] "Fingerprints" are unique to a particular user's combination of computer and browser settings, screen configuration, and other detectable information.[27] Session replay providers collect fingerprints across all of the sites they monitor.[28] If a user identifies themselves to one of these websites, the session replay provider can match the fingerprint with the user identity.[29] Session replay providers can then back-reference all of the user's web browsing activity across other websites previously visited, including websites where the user intended to remain anonymous.[30]

### *The session replay Website Users' allegations.*

Eight persons bringing a consolidated class action complaint through the multi-district litigation accessed either the Bass or Cabela's website. These session replay Website Users Brian Calvert, Heather Cornell, Timothy Durham, Marilyn Hernandez, Peter Montecalvo, Greg Moore, Arlie Tucker, and Brittany Vonbergen did not know Bass and Cabela's embed session replay code on their websites.[31] Session replay Website Users transmitted communications to Bass and Cabela's website servers, including mouse clicks and movements, keystrokes, search terms, substantive information they inputted, pages they viewed, scroll movements, and copy and paste actions.[32] Session replay code automatically and instantaneously captured their acts and sent them to session replay providers.[33] Session replay providers created a unique ID and profile for each of the eight website users.[34] Bass and Cabela's did not include a pop-up disclosure, consent form, or privacy policy alerting them of Bass and Cabela's recording their visits through a third party.[35]

The eight session replay Website Users from five different states plead different browsing and purchasing experiences. Two session replay Website Users accessed the websites from California. Session replay Website User Durham accessed Cabela's website while in California.[36] Session replay Website User Moore also visited Bass's website on his computers and/or mobile

5

devices while in California.[37] Session replay Website User Hernandez visited Bass's website on her computer while in Maryland.[38]  She browsed for jackets but did not purchase anything.[39] Session replay Website User Montecalvo consistently visited Cabela's website on his computer, smartphone, and iPad between 2010 through 2021 while in Massachusetts.[40]  He made purchases during some of his visits.[41]  He communicated with Cabela's by telling Cabela's what product he was interested in, what color light duty belt he wanted, and where he wanted the belt shipped.[42] He provided Cabela's with his name, address, and unpleaded payment and billing information during the checkout process.[43]  Session replay Website User Tucker visited Bass's website on his mobile phone and computer while in Missouri.[44]

Three session replay Website Users accessed the websites in Pennsylvania. Website User Calvert visited Cabela's website to browse but did not purchase anything.[45]  Session replay Website User Cornell visited Bass's website to browse and purchased a chair.[46]  She informed Bass of the product she was interested in, what color chair she wanted, and where she wanted the chair shipped.[47]  Session replay Website User Cornell provided her name, address, and unpleaded payment and billing information.[48] Session replay Website User Vonbergen visited Cabela's website on her computer and/or smartphone approximately four times while in Pennsylvania but did not plead purchasing products during the website use.[49]

### The Facebook Website User's allegations.

Pennsylvanian David Irvin has a Facebook account and purchased a firearm from cabelas.com.[50]  Bass and Cabela's disclosed to Facebook information he provided to them in connection with his purchase of the firearm, including his name, address, Facebook ID, and the type of gun he purchased.[51]   Facebook Website User Irvin does not allege he entered payment or billing information on the Cabela's website.

Facebook Website User Irvin alleges Bass and Cabela's assisted Facebook with intercepting communications containing personally identifiable information and protected information about website visitors' firearms purchases using Facebook Tracking Pixel code.[52] Facebook Website User Irvin alleges Facebook Tracking Pixel code captures and transmits largely the same types of information as session replay code. Facebook Tracking Pixel is a piece of code advertisers like Bass and Cabela's can integrate into their website to track visitors' identities and interactions with their websites.[53] Facebook Tracking Pixel captures an action and sends a record to Facebook.[54] Facebook processes it, analyzes it, and assimilates it into datasets which it uses to target website visitors.[55] Bass and Cabela's websites host Facebook Tracking Pixel code configured to capture and transmit: (1) "PageView," which transmits the Uniform Resource Locators (URLs) accessed by visitors on Bass and Cabela's websites; (2) "ViewContent" which shows similar information but tracks users' access to pages for particular products; and (3) "Button Click Automatically Deleted," which tracks when users add a product, such as a firearm, to their cart and/or checkout.[56]

Facebook Tracking Pixel uses first- and third-party cookies.[57] Cookies are small blocks of data websites store on your computer. A first-party cookie is created by the website the user is visiting.[58] A third-party cookie is created by a different website than the one the user is visiting.[59] Facebook Tracking Pixel compels a user's browser to send cookies to Facebook when the user is visiting the Websites.[60] These cookies contain, among other things, the visitor's unencrypted Facebook ID and browser identifier.[61] These cookies combine the identifiers with the event data gathered by Facebook Tracking Pixel to determine the webpages visitors are visiting and the products they are purchasing.[62] Bass and Cabela's also use the "Advanced Matching" tool to find information on their websites containing users' first names, last names, and emails.[63] Bass and

Cabela's disclose this information to Facebook so it can match visitors to their Facebook profiles.[64] A Facebook user agrees to abide by Facebook's Terms of Service, Cookies Policy, and Data Policy.[65] Facebook represents through its policies and public statements it does not use sensitive personal data for ad targeting.[66]

## II.    Analysis

The eight session replay Website Users bring this action individually and on behalf of a nationwide class and various state subclasses of all website users whose communications were intercepted through the use of session replay code embedded on Cabela's and Bass's websites.[67] Session replay Website Users allege Cabela's and Bass's conduct violates the Federal Wiretap Act, Computer Fraud and Abuse Act, California Invasion of Privacy Act, California Statutory Larceny, California Unfair Competition Law, Maryland Wiretapping and Electronic Surveillance Act, Massachusetts Wiretapping Statute, Missouri Wiretap Act, Missouri Merchandising Practices Act, and, Pennsylvania Wiretapping and Electronic Surveillance Control Act. They also claim the same conduct constitutes an invasion of privacy rights, trespass to chattels, and conversion to chattels under each relevant state's law.[68] Session replay Website Users seek compensatory, statutory, nominal, and/or punitive damages, restitution, declaratory and injunctive relief, pre-judgment and post-judgment interest, and attorneys' fees, costs, and expenses.[69]

Facebook Website User Irvin focuses on Facebook's role and seeks to represent a class of "all persons in Pennsylvania who have a Facebook account and who visited either cabelas.com, basspro.com or both."[70] Facebook Website User Irvin also seeks to represent a subclass defined as "all persons in Pennsylvania who have a Facebook account and who purchased a firearm from either cabelas.com, basspro.com or both."[71]

Cabela's and Bass move to dismiss the session replay Website Users' consolidated

8

complaint arguing: (1) session replay Website Users lack Article III standing because they do not adequately allege they suffered concrete injury or are likely to suffer the future harm of visiting Bass and Cabela's websites without their knowledge of session replay code, (2) session replay Website Users' various wiretap claims under state and federal law fail because both parties consented to the alleged interceptions and their allegations fail to meet several of the necessary elements to state a claim under the respective statutes; (3) session replay Website Users' invasion of privacy claims fail because they do not adequately allege (a) an intentional intrusion by Cabela's and Bass, (b) a reasonable expectation of privacy in the data collected, or (c) a "highly offensive" intrusion; (4) session replay Website Users fail to state a claim under the Computer Fraud and Abuse Act because they do not adequately allege Bass and Cabela's "accessed" their computers and mobile devices or caused any damage; (5) session replay Website Users lack statutory standing to bring a claim under the California Unfair Competition Law and fail to adequately allege an "unlawful" or "unfair" act by Bass and Cabela's; (6) session replay Website User Tucker's claim under the Missouri Merchandising Practices Act fails because session replay Website User Tucker does not allege (a) a "purchase;" (b) any alleged fraud was made "in connection with" any "merchandise;" or (c) he suffered an "ascertainable loss; (7) state law claims for conversion and trespass to chattels fail because session replay Website Users fail to allege a physical interference or the requisite intent; and (8) the statutory larceny claim fails because session replay Website Users do not allege the type of loss or the requisite intent.[72]

Bass and Cabela's separately moved to dismiss Facebook Website User Irvin's amended Complaint arguing: (1) Facebook Website User Irvin lacks Article III standing because he does not adequately allege he suffered concrete injury; (2) Facebook Website User Irvin does not state a claim under the Pennsylvania Wiretapping and Electronic Surveillance Control Act because he

9

(a) does not allege the interceptions took place in Pennsylvania, (b) does not allege several key elements under the statute, including an interception of "contents", and (c) consented to any supposed "interception" when he agreed to Facebook and Bass's policies.[73]

We dismiss all claims of session replay Website Users Durham, Calvert, Hernandez, Moore, Tucker, and Vonbergen with prejudice as they do not have standing and amendment would be futile given they have not plead a purchase or disclosure of financial information after two attempts. We dismiss the claims of session replay Website Users Cornell and Montecalvo and Facebook Website User Irvin without prejudice to timely filing amended Complaints if they can allege Bass and Cabela's intercepted their highly sensitive personal information such as financial data from banks or credit cards consistent with their obligations under Rule 11. We also dismiss Facebook Website User Irvin's claims under the non-disclosures mandates in the Pennsylvania Uniform Firearms Act without prejudice.

### A.   Website Users do not plead Article III standing for the statutory and common law privacy and wiretapping claims.

Bass and Cabela's argue the session replay Website Users and Facebook Website User Irvin do not meet their burden to establish Article III standing because they do not adequately plead they suffered a concrete harm arising from their website visits.[74] Website Users counter they suffered harm bearing a close relationship to privacy torts which have been historically recognized as a basis for suit.[75]

We find session replay Website Users Durham, Calvert, Hernandez, Moore, Tucker, and Vonbergen lack standing because they do not allege they made purchases on the Websites or engaged in activity which would cause their browsers to send highly sensitive personal information such as medical diagnosis information or financial data from banks or credit cards to Bass or Cabela's. Session replay Website Users Cornell and Montecalvo and Facebook Website User

10

Irvin's allegations do not establish standing because they do not identify the personal information they inputted in the process of making purchases on the Websites. Session replay Website Users' fingerprinting allegations do not allow us to plausibly infer they suffered concrete harm. Session replay Website Users' remaining allegations of mental anguish and diminution of value are insufficient to confer standing.

We must first clarify the law to be applied to our standing analysis. The parties dispute what the Website Users are required to plead to establish standing to sue under a statute protecting against intangible harms. Website Users contend they have standing as long as they allege violations of statutes protecting against the same general types of harms traditionally recognized as the basis for lawsuits at common law.[76] Bass and Cabela's counter we must determine whether Website Users allege facts showing a harm closely related to the harm traditionally forming the basis of lawsuits at common law.[77] We find we must compare the nature of the harm alleged to analogous harms which were protected against at common law and determine whether there is a close enough relationship between the two to find concrete harm.

The Supreme Court's 2016 guidance in *Spokeo, Inc. v. Robins* instructs Website Users must allege Article III standing by pleading (1) they suffered an injury in fact, (2) fairly traceable to Cabela's and Bass's challenged conduct, and (3) likely to be redressed by a favorable judicial decision.[78] To establish injury in fact, Website Users must show they suffered "an invasion of a legally protected interest" which is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical."[79] "Standing allegations need not be crafted with precise detail, nor must the plaintiff prove his allegations of injury."[80]

Concrete does not mean tangible.[81] While tangible injuries are often easier to recognize, "[v]arious intangible harms can also be concrete," including "reputational harms, disclosure of

11

private information, and intrusion upon seclusion."[82]  Intangible harms are concrete if they have "a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts."[83]

An alleged violation of a statute is not enough to confer standing.[84]  In *TransUnion v. Ramirez*, the Supreme Court emphasized the "important difference" between "(i) a plaintiff's statutory cause of action to sue a defendant over the defendant's violation of federal law, and (ii) a plaintiff's suffering concrete harm because of the defendant's violation of federal law."[85]  An injury in law is different than an injury in fact.  Congress may "create causes of action for plaintiffs to sue those who violate them," but "only plaintiffs who have shown that they suffered concrete harm by a defendant's statutory violation have standing to sue."[86]  A risk of future harm, without more, does not establish standing in a suit for damages.[87]

"In the class action context, our standing inquiry focuses solely on the class representative(s)."[88]  "That a suit may be a class action ... adds nothing to the question of standing, for even named plaintiffs who represent a class 'must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong.'"[89]

The parties interpret the Supreme Court's 2021 teaching in *TransUnion* differently. Website Users focus on the section of the *TransUnion* opinion in which the Court explains Congress may "elevate to the status of legally cognizable injuries concrete, de facto injuries that were previously inadequate in law."[90] Website Users read the Court as saying all we must do to find concrete harm is determine whether the harm the statute protects against is *of the same general type* traditionally recognized as a basis for a lawsuit; if it is, then Congress may elevate the harm to a legally cognizable injury under the statute and we may find standing even if the *quantity or*

*extent* of the harm differs.[91] Website Users analogize their harms to the common law privacy-related torts of intrusion upon seclusion and public disclosure of private information.[92] Website Users argue because the wiretapping statutes protect against the same general type of harm as an invasion of privacy claim, all claims arising under the wiretapping statutes are based on concrete harm. Under Website Users' theory, the mere fact Cabela's and Bass recorded *any* information during their visits to the websites is enough to confer standing to sue.[93] Bass and Cabela's counter Website Users' allegations are not enough to establish injury post-*TransUnion* because allowing the standing inquiry to begin and end with the statutory violation "runs directly counter to the Supreme Court's clarification that a legislature's creation of a statutory prohibition or obligation and a cause of action does not relieve courts of their responsibility to independently decide whether a plaintiff has suffered a concrete harm under Article III."[94]

Website Users' interpretation runs counter to our Supreme Court's explicit guidance in *TransUnion*. In *TransUnion*, consumers alleged TransUnion put alerts on credit reports identifying individuals as potential terrorists based on a comparison of their first and last names to names on a list maintained by the United States Treasury.[95] Consumers alleged TransUnion violated the Fair Credit Reporting Act by failing to use reasonable procedures to ensure the accuracy of their credit files.[96] The Court assumed TransUnion violated its obligations under the Fair Credit Reporting Act to use reasonable procedures.[97] The Court nonetheless analyzed whether, based on the facts alleged, all class members suffered harm. The Court found only the 1,853 consumers whose reports containing misleading alerts were disseminated to third parties suffered concrete harm.[98] The Court reasoned, "[t]he mere existence of inaccurate information, absent dissemination, traditionally has not provided the basis for a lawsuit in American courts."[99] The Court found consumers who did not have their reports disseminated did not suffer concrete

harm.

The Court in *TransUnion* did not first look to see whether the harm the Act protects against is of the same *general type* as the harm protected at common law and then find all consumers had standing because they all alleged claims under the Act. The Court instead divided consumers into two groups for analytical purposes: (1) consumers whose information was disseminated to third parties, and (2) consumers whose information was not disseminated to third parties. The Court then independently analyzed the details of each group's factual allegations to assess whether the group's alleged harm had a "close relationship" to the harm traditionally recognized as providing a basis for a lawsuit. The mere fact TransUnion did not comply with reasonable procedures under the Act did not confer standing.

We face a similar analysis because the mere fact Website Users allege Cabela's and Bass intercepted electronic communications does not confer standing. We proceed as the Supreme Court instructs in *TransUnion* - first by grouping the Website Users based on the details of their alleged harms, and then by independently analyzing the details of their allegations to see whether they have a "close relationship" to a traditional harm.

We are guided by several thoughtful evaluations of similar claims over the past several months including from our colleague Judge Ranjan a little over three months ago in *Cook v. GameStop*.[100] Ms. Cook sued GameStop alleging GameStop's use of session replay on its website violated the same Pennsylvania wiretapping statute we are reviewing in part and the common law tort of intrusion upon seclusion.[101] Ms. Cook argued she had standing and Judge Ranjan need not analyze the sensitivity of the disclosed information because "there has been historical protection against 'the idea of somebody eavesdropping on you, somebody intruding on your privacy, regardless of what the intrusion yields them.'"[102] Ms. Cook contended the mere fact GameStop

14

recorded *any* information during her visit to its website is enough to give her standing to sue.[103] Judge Ranjan rejected this argument as "circular" because it "folds back onto a bare statutory violation."[104] Judge Ranjan, like we do, concluded under *TransUnion* he must examine the nature of the information intercepted to determine if it amounts to an invasion of historically protected privacy interests.[105]

Judge Andrews engaged in a similar analysis over eighteen months ago in *Massie v. General Motors LLC*, where Ms. Massie and Mr. Manglani challenged General Motors' use of session replay code on its website.[106] Like Ms. Cook, Ms. Massie and Mr. Manglani analogized their injuries to an invasion of privacy.[107] Judge Andrews granted General Motors' motion to dismiss finding Ms. Massie and Mr. Manglani lacked standing because they could not plead a "close relationship" between an invasion of privacy claim and "eavesdropping" on communications which do not involve personal information.[108]

Like Ms. Cook and Ms. Massie, Website Users look past our Supreme Court's critical directive a plead statutory violation does not relieve us of our duty to decide whether a Website User is harmed under Article III.[109] Even if the *type* of harm a statute is designed to protect resembles a *type* of harm traditionally protected, we cannot find harm where there is none. Website Users analogize their harms to intrusion upon seclusion and public disclosure of private facts – torts which require the interception or disclosure of private and personal information.[110] The protections which existed traditionally at common law existed only as to *private* information.[111]

Website Users' argument we must ignore the sensitivity of the intercepted content when considering standing does not withstand scrutiny. When asked during oral argument whether someone who has cabelas.com as their homepage suffers harm by merely loading their web browser and leaving it open, session replay Website Users' counsel responded, "I would say yes,

depending—because of the definition of electronic communication…it includes any nature of communication electronically."[112] Session replay Website Users' counsel continued, "[I]t depends on what the software would capture."[113] Session replay Website Users' counsel openly admitted the answer to the standing question "goes to content."[114] Website Users argue we must not consider the contents of the intercepted information but we also must consider the contents of the intercepted information. Website Users only want us to interpret harm *as Congress defines it under the statute*. But doing so leaves us with nothing but a bare statutory violation – which is not enough to confer standing under *TransUnion*.

Session replay Website Users contend Judge Ranjan in *Cook* and Judge Andrews in *Massie* erred in their standing analyses by requiring website visitors allege a privacy interest *identical* to the privacy right recognized at common law.[115] Session replay Website Users argue this interpretation is not in line with the Supreme Court's teachings since 2016 in *Spokeo* and its progeny, which only requires the interest protected by a statute bear a *close* relationship to a right traditionally recognized at common law.[116]

We disagree with the session replay Website Users' suggestion *Massie* and *Cook* are wrongly decided. Neither Judge Andrews nor Judge Ranjan required website visitors' privacy interests be identical to the right of privacy recognized at common law to establish standing. Both judges compared the harm alleged to analogous harms at common law and found there was not a close enough relationship between the two to find concrete harm.[117] This thoughtful parsing is precisely what the Supreme Court in *TransUnion* asks us to do.

We recognize many website visitors across the country are challenging the use of session replay code.[118] Most judges to consider the standing issue required website visitors "plead that the defendants' interception of their information amounts to 'an invasion of privacy interests that have

16

been historically protected' to satisfy the injury-in-fact element of Article III standing."[119] "These courts held where there are no allegations that the plaintiff shared personal or sensitive information on the website in question, the plaintiff has not adequately alleged a concrete harm to support Article III standing."[120]

Guided by our Supreme Court in *TransUnion* and our colleagues' reasoning in session replay decisions across the country, we now consider the sensitivity of the information Bass and Cabela's allegedly intercepted to determine "whether the interception of that kind of information amounts to an invasion of privacy interests that have been historically protected."[121]

While we recognize "standing is not dispensed in gross," we find Facebook Website User Irvin and session replay Website Users' alleged harm under the wiretapping statutes is the same as their alleged harm underlying their common law invasion of privacy claims.[122] We need not assess standing separately with respect to these claims. We assess Facebook Website User Irvin's standing under the Pennsylvania Uniform Firearms Act separately because this claim is based on slightly different disclosure conduct by Bass and Cabela's. We analyze standing on a website user-by-website user basis.

### 1. Session replay Website User Durham lacks standing.

Session replay Website User Durham alleges he accessed www.cabelas.com while in California.[123] He does not allege the types of interactions he had with Cabela's website or the specific information he disclosed on Cabela's website. He does not allege he browsed the website or even shared *any* information about himself. Mr. Durham does not even attempt to allege harm, much less harm which closely relates to the harm upon which intrusion upon seclusion or other privacy torts are based. We dismiss session replay Website User Durham's claims for lack of standing.

    **2.**    **Session replay Website Users Calvert, Hernandez, Moore, Tucker, and Vonbergen lack standing.**

Bass and Cabela's argue session replay Website Users who allege they did not purchase items on their websites lack Article III standing because they do not—and cannot—allege Bass and Cabela's captured anything other than their browsing activity and browsing activity is not sufficiently private to establish concrete harm.[124] Session replay Website Users counter their harm stems from the conduct of the wiretapping itself, regardless of the sensitivity of the content captured. We find session replay Website Users Durham, Calvert, Hernandez, Moore, Tucker, and Vonbergen cannot establish standing because they did not purchase items on the websites or engage in activity prompting their browsers to send sensitive personal information such as banking or credit card information to Bass or Cabela's.

Session replay Website Users allege Mr. Calvert, Ms. Hernandez, Mr. Moore, Mr. Tucker, and Ms. Vonbergen communicated with Cabela's and Bass's servers, which captured "mouse clicks and movements, keystrokes, search terms, substantive information inputted by [Website Users], pages and content viewed by [Website Users], scroll movement, and copy and paste actions."[125]

Session replay Website Users argue these allegations are sufficient to establish concrete harm because our Court of Appeals found unlawful tracking of internet activity satisfies Article III's "concrete harm" requirement in two decisions *In re Google* and *In re Nickelodeon*.[126] Both of these decisions predated the Supreme Court's 2021 teachings in *TransUnion*. Internet users sued internet advertising companies in *In re Google* under federal and state wiretapping and privacy laws alleging the advertising companies bypassed users' cookie blockers and placed tracking cookies on their personal computers.[127] The advertising companies used the tracking cookies to compile internet histories and create detailed profiles for each internet user.[128] The internet users

18

alleged Google bypassed the cookie blockers through deception and in contravention of its privacy policy which assured users its cookie blocker prevented the installation of tracking cookies.[129] Our Court of Appeals recognized internet users' standing, reasoning they "base their claims on highly specific allegations that the defendants, in the course of serving advertisements to their *personal* web browsers, implanted tracking cookies on their *personal* computers."[130]

In *In re Nickelodeon*, children sued Viacom and Google alleging they used cookies to unlawfully collect their personal information including their gender, birthdate, IP address, operating system, and browser version.[131] The children alleged Viacom and Google did this despite explicitly promising not to collect any personal information about children who browsed its websites.[132] The children also alleged the companies used "browser fingerprinting" to identify website visitors and link online and offline activity to identify specific users.[133] Our Court of Appeals five years before *TransUnion* reasoned the children's harm is concrete because it involves "a clear *de facto* injury, *i.e.*, the unlawful disclosure of legally protected information."

Cabela's and Bass counter the allegations in *Google* and *Nickelodeon* are distinguishable based on the type of information at issue in those cases.[134] Cabela's and Bass rely primarily on two session replay decisions in which our colleagues distinguished the allegations in *Google* and *Nickelodeon*.[135] In *Cook v. GameStop*, Judge Ranjan rejected Ms. Cook's argument she has standing under *Google* and *Nickelodeon*.[136] Judge Ranjan reasoned these decisions "might be abrogated by *TransUnion*" but are also distinguishable because they involved the capture of personal information – "registered account information in *Nickelodeon*, and tracking cookies embedded within the plaintiffs' personal computers and browsers in *Google*."[137] Judge Ranjan found Ms. Cook did not have standing to sue under the wiretapping statute because Ms. Cook did not enter any personally identifying information (e.g., name, address, credit card information)

which could connect her browsing activity to her.[138] Judge Ranjan found Ms. Cook still could not

establish harm even if GameStop could tie her browsing activity to her because observing her

product preferences "is no different from what GameStop employees would have been able to

observe if Ms. Cook had gone into a brick-and-mortar store and began browsing the inventory."[139]

Cabela's and Bass also rely on Judge Andrews's analysis in *Massie* where Ms. Massie and

Mr. Manglani browsed the vehicle sections of the website but did not purchase anything and did

not input any of their personal information such as their zip codes, phone numbers, or email

addresses.[140] Ms. Massie and Mr. Manglani relied on several cases, including *Google* and

*Nickelodeon*, where judges identified invasion of privacy as an injury sufficient to confer

standing.[141] Judge Andrews distinguished these authorities as they involved "the collection and

disclosure of personal information," whereas Ms. Massie and Mr. Manglani did not allege the

information collected was "personal or private within the common law understanding of a privacy

right."[142] Judge Andrews granted the motion to dismiss for lack of standing.[143]

We find Website Users who did not disclose highly sensitive personal information such as

medical diagnosis information or financial data from banks or credit cards cannot establish

concrete harm. Both intrusion upon seclusion and public disclosure of private facts involve the

interception or disclosure of private personal information in a highly offensive manner.[144]

Although Website Users provide slightly more detail as to the actions taken by Mr. Calvert, Ms.

Hernandez, Mr. Moore, Mr. Tucker, and Ms. Vonbergen, they do not allege these individuals

disclosed highly sensitive personal information such as medical diagnosis information or financial

data from banks or credit cards. Website Users merely allege session replay code captured "mouse

clicks, keystrokes, pages and content viewed." This is no different than what Bass and Cabela's

employees would have been able to observe if Website Users had gone into a brick-and-mortar

store and began browsing the inventory. Website Users do not have a personal privacy interest in their shopping activity.

We agree our Court of Appeals' pre-*TransUnion* analyses in *Nickelodeon* and *Google* are distinguishable.[145] Unlike the website visitors in those cases, Website Users Calvert, Hernandez, Moore, Tucker, and Vonbergen do not allege Bass or Cabela's intercepted private communications or personal information. Although Website Users allege session replay code captured "substantive information inputted," they do not plead the substantive information after two attempts. Website Users' vague allegations session replay providers collect their "highly personal information and substantive communications" do nothing to clarify the concreteness of harm.[146]

Website Users' allegations regarding the types of information session replay *can* capture are likewise insufficient. For example, session replay Website Users allege "if a website displays user account information to a logged-in user, that content *may be* captured by Session Replay Code" and "researchers have found that a variety of highly sensitive information *can be* captured in event responses from website visitors."[147] We need to know what session replay code actually captured, not what session replay code is capable of capturing.[148]

We are also guided by Judge White's reasoning in *Adams v. PSP Group*.[149] Ms. Adams sued Pet Supplies Plus alleging it used session replay code on its website to unlawfully intercept communications.[150] Ms. Adams did not make a purchase on the website.[151] She did not specify what information she shared on the website.[152] Pet Supplies moved to dismiss for lack of Article III standing.[153] Ms. Adams' analogized her harm to intrusion upon seclusion, which involves obtaining private, personal information about a person.[154] Judge White reasoned the question is "whether Plaintiff adequately alleges *facts* showing a harm that is closely related to the harm that forms the basis of the tort of intrusion upon seclusion."[155]

21

Judge White granted Pet Supplies' motion to dismiss for lack of standing because Ms. Adams did not allege she input sensitive, personal, or confidential information while on the website, she did not allege she made a purchase on the website, and she did not allege she shared any financial information such as credit card details.[156] Judge White reasoned, "A large portion of the Complaint is devoted to explaining Session Replay Code and its capabilities...But importantly, the Complaint does not allege or describe what information Plaintiff provided to Defendant while she was visiting its website."[157]

We join Judge White and our colleagues in finding website visitors do not have standing to sue under the wiretap statutes where they fail to identify the specific personal information captured by session replay code.[158] While we recognize "standing is not dispensed in gross," we find Facebook Website User Irvin and session replay Website Users' alleged harm under the wiretapping statutes is the same as their alleged harm underlying their common law invasion of privacy claims.[159] We need not assess standing separately with respect to these claims.

We are aware of Judge Chen's decision four weeks ago in *James v. Walt Disney* recognizing website visitors' standing based on browsing. Website users in *James* alleged the website's owner violated their privacy rights by embedding a third-party software on its website which captured and collected data as individuals browsed the website.[160] The website users alleged the intercepted information was not anonymized and included "specific web pages viewed, search terms entered, and purchase behavior."[161] Judge Chen found standing when they refer "to webpages viewed, searches conducted, purchase behavior, and so forth. That is enough to support standing."[162]

We disagree with Judge Chen's reasoning to the extent it suggests viewing activity, search activity, and purchase behavior is enough to establish concrete harm. Judge Chen relied on

precedent set by the Court of Appeals for the Ninth Circuit before it had the benefit of the Supreme Court's guidance in *TransUnion*.[163] We are guided instead by the law of standing following *TransUnion*.

Session replay Website Users Calvert, Hernandez, Moore, Tucker, and Vonbergen lack standing.

> **3.    We grant session replay Website Users Cornell, Montecalvo, and Facebook Website User Irvin leave to amend to allege disclosure of credit card or financial information during their purchases.**

Ms. Cornell, Mr. Montecalvo, and Mr. Irvin allege they purchased items on the Websites. But they do not plead what information they shared in the purchase.

Bass and Cabela's argue session replay Website Users Cornell and Mr. Montecalvo "fare no better" than the other session replay Website Users who did not make purchases because they only allege they entered basic personal information, which is not sufficiently private to confer standing.[164]  Bass and Cabela's argue Facebook Website User Irvin cannot show he suffered concrete harm because he also did not disclose medical diagnosis information or financial data from banks or credit cards to Bass or Cabela's.[165]  We find session replay Website Users Cornell and Montecalvo and Facebook Website User Irvin may be able to establish standing under the pleaded wiretap and privacy claims if they can truthfully allege Bass and Cabela's captured their highly sensitive personal information such as medical diagnosis information or financial data from banks or credit cards.

Session replay Website Users Cornell and Montecalvo allege they provided information to Bass and Cabela's by using their keyboards to enter their names, addresses, payment, and billing information when they made website purchases.[166] Ms. Cornell and Mr. Montecalvo also allege their website communications, which included "keystrokes (such as text being entered into an

information field or text box, both intentional and unintentional)", were "captured automatically and instantaneously by session replay code and sent to various Session Replay Providers."[167] Facebook Website User Irvin alleges Bass and Cabela's assisted Facebook in intercepting communications which contained "[his] name, address, Facebook ID, [and] gun he purchased, among other items."[168]

Unlike the other website users in the multi-district consolidated complaint, session replay Website Users Cornell and Montecalvo and Facebook Website User Irvin plausibly allege they entered personal information. Unlike website users in many of the other session replay cases around the country, session replay Website Users Cornell and Montecalvo and Facebook Website User Irvin allege session replay code captured more than simply their "shopping preferences," or information which could be revealed during a visit to Bass or Cabela's brick-and-mortar stores. Session replay Website Users Cornell and Montecalvo and Facebook Website User Irvin plead more than merely allege session replay *can* capture their personal information—they plausibly allege session replay code *did in fact* capture their personal information.

We find their allegations still fall short. We are not persuaded concrete injury exists merely because Bass and Cabela's disclosed Website Users' names and addresses. We are aware of two decisions in which judges held the disclosure of basic contact information such as names, addresses, and phone numbers inadequate to establish standing.[169] But we also note many of our colleagues deciding session replay standing issues have found significant the fact website visitors did not allege disclosure of information including names and addresses.[170] Case law is unclear on this point.

But Congress repeatedly advises us credit card data often warrants special protection under federal law.[171] Facebook Website User Irvin alleges he made a purchase, but he does not allege he

entered credit card details or other financial information. Although session replay Website Users Cornell and Montecalvo allege they disclosed "payment and billing information," they do not specifically allege Cabela's and Bass intercepted their credit card details.[172]   Session replay Website Users Cornell and Montecalvo also do not allege whether the intercepted information is anonymized or encrypted.  We are guided by our colleagues who found this allegation crucial to deciding whether a website visitor suffered concrete harm from session replay code.[173]

We grant session replay Website Users Cornell and Montecalvo and Facebook Website User Irvin leave to amend their statutory wiretap and common law privacy claims if they can truthfully allege Bass and Cabela's captured non-anonymized and unencrypted highly sensitive personal information such as medical diagnosis information or financial data from banks or credit cards.[174]

### 4.   Session replay Website Users' fingerprinting allegations do not allow us to plausibly infer they suffered concrete harm.

Session replay Website Users allege session replay providers aggregated and stored their data under unique identifiers, or "fingerprints," which they can use to identify website users across other websites based on information entered on other websites.[175]  Session replay Website Users contend these fingerprinting allegations are sufficient to confer standing under *In re Google*.[176] Bass and Cabela's argue browsing activity is not sufficiently personal or private to confer Article III standing.[177]  We find  session replay Website Users' fingerprinting allegations do not establish concrete harm.

We agree with session replay Website Users the fingerprinting allegations bear certain similarities to the allegations in *Google* and *Nickelodeon,* but we find those cases distinguishable. We are persuaded by Judge Conner's reasoning in *Farst v. Autozone*.[178] Matthew Farst sued AutoZone challenging its use of session replay code on its website under the Pennsylvania

25

wiretapping statute. Mr. Farst relied on *In re Nickelodeon* and *In re Google* in support of his standing argument.[179] Judge Conner reasoned Mr. Farst's reliance is "misplaced" because the manner of data collection and the type of data collected in those cases is different.[180] Judge Conner explained, "[t]hose cases involve defendants who deceived plaintiffs by secretly collecting their private data after promising they would not."[181] The type of data collected is different because unlike Mr. Farst, the website visitors in *Google* alleged Viacom and Google compiled internet-wide search histories and created detailed user profiles to serve targeted ads and the website visitors in *Nickelodeon* alleged internet advertising companies disclosed legally protected information.[182]

Unlike the website visitors in *Nickelodeon* and *Google*, session replay Website Users before us do not allege Bass or Cabela's deceived them or disclosed legally protected information. Session replay Website Users admit the Privacy Notices disclose they collect "browsing or search history, website interactions, and advertisement interactions" and then disclose the information "to service providers and others, such as advertising and analytics partners; affiliated companies; law enforcement."[183]

We find session replay Website Users' fingerprinting allegations do not establish concrete harm.

5.    **Session replay Website Users' remaining allegations of mental anguish and diminution of value are insufficient to confer standing.**

Session replay Website Users claim Article III standing by alleging Bass and Cabela's caused them "mental anguish and suffering arising from their loss of privacy and confidentiality of their electronic communications."[184] Bass and Cabela's argue we should dismiss these "threadbare assertions" as conclusory.[185] Session replay Website Users counter they need not prove mental anguish or suffering to establish standing.[186] Session replay Website Users also

argue "diminution of the value of private information is actionable."[187] We find session replay Website Users' vague allegations of mental anguish and diminution of value are not sufficient to establish concrete harm. Session replay Website Users cannot establish standing based on vague allegations of mental distress.[188] And "without particularized allegations the [plaintiffs'] Personal Information [was] actually accessed or misused, these plaintiffs cannot plausibly allege that their information suffered any decrease in value."[189]

We need not analyze session replay Website Users' harm separately under the wiretapping statutes and the privacy tort claims because the harm upon which all these claims are based is the same: Bass and Cabela's unlawful interception of their private information. We will analyze Facebook Website User Irvin's standing under the Uniform Firearms Act separately because his alleged harm is based on slightly different conduct – the disclosure of protected firearm purchase information.

### B. Facebook Website User Irvin lacks standing to sue under the nondisclosure mandates in the Pennsylvania Uniform Firearms Act.

Bass and Cabela's argue Facebook Website User Irvin cannot show he suffered concrete harm for his Pennsylvania Uniform Firearms Act claim because he does not allege he was affected by disclosure of his data to Facebook and he consented to Facebook's terms and Cabela's privacy policies.[190] Bass and Cabela's argue Facebook Website User Irvin lacks standing because he alleges Bass and Cabela's only disclosed his information to one entity—Facebook—and the tort of public disclosure of private facts requires publicity.[191] Facebook Website User Irvin counters he suffered concrete harm because Bass and Cabela's disclosed protected information about his firearms purchases.[192] We find Facebook Website User Irvin does not allege facts allowing us to plausibly infer he suffered concrete harm under Article III.

The Pennsylvania General Assembly, through the Pennsylvania Uniform Firearms Act,

provides in pertinent part:

> "All information provided by the potential purchaser, transferee or applicant, including, but not limited to, the potential purchaser, transferee or applicant's **name or identity, furnished by a potential purchaser** or transferee under this section or any applicant for a license to carry a firearm …**shall be confidential and not subject to public disclosure**."[193]

Facebook Website User Irvin alleges Bass and Cabela's violated the Uniform Firearms Act by disclosing his "[his] name, address, Facebook ID, [and] gun he purchased" to Facebook without his "knowledge, consent or express written authorization."[194] He analogizes his harm to the torts of public disclosure of private information and intrusion upon seclusion. We must determine whether his alleged harm has a "close relationship" to harms traditionally recognized as the basis for lawsuits at common law.

Bass and Cabela's rely primarily on *Barclift v. Keystone Credit Services* in support of their position Facebook Website User Irvin lacks standing.[195] Keystone hired a mailing vendor to print and send Ms. Barclift a letter notifying her Keystone intended to collect a debt.[196] Ms. Barclift sued Keystone under the Fair Debt Collections Practices Act for sharing her personal information with the mailing vendor.[197] Judge Leeson reasoned her alleged harm most closely resembles the common law claim of public disclosure of private facts.[198] One of the elements of the tort is publicity of private facts. Judge Leeson reasoned because Ms. Barclift did not allege Keystone shared her information with a larger group of people, her alleged injury does not bear a close relationship to the tort.[199]

Facebook Website User Irvin counters his claim is analogous to the tort of intrusion upon seclusion which does not require publicity.[200] Facebook Website User Irvin relies on case law arising under the federal Video Privacy Protection Act and Michigan's Preservation of Personal Privacy Act in support of his position.[201] Facebook Website User Irvin argues, "[a]s with the

[Video Privacy Protection Act] and the [Preservation of Personal Privacy Act], the [Uniform Firearms Act] deems a type of information 'confidential' and prohibits its 'disclosure.'"[202] Facebook Website User Irvin claims because Bass and Cabela's disclosed his information in violation of the Uniform Firearms Act, he suffered an intangible harm akin to intrusion upon seclusion.[203]

We recognize Facebook Website User Irvin's argument bears some resemblance to standing arguments arising under cases addressing the Video Privacy Protection Act and Michigan's Protection of Personal Privacy Act. But the Supreme Court in *TransUnion* teaches we must analyze the alleged harm—not the statute—to determine whether Facebook Website User Irvin has standing.[204] We proceed as the Court instructs us in *TransUnion*: first by analyzing the details of the alleged harm, and then by determining whether the allegations have a "close relationship" to a traditional harm.

We agree Facebook Website User Irvin cannot establish harm using the analog of public disclosure of private facts because this tort requires publicity. "To recover damages for disclosure of private information a plaintiff must allege the matter publicized is (1) publicity, given to (2) private facts, (3) which would be highly offensive to a reasonable person, and (4) is not of legitimate concern to the public."[205] Facebook Website User Irvin alleges only one party— Facebook—received his information. He does not allege widespread disclosure or disclosure "to so many persons that the matter must be regarded as substantially certain to become one of public knowledge."[206] Public disclosure of private facts is not a proper analog.

Facebook Website User Irvin analogizes his harm to intrusion upon seclusion. We again note the disclosure of basic personal information does not necessarily confer standing. Facebook Website User Irvin also alleges Bass and Cabela's disclosed his Facebook ID and his gun purchase.

29

The retailers' disclosure of Facebook Website User Irvin's Facebook ID *to Facebook* is hardly intrusive. We find disclosing a gun purchase is not the type of highly offensive or objectionable conduct to which liability can attach. After Facebook Website User Irvin made his online gun purchase, he needed to pick up the firearm at a store.[207] Other shoppers and employees of Cabela's would identify Facebook Website User Irvin and observe his gun purchase. "The difference in fora between online and in-person shopping outlets does not transform the generally public nature of shopping into a 'private affair.'"[208] We find the information Bass and Cabela's allegedly disclosed to Facebook—name, address, Facebook ID, and gun purchase—is not sufficiently private to confer standing.[209]

We dismiss Facebook Website User Irvin's claim under the Pennsylvania Uniform Firearms Act with leave to amend if he can allege Facebook Tracking Pixel captured non-anonymized and unencrypted highly sensitive personal information such as medical diagnosis information or financial data from banks or credit cards.

### C. Website Users do not have standing to assert claims for injunctive relief.

Website Users ask us to enjoin Cabela's and Bass from "continuing the unlawful practices described herein" and prevent the future interceptions of communications.[210] Cabela's and Bass contend Website Users lack standing to pursue a claim for injunctive relief because injunctions protect against future harm and Website Users cannot contend they will suffer the future harm of visiting the websites with session replay running without their knowledge.[211] Website Users counter they have standing because Bass and Cabela's continue to employ session replay code and they suffer continuing adverse effects.[212] We find Website Users do not have standing to seek injunctive relief because they do not plausibly allege they are likely to suffer future injury from Bass or Cabela's conduct.

Standing "is not dispensed in gross;" it must be shown "for each claim . . . and for each form of relief [sought] (for example, injunctive relief and damages)."[213] In order to have standing to seek injunctive relief, Website Users must establish they are "likely to suffer future injury" from Bass and Cabela's conduct.[214]   "[A] plaintiff must demonstrate "continuing, present adverse effects" and may not rely solely on "[p]ast exposure to illegal conduct."[215]   Instead, they must show a real and immediate threat of repeated future injury in order to satisfy the "injury in fact" requirement of Article III.[216]

Bass and Cabela's rely in part on a decision of our Court of Appeals in *McNair v. Synapse Group*.[217]   Former customers of a magazine sued a magazine marketing company for consumer fraud alleging the marketing company sold subscriptions in an unlawfully deceptive way.[218] Our Court of Appeals held the magazine customers did not have standing to seek injunctive relief reasoning any future injury is "wholly conjectural" because the former customers were already aware of Synapse's advertising practices.[219]   The Court of Appeals explained, "[T]he law accords people the dignity of assuming that they act rationally, in light of the information they possess."[220]

Bass and Cabela's also rely on our Court of Appeals' decision in *In re Johnson & Johnson Talcum Powder Litigation*.[221]   In *In re Johnson & Johnson*, Ms. Estrada alleged a Johnson & Johnson product increased the risk of developing ovarian cancer. Ms. Estrada asserted she suffered an economic injury by purchasing improperly marketed Baby Powder.[222] She sought to enjoin the manufacturer of the baby powder product from continuing to sell baby powder without warning customers of the alleged health risks.[223]   Our Court of Appeals held Ms. Estrada did not have standing to seek injunctive relief, reasoning, "Because Estrada makes clear in this very lawsuit that she is well aware of health risks associated with using Baby Powder, we readily conclude that she is not likely to suffer future economic injury."[224]   The Court of Appeals explained the fact Ms.

31

Estrada is aware of the health risks is fatal to her suit for failure to warn of certain health risks because Ms. Estrada cannot "possibly be deceived again into buying Baby Powder without being aware of those same risks."[225]

Website Users counter the *interception*, rather than the lack of awareness Bass and Cabela's are tracking them, is the injury.[226]  Website Users rely on *Brown v. Google* in support of their argument they have standing to seek injunctive relief.[227]  Website visitors sued Google for its "surreptitious interception and collection of personal and sensitive user data while users are in 'private browsing mode.'"[228]  Website visitors sought to enjoin Google from intercepting, tracking, or collecting class members' communications after class members used a browser while in "private browsing mode."[229]  Google sought summary judgment on the basis the website visitors could not show the risk of harm is sufficiently imminent and substantial to confer standing.  Judge Gonzalez Rogers disagreed and denied summary judgment, reasoning, "Google's conduct has not stopped.  Plaintiffs have demonstrated that absent an injunction, Google will continue to collect users' private browsing data for its own use without users' express consent."[230]

We note Website Users' authority is from the Court of Appeals for the Ninth Circuit reviewing a summary judgment analysis of much different facts on a developed record in which website visitors demonstrated Google would continue to collect private browsing data without user consent absent an injunction.[231]  As Judge Gonzalez Rogers notes in her opinion, "[T]he standing analysis is contextual."[232]  This case arises in a different context.  As a federal district court sitting in Pennsylvania reviewing a motion to dismiss, we are bound to follow the precedent set forth by the Third Circuit.

We find our Website Users are not likely to suffer future injury from Bass or Cabela's conduct.  Website Users allege Bass and Cabela's used a third party to track their movements on

the websites without their knowledge. Website Users brought this lawsuit and are presumably now aware of the alleged risks associated with browsing Cabela's and Bass's websites.[233] Website Users' activity on Bass and Cabela's websites is entirely voluntary and we assume Website Users will act rationally in light of the information they possess.[234] They may visit Cabela's or Bass's website again, but they will do so with the knowledge session replay is capturing their movements. "Pleading a lack of self-restraint may elicit sympathy but it will not typically invoke the jurisdiction of a federal court."[235] Website Users will not be deceived again in the future.

We dismiss Website Users' claims for injunctive relief because Website Users do not allege they are "likely to suffer future injury" from Bass and Cabela's conduct.[236]

## III.   Conclusion

Session replay Website Users Durham, Calvert, Hernandez, Moore, Tucker, and Vonbergen cannot establish concrete harm after two attempts because they did not make purchases on the Websites or engage in any activity prompting their browsers to send highly sensitive personal information such as medical diagnosis information or financial data from banks or credit cards to Bass or Cabela's. We dismiss their claims with prejudice because they lack standing. We afforded Ms. Vonbergen, Mr. Moore, Jr., Mr. Calvert, Mr. Tucker, Mr. Durham, and Ms. Hernandez two chances to state a claim. Case law in this area, while evolving, recognized the website users must be able to plead facts of sharing highly sensitive personal information such as a medical diagnosis or financial data from banks or credit cards to enjoy Article III standing. We dismiss their statutory and common law claims with prejudice because all named Website Users asserting claims under those laws lack standing.[237]

Session replay Website Users Cornell and Montecalvo and Facebook Website User Irvin do not establish concrete harm because they do not identify the information Bass and Cabela's

allegedly intercepted during their purchasing activity. We dismiss their claims without prejudice to their timely filing amended Complaints if they can truthfully allege Bass and Cabela's intercepted and shared highly sensitive personal information such as medical diagnosis information or financial data from banks or credit cards under Rule 11 during their interactions (including the alleged purchase) on the website. We dismiss the statutory and common law claims arising under federal law and the laws of Pennsylvania and Massachusetts without prejudice.[238]

---

[1] ECF No. 53 ¶¶ 26, 88.

[2] *Id.* ¶¶ 155, 157.

[3] *Id.* ¶¶ 155-157.

[4] *Id.* ¶¶ 156-157.

[5] *Id.* ¶¶ 5, 7.

[6] *Id.* ¶¶ 31, 64.

[7] *Id.* ¶¶ 1-2, 89.

[8] *Id.* ¶ 1.

[9] *Id.*

[10] *Id.* ¶ 66.

[11] *Id.*

[12] *Id.* ¶ 67.

[13] *Id.* ¶ 142.

[14] *Id.* ¶ 68.

[15] *Id.*

[16] *Id.*

[17] *Id.* ¶ 70.

[18] *Id.* ¶ 3.

[19] *Id.* ¶ 183.

[20] *Id.* ¶ 65.

[21] *Id.* ¶ 69.

[22] *Id.* ¶¶ 65, 74.

[23] *Id.* ¶ 7.

[24] *Id.* ¶ 76.

[25] *Id.* ¶ 92. Session replay code can only be identified by technical users who understand web technologies and can enable alternative display modes showing the underlying HTML containing the code. *Id.* ¶ 93.

[26] *Id.* ¶ 47.

[27] *Id.* ¶ 79.

[28] *Id.*

[29] *Id.* ¶ 80.

[30] *Id.*

[31] *Id.* ¶ 137.

[32] *Id.* ¶¶ 99, 105, 111, 118, 123, 128, 133.

[33] *Id.* ¶ 138.

[34] *Id.* ¶ 139.

[35] *Id.* ¶¶ 101, 107, 113, 120, 125, 130, 135.

[36] ECF No. 53 ¶ 12.

[37] *Id.* ¶ 122.

[38] *Id.* ¶ 109.

[39] *Id.* ¶¶ 109-110.

[40] *Id.* ¶¶ 115-116.

[41] *Id.* ¶ 117.

[42] *Id.*

[43] *Id.*

[44] *Id.* ¶ 127.

[45] *Id.* ¶¶ 97-98.

[46] *Id.* ¶¶ 103-104.

[47] *Id.* ¶ 104.

[48] *Id.*

[49] *Id.* ¶ 132.

[50] *Id.* ¶ 6.

[51] *Id.* ¶ 70.

[52] *Irvin* ECF No. 20 ¶¶ 2, 9.

[53] *Id.* ¶ 14.

[54] *Id.*

[55] *Id.* ¶¶ 12-14.

[56] *Id.* ¶¶ 17-25.

[57] *Id.* ¶ 27.

[58] *Id.*

[59] *Id.*

[60] *Id.* ¶ 28.

[61] *Id.* ¶¶ 29-30.

[62] *Id.* ¶ 31.

[63] *Id.* ¶ 32.

[64] *Id.* ¶ 33.

[65] *Id.* ¶ 40.

[66] *Id.* ¶¶ 42-46.

[67] ECF No. 53 ¶¶ 9, 158. Session replay Website Users bring state subclass actions on behalf of website users in California, Maryland, Massachusetts, Missouri, and Pennsylvania whose communications were intercepted using session replay code embedded on Bass and Cabela's websites.

[68] *Id.* ¶¶ 8, 167-476.

[69] *Id.* ¶ 9, Request for Relief ¶¶ C-H.

[70] *Irvin* ECF No. 20 ¶ 49.

[71] *Id.*

[72] ECF No. 54-1. Bass and Cabela's challenge the sufficiency of the fact allegations in Website Users' complaints. Website Users must state a claim upon which relief can be granted to proceed beyond a motion to dismiss. Fed. R. Civ. P. 12(b)(6). The purpose of Rule 12(b)(6) is to test the sufficiency of the factual allegations in a complaint. *Sanders v. United States*, 790 F. App'x 424, 426 (3d Cir. 2019). If a plaintiff is unable to plead "enough facts to state a claim to relief that is plausible on its face," the court should dismiss the complaint. *Id.* (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Kajla v. U.S. Bank Nat'l Ass'n as Tr. for Credit Suisse First Boston MBS ARMT 2005-8*, 806 F. App'x 101, 104 n.5 (3d Cir. 2020) (quoting *Warren Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77, 84 (3d Cir. 2011)). "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Klotz v. Celentano Stadtmauer and Walentowicz LLP*, 991 F.3d 458, 462 (3d Cir. 2021) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). While "[t]he plausibility standard is not akin to a 'probability requirement,'" it does require the pleading show "more than a sheer possibility ... a defendant has acted unlawfully." *Riboldi v. Warren Cnty. Dep't of Human Servs. Div. of Temp. Assistance & Soc. Servs.*, 781 F. App'x 44, 46 (3d Cir. 2019) (quoting *Iqbal*, 556 U.S. at 678). "A pleading that merely 'tenders naked assertion[s] devoid of further factual enhancement' is insufficient." *Id.* (quoting *Iqbal*, 556 U.S. at 668).

In determining whether to grant a Rule 12(b)(6) motion, "we accept all well-pleaded allegations as true and draw all reasonable inferences in favor of the plaintiff" but "disregard threadbare recitals of the elements of a cause of action, legal conclusions, and conclusory statements." *Robert*

*W. Mauthe, M.D., P.C. v. Spreemo, Inc.*, 806 F. App'x 151, 152 (3d Cir. 2020) (quoting *City of Cambridge Ret. Sys. v. Altisource Asset Mgmt. Corp.*, 908 F.3d 872, 878–79 (3d Cir. 2018)). Our Court of Appeals requires us to apply a three-step analysis to a 12(b)(6) motion: (1) we "'tak[e] note of the elements a plaintiff must plead to state a claim'"; (2) we "identify allegations that … 'are not entitled to the assumption of truth' because those allegations 'are no more than conclusion[s]'"; and, (3) "'[w]hen there are well-pleaded factual allegations,' we 'assume their veracity' … in addition to assuming the veracity of 'all reasonable inferences that can be drawn from' those allegations … and, construing the allegations and reasonable inferences 'in the light most favorable to the [plaintiff]'…, we determine whether they 'plausibly give rise to an entitlement to relief.'" *Oakwood Lab'ys LLC v. Thanoo*, 999 F.3d 892, 904 (3d Cir. 2021) (internal citations omitted); *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016).

Bass and Cabela's also make a jurisdictional challenge under Federal Rule 12(b)(1). A Rule 12(b)(1) challenge can be either a facial or factual attack. *Davis v. Wells Fargo*, 824 F.3d 333, 346 (3d Cir. 2016). A facial challenge is reviewed like a 12(b)(6) motion, requiring us to consider all allegations of the complaint to be true. *Hartig Drug Co., Inc. v. Senju Pharm. Co.*, 836 F.3d 261, 268 (3d Cir. 2016). A factual attack, on the other hand, does not give the plaintiff the presumption of truth and instead allows "a court [to] weigh and consider evidence outside the pleadings." *Id.* (citations and quotations omitted). Bass and Cabela's make a facial attack.

[73] *Irvin* ECF No. 39.

[74] ECF No. 54-1 at 14-16; *Irvin* ECF No. 39 at 12-15.

[75] ECF No. 56 at 16-19; *Irvin* ECF No. 47 at 7.

[76] ECF No. 56 at 18 ("Thus, so long as the underlying *type* of harm is similar, the *quantity or extent* of the harm need not be the same.") (emphasis in original).; ECF No. 73 at 20:20-22:8.

[77] ECF No. 57 at 12 ("Accordingly, to determine whether Plaintiffs have standing to bring their claims, the Court here must determine 'whether Plaintiff[s] adequately allege facts showing a harm that is closely related to the harm that forms the basis of the tort of intrusion upon seclusion.'") (quoting *Adams v. PSP Grp., LLC*, No. 22-1210, 2023 WL 5951784, *6 (E.D. Mo.)).

[78] *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)); *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000)).

[79] *Spokeo*, 578 U.S. at 339 (citing *Lujan*, 504 U.S. at 560).

[80] *Baur v. Veneman*, 352 F.3d 625, 631 (2d Cir. 2003).

[81] *Spokeo*, 578 U.S. at 340.

[82] *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021).

[83] *Id.* at 2204.

[84] *Spokeo*, 578 U.S. at 341 (2016) ("Congress' role in identifying and elevating intangible harms does not mean that a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right. Article III standing requires a concrete injury even in the context of a statutory violation.").

[85] *TransUnion*, 141 S. Ct. at 2205.

[86] *Davis v. Universal Prot. Servs., LLC*, 558 F. Supp. 3d 220, 224 (E.D. Pa. 2021) (citations omitted).

[87] *Id.*

[88] *Mielo v. Steak 'N Shake Operations, Inc.*, 897 F.3d 467, 478 (3d Cir. 2018).

[89] *Spokeo*, 578 U.S. at 338 (citations omitted).

[90] *TransUnion*, 141 S. Ct. at 2205. Website Users also rely on a pre-*TransUnion* United States Court of Appeals for the Seventh Circuit decision for this proposition. *See Gadelhak v. AT&T Services, Inc.*, 950 F.3d 458, 462 (7th Cir. 2020).

[91] ECF No. 56 at 18; ECF No. 73 at 20:20-21:6.

[92] ECF No. 56 at 17.

[93] ECF No. 73 at 23:8-24:6.

[94] ECF No. 57 at 9-10.

[95] *TransUnion*, 141 S. Ct. at 2197.

[96] *Id.*

[97] *Id.* at 2208 ("Assuming that the plaintiffs are correct that TransUnion violated its obligations under the Fair Credit Reporting Act to use reasonable procedures in internally maintaining the credit files, we must determine whether the 8,185 class members suffered concrete harm from TransUnion's failure to employ reasonable procedures.").

[98] *Id.*

[99] *Id.* at 2197.

[100] *Cook v. GameStop, Inc.*, No. 22-1292, 2023 WL 5529772 (W.D. Pa. Aug. 28, 2023).

[101] *Id.* at *1.

[102] *Id.* at *3.

[103] *Id.*

[104] *Id.*

[105] *Id.* at *4.

[106] *Massie v. Gen. Motors LLC*, No. 21-0787, 2022 WL 534468 (D. Del. Feb. 17, 2022).

[107] *Id.* at *3.

[108] *Id.* at *5 ("'Eavesdropping' on communications that do not involve personal information, personally identifiable information, or information over which a party has a reasonable expectation of privacy does not amount to a concrete injury.").

[109] *TransUnion*, 141 S. Ct. at 2205.

[110] Website Users analogize their harms to the common law privacy-related torts of intrusion upon seclusion and public disclosure of private information. ECF No. 56 at 17. "Intrusion upon seclusion involves obtaining or intercepting private, personal communications or information about a person in a matter that is highly offensive or unreasonable." *Adams*, 2023 WL 5951784, at *7. Disclosure of private information involves "(1) publicity, given to (2) private facts, (3) which would·be highly offensive to a reasonable person, and (4) is not of legitimate concern to the public." *Farst v. AutoZone, Inc.*, No. 22-1435, 2023 WL 7179807, at *4 (M.D. Pa. Nov. 1, 2023) (internal citations and quotations omitted).

[111] *U.S. Dep't of Justice v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 763 (1989) ("[B]oth the common law and the literal understandings of privacy encompass the individual's control of information concerning his or her person.").

[112] ECF No. 73 at 27:12-23.

[113] *Id.* at 28:6-14.

[114] *Id.* at 28:15-20.

[115] ECF No. 56 at 21.

[116] *Id.*

[117] *Cook*, 2023 WL 5529772, at *4 ("[T]he Court must examine the nature of the information that GameStop allegedly intercepted and determine whether the interception of that kind of information amounts to an invasion of privacy interests that have been historically protected."); *Massie*, 2022

WL 534468, at *3 ("Here, Plaintiffs do not allege that any of their information collected by the Session Replay software was personal or private within the common law understanding of a privacy right. Therefore, I find Plaintiffs have not suffered a concrete injury because they do not have a privacy interest at stake.").

[118] *See, e.g., Farst v. AutoZone, Inc.*, No. 22-1435 (M.D. Pa.); *In re Zillow Grp., Inc. Session Replay Software Litig.*, No. 22-1282 (W.D. Wash.); *Popa v. PSP Grp., LLC*, No. 23-294 (W.D. Wash.); *Adams v. PSP Grp., LLC*, No. 22-1210 (E.D. Mo.); *Jones v. Bloomingdales.com, LLC*, No. 22-1095, 2023 (E.D. Mo.); *Cook v. GameStop, Inc.*, No. 22-1292 (W.D. Pa.); *Massie v. Gen. Motors LLC*, No. 21-787 (D. Del.); *Lightoller v. Jetblue Airways Corp.*, No. 23-361 (S.D. Cal.); *Mikulsky v. Noom, Inc.*, No. 23-285 (S.D. Cal.); *Straubmuller v. Jetblue Airways Corp.*, No. 23-384 (D. Md.); *James v. Walt Disney Co.*, No. 23-2500 (N.D. Cal.); *Thomas v. Papa Johns Int'l, Inc.*, No. 22-2012 (S.D. Cal.); *Toston v. JetBlue Airways Corp.*, No. 23-1156 (C.D. Cal.).

[119] *In re Zillow Grp., Inc. Session Replay Software Litig.*, No. 22-1282, 2023 WL 5916559, at *1 (W.D. Wash. Sept. 11, 2023).

[120] *Adams,* 2023 WL 5951784, at *7 n. 4.

[121] *Cook,* 2023 WL 5529772, at *4.

[122] *Town of Chester, N.Y. v. Laroe Estates, Inc.*, 581 U.S. 433, 439 (2017).

[123] ECF No. 53 ¶ 12.

[124] ECF No. 54-1 at 15.

[125] ECF No. 53 ¶¶ 99, 111, 123, 128, 133.

[126] ECF No. 56 at 20. *See In re Google Inc. Cookie Placement Cons. Priv. Litig.*, 934 F.3d 316 (3d Cir. 2019); *In re Nickelodeon Cons. Priv. Litig.*, 827 F.3d 262 (3d Cir. 2016).

[127] 806 F.3d 125 (3d Cir. 2015).

[128] *Id.* at 131.

[129] *Id.* at 132.

[130] *Id.* at 134-35. After the decision in *Spokeo,* our Court of Appeals addressed the internet users' standing again in *In re Google Inc. Cookie Placement Cons. Priv. Litig.*, 934 F.3d 316 (3d Cir. 2019) and upheld standing. Our Court of Appeals recognized internet users still have standing post-*Spokeo,* finding, "History and tradition reinforce that a concrete injury for Article III standing purposes occurs when Google, or any other third party, tracks a person's internet browser activity without authorization." *Id.* at 325.

[131] 827 F.3d 262 (3d Cir. 2016).

[132] *Id.* at 267.

[133] *Id.* at 270.

[134] ECF No. 57 at 11-12.

[135] *Id.*

[136] *Cook*, 2023 WL 5529772, at *5.

[137] *Id.*

[138] *Id.*

[139] *Id.*

[140] *Massie*, 2022 WL 534468, at *2.

[141] *Id.* at *3-4.

[142] *Id.*

[143] *Id.* at *5 ("'Eavesdropping' on communications that do not involve personal information, personally identifiable information, or information over which a party has a reasonable expectation of privacy does not amount to a concrete injury.").

[144] "Intrusion upon seclusion involves obtaining or intercepting private, personal communications or information about a person in a matter that is highly offensive or unreasonable." *Adams*, 2023 WL 5951784, at *7. Disclosure of private information involves "(1) publicity, given to (2) private facts, (3) which would be highly offensive to a reasonable person, and (4) is not of legitimate concern to the public." *Farst v. AutoZone, Inc.*, No. 22-1435, 2023 WL 7179807, at *4 (M.D. Pa. Nov. 1, 2023) (internal citations and quotations omitted).

[145] Cabela's and Bass suggest these cases may be abrogated by *TransUnion*, which clarified lone statutory violations are not enough to establish standing. ECF No. 57 at 11-12. We need not decide this today because even if they are not abrogated by *TransUnion*, they are distinguishable.

[146] ECF No. 53 ¶ 91.

[147] *Id.* at ¶¶ 73, 77; *see also,* ¶ 65 ("Unlike other online advertising tools, Session Replay Code allows a website to capture and record nearly every action a website visitor takes while visiting the website, including actions that reveal the visitor's personal or private sensitive data...").

[148] *See Straubmuller*, 2023 WL 5671615, at *4 ("Here, it is dispositive that Plaintiff only alleges that Session Replay Code could capture personal information, not that it actually captured Plaintiff's personal information.").

[149] *Adams*, 2023 WL 5951784.

[150] *Id.* at *2.

[151] *Id.*

[152] *Id.*

[153] *Id.* at *5.

[154] *Id.* at *6.

[155] *Id.* (emphasis added).

[156] *Id.* at *7.

[157] *Id.*

[158] *See Straubmuller*, 2023 WL 5671615, at *4 ("Because the Complaint says nothing about the kinds of interactions Plaintiff had with Defendant's website, much less the specific kinds of captured personal information implicating a substantive privacy interest, Plaintiff has not alleged that his personal information was intercepted and recorded by Defendant."); *Mikulsky*, 2023 WL 4567096, at *5 ("To survive a motion to dismiss, a plaintiff must identify the 'specific personal information she disclosed that implicates a protectable privacy interest.'") (citations omitted).

[159] *Town of Chester, N.Y. v. Laroe Estates, Inc.*, 581 U.S. 433, 439 (2017).

[160] No. 23-2500, 2023 WL 7392285 (N.D. Cal. Nov. 8, 2023). Although website visitors in *James v. Walt Disney* do not characterize the third-party software as "session replay," they allege the third party embeds code into websites without visitors' knowledge and then instructs the user's browser to send certain captured data points to the third party for analysis of consumer behavior. *Id.* at *1, 14-15.

[161] *Id.* at *5.

[162] *Id.* at *7. Judge Chen also recognized "simply referring to keystrokes, mouse clicks, and "other communications" – without additional allegations – would standing alone arguably be insufficient" to demonstrate Article III standing. *Id.*

[163] *Id.* at *5-6. Judge Chen relied on the decision of the Court of Appeals for the Ninth Circuit in *In re Facebook, Inc. Internet Tracking Litig.*, where the court of appeals held website visitors established standing because Facebook's tracking practices allowed it to gather an individual's

43

likes, dislikes, and habits over a significant amount of time "without affording users a meaningful opportunity to control or prevent the unauthorized exploration of their private lives." *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 598-99 (9th Cir. 2020). Judge Chen reasoned *Facebook* involved more personal information than the allegedly intercepted information in the case before him. *Id.* at *6.

[164] ECF No. 54-1 at 15-16.

[165] *Irvin* ECF No. 52 at 3.

[166] ECF No. 53 ¶¶ 104, 117.

[167] *Id.* at ¶¶ 1, 138.

[168] *Irvin* ECF No. 20 ¶ 70.

[169] *See I.C. Zynga, Inc.*, 600 F. Supp. 3d 1034, 1049-50 (N.D. Cal. 2022) (finding disclosure of "basic contact information, including one's email address, phone number, or . . . username" inadequate to establish standing); *Brignola v. Home Properties, L.P.*, No. 10-3884, 2013 WL 1795336, at *12 (E.D. Pa. Apr. 26, 2013) (finding a plaintiff's "name, address, phone number, etc. . . . are not private facts actionable for an [invasion of privacy] claim").

[170] *See Farst v*, 2023 WL 7179807, at *5 ("Farst does not aver AutoZone disclosed his home address, credit card, bank account, social security number, or any other information that could potentially be used to identify him or materially increases his risk of future harm."); *Cook*, 2023 WL 5529772, at *4 ("Ms. Cook did not enter any personally identifying information at any point during her interaction. Not her name. Not her address. Not her credit card information."); *Adams*, 2023 WL 5951784, at *7 (E.D. Mo. Sept. 13, 2023) ("There are no allegations that Plaintiff typed any information about herself, such as her name, address, phone number, or email address into data fields on Defendant's website. Plaintiff also does not allege that she shared any financial information, such as credit card or banking routing numbers."); *Straubmuller*, 2023 WL 5671615, at *4 ("Plaintiff further describes various types of 'highly sensitive' personal information that *could* be captured by Session Replay Code, including....credit card details.").

[171] *See e.g.*, Credit and Debit Card Receipt Clarification Act of 2007 (requiring account numbers printed on receipts have to be shortened to five digits in order to protect consumer privacy); *Greenstein v. Noblr Reciprocal Exch.*, 585 F. Supp. 3d 1220, 1227 (N.D. Cal. 2022) ("[T]he injury-in-fact requirement will be satisfied when highly sensitive personal data, such as social security numbers and credit card numbers, are inappropriately revealed to the public and increase the risk of immediate future harm to the plaintiff."); *Carlsen v. GameStop, Inc.*, 112 F. Supp. 3d 855, 862 (D. Minn. 2015) (finding no standing reasoning, "Plaintiff further fails to allege that Defendants disclosed any highly sensitive financial information such as credit card or social security data, but rather alleges that Defendants disclosed Plaintiff's Facebook ID and browsing patterns. This alone does not suffice to establish injury or imminent injury stemming from disclosure and differs substantially from injuries such as identity theft or costs to change account information."); *State v. Lunsford*, 226 N.J. 129, 131, 141 A.3d 270, 271 (2016) ("[A]ccount holders have a reasonable expectation of privacy in their bank and credit card records."); *Straubmuller*, 2023 WL 5671615,

at *4 ("Plaintiff further describes various types of 'highly sensitive' personal information that could be captured by Session Replay Code, including....credit card details.").

[172] We asked session replay Website Users' counsel whether Website Users are alleging Bass and Cabela's intercepted credit card information during oral argument. Session replay Website Users' counsel hesitated and eventually responded, "We are, your Honor, for the payment information, in order to make a payment." ECF No. 73 at 13:10-14:4. But Website Users do not allege the interception of credit card details. They instead rely on vague allegations session replay codes are *capable of* capturing credit card details. *See, e.g.*, ECF No. 53 at ¶¶ 73, 83, 85.

[173] *See Cook*, 2023 WL 5529772, at *4 ("That Ms. Cook's browsing activity here was anonymous is particularly significant and dooms any attempt to establish a concrete injury in fact."); *Massie*, 2022 WL 534468, at *5 ("Plaintiffs do not have a reasonable expectation of privacy over the anonymized data captured by the Session Replay software at issue here."); *James*, 2023 WL 7392285, at *7 ("To the extent *Lightoller* is read to hold non-anonymized information on, e.g., websites visited or search terms used is not sufficiently personal, the Court disagrees.").

[174] We are aware of several cases finding website visitors allege concrete harm arising from Facebook Tracking Pixel. We do not find these cases persuasive because they can be distinguished since they involve the private video viewing activity of website users *See, e.g., Carter v. Scripps Networks, LLC*, No. 22-2031, 2023 WL 3061858, at *1 (S.D.N.Y. Apr. 24, 2023) (finding concrete harm where Facebook allegedly tracked website visitors' video viewing activity through the Facebook Tracking Pixel); *Alex v. NFL Enterprises LLC*, No. 22-09239, 2023 WL 6294260, at *3 (S.D.N.Y. Sept. 27, 2023) ("Plaintiffs have sufficiently alleged they were injured when Defendants shared their private information and video watching data with Facebook without consent."); *Salazar v. Nat'l Basketball Ass'n*, No. 22-07935, 2023 WL 5016968, at *6 (S.D.N.Y. Aug. 7, 2023) ("Plaintiffs claim that Defendant purposefully shared his private viewing information with a third party without Plaintiff's knowledge or consent is akin to [intrusion upon seclusion]."); *Feldman v. Star Trib. Media Co. LLC*, No. 22-1731, 2023 WL 2388381, at *4 (D. Minn. Mar. 7, 2023) ("So described, this common law tradition bears a close relationship to Mr. Feldman's injury allegations: Mr. Feldman alleges that his video viewing history was his private concern, that the Star Tribune intruded by sharing this history with Facebook, and that this sharing would be offensive to a reasonable person. That seems enough at the motion-to-dismiss stage.").

[175] ECF No. 53 ¶¶ 47, 79-80.

[176] ECF No. 56 at 22 (citing *In re Google*, 806 F.3d 125).

[177] ECF No. 54-1 at 15.

[178] 2023 WL 7179807.

[179] *Id.* at *4.

[180] *Id.*

[181] *Id.*

[182] *Id.*

[183] ECF No. 56 at 41-42.

[184] ECF No. 53 ¶¶ 290-291.

[185] ECF No. 54-1 at 16.

[186] ECF No. 56 at 22.

[187] *Id.* at 23.

[188] *See Reilly v. Ceridian Corp.*, 664 F.3d 38, 44 (3d Cir. 2011) (dismissing for lack of standing despite allegations of "emotional distress"); *Heimbecker v. 555 Assocs.*, No. 01-6140, 2003 WL 21652182, at *14 (E.D. Pa. Mar. 26, 2003), *aff'd*, 90 F. App'x 435 (3d Cir. 2004) ("Plaintiff's allegations of emotional distress and damage to reputation are clearly insufficient to establish standing.").

[189] *In re Am. Med. Collection Agency, Inc. Customer Data Sec. Breach Litig.*, No. 19-2904, 2021 WL 5937742, at *10 (D.N.J. Dec. 16, 2021) (rejecting attempts to "prop up their standing argument" on the theory a data breach diminished the value of their personal information).

[190] *Irvin* ECF No. 39 at 12.

[191] *Id.* at 14.

[192] *Irvin* ECF No. 47 at 8-9.

[193] 18 Pa. C.S. § 6111(i).

[194] *Irvin* ECF No. 20, ¶¶ 9, 69–70.

[195] *Barclift v. Keystone Credit Servs., LLC*, 585 F. Supp. 3d 748 (E.D. Pa. 2022).

[196] *Id.* at 751.

[197] *Id.* at 750.

[198] *Id.* at 758.

[199] *Id.*

[200] *Irvin* ECF No. 47 at 12-13.

[201] *Id.* at 9-10 (citing *Nickelodeon*, 827 F.3d at 274 (federal law); *Batts v. Gannett Co.*, 2023 WL 3143695, at *3 (E.D. Mich. Mar. 30, 2023) (Michigan law); *Salazar v. Nat'l Basketball Ass'n*, 2023 WL 5016968, at *5 (S.D.N.Y. Aug. 7, 2023) (Michigan law); and *Lin v. Crain Commc'ns, Inc.*, 2020 WL 248445, at *6 (E.D. Mich. Jan. 16, 2020) (Michigan law)).

[202] *Id.* at 10 (citing 18 Pa.C.S. § 6111(i)).

[203] *Id.*

[204] *TransUnion*, 141 S. Ct. at 2205 ("Congress's creation of a statutory prohibition or obligation and a cause of action does not relieve courts of their responsibility to independently decide whether a plaintiff has suffered a concrete harm under Article III.").

[205] *Farst*, 2023 WL 7179807, at *4 (citing *Boring v. Google Inc.*, 362 F. App'x 273, 280 (3d Cir. 2010)).

[206] Restatement (Second) of Torts § 652D cmt. a.

[207] See Cabela's Online Firearm Purchase Guidelines, https://www.cabelas.com/shop/en/online-firearm-purchaseguidelines#:~:text=Placing%20an%20Order%201%20Browse%20our%20available%20 firearms,order%20will%20ship%20to%20the%20same%20store.%20

[208] *Farst*, 2023 WL 7179807, at *4.

[209] We found two state court cases in which individuals brought claims under section 6111(i) of the Uniform Firearms Act based on the alleged disclosure of confidential information. "Unlike federal courts, [Pennsylvania state courts] are open to resolve all controversies impacting the rights of Pennsylvanians and are vested by Article V, section 1 of the Pennsylvania Constitution with all judicial authority." *Firearm Owners Against Crime v. Papenfuse*, 261 A.3d 467, 496 n.6 (Pa. 2021). "[State court judges'] standing considerations account for many varied disputes that would fall short of constituting 'cases and controversies' in federal court." *Id.*

[210] ECF No. 53, Wherefore Clause, ¶ E; ¶¶ 221, 275, 296, 317, 339, 363, 381, 402, 421, 441.

[211] ECF No. 54-1 at 16-17.

[212] ECF No. 56 at 23.

[213] *TransUnion*, 141 S. Ct. at 2208 (citations omitted).

[214] *McNair v. Synapse Group Inc.*, 672 F.3d 213, 223 (3d Cir. 2012) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983)).

[215] *Lyons*, 461 U.S. at 102; *O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974).

[216] *Lyons*, 461 U.S. at 102 (1983).

[217] 672 F.3d 213 (3d Cir. 2012).

[218] *Id.* at 215-19.

[219] *Id.* at 225.

[220] *Id.*

[221] 903 F.3d 278 (3d Cir. 2018).

[222] *Id.* at 282.

[223] *Id.* at 292.

[224] *Id.*

[225] *Id.* at 292-93.

[226] ECF No. 56 at 23.

[227] No. 20-3664, 2023 WL 5029899, at *7 (N.D. Cal. Aug. 7, 2023).

[228] *Id.* at *1.

[229] *Id.* at *7.

[230] *Id.*

[231] *Id.*

[232] *Id.* at *6.

[233] *See Kimca v. Sprout Foods, Inc.,* No. 21-12977, 2022 WL 1213488, at *10 (D.N.J. Apr. 25, 2022) (finding "[b]ecause [p]laintiffs . . . brought th[e] lawsuit, it is common sense that they are now aware of the alleged risks associated with the [allegedly deceptive product] and, thus, will not be deceived by [defendant's] marketing in the future").

[234] *McNair*, 672 F.3d at 225.

[235] *Id.* at 225 n.13.

[236] *McNair*, 672 F.3d at 223 (quoting *Lyons*, 461 U.S. at 105).

[237] *In re Flonase Antitrust Litig.*, 610 F. Supp. 2d 409, 413 (E.D. Pa. 2009) ("Unless at least one named Plaintiff can state a claim for relief under each count[,] Plaintiffs do not have standing to bring claims as part of a putative class action."). We dismiss with prejudice all claims under Count III (California Invasion of Privacy Act); Count IV (California statutory larceny); Count V (California Unfair Competition Law); Count VI (Maryland Wiretapping and Electronic Surveillance Act); Count VII (Maryland tort of invasion of privacy); Count X (Missouri Wiretap Act); Count XI (Missouri Merchandising Practices Act); and Count XII (Missouri common law intrusion upon seclusion).

[238] We dismiss without prejudice all claims under Count I (Federal Wiretap Act); Count II (Computer Fraud and Abuse Act), Count VIII (Massachusetts Wiretapping Statute), Count IX (Massachusetts Intrusion Upon Seclusion); Count XIII (Pennsylvania Wiretapping and Electronic Surveillance Control Act); Count XIV (Pennsylvania Intrusion Upon Seclusion); Count XV (Trespass to Chattels); Count XVI (Conversion to Chattels).

DAVID IRVIN, on behalf of himself and all
others similarly situated,

     Plaintiff,

     v.

CABELA'S L.L.C. and BPS DIRECT, L.L.C.,

     Defendants.

:
:
:
:
:
:
:
:
:
:
:
:

COURT OF COMMON PLEAS
LEBANON COUNTY

NO. 2023-01668

## ORDER

  AND NOW, this _____ day of _____, 2024, upon consideration of

the Preliminary Objections of Defendants, Cabela's L.L.C. and BPS Direct, LLC, to Plaintiff's

Complaint, and any response in opposition thereto, it is hereby ORDERED and DECREED that

said Preliminary Objections are SUSTAINED.

  It is FURTHER ORDERED that all claims against the Defendants in the above-captioned

action are hereby DISMISSED, with prejudice.

        BY THE COURT:

        _____, J.

# EXHIBIT 7

Exhibit A-7

# ORIGINAL

### IN THE COURT OF COMMON PLEAS
### LEBANON COUNTY, PENNSYLVANIA

ENTERED & FILED
PROTHONOTARY OFFICE
LEBANON, PA

2024 MAR 21  P 3: 46

**DAVID IRVIN,**
   **Plaintiff**

  v.

**CABELAS, LLC,**
   **Defendant**

:
:
:
:
:  No. 2023-01668
:
:
:
:

### ORDER OF COURT

 **AND NOW,** this 21ST day of March, 2024 it appearing to the Court, a Civil Complaint has been filed in this matter, you are hereby advised, your case has been designated as follows:

 ☐ ARBITRATION (Damages sought $50,000 or less)

 ☐ FAST TRACK (Trial within 12 months)

 ☒ STANDARD (Trial within 18 months)

 ☐ COMPLEX (Trial within 24 months)

 Your case is scheduled for a case management conference on June 10, 2024 at 1:30 PM in Courtroom No. 1 before the Honorable John C. Tylwalk.  If you disagree with the designation assigned to your case, you can present information to the Judge assigned to the case as to why the designation should be changed at that time.

 Counsel and/or unrepresented litigants are expected to appear in person. At the time of the case management conference, deadlines will be established for the completion of discovery, the exchange of expert reports and the filing of dispositive motions.

       BY THE COURT:

       _____ P.J.
       JOHN C. TYLWALK

cc: Steven A. Schwartz, Esq. // 361 W. Lancaster Avenue, Haverford, PA 19041- mail
  Erin L. Leffler, Esq. // 2001 Market Street, Suite 3000, Philadelphia, PA 19103- mail
  Court Administration - I\O
  Shannon Dougher/Judges' Chambers I\O

Pursuant to Pa. R. Civil P. 236
All parties are hereby notified
this date: 3\21\04  JL
Prothonotary, Lebanon PA

# EXHIBIT 8

Exhibit A-8

ORIGINAL

**IN THE COURT OF COMMON PLEAS OF
LEBANON COUNTY, PENNSYLVANIA**

ENTERED & FILED
PROTHONOTARY OFFICE
LEBANON, PA

2024 MAR 22 P 1: 34

| | |
|---|---|
| DAVID IRVIN, on behalf of himself and all others similarly situated, | CIVIL DIVISION |
| Plaintiff, | Case No. 2023-01668 |
| v. | **FIRST AMENDED CLASS ACTION COMPLAINT** |
| CABELA'S L.L.C. and BPS DIRECT, L.L.C., | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff David Irvin ("Plaintiff"), on behalf of himself and all other similarly situated (the "Class members") bring this case against Cabela's L.L.C. ("Cabela's") and BPS Direct, L.L.C. ("BPS") (collectively, "Defendants"), which operate, control and manage the websites cabelas.com and basspro.com, respectively. Plaintiff brings this action based upon personal knowledge of the facts pertaining to himself, and on information and belief as to all other matters, by and through the investigation of undersigned counsel.

## NATURE OF THE ACTION

1.      This is a class action lawsuit brought on behalf of all Pennsylvania residents who have visited and/or purchased firearms from cabelas.com and/or basspro.com.

2.      Defendants aid, employ, agree, and conspire with Meta Platforms, Inc. ("Facebook") to intercept communications sent and received by Plaintiff and Class Members, including communications containing protected information about firearms purchases. Plaintiff brings this action for legal and equitable remedies resulting from these illegal actions.

## JURISDICTION AND VENUE

3.     The Court has subject matter jurisdiction over this action pursuant to Pa. Cons. Art. 5, §5(b) and 42 Pa. C.S.A. § 931(b).

4.     The Court has personal jurisdiction over Defendant pursuant to 42 Pa. C.S.A. 5301(a)(2).

5.     Venue is proper pursuant to Pa. R. Civ. P. 2179(a)(2)-(4) because Defendant regularly conducts business in this county, the causes of action arose out of conduct in this county, and the transaction or occurrence out of which the causes of action arose took place in this county.

## THE PARTIES

6.     Plaintiff David Irvin is an adult citizen of the Commonwealth and is domiciled in Fredericksburg, Pennsylvania.  On December 2, 2021, Plaintiff Irvin purchased a Henry Big Boy Classic Centerfire Lever-Action Rifle - .45 Colt from cabelas.com.  When accessing the website and completing the purchase, Plaintiff Irvin was located in Pennsylvania.  Plaintiff Irvin also has an active Facebook account which he has maintained since approximately 2007.  Plaintiff Irvin accesses his Facebook account from multiple devices, including his laptop and smartphone.

7.     Defendant Cabela's L.L.C. is a Pennsylvania company headquartered in Springfield, Missouri.  Cabela's owns and operates cabelas.com, through which it sells sporting goods, including firearms.  Cabela's is a wholly-owned subsidiary of BPS Direct, L.L.C.

8.     Defendant BPS Direct, L.L.C., doing business as Bass Pro Shops, is a Delaware corporation headquartered in Springfield, Missouri.  BPS owns and operates basspro.com, through which it sells sporting goods, including firearms.  BPS also assists in the operation of the cabelas.com website and is the parent company of Cabela's.

9.     The basspro.com and cabelas.com websites are largely the same.  Both are

operated, at least in part, by BPS. Both offer the same products, including the same firearms, for sale and offer the same sale promotions. Both websites also function identically in unlawfully assisting Facebook in intercepting information about consumers firearms purchases.

10.     Pursuant to the systematic process described herein, Defendants, through cabela's.com and basspro.com, assisted Facebook with intercepting Plaintiff's communications, including those that contained personally identifiable information and protected information about their firearms purchases. Defendants assisted these interceptions without Plaintiff's knowledge, consent or express written authorization. By failing to receive the requisite consent, Defendants breached confidentiality and unlawfully disclosed Plaintiff's personally identifiable information and protected information about his firearms purchases.

**FACTUAL ALLEGATIONS**

**1.     Facebook and the Facebook Tracking Pixel**

11.     Facebook is the largest social networking site on the planet, touting 2.9 billion monthly active users.[1] Facebook describes itself as a "real identity platform,"[2] meaning users are allowed only one account and must share "the name they go by in everyday life."[3] To that end, when creating an account, users must provide their first and last name, along with their birthday and gender.[4]

12.     Facebook generates revenue by selling advertising space on its website.[5]

---

[1] Sean Burch, *Facebook Climbs to 2.9 Billion Users, Report 29.1 Billion in Q2 Sales*, YAHOO (July 28, 2021), https://www.yahoo.com/now/facebook-climbs-2-9-billion-202044267.html
[2] Sam Schechner and Jeff Horwitz, *How Many Users Does Facebook Have? The Company Struggles to Figure It Out*, WALL. ST. J. (Oct. 21, 2021).
[3] FACEBOOK, COMMUNITY STANDARDS, PART IV INTEGRITY AND AUTHENTICITY, https://www.facebook.com/communitystandards/integrity_authenticity.
[4] FACEBOOK, SIGN UP, https://www.facebook.com/
[5] Mike Isaac, *Facebook's profit surges 101 percent on strong ad sales.*, N.Y. TIMES (July 28, 2021), https://www.nytimes.com/2021/07/28/business/facebook-q2-earnings.html.

13.     Facebook sells advertising space by highlighting its ability to target users.[6] Facebook can target users so effectively because it surveils user activity both on and off its site.[7] This allows Facebook to make inferences about users beyond what they explicitly disclose, like their "interests," "behavior," and "connections."[8] Facebook compiles this information into a generalized dataset called "Core Audiences," which advertisers use to apply highly specific filters and parameters for their targeted advertisements.[9]

14.     Advertisers can also build "Custom Audiences."[10] Custom Audiences enable advertisers to reach "people who have already shown interest in [their] business, whether they're loyal customers or people who have used [their] app or visited [their] website."[11] Advertisers can use a Custom Audience to target existing customers directly, or they can use it to build a "Lookalike Audiences," which "leverages information such as demographics, interests, and behavior from your source audience to find new people who share similar qualities."[12] Unlike Core Audiences, Custom Audiences require an advertiser to supply the underlying data to Facebook. They can do so through two mechanisms: by manually uploading contact information for customers, or by utilizing Facebook's "Business Tools," which collect and transmit the data

---

[6] FACEBOOK, WHY ADVERTISE ON FACEBOOK,
https://www.facebook.com/business/help/205029060038706.
[7] FACEBOOK, ABOUT FACEBOOK PIXEL,
https://www.facebook.com/business/help/742478679120153?id=1205376682832142.
[8] FACEBOOK, AD TARGETING: HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS,
https://www.facebook.com/business/ads/ad-targeting.
[9] FACEBOOK, EASIER, MORE EFFECTIVE WAYS TO REACH THE RIGHT PEOPLE ON FACEBOOK,
https://www.facebook.com/business/news/Core-Audiences.
[10] FACEBOOK, ABOUT CUSTOM AUDIENCES,
https://www.facebook.com/business/help/744354708981227?id=2469097953376494.
[11] FACEBOOK, ABOUT EVENTS CUSTOM AUDIENCE,
https://www.facebook.com/business/help/366151833804507?id=300360584271273.
[12] FACEBOOK, ABOUT LOOKALIKE AUDIENCES,
https://www.facebook.com/business/help/164749007013531?id=401668390442328.

automatically.[13] One such Business Tool is the Facebook Tracking Pixel.

15.    The Facebook Tracking Pixel is a piece of code that advertisers, like Defendant, can integrate into their website. Once activated, the Facebook Tracking Pixel "tracks the people and type of actions they take."[14] When the Facebook Tracking Pixel captures an action, it sends a record to Facebook. Once this record is received, Facebook processes it, analyzes it, and assimilates it into datasets like the Core Audiences and Custom Audiences.

16.    Advertisers control what actions—or, as Facebook calls it, "events"—the Facebook Tracking Pixel will collect, including the website's metadata, along with what pages a visitor views and what buttons a visitor clicks.[15] Advertisers can also configure the Facebook Tracking Pixel to track other events. Facebook offers a menu of "standard events" from which advertisers can choose, including what content a visitor views or purchases.[16] An advertiser can also create their own tracking parameters by building a "custom event."[17]

17.    Advertisers control how the Facebook Tracking Pixel identifies visitors. The Facebook Tracking Pixel is configured to automatically collect "HTTP Headers" and "Pixel-specific Data."[18] HTTP Headers collect "IP addresses, information about the web browser, page

---

[13] FACEBOOK, CREATE A CUSTOMER LIST CUSTOM AUDIENCE,
https://www.facebook.com/business/help/170456843145568?id=2469097953376494;
FACEBOOK, CREATE A WEBSITE CUSTOM AUDIENCE,
https://www.facebook.com/business/help/1474662202748341?id=2469097953376494.
[14] FACEBOOK, RETARGETING, https://www.facebook.com/business/goals/retargeting.
[15] See FACEBOOK, FACEBOOK PIXEL, ACCURATE EVENT TRACKING, ADVANCED,
https://developers.facebook.com/docs/facebook-pixel/advanced/; see also FACEBOOK, BEST
PRACTICES FOR FACEBOOK PIXEL SETUP,
https://www.facebook.com/business/help/218844828315224?id=1205376682832142.
[16] FACEBOOK, SPECIFICATIONS FOR FACEBOOK PIXEL STANDARD EVENTS,
https://www.facebook.com/business/help/402791146561655?id=1205376682832142.
[17] FACEBOOK, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS,
https://www.facebook.com/business/help/964258670337005?id=1205376682832142.
[18] FACEBOOK, FACEBOOK PIXEL, https://developers.facebook.com/docs/facebook-pixel/.

location, document, referrer and persons using the website."[19]  Pixel-specific Data includes "the Pixel ID and cookie."[20]

### B.    Defendants' Websites and the Facebook Pixel

18.     Defendants' websites cabelas.com and basspro.com are largely mirror images of one another.  Both host code for the Facebook Tracking Pixel and are configured to transmit three distinct events to Facebook:[21]

**Figures 1 and 2:**



19.     PageView transmits the Uniform Resource Locator ("URL") accessed, which shows what webpage the visitor visited:

**Figures 3 and 4:**



---

[19] *Id.*

[20] *Id.*

[21] This data derives from a tool created and offered by Facebook.

20.    Defendants' URLs contain detailed information disclosing what products users have browsed.    For example, if a user searches for "Vortex scope," the URL displayed is "basspro.com/SearchDisplay#q=Vortex%20scope," and if that user then clicks on the "Vortext Diamondback Rifle Scope," the URL changes to "basspro.com/shop/en/vortex-diamondback-rifle-scope."

21.    ViewContent shows similar information to PageView, but specifically tracks when users access pages for particular products.

22.    Microdata transmits the title and description of the webpage:

**Figures 5 and 6:**



23.    Another event titled "Button Click Automatically Detected" registers when users add a product, such as a firearm, to their online shopping cart and when they checkout:

**Figures 7 and 8:**



One pixel found on www.cabelas.com

Facebook Pixel                                    Troubleshoot Pixel
Pixel ID: 841232062592664 click to copy           View Analytics

▼ ⚙ Button Click Automatically Detected

CUSTOM PARAMETERS SENT

**formFeatures**: []
**buttonText**: ORDER ONLINE
**buttonFeatures**: Hide

{"classList":"btn primary chartcomposerprimary left pdp_ch
art_addtocart_button","destination":"javascript: if (typeo
f onBehalfUtilitiesJS == 'undefined') {setCurrentId('SKU_L
ist_Widget_Add2CartButton_30744573456233226621_table');Fire
armsDisplayJS.orderFirearmsOnlineWrapper('30744573456233326
621', '30744573456233226621_Quantity_Input', 'https://www.ca
belas.com/shop/en/FirearmResidencyCheckView', '30744573456
2326120');} else if (onBehalfUtilitiesJS.csrProceedCheck
()) {setCurrentId('SKU_List_Widget_Add2CartButton_30744573
456233226621';FirearmsDisplayJS.orderFirearmsOnlineW
rapper('30744573456233226621', '30744573456233226621_Quantit
y_Input', 'https://www.cabelas.com/shop/en/FirearmResidency
CheckView', '30744573456233226120');} else {MessageHelper.di
splayErrorMessage(MessageHelper.messages['ERROR_CSR_USER_P
ROCEED']);}", "id":"SKU_List_Widget_Add2CartButton_30744573
456233226621_table", "imageUrl":"", "innerText":"ORDER ONLIN
E", "numChildButtons":0, "tag":"a", "type":null, "name":""}

**pageFeatures**: Hide

{"title":"Savage Arms AXIS II XP TrueTimber VSX Bolt-Actio
n Rifle | Cabela's"}

---

One pixel found on www.basspro.com

Facebook Pixel                                    Troubleshoot Pixel
Pixel ID: 1923186964632693 click to copy          View Analytics

▼ ⚙ Button Click Automatically Detected

CUSTOM PARAMETERS SENT

**formFeatures**: []
**buttonText**: ORDER ONLINE
**buttonFeatures**: Hide

{"classList":"btn primary chartcomposerprimary left pdp_ch
art_addtocart_button","destination":"javascript: if (typeo
f onBehalfUtilitiesJS == 'undefined') {setCurrentId('SKU_L
ist_Widget_Add2CartButton_30744573456233226620_table');Fire
armsDisplayJS.orderFirearmsOnlineWrapper('30744573456233326
620', '30744573456233226620_Quantity_Input', 'https://www.ba
sspro.com/shop/en/FirearmResidencyCheckView', '30744573456
2324136');} else if (onBehalfUtilitiesJS.csrProceedCheck
()) {setCurrentId('SKU_List_Widget_Add2CartButton_30744573
456233226620_table';FirearmsDisplayJS.orderFirearmsOnlineW
rapper('30744573456233226620', '30744573456233226620_Quantit
y_Input', 'https://www.basspro.com/shop/en/FirearmResidency
CheckView', '30744573456233224136');} else {MessageHelper.di
splayErrorMessage(MessageHelper.messages['ERROR_CSR_USER_P
ROCEED']);}", "id":"SKU_List_Widget_Add2CartButton_30744573
456233226620_table", "imageUrl":"", "innerText":"ORDER ONLIN
E", "numChildButtons":0, "tag":"a", "type":null, "name":""}

**pageFeatures**: Hide

{"title":"Savage Arms AXIS II XP TrueTimber VSX Bolt-Actio
n Rifle with Threaded Barrel | Bass Pro Shops"}

24.     This event registers, for example, when a purchaser clicks "ORDER ONLINE,"
"ADD TO CART," "CHECKOUT," "CONTINUE," "REVIEW ORDER," and "PLACE
ORDER."

25.     The Button Click event also transmits content that purchasers enter into form
fields:

## Figures 9 and 10:




26.     This includes form fields that must be completed prior to purchase:

## Figure 11:



27.     This event data, jointly and independently, permit an ordinary person to identify what a consumer has viewed and/or purchased on Defendants' websites.

28.     The Facebook Tracking Pixel uses both first- and third-party cookies.  A first-party cookie is "created by the website the user is visiting"—*i.e.*, cabelas.com or basspro.com.[22] A third-party cookie is "created by a website with a domain name other than the one the user is currently visiting"—*i.e.*, Facebook.[23]

29.     When viewing Defendants' websites, the Facebook Tracking Pixel compels the user's browser to send nine cookies to Facebook:

**Figure 12:**

| Name | Value | Domain |
|---|---|---|
| xs | 156%3AKGXBbut-SjxSCw%3A2%3A1639601808%... | .facebook.com |
| wd | 1313x646 | .facebook.com |
| usida | eyJ2ZXIiOjEsImIkIjoiQXJvZndreDE1OTA1ZmsiLCJ0... | .facebook.com |
| c_user | 679395441 | .facebook.com |
| datr | jVa6YcoeBSLOAo0a9bvz1mtE | .facebook.com |
| presence | C%7B%22t3%22%3A%5B%5D%2C%22utc3%22%... | .facebook.com |
| dpr | 1.4630000591278076 | .facebook.com |
| sb | jVa6YaHou2Nev98LSBnWYOo7 | .facebook.com |
| fr | 0ZzdZn9Ygh60Xbk36.AWVC5uksSXTsGC3302SbE... | .facebook.com |

30.     The c_user cookie contains that visitor's unencrypted Facebook ID.  A Facebook ID is personally identifiable information.  Anyone can identify a Facebook profile—and all personal information publicly listed on that profile—by appending the Facebook ID to the end of Facebook.com.

31.     The fr cookie contains, at least, an encrypted Facebook ID and browser

---

[22] PC MAG, FIRST-PARTY COOKIES, https://www.pcmag.com/encyclopedia/term/first-party-cookie.  This is confirmable by using developer tools to inspect a website's cookies and track network activity.

[23] PC MAG, THIRD-PARTY COOKIES, https://www.pcmag.com/encyclopedia/term/third-party-cookie.  This is also confirmable by tracking network activity.

identifier.[24] The datr cookies also identifies a browser.[25] Facebook, at a minimum, uses the fr and c_user cookies to identify users by their Facebook IDs and corresponding Facebook profiles.[26]

32.     Through the Facebook Tracking Pixel's code, these cookies combine the identifiers with the event data, allowing Facebook to know, among other things, what webpages visitors to Defendants' websites are visiting and what products they are purchasing.[27]

33.     Defendants also use "Advanced Matching." With Advanced Matching, Defendants' Pixels "look[s] for recognizable form field and other sources on your website that contain information such as first name, last name and email."[28] That information is recorded, "along with the event, or action, that took place."[29] This information is also "hashed,"[30] meaning it is "[a] computed summary of digital data that is a one-way process." In other words, it "cannot be reversed back into the original data."[31]

---

[24] DATA PROTECTION COMMISSIONER, FACEBOOK IRELAND LTD, REPORT OF RE-AUDIT (Sept. 21, 2012), http://www.europe-v-facebook.org/ODPC_Review.pdf.
[25] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.
[26] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.
[27] FACEBOOK, GET STARTED, https://developers.facebook.com/docs/meta-pixel/get-started.
[28] https://www.facebook.com/business/help/611774685654668?id=1205376682832142
[29] FACEBOOK, ABOUT ADVANCED MATCHING FOR WEB, https://www.facebook.com/business/help/611774685654668?id=1205376682832142.
[30] DEFINITION OF HASH, https://www.pcmag.com/encyclopedia/term/hash
[31] *Id.*

First Amended Complaint (H0123737xCF4AF).                11

**Figure 13:**

> You can use Advanced Matching to help:
>
> - Increase the number of attributed conversions. We can match more of the conversions that happen on your website to people on Meta. This helps you understand the impact of your ads on website conversions.
>
> - Increase your Custom Audience size. We're able to better match your website visitors to people on Meta and increase the size of your Custom Audience.
>
> - Decrease the cost per conversion. Conversion-optimized campaigns become more efficient because we can better identify and deliver ads to the types of people likely to take the actions you care about.

34.     Defendants disclose this information to Facebook so it can better match visitors to their Facebook profiles.

35.     As part of Advanced Matching, Defendants enabled "Automatic Advanced Matching." That means Defendants configured the pixel to scan form fields containing a user's email address, first name, last name, phone number, gender, zip code, city and state.[32] The highlighted line, along with the line three below it, shows that Defendants enabled Automatic Matching.

**Figure 14:**

```
33 fbq.registerPlugin("841232062592664", {__fbEventsPlugin: 1, plugin: function(fbq, instance, config) { fbq.loadPlugin(
34 fbq.loadPlugin("identity");
35 instance.optIn("841232062592664", "InferredEvents", true);
36 fbq.loadPlugin("jsonld_microdata");
37 instance.optIn("841232062592664", "MicrodataJsonLd", true);
38 config.set("841232062592664", "automaticMatching", {"selectedMatchKeys":["em","fn","ln","ph","ge","zp","ct","st"]});
39 fbq.loadPlugin("inferredevents");
40 fbq.loadPlugin("identity");
41 instance.optIn("841232062592664", "AutomaticMatching", true);
42 fbq.loadPlugin("iwlbootstrapper");
43 instance.optIn("841232062592664", "IWLBootstrapper", true);
44 fbq.loadPlugin("iwlparameters");
45 fbq.loadPlugin("estruleengine");
46 instance.optIn("841232062592664", "IWLParameters", true);
```

36.     Defendants know that Facebook will match the Advanced Matching parameters with a customer's subsequent activity, thereby helping them "[i]ncrease the number of attributed

---

[32] Facebook provides a corresponding look-up table: FACEBOOK, ADVANCED MATCHING, https://developers.facebook.com/docs/meta-pixel/advanced/advanced-matching.

conversions," "[i]ncrease [their] Custom Audience size," and "[d]ecrease the cost per conversion."[33]

37.     By compelling a visitor's browser to disclose the Advanced Matching parameters and event data for videos, Defendants knowingly disclose information sufficiently permitting an ordinary person to identify a specific individual's website activity, including what webpages they visit and what products they purchase.

**C.     Defendants Never Received Consent from Plaintiff and Class Members to Assist Facebook with Intercepting Their Communications**

38.     Defendants never received consent from users to intercept their electronic communications.

39.     Plaintiff and Class members did not consent to Defendants' privacy policies prior to Facebook intercepting their electronic communications.  Even if applicable, that privacy policy fails to disclose that Defendants assist Facebook with intercepting communications that contain sensitive information.

40.     Likewise, Facebook never receives consent from users to intercept and collect electronic communications containing their sensitive and unlawfully disclosed information.  In fact, Facebook expressly warrants the opposite.

41.     When first signing up, a user assents to three agreements: the Terms of Service,[34] the Cookies Policy,[35] and the Data Policy.[36]

42.     Facebook's Terms of Service begins by stating that "[p]rotecting people's

---

[33] FACEBOOK, ABOUT ADVANCED MATCHING FOR WEB,
https://www.facebook.com/business/help/611774685654668?id=1205376682832142.
[34] FACEBOOK, TERMS OF SERVICE, https://www.facebook.com/legal/terms/update.
[35] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES,
https://www.facebook.com/policies/cookies/.
[36] FACEBOOK, DATA POLICY, https://www.facebook.com/about/privacy/update.

privacy is central to how we've designed our ad system."[37]  The Terms of Service then prohibits anyone from using Facebook's Products in a manner that is "unlawful, misleading, discriminatory or fraudulent."[38]

43.    Facebook's Data Policy recognizes that there may be "[d]ata with special protections," meaning information that "could be subject to special protections under the laws of your country."[39]  The Data Policy goes on to describe how Facebook collects information from its "Meta Business Tools," including "our social plug-ins (such as the Like button), Facebook Login, our APIs and SDKs, or the Meta pixel."[40]  Specifically, Facebook acknowledges that "[p]artners receive your data when you visit or use their services or through third parties they work with."[41]

44.    Facebook then offers an express representation: **"We require each of these partners to have lawful rights to collect, use and share your data before providing any data to us."**[42]  Facebook does acknowledge collecting "data with special protections" to personalize ads, but critically, only sensitive information that users "choose to provide."[43]

45.    Facebook's Cookies Policy ratifies those representations, stating "the Data Policy will apply to our processing of the data that we collect via cookies."[44]

46.    Facebook's other representations reinforce these warranties.  In its Advertising

---

[37]FACEBOOK, TERMS OF SERVICE, https://www.facebook.com/legal/terms/update..
[38] *Id.*
[39] FACEBOOK, DATA POLICY, https://www.facebook.com/about/privacy/update.
[40] FACEBOOK, DATA POLICY, https://www.facebook.com/about/privacy/update.
[41] *Id.*
[42] *Id.*
[43] *Id.*
[44] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES,
https://www.facebook.com/policies/cookies/.

Policy, Facebook states "[w]e do not use sensitive personal data for ad targeting."[45]  And in a

blog post titled "About Restricted Meta Business Tools Data," Facebook asserts it has "policies

around the kinds of information businesses can share with us."[46]  Facebook does not "want

websites or apps sending us sensitive information about people."[47]  Sensitive information

includes, among other things, "any information defined as sensitive under applicable laws,

regulations and applicable industry guidelines."[48]

47.     These representations are repeated frequently.  Facebook created a "Help Center"

to better explain its practices to users.  In an article titled, "How does Facebook receive

information from other businesses and organizations?," Facebook reiterates its promise to

"prohibit businesses or organizations from sharing sensitive information with us," and if

Facebook "determine[s] that a business or an organization is violating our terms, we'll take

action against that business or organization."[49]  In another article, titled, "How does Meta work

with data providers?," Facebook repeats this promise, stating "[b]usinesses that advertise on

Facebook are required to have any necessary rights and permissions to use this information, as

outlined in our Custom Audience Terms that businesses must agree to."[50]

48.     Based on these representations, Facebook never receives consent from users to

intentionally intercept and monetize electronic communications disclosing sensitive information

that the law protects.

---

[45] FACEBOOK, ADVERTISING POLICY, https://www.facebook.com/policies/ads/.
[46] FACEBOOK, ABOUT RESTRICTED META BUSINESS TOOLS DATA,
https://www.facebook.com/business/help/1057016521436966?id=188852726110565
[47] Id.
[48] Id.
[49] FACEBOOK, HOW DOES FACEBOOK RECEIVE INFORMATION FROM OTHER BUSINESSES AND
ORGANIZATIONS, https://www.facebook.com/help/2230503797265156.
[50] HOW DOES META WORK WITH DATA PROVIDERS?,
https://www.facebook.com/help/494750870625830?ref=dp.

Policy, Facebook states "[w]e do not use sensitive personal data for ad targeting."[45] And in a blog post titled "About Restricted Meta Business Tools Data," Facebook asserts it has "policies around the kinds of information businesses can share with us."[46] Facebook does not "want websites or apps sending us sensitive information about people."[47] Sensitive information includes, among other things, "any information defined as sensitive under applicable laws, regulations and applicable industry guidelines."[48]

47.     These representations are repeated frequently. Facebook created a "Help Center" to better explain its practices to users. In an article titled, "How does Facebook receive information from other businesses and organizations?," Facebook reiterates its promise to "prohibit businesses or organizations from sharing sensitive information with us," and if Facebook "determine[s] that a business or an organization is violating our terms, we'll take action against that business or organization."[49] In another article, titled, "How does Meta work with data providers?," Facebook repeats this promise, stating "[b]usinesses that advertise on Facebook are required to have any necessary rights and permissions to use this information, as outlined in our Custom Audience Terms that businesses must agree to."[50]

48.     Based on these representations, Facebook never receives consent from users to intentionally intercept and monetize electronic communications disclosing sensitive information that the law protects.

---

[45] FACEBOOK, ADVERTISING POLICY, https://www.facebook.com/policies/ads/.
[46] FACEBOOK, ABOUT RESTRICTED META BUSINESS TOOLS DATA,
https://www.facebook.com/business/help/1057016521436966?id=188852726110565
[47] Id.
[48] Id.
[49] FACEBOOK, HOW DOES FACEBOOK RECEIVE INFORMATION FROM OTHER BUSINESSES AND
ORGANIZATIONS, https://www.facebook.com/help/2230503797265156.
[50] HOW DOES META WORK WITH DATA PROVIDERS?,
https://www.facebook.com/help/494750870625830?ref=dp.

49.    Moreover, upon information and belief, Defendants have never entered into an agreement with Facebook that would obligate Facebook to keep disclosed information confidential.

50.    By assisting Facebook with intercepting information about consumers' firearm purchases, Defendants violated the Pennsylvania Wiretap Act and Uniform Firearms Act. Defendants also invaded the personal privacy of Plaintiff and putative class members by disclosing this sensitive and protected information.

## CLASS ALLEGATIONS

51.    Plaintiff, pursuant to Rules 1702, 1708 and 1709 of the Pennsylvania Rules of Civil Procedure, asserts this action individually and on behalf of the following Class: All persons in Pennsylvania who have a Facebook account and who visited either cabelas.com, basspro.com or both (the "Class"). Plaintiff also seeks to represent a subclass of similarly situated individuals defined as all persons in Pennsylvania who have a Facebook account and who purchased a firearm from either cabelas.com, basspro.com or both (the "Subclass").

52.    Subject to additional information obtained through further investigation and discovery, the above-described Class and Subclass may be modified or narrowed as appropriate, including through the use of multi-state subclasses.

53.    **Numerosity.**  Consistent with Pennsylvania Rule of Civil Procedure 1702(1), the Class is so numerous that joinder of all members is impracticable.  While Plaintiff does not know the exact number of members of the Class, Plaintiff believes the Class contains at least hundreds of thousands of individuals, and the members can be identified through Defendant's records. Class Members may be notified of the pendency of this action by recognized, Court-approved

notice dissemination methods, which may include U.S. mail, electronic mail, internet postings, social media and/or published notice.

54.    **Commonality.**  Consistent with Pennsylvania Rule of Civil Procedure 1702(2), common questions of law and fact exist as to all Class Members.  These common questions of law or fact predominate over any questions affecting only individual members of the Class. Common questions include, but are not limited to the following:

    a.  whether Defendants collected users' PII, website activities and firearms purchases;

    b.  whether Defendants unlawfully disclosed and continue to disclose their users' PII, website activities and firearms purchases in violation of Pennsylvania Wiretapping Act, 8 Pa. Cons. Stat. § 5701, *et seq.*;

    c.  whether Defendants unlawfully disclosed and continue to disclose its users' PII, website activities and firearms purchases in violation of Uniform Firearms Act, 18 Pa.C.S. § 6111(i); and

    d.  whether Defendants disclosed its users PII, website activities and firearms purchases without consent.

55.    **Typicality.**  Consistent with Pennsylvania Rule of Civil Procedure 1702(3), Plaintiff's claims are typical of the claims of the Class he seeks to represent because Plaintiff and all Class Members have suffered similar injuries as a result of the same practices alleged herein. Plaintiff has no interests to advance adverse to the interests of the other Class Members, and Defendant has no defenses unique to any Plaintiff.

56.    **Adequate Representation.**  Consistent with Pennsylvania Rule of Civil Procedure 1702(4) and 1709, Plaintiff has and will continue to fairly and adequately represent and protect the interests of the Class and has retained as his counsel attorneys competent and experienced in class actions and complex litigation, including litigation to remedy privacy

violations. Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of Class Members, and they have the resources to do so.

57.    **Predominance.** Consistent with Pennsylvania Rule of Civil Procedure 1708(a)(1), common questions of law and fact predominate over any questions affecting only individual class members. For example, Defendant's liability and the fact of damages is common to all members of the Class.

58.    **Superiority and Manageability.** Consistent with Pennsylvania Rule of Civil Procedure 1708(a)(2), a class action is superior to other available means for the fair and efficient adjudication of this dispute. The injury suffered by each Class Member, while meaningful on an individual basis, may not be of such magnitude as to make the prosecution of individual actions against Defendant economically feasible. Even if Class Members could afford individual litigation, those actions would put immeasurable strain on the court system. Moreover, individual litigation of the legal and factual issues of the case would increase the delay and expense to all parties and the court system. A class action, however, presents far fewer management difficulties and provides the benefit of single adjudication, economy of scale and comprehensive supervision by a single court.

59.    **Risk of Inconsistent, Varying, or Prejudicial Adjudications.** Consistent with Pennsylvania Rule of Civil Procedure 1708(a)(3), a class action will minimize the risk of inconsistent, varying or prejudicial adjudications. If Plaintiff's and Class members' claims were tried separately, Defendant would be confronted with incompatible standards of conduct and divergent court decisions.

60.    **Litigation Already Commenced.** Consistent with Pennsylvania Rule of Civil Procedure 1708(a)(4), to Plaintiff's knowledge, there are no other cases that have been brought

against Defendant, or that are currently pending against Defendant, where Pennsylvania consumers seek to represent a class of Pennsylvania residents based on conduct alleged in this Complaint.

61.    **Appropriateness of Forum.**  Consistent with Pennsylvania Rule of Civil Procedure 1708(a)(5), the most appropriate forum to concentrate the litigation is this County because Defendant conducts business in this county, the conduct at issue took place in part in this county and a substantial number of Class members were injured in this County.

62.    **Support for Class Certification.**  Consistent with Pennsylvania Rule of Civil Procedure 1708(a)(6) and (7), there is support for a class to be certified because of the relatively low amount recoverable by each Class member and the expenses of individual litigation.

63.    **The General Applicability of Defendant's Conduct.**  Consistent with Pennsylvania Rule of Civil Procedure 1708(b)(2), Defendant's conduct is generally applicable to the class as a whole, making relief appropriate with respect to each Class member.

## CLAIMS FOR RELIEF

### COUNT I
### Violation of the Pennsylvania Wiretapping Act
### 18 Pa. Cons. Stat. § 5701, *et seq.*

64.    Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein.

65.    Plaintiff brings this Count individually and on behalf of the members of the Class.

66.    The Pennsylvania Wiretapping Act prohibits (1) the interception or procurement of another to intercept any wire, electronic, or oral communication; (2) the intentional disclosure of the contents of any wire, electronic, or oral communication that the discloser knew or should have known was obtained through the interception of a wire, electronic, or oral communication;

and (3) the intentional use of the contents of any wire, electronic, or oral communication that the discloser knew or should have known was obtained through the interception of a wire, electronic, or oral communication.  18 Pa. Cons. Stat. § 5703.

67.    Any person who intercepts, discloses, or uses or procures any other person to intercept, disclose, or use, a wire, electronic, or oral communication in violation of the Act is subject to a civil action for (1) actual damages, not less than liquidated damages computed at a rate of $100 per day for each violation or $1,000, whichever is higher; (2) punitive damages; and (3) reasonable attorneys' fees and other litigation costs incurred.  18 Pa. Cons. Stat. § 5725(a).

68.    "Intercept" is defined as the "[a]ural or other acquisition of the contents of any wire, electronic or oral communication through the use of any electronic, mechanical or other device."  18 Pa. Cons. Stat. § 5702.  "Electronic, mechanical or other device," in turn, means "[a]ny device or apparatus … that can be used to intercept a wire, electronic or oral communication[.]"  *Id.*

69.    The following constitutes a device within the meaning of 18 Pa. Cons. Stat. § 5702:

      a.   The computer codes and programs that Defendants used to track Plaintiff and Class members' communications while navigating the websites;

      b.   Plaintiff's and Class members' web browsers;

      c.   Plaintiff's and Class members' computing devices;

      d.   Defendants' web servers;

      e.   The web servers from which Facebook received the Plaintiff's and Class members' communications while they were using a web browser to access Defendants' websites;

f.  The plan Defendants carried out to effectuate their tracking of Plaintiff's and Class members' communications while using a web browser to access the websites.

70.  At all relevant times, Defendants procured Facebook to track and intercept Plaintiff's and other Class and Subclass members' internet communications while navigating their websites.  Defendants sent these communications to Facebook without authorization or consent from Plaintiff or Class members.

71.  Defendants, when procuring Facebook to intercept Plaintiff' communications, intended Facebook to learn the meaning of the content the visitor requested.

72.  Plaintiff and Class members had a justified expectation under the circumstances that their electronic communications would not be intercepted.

73.  Plaintiff and Class members were not aware that their electronic communications were being intercepted by Facebook.

## COUNT II
### Violation of the Uniform Firearms Act
18 Pa.C.S. § 6111(i)

74.  Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein.

75.  Plaintiff brings this Count individually and on behalf of the members of the Subclass.

76.  Section 6111(i) of the Uniform Firearms Act ("UFA") provides the following:

(i) Confidentiality.--All information provided by the potential purchaser, transferee or applicant, including, but not limited to, the potential purchaser, transferee or applicant's name or identity, furnished by a potential purchaser or transferee under this section or any applicant for a license to carry a firearm as provided by section 6109 shall be confidential and not subject to public

> disclosure. In addition to any other sanction or penalty imposed by this chapter, any person, licensed dealer, State or local governmental agency or department that violates this subsection shall be liable in civil damages in the amount of $1,000 per occurrence or three times the actual damages incurred as a result of the violation, whichever is greater, as well as reasonable attorney fees.

77.     Plaintiff is a "purchaser" under the UFA because he purchased a firearm from Defendants. On December 2, 2021, Plaintiff Irvin purchased a Henry Big Boy Classic Centerfire Lever-Action Rifle - .45 Colt form cabelas.com.

78.     Defendants disclosed to Facebook information that Plaintiff provided to them in connection with his purchase of these firearms. Specifically, Defendants disclosed Plaintiff's name, address, his Facebook ID, the type of gun that he purchased, among other items.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendants, as follows:

a.     Determining that this action is a proper class action;

b.     For an order certifying the Class and Subclass, naming Plaintiff as representative of the Class and Subclass, and naming Plaintiff's attorneys as Class Counsel to represent the Class and Subclass;

c.     For an order declaring that Defendants' conduct violates the statute referenced herein;

d.     For an order finding in favor of Plaintiff and the Class and Subclass on the counts asserted herein;

e.     Awarding compensatory damages, including statutory damages where available, to Plaintiff and the Class and Subclass members against Defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial;

f.      For punitive damages, as warranted, in an amount to be determined at trial;

g.      Ordering Defendants to disgorge revenues and profits wrongfully obtained;

h.      For prejudgment interest on all amounts awarded;

i.      For injunctive relief as pleaded or as the Court may deem proper;

j.      For an order awarding Plaintiff and the Class and Subclass their reasonable

        attorneys' fees and expenses and costs of suit; and

k.      Granting Plaintiff and the Class and Subclass members such further relief as the

        Court deems appropriate.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all claims so triable in this action.

Dated:  March 21, 2024                           Respectfully submitted,

                                                 By:      *Steven A. Schwartz*

                                                 **CHIMICLES SCHWARTZ KRINER**
                                                 **& DONALDSON-SMITH LLP**
                                                 Steven A. Schwartz (PA I.D. No. 50579)
                                                 361 W. Lancaster Avenue
                                                 Haverford, PA 19041
                                                 Tel: (610) 642-8500
                                                 Fax: (610) 649-3633
                                                 E-Mail: sas@chimicles.com

                                                 **BURSOR & FISHER, P.A.**
                                                 Joshua D. Arisohn (*Pro Hac Vice Forthcoming*)
                                                 Philip L. Fraietta (*Pro Hac Vice Forthcoming*)
                                                 1330 Avenue of the Americas, 32 Fl.
                                                 New York, NY 10019
                                                 Tel: (646) 837-7150
                                                 Fax: (212) 989-9163
                                                 E-Mail: jarisohn@bursor.com
                                                         pfraietta@bursor.com

                                                 **BURSOR & FISHER, P.A.**
                                                 Stephen A. Beck (*Pro Hac Vice Forthcoming*)
                                                 701 Brickell Ave., Suite 1420
                                                 Miami, FL 33131-2800
                                                 Telephone: (305) 330-5512
                                                 Facsimile: (305) 676-9006
                                                 E-Mail: sbeck@bursor.com

                                                 *Attorneys for Plaintiff and the Putative Class*

## VERIFICATION

I, _David A. Irvin_____, hereby state:

1.      I am a plaintiff in this action;

2.      I verify that the statements made in the foregoing Complaint are true and correct to the best of my knowledge, information, and belief; and

3.      I understand that the statements in said Complaint are subject to the penalties of 18 Pa.C.S. § 4904 relating to unsworn falsification to authorities.

_____
CLIENT NAME

DATED:    3/20/2024_____

VERIFICATION.

# EXHIBIT 9

ORIGINAL

Exhibit A-9

**NOTICE TO PLEAD TO PLAINTIFF:**
**You must plead in response to these**
**preliminary objections within twenty (20)**
**days of service thereof, or risk a judgment**
**against you.**

**SHOOK, HARDY & BACON L.L.P.**
Erin L. Leffler (PA ID No. 204507)
Two Commerce Square
2001 Market St., Suite 3000
Philadelphia, PA 19103
Telephone: (215) 278-2555
Facsimile: (215) 278-2594
eleffler@shb.com

*Attorneys for Defendants Cabela's L.L.C.*
*and BPS Direct, L.L.C.*

| | | |
|---|---|---|
| DAVID IRVIN, on behalf of himself and all others similarly situated, | : : : : | |
| Plaintiff, | : : | COURT OF COMMON PLEAS LEBANON COUNTY |
| v. | : : : | NO. 2023-01668 |
| CABELA'S L.L.C. and BPS DIRECT, L.L.C., | : : : | |
| Defendants. | : : | |

## DEFENDANTS' PRELIMINARY OBJECTIONS TO
## PLAINTIFF'S FIRST AMENDED CLASS ACTION COMPLAINT

Defendants, Cabela's LLC and BPS Direct, LLC (together, "BPS" or "Defendants"), by

and through their undersigned counsel, preliminarily object to Plaintiff's First Amended Class

Action Complaint ("Am. Compl.") and seek dismissal of all claims against them for lack of

standing.

In this action, Plaintiff alleges that when he purchased a firearm from cabelas.com, information about his website visit was disclosed to Facebook, including his name, address, Facebook ID, and the type of gun he purchased. Plaintiff alleges this information was disclosed because Facebook's pixel was implemented on cabelas.com. Plaintiff does not allege that he visited or made a purchase on basspro.com. Yet, Plaintiff seeks to represent a class of "[a]ll persons in Pennsylvania who have a Facebook account and who visited either cabelas.com, basspro.com or both," and asserts claims under the Pennsylvania Wiretapping Act and the Uniform Firearms Act. (*See* Am. Compl. ¶¶ 51, 64–78 attached as **Exhibit A**). However, there are no allegations demonstrating that Plaintiff has standing to pursue either of his claims. For this reason, Plaintiff's claims should be dismissed with prejudice.

In further support of these preliminary objections, BPS states as follows:

1.      BPS is a nationwide retailer of outdoor products, including camping, hunting, and other outdoor equipment. (*See* **Exhibit A**: Am. Compl. ¶¶ 7, 8).

2.      Plaintiff David Irvin alleges he is a Pennsylvania citizen who purchased a Henry Big Boy Classic Centerfire Lever-Action Rifle - .45 from cabelas.com on December 2, 2021. (*Id.* ¶ 6). Plaintiff claims that Defendants "assisted Facebook" with "intercepting" his communications with Cabela's through its website by use of the Facebook pixel. (*Id.* ¶ 10). Plaintiff further alleges that the Facebook pixel transmits "three distinct events to Facebook," including (1) URLs of webpages visited, (2) information "similar" to URLs, but which supposedly "tracks when users access pages for particular products," and (3) the title and description of the webpage visited. (*Id.* ¶¶ 18–22). Plaintiff also alleges that the pixel captures certain button clicks, such as "when users add a product . . . to their online shopping cart and when they checkout." (*Id.* ¶ 23). As a result,

2

Plaintiff alleges that when he visited cabelas.com to purchase a firearm, his name, address, Facebook ID, and the type of gun he purchased were disclosed to Facebook. (*Id.* ¶ 78).

3.      Based on these allegations, Plaintiff asserts this putative class action, claiming BPS's use of Facebook pixel helped Facebook "wiretap" his communications with BPS's website in violation of the Pennsylvania Wiretapping Act, and violated Pennsylvania's Uniform Firearms Act by disclosing "information that [Plaintiff] provided to [BPS] in connection with his purchase of these firearms." (*Id.*).

4.      Plaintiff filed this action on December 21, 2023. Defendants served their preliminary objections to Plaintiff's Complaint on March 1, 2024. Instead of responding to Defendants' preliminary objections, Plaintiff filed a nearly-identical First Amended Class Action Complaint on March 22, 2024.

5.      Despite this amendment, Plaintiff still lacks standing to proceed with this lawsuit. First, Plaintiff lacks standing to assert claims relating to basspro.com because Plaintiff does not allege that he visited or made a purchase from basspro.com. Second, Plaintiff lacks standing entirely to pursue his claims because he has not alleged facts demonstrating that he has been adversely affected in any way from Defendants' conduct. Third, Plaintiff's claim for injunctive relief is barred.

6.      This Court would not be the first to conclude that Plaintiff lacks standing under these circumstances. On December 5, 2023, the United States District Court for the District of Pennsylvania held that Plaintiff Irvin lacked Article III standing with respect to both causes of action alleged. *In re BPS Direct, LLC*, No. 22-CV-4709, 2023 WL 8458245, at *1 (E.D. Pa. Dec. 5, 2023), attached as **Exhibit B**.

3

7.      Specifically, the District Court held that Plaintiff failed to show he suffered a concrete harm under the Pennsylvania Wiretapping Act because he did not allege that BPS captured his "highly sensitive personal information such as medical diagnosis information or financial data from banks or credit cards." *Id.* at *15–*16. And the District Court also held that Plaintiff lacked standing under the Uniform Firearms Act because "the information Bass and Cabela's allegedly disclosed to Facebook—name, address, Facebook ID, and gun purchase—is not sufficiently private to confer standing." *Id.* at *19.

8.      Plaintiff has not (and cannot) allege adequate facts to establish standing. Therefore, Defendants now seek an order dismissing all claims against them with prejudice.

### PRELIMINARY OBJECTION #1
### Lack of Standing to Counts I (Pennsylvania Wiretapping Act) and II (Uniform Firearms Act) Pursuant to Pa. R.C.P. 1028(a)(1)

1.      BPS incorporates the prior paragraphs of these objections as if set forth fully herein.

2.      Under Rule 1028(a)(1), a defendant may file preliminary objections for  lack of jurisdiction over the subject matter of the action. Pa. R.C.P. No. 1028(a)(1).

3.      As argued in the attached Memorandum of Law, which is incorporated herein by reference, Plaintiff lacks standing to represent a class of individuals who made a purchase on the basspro.com website because Plaintiff himself did not do so. Plaintiff also lacks standing entirely to pursue his claims because he has not alleged facts demonstrating that he has been adversely affected in any way from Defendants' conduct. Moreover, Plaintiff lacks standing to pursue injunctive relief.

4.      Accordingly, Count One (Pennsylvania Wiretapping Act) and Count Two (Uniform Firearms Act) should be dismissed with prejudice.

WHEREFORE, BPS respectfully requests that this Honorable Court sustain these Preliminary Objections in accordance with the proposed order attached hereto.

Respectfully submitted,

SHOOK, HARDY & BACON L.L.P.

Dated: April 11, 2024                    By:_____

Erin L. Leffler (PA ID No. 204507)
SHOOK, HARDY & BACON L.L.P.
Two Commerce Square
2001 Market St., Suite 3000
Philadelphia, PA 19103
Tel: (215) 278-2555
eleffler@shb.com

Jennifer A. McLoone (*pro hac vice forthcoming*)
SHOOK, HARDY & BACON L.L.P.
201 South Biscayne Blvd., Suite 3200
Miami, FL 33131
Tel: (305) 358-5171
jmcloone@shb.com

Anna A. Gadberry (*pro hac vice forthcoming*)
SHOOK, HARDY & BACON L.L.P.
2555 Grand Boulevard
Kansas City, MO 64108
Tel: (816) 474-6550
agadberry@shb.com

Maveric R. Searle, (*pro hac vice forthcoming*)
SHOOK, HARDY & BACON L.L.P.
111 South Wacker Drive, Suite 4700
Chicago, IL 60606
Tel: (312) 704-7700
msearle@shb.com

*Attorneys for Defendants Cabela's L.L.C. and BPS Direct, LLC*

**SHOOK, HARDY & BACON L.L.P.**
Erin L. Leffler (PA ID No. 204507)
Two Commerce Square
2001 Market St., Suite 3000
Philadelphia, PA 19103
Telephone: (215) 278-2555
Facsimile: (215) 278-2594
eleffler@shb.com

*Attorneys for Defendants Cabela's LLC*
*and BPS Direct, LLC*

ENTERED & FILED
PROTHONOTARY OFFICE
LEBANON, PA

2024 APR 12 P 1: 45

---

DAVID IRVIN, on behalf of himself and all
others similarly situated,

         Plaintiff,

         v.

CABELA'S L.L.C. and BPS DIRECT, L.L.C.,

         Defendants.

:    COURT OF COMMON PLEAS
::   LEBANON COUNTY
:    NO. 2023-01668

---

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' PRELIMINARY OBJECTIONS TO PLAINTIFF'S FIRST AMENDED CLASS ACTION COMPLAINT

### I.    MATTER BEFORE THE COURT

Plaintiff filed his original Complaint on December 21, 2023. Defendants, Cabela's LLC and BPS Direct, LLC (collectively "Defendants") served their preliminary objections to Plaintiff's Complaint on March 1, 2024. Instead of responding to Defendants' preliminary objections, Plaintiff filed the First Amended Class Action Complaint ("Am. Compl.") on March 22, 2024.

Now before the Court are the preliminary objections of Defendants to Plaintiff's Amended Complaint. As discussed below—despite Plaintiff's amended pleading—Plaintiff still lacks standing in at least three ways: (1) he does not have standing to represent a class of individuals who made a purchase on basspro.com, because Plaintiff himself did not do so; (2) Plaintiff lacks

standing to pursue either of his claims because he has not alleged facts demonstrating that he was adversely affected in any way from Defendants' conduct; and (3), Plaintiff lacks standing to pursue injunctive relief. Thus, all of Plaintiff's claims should be dismissed with prejudice.

## II.     QUESTIONS PRESENTED

(1)     Does Plaintiff have standing to assert claims against Defendants when he makes no allegations indicating that he was aggrieved by any conduct related to basspro.com when he fails to allege he made a purchase on basspro.com or even visited the website?

Suggested Answer:     No.

(2)     Does Plaintiff have standing to assert claims under the Pennsylvania Wiretapping Act (Count One) and the Uniform Firearms Act (Count Two), when the only harm alleged was a bare statutory violation and no actual harm, or a substantial risk of harm, was alleged?

Suggested Answer:     No.

(3)     Does Plaintiff have standing to pursue injunctive relief, when he has not, and cannot, allege that he will visit cabelas.com without knowledge that the site employs pixel technology?

Suggested Answer:     No.

## III.     FACTUAL AND PROCEDURAL BACKGROUND

This is now Plaintiff's *third* bite at the apple, after his claims were dismissed in federal court for lack of standing and after he amended his original complaint in response to Defendants' preliminary objections. Plaintiff originally filed suit against Defendants on March 28, 2023, in the Middle District of Pennsylvania. *See Irvin v. Cabela's L.L.C. et al.*, Case No. 1:23-cv-00530-CCC (M.D. Pa.). On October 2, 2023, the action was transferred to the MDL No. 304, *In re: BPS Direct, LLC and Cabela's LLC, Wiretapping Litigation*, pending in front of Judge Kearney in the Eastern

2

District of Pennsylvania, where it was subsequently dismissed for lack of standing. Specifically, Judge Kearney held that Plaintiff failed to show he suffered a concrete harm under the Pennsylvania Wiretapping Act because he did not allege that BPS captured his "highly sensitive personal information such as medical diagnosis information or financial data from banks or credit cards." *In re BPS Direct, LLC*, No. 22-CV-4709, 2023 WL 8458245, at *15–*16 (E.D. Pa. Dec. 5, 2023). He also found that Plaintiff lacked standing under the Uniform Firearms Act because "the information Bass and Cabela's allegedly disclosed to Facebook—name, address, Facebook ID, and gun purchase—is not sufficiently private to confer standing." *Id.* at *19.

Two weeks after dismissal of his federal court action, Plaintiff filed a nearly identical Complaint. Defendants served their preliminary objections to Plaintiff's Complaint on March 1, 2024. Instead of responding to the preliminary objections, Plaintiff filed another substantively-identical Amended Complaint, which still features all of the same deficiencies as the original Complaint.[1]

Of note, this is one of 5 cases filed by Plaintiff's counsel alleging similar violations against various defendants. *See Petris v. Sportsman's Warehouse, Inc. and Sportsman's Warehouse Holdings, Inc.*, Case No. 2:23-cv-1867 (W.D. Pa.); *Delong v. Sportsman's Guide, Inc.*, Case No. 2:23-cv-04356 (E.D. Pa.); *Digregorio v. Brownells, Inc.*, Case No. 2:23-cv-4557-JMY (E.D. Pa.); *Mcqueen v. Primary Arms LLC*, Case No. 2:24-cv-725 (E.D. Pa.).

## IV.    LEGAL ARGUMENT

### A.    Standard of Review.

Any party may file preliminary objections to any pleading for a variety of reasons, including failure of a pleading to conform to law or rule of court; insufficient specificity in a

---

[1] Plaintiff cured the lack of party verification initially raised by Defendants in their first Preliminary Objections.

pleading; and/or legal insufficiency of a pleading (demurrer). Pa. R.C.P. 1028(a). The Court should

sustain preliminary objections if it "lack[s] . . . jurisdiction over the subject matter of the action[.]"

Pa. R.C.P. 1028(a)(1). In ruling on preliminary objections, courts "accept as true all well-pleaded

material allegations in the petition for review and any reasonable inferences that we may draw

from the averments." *Armstrong Cnty. Mem'l Hosp. v. Dep't of Pub. Welfare*, 67 A.3d 160, 170

(Pa. Commw. Ct. 2013) (citing *Meier v. Maleski*, 167 Pa. Commw. 458, 648 A.2d 595, 600

(1994)). However, courts "[are] not bound by legal conclusions, unwarranted inferences from

facts, argumentative allegations, or expressions of opinion encompassed in the petition for

review." *Id.*

Based on these standards, Defendants' objections should be sustained, and all claims

asserted against Defendants should be dismissed with prejudice.

**B.    Plaintiff Lacks Standing to Bring Claims On Behalf of Class Members Who
        Visited basspro.com.**

In Pennsylvania, it is well established that "a plaintiff in a class action who has not suffered

an injury from the challenged conduct of a defendant cannot maintain a class action against that

defendant." *Nye v. Erie Ins. Exch.*, 504 Pa. 3, 6 (1983) (citing *McMonagle v. Allstate Insurance

Co.*, 460 Pa. 159, 331 A.2d 467 (1975)). "For a petitioner in a class action to maintain an action

against multiple respondents, the petitioner must allege that he has been aggrieved by each

respondent; and where the petitioner alleges that he has been aggrieved by only one respondent—

and not by any of the others—he fails to establish the standing necessary to maintain the action

against those other respondents." *Chester Upland Sch. Dist. v. Rossi*, 275 A.3d 1117, 1125–26 (Pa.

Commw. Ct. 2022) (citing *Nye*).

Plaintiff acknowledges that cabelas.com and basspro.com are separate websites. Am.

Compl. ¶¶ 7, 8. Yet, Plaintiff still does not allege he *ever* visited basspro.com, or that he purchased

*any* product—including a firearm—from that website. In fact, the only allegation Plaintiff added

to his Amended Complaint related to this issue is still wholly deficient:

> The basspro.com and cabelas.com websites are largely the same.
> Both are operated, at least in part, by BPS. Both offer the same
> products, including the same firearms, for sale and offer the same
> sale promotions. Both websites also function identically in
> unlawfully assisting Facebook in intercepting information about
> consumers [sic] firearms purchases.

Am. Compl. ¶ 9. Even accepting this allegation as true, it does not confer standing. Whether or not

the websites are "largely the same" makes no difference. Plaintiff *himself* must have been

aggrieved by the use of basspro.com. But Plaintiff does not even attempt to allege that he had any

contact with basspro.com. As a result, Plaintiff lacks standing to assert claims arising out of other

individuals' visits to basspro.com and his attempt to represent a class of website visitors to

basspro.com must be denied. *Id.* ¶ 51; *see also Nye*, 504 Pa. at 6 ("In the present case, [p]aintiff's]

complaint fails to allege that he has been aggrieved by the conduct of any of the defendant

insurance companies except Erie. Consequently, appellee lacks standing to maintain an action

against these defendants."); *Chester Upland Sch. Dist.*, 275 A.3d at 1126 ("Petitioners lack

standing to maintain an action against any Respondents other than the Delaware County OJS

because Petitioners fail to allege that they have been aggrieved by the conduct of those other

Respondents.").[2]

    For these reasons, this Court should conclude that Plaintiff lacks standing to represent a

class of website visitors to basspro.com.

---

[2] Federal authority is in accord. *Cf. LaSpina v. SEIU Pennsylvania State Council*, 2019 WL 4081900, *4—*6 (M.D.
Pa. Aug. 29, 2019) ("Standing cannot be predicated on an injury which the plaintiff has not suffered, nor can it be
acquired through the back door of a class action." (cleaned up)); *Hemy v. Perdue Farms*, 2011 WL 6002463, at *11
(D.N.J. Nov. 30, 2011) ("Plaintiffs' failure to allege that they purchased the 'Perdue' brand chicken products is a
critical omission because, without [that allegation], Plaintiffs have failed to sufficiently allege an injury-in-fact with
respect to those products. . . . [A] plaintiff in a class action must show that she has personally been injured; the class
plaintiff cannot rely on 'injuries suffered by other, unidentified members of the class.'").

**C.    Plaintiff Lacks Standing To Assert Either of His Claims Arising Out of His Visit to cabelas.com.**

A party filing suit in a Pennsylvania court "must establish as a threshold matter that he has standing to maintain the action." *Johnson v. Am. Standard*, 8 A.3d 318, 329 (Pa. 2010)! "Unlike the federal courts, which derive their standing requirements from Article III of the United States Constitution, standing for Pennsylvania litigants has been created judicially." *Id.*

In Pennsylvania, there are two types of standing: statutory standing and traditional standing. To have statutory standing, the statute must "expressly prescribe[] the individuals who have standing to pursue a particular action thereunder." *Gennock v. Kirkland's Inc.*, 299 A.3d 900, *2 (Pa. Super. Ct. 2023), *appeal denied*, 2023 WL 7545980 (Pa. Nov. 14, 2023). "[T]he answer to any question concerning statutory standing involves a careful analysis of the relevant statutory scheme. For example, the Child Custody Act expressly prescribes who may pursue an action thereunder. *See* 23 Pa.C.S. § 5324 ("Standing for any form of physical custody or legal custody"), 5325 ("Standing for partial physical custody and supervised physical custody")." Moreover, "[a] statute setting forth a private right of action does not automatically confer standing." *Gennock*, 299 A.3d at *3 (Pa. Super. Ct. 2023); *Budai v. Country Fair, Inc.*, 2023 PA Super 85, 296 A.3d 20, 26 (2023), *appeal denied*, 2023 WL 7517160 (Pa. Nov. 14, 2023) (same). Unless a statute has an *express* provision stating who has standing to pursue an action, there is no statutory standing. *Gennock*, 299 A.3d at *3 (refusing to find statutory standing under the FACTA because "[n]otably absent from FACTA is a provision, like those in the Child Custody Act, delineating who has standing to pursue an action thereunder. . . . As FACTA contains no standing provision, Plaintiffs may not invoke statutory standing to pursue their action in state court.").

To establish traditional standing, the litigant must be "adversely affected" in some way. *Id.* "[I]t is not sufficient for the person claiming to be 'aggrieved' to assert the common interest of all

citizens in procuring obedience to the law." *Id.* (citing *Wm. Penn Parking Garage, Inc. v. City of Pittsburgh*, 346 A.2d 269, 280–81 (Pa. 1975)). "[T]he doctrine of standing stems from the principle that judicial intervention is appropriate only where the underlying controversy is real and concrete, rather than abstract." *Id.*

Once again, Plaintiff has no standing under either theory. First, Plaintiff does not have statutory standing because neither the Pennsylvania Wiretapping Act nor the Uniform Firearms Act contain an express provision prescribing the parties who may sue in Pennsylvania courts. *See* 18 Pa. Cons. Stat. § 5703 *et seq.*; 18 Pa. Cons. Stat. § 6111; *see also Gennock*, 299 A.3d at *2 (to have statutory standing, the statute must "expressly prescribe[] the individuals who have standing to pursue a particular action thereunder."); *id.* at *3 ("[a] statute setting forth a private right of action does not automatically confer standing.").

Second, Plaintiff does not have traditional standing. The touchstone of traditional standing is that "the person must be negatively impacted in some **real** and **direct** fashion." *Young v. Wetzel*, 260 A.3d 281, 287 (Pa. Commw. Ct. 2021) (emphasis supplied), *publication ordered* (July 8, 2021) (quoting *Markham v. Wolf*, 635 Pa. 288, 136 A.3d 134, 140 (2016)). In determining whether a plaintiff has traditional standing, courts consider "whether the litigant has a substantial, direct, and immediate interest in the matter." *Young*, 260 A.3d at 287. "To have a substantial interest, the concern in the outcome of the challenge must surpass the common interest of all citizens in procuring obedience to the law." *Id.* A direct interest "is an interest that mandates demonstration that the matter caused harm to the party's interest." *Id.* Lastly, an immediate interest is one in which the "causal connection is not remote or speculative." *Id.*

Plaintiff does not allege any of the factors necessary to establish traditional standing. Assuming Plaintiff's version of facts is true and Plaintiff's name, address, Facebook user ID, and

type of firearm purchased were actually disclosed to Facebook, Plaintiff does not explain how he was negatively impacted by the alleged conduct *at all*, let alone in a "real and direct fashion." *Young*, 260 A.3d at 287. Indeed, Plaintiff's Amended Complaint merely alleges that Defendants "invaded the personal privacy of Plaintiff and putative class members by disclosing this sensitive and protected information." (Am. Compl. ¶ 50.). But, importantly, Plaintiff does not assert a claim for invasion of privacy here. Plaintiff asserts claims under the Pennsylvania Wiretapping Act and the Uniform Firearms Act. And to establish standing *for those claims*, Plaintiff must allege that Defendants' alleged violations of the two Pennsylvania statutes aggrieved him in a "real and direct" fashion. He has not done so. Plaintiff's alleged "invasion" of privacy simply parrots the rest of the allegations in the Amended Complaint; it does not demonstrate a "real and direct" harm to Plaintiff, or show that Plaintiff was "adversely affected in any way by the matter he seeks to challenge[.]" *Young*, 260 A.3d at 287. Plaintiffs allegations are "general averments" which "lack the necessary factual depth to support a conclusion that a [petitioner] is an aggrieved party[.]" *Open PA Sch. v. Dep't of Educ.*, 280 A.3d 343 (Pa. Commw. Ct. 2022). At bottom, the Amended Complaint alleges a bare statutory violation that is not sufficient to satisfy the "core concept" of standing. *Id.* (quoting *Wm. Penn Parking*, 464 Pa. 168); *Atiyeh v. Com.*, 2013 WL 3156585, at *5 (Pa. Commw. Ct. May 28, 2013) (sustaining Preliminary Objections based on lack of standing because "[t]he allegations do not show how Petitioners are negatively impacted in a real and direct fashion" and "they do not describe any substantial, direct, or immediate interest. Instead, the allegations are conclusory and speculative[.]").

This would not be the first time Plaintiff's claims were dismissed for lack of standing. Judge Kearney in the Eastern District of Pennsylvania recently dismissed Plaintiff's identical wiretapping claim because he alleged only that he "entered basic personal information, which is

not sufficiently private to confer standing." *In re BPS Direct, LLC*, 2023 WL 8458245, at *14 (E.D. Pa. Dec. 5, 2023). The court further suggested that to establish standing for Plaintiff's wiretapping claim, he would need to "truthfully allege Bass and Cabela's captured [his] highly sensitive personal information such as medical diagnosis information or financial data from banks or credit cards." *Id.* Plaintiff has not alleged any such facts here.

Likewise, Judge Kearney dismissed Plaintiff's identical claim under the Uniform Firearms Act, finding that Plaintiff's allegations did not share a "close relationship" with the tort of public disclosure of private facts, because there was no "publicity" (*i.e.*, the information was only shared with one entity, Facebook). Nor did Plaintiff's allegations share a "close relationship" with the tort of intrusion upon seclusion. As the court noted, "[a]fter [] Irvin made his online gun purchase, he needed to pick up the firearm at a store. Other shoppers and employees of Cabela's would identify Facebook Website User Irvin and observe his gun purchase." *In re BPS Direct, LLC*, 2023 WL 8458245, at *19. Moreover, "the information Bass and Cabela's allegedly disclosed to Facebook—name, address, Facebook ID, and gun purchase—is not sufficiently private to confer standing." *Id.* The court ultimately held that "disclosing a gun purchase is not the type of highly offensive or objectionable conduct to which liability can attach." *Id.*

The Pennsylvania Superior Court's recent decision in *Gennock* is another helpful example. There, the court held that the plaintiffs' allegations of a bare statutory violation of the Fair and Accurate Credit Transactions Act ("FACTA") were not enough to confer standing. *Gennock*, 299 A.3d at *2–*6. The Court recognized that "Plaintiffs' speculative chain of events that the receipts [improperly listing their credit card information] placed them at heightened risk for identity theft solely based on their existence simply does not amount to an interest that is substantial, direct, and

immediate, which our Supreme Court identified as the foundational components of standing." *Id.* at *5.

Notably, the allegations in Plaintiff's Amended Complaint here are even more bare-bones than those in *Gennock*. The *Gennock* plaintiffs alleged that the defendant violated the FACTA by listing their full credit card number on printed receipts, and as a result they were at a greater risk of identity theft. *Gennock*, 299 A.3d at *4. Those allegations were not enough to confer standing because the plaintiffs' claims of increased risk of identity theft were speculative. *Id.* at *6. Here, Plaintiff has had multiple opportunities to amend his allegations, and yet the best he can do is assert a single conclusory allegation that Defendants "invaded [his] personal privacy." This is not enough. An alleged "invasion of privacy" is not a concrete harm based in fact; it is nothing but a legal conclusion – indeed, it is simply an allegation that the violation itself is the harm. As the Court in *Gennock* held, Plaintiff has simply not alleged enough to confer standing. *Id.* at *5 (dismissing plaintiffs' complaint because "[s]tated simply, [the defendant's] conduct has not adversely affected them."); *see also Young*, 260 A.3d at 287–88 ("Having failed to establish that he was adversely affected in any way by the data breach, Young lacks standing to pursue his negligence claim.")

For all these reasons, this Court should conclude that Plaintiff lacks standing to assert either of his claims and dismiss the case with prejudice. *Young*, 260 A.3d at 287 ("[j]udicial intervention is appropriate only where the underlying controversy is real and concrete, rather than abstract.").

### D. Plaintiff Lacks Standing to Pursue Injunctive Relief.

Plaintiff lacks standing to seek an injunction. An injunction is only appropriate to protect against future harm. Here, Plaintiff does not, *and cannot*, allege that he will visit cabelas.com without knowledge that the site employs pixel technology. Indeed, Judge Kearney concluded as much:

> We find our Website Users are not likely to suffer future injury from Bass or Cabela's conduct. Website Users allege Bass and Cabela's used a third party to track their movements on the websites without their knowledge. Website Users brought this lawsuit and are presumably now aware of the alleged risks associated with browsing Cabela's and Bass's websites. Website Users' activity on Bass and Cabela's websites is entirely voluntary and we assume Website Users will act rationally in light of the information they possess. 234 They may visit Cabela's or Bass's website again, but they will do so with the knowledge session replay is capturing their movements. "Pleading a lack of self-restraint may elicit sympathy but it will not typically invoke the jurisdiction of a federal court." Website Users will not be deceived again in the future.

*In re BPS Direct, LLC*, 2023 WL 8458245, at *32–*33. Plaintiff's claim for injunctive relief should therefore be dismissed for lack of standing. *See, e.g.*, *Logan v. Lillie*, 728 A.2d 995, 1000 (Pa. Commw. Ct. 1999) (sustaining preliminary objections related to equitable relief because the plaintiff could "not establish that there is a real and immediate threat that he will be wronged in the future."); *Seidman v. Snack Factory, LLC*, 2015 WL 1411878 at *5 (S.D. Fla. Mar. 26, 2015) (dismissing for lack of standing).

## V.    REQUESTED RELIEF

Defendants respectfully requests that this Court sustain these Preliminary Objections in accordance with the proposed order attached hereto.

Respectfully submitted,

SHOOK, HARDY & BACON L.L.P.

Dated:  April 11, 2024                 By:_____

Erin L. Leffler (PA ID No. 204507)
SHOOK, HARDY & BACON L.L.P.
Two Commerce Square
2001 Market St., Suite 3000
Philadelphia, PA 19103
Tel: (215) 278-2555
eleffler@shb.com

Jennifer A. McLoone (*pro hac vice forthcoming*)
SHOOK, HARDY & BACON L.L.P.
201 South Biscayne Blvd., Suite 3200
Miami, FL 33131
Tel: (305) 358-5171
jmcloone@shb.com

Anna A. Gadberry (*pro hac vice forthcoming*)
SHOOK, HARDY & BACON L.L.P.
2555 Grand Boulevard
Kansas City, MO 64108
Tel: (816) 474-6550
agadberry@shb.com

Maveric R. Searle, (*pro hac vice forthcoming*)
SHOOK, HARDY & BACON L.L.P.
111 South Wacker Drive, Suite 4700
Chicago, IL 60606
Tel: (312) 704-7700
msearle@shb.com

*Attorneys for Defendants Cabela's LLC and BPS Direct, LLC*

## **CERTIFICATE OF SERVICE**

I, Erin L. Leffler, hereby certify that on April 11, 2024, I filed the foregoing Preliminary

Objections to Plaintiff's First Amended Class Action Complaint and served a true and correct copy

by electronic mail on the following counsel of record:

> Steven A. Schwartz
> Chimicles Schwartz Krinner & Donaldson-Smith LLP
> 361 W. Lancaster Avenue
> Haverford, PA 19041
> sas@chimicles.com
>
> Joshua D. Arisohn
> Philip L. Fraietta
> Burson & Fisher, P.A.
> 1330 Avenue of the Americas
> New York, NY 10019
> jarisohn@bursor.com
> pfraietta@bursor.com
>
> Christopher R. Reilly
> 701 Brickell Ave., Suite 1420
> Miami, FL 33131
> creilly@bursor.com
>
> *Attorneys for Plaintiff*

By:_____
    Erin L. Leffler

*Attorney for Defendant Cabela's LLC and BPS
Direct, LLC*

# EXHIBIT A

# ORIGINAL

**IN THE COURT OF COMMON PLEAS OF
LEBANON COUNTY, PENNSYLVANIA**

ENTERED & FILED
PROTHONOTARY OFFICE
LEBANON, PA

2024 MAR 22  P 1: 34

|  |  |
|---|---|
| DAVID IRVIN, on behalf of himself and all others similarly situated, | CIVIL DIVISION |
| Plaintiff, | Case No. 2023-01668 |
| | **FIRST AMENDED CLASS ACTION COMPLAINT** |
| v. | |
| CABELA'S L.L.C. and BPS DIRECT, L.L.C., | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff David Irvin ("Plaintiff"), on behalf of himself and all other similarly situated (the "Class members") bring this case against Cabela's L.L.C. ("Cabela's") and BPS Direct, L.L.C. ("BPS") (collectively, "Defendants"), which operate, control and manage the websites cabelas.com and basspro.com, respectively. Plaintiff brings this action based upon personal knowledge of the facts pertaining to himself, and on information and belief as to all other matters, by and through the investigation of undersigned counsel.

## NATURE OF THE ACTION

1.      This is a class action lawsuit brought on behalf of all Pennsylvania residents who have visited and/or purchased firearms from cabelas.com and/or basspro.com.

2.      Defendants aid, employ, agree, and conspire with Meta Platforms, Inc. ("Facebook") to intercept communications sent and received by Plaintiff and Class Members, including communications containing protected information about firearms purchases. Plaintiff brings this action for legal and equitable remedies resulting from these illegal actions.

## JURISDICTION AND VENUE

3.      The Court has subject matter jurisdiction over this action pursuant to Pa. Cons. Art. 5, §5(b) and 42 Pa. C.S.A. § 931(b).

4.      The Court has personal jurisdiction over Defendant pursuant to 42 Pa. C.S.A. 5301(a)(2).

5.      Venue is proper pursuant to Pa. R. Civ. P. 2179(a)(2)-(4) because Defendant regularly conducts business in this county, the causes of action arose out of conduct in this county, and the transaction or occurrence out of which the causes of action arose took place in this county.

## THE PARTIES

6.      Plaintiff David Irvin is an adult citizen of the Commonwealth and is domiciled in Fredericksburg, Pennsylvania.  On December 2, 2021, Plaintiff Irvin purchased a Henry Big Boy Classic Centerfire Lever-Action Rifle - .45 Colt from cabelas.com.  When accessing the website and completing the purchase, Plaintiff Irvin was located in Pennsylvania.  Plaintiff Irvin also has an active Facebook account which he has maintained since approximately 2007.  Plaintiff Irvin accesses his Facebook account from multiple devices, including his laptop and smartphone.

7.      Defendant Cabela's L.L.C. is a Pennsylvania company headquartered in Springfield, Missouri.  Cabela's owns and operates cabelas.com, through which it sells sporting goods, including firearms.  Cabela's is a wholly-owned subsidiary of BPS Direct, L.L.C.

8.      Defendant BPS Direct, L.L.C., doing business as Bass Pro Shops, is a Delaware corporation headquartered in Springfield, Missouri.  BPS owns and operates basspro.com, through which it sells sporting goods, including firearms.  BPS also assists in the operation of the cabelas.com website and is the parent company of Cabela's.

9.      The basspro.com and cabelas.com websites are largely the same.  Both are

operated, at least in part, by BPS. Both offer the same products, including the same firearms, for sale and offer the same sale promotions. Both websites also function identically in unlawfully assisting Facebook in intercepting information about consumers firearms purchases.

10.     Pursuant to the systematic process described herein, Defendants, through cabela's.com and basspro.com, assisted Facebook with intercepting Plaintiff's communications, including those that contained personally identifiable information and protected information about their firearms purchases. Defendants assisted these interceptions without Plaintiff's knowledge, consent or express written authorization. By failing to receive the requisite consent, Defendants breached confidentiality and unlawfully disclosed Plaintiff's personally identifiable information and protected information about his firearms purchases.

## FACTUAL ALLEGATIONS

### 1.     Facebook and the Facebook Tracking Pixel

11.     Facebook is the largest social networking site on the planet, touting 2.9 billion monthly active users.[1] Facebook describes itself as a "real identity platform,"[2] meaning users are allowed only one account and must share "the name they go by in everyday life."[3] To that end, when creating an account, users must provide their first and last name, along with their birthday and gender.[4]

12.     Facebook generates revenue by selling advertising space on its website.[5]

---

[1] Sean Burch, *Facebook Climbs to 2.9 Billion Users, Report 29.1 Billion in Q2 Sales*, YAHOO (July 28, 2021), https://www.yahoo.com/now/facebook-climbs-2-9-billion-202044267.html
[2] Sam Schechner and Jeff Horwitz, *How Many Users Does Facebook Have? The Company Struggles to Figure It Out*, WALL. ST. J. (Oct. 21, 2021).
[3] FACEBOOK, COMMUNITY STANDARDS, PART IV INTEGRITY AND AUTHENTICITY, https://www.facebook.com/communitystandards/integrity_authenticity.
[4] FACEBOOK, SIGN UP, https://www.facebook.com/
[5] Mike Isaac, *Facebook's profit surges 101 percent on strong ad sales.*, N.Y. TIMES (July 28, 2021), https://www.nytimes.com/2021/07/28/business/facebook-q2-earnings.html.

13.    Facebook sells advertising space by highlighting its ability to target users.[6] Facebook can target users so effectively because it surveils user activity both on and off its site.[7] This allows Facebook to make inferences about users beyond what they explicitly disclose, like their "interests," "behavior," and "connections."[8]  Facebook compiles this information into a generalized dataset called "Core Audiences," which advertisers use to apply highly specific filters and parameters for their targeted advertisements.[9]

14.    Advertisers can also build "Custom Audiences."[10]  Custom Audiences enable advertisers to reach "people who have already shown interest in [their] business, whether they're loyal customers or people who have used [their] app or visited [their] website."[11] Advertisers can use a Custom Audience to target existing customers directly, or they can use it to build a "Lookalike Audiences," which "leverages information such as demographics, interests, and behavior from your source audience to find new people who share similar qualities."[12]   Unlike Core Audiences, Custom Audiences require an advertiser to supply the underlying data to Facebook.  They can do so through two mechanisms: by manually uploading contact information for customers, or by utilizing Facebook's "Business Tools," which collect and transmit the data

---

[6] FACEBOOK, WHY ADVERTISE ON FACEBOOK,
https://www.facebook.com/business/help/205029060038706.
[7] FACEBOOK, ABOUT FACEBOOK PIXEL,
https://www.facebook.com/business/help/742478679120153?id=1205376682832142.
[8] FACEBOOK, AD TARGETING: HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS,
https://www.facebook.com/business/ads/ad-targeting.
[9] FACEBOOK, EASIER, MORE EFFECTIVE WAYS TO REACH THE RIGHT PEOPLE ON FACEBOOK,
https://www.facebook.com/business/news/Core-Audiences.
[10] FACEBOOK, ABOUT CUSTOM AUDIENCES,
https://www.facebook.com/business/help/744354708981227?id=2469097953376494.
[11] FACEBOOK, ABOUT EVENTS CUSTOM AUDIENCE,
https://www.facebook.com/business/help/366151833804507?id=300360584271273.
[12] FACEBOOK, ABOUT LOOKALIKE AUDIENCES,
https://www.facebook.com/business/help/164749007013531?id=401668390442328.

automatically.[13] One such Business Tool is the Facebook Tracking Pixel.

15.     The Facebook Tracking Pixel is a piece of code that advertisers, like Defendant,

can integrate into their website. Once activated, the Facebook Tracking Pixel "tracks the people

and type of actions they take."[14] When the Facebook Tracking Pixel captures an action, it sends

a record to Facebook. Once this record is received, Facebook processes it, analyzes it, and

assimilates it into datasets like the Core Audiences and Custom Audiences.

16.     Advertisers control what actions—or, as Facebook calls it, "events"—the

Facebook Tracking Pixel will collect, including the website's metadata, along with what pages a

visitor views and what buttons a visitor clicks.[15] Advertisers can also configure the Facebook

Tracking Pixel to track other events. Facebook offers a menu of "standard events" from which

advertisers can choose, including what content a visitor views or purchases.[16] An advertiser can

also create their own tracking parameters by building a "custom event."[17]

17.     Advertisers control how the Facebook Tracking Pixel identifies visitors. The

Facebook Tracking Pixel is configured to automatically collect "HTTP Headers" and "Pixel-

specific Data."[18] HTTP Headers collect "IP addresses, information about the web browser, page

---

[13] FACEBOOK, CREATE A CUSTOMER LIST CUSTOM AUDIENCE,
https://www.facebook.com/business/help/170456843145568?id=2469097953376494;
FACEBOOK, CREATE A WEBSITE CUSTOM AUDIENCE,
https://www.facebook.com/business/help/1474662202748341?id=2469097953376494.
[14] FACEBOOK, RETARGETING, https://www.facebook.com/business/goals/retargeting.
[15] *See* FACEBOOK, FACEBOOK PIXEL, ACCURATE EVENT TRACKING, ADVANCED,
https://developers.facebook.com/docs/facebook-pixel/advanced/; *see also* FACEBOOK, BEST
PRACTICES FOR FACEBOOK PIXEL SETUP,
https://www.facebook.com/business/help/218844828315224?id=1205376682832142.
[16] FACEBOOK, SPECIFICATIONS FOR FACEBOOK PIXEL STANDARD EVENTS,
https://www.facebook.com/business/help/402791146561655?id=1205376682832142.
[17] FACEBOOK, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS,
https://www.facebook.com/business/help/964258670337005?id=1205376682832142.
[18] FACEBOOK, FACEBOOK PIXEL, https://developers.facebook.com/docs/facebook-pixel/.

location, document, referrer and persons using the website."[19]  Pixel-specific Data includes "the Pixel ID and cookie."[20]

**B.    Defendants' Websites and the Facebook Pixel**

18.    Defendants' websites cabelas.com and basspro.com are largely mirror images of one another.  Both host code for the Facebook Tracking Pixel and are configured to transmit three distinct events to Facebook:[21]

**Figures 1 and 2:**



19.    PageView transmits the Uniform Resource Locator ("URL") accessed, which shows what webpage the visitor visited:

**Figures 3 and 4:**



---

[19] *Id.*

[20] *Id.*

[21] This data derives from a tool created and offered by Facebook.

20.     Defendants' URLs contain detailed information disclosing what products users have browsed.  For example, if a user searches for "Vortex scope," the URL displayed is "basspro.com/SearchDisplay#q=Vortex%20scope," and if that user then clicks on the "Vortext Diamondback Rifle Scope," the URL changes to "basspro.com/shop/en/vortex-diamondback-rifle-scope."

21.     ViewContent shows similar information to PageView, but specifically tracks when users access pages for particular products.

22.     Microdata transmits the title and description of the webpage:

**Figures 5 and 6:**



23.     Another event titled "Button Click Automatically Detected" registers when users add a product, such as a firearm, to their online shopping cart and when they checkout:

**Figures 7 and 8:**

One pixel found on www.cabelas.com

🔘 **Facebook Pixel**                          Troubleshoot Pixel
    Pixel ID: 841232062592664 click to copy     View Analytics

▼ ✧ Button Click Automatically Detected

**CUSTOM PARAMETERS SENT**

formFeatures: []
buttonText: ORDER ONLINE
buttonFeatures: Hide

```
{"classList":"btn primary chartcomposerprimary left pdp_ch
art_addtocart_button","destination":"javascript: if (typeo
f onBehalfUtilitiesJS == 'undefined') {setCurrentId('SKU_L
ist_Widget_Add2CartButton_30744573456233226621_table');fire
armsDisplayJS.orderFirearmsOnlineWrapper('3074457345623326
621', '30744573456233226621_quantity_input','https://www.ca
belas.com/shop/en/FirearmsResidencyCheckView','30744573456
3326120');} else if (onBehalfUtilitiesJS.csrProceedcheck
()) {setCurrentId('SKU_List_Widget_Add2CartButton_30744573
45623326621_table');firearmsDisplayJS.orderFirearmsOnlineW
rapper('30744573456233226621','3074457345623326621_quantit
y_input','https://www.cabelas.com/shop/en/FirearmsResidency
CheckView','3074457345623326120');} else {messageHelper.di
splayErrorMessage(messageHelper.messages['ERROR_CSR_USER_P
ROCEED']);}","id":"SKU_List_Widget_Add2CartButton_30744573
45623326621_table","imageUrl":"","innerText":"ORDER ONLIN
E","numChildButtons":0,"tag":"a","type":null,"name":""}
```

pageFeatures: Hide

```
{"title":"Savage Arms AXIS II XP TrueTimber VSX Bolt-Actio
n Rifle | Cabela's"}
```

One pixel found on www.basspro.com

🔘 **Facebook Pixel**                          Troubleshoot Pixel
    Pixel ID: 1923188964632693 click to copy    View Analytics

▼ ✧ Button Click Automatically Detected

**CUSTOM PARAMETERS SENT**

formFeatures: []
buttonText: ORDER ONLINE
buttonFeatures: Hide

```
{"classList":"btn primary chartcomposerprimary left pdp_ch
art_addtocart_button","destination":"javascript: if (typeo
f onBehalfUtilitiesJS == 'undefined') {setCurrentId('SKU_L
ist_Widget_Add2CartButton_30744573456233226620_table');fire
armsDisplayJS.orderFirearmsOnlineWrapper('3074457345623326
620', '30744573456233226620_quantity_input','https://www.ba
sspro.com/shop/en/FirearmsResidencyCheckView','30744573456
3324136');} else if (onBehalfUtilitiesJS.csrProceedcheck
()) {setCurrentId('SKU_List_Widget_Add2CartButton_30744573
45623326620_table');firearmsDisplayJS.orderFirearmsOnlineW
rapper('30744573456233226620','3074457345623326620_quantit
y_input','https://www.basspro.com/shop/en/FirearmsResidency
CheckView','3074457345623324136');} else {messageHelper.di
splayErrorMessage(messageHelper.messages['ERROR_CSR_USER_P
ROCEED']);}","id":"SKU_List_Widget_Add2CartButton_30744573
45623326620_table","imageUrl":"","innerText":"ORDER ONLIN
E","numChildButtons":0,"tag":"a","type":null,"name":""}
```

pageFeatures: Hide

```
{"title":"Savage Arms AXIS II XP TrueTimber VSX Bolt-Actio
n Rifle with Threaded Barrel | Bass Pro Shops"}
```

24.     This event registers, for example, when a purchaser clicks "ORDER ONLINE,"
"ADD TO CART," "CHECKOUT," "CONTINUE," "REVIEW ORDER," and "PLACE
ORDER."

25.     The Button Click event also transmits content that purchasers enter into form
fields:

**Figures 9 and 10:**



26.    This includes form fields that must be completed prior to purchase:

**Figure 11:**



27.    This event data, jointly and independently, permit an ordinary person to identify what a consumer has viewed and/or purchased on Defendants' websites.

28.    The Facebook Tracking Pixel uses both first- and third-party cookies. A first-party cookie is "created by the website the user is visiting"—*i.e.,* cabelas.com or basspro.com.[22] A third-party cookie is "created by a website with a domain name other than the one the user is currently visiting"—*i.e.,* Facebook.[23]

29.    When viewing Defendants' websites, the Facebook Tracking Pixel compels the user's browser to send nine cookies to Facebook:

**Figure 12:**

| Name | Value | Domain |
|---|---|---|
| xs | 156%3AKGXBbut-SJxSCw%63A2%3A16396O1808%... | .facebook.com |
| wd | 1313x646 | .facebook.com |
| usida | eyJ2ZXIiOjEsImIkIjoiQXJvZndreDE1OTA1ZmsiLCJ0... | .facebook.com |
| c_user | 679395441 | .facebook.com |
| datr | jVa6YcoeBSLOAo0a9bvz1mtE | .facebook.com |
| presence | C%7B%22t3%22%3A%58%5D%2C%22utc3%22%... | .facebook.com |
| dpr | 1.4630000591278076 | .facebook.com |
| sb | jVa6YaHou2Nev98LSBnWYOo7 | .facebook.com |
| fr | 0ZzdZn9Ygh60Xbk36AWVC5uksSXTsGC3302SbE... | .facebook.com |

30.    The c_user cookie contains that visitor's unencrypted Facebook ID. A Facebook ID is personally identifiable information. Anyone can identify a Facebook profile—and all personal information publicly listed on that profile—by appending the Facebook ID to the end of Facebook.com.

31.    The fr cookie contains, at least, an encrypted Facebook ID and browser

---

[22] PC MAG, FIRST-PARTY COOKIES, https://www.pcmag.com/encyclopedia/term/first-party-cookie. This is confirmable by using developer tools to inspect a website's cookies and track network activity.

[23] PC MAG, THIRD-PARTY COOKIES, https://www.pcmag.com/encyclopedia/term/third-party-cookie. This is also confirmable by tracking network activity.

identifier.[24] The datr cookies also identifies a browser.[25] Facebook, at a minimum, uses the fr and c_user cookies to identify users by their Facebook IDs and corresponding Facebook profiles.[26]

32.    Through the Facebook Tracking Pixel's code, these cookies combine the identifiers with the event data, allowing Facebook to know, among other things, what webpages visitors to Defendants' websites are visiting and what products they are purchasing.[27]

33.    Defendants also use "Advanced Matching." With Advanced Matching, Defendants' Pixels "look[s] for recognizable form field and other sources on your website that contain information such as first name, last name and email."[28] That information is recorded, "along with the event, or action, that took place."[29] This information is also "hashed,"[30] meaning it is "[a] computed summary of digital data that is a one-way process." In other words, it "cannot be reversed back into the original data."[31]

---

[24] DATA PROTECTION COMMISSIONER, FACEBOOK IRELAND LTD, REPORT OF RE-AUDIT (Sept. 21, 2012), http://www.europe-v-facebook.org/ODPC_Review.pdf.
[25] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.
[26] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.
[27] FACEBOOK, GET STARTED, https://developers.facebook.com/docs/meta-pixel/get-started.
[28] https://www.facebook.com/business/help/611774685654668?id=1205376682832142
[29] FACEBOOK, ABOUT ADVANCED MATCHING FOR WEB, https://www.facebook.com/business/help/611774685654668?id=1205376682832142.
[30] DEFINITION OF HASH, https://www.pcmag.com/encyclopedia/term/hash
[31] Id.

**Figure 13:**

You can use Advanced Matching to help:

- Increase the number of attributed conversions. We can match more of the conversions that happen on your website to people on Meta. This helps you understand the impact of your ads on website conversions.

- Increase your Custom Audience size. We're able to better match your website visitors to people on Meta and increase the size of your Custom Audience.

- Decrease the cost per conversion. Conversion-optimized campaigns become more efficient because we can better identify and deliver ads to the types of people likely to take the actions you care about.

34.    Defendants disclose this information to Facebook so it can better match visitors to their Facebook profiles.

35.    As part of Advanced Matching, Defendants enabled "Automatic Advanced Matching." That means Defendants configured the pixel to scan form fields containing a user's email address, first name, last name, phone number, gender, zip code, city and state.[32] The highlighted line, along with the line three below it, shows that Defendants enabled Automatic Matching.

**Figure 14:**

```
33 fbq.registerPlugin("841232062592664", {__fbEventsPlugin: 1, plugin: function(fbq, instance, config) { fbq.loadPlugin(
34 fbq.loadPlugin("identity");
35 instance.optIn("841232062592664", "InferredEvents", true);
36 fbq.loadPlugin("jsonld_microdata");
37 instance.optIn("841232062592664", "MicrodataJsonLd", true);
38 config.set("841232062592664", "automaticMatching", {"selectedMatchKeys":["em","fn","ln","ph","ge","zp","ct","st"]});
39 fbq.loadPlugin("inferredevents");
40 fbq.loadPlugin("identity");
41 instance.optIn("841232062592664", "AutomaticMatching", true);
42 fbq.loadPlugin("iwlbootstrapper");
43 instance.optIn("841232062592664", "IWLBootstrapper", true);
44 fbq.loadPlugin("iwlparameters");
45 fbq.loadPlugin("estruleengine");
46 instance.optIn("841232062592664", "IWLParameters", true);
```

36.    Defendants know that Facebook will match the Advanced Matching parameters with a customer's subsequent activity, thereby helping them "[i]ncrease the number of attributed

---

[32] Facebook provides a corresponding look-up table: FACEBOOK, ADVANCED MATCHING, https://developers.facebook.com/docs/meta-pixel/advanced/advanced-matching.

conversions," "[i]ncrease [their] Custom Audience size," and "[d]ecrease the cost per conversion."[33]

37.   By compelling a visitor's browser to disclose the Advanced Matching parameters and event data for videos, Defendants knowingly disclose information sufficiently permitting an ordinary person to identify a specific individual's website activity, including what webpages they visit and what products they purchase.

**C.   Defendants Never Received Consent from Plaintiff and Class Members to Assist Facebook with Intercepting Their Communications**

38.   Defendants never received consent from users to intercept their electronic communications.

39.   Plaintiff and Class members did not consent to Defendants' privacy policies prior to Facebook intercepting their electronic communications.  Even if applicable, that privacy policy fails to disclose that Defendants assist Facebook with intercepting communications that contain sensitive information.

40.   Likewise, Facebook never receives consent from users to intercept and collect electronic communications containing their sensitive and unlawfully disclosed information.  In fact, Facebook expressly warrants the opposite.

41.   When first signing up, a user assents to three agreements: the Terms of Service,[34] the Cookies Policy,[35] and the Data Policy.[36]

42.   Facebook's Terms of Service begins by stating that "[p]rotecting people's

---

[33] FACEBOOK, ABOUT ADVANCED MATCHING FOR WEB,
https://www.facebook.com/business/help/611774685654668?id=1205376682832142.
[34] FACEBOOK, TERMS OF SERVICE, https://www.facebook.com/legal/terms/update.
[35] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES,
https://www.facebook.com/policies/cookies/.
[36] FACEBOOK, DATA POLICY, https://www.facebook.com/about/privacy/update.

privacy is central to how we've designed our ad system."[37]  The Terms of Service then prohibits anyone from using Facebook's Products in a manner that is "unlawful, misleading, discriminatory or fraudulent."[38]

      43.     Facebook's Data Policy recognizes that there may be "[d]ata with special protections,"  meaning information that "could be subject to special protections under the laws of your country."[39]  The Data Policy goes on to describe how Facebook collects information from its "Meta Business Tools," including "our social plug-ins (such as the Like button), Facebook Login, our APIs and SDKs, or the Meta pixel."[40]  Specifically, Facebook acknowledges that "[p]artners receive your data when you visit or use their services or through third parties they work with."[41]

      44.     Facebook then offers an express representation: **"We require each of these partners to have lawful rights to collect, use and share your data before providing any data to us."**[42]  Facebook does acknowledge collecting "data with special protections" to personalize ads, but critically, only sensitive information that users "choose to provide."[43]

      45.     Facebook's Cookies Policy ratifies those representations, stating "the Data Policy will apply to our processing of the data that we collect via cookies."[44]

      46.     Facebook's other representations reinforce these warranties.  In its Advertising

---

[37]FACEBOOK, TERMS OF SERVICE, https://www.facebook.com/legal/terms/update..
[38] *Id.*
[39] FACEBOOK, DATA POLICY, https://www.facebook.com/about/privacy/update.
[40] FACEBOOK, DATA POLICY, https://www.facebook.com/about/privacy/update.
[41] *Id.*
[42] *Id.*
[43] *Id.*
[44] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policies/cookies/.

Policy, Facebook states "[w]e do not use sensitive personal data for ad targeting."[45]  And in a

blog post titled "About Restricted Meta Business Tools Data," Facebook asserts it has "policies

around the kinds of information businesses can share with us."[46]  Facebook does not "want

websites or apps sending us sensitive information about people."[47]  Sensitive information

includes, among other things, "any information defined as sensitive under applicable laws,

regulations and applicable industry guidelines."[48]

   47. These representations are repeated frequently.  Facebook created a "Help Center"

to better explain its practices to users.  In an article titled, "How does Facebook receive

information from other businesses and organizations?," Facebook reiterates its promise to

"prohibit businesses or organizations from sharing sensitive information with us," and if

Facebook "determine[s] that a business or an organization is violating our terms, we'll take

action against that business or organization."[49]  In another article, titled, "How does Meta work

with data providers?," Facebook repeats this promise, stating "[b]usinesses that advertise on

Facebook are required to have any necessary rights and permissions to use this information, as

outlined in our Custom Audience Terms that businesses must agree to."[50]

   48. Based on these representations, Facebook never receives consent from users to

intentionally intercept and monetize electronic communications disclosing sensitive information

that the law protects.

---

[45] FACEBOOK, ADVERTISING POLICY, https://www.facebook.com/policies/ads/.
[46] FACEBOOK, ABOUT RESTRICTED META BUSINESS TOOLS DATA,
https://www.facebook.com/business/help/1057016521436966?id=188852726110565
[47] *Id.*
[48] *Id.*
[49] FACEBOOK, HOW DOES FACEBOOK RECEIVE INFORMATION FROM OTHER BUSINESSES AND
ORGANIZATIONS, https://www.facebook.com/help/2230503797265156.
[50] HOW DOES META WORK WITH DATA PROVIDERS?,
https://www.facebook.com/help/494750870625830?ref=dp.

Policy, Facebook states "[w]e do not use sensitive personal data for ad targeting."[45] And in a blog post titled "About Restricted Meta Business Tools Data," Facebook asserts it has "policies around the kinds of information businesses can share with us."[46] Facebook does not "want websites or apps sending us sensitive information about people."[47] Sensitive information includes, among other things, "any information defined as sensitive under applicable laws, regulations and applicable industry guidelines."[48]

47.     These representations are repeated frequently. Facebook created a "Help Center" to better explain its practices to users. In an article titled, "How does Facebook receive information from other businesses and organizations?," Facebook reiterates its promise to "prohibit businesses or organizations from sharing sensitive information with us," and if Facebook "determine[s] that a business or an organization is violating our terms, we'll take action against that business or organization."[49] In another article, titled, "How does Meta work with data providers?," Facebook repeats this promise, stating "[b]usinesses that advertise on Facebook are required to have any necessary rights and permissions to use this information, as outlined in our Custom Audience Terms that businesses must agree to."[50]

48.     Based on these representations, Facebook never receives consent from users to intentionally intercept and monetize electronic communications disclosing sensitive information that the law protects.

---

[45] FACEBOOK, ADVERTISING POLICY, https://www.facebook.com/policies/ads/.
[46] FACEBOOK, ABOUT RESTRICTED META BUSINESS TOOLS DATA, https://www.facebook.com/business/help/1057016521436966?id=188852726110565
[47] Id.
[48] Id.
[49] FACEBOOK, HOW DOES FACEBOOK RECEIVE INFORMATION FROM OTHER BUSINESSES AND ORGANIZATIONS, https://www.facebook.com/help/2230503797265156.
[50] HOW DOES META WORK WITH DATA PROVIDERS?, https://www.facebook.com/help/494750870625830?ref=dp.

49.     Moreover, upon information and belief, Defendants have never entered into an agreement with Facebook that would obligate Facebook to keep disclosed information confidential.

50.     By assisting Facebook with intercepting information about consumers' firearm purchases, Defendants violated the Pennsylvania Wiretap Act and Uniform Firearms Act. Defendants also invaded the personal privacy of Plaintiff and putative class members by disclosing this sensitive and protected information.

## CLASS ALLEGATIONS

51.     Plaintiff, pursuant to Rules 1702, 1708 and 1709 of the Pennsylvania Rules of Civil Procedure, asserts this action individually and on behalf of the following Class: All persons in Pennsylvania who have a Facebook account and who visited either cabelas.com, basspro.com or both (the "Class").  Plaintiff also seeks to represent a subclass of similarly situated individuals defined as all persons in Pennsylvania who have a Facebook account and who purchased a firearm from either cabelas.com, basspro.com or both (the "Subclass").

52.     Subject to additional information obtained through further investigation and discovery, the above-described Class and Subclass may be modified or narrowed as appropriate, including through the use of multi-state subclasses.

53.     **Numerosity.**  Consistent with Pennsylvania Rule of Civil Procedure 1702(1), the Class is so numerous that joinder of all members is impracticable.  While Plaintiff does not know the exact number of members of the Class, Plaintiff believes the Class contains at least hundreds of thousands of individuals, and the members can be identified through Defendant's records. Class Members may be notified of the pendency of this action by recognized, Court-approved

notice dissemination methods, which may include U.S. mail, electronic mail, internet postings, social media and/or published notice.

54.    **Commonality.** Consistent with Pennsylvania Rule of Civil Procedure 1702(2), common questions of law and fact exist as to all Class Members. These common questions of law or fact predominate over any questions affecting only individual members of the Class. Common questions include, but are not limited to the following:

    a. whether Defendants collected users' PII, website activities and firearms purchases;

    b. whether Defendants unlawfully disclosed and continue to disclose their users' PII, website activities and firearms purchases in violation of Pennsylvania Wiretapping Act, 8 Pa. Cons. Stat. § 5701, *et seq.*;

    c. whether Defendants unlawfully disclosed and continue to disclose its users' PII, website activities and firearms purchases in violation of Uniform Firearms Act, 18 Pa.C.S. § 6111(i); and

    d. whether Defendants disclosed its users PII, website activities and firearms purchases without consent.

55.    **Typicality.** Consistent with Pennsylvania Rule of Civil Procedure 1702(3), Plaintiff's claims are typical of the claims of the Class he seeks to represent because Plaintiff and all Class Members have suffered similar injuries as a result of the same practices alleged herein. Plaintiff has no interests to advance adverse to the interests of the other Class Members, and Defendant has no defenses unique to any Plaintiff.

56.    **Adequate Representation.** Consistent with Pennsylvania Rule of Civil Procedure 1702(4) and 1709, Plaintiff has and will continue to fairly and adequately represent and protect the interests of the Class and has retained as his counsel attorneys competent and experienced in class actions and complex litigation, including litigation to remedy privacy

violations. Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of Class Members, and they have the resources to do so.

57. **Predominance.** Consistent with Pennsylvania Rule of Civil Procedure 1708(a)(1), common questions of law and fact predominate over any questions affecting only individual class members. For example, Defendant's liability and the fact of damages is common to all members of the Class.

58. **Superiority and Manageability.** Consistent with Pennsylvania Rule of Civil Procedure 1708(a)(2), a class action is superior to other available means for the fair and efficient adjudication of this dispute. The injury suffered by each Class Member, while meaningful on an individual basis, may not be of such magnitude as to make the prosecution of individual actions against Defendant economically feasible. Even if Class Members could afford individual litigation, those actions would put immeasurable strain on the court system. Moreover, individual litigation of the legal and factual issues of the case would increase the delay and expense to all parties and the court system. A class action, however, presents far fewer management difficulties and provides the benefit of single adjudication, economy of scale and comprehensive supervision by a single court.

59. **Risk of Inconsistent, Varying, or Prejudicial Adjudications.** Consistent with Pennsylvania Rule of Civil Procedure 1708(a)(3), a class action will minimize the risk of inconsistent, varying or prejudicial adjudications. If Plaintiff's and Class members' claims were tried separately, Defendant would be confronted with incompatible standards of conduct and divergent court decisions.

60. **Litigation Already Commenced.** Consistent with Pennsylvania Rule of Civil Procedure 1708(a)(4), to Plaintiff's knowledge, there are no other cases that have been brought

against Defendant, or that are currently pending against Defendant, where Pennsylvania consumers seek to represent a class of Pennsylvania residents based on conduct alleged in this Complaint.

61.    **Appropriateness of Forum.**  Consistent with Pennsylvania Rule of Civil Procedure 1708(a)(5), the most appropriate forum to concentrate the litigation is this County because Defendant conducts business in this county, the conduct at issue took place in part in this county and a substantial number of Class members were injured in this County.

62.    **Support for Class Certification.**  Consistent with Pennsylvania Rule of Civil Procedure 1708(a)(6) and (7), there is support for a class to be certified because of the relatively low amount recoverable by each Class member and the expenses of individual litigation.

63.    **The General Applicability of Defendant's Conduct.**  Consistent with Pennsylvania Rule of Civil Procedure 1708(b)(2), Defendant's conduct is generally applicable to the class as a whole, making relief appropriate with respect to each Class member.

<u>CLAIMS FOR RELIEF</u>

<u>COUNT I</u>
**Violation of the Pennsylvania Wiretapping Act**
**18 Pa. Cons. Stat. § 5701, *et seq.***

64.    Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein.

65.    Plaintiff brings this Count individually and on behalf of the members of the Class.

66.    The Pennsylvania Wiretapping Act prohibits (1) the interception or procurement of another to intercept any wire, electronic, or oral communication; (2) the intentional disclosure of the contents of any wire, electronic, or oral communication that the discloser knew or should have known was obtained through the interception of a wire, electronic, or oral communication;

and (3) the intentional use of the contents of any wire, electronic, or oral communication that the discloser knew or should have known was obtained through the interception of a wire, electronic, or oral communication. 18 Pa. Cons. Stat. § 5703.

67.     Any person who intercepts, discloses, or uses or procures any other person to intercept, disclose, or use, a wire, electronic, or oral communication in violation of the Act is subject to a civil action for (1) actual damages, not less than liquidated damages computed at a rate of $100 per day for each violation or $1,000, whichever is higher; (2) punitive damages; and (3) reasonable attorneys' fees and other litigation costs incurred. 18 Pa. Cons. Stat. § 5725(a).

68.     "Intercept" is defined as the "[a]ural or other acquisition of the contents of any wire, electronic or oral communication through the use of any electronic, mechanical or other device." 18 Pa. Cons. Stat. § 5702. "Electronic, mechanical or other device," in turn, means "[a]ny device or apparatus … that can be used to intercept a wire, electronic or oral communication[.]" *Id.*

69.     The following constitutes a device within the meaning of 18 Pa. Cons. Stat. § 5702:

    a.  The computer codes and programs that Defendants used to track Plaintiff and Class members' communications while navigating the websites;

    b.  Plaintiff's and Class members' web browsers;

    c.  Plaintiff's and Class members' computing devices;

    d.  Defendants' web servers;

    e.  The web servers from which Facebook received the Plaintiff's and Class members' communications while they were using a web browser to access Defendants' websites;

f. The plan Defendants carried out to effectuate their tracking of Plaintiff's and Class members' communications while using a web browser to access the websites.

70. At all relevant times, Defendants procured Facebook to track and intercept Plaintiff's and other Class and Subclass members' internet communications while navigating their websites. Defendants sent these communications to Facebook without authorization or consent from Plaintiff or Class members.

71. Defendants, when procuring Facebook to intercept Plaintiff' communications, intended Facebook to learn the meaning of the content the visitor requested.

72. Plaintiff and Class members had a justified expectation under the circumstances that their electronic communications would not be intercepted.

73. Plaintiff and Class members were not aware that their electronic communications were being intercepted by Facebook.

## COUNT II
## Violation of the Uniform Firearms Act
## 18 Pa.C.S. § 6111(i)

74. Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein.

75. Plaintiff brings this Count individually and on behalf of the members of the Subclass.

76. Section 6111(i) of the Uniform Firearms Act ("UFA") provides the following:

(i) Confidentiality.--All information provided by the potential purchaser, transferee or applicant, including, but not limited to, the potential purchaser, transferee or applicant's name or identity, furnished by a potential purchaser or transferee under this section or any applicant for a license to carry a firearm as provided by section 6109 shall be confidential and not subject to public

disclosure.  In addition to any other sanction or penalty imposed by this chapter, any person, licensed dealer, State or local governmental agency or department that violates this subsection shall be liable in civil damages in the amount of $1,000 per occurrence or three times the actual damages incurred as a result of the violation, whichever is greater, as well as reasonable attorney fees.

77.    Plaintiff is a "purchaser" under the UFA because he purchased a firearm from Defendants.  On December 2, 2021, Plaintiff Irvin purchased a Henry Big Boy Classic Centerfire Lever-Action Rifle - .45 Colt form cabelas.com.

78.    Defendants disclosed to Facebook information that Plaintiff provided to them in connection with his purchase of these firearms.  Specifically, Defendants disclosed Plaintiff's name, address, his Facebook ID, the type of gun that he purchased, among other items.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendants, as follows:

a.    Determining that this action is a proper class action;

b.    For an order certifying the Class and Subclass, naming Plaintiff as representative of the Class and Subclass, and naming Plaintiff's attorneys as Class Counsel to represent the Class and Subclass;

c.    For an order declaring that Defendants' conduct violates the statute referenced herein;

d.    For an order finding in favor of Plaintiff and the Class and Subclass on the counts asserted herein;

e.    Awarding compensatory damages, including statutory damages where available, to Plaintiff and the Class and Subclass members against Defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial;

f.    For punitive damages, as warranted, in an amount to be determined at trial;

g.    Ordering Defendants to disgorge revenues and profits wrongfully obtained;

h.    For prejudgment interest on all amounts awarded;

i.    For injunctive relief as pleaded or as the Court may deem proper;

j.    For an order awarding Plaintiff and the Class and Subclass their reasonable attorneys' fees and expenses and costs of suit; and

k.    Granting Plaintiff and the Class and Subclass members such further relief as the Court deems appropriate.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all claims so triable in this action.

Dated: March 21, 2024

Respectfully submitted,

By:      *Steven A. Schwartz*

**CHIMICLES SCHWARTZ KRINER & DONALDSON-SMITH LLP**
Steven A. Schwartz (PA I.D. No. 50579)
361 W. Lancaster Avenue
Haverford, PA 19041
Tel: (610) 642-8500
Fax: (610) 649-3633
E-Mail: sas@chimicles.com

**BURSOR & FISHER, P.A.**
Joshua D. Arisohn (*Pro Hac Vice Forthcoming*)
Philip L. Fraietta (*Pro Hac Vice Forthcoming*)
1330 Avenue of the Americas, 32 Fl.
New York, NY 10019
Tel: (646) 837-7150
Fax: (212) 989-9163
E-Mail: jarisohn@bursor.com
          pfraietta@bursor.com

**BURSOR & FISHER, P.A.**
Stephen A. Beck (*Pro Hac Vice Forthcoming*)
701 Brickell Ave., Suite 1420
Miami, FL 33131-2800
Telephone: (305) 330-5512
Facsimile: (305) 676-9006
E-Mail: sbeck@bursor.com

*Attorneys for Plaintiff and the Putative Class*

## VERIFICATION

I, __David A. Irvin__, hereby state:

1.    I am a plaintiff in this action;

2.    I verify that the statements made in the foregoing Complaint are true and correct to the best of my knowledge, information, and belief; and

3.    I understand that the statements in said Complaint are subject to the penalties of 18 Pa.C.S. § 4904 relating to unsworn falsification to authorities.

CLIENT NAME

DATED:    __3/20/2024__

VERIFICATION.

# EXHIBIT B

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: BPS DIRECT, LLC, AND | : | **MDL 3074** |
| CABELA'S, LLC, WIRETAPPING | : | |
| | : | |
| | : | **E.D.Pa. ACTION NOS.:** |
| | : | **23-md-3074** |
| | : | **22-cv-4709** |
| | : | **23-cv-2282** |
| | : | **23-cv-2287** |
| | : | **23-cv-2293** |
| | : | **23-cv-2294** |
| | : | **23-cv-2295** |
| | : | **23-cv-2306** |
| | : | **23-cv-2338** |
| | : | **23-cv-4008** |

## <u>ORDER</u>

**AND NOW**, this 5th day of December 2023, upon considering the Motions to dismiss (ECF No. 54 and ECF Nos. 38-39 in No. 23-4008), lead Plaintiffs' and David Irvin's Oppositions (ECF No. 56 and ECF No. 47 in No. 23-4008), Replies (ECF No. 57 and ECF No. 52 in No. 23-4008), following oral argument, and for reasons in today's accompanying Memorandum, it is

**ORDERED** Defendants' Motions (ECF No. 54 and ECF No. 38 in No. 23-4008) are **GRANTED** requiring:

1. We **dismiss** Brittany Vonbergen, Gregory Moore, Jr., Brian Calvert, Arlie Tucker, Timothy Durham, and Marilyn Hernandez's claims for damages with prejudice;

2. We **dismiss** all plead claims for injunctive relief with prejudice;

3. We **dismiss** Heather Cornell, Peter Montecalvo, and David Irvin's claims for damages without prejudice to their filing amended Complaints on or before **January 5, 2024** if they can specifically plead standing based on the sharing of highly sensitive personal information such as a medical diagnosis or financial data from banks or credit cards;

4.      We **stay** until further Order the parties' prospective obligations regarding discovery including in our October 23, 2023 (ECF No. 67), November 17, 2023 Order (ECF No. 81), and November 27, 2023 Order (ECF No. 82), as well as fee and costs reporting, expert disclosure, and class certification obligations in our July 26, 2023 Order (ECF No. 52), but counsel remain obligated to follow our Policies and Procedures as to conferring before moving for relief, maintaining and preserving records including billing records (ECF No. 52 at ¶ 4), and addressing a Rule 408 demand and response and timely moving for summary judgment (*Id.* at ¶¶ 10, 21) should Plaintiffs file an amended Complaint.

KEARNEY, J.

2

DAVID IRVIN, on behalf of himself and all        :
others similarly situated,                        :
                                                  :
        Plaintiff,                               :        COURT OF COMMON PLEAS
                                                  :        LEBANON COUNTY
        v.                                       :        NO. 2023-01668
                                                  :
CABELA'S L.L.C. and BPS DIRECT, L.L.C.,           :
                                                  :
        Defendants.                              :

## ORDER

    AND NOW, this _____ day of _____, 2024, upon consideration of

the Preliminary Objections of Defendants, Cabela's L.L.C. and BPS Direct, LLC, to Plaintiff's

First Amended Class Action Complaint, and any response in opposition thereto, it is hereby

ORDERED and DECREED that said Preliminary Objections are SUSTAINED.

    It is FURTHER ORDERED that all claims against the Defendants in the above-captioned

action are hereby DISMISSED, with prejudice.


                                      BY THE COURT:


                                      _____ , J.

# EXHIBIT 10

ORIGINAL

Exhibit A-10

**SHOOK, HARDY & BACON L.L.P.**
Erin L. Leffler (PA ID No. 204507)
Two Commerce Square
2001 Market St., Suite 3000
Philadelphia, PA 19103
Telephone: (215) 278-2555
Facsimile: (215) 278-2594
eleffler@shb.com

*Attorneys for Defendants Cabela's L.L.C.*
*and BPS Direct, L.L.C.*

ENTERED & FILED
PROTHONOTARY OFFICE
LEBANON, PA

2024 APR 23  P 12: 49

| | |
|---|---|
| DAVID IRVIN, on behalf of himself and all others similarly situated, | : : : : |
| Plaintiff, | : COURT OF COMMON PLEAS : LEBANON COUNTY |
| v. | : : NO. 2023-01668 |
| CABELA'S L.L.C. and BPS DIRECT, L.L.C., | : |
| Defendants. | : : |

## <u>PRAECIPE FOR DISPOSITION</u>

TO THE PROTHONOTARY:

Please transmit the <u>Defendants' Preliminary Objections to Plaintiff's First Amended Class</u>

<u>Action Complaint filed on April 12, 2024</u> to the Court for disposition pursuant to Leb.R.C.P. 205.5.

Judge previously assigned to this matter:  <u>None</u>.

Oral argument <u>IS</u> requested.

The names and addresses of all opposing counsel/pro se litigants are as follows:

Steven A. Schwartz
Chimicles Schwartz Krinner & Donaldson-Smith LLP
361 W. Lancaster Avenue
Haverford, PA 19041
sas@chimicles.com

Joshua D. Arisohn
Philip L. Fraietta
Burson & Fisher, P.A.
1330 Avenue of the Americas
New York, NY 10019
jarisohn@bursor.com
pfraietta@bursor.com

*Attorneys for Plaintiff*

Respectfully submitted,

SHOOK, HARDY & BACON L.L.P.

Dated: April 22, 2024

By:_____

Erin L. Leffler (PA ID No. 204507)
SHOOK, HARDY & BACON L.L.P.
Two Commerce Square
2001 Market St., Suite 3000
Philadelphia, PA 19103
Tel: (215) 278-2555
eleffler@shb.com

Jennifer A. McLoone (*pro hac vice forthcoming*)
SHOOK, HARDY & BACON L.L.P.
201 South Biscayne Blvd., Suite 3200
Miami, FL 33131
Tel: (305) 358-5171
jmcloone@shb.com

Anna A. Gadberry (*pro hac vice forthcoming*)
SHOOK, HARDY & BACON L.L.P.
2555 Grand Boulevard
Kansas City, MO 64108
Tel: (816) 474-6550
agadberry@shb.com

Maveric R. Searle, (*pro hac vice forthcoming*)
SHOOK, HARDY & BACON L.L.P.
111 South Wacker Drive, Suite 4700
Chicago, IL 60606
Tel: (312) 704-7700
msearle@shb.com

*Attorneys for Defendants Cabela's L.L.C. and
BPS Direct, LLC*

2

## **CERTIFICATE OF SERVICE**

I, Erin L. Leffler, hereby certify that on April 22, 2024, I filed the foregoing Praecipe for Disposition and served a true and correct copy by electronic mail on the following counsel of record:

> Steven A. Schwartz
> Chimicles Schwartz Krinner & Donaldson-Smith LLP
> 361 W. Lancaster Avenue
> Haverford, PA 19041
> sas@chimicles.com
>
> Joshua D. Arisohn
> Philip L. Fraietta
> Burson & Fisher, P.A.
> 1330 Avenue of the Americas
> New York, NY 10019
> jarisohn@bursor.com
> pfraietta@bursor.com
>
> *Attorneys for Plaintiff*

By: _____
      Erin L. Leffler

*Attorney for Defendant Cabela's LLC and BPS Direct, LLC*

# EXHIBIT 11

IN THE COURT OF COMMON PLEAS
OF LEBANON COUNTY, PENNSYLVANIA

ORIGINAL

CIVIL ACTION – LAW

ENTERED & FILED
PROTHONOTARY OFFICE
LEBANON, PA

DAVID IRVIN, on behalf of himself and :
all others similarly situated,                :
      vs.                                          :        No. 2023-01668   2024 APR 26  P 3: 01
                                  :
CABELA'S, LLC & BPS DIRECT, LLC,   :

**ORDER OF COURT**

AND NOW, to wit, this ___25th___ of _____April_____, __2024__,

upon Praecipe for Disposition of ____Defendant's Preliminary Objections to

Plaintiff's First Amended Class Action Complaint filed on April 12, 2024___

the Court hereby directs the Prothonotary of Lebanon County to list this case for

the ___June 2024___ term of argument court.

☐    This case has been submitted on the briefs and will be ripe for disposition

on the argument court date.  You do not need to appear for argument.

☒    This case is listed for oral argument.  Argument will be heard in the

designated courtroom at 2:00 p.m. on the ___7th___ day of _____June_____,

20___24___.

      Proponent's Brief is due: __May 10, 2024___

      Opponent's Brief is due: __May 24, 2024___

(Proponent is the Party that filed the motion to be resolved)

BY THE COURT:

_____, P.J.
JOHN C. TYLWALK

/sa
cc:  Erin L. Leffler, Esq. // 2001 Market Street, Suite 3000, Philadelphia, PA 19103 >mail
     Steven A. Schwartz, Esq. // 361 W. Lancaster Avenue, Haverford, PA 19041
     Shannon Dougher//Judges Chambers - I/o

Pursuant to Pa. R. Civil P. 236
All parties are hereby notified,
this date: 4/26/2024 Cu
Prothonotary, Lebanon PA

# EXHIBIT 12

Exhibit A-12

# ORIGINAL

### IN THE COURT OF COMMON PLEAS
### LEBANON COUNTY, PENNSYLVANIA

ENTERED & FILED
PROTHONOTARY OFFICE
LEBANON, PA

2024 MAY -1   A 11: 18

| | |
|---|---|
| DAVID IRVIN, on behalf of himself and all others similarly situated, | |
| Plaintiff, | No. 2023-01668 |
| v. | |
| CABELA'S L.L.C. and BPS DIRECT, L.L.C., | |
| Defendants. | |

## PLAINTIFF'S RESPONSE AND BRIEF IN OPPOSITION TO DEFENDANTS' PRELIMINARY OBJECTIONS TO PLAINTIFF'S FIRST AMENDED COMPLAINT

**CHIMICLES SCHWARTZ KRINER & DONALDSON-SMITH LLP**
Steven A. Schwartz (PA I.D. No. 50579)
361 W. Lancaster Avenue
Haverford, PA 19041
Tel: (610) 642-8500
Fax: (610) 649-3633
E-Mail: sas@chimicles.com

**BURSOR & FISHER, P.A.**
Joshua D. Arisohn (*Pro Hac Vice Forthcoming*)
Philip L. Fraietta (*Pro Hac Vice Forthcoming*)
1330 Avenue of the Americas, 32 Fl.
New York, NY 10019
Tel: (646) 837-7150
Fax: (212) 989-9163
E-Mail: jarisohn@bursor.com
        pfraietta@bursor.com

**BURSOR & FISHER, P.A.**
Stephen A. Beck (*Pro Hac Vice Forthcoming*)
701 Brickell Ave., Suite 1420
Miami, FL 33131-2800
Telephone: (305) 330-5512
Facsimile: (305) 676-9006
E-Mail: sbeck@bursor.com

# TABLE OF CONTENTS

PAGE(S)

INTRODUCTION ........................................................................................................... 1

LEGAL STANDARD ..................................................................................................... 3

ARGUMENT ................................................................................................................... 4

I.    PLAINTIFF HAS STANDING TO BRING HIS CLAIM UNDER THE
      UNIFORM FIREARMS ACT ............................................................................... 4

      A.    Plaintiff Satisfies Traditional Standing Requirements ............................. 4

      B.    Plaintiff's Injury Is Sufficient To Confer Standing. .............................. 6

II.   PLAINTIFF HAS STANDING TO BRING HIS CLAIM UNDER THE
      PENNSYLVANIA WIRETAPPING ACT .......................................................... 10

III.  PLAINTIFF CAN REPRESENT PURCHASERS OF BASSPRO.COM ............ 11

CONCLUSION .............................................................................................................. 12

# TABLE OF AUTHORITIES

## CASES

*Astiana v. Dreyer's Grand Ice Cream, Inc.,*
   2012 WL 2990766 (N.D. Cal. Jul. 20, 2012) ..................................................................... 11

*Borse v. Piece Goods Shop, Inc.,*
   963 F.2d 611 (3d Cir. 1992) ............................................................................................. 7

*Bower v. Bower,*
   531 Pa. 54 (1992) ............................................................................................................. 3

*Butler Area School Dist. v. Penn. For Union Reform,*
   172 A.3d 1173 (Pa. Cmwlth. 2017) ................................................................................. 7

*Chester Upland Sch. Dist. V. Rossi,*
   275 A.3d 1117 (Pa. Cmwlth. 2022) ............................................................................... 11

*Commonwealth of Pennsylvania v. DeJohn,*
   486 Pa. 32 (1979) ............................................................................................................. 6

*Doe v. Franklin County,*
   139 A.3d 296 (Pa. Cmwlth. 2016) ............................................................................... 6, 8

*Doe v. Franklin County,*
   644 Pa. 1 (2017) ............................................................................................................... 6

*Doe 1 v. Franklin County,*
   272 A.3d 1022 (Pa. Cmwlth. 2022) ............................................................. 2, 6, 10, 11

*Firearm Owners Against Crime v. Paperfuse,*
   261 A.3d 467 (2021) ........................................................................................................ 3

*Fumo v. City of Philadelphia,*
   601 Pa. 322, 972 A.2d 487 (2009) .................................................................................. 3

*Gennock v. Kirkland's Inc.,*
   299 A.3d 900 (Pa. Super. Ct. 2023) ................................................................................ 9

*Harris v. Easton Pub. Co.,*
   483 A.2d 1377 (Pa. Super. Ct. 1984) ............................................................. 4, 5, 10, 11

*Haun v. Cmty. Health Sys., Inc.,*
   14 A.3d 120 (Pa. Super. Ct. 2011) .................................................................................. 3

*Hykes v. Hughes,*
   835 A.2d 382 (Pa. Super. Ct. 2003) ................................................................................ 3

*In re Hard Disk Drive Suspension Assemblies Antitrust Litig.,*
  2021 WL 4306018 (N.D. Cal. Sept. 22, 2021) ........................................................ 12

*In re: BPS Direct, LLC, and Cabela's, LLC, Wiretapping,*
  2023 WL 8458245 (E.D. Pa. Dec. 5, 2023) .............................................................. 1

*In re: Google, Inc. Cookie Placement Consumer Privacy Litig.,*
  934 F.3d 316 (3d Cir. 2019)..................................................................................... 11

*Interest of K.N.L.,*
  284 A.3d 121 (Pa. 2022) .......................................................................................... 5

*Johnson v. American Standard,*
  607 Pa. 492, 8 A.3d 318 (2010) ............................................................................... 3

*Johnson v. Bryco Arms,*
  224 F.R.D. 536 (E.D.N.Y. Nov. 22, 2004) .............................................................. 8

*McMullan v. Wohlgemuth,*
  453 Pa. 147 (1973)............................................................................................... 6, 7

*Milby v. Pote,*
  189 A.3d 1065 (Pa. Super. 2018)............................................................................. 3

*Murray v. Surgical Specialties Corp.,*
  1999 WL 46583 (E.D. Pa. Jan. 14, 1999)................................................................ 7

*Nye v. Erie Ins. Exch.,*
  504 Pa. 3 (1983)...................................................................................................... 11

*Pa. State Lodge, Fraternal Order of Police v. Com., Dep't of Conservation & Nat.,*
  909 A.2d 413 (Pa. Commw. Ct. 2006) ..................................................................... 3

*Pennsylvania Liquor Control Board v. Burns,*
  2020 WL 3256836 (Pa. Cmwlth. June 16, 2020) ..................................................... 8

*Pittsburgh Palisades Park, LLC v. Com.,*
  585 Pa. 196 (2005)................................................................................................ 4, 5

*Taha v. Bucks County,*
  9 F. Supp. 3d 490 (E.D. Pa. 2014) ........................................................................... 7

*Times Pub. Co., Inc. v. Michel,*
  633 A.2d 1233 (Pa. Cmwlth. 1993)......................................................................... 8

*Trust Under Will of Ashton,*
  260 A.3d 81 (Pa. 2021)............................................................................................ 4

*Warth v. Seldin,*
  422 U.S. 490 (1975)............................................................................................. 2, 4

*Young v. Wetzel,*
   260 A.3d 281 (Pa. Cmwlth. 2021) ................................................................. 9

**STATUTES**

18 Pa. C.S. § 6111(i) ............................................................................................ 5

18 Pa. C.S. § 7326(a) ........................................................................................... 6

18 Pa. C.S. § 9121 ................................................................................................ 7

75 Pa. C.S. § 6114(a)(1) ...................................................................................... 7

Ariz. Rev. Stat. §13-3112(J) ................................................................................ 8

Conn. Gen. Stat. Ann. §29-28(d) ......................................................................... 8

Del. Code, tit. 29, §10002(g)(11) ........................................................................ 8

Fla. Stat. Ann. §790.0601 ................................................................................... 8

Ga. Code Ann. §50-18-72(d) ............................................................................... 8

Me. Rev. Stat. Ann., tit. 25 §2006 ...................................................................... 8

Miss. Code Ann. § 25-61-11.1 ............................................................................ 8

Va. Code Ann. § 18.2-308.07(C) ......................................................................... 8

Wash. Rev. Code Ann. §42.56.240(4) ................................................................. 8

**REGULATIONS**

43 Pa. Code § 1.2(a) ............................................................................................ 7

**OTHER AUTHORITIES**

Restatement (Second) of Torts § 652B ................................................................ 10

## **INTRODUCTION**

In 1995, the Pennsylvania legislature amended the Uniform Firearms Act, adding a provision that requires companies and public entities to keep information about gun ownership confidential. While the legislative history is sparse, the motivations for the amendment are clear. Unlike other consumer goods, knowledge about gun ownership, when given to the wrong person, can have dire, life-threatening consequences. It is no one's business, the Pennsylvania legislature has determined, to know which law-abiding citizens are also gun owners. However, this did not stop Defendants Cabela's LLC ("Cabela's") and BPS Direct, LLC ("BPS") (collectively, "Defendants") from disclosing consumers', including Plaintiff's, private gun purchases to third parties, including to the world's largest social media company.

Defendants now move to dismiss Plaintiff's First Amended Complaint ("FAC"), relying, in part, on the same arguments raised in a recent federal court case concerning the same disclosures of gun purchasing information. *See In re: BPS Direct, LLC, and Cabela's, LLC, Wiretapping*, 2023 WL 8458245 (E.D. Pa. Dec. 5, 2023). While Judge Kearney held that Plaintiff did not satisfy Article III's heightened standing requirements to bring his claims in federal court, he explained that "State courts judges' standing considerations account for many varied disputes that would fall short of constituting 'cases and controversies' in federal court." *Id.*, at *19 n. 209. Despite this guidance, Defendants now argue that Plaintiff also does not have standing to bring his claims in state court. That cannot be correct.

Specifically, Defendants argue that Plaintiff lacks standing for all of his claims because: 1) he has not alleged that he was adversely affected by Defendants' conduct, and 2) he did not have his firearm purchasing information disclosed on basspro.com.[1] *See* Memorandum of Law

---

[1] Plaintiff withdraws his request for injunctive relief.

in Support of Defendants' Preliminary Objections to Plaintiff's First Amended Class Action Complaint ("Motion"). Defendants are wrong on both counts.

First, Plaintiff adequately alleges that he was harmed by Defendants' conduct. *See* FAC, ¶ 50 ("Defendants [] invaded the personal privacy of Plaintiff [] by disclosing this sensitive and protected information."). As a threshold matter, arguments that question whether information is "sufficiently private to confer standing" raise a merits issue that is not properly decided at the pleading stage. *See Warth v. Seldin*, 422 U.S. 490, 500 (1975) ("[S]tanding in no way depends on the merits of the plaintiff's contention that particular conduct is illegal."). Moreover, the Pennsylvania legislature has determined that gun purchasing information is "sufficiently private" by amending the Uniform Firearms Act to require companies, like Defendants, to keep gun purchasing information confidential. Courts in Pennsylvania have already found that a plaintiff states a claim under the Uniform Firearms Act when gun ownership information is disclosed. *See Doe 1 v. Franklin County*, 272 A.3d 1022, 1035 (Pa. Cmwlth. 2022) ("[T]his Court held that because the County used unenveloped postcards that displayed Licensees' names, addresses, and license status, Licensees stated a claim under Section 6111(i) of the Firearms Act.").

Second, arguments centered upon the use of basspro.com conflate the issues of standing and class representation. "Both [websites] are operated, at least in part, by BPS…Both websites also function identically in unlawfully assisting Facebook in intercepting information about consumers firearms purchases." FAC, ¶ 9. Because Plaintiff was harmed by the conduct of BPS, he has standing to represent other consumers who were also harmed by BPS's unlawful disclosures of their protected information.

For the foregoing reasons, and for those set forth below, Defendants' preliminary objections should be overruled.

2

## LEGAL STANDARD

"The test on preliminary objections is whether it is clear and free from doubt from all of the facts pleaded that the pleader will be unable to prove facts legally sufficient to establish his right to relief." *Bower v. Bower*, 531 Pa. 54, 57 (1992). "When considering preliminary objections, all material facts set forth in the challenged pleadings are admitted as true, as well as all inferences reasonably deducible therefrom." *Haun v. Cmty. Health Sys., Inc.*, 14 A.3d 120, 123 (Pa. Super. Ct. 2011) (quoting *Hykes v. Hughes*, 835 A.2d 382, 383 (Pa. Super. Ct. 2003)). "[W]here any doubt exists as to whether the preliminary objections should be sustained, the doubt must be resolved in favor of overruling the preliminary objections." *Pa. State Lodge, Fraternal Order of Police v. Com., Dep't of Conservation & Nat. Res.*, 909 A.2d 413, 416 (Pa. Commw. Ct. 2006).

"Under Pennsylvania law, the doctrine of standing is a prudential, judicially-created tool, affording discretion to the courts." *Firearm Owners Against Crime v. Paperfuse*, --Pa.--, 261 A.3d 467, 481 (2021) (internal quotations omitted). "[A] party seeking judicial resolution of a controversy 'must establish as a threshold matter that he has standing to maintain the action.'" *Johnson v. American Standard*, 607 Pa. 492, 8 A.3d 318, 329 (2010) (quoting *Fumo v. City of Philadelphia*, 601 Pa. 322, 972 A.2d 487, 496 (2009). When standing to bring a cause of action is not prescribed by statute, a litigant must satisfy the requirements of Pennsylvania's traditional standing doctrine. *See Milby v. Pote*, 189 A.3d 1065, 1076-77 (Pa. Super. 2018). As explained by the Pennsylvania Supreme Court:

> The "core concept" of standing is that the litigant must be "adversely affected" in some way. Under this Court's precedent, the prerequisites to standing are satisfied where the complaining party's interest is substantial, direct, and immediate, meaning that the party's interest surpasses that of the general public in procuring obedience to the law, the harm alleged was caused by the matter complained of, and the harm is not remote and speculative.

3

*Trust Under Will of Ashton*, 260 A.3d 81, 88 (Pa. 2021). "The keystone to standing in these terms is that the person must be negatively impacted in some real and direct fashion." *Pittsburgh Palisades Park, LLC v. Com.*, 585 Pa. 196, 204 (2005).

## ARGUMENT

## I.   PLAINTIFF HAS STANDING TO BRING HIS CLAIM UNDER THE UNIFORM FIREARMS ACT

Defendants contend that Plaintiff lacks standing to bring a claim under the Uniform Firearms Act because his claims do "not share a 'close relationship' with the tort of intrusion upon seclusion." Motion at 9. More specifically, Defendants argue that, unlike a claim for intrusion upon seclusion, the privacy violation alleged here fails because Plaintiff "needed to pick up the firearm at a store," and gun purchasing information is "not sufficiently private to confer standing." *Id.* As a threshold matter, arguments that question whether information is "sufficiently private" raise a merits issue that is not properly decided at the pleading stage. *See Warth v. Seldin*, 422 U.S. 490, 500 (1975). Moreover, in keeping with Pennsylvania precedent, Plaintiff alleges a harm that bears a close relationship to the common-law tort intrusion upon seclusion. That is more than enough to establish an injury under Pennsylvania law.

### A.   Plaintiff Satisfies Traditional Standing Requirements.

Plaintiff plausibly pleads that Defendants violated the Uniform Firearms Act, thereby injuring him in a way that bears a close relationship to intrusion upon seclusion.

"It is well established in Pennsylvania that a violation of the right to privacy is an actionable tort." *Harris v. Easton Pub. Co.*, 483 A.2d 1377, 1383 (Pa. Super. Ct. 1984). Under Pennsylvania's traditional standing doctrine, a party must only show that he has a substantial, direct, and legitimate interest in the action. *Trust Under Will of Ashton*, 260 A.3d at 88. In other words, a party must establish that they have been "negatively impacted in some real and direct fashion." *Pittsburgh Palisades Park, LLC*, 585 Pa. at 204. This is not a demanding standard.

4

*See Interest of K.N.L.*, 284 A.3d 121, 136 (Pa. 2022) ("In Pennsylvania, the doctrine of standing is a judicially-created tool intended to 'winnow out' litigants with no direct interest in the matter.").

Plaintiff alleges that on "December 2, 2021, [he] purchased a Henry Big Boy Classic Centerfire Lever-Action Rifle-.45 Colt from cabelas.com" and without his knowledge, "Defendants disclosed Plaintiff's name, address, his Facebook ID, [and] the type of gun he purchased." FAC, ¶¶ 77-78. Defendants' conduct "invaded the personal privacy of Plaintiff [] by disclosing this sensitive and protected information." *Id.*, ¶ 50. The Pennsylvania legislature made this harm cognizable by enacting the Uniform Firearms Act, a statute requiring Defendants to keep "[a]ll information" provided by firearms purchasers, including their "name or identity," "confidential." 18 Pa. C.S. § 6111(i). Accordingly, by nonetheless disclosing "protected information about his firearms purchases," Defendants created a harm for which Plaintiff has a substantial, direct, and immediate interest. FAC, ¶ 10.

Plaintiff's interest is substantial because his private and protected information was unlawfully disclosed to Facebook. Therefore, his individualized interest in this litigation "is greater than that of any other citizen." *Pittsburgh Palisades Park, LLC*, 585 Pa. at 205. Similarly, Plaintiff's interest is direct because he has been personally harmed by the unlawful disclosures at issue. *Id.*; FAC, ¶ 50. Finally, Plaintiff's interest is immediate because the harm suffered by Plaintiff is not remote or speculative, as Pennsylvania courts routinely deem privacy violations to be actionable torts. *Easton Pub. Co.*, 483 A.2d at 1383. Accordingly, the privacy violations underlying Plaintiff's claim for violation of the Uniform Firearms Act satisfied traditional notions of standing under Pennsylvania law.

Defendants' argument that "Plaintiff does not assert a claim for invasion of privacy here," is wrong. Motion at 8. Plaintiff brings a cause of action under Pennsylvania's Uniform Firearms

5

Act, which requires companies, like Defendants, to keep gun purchasing information confidential. By unlawfully disclosing this information, Defendants invaded Plaintiff's privacy, thereby violating the Uniform Firearms Act. *See Doe 1 v. Franklin County*, 272 A.3d 1022, 1035 (Pa. Cmwlth. 2022) (reversing denial of class certification, finding that "Licensees did not have to establish that the postcards were actually read by someone other than the intended recipient to establish public disclosure of confidential information under Section 6111(i) of the Firearms Act."); *Doe v. Franklin County*, 139 A.3d 296, 309 (Pa. Cmwlth. 2016) ("Given our interpretation of the statutory provision, it is not clear at this stage of the proceedings that sending the postcard does not breach the confidentiality the General Assembly deliberately and extensively crafted into the UFA."); *rev'd on other grounds*, 644 Pa. 1, 174 A.3d 593 (2017).

### B.    Plaintiff's Injury Is Sufficient To Confer Standing.

Relying primarily on *BPS Direct*, Defendants argue that, unlike a claim for intrusion upon seclusion, the privacy violation alleged here—the disclosure of gun records to the largest social media company on the planet—fails because Plaintiff "needed to pick up the firearm at a store," and gun purchasing information is "not sufficiently private to confer standing." Motion at 9. However, *BPS Direct* has no bearing on this Court's standing analysis, as the *BPS Direct* court analyzed Plaintiff's claims under the heightened Article III standard. Pennsylvania's traditional standing doctrine is not so demanding.

In Pennsylvania, "customers have a legitimate expectation of privacy in records pertaining to their affairs[.]" *Commonwealth of Pennsylvania v. DeJohn*, 486 Pa. 32, 49 (1979). Moreover, where state law shields certain information from disclosure, courts must "give great deference to this sound legislative judgment." *McMullan v. Wohlgemuth*, 453 Pa. 147, 165 (1973). In addition to gun records, Pennsylvania law protects information relating to criminal history, military service, public assistance, taxes, driving records, and drug tests. *See* 18 Pa. C.S.

§ 7326(a) (prohibiting a person from disclosing "tax information" and designating that information "confidential"); 18 Pa. C.S. § 9121 (prohibiting the disclosure of "criminal history record information"); 62 P.S. § 404(b) (prohibiting "publication" of "applicants for and recipients of public assistance"); 43 Pa. Code § 1.2(a) (prohibiting the disclosure of "military personnel" records and describing it as "an unwarranted invasion of the personal privacy"); 75 Pa. C.S. § 6114(a)(1) (protecting all "records or reports which relate to the driving record of any person"); *Murray v. Surgical Specialties Corp.*, 1999 WL 46583, at *7 (E.D. Pa. Jan. 14, 1999) (interpreting Pa C.S. § 1690.108(c) to "protect the release of confidential drug and alcohol tests").

By violating one of those statutes, the disclosure becomes sufficiently offensive to establish a claim for intrusion upon seclusion. *See McMullan v. Wohlgemuth*, 453 Pa. 147, 165 (1973) ("The statutory ban against disclosing the names of public assistance recipients is a clear recognition and directive by the Legislature that the privacy of the recipient is a fundamental need worthy of protection."); *see also Borse v. Piece Goods Shop, Inc.*, 963 F.2d 611, 621 (3d Cir. 1992) (recognizing that "an intrusion upon seclusion" may be "defined by Pennsylvania law").

At the very least, courts must "give great deference" to "legislative judgment." *Id.*; *see also Taha v. Bucks County*, 9 F. Supp. 3d 490, 494 (E.D. Pa. 2014) (declining to extend Pennsylvania's Criminal History Record Information Act to private actors, but upholding "a false-light claim" against a company because its website disseminated "a highly offensive false statement" by "creat[ing] the impression that [the plaintiff] is a 'criminal'"); *Butler Area School Dist. v. Penn. For Union Reform*, 172 A.3d 1173, 1183 (Pa. Cmwlth. 2017) ("[I]nformation obtained by an agency premised on statutory confidentiality is protected.").

7

The Pennsylvania legislature protected gun records for good reason. First, "if the address of firearms licensees are made public, this information could become available to individuals unable to obtain firearms legally who might burglarize the homes in search of firearms." *See Times Pub. Co., Inc. v. Michel*, 633 A.2d 1233, 1237 (Pa. Cmwlth. 1993), *reversed on other grounds Pennsylvania Liquor Control Board v. Burns*, 2020 WL 3256836 (Pa. Cmwlth. June 16, 2020). Second, "disclosure of the licensees' address would make public the address of for example abuse victims who apply for a gun permit as well as judges, prosecutors, parole and probation officers who are licensed to carry firearms and necessarily take precautions to shield information about their address." *Id.* These possibilities "pose[] a threat to ... personal security." *Id.* Because of those potential threats, many states shield gun records from disclosure.[2] And where states lack such a statute, "[t]he purchase of a firearm—because of the social, political, and moral controversy that may surround it in our culture—arguably merits heightened protection." *Johnson v. Bryco Arms*, 224 F.R.D. 536, 543 (E.D.N.Y. Nov. 22, 2004).

Judge Kearney himself recognized that "State court judges' standing considerations account for many varied disputes that would fall short of constituting 'cases and controversies' in federal court." *BPS Direct*, at *19 n. 209 (internal quotations omitted). This is especially true here, as this is not the first time a Pennsylvania court has heard claims brought "under section 6111(i) of the Uniform Firearms Act based on the alleged disclosure of confidential information." *Id.*; *See also Doe v. Franklin County*, 139 A.3d at 309. Because violating the UFA would sufficiently establish a claim on the merits for intrusion upon seclusion, Plaintiff's allegations are more than sufficient to establish standing for his statutory claim.

---

[2] *See, e.g.*, Ariz. Rev. Stat. §13-3112(J) (2001); Del. Code, tit. 29, §10002(g)(11) (2003); Fla. Stat. Ann. §790.0601 (West 2007); Ga. Code Ann. §50-18-72(d) (2006); Me. Rev. Stat. Ann., tit. 25 §2006 (2007); Wash. Rev. Code Ann. §42.56.240(4) (West Supp. 2009); *see also* Conn. Gen. Stat. Ann. §29-28(d); Va. Code Ann. § 18.2-308.07(C) (2013); Miss. Code Ann. § 25-61-11.1 (2013).

Defendants' arguments are without merit. For example, that Plaintiff picked up his firearm at a store is a red herring. In order to receive medical care or a driver's license, consumers must walk into a doctor's office or DMV, but that does not mean they no longer expect their medical records or driving records to remain private. Defendants' reliance on *Gennock* and *Young* is similarly misguided. It is undisputed that "a bare statutory violation…[is] not enough to confer standing." Motion at 9. However, both precedents are distinguishable in one key aspect, as both plaintiffs complained of merely a heightened risk of harm. *See Gennock v. Kirkland's Inc.*, 299 A.3d 900 (Pa. Super. Ct. 2023), *appeal denied*, 307 A.3d 1202 (Pa. 2023) ("As in *Kamal*, **Plaintiffs have 'alleged neither third-party access of [the] information**, nor that the receipt included enough information to likely enable identity theft.' All Plaintiffs have alleged is the same interest of all customers in receiving receipts in compliance with FACTA, namely, that they be properly truncated when printed.") (emphasis added); *Young v. Wetzel*, 260 A.3d 281, 288 (Pa. Cmwlth. 2021) ("**Failing even to allege that his personal information was among data compromised in the breach**, [plaintiff], therefore, is unable to establish a 'real and concrete' controversy or that any potential, future harm is neither remote nor speculative. [Plaintiff] merely alleged that the data breach resulted in 'the increased and imminent risk' of falling victim to identity theft and fraud. Having failed to establish that he was adversely affected in any way by the data breach, [plaintiff] lacks standing to pursue his negligence claim.") (emphasis added). That is in stark contrast to the present allegations, where the unauthorized disclosure of Plaintiff's confidential and protected information has *already* occurred. *See* FAC, ¶ 10 ("Defendants breached confidentiality and unlawfully disclosed Plaintiff's personally identifiable information and protected information about his firearms purchases."); *Id.*, ¶ 50 ("By assisting Facebook with intercepting information about consumers' firearms purchases, Defendants violated [WESCA] and the [UFA]. Defendants also invaded the

personal privacy of Plaintiff…by disclosing this sensitive and protected information."). Because Plaintiff complains of a harm that has already occurred, as opposed to a speculative future harm, he satisfies traditional standing requirements under Pennsylvania law. *See Easton Pub. Co.*, 483 A.2d at 1383.

## II.   PLAINTIFF HAS STANDING TO BRING HIS CLAIM UNDER THE PENNSYLVANIA WIRETAPPING ACT

Defendants argue that Plaintiff lacks standing for his claim under Pennsylvania's Wiretapping Act because the disclosure of gun purchasing information "is not sufficiently private to confer standing." Motion at 9. That is wrong.

Plaintiff has standing to bring his WESCA claim because his injury bears a close relationship to intrusion upon seclusion. The prevailing view is that a wiretap, by itself, constitutes an injury sufficient to confer standing. *See, e.g.,* Restatement (Second) of Torts § 652B, cmt. B (listing examples of intrusion upon seclusion, including "tapping…phone lines" and "opening…private and personal mail"). More importantly, in Pennsylvania, courts have already established that "public disclosure of confidential information [i.e. gun purchasing information]" is sufficiently private as prescribed by the Uniform Firearms Act. *Doe 1*, 272 A.3d at 1035.

Given the protected nature of the disclosures at issue, Plaintiff's allegations are sufficient to satisfy traditional notions of standing under Pennsylvania law. *See, e.g.,* FAC, ¶ 10 (alleging Defendants "assisted Facebook with intercepting Plaintiff's communications, including those that contained [PII] and protected information about [his] firearm purchases."); *Id.*, ¶ 78 (Such information included "Plaintiff's name, address, his Facebook ID, the type of gun he purchased, among other items."). Information concerning his gun purchase was confidential because it was shielded from disclosure by the Uniform Firearms Act. At no point, moreover, did Defendants ever receive Plaintiff's "consent or express written authorization." *Id.*, ¶ 10. Taken together,

under any standard, those allegations are enough to establish an injury. *See, e.g., Easton Pub. Co.*, 483 A.2d at 1383; *In re: Google, Inc. Cookie Placement Consumer Privacy Litig.*, 934 F.3d 316, 325 (3d Cir. 2019) ("History and tradition reinforce that a[n] injury for…standing purposes occurs when Google, or any other third party, tracks a person's internet browser activity without authorization.").

As discussed, *supra*, the authority relied upon by Defendants is inapposite. Plaintiff has alleged that he was harmed related to the inva[sion of] personal privacy" from Defendants' "disclos[ure of] sensitive and protected information." FAC, ¶ 50. This harm satisfies Plaintiff's burden for establishing a substantial, direct, and immediate interest in this matter. *Easton Pub. Co.*, 483 A.2d at 1383; *Doe 1*, 272 A.3d at 1035.

## III.    PLAINTIFF CAN REPRESENT PURCHASERS OF BASSPRO.COM

Defendants argue that Plaintiff lacks standing to bring claims on behalf of purchasers of basspro.com because he has not alleged that he was "aggrieved by the use of basspro.com." Motion at 5. That is wrong and misstates Pennsylvania's standing doctrine.

Defendants provide ample authority to support the proposition that a plaintiff bringing an action against multiple parties must establish an injury related to the conduct of each party. *See Nye v. Erie Ins. Exch.*, 504 Pa. 3, 6 (1983) ("a plaintiff in a class action who has not suffered an injury from the challenged conduct of a defendant cannot maintain a class action against that defendant."); *Chester Upland Sch. Dist. V. Rossi*, 275 A.3d 1117, 1125-26 (Pa. Cmwlth. 2022) ("For a petitioner in a class action to maintain an action against multiple respondents, the petitioner must allege that he has been aggrieved by each respondent."). However, such cases do not limit a plaintiff from representing other putative class members that suffered the *same injury* from the *same party*. Arguments centered upon the use of the *website* basspro.com, which is not a party to this lawsuit, conflate the issues of standing and class representation. *See Astiana v.*

*Dreyer's Grand Ice Cream, Inc.*, 2012 WL 2990766, at *13 (N.D. Cal. Jul. 20, 2012) (plaintiff satisfied class standing requirements where same unlawful practices were consistent across different products); *see also In re Hard Disk Drive Suspension Assemblies Antitrust Litig.*, 2021 WL 4306018, at *5 (N.D. Cal. Sept. 22, 2021) (where every product contained the relevant component, that named plaintiffs and putative class members may have purchased different products did not warrant dismissal of the class claims for lack of standing).

Plaintiff alleges that "BPS owns and operates basspro.com, through which it sells sporting goods, including firearms. *BPS also assists in the operation of the cabelas.com website and is the parent company of Cabela's*." FAC, ¶ 8 (emphasis added). Importantly, Defendants concede that Plaintiff "alleges that *Defendants* invaded [his] personal privacy." Motion at 8 (emphasis added). Moreover, here,

> [t]he basspro.com and cabelas.com websites are largely the same. Both are operated, at least in part, by BPS. Both offer the same products, including the same firearms, for sale and offer the same sale promotions. Both websites also function identically in unlawfully assisting Facebook in intercepting information about consumers firearms purchases.

FAC, ¶ 9. Plaintiff has established that he was harmed by the conduct of BPS. Under Pennsylvania law, nothing more is required to represent consumers who were also harmed by BPS's unlawful disclosures of their protected information.

## CONCLUSION

WHEREFORE, the Plaintiff respectfully requests that this Honorable Court overrule Defendants Cabela's, LLC and BPS Direct, LLC's Preliminary Objections to Plaintiff's Complaint and direct the defendants to Answer the Plaintiff's Complaint within twenty (20) days.

Dated: April 30, 2024

Respectfully submitted,

By: */s/ Steven A. Schwartz*
Steven A. Schwartz
**CHIMICLES SCHWARTZ KRINER**
**& DONALDSON-SMITH LLP**
Steven A. Schwartz (PA I.D. No. 50579)
361 W. Lancaster Avenue
Haverford, PA 19041
Tel: (610) 642-8500
Fax: (610) 649-3633
E-Mail: sas@chimicles.com

**BURSOR & FISHER, P.A.**
Joshua D. Arisohn (*Pro Hac Vice Forthcoming*)
Philip L. Fraietta (*Pro Hac Vice Forthcoming*)
1330 Avenue of the Americas, 32 Fl.
New York, NY 10019
Tel: (646) 837-7150
Fax: (212) 989-9163
E-Mail: jarisohn@bursor.com
        pfraietta@bursor.com

**BURSOR & FISHER, P.A.**
Stephen A. Beck (*Pro Hac Vice Forthcoming*)
701 Brickell Ave., Suite 1420
Miami, FL 33131-2800
Telephone: (305) 330-5512
Facsimile: (305) 676-9006
E-Mail: sbeck@bursor.com

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I, Steven A. Schwartz, do hereby certify that a true and correct copy of the foregoing Plaintiff's Response and Brief in Opposition to Defendants' Preliminary Objections to Plaintiff's First Amended Complaint was served upon all known counsel of record via Electronic Mail, this 30th day of April, 2024.

/s/ *Steven A. Schwartz*
Steven A. Schwartz

# EXHIBIT 13

Exhibit A-13

# ORIGINAL

DAVID IRVIN, on behalf of himself and all
others similarly situated,

        Plaintiff,

        v.

CABELA'S LLC and BPS DIRECT, LLC,

        Defendants.

ENTERED & FILED
PROTHONOTARY OFFICE
LEBANON, PA

2024 MAY -3 P 3: 24

COURT OF COMMON PLEAS
LEBANON COUNTY

NO. 2023-01668

### JOINT MOTION FOR ENTRY OF STIPULATED PROTECTIVE ORDER

Plaintiff and Defendants (collectively, "the Parties"), by and through their undersigned counsel, and pursuant to Pennsylvania Rule of Civil Procedure 4012, move this Court for entry of a Stipulated Protective Order governing the use and dissemination of all information, documents, or materials that are produced in this action and designated as confidential. In support thereof, the Parties state as follows:

The Parties have jointly agreed to a Stipulated Protective Order to facilitate prompt discovery and preparation for trial while also affording protections which are consistent with applicable state law. The Stipulated Protective Order will adequately protect information the Parties are entitled to keep confidential, ensure that the Parties are permitted reasonably necessary uses of such material in preparation for and in the conduct of trial, address the Parties' handling of such information at the end of the litigation, and serve the ends of justice. Therefore, the Parties respectfully submit that good cause exists for the Court's approval and entry of the Stipulated Protective Order. *See, e.g., Est. of Bouher v. Giftwares Co.*, 2015 WL 6456345, at *5 (Pa. Super. Ct. Oct. 23, 2015) ("Whether to grant or deny the motion, and what kind or kinds of protective orders to issue are matters that lie within the sound judicial discretion of the court.").

The Parties respectfully request that this Court grant this motion and approve and enter their Stipulated Protective Order, attached hereto as **Exhibit A**.

Dated:  April 26, 2024

**Attorneys for Plaintiff:**

By: *Steven A. Schwartz*

Steven A. Schwartz
Chimicles Schwartz Kriner &
 Donaldson-Smith LLP
361 W. Lancaster Avenue
Haverford, PA 19041
610-642-8500
Fax: 610-649-3633
sas@chimicles.com

Joshua D. Arisohn
Philip L. Fraietta
Burson & Fisher, P.A.
1330 Avenue of the Americas
New York, NY 10019
jarisohn@bursor.com
pfraietta@bursor.com

Christopher R. Reilly
701 Brickell Ave., Suite 1420
Miami, FL 33131
creilly@bursor.com

**Attorneys for Defendants:**

By: _____

Erin L. Leffler (PA ID No. 204507)
SHOOK, HARDY & BACON L.L.P.
Two Commerce Square
2001 Market St., Suite 3000
Philadelphia, PA 19103
Tel: (215) 278-2555
Fax: (215) 278-2594
eleffler@shb.com

Jennifer A. McLoone
SHOOK, HARDY & BACON L.L.P.
201 South Biscayne Blvd., Suite 3200
Miami, FL 33131
Tel: (305) 358-5171
Fax: (305) 358-7470
jmcloone@shb.com

Anna A. Gadberry
SHOOK, HARDY & BACON L.L.P.
2555 Grand Boulevard
Kansas City, MO 64108
Tel: (816) 474-6550
Fax: (816) 421-5547
agadberry@shb.com

# ORIGINAL

DAVID IRVIN, on behalf of himself and all
others similarly situated,

        Plaintiff,

        v.

CABELA'S LLC and BPS DIRECT, LLC,

        Defendants.

        :
        :
        :
        :     COURT OF COMMON PLEAS
        :     LEBANON COUNTY
        :
        :     NO. 2023-01668
        :
        :
        :

## STIPULATED PROTECTIVE ORDER

WHEREAS, Plaintiff David Irvin, on behalf of himself and all others similarly situated, and Defendants Cabela's LLC an BPS Direct, LLC (collectively, "Parties"), agree that the proceedings in the above-referenced matter may involve the discovery and disclosure of confidential, non-public, sensitive, and/or proprietary business, employment, tax, financial, and personally identifiable information, protected health information, documents and other materials;

WHEREAS, the Parties agree that such "Confidential" or "Highly Confidential" information should only be disclosed pursuant to the terms of this Stipulated Protective Order ("Order"); and

WHEREAS, the Parties agree that the confidential nature of certain information, particularly personally identifiable information and protected health information, establishes good cause for the issuance of this Stipulated Protective Order.

THEREFORE, the Parties seek entry of an Order, governing the disclosure of documents and information therein designated as "Confidential" or "Highly Confidential" on the terms set forth herein, as well as an Order, governing the return of privileged information, documents, and data and affording the Parties certain protections on the terms set forth herein.

Accordingly, it is ORDERED:

1.    The below terms, as used herein, shall be defined as follows:

    a.    "Action" shall refer to *Irvin v. Cabela's LLC, et al.*, Case No. 2023-01668.

    b.    "Confidential Information" shall mean information that a Designating Party identifies as "Confidential." Only information meeting the following criteria may be designated as "Confidential" (unless the parties expressly agree otherwise): Information (regardless of how generated, stored, or maintained) that the Designating Party in good faith believes: (i) contains sensitive personal identifying information, protected health information, trade secrets, or other confidential research, development, commercial or financial information, the disclosure of which may have the effect of causing harm to any Party, or person from whom the information was obtained, or to the Parties' or third-parties' legitimate privacy interests; or (ii) contains information over which the Designating Party has a duty or obligation to maintain confidentiality.

    c.    "Designating Party" shall mean the Party or Non-Party that designates information produced in this Action as "Confidential" or "Highly Confidential."

    d.    "Expert" shall mean any individual with specialized knowledge or expertise who is retained by a Party or its Counsel to serve as an expert witness or as a consultant in the Action.

    e.    "Highly Confidential Information" shall mean information that a Designating Party identifies as "Highly Confidential." Only information meeting the following criteria may be designated as "Highly Confidential" (unless the

parties expressly agree otherwise): Information (regardless of how generated, stored, or maintained) that the Designating Party in good faith believes: (i) concerns or relates to the highly sensitive personal, confidential, financial, commercial, proprietary, cybersecurity, competitively sensitive, or trade secret information of any Party or any third party; or (ii) contains "PII" or "PHI;" or (iii) contains information over which the Designating Party has a duty or obligation to maintain a high level of confidentiality, including for compliance with applicable data privacy laws or regulations.

f.    "Personal identifying information" or "PII" includes every data element protected by state or federal law including, but not limited to, name, payment card numbers, financial account numbers, Social Security numbers, addresses, phone numbers, email addresses, driver's license numbers or other state identification numbers, Employer Identification numbers, Tax Identification numbers, passport numbers, or a foreign government equivalent of any of these numbers or identifiers.

g.    "Privileged Material" means material protected by the attorney-client privilege or the attorney work product doctrine, or otherwise privileged or protected under applicable law.

h.    "Protected Health Information" or "PHI" shall have the same definition as the definition of "Protected Health Information" under 45 C.F.R. § 160.103.

i.    "Producing Party" shall mean a Party or Non-Party that produces information in the Action.

j.  "Protected Material" shall refer to any information designated as "Confidential" or "Highly Confidential" pursuant to this Order.

k.  "Receiving Party" shall mean a Party that receives information from a Producing Party in the Action.

l.  "Vendors" shall refer to individuals or entities engaged for the purpose of providing litigation support services (*e.g.*, ESI vendors; photocopying; videotaping; translating; preparing exhibits or demonstrations; organizing, storing, retrieving data in any form or medium; investigators and consultants; court reporters), as well as their employees, independent contractors, and subcontractors.

2.  The protections conferred by this Order cover not only Protected Material but also any information copied or extracted therefrom, and all copies, excerpts, summaries, or compilations thereof, plus testimony, conversations, or presentations by Parties or Counsel to or in Court or in other settings that might reveal Protected Material.

3.  Except as otherwise provided in this Order, all information, documents, and data to be designated as Protected Material must be clearly designated as such prior to any disclosure of same. Designations shall be made in the following manner:

a.  Protected Material in documents produced as images shall be marked with the designation "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL" on each page that contains Protected Material. If only a portion of the material on the page qualifies for designation as Protected Material, that portion shall be clearly designated as Protected Material and the level of protection asserted for each such portion must be specified. Documents produced in native

formats will have Confidentiality Designations indicated in the production file name or as specified in any Stipulated Protocol on the Discovery of Electronically Stored Information the Parties may enter into. Should the Parties need to identify which portions of a native document qualify as Protected Material, they will meet and confer to resolve the issue.

b.    Protected Material disclosed in testimony (in depositions, pre-trial proceedings, or trial proceedings) shall be designated as Protected Material either during the testimony or by written notice to Counsel within twenty-one (21) days of receiving the transcript of the proceedings (or in such other time period as the Parties shall mutually agree is appropriate). Notice after the testimony must specifically designate the portion(s) of the testimony that are to be designated as Protected Material and the level of protection asserted for each such portion must be specified. All transcripts of any testimony in this Action shall be designated as "HIGHLY CONFIDENTIAL" until twenty-one (21) days have passed following the receipt of the transcript, or the Parties agree to a different designation.

c.    Protected Material disclosed in any form other than a document or testimony must be designated "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL," as appropriate, in a prominent manner and in a manner that specifies only those portions of the information or data disclosed that are subject to the designated protection level.

d.    If a Designating Party fails to designate information, documents, or data disclosed as Protected Material at the time of disclosure, that Designating

Party shall make all reasonable efforts to timely designate the Protected Material and to identify the specific portion of the information, documents, or data disclosed to be designated as Protected Material and the level of protection to be accorded same. Upon notification, the Receiving Party shall make reasonable efforts to assure that any additional material designated as Protected Material is treated in accordance with the provisions of this Order from that point forward.

4.    If the Receiving Party wants to challenge either the designation of information, documents, or data as Protected Material or the designation of the Protected Material as "HIGHLY CONFIDENTIAL," it must first notify the Designating Party in writing of both the specific Protected Material challenged and the reason for the challenge. The Parties shall make reasonable efforts to resolve the dispute over the designation of the information, documents, or data as Protected Material. If the dispute cannot be resolved between the Parties, the Designating Party must promptly notify the Receiving Party in writing that it has not changed its position on the Protected Material. The Receiving Party may then seek relief from this Court, though the burden of proving confidentiality of designated information remains with the party asserting such confidentiality (i.e., the Designating Party). While any dispute over classification is ongoing, the information, document, or data at issue shall be treated in accordance with the protection level identified by the Designating Party.

5.    The Receiving Party shall keep all Protected Material secure except as permitted below and shall take reasonable efforts to place such documents in a secure area

and limit access to the Protected Material to the extent reasonably necessary for this Action.

6.     The Receiving Party may only use Protected Material for the purpose of prosecuting, defending, or attempting to resolve the Action and the Protected Material may only be disclosed in the manner and to the categories of recipients identified below. Until the Action is concluded, all Protected Material must be maintained and stored consistent with its designation.

    a.     Protected Material that is designated as "CONFIDENTIAL" may be disclosed to:

        i.     the Receiving Party's counsel and their staff who are assisting counsel in connection with the Action. All such staff shall be subject to the provisions of this Order.

        ii.     The Receiving Party's Expert(s), and staff of the Expert who are assisting the Expert in connection with the Action. All such staff shall be subject to the provisions of this Order.

        iii.     The Receiving Party's insurer and its staff who have responsibility for the insurer's obligations in connection with the Action. All such staff shall be subject to the provisions of this Order.

        iv.     The Court and its personnel.

        v.     A mediator jointly retained by the parties and the mediator's personnel.

        vi.     Vendors.

        vii.     Parties and Parties' staff, including management personnel, to whom disclosure is reasonably necessary to assist the Party in this Action. All such staff shall be subject to the Provisions of this Order.

        viii.     The author of any document or the source of any information or data designated as Protected Material.

        ix.     Witnesses providing testimony in either a deposition, hearing, trial, or other proceeding where the Receiving Party deems it reasonably

necessary for the witness to review the Protected Material in preparation and/or to provide testimony regarding the Protected Material. Any witness who is not otherwise subject to the terms of this Order shall be required to sign the Declaration attached as Exhibit A hereto.

x.  Such other persons as the Parties mutually agree may be shown the Protected Material. All such persons shall be required to sign the Declaration attached as Exhibit A hereto.

b.  All disclosures of Protected Material marked "HIGHLY CONFIDENTIAL" are to be limited and the Receiving Party is to only make such disclosures in the manner and to the degree it deems necessary for this Action, which in no event shall include disclosure of such materials beyond the scope of permissible disclosure of materials designated "CONFIDENTIAL."

7.  If a Party is served with a subpoena or a court order issued in other litigation or proceedings before any administrative or legislative body that compels disclosure of any information or items designated in this action as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL" that Party must:

a.  promptly notify in writing the Designating Party. Such notification shall include a copy of the subpoena or court order;

b.  promptly notify in writing the party who caused the subpoena or order to issue in the other litigation that some or all of the material covered by the subpoena or order is subject to this Protective Order. Such notification shall include a copy of this Stipulated Protective Order; and

c.  cooperate with respect to all reasonable procedures sought to be pursued by the Designating Party whose Protected Material may be affected.

d.  If the Designating Party timely seeks a protective order, the Party served with the subpoena or court order shall not produce any information designated in this action as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL" before a determination by the appropriate court, unless the Party has obtained the Designating Party's permission. The Designating Party shall bear the burden and expense of seeking protection in that court of its confidential material - and nothing in these provisions should be construed as authorizing or encouraging a Receiving Party in this action to disobey a lawful directive from another court.

8.  If a Receiving Party learns that, by inadvertence or otherwise, it has disclosed Protected Material to any person or entity not authorized to receive the Protected Material under this Order, the Receiving Party must immediately (a) notify in writing the Designating Party of the unauthorized disclosures, (b) use its best efforts to retrieve all copies of the Protected Material, (c) inform the person or entity to whom the Protected Material was disclosed that the disclosure was not authorized and demand immediate return and/or destruction of any tangible Protected Material that was disclosed, and (d) require the person or entity to whom the Protected Material was disclosed to sign the Declaration attached as Exhibit A hereto.

9.  If any Protected Material (or any pleading, motion, or memorandum disclosing them) is proposed to be filed or is filed with the Court, the filing party shall follow this Court's procedures to file documents under seal.

10. Any privileged information, confidential information, or protected information of third parties, that is contained within information, documents, or data being disclosed in this Action shall be redacted to the extent practicable or as subject to

the provisions concerning redactions in any Stipulated Protocol on the Discovery of Electronically Stored Information the Parties may enter into.

11.    With regard to the disclosure of Privileged Material:

a.    If the Producing Party determines, after production, that it has produced information, documents or data that are privileged or protected under the applicable rules of evidence or civil procedure or other applicable law, the Producing Party may notify the Receiving Party in writing of the discovery with the identification of the Privileged Material by Bates number range or hash value and a detailed statement as to the reason for the assertion that the information, document, or data is Privileged Material. The Receiving Party shall have ten business days following the receipt of notice to either return, sequester, or securely destroy all copies of such Privileged Material, along with any notes, abstracts, or compilations of the content thereof and may promptly present the information to the Court under seal for a determination of the claim.

b.    If the Receiving Party challenges the designation of the disclosed information, document, or data as Privileged Material, the procedures set forth in Paragraph 4 for challenging a designation of Protected Material shall also be followed.

12.    In the event the party who received PII experiences a data breach, it shall immediately notify the producing party of same and cooperate with the Producing Party to address and remedy the breach. Nothing herein shall preclude the Producing Party from asserting legal claims or constitute a waiver of legal rights

and defenses in the event of litigation arising out of the Receiving Party's failure to appropriately protect PII from unauthorized disclosure.

13. Unless otherwise agreed or ordered, this Order shall remain in force after dismissal or entry of final judgment not subject to further appeal.

14. Within sixty (60) days of the termination of this Action (including the expiration of time for any appellate challenge thereto), the Receiving Party must either return all Protected Material to the Producing Party or securely destroy all Protected Material. The Receiving Party must certify in writing that the Protected Material was returned or securely destroyed and that no copies, nor any abstracts, compilations, summaries, or other forms of retaining the Protected Material are in the Receiving Party's possession. Notwithstanding this provision, counsel for the Receiving Party is not expected to access and extract any Protected Material from their disaster recovery systems and counsel are entitled to retain an archival copy of all pleadings, motion papers, transcripts, legal memoranda, correspondence, deposition and trial exhibits, attorney work, and consultant and expert work product, even if such materials contain Protected Material, provided that all PII and PHI must be securely destroyed in the next routine destruction cycle after Termination of the Action. Any such archival copies that contain or constitute Protected Material remain subject to this Order and all of the protections set forth herein. Receiving Party will comply with all laws that apply to its use, disclosure, storage and processing of the personal information provided to it by the other party hereunder, and shall at all times protect the personal information with reasonable and appropriate administrative, technical and physical security controls.

15.    The Court retains the right to allow, *sua sponte* or upon motion, disclosure of any subject covered by this Stipulated Order or to modify this Stipulated Order at any time in the interest of justice.

16.    No Prior Judicial Determination. This Order is entered based on the representations and agreements of the parties and for the purpose of facilitating discovery. Nothing herein shall be construed or presented as a judicial determination that any document or material designated Confidential Information or Highly Confidential Information by counsel or the parties is entitled to protection under the rules of civil procedure or otherwise until such time as the Court may rule on a specific document or issue.

17.    This Order shall take effect when entered and shall be binding upon all counsel of record and their law firms, the Parties, and persons made subject to this Order by its terms.


**IT IS SO ORDERED.**


Dated: _____        _____

                                        Hon. Christopher C. Conner

**AGREED TO BY:**

Attorneys for Plaintiff:

By: _Steven A. Schwartz_
    Steven A. Schwartz
    Chimicles Schwartz Kriner &
     Donaldson-Smith LLP
    361 W. Lancaster Avenue
    Haverford, PA 19041
    610-642-8500
    Fax: 610-649-3633
    sas@chimicles.com

    Joshua D. Arisohn
    Philip L. Fraietta
    Burson & Fisher, P.A.
    1330 Avenue of the Americas
    New York, NY 10019
    jarisohn@bursor.com
    pfraietta@bursor.com

    Christopher R. Reilly
    701 Brickell Ave., Suite 1420
    Miami, FL 33131
    creilly@bursor.com

Attorneys for Defendants:

By: _[signature]_
    Erin L. Leffler (PA ID No. 204507)
    SHOOK, HARDY & BACON L.L.P.
    Two Commerce Square
    2001 Market St., Suite 3000
    Philadelphia, PA 19103
    Tel: (215) 278-2555
    Fax: (215) 278-2594
    eleffler@shb.com

    Jennifer A. McLoone
    SHOOK, HARDY & BACON L.L.P.
    201 South Biscayne Blvd., Suite 3200
    Miami, FL 33131
    Tel: (305) 358-5171
    Fax: (305) 358-7470
    jmcloone@shb.com

    Anna A. Gadberry
    SHOOK, HARDY & BACON L.L.P.
    2555 Grand Boulevard
    Kansas City, MO 64108
    Tel: (816) 474-6550
    Fax: (816) 421-5547
    agadberry@shb.com

**EXHIBIT A**

**CONFIDENTIAL UNDERTAKING**

The undersigned hereby acknowledges that he/she has read the Stipulated Protective Order executed by the attorneys of record for the Parties in this case and all cases consolidated herewith and entered by the Court in the action presently pending in the United States District Court for the Middle District of Pennsylvania, captioned *Irvin v. Cabela's LLC et al.*, Case No. 2023-01668, and understands the terms thereof, and agrees, upon threat of penalty of contempt, to be bound by such terms.

Date: _____

Signature: _____

Printed Name: _____

# EXHIBIT 14

**IN THE COURT OF COMMON PLEAS OF** ENTERED & FILED
**LEBANON COUNTY, PENNSYLVANIA** PROTHONOTARY OFFICE

|  |  |
|---|---|
| DAVID IRVIN, on behalf of himself and all others similarly situated, | CIVIL DIVISION  2024 MAY -6  P 12: 01 |
| Plaintiff, | Case No. 2023-01668 |
| v. | **JURY TRIAL DEMANDED** |
| CABELA'S L.L.C. and BPS DIRECT, L.L.C., |  |
| Defendants. |  |

## NOTICE OF APPEARANCE

Please take notice that Alex M. Kashurba, a member of the Supreme Court of Pennsylvania,

hereby enters his appearance on behalf of Plaintiff David Irvin in the above-captioned action.


Dated: May 2, 2024                    Respectfully submitted,

                                      */s/ Alex M. Kashurba*
                                      **CHIMICLES SCHWARTZ KRINER
                                      & DONALDSON-SMITH LLP**
                                      Alex M. Kashurba (PA Bar No. 319003)
                                      361 W Lancaster Ave.
                                      Haverford, PA 19041
                                      Tel: (610) 642-8500
                                      Fax: (610) 649-3633
                                      amk@chimicles.com

                                      *Attorney for Plaintiff*

## CERTIFICATE OF SERVICE

I, Alex M. Kashurba, do hereby certify that a true and correct copy of the foregoing Notice of Appearance was served upon all known counsel of record via Electronic Mail, this 2nd day of May, 2024.

/s/ *Alex M. Kashurba*
Alex M. Kashurba

# EXHIBIT 15

Exhibit A-15

# ORIGINAL

DAVID IRVIN, on behalf of himself and all
others similarly situated,

        Plaintiff,

        v.

CABELA'S LLC and BPS DIRECT, LLC,

        Defendants.

:
:
:
:
:
:
:
:
:
:
:

COURT OF COMMON PLEAS
LEBANON COUNTY

NO. 2023-01668

## STIPULATED PROTECTIVE ORDER

WHEREAS, Plaintiff David Irvin, on behalf of himself and all others similarly situated, and Defendants Cabela's LLC an BPS Direct, LLC (collectively, "Parties"), agree that the proceedings in the above-referenced matter may involve the discovery and disclosure of confidential, non-public, sensitive, and/or proprietary business, employment, tax, financial, and personally identifiable information, protected health information, documents and other materials;

WHEREAS, the Parties agree that such "Confidential" or "Highly Confidential" information should only be disclosed pursuant to the terms of this Stipulated Protective Order ("Order"); and

WHEREAS, the Parties agree that the confidential nature of certain information, particularly personally identifiable information and protected health information, establishes good cause for the issuance of this Stipulated Protective Order.

THEREFORE, the Parties seek entry of an Order, governing the disclosure of documents and information therein designated as "Confidential" or "Highly Confidential" on the terms set forth herein, as well as an Order, governing the return of privileged information, documents, and data and affording the Parties certain protections on the terms set forth herein.

Accordingly, it is ORDERED:

1. The below terms, as used herein, shall be defined as follows:

   a. "Action" shall refer to *Irvin v. Cabela's LLC, et al.*, Case No. 2023-01668.

   b. "Confidential Information" shall mean information that a Designating Party identifies as "Confidential." Only information meeting the following criteria may be designated as "Confidential" (unless the parties expressly agree otherwise): Information (regardless of how generated, stored, or maintained) that the Designating Party in good faith believes: (i) contains sensitive personal identifying information, protected health information, trade secrets, or other confidential research, development, commercial or financial information, the disclosure of which may have the effect of causing harm to any Party, or person from whom the information was obtained, or to the Parties' or third-parties' legitimate privacy interests; or (ii) contains information over which the Designating Party has a duty or obligation to maintain confidentiality.

   c. "Designating Party" shall mean the Party or Non-Party that designates information produced in this Action as "Confidential" or "Highly Confidential."

   d. "Expert" shall mean any individual with specialized knowledge or expertise who is retained by a Party or its Counsel to serve as an expert witness or as a consultant in the Action.

   e. "Highly Confidential Information" shall mean information that a Designating Party identifies as "Highly Confidential." Only information meeting the following criteria may be designated as "Highly Confidential" (unless the

parties expressly agree otherwise): Information (regardless of how generated, stored, or maintained) that the Designating Party in good faith believes: (i) concerns or relates to the highly sensitive personal, confidential, financial, commercial, proprietary, cybersecurity, competitively sensitive, or trade secret information of any Party or any third party; or (ii) contains "PII" or "PHI;" or (iii) contains information over which the Designating Party has a duty or obligation to maintain a high level of confidentiality, including for compliance with applicable data privacy laws or regulations.

f.   "Personal identifying information" or "PII" includes every data element protected by state or federal law including, but not limited to, name, payment card numbers, financial account numbers, Social Security numbers, addresses, phone numbers, email addresses, driver's license numbers or other state identification numbers, Employer Identification numbers, Tax Identification numbers, passport numbers, or a foreign government equivalent of any of these numbers or identifiers.

g.   "Privileged Material" means material protected by the attorney-client privilege or the attorney work product doctrine, or otherwise privileged or protected under applicable law.

h.   "Protected Health Information" or "PHI" shall have the same definition as the definition of "Protected Health Information" under 45 C.F.R. § 160.103.

i.   "Producing Party" shall mean a Party or Non-Party that produces information in the Action.

j. "Protected Material" shall refer to any information designated as "Confidential" or "Highly Confidential" pursuant to this Order.

k. "Receiving Party" shall mean a Party that receives information from a Producing Party in the Action.

l. "Vendors" shall refer to individuals or entities engaged for the purpose of providing litigation support services (*e.g.*, ESI vendors; photocopying; videotaping; translating; preparing exhibits or demonstrations; organizing, storing, retrieving data in any form or medium; investigators and consultants; court reporters), as well as their employees, independent contractors, and subcontractors.

2. The protections conferred by this Order cover not only Protected Material but also any information copied or extracted therefrom, and all copies, excerpts, summaries, or compilations thereof, plus testimony, conversations, or presentations by Parties or Counsel to or in Court or in other settings that might reveal Protected Material.

3. Except as otherwise provided in this Order, all information, documents, and data to be designated as Protected Material must be clearly designated as such prior to any disclosure of same. Designations shall be made in the following manner:

a. Protected Material in documents produced as images shall be marked with the designation "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL" on each page that contains Protected Material. If only a portion of the material on the page qualifies for designation as Protected Material, that portion shall be clearly designated as Protected Material and the level of protection asserted for each such portion must be specified. Documents produced in native

formats will have Confidentiality Designations indicated in the production file name or as specified in any Stipulated Protocol on the Discovery of Electronically Stored Information the Parties may enter into. Should the Parties need to identify which portions of a native document qualify as Protected Material, they will meet and confer to resolve the issue.

b.   Protected Material disclosed in testimony (in depositions, pre-trial proceedings, or trial proceedings) shall be designated as Protected Material either during the testimony or by written notice to Counsel within twenty-one (21) days of receiving the transcript of the proceedings (or in such other time period as the Parties shall mutually agree is appropriate). Notice after the testimony must specifically designate the portion(s) of the testimony that are to be designated as Protected Material and the level of protection asserted for each such portion must be specified. All transcripts of any testimony in this Action shall be designated as "HIGHLY CONFIDENTIAL" until twenty-one (21) days have passed following the receipt of the transcript, or the Parties agree to a different designation.

c.   Protected Material disclosed in any form other than a document or testimony must be designated "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL," as appropriate, in a prominent manner and in a manner that specifies only those portions of the information or data disclosed that are subject to the designated protection level.

d.   If a Designating Party fails to designate information, documents, or data disclosed as Protected Material at the time of disclosure, that Designating

Party shall make all reasonable efforts to timely designate the Protected Material and to identify the specific portion of the information, documents, or data disclosed to be designated as Protected Material and the level of protection to be accorded same. Upon notification, the Receiving Party shall make reasonable efforts to assure that any additional material designated as Protected Material is treated in accordance with the provisions of this Order from that point forward.

4.    If the Receiving Party wants to challenge either the designation of information, documents, or data as Protected Material or the designation of the Protected Material as "HIGHLY CONFIDENTIAL," it must first notify the Designating Party in writing of both the specific Protected Material challenged and the reason for the challenge. The Parties shall make reasonable efforts to resolve the dispute over the designation of the information, documents, or data as Protected Material. If the dispute cannot be resolved between the Parties, the Designating Party must promptly notify the Receiving Party in writing that it has not changed its position on the Protected Material. The Receiving Party may then seek relief from this Court, though the burden of proving confidentiality of designated information remains with the party asserting such confidentiality (i.e., the Designating Party). While any dispute over classification is ongoing, the information, document, or data at issue shall be treated in accordance with the protection level identified by the Designating Party.

5.    The Receiving Party shall keep all Protected Material secure except as permitted below and shall take reasonable efforts to place such documents in a secure area

and limit access to the Protected Material to the extent reasonably necessary for this Action.

6. The Receiving Party may only use Protected Material for the purpose of prosecuting, defending, or attempting to resolve the Action and the Protected Material may only be disclosed in the manner and to the categories of recipients identified below. Until the Action is concluded, all Protected Material must be maintained and stored consistent with its designation.

    a. Protected Material that is designated as "CONFIDENTIAL" may be disclosed to:

        i. the Receiving Party's counsel and their staff who are assisting counsel in connection with the Action. All such staff shall be subject to the provisions of this Order.

        ii. The Receiving Party's Expert(s), and staff of the Expert who are assisting the Expert in connection with the Action. All such staff shall be subject to the provisions of this Order.

        iii. The Receiving Party's insurer and its staff who have responsibility for the insurer's obligations in connection with the Action. All such staff shall be subject to the provisions of this Order.

        iv. The Court and its personnel.

        v. A mediator jointly retained by the parties and the mediator's personnel.

        vi. Vendors.

        vii. Parties and Parties' staff, including management personnel, to whom disclosure is reasonably necessary to assist the Party in this Action. All such staff shall be subject to the Provisions of this Order.

        viii. The author of any document or the source of any information or data designated as Protected Material.

        ix. Witnesses providing testimony in either a deposition, hearing, trial, or other proceeding where the Receiving Party deems it reasonably

necessary for the witness to review the Protected Material in preparation and/or to provide testimony regarding the Protected Material. Any witness who is not otherwise subject to the terms of this Order shall be required to sign the Declaration attached as Exhibit A hereto.

x. Such other persons as the Parties mutually agree may be shown the Protected Material. All such persons shall be required to sign the Declaration attached as Exhibit A hereto.

b. All disclosures of Protected Material marked "HIGHLY CONFIDENTIAL" are to be limited and the Receiving Party is to only make such disclosures in the manner and to the degree it deems necessary for this Action, which in no event shall include disclosure of such materials beyond the scope of permissible disclosure of materials designated "CONFIDENTIAL."

7. If a Party is served with a subpoena or a court order issued in other litigation or proceedings before any administrative or legislative body that compels disclosure of any information or items designated in this action as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL" that Party must:

a. promptly notify in writing the Designating Party. Such notification shall include a copy of the subpoena or court order;

b. promptly notify in writing the party who caused the subpoena or order to issue in the other litigation that some or all of the material covered by the subpoena or order is subject to this Protective Order. Such notification shall include a copy of this Stipulated Protective Order; and

c. cooperate with respect to all reasonable procedures sought to be pursued by the Designating Party whose Protected Material may be affected.

d.   If the Designating Party timely seeks a protective order, the Party served with the subpoena or court order shall not produce any information designated in this action as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL" before a determination by the appropriate court, unless the Party has obtained the Designating Party's permission. The Designating Party shall bear the burden and expense of seeking protection in that court of its confidential material - and nothing in these provisions should be construed as authorizing or encouraging a Receiving Party in this action to disobey a lawful directive from another court.

8.   If a Receiving Party learns that, by inadvertence or otherwise, it has disclosed Protected Material to any person or entity not authorized to receive the Protected Material under this Order, the Receiving Party must immediately (a) notify in writing the Designating Party of the unauthorized disclosures, (b) use its best efforts to retrieve all copies of the Protected Material, (c) inform the person or entity to whom the Protected Material was disclosed that the disclosure was not authorized and demand immediate return and/or destruction of any tangible Protected Material that was disclosed, and (d) require the person or entity to whom the Protected Material was disclosed to sign the Declaration attached as Exhibit A hereto.

9.   If any Protected Material (or any pleading, motion, or memorandum disclosing them) is proposed to be filed or is filed with the Court, the filing party shall follow this Court's procedures to file documents under seal.

10.   Any privileged information, confidential information, or protected information of third parties, that is contained within information, documents, or data being disclosed in this Action shall be redacted to the extent practicable or as subject to

the provisions concerning redactions in any Stipulated Protocol on the Discovery of Electronically Stored Information the Parties may enter into.

11.    With regard to the disclosure of Privileged Material:

a.    If the Producing Party determines, after production, that it has produced information, documents or data that are privileged or protected under the applicable rules of evidence or civil procedure or other applicable law, the Producing Party may notify the Receiving Party in writing of the discovery with the identification of the Privileged Material by Bates number range or hash value and a detailed statement as to the reason for the assertion that the information, document, or data is Privileged Material. The Receiving Party shall have ten business days following the receipt of notice to either return, sequester, or securely destroy all copies of such Privileged Material, along with any notes, abstracts, or compilations of the content thereof and may promptly present the information to the Court under seal for a determination of the claim.

b.    If the Receiving Party challenges the designation of the disclosed information, document, or data as Privileged Material, the procedures set forth in Paragraph 4 for challenging a designation of Protected Material shall also be followed.

12.    In the event the party who received PII experiences a data breach, it shall immediately notify the producing party of same and cooperate with the Producing Party to address and remedy the breach. Nothing herein shall preclude the Producing Party from asserting legal claims or constitute a waiver of legal rights

and defenses in the event of litigation arising out of the Receiving Party's failure to appropriately protect PII from unauthorized disclosure.

13.  Unless otherwise agreed or ordered, this Order shall remain in force after dismissal or entry of final judgment not subject to further appeal.

14.  Within sixty (60) days of the termination of this Action (including the expiration of time for any appellate challenge thereto), the Receiving Party must either return all Protected Material to the Producing Party or securely destroy all Protected Material. The Receiving Party must certify in writing that the Protected Material was returned or securely destroyed and that no copies, nor any abstracts, compilations, summaries, or other forms of retaining the Protected Material are in the Receiving Party's possession. Notwithstanding this provision, counsel for the Receiving Party is not expected to access and extract any Protected Material from their disaster recovery systems and counsel are entitled to retain an archival copy of all pleadings, motion papers, transcripts, legal memoranda, correspondence, deposition and trial exhibits, attorney work, and consultant and expert work product, even if such materials contain Protected Material, provided that all PII and PHI must be securely destroyed in the next routine destruction cycle after Termination of the Action. Any such archival copies that contain or constitute Protected Material remain subject to this Order and all of the protections set forth herein. Receiving Party will comply with all laws that apply to its use, disclosure, storage and processing of the personal information provided to it by the other party hereunder, and shall at all times protect the personal information with reasonable and appropriate administrative, technical and physical security controls.

15. The Court retains the right to allow, *sua sponte* or upon motion, disclosure of any subject covered by this Stipulated Order or to modify this Stipulated Order at any time in the interest of justice.

16. No Prior Judicial Determination. This Order is entered based on the representations and agreements of the parties and for the purpose of facilitating discovery. Nothing herein shall be construed or presented as a judicial determination that any document or material designated Confidential Information or Highly Confidential Information by counsel or the parties is entitled to protection under the rules of civil procedure or otherwise until such time as the Court may rule on a specific document or issue.

17. This Order shall take effect when entered and shall be binding upon all counsel of record and their law firms, the Parties, and persons made subject to this Order by its terms.

**IT IS SO ORDERED.**

Dated: May 6, 2024

_____, P.J.

JOHN C. Tylwalk

**AGREED TO BY:**

Attorneys for Plaintiff:

By: _Steven A. Schwartz_

Steven A. Schwartz
Chimicles Schwartz Kriner &
 Donaldson-Smith LLP
361 W. Lancaster Avenue
Haverford, PA 19041
610-642-8500
Fax: 610-649-3633
sas@chimicles.com

Joshua D. Arisohn
Philip L. Fraietta
Burson & Fisher, P.A.
1330 Avenue of the Americas
New York, NY 10019
jarisohn@bursor.com
pfraietta@bursor.com

Christopher R. Reilly
701 Brickell Ave., Suite 1420
Miami, FL 33131
creilly@bursor.com

Attorneys for Defendants:

By:_____

Erin L. Leffler (PA ID No. 204507)
SHOOK, HARDY & BACON L.L.P.
Two Commerce Square
2001 Market St., Suite 3000
Philadelphia, PA 19103
Tel: (215) 278-2555
Fax: (215) 278-2594
eleffler@shb.com

Jennifer A. McLoone
SHOOK, HARDY & BACON L.L.P.
201 South Biscayne Blvd., Suite 3200
Miami, FL 33131
Tel: (305) 358-5171
Fax: (305) 358-7470
jmcloone@shb.com

Anna A. Gadberry
SHOOK, HARDY & BACON L.L.P.
2555 Grand Boulevard
Kansas City, MO 64108
Tel: (816) 474-6550
Fax: (816) 421-5547
agadberry@shb.com

## EXHIBIT A

## CONFIDENTIAL UNDERTAKING

The undersigned hereby acknowledges that he/she has read the Stipulated Protective Order executed by the attorneys of record for the Parties in this case and all cases consolidated herewith and entered by the Court in the action presently pending in the United States District Court for the Middle District of Pennsylvania, captioned *Irvin v. Cabela's LLC et al.*, Case No. 2023-01668, and understands the terms thereof, and agrees, upon threat of penalty of contempt, to be bound by such terms.

Date: _____

Signature: _____

Printed Name: _____

Distribution:

Steven A Shwartz- 361 W Lancaster Ave, Haverford, PA 19041- MAIL

Joshua D Arisohn- 1330 Avenue of the Americas, New York, NY 10019- MAIL

Christopher R Reiley- 701 Brickell Ave, Suite 1420, Miami, FL 33131- MAIL

Erin L Leffler- Two Commerce Square, 2001 Market Street, Suite 3000, Philadelphia, PA 19103- MAIL

Jennifer A McLoone- 201 South Biscayne Blvd, Suite 3200, Miami, FL 33131- MAIL

Anna A Gadberry- 2555 Grand Boulevard, Kansas City, MO 64108- MAIL

# EXHIBIT 16

ORIGINAL

| DAVID IRVIN, on behalf of himself and all others similarly situated,<br><br>    Plaintiff,<br><br>v.<br><br>CABELA'S L.L.C. and BPS DIRECT, L.L.C.,<br><br>    Defendants. | IN THE COURT OF COMMON PLEAS OF LEBANON COUNTY, PA CIVIL DIVISION<br><br>Case No. 2023-01668<br><br><br>JURY TRIAL DEMANDED |

*ENTERED & FILED*
*PROTHONOTARY OFFICE*
*LEBANON, PA*
*MAY 13 P 12:33*

## MOTION FOR ADMISSION *PRO HAC VICE* OF PHILIP L. FRAIETTA

On behalf of Plaintiff David Irvin ("Plaintiff"), Steven A. Schwartz, attorney of record, hereby files the within Motion for Admission *Pro Hac Vice* pursuant to Pennsylvania Bar Admission Rule 301, stating as follows:

1.    The Plaintiff is represented in this action by the undersigned counsel who is an attorney duly licensed to practice law in the Commonwealth of Pennsylvania with attorney identification number 50579.

2.    Steven A. Schwartz, of Chimicles Schwartz Kriner & Donaldson-Smith LLP sponsors this Motion for Admission *Pro Hac Vice* of Philip L. Fraietta. An Affidavit by Mr. Schwartz is attached hereto as Exhibit A.

3.    Philip L. Fraietta, Esquire is a Partner at Bursor & Fisher, P.A., 1330 Avenue of the Americas, New York, New York 10019. He is admitted to practice in the state of New York, and his Bar Number is 5297825. Mr. Fraietta has never received public discipline, suspension or disbarment by any organization with authority to discipline attorneys. *See* Affidavit of Philip L. Fraietta attached hereto as Exhibit B.

4.     Philip L. Fraietta has not previously applied for admission *pro hac vice* in the Commonwealth of Pennsylvania.

5.     The Plaintiff seeks to have Philip L. Fraietta represent him with regard to the matters concerning the above-captioned lawsuit, under the supervision and with the assistance of Pennsylvania Counsel. Philip L. Fraietta seeks admission *pro hac vice* for the limited purpose of participating with Pennsylvania Counsel in further proceedings and trial in the above-captioned action.

6.     No party will suffer any prejudice by the admission of Philip L. Fraietta.

7.     Philip L. Fraietta has completed the necessary Pennsylvania IOLTA Board Form for *Pro Hac Vice* Admission and submitted the necessary fee with that form. A receipt from the IOLTA Board is attached hereto as Exhibit C.

8.     Philip L. Fraietta's firm, Bursor & Fisher, P.A., has registered for a City of Philadelphia Business Privilege License pursuant to 19-2602 of the Philadelphia Code. A copy of the receipt from the Philadelphia Department of Revenue is attached hereto as Exhibit D.

9.     Bursor & Fisher, P.A. shall pay all City business and wage tax as required.

**WHEREFORE,** on behalf of Plaintiff David Irvin, Steven A. Schwartz respectfully requests that this Court enter an order permitting the Admission *Pro Hac Vice* of Philip L. Fraietta, Esquire to the Bar of the Commonwealth for purposes limited to the above-captioned action.

Dated: May 9, 2024                  Respectfully submitted,

By:   *Steven A. Schwartz*
Steven A. Schwartz
**CHIMICLES SCHWARTZ KRINER
& DONALDSON-SMITH LLP**
Steven A. Schwartz (PA I.D. No. 50579)
361 W. Lancaster Avenue
Haverford, PA 19041
Tel: (610) 642-8500

2

Fax: (610) 649-3633
E-Mail: sas@chimicles.com

**BURSOR & FISHER, P.A.**
Joshua D. Arisohn*
Philip L. Fraietta*
1330 Avenue of the Americas, 32 Fl.
New York, NY 10019
Tel: (646) 837-7150
Fax: (212) 989-9163
E-Mail: jarisohn@bursor.com
        pfraietta@bursor.com

**BURSOR & FISHER, P.A.**
Christopher R. Reilly*
701 Brickell Ave., Suite 1420
Miami, FL 33131-2800
Telephone: (305) 330-5512
Facsimile: (305) 676-9006
E-Mail: creilly@bursor.com

*Pro Hac Vice Application Forthcoming*

*Attorneys for Plaintiff and the Putative Class*

3

# EXHIBIT A

| | |
|---|---|
| DAVID IRVIN, on behalf of himself and all others similarly situated,<br><br>  Plaintiff,<br><br>v.<br><br>CABELA'S L.L.C. and BPS DIRECT, L.L.C.,<br><br>  Defendants. | IN THE COURT OF COMMON PLEAS OF LEBANON COUNTY, PA CIVIL DIVISION<br><br>Case No. 2023-01668<br><br><br>JURY TRIAL DEMANDED |

## AFFIDAVIT OF STEVEN A. SCHWARTZ

COMMONWEALTH OF PENNSYLVANIA    :
                                :
COUNTY OF MONTGOMERY            :

I, Steven A. Schwartz, hereby depose and state as follows:

1.    I am a Partner at the law firm of Chimicles Schwartz Kriner & Donaldson-Smith LLP, counsel to Plaintiff David Irvin in the above-captioned action and am licensed to practice law in the Commonwealth of Pennsylvania and before this Court.

2.    As local counsel of record, I am sponsoring the admission of Philip L. Fraietta. After reasonable investigation, I believe Mr. Fraietta is a reputable and competent lawyer.

3.    Mr. Fraietta is a Partner with Bursor & Fisher, P.A., 1330 Avenue of the Americas, New York, New York 10019.

6.    Mr. Fraietta is admitted to practice, and is in good standing, in all Courts listed on the attached List of Admissions.

6.    He is a member in good standing of all Courts he is admitted to.

4

7.     Good cause exists for Mr. Fraietta's admission because the Plaintiff in this action has requested he represent him as counsel.

8.     The proceeds from any settlement of this action in which Mr. Fraietta is requesting *pro hac vice* admission shall be received, held, distributed, and accounted for in accordance with Rule 1.15 of the Pennsylvania Rules of Professional Conduct.

This Affidavit is made subject to the penalties of 18 Pa. C.S. § 4904 relating to unsworn falsification to authorities.  Signed under penalty of perjury under the laws of the Commonwealth of Pennsylvania on this __9th__ day of May, 2024.


Steven A. Schwartz

5

# EXHIBIT B

| DAVID IRVIN, on behalf of himself and all others similarly situated, | IN THE COURT OF COMMON PLEAS OF LEBANON COUNTY, PA CIVIL DIVISION |
|---|---|
| Plaintiff, | Case No. 2023-01668 |
| v. | |
| CABELA'S L.L.C. and BPS DIRECT, L.L.C., | |
| Defendants. | JURY TRIAL DEMANDED |

## AFFIDAVIT OF PHILIP L. FRAIETTA

STATE OF NEW YORK          :

                                          :

COUNTY OF NEW YORK       :

I, Philip L. Fraietta, hereby depose and state as follows:

1.    I have been retained by Plaintiff to appear and represent him in this case.

2.    I am a partner in the firm of Bursor & Fisher, P.A., 1330 Avenue of the Americas, New York, NY 10019. I am admitted to practice to the Bars of the states of New York, New Jersey, Illinois and Michigan.

3.    I am in active status and in good standing in every jurisdiction in which I am admitted to practice (*see* attached admissions list).

4.    I have never been suspended from the practice of law in any jurisdiction or received and public reprimand by the highest disciplinary authority of any bar in which I have been a member.

5.    I will comply with and be bound by the applicable statutes, case law and procedural rules of the Commonwealth of Pennsylvania, including the Pennsylvania Rules of Professional Conduct.

6.      I shall submit to the jurisdiction of the Pennsylvania Courts and the Pennsylvania Disciplinary Board with respect to acts or omissions occurring during the appearance in the case.

7.      I seek admission *pro hac vice* for the sole purpose of representing the Plaintiff and working with Chimicles Schwartz Kriner & Donaldson-Smith LLP as co-counsel. I have not previously applied for admission *pro hac vice* in any pending actions in the Commonwealth of Pennsylvania other than the above-captioned matter.

8.      I consent to the appointment of my local counsel of record and sponsor, Steven A. Schwartz, Esquire as the agent upon whom service of process shall be made for all actions, including disciplinary actions, that may arise out of the practice of law in the above-captioned matter.

9.      Bursor & Fisher, P.A. has applied for a Pennsylvania Business Privilege Law License and License No. 00-001965718 was issued to our firm on April 5, 2024.

This Affidavit is made subject to the penalties of 18 Pa. C.S. § 4904 relating to unsworn falsification to authorities. Signed under penalty of perjury under the laws of the Commonwealth of Pennsylvania on this 9th day of May____, 2024.


*Philip L. Fraietta*____
Philip L. Fraietta

## LIST OF ADMISSIONS

### STATE BAR ADMISSIONS

| STATE | ADMISSION DATE | BAR NO. |
|---|---|---|
| New York | 02/25/2015 | 5297825 |
| New Jersey | 10/31/2014 | 118322014 |
| Michigan | 07/13/2021 | P85228 |
| Illinois | 05/24/2022 | 6337165 |

### FEDERAL JURISDICTION ADMISSIONS

| STATE | ADMISSION DATE | BAR NO. |
|---|---|---|
| S.D.N.Y. | 03/10/2015 | PF7489 |
| E.D.N.Y. | 03/10/2015 | FP7489 |
| N.D.N.Y. | 02/26/2018 | 700079 |
| W.D.N.Y. | 08/14/2018 | N/A |
| D.N.J. | 11/20/2014 | N/A |
| C.D. Ill. | 04/27/2021 | N/A |
| N.D. Ill. | 09/27/2021 | 6337165 |
| E.D. Mich. | 06/23/2016 | N/A |
| W.D. Mich. | 01/29/2019 | NYS5297825 |
| U.S. Court of Appeals, 1st Circuit | 02/01/2024 | 1211189 |
| U.S. Court of Appeals, 2nd Circuit | 02/25/2015 | N/A |
| U.S. Court of Appeals, 3rd Circuit | 07/13/2021 | N/A |
| U.S. Court of Appeals, 9th Circuit | 08/24/2021 | N/A |

# EXHIBIT C

### PA Interest on Lawyers Trust Account Board
Return to the IOLTA PA Pro Hac Vice Website

## Thank you for your order!

You may print this receipt page for your records. A receipt has also been emailed to you.

Order Information

| | |
|---|---|
| Merchant: | Pennsylvania Interest on Lawyers Trust Account Board |
| Description: | Pro Hac Vice Application Fee |
| Date/Time: | 5-Apr-2024 15:06:28 EDT |
| Customer ID: | NY5520721 |

Invoice Number: PHV20240405150601

**Billing Information**
Rebecca Richter
Bursor & Fisher, P.A.
1330 Avenue of the Americas
New York, NY 10019
United States
rrichter@bursor.com
Phone: 6468377150
Fax: 2129899163

**Total:    $377.75 (USD)**

MasterCard **6152

| | |
|---|---|
| Date/Time: | 5-Apr-2024 15:06:28 EDT |
| Transaction ID: | 8037460781 |
| Auth Code: | 083105 |
| Payment Method: | MasterCard ****6152 |

Pursuant to 204 Pa Code §81.505.(a), no refunds will be issued under any circumstances. The total includes a $2.75 convenience fee.

Case ID: 230102149
Control No.: 240411800

# EXHIBIT D

 **City of Philadelphia**    Philadelphia Tax Center

 

**BURSOR & FISHER, P.A.**

2000219692

1330 AVENUE OF THE AMERICAS
NEW YORK NY 10019-5400

**Welcome, Rebecca**

*You last logged in on Friday, Apr 5, 2024 2:55:05 PM*

Summary    Action center    Settings    More options...

*Filter*

## Business Income and Receipts Tax

BURSOR & FISHER, P.A.

1330 AVENUE OF THE AMERICAS
NEW YORK NY 10019-5400

**Account**
00-001965718

Balance
**$0.00**

> Make a payment
> File, view or amend returns
> Apply for credit programs



phila.gov    News    Contact us    Privacy policy

Case ID: 230102149
Control No.: 240411800

| | |
|---|---|
| DAVID IRVIN, on behalf of himself and all others similarly situated, <br><br>         Plaintiff, <br><br>    v. <br><br> CABELA'S L.L.C. and BPS DIRECT, L.L.C., <br><br>         Defendants. | IN THE COURT OF COMMON PLEAS OF LEBANON COUNTY, PA CIVIL DIVISION <br><br> Case No. 2023-01668 <br><br><br> JURY TRIAL DEMANDED |

## [PROPOSED] ORDER

AND NOW, this _____ day of _____, 2024, upon consideration of the Motion for Admission *Pro Hac Vice* of Philip L. Fraietta, it is hereby ordered that the Motion is GRANTED.

 

                                           _____

                                                     J.

# EXHIBIT 17

Exhibit A-17

# ORIGINAL

| | |
|---|---|
| DAVID IRVIN, on behalf of himself and all others similarly situated,<br><br>    Plaintiff,<br><br>v.<br><br>CABELA'S L.L.C. and BPS DIRECT, L.L.C.,<br><br>    Defendants. | IN THE COURT OF COMMON PLEAS OF LEBANON COUNTY, PA<br>CIVIL DIVISION<br><br>Case No. 2023-01668<br><br><br>JURY TRIAL DEMANDED |

*(right margin stamp, rotated:)* 2024 MAY 15 P 12: 40

*(right margin stamp, rotated:)* ENTERED & FILED PROTHONOTARY OFFICE LEBANON, PA

## [PROPOSED] ORDER

AND NOW, this 14th day of May , 2024, upon consideration of the

Motion for Admission *Pro Hac Vice* of Philip L. Fraietta, it is hereby ordered that the Motion is

GRANTED.

BY THE COURT,

JOHN C. TYLWALK, P.J.

20.

Steven A Schwartz- 361 W. Lancaster Ave -mail
    Haverford, PA 19041

Erin Leffler - Two Commerce Square -mail
    2001 Market St. Suite 3000
    Philadelphia, PA 19103

Pursuant to Pa. R. Civil P. 236
All parties are hereby notified
this date: 5-16-24
Prothonotary, Lebanon PA

# EXHIBIT 18

Exhibit A-18

ORIGINAL

IN THE COURT OF COMMON PLEAS
LEBANON COUNTY, PENNSYLVANIA

ENTERED & FILED
PROTHONOTARY OFFICE
LEBANON, PA

2024 MAY 28  A 11: 25

DAVID IRVIN, on behalf of himself
and all others similarly situated,

                Plaintiff,

    v.

CABELA'S L.L.C. and BPS DIRECT, L.L.C.,

                Defendants.

No. 2023-01668

## PLAINTIFF'S UNOPPOSED MOTION TO CONSOLIDATE HEARINGS

Plaintiff David Irvin ("Plaintiff"), by and through undersigned counsel, hereby moves this Court for an order modifying the schedule for the upcoming proceedings as follows:

| Hearing | Current Hearing | Proposed Hearing |
|---|---|---|
| Defendant's Preliminary Objections | June 7, 2024 at 2:00 p.m. | June 7, 2024 at 2:00 p.m. |
| Case Management Conference | June 10, 2024 at 1:30 p.m. | June 7, 2024 at 2:00 p.m. |

    1.    Plaintiff filed the instant class action against Defendants Cabela's LLC and BPS Direct, LLC (collectively, "Defendants" and together with Plaintiff, the "Parties") on December 19, 2023.

    2.    On March 21, 2024, Plaintiff filed an amended class action complaint against Defendants.

    3.    That same day, the Court issued an Order scheduling a case management conference on Monday, June 10, 2024 at 1:30 p.m. in Courtroom No. 1.

    4.    On April 11, 2024, Defendants filed preliminary objections to Plaintiff's amended complaint.

5.      On April 25, 2024, the Court scheduled an oral argument on Defendants' preliminary objections for Friday, June 7, 2024 at 2:00 p.m.

6.      For the convenience of the Parties, as well as judicial economy, Plaintiff requests that the Court reschedule the case management conference to be held concurrently with Defendant's preliminary objections.

7.      Counsel for the Parties do not reside within Lebanon County and would be subject to unnecessary travel and expense by attending two separate hearings.

8.      The interests of judicial economy will also be served by resolving both hearings on the same day.

9.      This request is made in good faith and not for the purpose of delay.

10.     Plaintiff has conferred with Defendants who do not oppose the relief sought by this motion.

Dated: May 24, 2024                 Respectfully submitted,

                                    By: _/s/ Steven A. Schwartz_____
                                          Steven A. Schwartz
                                    **CHIMICLES SCHWARTZ KRINER
                                    & DONALDSON-SMITH LLP**
                                    Steven A. Schwartz (PA I.D. No. 50579)
                                    361 W. Lancaster Avenue
                                    Haverford, PA 19041
                                    Tel: (610) 642-8500
                                    Fax: (610) 649-3633
                                    E-Mail: sas@chimicles.com

                                    **BURSOR & FISHER, P.A.**
                                    Joshua D. Arisohn (*Pro Hac Vice Forthcoming*)
                                    Philip L. Fraietta (*Pro Hac Vice Forthcoming*)
                                    1330 Avenue of the Americas, 32 Fl.
                                    New York, NY 10019
                                    Tel: (646) 837-7150
                                    Fax: (212) 989-9163
                                    E-Mail: jarisohn@bursor.com
                                              pfraietta@bursor.com

**BURSOR & FISHER, P.A.**
Stephen A. Beck (*Pro Hac Vice Forthcoming*)
701 Brickell Ave., Suite 1420
Miami, FL 33131-2800
Telephone: (305) 330-5512
Facsimile: (305) 676-9006
E-Mail: sbeck@bursor.com

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I, Stephen Beck, do hereby certify that a true and correct copy of the foregoing Plaintiff's Unopposed Motion to Consolidate Hearings was served upon all known counsel of record via Electronic Mail, this 24th day of May, 2024.

_/s/ Stephen Beck_

Stephen A. Beck

# IN THE COURT OF COMMON PLEAS
## LEBANON COUNTY, PENNSYLVANIA

DAVID IRVIN, on behalf of himself
and all others similarly situated,

               Plaintiff,

   v.

CABELA'S L.L.C. and BPS DIRECT, L.L.C.,

               Defendants.

No. 2023-01668

## **ORDER**

AND NOW, this _____ day of _____, 2024, upon consideration of Plaintiff's Unopposed Motion to Consolidate Hearings, it is hereby ORDERED and DECREED that said Motion is SUSTAINED.

It is FURTHER ORDERED that the Parties case management conference shall be held on June 7, 2024 at 2:00 p.m. before the Honorable John C. Tylwalk.

BY THE COURT:

_____ , J.

# EXHIBIT 19

Exhibit A-19

# ORIGINAL

### IN THE COURT OF COMMON PLEAS
### LEBANON COUNTY, PENNSYLVANIA

ENTERED & FILED
PROTHONOTARY OFFICE
LEBANON, PA

2024 MAY 28 A 11: 25

DAVID IRVIN, on behalf of himself
and all others similarly situated,

                Plaintiff,

  v.

CABELA'S L.L.C. and BPS DIRECT, L.L.C.,

                Defendants.

No. 2023-01668

### PLAINTIFF'S RESPONSE AND BRIEF IN OPPOSITION TO DEFENDANTS' PRELIMINARY OBJECTIONS TO PLAINTIFF'S FIRST AMENDED COMPLAINT

**CHIMICLES SCHWARTZ KRINER**
**& DONALDSON-SMITH LLP**
Steven A. Schwartz (PA I.D. No. 50579)
361 W. Lancaster Avenue
Haverford, PA 19041
Tel: (610) 642-8500
Fax: (610) 649-3633
E-Mail: sas@chimicles.com

**BURSOR & FISHER, P.A.**
Joshua D. Arisohn (*Pro Hac Vice Forthcoming*)
Philip L. Fraietta (*Pro Hac Vice Forthcoming*)
1330 Avenue of the Americas, 32 Fl.
New York, NY 10019
Tel: (646) 837-7150
Fax: (212) 989-9163
E-Mail: jarisohn@bursor.com
       pfraietta@bursor.com

**BURSOR & FISHER, P.A.**
Stephen A. Beck (*Pro Hac Vice Forthcoming*)
701 Brickell Ave., Suite 1420
Miami, FL 33131-2800
Telephone: (305) 330-5512
Facsimile: (305) 676-9006
E-Mail: sbeck@bursor.com

# TABLE OF CONTENTS

PAGE(S)

INTRODUCTION ........................................................................................................ 1

LEGAL STANDARD ................................................................................................... 3

ARGUMENT ................................................................................................................ 4

I.     PLAINTIFF HAS STANDING TO BRING HIS CLAIM UNDER THE UNIFORM FIREARMS ACT ................................................................... 4

     A.     Plaintiff Satisfies Traditional Standing Requirements ............................... 4

     B.     Plaintiff's Injury Is Sufficient To Confer Standing. .................................. 6

II.     PLAINTIFF HAS STANDING TO BRING HIS CLAIM UNDER THE PENNSYLVANIA WIRETAPPING ACT ................................................. 10

III.     PLAINTIFF CAN REPRESENT PURCHASERS OF BASSPRO.COM ............................ 11

CONCLUSION ........................................................................................................... 12

# TABLE OF AUTHORITIES

**PAGE(S)**

## CASES

*Astiana v. Dreyer's Grand Ice Cream, Inc.,*
    2012 WL 2990766 (N.D. Cal. Jul. 20, 2012)..............................................................11

*Borse v. Piece Goods Shop, Inc.,*
    963 F.2d 611 (3d Cir. 1992) .....................................................................................7

*Bower v. Bower,*
    531 Pa. 54 (1992).....................................................................................................3

*Butler Area School Dist. v. Penn. For Union Reform,*
    172 A.3d 1173 (Pa. Cmwlth. 2017).........................................................................7

*Chester Upland Sch. Dist. V. Rossi,*
    275 A.3d 1117 (Pa. Cmwlth. 2022).......................................................................11

*Commonwealth of Pennsylvania v. DeJohn,*
    486 Pa. 32 (1979).....................................................................................................6

*Doe v. Franklin County,*
    139 A.3d 296 (Pa. Cmwlth. 2016) .......................................................................6, 8

*Doe v. Franklin County,*
    644 Pa. 1 (2017).......................................................................................................6

*Doe 1 v. Franklin County,*
    272 A.3d 1022 (Pa. Cmwlth. 2022) ..................................................2, 6, 10, 11

*Firearm Owners Against Crime v. Paperfuse,*
    261 A.3d 467 (2021)................................................................................................3

*Fumo v. City of Philadelphia,*
    601 Pa. 322, 972 A.2d 487 (2009)...........................................................................3

*Gennock v. Kirkland's Inc.,*
    299 A.3d 900 (Pa. Super. Ct. 2023)........................................................................9

*Harris v. Easton Pub. Co.,*
    483 A.2d 1377 (Pa. Super. Ct. 1984)............................................4, 5, 10, 11

*Haun v. Cmty. Health Sys., Inc.,*
    14 A.3d 120 (Pa. Super. Ct. 2011)...........................................................................3

*Hykes v. Hughes,*
    835 A.2d 382 (Pa. Super. Ct. 2003).........................................................................3

*In re Hard Disk Drive Suspension Assemblies Antitrust Litig.,*
　　2021 WL 4306018 (N.D. Cal. Sept. 22, 2021) ........................................................ 12

*In re: BPS Direct, LLC, and Cabela's, LLC, Wiretapping,*
　　2023 WL 8458245 (E.D. Pa. Dec. 5, 2023) ........................................................ 1

*In re: Google, Inc. Cookie Placement Consumer Privacy Litig.,*
　　934 F.3d 316 (3d Cir. 2019) ........................................................ 11

*Interest of K.N.L.,*
　　284 A.3d 121 (Pa. 2022) ........................................................ 5

*Johnson v. American Standard,*
　　607 Pa. 492, 8 A.3d 318 (2010) ........................................................ 3

*Johnson v. Bryco Arms,*
　　224 F.R.D. 536 (E.D.N.Y. Nov. 22, 2004) ........................................................ 8

*McMullan v. Wohlgemuth,*
　　453 Pa. 147 (1973) ........................................................ 6, 7

*Milby v. Pote,*
　　189 A.3d 1065 (Pa. Super. 2018) ........................................................ 3

*Murray v. Surgical Specialties Corp.,*
　　1999 WL 46583 (E.D. Pa. Jan. 14, 1999) ........................................................ 7

*Nye v. Erie Ins. Exch.,*
　　504 Pa. 3 (1983) ........................................................ 11

*Pa. State Lodge, Fraternal Order of Police v. Com., Dep't of Conservation & Nat.,*
　　909 A.2d 413 (Pa. Commw. Ct. 2006) ........................................................ 3

*Pennsylvania Liquor Control Board v. Burns,*
　　2020 WL 3256836 (Pa. Cmwlth. June 16, 2020) ........................................................ 8

*Pittsburgh Palisades Park, LLC v. Com.,*
　　585 Pa. 196 (2005) ........................................................ 4, 5

*Taha v. Bucks County,*
　　9 F. Supp. 3d 490 (E.D. Pa. 2014) ........................................................ 7

*Times Pub. Co., Inc. v. Michel,*
　　633 A.2d 1233 (Pa. Cmwlth. 1993) ........................................................ 8

*Trust Under Will of Ashton,*
　　260 A.3d 81 (Pa. 2021) ........................................................ 4

*Warth v. Seldin,*
　　422 U.S. 490 (1975) ........................................................ 2, 4

*Young v. Wetzel*,
   260 A.3d 281 (Pa. Cmwlth. 2021) ................................................................. 9

## STATUTES

18 Pa. C.S. § 6111(i) ........................................................................................ 5

18 Pa. C.S. § 7326(a) ....................................................................................... 6

18 Pa. C.S. § 9121 ............................................................................................ 7

75 Pa. C.S. § 6114(a)(1) ................................................................................... 7

Ariz. Rev. Stat. §13-3112(J) ............................................................................ 8

Conn. Gen. Stat. Ann. §29-28(d) ..................................................................... 8

Del. Code, tit. 29, §10002(g)(11) ..................................................................... 8

Fla. Stat. Ann. §790.0601 ................................................................................ 8

Ga. Code Ann. §50-18-72(d) ............................................................................ 8

Me. Rev. Stat. Ann., tit. 25 §2006 .................................................................... 8

Miss. Code Ann. § 25-61-11.1 .......................................................................... 8

Va. Code Ann. § 18.2-308.07(C) ...................................................................... 8

Wash. Rev. Code Ann. §42.56.240(4) ............................................................... 8

## REGULATIONS

43 Pa. Code § 1.2(a) ......................................................................................... 7

## OTHER AUTHORITIES

Restatement (Second) of Torts § 652B ............................................................. 10

# **INTRODUCTION**

In 1995, the Pennsylvania legislature amended the Uniform Firearms Act, adding a provision that requires companies and public entities to keep information about gun ownership confidential. While the legislative history is sparse, the motivations for the amendment are clear. Unlike other consumer goods, knowledge about gun ownership, when given to the wrong person, can have dire, life-threatening consequences. It is no one's business, the Pennsylvania legislature has determined, to know which law-abiding citizens are also gun owners. However, this did not stop Defendants Cabela's LLC ("Cabela's") and BPS Direct, LLC ("BPS") (collectively, "Defendants") from disclosing consumers', including Plaintiff's, private gun purchases to third parties, including to the world's largest social media company.

Defendants now move to dismiss Plaintiff's First Amended Complaint ("FAC"), relying, in part, on the same arguments raised in a recent federal court case concerning the same disclosures of gun purchasing information. *See In re: BPS Direct, LLC, and Cabela's, LLC, Wiretapping*, 2023 WL 8458245 (E.D. Pa. Dec. 5, 2023). While Judge Kearney held that Plaintiff did not satisfy Article III's heightened standing requirements to bring his claims in federal court, he explained that "State courts judges' standing considerations account for many varied disputes that would fall short of constituting 'cases and controversies' in federal court." *Id.*, at *19 n. 209. Despite this guidance, Defendants now argue that Plaintiff also does not have standing to bring his claims in state court. That cannot be correct.

Specifically, Defendants argue that Plaintiff lacks standing for all of his claims because: 1) he has not alleged that he was adversely affected by Defendants' conduct, and 2) he did not have his firearm purchasing information disclosed on basspro.com.[1] *See* Memorandum of Law

---

[1] Plaintiff withdraws his request for injunctive relief.

in Support of Defendants' Preliminary Objections to Plaintiff's First Amended Class Action Complaint ("Motion"). Defendants are wrong on both counts.

First, Plaintiff adequately alleges that he was harmed by Defendants' conduct. *See* FAC, ¶ 50 ("Defendants [] invaded the personal privacy of Plaintiff [] by disclosing this sensitive and protected information."). As a threshold matter, arguments that question whether information is "sufficiently private to confer standing" raise a merits issue that is not properly decided at the pleading stage. *See Warth v. Seldin*, 422 U.S. 490, 500 (1975) ("[S]tanding in no way depends on the merits of the plaintiff's contention that particular conduct is illegal."). Moreover, the Pennsylvania legislature has determined that gun purchasing information is "sufficiently private" by amending the Uniform Firearms Act to require companies, like Defendants, to keep gun purchasing information confidential. Courts in Pennsylvania have already found that a plaintiff states a claim under the Uniform Firearms Act when gun ownership information is disclosed. *See Doe 1 v. Franklin County*, 272 A.3d 1022, 1035 (Pa. Cmwlth. 2022) ("[T]his Court held that because the County used unenveloped postcards that displayed Licensees' names, addresses, and license status, Licensees stated a claim under Section 6111(i) of the Firearms Act.").

Second, arguments centered upon the use of basspro.com conflate the issues of standing and class representation. "Both [websites] are operated, at least in part, by BPS...Both websites also function identically in unlawfully assisting Facebook in intercepting information about consumers firearms purchases." FAC, ¶ 9. Because Plaintiff was harmed by the conduct of BPS, he has standing to represent other consumers who were also harmed by BPS's unlawful disclosures of their protected information.

For the foregoing reasons, and for those set forth below, Defendants' preliminary objections should be overruled.

## **LEGAL STANDARD**

"The test on preliminary objections is whether it is clear and free from doubt from all of the facts pleaded that the pleader will be unable to prove facts legally sufficient to establish his right to relief" *Bower v. Bower*, 531 Pa. 54, 57 (1992). "When considering preliminary objections, all material facts set forth in the challenged pleadings are admitted as true, as well as all inferences reasonably deducible therefrom." *Haun v. Cmty. Health Sys., Inc.*, 14 A.3d 120, 123 (Pa. Super. Ct. 2011) (quoting *Hykes v. Hughes*, 835 A.2d 382, 383 (Pa. Super. Ct. 2003)). "[W]here any doubt exists as to whether the preliminary objections should be sustained, the doubt must be resolved in favor of overruling the preliminary objections." *Pa. State Lodge, Fraternal Order of Police v. Com., Dep't of Conservation & Nat. Res.*, 909 A.2d 413, 416 (Pa. Commw. Ct. 2006).

"Under Pennsylvania law, the doctrine of standing is a prudential, judicially-created tool, affording discretion to the courts." *Firearm Owners Against Crime v. Paperfuse*, --Pa.--, 261 A.3d 467, 481 (2021) (internal quotations omitted). "[A] party seeking judicial resolution of a controversy 'must establish as a threshold matter that he has standing to maintain the action.'" *Johnson v. American Standard*, 607 Pa. 492, 8 A.3d 318, 329 (2010) (quoting *Fumo v. City of Philadelphia*, 601 Pa. 322, 972 A.2d 487, 496 (2009). When standing to bring a cause of action is not prescribed by statute, a litigant must satisfy the requirements of Pennsylvania's traditional standing doctrine. *See Milby v. Pote*, 189 A.3d 1065, 1076-77 (Pa. Super. 2018). As explained by the Pennsylvania Supreme Court:

> The "core concept" of standing is that the litigant must be "adversely affected" in some way. Under this Court's precedent, the prerequisites to standing are satisfied where the complaining party's interest is substantial, direct, and immediate, meaning that the party's interest surpasses that of the general public in procuring obedience to the law, the harm alleged was caused by the matter complained of, and the harm is not remote and speculative.

*Trust Under Will of Ashton*, 260 A.3d 81, 88 (Pa. 2021). "The keystone to standing in these terms is that the person must be negatively impacted in some real and direct fashion." *Pittsburgh Palisades Park, LLC v. Com.*, 585 Pa. 196, 204 (2005).

## ARGUMENT

## I.    PLAINTIFF HAS STANDING TO BRING HIS CLAIM UNDER THE UNIFORM FIREARMS ACT

Defendants contend that Plaintiff lacks standing to bring a claim under the Uniform Firearms Act because his claims do "not share a 'close relationship' with the tort of intrusion upon seclusion." Motion at 9. More specifically, Defendants argue that, unlike a claim for intrusion upon seclusion, the privacy violation alleged here fails because Plaintiff "needed to pick up the firearm at a store," and gun purchasing information is "not sufficiently private to confer standing." *Id.* As a threshold matter, arguments that question whether information is "sufficiently private" raise a merits issue that is not properly decided at the pleading stage. *See Warth v. Seldin*, 422 U.S. 490, 500 (1975). Moreover, in keeping with Pennsylvania precedent, Plaintiff alleges a harm that bears a close relationship to the common-law tort intrusion upon seclusion. That is more than enough to establish an injury under Pennsylvania law.

### A.    Plaintiff Satisfies Traditional Standing Requirements.

Plaintiff plausibly pleads that Defendants violated the Uniform Firearms Act, thereby injuring him in a way that bears a close relationship to intrusion upon seclusion.

"It is well established in Pennsylvania that a violation of the right to privacy is an actionable tort." *Harris v. Easton Pub. Co.*, 483 A.2d 1377, 1383 (Pa. Super. Ct. 1984). Under Pennsylvania's traditional standing doctrine, a party must only show that he has a substantial, direct, and legitimate interest in the action. *Trust Under Will of Ashton*, 260 A.3d at 88. In other words, a party must establish that they have been "negatively impacted in some real and direct fashion." *Pittsburgh Palisades Park, LLC*, 585 Pa. at 204. This is not a demanding standard.

*See Interest of K.N.L.*, 284 A.3d 121, 136 (Pa. 2022) ("In Pennsylvania, the doctrine of standing is a judicially-created tool intended to 'winnow out' litigants with no direct interest in the matter.").

Plaintiff alleges that on "December 2, 2021, [he] purchased a Henry Big Boy Classic Centerfire Lever-Action Rifle-.45 Colt from cabelas.com" and without his knowledge, "Defendants disclosed Plaintiff's name, address, his Facebook ID, [and] the type of gun he purchased." FAC, ¶¶ 77-78. Defendants' conduct "invaded the personal privacy of Plaintiff [] by disclosing this sensitive and protected information." *Id.*, ¶ 50. The Pennsylvania legislature made this harm cognizable by enacting the Uniform Firearms Act, a statute requiring Defendants to keep "[a]ll information" provided by firearms purchasers, including their "name or identity," "confidential." 18 Pa. C.S. § 6111(i). Accordingly, by nonetheless disclosing "protected information about his firearms purchases," Defendants created a harm for which Plaintiff has a substantial, direct, and immediate interest. FAC, ¶ 10.

Plaintiff's interest is substantial because his private and protected information was unlawfully disclosed to Facebook. Therefore, his individualized interest in this litigation "is greater than that of any other citizen." *Pittsburgh Palisades Park, LLC*, 585 Pa. at 205. Similarly, Plaintiff's interest is direct because he has been personally harmed by the unlawful disclosures at issue. *Id.*; FAC, ¶ 50. Finally, Plaintiff's interest is immediate because the harm suffered by Plaintiff is not remote or speculative, as Pennsylvania courts routinely deem privacy violations to be actionable torts. *Easton Pub. Co.*, 483 A.2d at 1383. Accordingly, the privacy violations underlying Plaintiff's claim for violation of the Uniform Firearms Act satisfied traditional notions of standing under Pennsylvania law.

Defendants' argument that "Plaintiff does not assert a claim for invasion of privacy here," is wrong. Motion at 8. Plaintiff brings a cause of action under Pennsylvania's Uniform Firearms

Act, which requires companies, like Defendants, to keep gun purchasing information confidential. By unlawfully disclosing this information, Defendants invaded Plaintiff's privacy, thereby violating the Uniform Firearms Act. *See Doe 1 v. Franklin County*, 272 A.3d 1022, 1035 (Pa. Cmwlth. 2022) (reversing denial of class certification, finding that "Licensees did not have to establish that the postcards were actually read by someone other than the intended recipient to establish public disclosure of confidential information under Section 6111(i) of the Firearms Act."); *Doe v. Franklin County*, 139 A.3d 296, 309 (Pa. Cmwlth. 2016) ("Given our interpretation of the statutory provision, it is not clear at this stage of the proceedings that sending the postcard does not breach the confidentiality the General Assembly deliberately and extensively crafted into the UFA."); *rev'd on other grounds*, 644 Pa. 1, 174 A.3d 593 (2017).

## B.    Plaintiff's Injury Is Sufficient To Confer Standing.

Relying primarily on *BPS Direct,* Defendants argue that, unlike a claim for intrusion upon seclusion, the privacy violation alleged here—the disclosure of gun records to the largest social media company on the planet—fails because Plaintiff "needed to pick up the firearm at a store," and gun purchasing information is "not sufficiently private to confer standing." Motion at 9. However, *BPS Direct* has no bearing on this Court's standing analysis, as the *BPS Direct* court analyzed Plaintiff's claims under the heightened Article III standard. Pennsylvania's traditional standing doctrine is not so demanding.

In Pennsylvania, "customers have a legitimate expectation of privacy in records pertaining to their affairs[.]" *Commonwealth of Pennsylvania v. DeJohn*, 486 Pa. 32, 49 (1979). Moreover, where state law shields certain information from disclosure, courts must "give great deference to this sound legislative judgment." *McMullan v. Wohlgemuth*, 453 Pa. 147, 165 (1973). In addition to gun records, Pennsylvania law protects information relating to criminal history, military service, public assistance, taxes, driving records, and drug tests. *See* 18 Pa. C.S.

§ 7326(a) (prohibiting a person from disclosing "tax information" and designating that information "confidential"); 18 Pa. C.S. § 9121 (prohibiting the disclosure of "criminal history record information"); 62 P.S. § 404(b) (prohibiting "publication" of "applicants for and recipients of public assistance"); 43 Pa. Code § 1.2(a) (prohibiting the disclosure of "military personnel" records and describing it as "an unwarranted invasion of the personal privacy"); 75 Pa. C.S. § 6114(a)(1) (protecting all "records or reports which relate to the driving record of any person"); *Murray v. Surgical Specialties Corp.*, 1999 WL 46583, at *7 (E.D. Pa. Jan. 14, 1999) (interpreting Pa C.S. § 1690.108(c) to "protect the release of confidential drug and alcohol tests").

By violating one of those statutes, the disclosure becomes sufficiently offensive to establish a claim for intrusion upon seclusion. *See McMullan v. Wohlgemuth*, 453 Pa. 147, 165 (1973) ("The statutory ban against disclosing the names of public assistance recipients is a clear recognition and directive by the Legislature that the privacy of the recipient is a fundamental need worthy of protection."); *see also Borse v. Piece Goods Shop, Inc.*, 963 F.2d 611, 621 (3d Cir. 1992) (recognizing that "an intrusion upon seclusion" may be "defined by Pennsylvania law").

At the very least, courts must "give great deference" to "legislative judgment." *Id.*; *see also Taha v. Bucks County*, 9 F. Supp. 3d 490, 494 (E.D. Pa. 2014) (declining to extend Pennsylvania's Criminal History Record Information Act to private actors, but upholding "a false-light claim" against a company because its website disseminated "a highly offensive false statement" by "creat[ing] the impression that [the plaintiff] is a 'criminal'"); *Butler Area School Dist. v. Penn. For Union Reform*, 172 A.3d 1173, 1183 (Pa. Cmwlth. 2017) ("[I]nformation obtained by an agency premised on statutory confidentiality is protected.").

The Pennsylvania legislature protected gun records for good reason. First, "if the address of firearms licensees are made public, this information could become available to individuals unable to obtain firearms legally who might burglarize the homes in search of firearms." *See Times Pub. Co., Inc. v. Michel*, 633 A.2d 1233, 1237 (Pa. Cmwlth. 1993), *reversed on other grounds Pennsylvania Liquor Control Board v. Burns*, 2020 WL 3256836 (Pa. Cmwlth. June 16, 2020). Second, "disclosure of the licensees' address would make public the address of for example abuse victims who apply for a gun permit as well as judges, prosecutors, parole and probation officers who are licensed to carry firearms and necessarily take precautions to shield information about their address." *Id.* These possibilities "pose[] a threat to … personal security." *Id.* Because of those potential threats, many states shield gun records from disclosure.[2] And where states lack such a statute, "[t]he purchase of a firearm—because of the social, political, and moral controversy that may surround it in our culture—arguably merits heightened protection." *Johnson v. Bryco Arms*, 224 F.R.D. 536, 543 (E.D.N.Y. Nov. 22, 2004).

Judge Kearney himself recognized that "State court judges' standing considerations account for many varied disputes that would fall short of constituting 'cases and controversies' in federal court." *BPS Direct,* at *19 n. 209 (internal quotations omitted). This is especially true here, as this is not the first time a Pennsylvania court has heard claims brought "under section 6111(i) of the Uniform Firearms Act based on the alleged disclosure of confidential information." *Id.*; *See also Doe v. Franklin County*, 139 A.3d at 309. Because violating the UFA would sufficiently establish a claim on the merits for intrusion upon seclusion, Plaintiff's allegations are more than sufficient to establish standing for his statutory claim.

---

[2] *See, e.g.*, Ariz. Rev. Stat. §13-3112(J) (2001); Del. Code, tit. 29, §10002(g)(11) (2003); Fla. Stat. Ann. §790.0601 (West 2007); Ga. Code Ann. §50-18-72(d) (2006); Me. Rev. Stat. Ann., tit. 25 §2006 (2007); Wash. Rev. Code Ann. §42.56.240(4) (West Supp. 2009); *see also* Conn. Gen. Stat. Ann. §29-28(d); Va. Code Ann. § 18.2-308.07(C) (2013); Miss. Code Ann. § 25-61-11.1 (2013).

Defendants' arguments are without merit. For example, that Plaintiff picked up his firearm at a store is a red herring. In order to receive medical care or a driver's license, consumers must walk into a doctor's office or DMV, but that does not mean they no longer expect their medical records or driving records to remain private. Defendants' reliance on *Gennock* and *Young* is similarly misguided. It is undisputed that "a bare statutory violation...[is] not enough to confer standing." Motion at 9. However, both precedents are distinguishable in one key aspect, as both plaintiffs complained of merely a heightened risk of harm. *See Gennock v. Kirkland's Inc.*, 299 A.3d 900 (Pa. Super. Ct. 2023), *appeal denied*, 307 A.3d 1202 (Pa. 2023) ("As in *Kamal*, **Plaintiffs have 'alleged neither third-party access of [the] information** nor that the receipt included enough information to likely enable identity theft.' All Plaintiffs have alleged is the same interest of all customers in receiving receipts in compliance with FACTA, namely, that they be properly truncated when printed.") (emphasis added); *Young v. Wetzel*, 260 A.3d 281, 288 (Pa. Cmwlth. 2021) ("**Failing even to allege that his personal information was among data compromised in the breach**, [plaintiff], therefore, is unable to establish a 'real and concrete' controversy or that any potential, future harm is neither remote nor speculative. [Plaintiff] merely alleged that the data breach resulted in 'the increased and imminent risk' of falling victim to identity theft and fraud. Having failed to establish that he was adversely affected in any way by the data breach, [plaintiff] lacks standing to pursue his negligence claim.") (emphasis added). That is in stark contrast to the present allegations, where the unauthorized disclosure of Plaintiff's confidential and protected information has *already* occurred. *See* FAC, ¶ 10 ("Defendants breached confidentiality and unlawfully disclosed Plaintiff's personally identifiable information and protected information about his firearms purchases."); *Id.*, ¶ 50 ("By assisting Facebook with intercepting information about consumers' firearms purchases, Defendants violated [WESCA] and the [UFA]. Defendants also invaded the

personal privacy of Plaintiff…by disclosing this sensitive and protected information."). Because Plaintiff complains of a harm that has already occurred, as opposed to a speculative future harm, he satisfies traditional standing requirements under Pennsylvania law. *See Easton Pub. Co.*, 483 A.2d at 1383.

## II. PLAINTIFF HAS STANDING TO BRING HIS CLAIM UNDER THE PENNSYLVANIA WIRETAPPING ACT

Defendants argue that Plaintiff lacks standing for his claim under Pennsylvania's Wiretapping Act because the disclosure of gun purchasing information "is not sufficiently private to confer standing." Motion at 9. That is wrong.

Plaintiff has standing to bring his WESCA claim because his injury bears a close relationship to intrusion upon seclusion. The prevailing view is that a wiretap, by itself, constitutes an injury sufficient to confer standing. *See, e.g.,* Restatement (Second) of Torts § 652B, cmt. B (listing examples of intrusion upon seclusion, including "tapping…phone lines" and "opening…private and personal mail"). More importantly, in Pennsylvania, courts have already established that "public disclosure of confidential information [i.e. gun purchasing information]" is sufficiently private as prescribed by the Uniform Firearms Act. *Doe 1*, 272 A.3d at 1035.

Given the protected nature of the disclosures at issue, Plaintiff's allegations are sufficient to satisfy traditional notions of standing under Pennsylvania law. *See, e.g.,* FAC, ¶ 10 (alleging Defendants "assisted Facebook with intercepting Plaintiff's communications, including those that contained [PII] and protected information about [his] firearm purchases."); *Id.*, ¶ 78 (Such information included "Plaintiff's name, address, his Facebook ID, the type of gun he purchased, among other items."). Information concerning his gun purchase was confidential because it was shielded from disclosure by the Uniform Firearms Act. At no point, moreover, did Defendants ever receive Plaintiff's "consent or express written authorization." *Id.*, ¶ 10. Taken together,

under any standard, those allegations are enough to establish an injury. *See, e.g., Easton Pub. Co.*, 483 A.2d at 1383; *In re: Google, Inc. Cookie Placement Consumer Privacy Litig.*, 934 F.3d 316, 325 (3d Cir. 2019) ("History and tradition reinforce that a[n] injury for…standing purposes occurs when Google, or any other third party, tracks a person's internet browser activity without authorization.").

As discussed, *supra*, the authority relied upon by Defendants is inapposite. Plaintiff has alleged that he was harmed related to the inva[sion of] personal privacy" from Defendants "disclos[ure of] sensitive and protected information." FAC, ¶ 50. This harm satisfies Plaintiff's burden for establishing a substantial, direct, and immediate interest in this matter. *Easton Pub. Co.*, 483 A.2d at 1383; *Doe 1*, 272 A.3d at 1035.

## III.   PLAINTIFF CAN REPRESENT PURCHASERS OF BASSPRO.COM

Defendants argue that Plaintiff lacks standing to bring claims on behalf of purchasers of basspro.com because he has not alleged that he was "aggrieved by the use of basspro.com." Motion at 5. That is wrong and misstates Pennsylvania's standing doctrine.

Defendants provide ample authority to support the proposition that a plaintiff bringing an action against multiple parties must establish an injury related to the conduct of each party. *See Nye v. Erie Ins. Exch.*, 504 Pa. 3, 6 (1983) ("a plaintiff in a class action who has not suffered an injury from the challenged conduct of a defendant cannot maintain a class action against that defendant."); *Chester Upland Sch. Dist. V. Rossi*, 275 A.3d 1117, 1125-26 (Pa. Cmwlth. 2022) ("For a petitioner in a class action to maintain an action against multiple respondents, the petitioner must allege that he has been aggrieved by each respondent."). However, such cases do not limit a plaintiff from representing other putative class members that suffered the *same injury* from the *same party*. Arguments centered upon the use of the *website* basspro.com, which is not a party to this lawsuit, conflate the issues of standing and class representation. *See Astiana v.*

*Dreyer's Grand Ice Cream, Inc.*, 2012 WL 2990766, at *13 (N.D. Cal. Jul. 20, 2012) (plaintiff

satisfied class standing requirements where same unlawful practices were consistent across

different products); *see also In re Hard Disk Drive Suspension Assemblies Antitrust Litig.*, 2021

WL 4306018, at *5 (N.D. Cal. Sept. 22, 2021) (where every product contained the relevant

component, that named plaintiffs and putative class members may have purchased different

products did not warrant dismissal of the class claims for lack of standing).

Plaintiff alleges that "BPS owns and operates basspro.com, through which it sells

sporting goods, including firearms. *BPS also assists in the operation of the cabelas.com website*

*and is the parent company of Cabela's.*" FAC, ¶ 8 (emphasis added). Importantly, Defendants

concede that Plaintiff "alleges that *Defendants* invaded [his] personal privacy." Motion at 8

(emphasis added). Moreover, here,

> [t]he basspro.com and cabelas.com websites are largely the same.
> Both are operated, at least in part, by BPS. Both offer the same
> products, including the same firearms, for sale and offer the same
> sale promotions. Both websites also function identically in
> unlawfully assisting Facebook in intercepting information about
> consumers firearms purchases.

FAC, ¶ 9. Plaintiff has established that he was harmed by the conduct of BPS. Under

Pennsylvania law, nothing more is required to represent consumers who were also harmed by

BPS's unlawful disclosures of their protected information.

## CONCLUSION

WHEREFORE, the Plaintiff respectfully requests that this Honorable Court overrule

Defendants Cabela's, LLC and BPS Direct, LLC's Preliminary Objections to Plaintiff's

Complaint and direct the defendants to Answer the Plaintiff's Complaint within twenty (20)

days.

Dated: May 24, 2024

Respectfully submitted,

By: */s/ Steven A. Schwartz*
      Steven A. Schwartz

**CHIMICLES SCHWARTZ KRINER**
**& DONALDSON-SMITH LLP**
Steven A. Schwartz (PA I.D. No. 50579)
361 W. Lancaster Avenue
Haverford, PA 19041
Tel: (610) 642-8500
Fax: (610) 649-3633
E-Mail: sas@chimicles.com

**BURSOR & FISHER, P.A.**
Joshua D. Arisohn (*Pro Hac Vice Forthcoming*)
Philip L. Fraietta (*Pro Hac Vice Forthcoming*)
1330 Avenue of the Americas, 32 Fl.
New York, NY 10019
Tel: (646) 837-7150
Fax: (212) 989-9163
E-Mail: jarisohn@bursor.com
        pfraietta@bursor.com

**BURSOR & FISHER, P.A.**
Stephen A. Beck (*Pro Hac Vice Forthcoming*)
701 Brickell Ave., Suite 1420
Miami, FL 33131-2800
Telephone: (305) 330-5512
Facsimile: (305) 676-9006
E-Mail: sbeck@bursor.com

*Attorneys for Plaintiff*

# EXHIBIT 20

Exhibit A-20

# ORIGINAL

### IN THE COURT OF COMMON PLEAS
### LEBANON COUNTY, PENNSYLVANIA

DAVID IRVIN, on behalf of himself
and all others similarly situated,

                Plaintiff,

    v.

CABELA'S L.L.C. and BPS DIRECT, L.L.C.,

                Defendants.

No. 2023-01668

ENTERED & FILED
PROTHONOTARY OFFICE
LEBANON, PA
2024 JUN -7 P 4: 25

### ORDER

AND NOW, this __6th__ day of __June__, 2024, upon consideration of Plaintiff's

Unopposed Motion to Consolidate Hearings, it is hereby ORDERED and DECREED that said

Motion is SUSTAINED.

It is FURTHER ORDERED that the Parties case management conference shall be held *on*

*August 2, 2024* at 2:00 p.m. before the Honorable John C. Tylwalk *immediately following*

*Argument on Defendants' Preliminary Objections.*

BY THE COURT:

_____ P. J.
JOHN C. TYLWALK,

cc: Shannon Dougher, Judges' Chambers - I/o
Cassidy Kleinfelter, Prothonotary
Steven A Schwartz - 361 W. Lancaster Ave - mail
            Haverford, PA 19041
Erin L. Leffler - 2001 Market Street
       Suite 3000
       Philadelphia, PA 19103

Pursuant to Pa. R. Civil P. 236
All parties are hereby notified
this date: 6/11/24
Prothonotary, Lebanon PA

# EXHIBIT 21

Exhibit A-21

**IN THE COURT OF COMMON PLEAS
LEBANON COUNTY, PENNSYLVANIA**

ENTERED & FILED
PROTHONOTARY OFFICE
LEBANON, PA

2024 JUN 10 P 1: 19

DAVID IRVIN, on behalf of himself
and all others similarly situated,

               Plaintiff,

    v.

CABELA'S L.L.C. and BPS DIRECT, L.L.C.,

               Defendants.

No. 2023-01668

## PLAINTIFF'S NOTICE OF SUPPLEMENTAL AUTHORITY

Plaintiff David Irvin ("Plaintiff") respectfully submits this Notice of Supplemental

Authority regarding Defendants Cabela's L.L.C. and BPS Direct, L.L.C.'s (collectively,

"Defendants") pending motion to dismiss.  Plaintiff brings to the Court's attention a recent Order

entered on June 3, 2024, by Judge William S. Stickman IV in *Petris v. Sportsman's Warehouse,*

*Inc., et al.*, Case No. 2:23-cv-01867-WSS (W.D. Pa. Jun. 3, 2024), attached hereto as **Exhibit 1**.

*Petris* is a District Court decision denying a defendant's motion to dismiss the plaintiff's claims

brought under Pennsylvania's Uniform Firearms Act, 18 Pa. Stat. and Cons. Stat. Ann. §6111(i)

and Pennsylvania's Wiretapping and Electronic Surveillance Control Act ("WESCA"), 18 Pa.

Stat. and Cons. Stat. Ann. § 5701, related to unauthorized disclosures of gun purchasing

information of Pennsylvania consumers to Facebook and Listrak.

Dated: June 6, 2024

               Respectfully submitted,

               By:     *Steven A. Schwartz*
                      Steven A. Schwartz

1

**CHIMICLES SCHWARTZ KRINER & DONALDSON-SMITH LLP**
Steven A. Schwartz (PA I.D. No. 50579)
361 W. Lancaster Avenue
Haverford, PA 19041
Tel: (610) 642-8500
Fax: (610) 649-3633
E-Mail: sas@chimicles.com

**BURSOR & FISHER, P.A.**
Joshua D. Arisohn*
Philip L. Fraietta*
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Tel: (646) 837-7150
Fax: (212) 989-9163
E-Mail: jarisohn@bursor.com
        pfraietta@bursor.com

**BURSOR & FISHER, P.A.**
Stephen A. Beck*
701 Brickell Ave., Suite 1420
Miami, FL 33131-2800
Telephone: (305) 330-5512
Facsimile: (305) 676-9006
E-Mail: sbeck@bursor.com

*Pro Hac Vice Application Forthcoming*
*Attorneys for Plaintiff and the Putative Class*

Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| ADAM PETRIS, *on behalf of himself and all others similarly situated*, | |
| *Plaintiff,* | Civil Action No. 2:23-cv-1867 |
| v. | Hon. William S. Stickman IV |
| SPORTSMAN'S WAREHOUSE, INC. *and* SPORTSMAN'S WAREHOUSE HOLDINGS, INC., | |
| *Defendants.* | |

## **ORDER OF COURT**

AND NOW, this _____3_____ day of June 2024, for the reasons set forth in the Opinion

filed this day, IT IS HEREBY ORDERED that Defendants Sportsman's Warehouse, Inc.'s and

Sportsman's Warehouse Holdings, Inc.'s Motion to Dismiss Plaintiff's First Amended Class

Action Complaint (ECF No. 21) is DENIED.

BY THE COURT:

WILLIAM S. STICKMAN IV
UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ADAM PETRIS, *on behalf of himself and all others similarly situated,*

              *Plaintiff,*

    v.

SPORTSMAN'S WAREHOUSE, INC. *and* SPORTSMAN'S WAREHOUSE HOLDINGS, INC.,

              *Defendants.*

Civil Action No. 2:23-cv-1867

Hon. William S. Stickman IV

## OPINION

WILLIAM S. STICKMAN IV, United States District Judge

### I.    INTRODUCTION

Plaintiff Adam Petris ("Petris"), on behalf of himself and all others similarly situated (the "Class Members"), brings this case against Defendants Sportsman's Warehouse, Inc. and Sportsman's Warehouse Holdings, Inc. (collectively, "Sportsman's Warehouse"), which operate, control, and manage the website, sportsmans.com. (ECF No. 19, p. 1). Petris filed a First Amended Class Action Complaint ("Amended Complaint") on January 26, 2024, alleging that Sportsman's Warehouse disclosed personal information related to consumers' private gun purchases, including his own, to third parties in violation of Pennsylvania's Wiretapping and Electronic Surveillance Control Act ("WESCA"), 18 PA. STAT. AND CONS. STAT. ANN. § 5701 *et seq.* ("Count I"), and Uniform Firearms Act ("Firearms Act"), 18 PA. STAT. AND CONS. STAT. ANN. § 6111(i) ("Count II"). (*Id.* at pp. 21-24).[1]  In turn, Sportsman's Warehouse filed a Motion to

---

[1] Petris filed the initial Class Action Complaint on October 27, 2023. (ECF No. 1).

Dismiss Plaintiff's First Amended Class Action Complaint ("Motion") (ECF No. 21). [2] The

Motion turns on the issue of whether Petris alleged a concrete harm, which is a requirement of

Article III standing. For the following reasons, the Court will deny Sportsman's Warehouse's

Motion as to both Counts I and II.

## II. FACTUAL BACKGROUND

Sportsman's Warehouse Holdings, Inc. and its wholly owned subsidiary, Sportsman's

Warehouse, Inc., own and operate sportsmans.com, which sells sporting goods and firearms. (ECF

No. 19, pp. 2-3). Petris purchased a Smith & Wesson M&P FPC 9mm Luger 16.25-inch Black

Anodized Semi-Automatic Modern Sporting Rifle from sportsmans.com. (*Id.* at p. 2). After

purchasing his firearm, Petris alleges that Sportsman's Warehouse, through sportsmans.com,

assisted third parties, including Meta Platforms, Inc. ("Facebook") and Listrak Inc. ("Listrak"),

with intercepting his communications, including those that contained personally identifiable

information and protected information about the purchase of his firearm. (*Id.* at pp. 1, 3).

According to Petris, the "Facebook Tracking Pixel" captures a user's web activity on sites

like sportsmans.com and sends a record of it back to Facebook. (*Id.* at p. 5). Petris also claims

that sportsmans.com hosts code for Listrak, which allows Listrak to intercept consumers'

electronic communications, including Petris's. (*Id.* at p. 14). Petris's lawsuit, however, is limited

to the personally identifiable information that sportsmans.com disclosed to Facebook and Listrak

without his consent after he purchased his firearm. (*Id.* at p. 3).

---

[2] Sportsman's Warehouse brings this Motion under Federal Rules of Civil Procedure 12(b)(1) and
12(b)(6). Yet, Sportsman's Warehouse advances no actual argument as to a Rule 12(b)(6)-related
motion. Petris, in turn, only addresses Sportsman's Warehouse's Rule 12(b)(1) related arguments.
Consequently, the Court will treat the Motion as seeking relief under Rule 12(b)(1). It denies
Sportsman's Warehouse's Motion on Rule 12(b)(6) grounds.

Petris claims that Sportsman's Warehouse sent personally identifiable information, including his name, address, Facebook ID, and the type of firearm he purchased, via sportsmans.com to Facebook and Listrak. (*Id.* at p. 24). Petris also alleges Sportsman's Warehouse assisted with these interceptions without Petris's knowledge, consent, or express written authorization. (*Id.* at p. 3). By failing to receive the requisite consent, Petris states Sportsman's Warehouse breached confidentiality and unlawfully disclosed Petris's personally identifiable information and protected information about his firearm purchase. (*Id.*).

Petris brings this class action lawsuit seeking to represent a class of all Pennsylvania residents who have purchased guns from sportsmans.com. (*Id.* at p. 1). In turn, Sportsman's Warehouse has moved to dismiss, arguing that Petris lacks standing under Article III to bring the Amended Complaint. (ECF No. 21).

### III.   STANDARD OF REVIEW

Under Rule 12(b)(1), a court must grant a motion to dismiss if there is a lack of subject matter jurisdiction. FED. R. CIV. P. 12(b)(1). A plaintiff bears the burden of persuasion that federal jurisdiction is present. *Saint Vincent Health Ctr. v. Shalala*, 937 F. Supp. 496, 501 (W.D. Pa. 1995) (citing *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991)). The threshold to survive a motion to dismiss under Rule 12(b)(1) is lower than that under Rule 12(b)(6). *Lunderstadt v. Colafella*, 886 F.2d 66, 70 (3d Cir. 1989). This is because dismissal for lack of jurisdiction cannot be predicated on the mere probability that a plaintiff's legal theories are false; a court will only dismiss for a lack of jurisdiction if a plaintiff's legal theories (1) are solely proffered to obtain federal jurisdiction but otherwise are immaterial, or (2) are "insubstantial on their face." *Growth Horizons, Inc. v. Del. Cnty., Pa.*, 983 F.2d 1277, 1280 (3d Cir. 1993) (quoting *Bell v. Hood*, 327 U.S. 678, 773, 776 (1946)).

3

Standing is a jurisdictional requirement rooted in Article III of the Constitution, which limits federal courts to resolving cases or controversies. U.S. CONST. art. III, § 2. For there to be standing under Article III, plaintiffs must have a "personal stake" in the outcome of a given case. *Baker v. Carr*, 369 U.S. 186, 204 (1962). To show they have a personal stake, the party invoking federal jurisdiction must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citation omitted). The party invoking federal jurisdiction here, the plaintiff, bears the burden of establishing each element. *Id.* (citation omitted).

An injury in fact is an "invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (citations omitted). Particularization and concreteness are quite different. "For an injury to be particularized, it must affect the plaintiff in a personal and individual way." *Spokeo*, 578 U.S. at 339 (citations and internal quotation marks omitted). "[E]ven named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong." *Id.* at 338 n.6 (cleaned up). Accordingly, whether a suit may be a class action does not factor into a court's standing analysis.

While particularization is necessary to establish injury in fact, it is not sufficient. *Id.* at 340. An injury in fact still must be real, and not abstract, or concrete. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021). In other words, it is concrete if it is de facto, meaning that it must actually exist. *Spokeo*, 578 U.S. at 340 (citation omitted). Yet, "concrete" is not synonymous with "tangible." *Id.* While tangible harms, such as physical and monetary harms, may more readily

qualify as concrete injuries under Article III, intangible harms can also be concrete. *TransUnion*, 594 U.S. at 425.

## IV.   ANALYSIS

Sportsman's Warehouse contends in its Motion that Petris does not have standing to bring his claims under WESCA and the Firearms Act because he does not plead any actual concrete and particularized injury. (ECF No. 22, p. 9). More specifically, it asserts that the Supreme Court's precedent from *Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016) and *TransUnion LLC v. Ramirez*, 594 U.S. 314 (2021) directs the Court to find that Petris did not suffer a concrete harm because none of the information at issue constitutes highly sensitive personal information. (*Id.* at p. 11). In other words, Sportsman's Warehouse avers that its alleged disclosure of Petris's personal information to third parties did not constitute an injury under Article III. (*See id.*). Petris counters that the Court can plausibly infer that he did suffer concrete harm, one closely related to two common-law torts, intrusion upon seclusion and public disclosure of private information. (ECF No. 24, p. 10). Before determining whether Petris has standing, the Court must examine the applicable law regarding Article III.

The parties' dispute primarily concerns the first element of standing–whether Petris has alleged that he suffered an injury in fact. In further distilling the parties' dispute to its core, the Court is left with the question of whether Petris alleges a concrete harm. In five recent decisions, the United States Supreme Court and the United States Court of Appeals for the Third Circuit addressed the metaphysical quandary of what specifically constitutes an injury in fact in the context of electronic communications.

The Court's analysis begins with *Spokeo*. In that case, a consumer sued an online background check company under the Fair Credit Reporting Act ("FCRA") after it allegedly

reported inaccurate information about him to its customers. *Spokeo*, 578 U.S. at 333, 335-36. The case made its way to the Supreme Court after the Ninth Circuit concluded the consumer satisfied the Article III standing injury-in-fact requirement due to his personal interests in handling his credit information and the alleged statutory violations created by the FCRA. *Id.* at 336-37. Rather than address whether Congress can create a concrete injury in fact by authorizing a private right of action predicated on a bare statutory violation, the Supreme Court vacated the Ninth Circuit's judgment and remanded the case. *Id.* at 343.

The Supreme Court held that the Ninth Circuit's standing analysis was incomplete. *Id.* at 342. It observed that the Ninth Circuit had concentrated on the particularization of the consumer's alleged injury without properly evaluating concreteness. *Id.* at 343. The Supreme Court ruled that the plaintiffs, including the consumer in the case, could not satisfy the requirements of Article III standing by alleging a bare procedural violation. *Id.* at 342. It explained that "Congress'[s] role in identifying and elevating intangible harms does not mean that a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right." *Id.* at 341.

The Supreme Court, however, maintained that history and Congress still play critical roles in determining whether an intangible harm constitutes an injury in fact. *Id.* at 340-41. In evaluating whether a harm qualifies as an injury in fact, *Spokeo* guides federal courts to inquire whether "an alleged intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Id.* at 341. *Spokeo* also directs federal courts to look at Congress's judgment, as it has the power to "elevat[e] to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law." *Id.* (quoting *Lujan*, 504 U.S. at 578) (internal quotes omitted).

6

In the wake of *Spokeo*, the Third Circuit confronted the issue of concreteness in the electronic communications context in *In re Nickelodeon Consumer Privacy Litigation*, 827 F.3d 262 (3d Cir. 2016) and *In re Google Inc. Cookie Placement Consumer Privacy Litigation*, 934 F.3d 316 (3d Cir. 2019). In *Nickelodeon*, the Third Circuit considered whether a concrete injury existed when a website operator informed users that it would not track the browsing and video-watching habits of children but then proceeded to compile their web activity with their account information to sell targeted advertising. *Nickelodeon*, 827 F.3d at 269. *Google* similarly dealt with an internet company's surreptitious capture and collection of web users' personal information. There, web users claimed that an internet search engine collected private data regarding their personal internet browsing by circumventing their cookie blockers and attaching tracking cookies to their web browsers. *Google*, 934 F.3d at 321, 325. In both cases, the Third Circuit applied the *Spokeo* framework as to concrete harm

As the Third Circuit articulated in *Nickelodeon*, and reiterated in *Google*, the intangible harms resulting from the furtive capture of web users' personal information are "concrete" as they involve "clear *de facto* injur[ies], *i.e.*, the unlawful disclosure[s] of legally protected information." *Nickelodeon*, 827 F.3d at 274; *see also Google*, 934 F.3d at 325. According to the Third Circuit, *Spokeo's* instruction—to "consider whether an alleged injury-in-fact 'has traditionally been regarded as providing a basis for a lawsuit'"—supports both of those findings. *Nickelodeon*, 827 F.3d at 274. It stated,

> [p]rivacy torts have become "well-ensconced in the fabric of American law." *In re Horizon Healthcare Servs. Inc. Data Breach Litig.*, 846 F.3d 625, 638 (3d Cir. 2017). Indeed, as Justice Thomas has explained, private actions to remedy intrusions on the private sphere trace back to England, where a property owner needed only to show that another person placed a foot on his property to establish a traditional case or controversy. *See Spokeo*, 136 S. Ct. at 1551 (Thomas, J., concurring) (citing *Entick v. Carrington*, 2 Wils. K.B. 275, 291 (1765)). Likewise, "Congress has long provided plaintiffs with the right to seek redress for

unauthorized disclosures of information that, in Congress's judgment, ought to remain private." *Nickelodeon*, 827 F.3d at 274. In an era when millions of Americans conduct their affairs increasingly through electronic devices, the assertion ... that federal courts are powerless to provide a remedy when an internet company surreptitiously collects private data [] is untenable. *Nothing in Spokeo or any other Supreme Court decision suggests otherwise.*

*Google*, 934 F.3d at 325 (emphases added).

The Supreme Court later revisited its *Spokeo* decision in *TransUnion* to provide clarity on the type of concrete harm needed to establish Article III standing. Like *Spokeo*, *TransUnion* involved a federal class action complaint brought under the FCRA, which creates a cause of action for consumers to sue and recover damages for certain violations. *TransUnion*, 594 U.S. at 421. In the case, a credit reporting agency allegedly placed an inaccurate alert on some of its consumers' credit reports indicating that the consumer's name was a potential match to a name on the U.S. Treasury Department's Office of Foreign Assets Control's ("OFAC") terrorist and narcotics trafficker list. *Id.* at 420-21. Consequently, 8,185 consumers with OFAC alerts in their credit files sued the credit reporting agency for failing to use reasonable procedures to ensure the accuracy of their files. *Id.* at 421. Prior to trial, however, the parties stipulated that only 1,853 of those consumers had their misleading credit reports shared with third parties. *Id.*

The Supreme Court began by reinforcing the notion that, although harder to discern, intangible harms can qualify as concrete injuries under Article III, especially ones traditionally recognized, such as "reputational harms, disclosure of private information, and intrusion upon seclusion." *Id.* at 425 (citation omitted). It also emphasized that Congress may not enact an injury into existence (that otherwise would not exist). *Id.* at 426 (citation omitted). While "Congress's views may be instructive," *TransUnion* bolstered the *Spokeo* principle that "Article III standing requires a concrete injury even in the context of a statutory violation." *Id.* at 425, 426 (citation and internal quotation marks omitted).

8

*TransUnion* then expounded upon *Spokeo*'s standard in applying these principles of the facts of the case. In *TransUnion*, the Supreme Court found that the 1,853 consumers whose inaccurate credit reports had been disseminated to third parties were personally harmed and thus suffered a concrete reputational harm akin to the tort of definition. *Id.* at p. 433. After holding that plaintiffs' asserted harm has a "close relationship" to the traditionally recognized reputational harm of defamation, the Supreme Court reasoned that "[t]he harm from being labeled a 'potential terrorist' bears a close relationship to the harm from being labeled a 'terrorist.'" *Id.* However, it held that the remaining 6,332 consumers whose credit reports had not been shared with third parties did not demonstrate an intangible concrete harm since their alleged inaccurate credit reports were never disseminated to third parties. *Id.* at 439. The Supreme Court explained that no historical or common-law analog supports the proposition that "the mere existence of inaccurate information, absent dissemination, amounts to concrete injury." *Id.* at 434 (citation and internal quotation marks omitted). In other words, the Anglo-American legal tradition has never recognized an actionable harm with respect to or arising out of the failure to keep accurate records in good order.

In conferring standing to 1,853 consumers whose reports had been transmitted to third parties but not the others, the Supreme Court did not create such a high bar to Article III that it precludes causes of action for statutory violations where harm is: (1) clearly defined by the statute and (2) conceptually analogous to recognized harms. *TransUnion* instead curtailed the statutory broadening of injuries that may be alleged to support a claim for standing. It instructs federal courts to filter out litigants who assert intangible harms derived from bare procedural violations that are not "remotely harmful" in a traditional sense. In the Court's view, neither *TransUnion* nor *Spokeo* prevents Congress from legislating enforceable statutory rights where the nature of the harm, not the remedy, is akin to one traditionally recognized by the law.

9

Nor does *TransUnion* abrogate *Nickelodeon* or *Google*. Both Third Circuit decisions postdate *Spokeo*, the precedent *TransUnion* primarily relied on. The facts are largely congruent as well. The litigants of all three cases—*TransUnion, Google, Nickelodeon*—were all found to have standing after they were allegedly personally harmed, whether it be the furtive capture or surreptitious disclosure of their personal information. While *TransUnion* can be differentiated from *Nickelodeon* or *Google* by the nature of the harm at issue, all three cases deal with traditionally recognized harms. Guided by *TransUnion, Spokeo, Nickelodeon,* and *Google,* the Court will evaluate whether Petris's alleged intangible harm is merely procedural or concrete.

Petris claims that he has standing because his injury "bears a close relationship to two common-law torts: intrusion upon seclusion and the public disclosure of private information." (ECF No. 24, p. 10). In response, Sportsman's Warehouse argues both analogies fail. (ECF No. 25, pp. 6). First, Sportsman's Warehouse argues that the public disclosure of private information more appropriately matches the type of harm alleged rather than an intrusion upon seclusion. (*Id.*). Second, Sportsman's Warehouse claims that, even if intrusion upon seclusion were the correct analog, Petris has failed to plead a key element of the tort, a highly offensive act. (*Id.* at p. 8). Third, Sportsman's Warehouse contends that public disclosure of private information analog fails because Petris did not plead the necessary "publicity" element. (*Id.* at p. 16). From Sportsman's Warehouse's perspective, the alleged disclosure of Petris's name, address, Facebook ID, and the type of firearm that he purchased is not a sufficiently concrete injury because the information allegedly disclosed does not constitute highly sensitive personal information, such as medical diagnosis information or financial data from banks or credit cards. (ECF No. 22, pp. 10-11).

The Court disagrees with both parties. First, the Court finds that Sportsman's Warehouse is misguided because at least some of the information Petris alleged was intercepted and shared

with third parties amounts to a clear de facto injury. A "de facto injury, *i.e.*, the unlawful disclosure of legally protected information," is enough to confer standing. *Nickelodeon*, 827 F.3d at 274. Here, the Firearms Act explicitly prohibits the disclosure of information furnished by purchasers in firearm transactions. *See* 18 PA. STAT. AND CONS. STAT. ANN. § 6111(i) ("All information provided by the potential purchaser, transferee or applicant, including, but not limited to, the potential purchaser, transferee or applicant's name or identity, furnished by a potential purchaser or transferee under this section ... shall be confidential and not subject to public disclosure."). Additionally, the information at issue is personally identifiable. If true, Petris's name, address, Facebook ID, and other information are all now connected to the firearm he purchased and shared with two prominent social media and digital marketing platforms. Under these circumstances, the Court can plausibly infer that Petris suffered a concrete harm.

Second, the Court holds that Petris's purported harms are more analogous to the right to privacy in communications embodied in the common law and WESCA than the two common-law torts he posits. The common law right to privacy has its roots in the long-established recognition that citizens have a protectable interest in their private information and in the sanctity of their communications that may not be disseminated to third parties without their knowledge and consent.[3] Originally ingrained into the common law, the right to privacy as to wiretapping has largely been supplanted by federal and state statutes, like the Federal Wiretap Act, 18 U.S.C. §§

---

[3] "Eavesdropping is indictable at the common law, not only in England but in our states. It is seldom brought to the attention of the courts, and our books contain too few decisions upon it to enable an author to define it with confidence .... It never occupied much space in the law, and it has nearly faded from the legal horizon." 1 BISHOP, COMMENTARIES ON THE CRIMINAL LAW, 670 (1882).

2510-2522, and its state analog, WESCA.[4]  Like the common law, WESCA protects the privacy

rights of individuals. *See Commonwealth v. Spangler*, 809 A.2d 234, 237 (Pa. 2002).  Specifically,

WESCA guards these privacy rights by regulating the interception and disclosure of wire,

electronic, and oral communications. *See* 18 PA. STAT. AND CONS. STAT. ANN. § 5703.

It is critical to note that both *Spokeo* and *TransUnion* look to whether a statutory cause of

action bears a "close relationship *to a harm* that has traditionally been regarded as providing a

basis for a lawsuit in English or American courts." *Spokeo*, 578 U.S. at 341 (emphasis added); *see*

*also TransUnion*, 594 U.S. at 440 (citation omitted).  The focus of the analysis for Article III

purposes is the harm, not the cause of action or the remedy.  In other words, neither *Spokeo* nor

*TransUnion* can be read to preclude the creation of a cause of action for a statutory violation that

seeks redress for an injury that is analogous to one for which Anglo-American courts have

traditionally provided an avenue for relief.  It is not necessary, as Sportsman's Warehouse argues

here, for a plaintiff asserting such a claim to plead or establish *the elements* of a traditional cause

of action, but rather, only that an analogous harm exists.  By way of example, a legislature may

enact a consumer protection statute that provides redress for harm that is of a similar nature to the

common law tort of fraud.  The legislature may designate the elements of the statutory cause of

action and even provide for a different measure of damages.  A plaintiff will have standing,

consistent with Article III, to maintain a suit in federal court under the statutory consumer

protection without regard to whether he could establish the traditional common law elements of

---

[4] In 1918, Congress enacted the first federal wiretap statute to prevent the disclosure of government
secrets during World War I.  CHARLES DOYLE, CONG. RSCH. SERV., R41733, PRIVACY: AN
OVERVIEW OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT 2 (2012),
https://crsreports.congress.gov/product/pdf/R/R41733/9.    Later in 1927, it prohibited the
interception and disclosure of private radio messages. *Id.*  By 1928, "at least forty-one of the forty-
eight states had banned wiretapping or forbidden telephone and telegraph employees and officers
from disclosing the content of telephone or telegraph messages or both." *Id.*

fraud provided that the injury is analogous. In other words, neither *Spokeo* nor *TransUnion* can be read for the proposition that a federal court cannot entertain a cause of action for a statutory violation provided that the cause of action aims to redress a harm that is analogous to a traditionally recognized injury.

Both the common law right to privacy and a cause of action under WESCA address the same interest: a person's control of private information concerning his or her private information. *See U.S. Dep't of Justice v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 763 (1989). WECSA grants a statutory cause of action to "[a]ny person whose wire, electronic or oral communication is intercepted, disclosed or used in violation of [the statute]" against "any person who intercepts, discloses or uses or procures any other person to intercept, disclose or use, such communication." 18 PA. STAT. AND CONS. STAT. ANN. § 5725(a). A person also has an actionable right under the common law to be free from an invasion of their right to privacy. However, "the extent of the protection accorded [to] a privacy right at common law rested in part on the degree of dissemination of the allegedly private fact and the extent to which the passage of time rendered it private." *Reporters Comm.*, 489 U.S. at 763. Where a record is not open to public inspection, such as one's tax returns, "it is not public and there is an invasion of privacy when it is made so." *Id.* at 763 n.15 (citing Restatement (Second) of Torts § 652D (Am. L. Inst. 1977)).

In the instant case, Petris has adequately alleged a harm to his privacy interests. The common-law right of privacy and WESCA give Petris the right to control the flow of information concerning his person, which includes his firearm purchase. As alleged, Sportsman's Warehouse surreptitiously disclosed Petris's personal information related to his firearm purchase, which is not information "open to public inspection," to third parties without his consent. Such information is

13

prohibited from being amassed. *See* 18 U.S.C. § 926.[5]  Additionally, the disclosure amounted to

a high degree of dissemination as it reportedly shared Petris's personal information with social

media and digital marketing services.  With that level of dissemination, Petris has sufficiently

alleged that he was personally harmed as he did not have a meaningful opportunity to control the

unauthorized dissemination of his firearm purchase.  Accordingly, as pled, Petris purportedly

suffered a harm with a close relationship to the harm associated with the historically recognized

right to privacy.

As *TransUnion* dictates, Congress's judgment on such matters is also "instructive."

*TransUnion*, 594 U.S. at 425.  Yet, legislative judgment does not alter the Court's application of

the *TransUnion* standard of concrete harm.  On this exact issue, the Third Circuit has noted that

"Congress has long provided plaintiffs with the right to seek redress for unauthorized disclosures

of information that, in Congress's judgment, ought to remain private." *Nickelodeon*, 827 F.3d at

274 (citations omitted).  As to firearm sales, Congress has shielded such information from the

public.  Since 1986, federal law has prohibited a database containing gun registration information

or gun permit holders from being maintained. *See* 18 U.S.C. § 926.  The Firearms Owners'

Protection Act of 1986 ("FOPA") is a direct reflection of Congress's judgment to keep information

related to firearm purchases private.  With Congress's judgment viewed as instructive by

*TransUnion*, it is evident to the Court that, if true, Petris's alleged harm is sufficiently concrete.

---

[5] Section 6 of FOPA amended § 926 to prohibit a registry of firearms, firearms owners, or firearms
transactions. The pertinent language of § 926 reads:

> No such rule or regulation prescribed after the date of the enactment of the Firearms
> Owners' Protection Act may require that records required to be maintained under
> this chapter or any portion of the contents of such records, be recorded at or
> transferred to a facility owned, managed, or controlled by the United States or any
> State or any political subdivision thereof, nor that any system of registration of
> firearms, firearms owners, or firearms transactions or dispositions be established.

14

As to Sportsman's Warehouse's contention that Petris's alleged harm cannot be concrete because none of the information related to the firearm purchase constitutes highly sensitive personal information, the Court disagrees. (ECF No. 22, p. 10). As explained above, there are other kinds of privacy rights at issue in this case besides the public disclosure of private information and intrusion upon seclusion. Here, Petris's right to privacy embraces his ability to control the information that concerns him. It does not require that the information amount to highly sensitive personal information. The common law traditionally extended protection to a record that was not open to public inspection. *See Reporters Comm.* at 763. Even if the common law necessitated that the information shared amounted to highly sensitive personal information, FOPA suggests that Congress may view information related to a firearm purchase as private.

Finally, Petris must also meet the particularization requirement for his alleged harm to qualify as an injury in fact. Concreteness alone is not enough. *Spokeo*, 578 U.S. at 339-40. Petris's purported injury, however, is particularized, as his Amended Complaint relates to the capture and disclosure of his protected personal information to third parties. (*See* ECF No. 19, p. 3). These specific allegations described in the Amended Complaint show that Petris properly alleges that he has been personally injured.

With the concreteness and particularization requirements met, Petris has sufficiently established standing by alleging an invasion of the historically recognized right to privacy. As such, Petris overcomes Sportsman's Warehouse's 12(b)(1) Motion as to his privacy claims under WESCA and the Firearms Act.

15

## V.   CONCLUSION

For these reasons, Sportsman's Warehouse's Motion will be denied as to Counts I and II.

An Order of Court will follow.

BY THE COURT:

WILLIAM S. STICKMAN IV
UNITED STATES DISTRICT JUDGE

**6-3-24**
Dated

16

# EXHIBIT 22

Exhibit A-22

# ORIGINAL

**IN THE COURT OF COMMON PLEAS OF** ENTERED & FILED
**LEBANON COUNTY, PENNSYLVANIA** PROTHONOTARY OFFICE
LEBANON, PA.

2024 JUN 14 P 1:57

| | |
|---|---|
| DAVID IRVIN, on behalf of himself and all others similarly situated, | CIVIL DIVISION |
| Plaintiff, | Case No. 2023-01668 |
| v. | **JURY TRIAL DEMANDED** |
| CABELA'S L.L.C. and BPS DIRECT, L.L.C., | |
| Defendants. | |

## NOTICE OF APPEARANCE

Please take notice that Marissa Pembroke, a member of the Supreme Court of Pennsylvania, hereby enters her appearance on behalf of Plaintiff David Irvin in the above-captioned action.

Dated: June 12, 2024

Respectfully submitted,

*/s/ Marissa Pembroke*
**CHIMICLES SCHWARTZ KRINER & DONALDSON-SMITH LLP**
Marissa Pembroke (PA Bar No. 330494)
361 W Lancaster Ave.
Haverford, PA 19041
Tel: (610) 642-8500
Fax: (610) 649-3633
mnp@chimicles.com

*Attorney for Plaintiff*

## CERTIFICATE OF SERVICE

I, Marissa Pembroke, do hereby certify that a true and correct copy of the foregoing Notice of Appearance was served upon all known counsel of record via Elecgronic Mail, this 12th day of June, 2024.


/s/ Marissa Pembroke
Marissa Pembroke

# EXHIBIT 23

Exhibit A-23

# ORIGINAL

### IN THE COURT OF COMMON PLEAS
### LEBANON COUNTY, PENNSYLVANIA

'ENTERED & FILED
PROTHONOTARY OFFICE
LEBANON, PA

2024 JUL 19 P 12: 51

| | |
|---|---|
| DAVID IRVIN, on behalf of himself and all others similarly situated,<br><br>    Plaintiff,<br><br>v.<br><br>CABELA'S L.L.C., ET AL, et al.,<br><br>    Defendant. | Case No. 2023-01668 |

## MOTION FOR ADMISSION *PRO HAC VICE* OF STEPHEN A. BECK

Plaintiff David Irvin, by and through his counsel, Alex M. Kashurba, hereby moves this Court to admit Stephen A. Beck *pro hac vice*, pursuant to 204 Pa. Code§ 81.501 et seq., and P.R.C.P. 1012 and Pennsylvania Bar Admission Rule 301.

1.    I, Alex M. Kashurba, represent Mr. David Irvin, in the above-captioned case.

2.    This is a class action lawsuit brought on behalf of all Pennsylvania residents who have visited and/or purchased firearms from cabelas.com and/or basspro.com.

3.    Stephen A. Beck was admitted to the Florida Bar in 2018, and is a member in good standing. Mr. Beck is an Associate in the Law Firm of Bursor & Fisher, P.A. in Miami, Florida and has never been the subject of any disciplinary proceedings. He has never been denied admission *pro hac vice*.

4.    Mr. Beck has attached a copy of his fee payment certifications from the IOLTA Regulations, Section 81.505(a). (See Exhibit "A.")

5.    Pursuant to the Pennsylvania Bar Admission Rules, "[a]n attorney, barrister or advocate who is qualified to practice in the courts of another state or of any

1

foreign jurisdiction may be specially admitted to the Bar of this Commonwealth for purposes limited to a particular matter." Rule 301(a) of the Pennsylvania Bar Admission Rules.

6.   In this case, counsel for Plaintiff requests that Stephen A. Beck be admitted for the limited purpose of assisting in the representation of Plaintiff in the above captioned matter.

7.   In the event of their special admission, Mr. Kashurba remains the attorney of record in this case pursuant to Rule 301(a), which states that an attorney admitted *pro hac vice* "shall not, however, thereby be authorized to act as attorney of record."

8.   A motion for admission *pro hac vice* shall be granted by the Court absent "good cause for denial." Pa.R.C.P. 1012.l(e).

9.   Here, there is no good cause for denial of the special admission of Mr. Beck to the Bar of the Commonwealth of Pennsylvania.

10.  The Commonwealth will not be prejudiced in any way if Mr. Beck is admitted to the Bar of this Court, *pro hac vice*.

11.  That Alex M. Kashurba, Esquire has submitted a verified statement in compliance with Rule 1012.1.

Wherefore, Plaintiff respectfully requests that this Court admit Stephen A. Beck to the practice of law in the Commonwealth of Pennsylvania *pro hac vice* in this matter.

Respectfully submitted,

*Alex Kashurba*

Alex M. Kashurba

2

## **CERTIFICATE OF SERVICE**

I, Alex M. Kashurba, do hereby certify that a true and correct copy of the Motion for

Admission *Pro Hac Vice* of Stephen A. Beck was served upon all known counsel of record via

Electronic Mail, this 17th day of July, 2024.

*/s/ Alex M. Kashurba*
Alex M. Kashurba

ENTERED & FILED
PROTHONOTARY OFFICE
LEBANON, PA

2024 JUL 19 P 12: 51

**IN THE COURT OF COMMON PLEAS**
**LEBANON COUNTY, PENNSYLVANIA**

---

DAVID IRVIN, on behalf of himself
and all others similarly situated,

        Plaintiff,

    v.

CABELA'S L.L.C. and BPS DIRECT, L.L.C.,

        Defendants.

No. 2023-01668

---

### VERIFICATION OF ALEX M. KASHURBA IN SUPPORT OF
### MOTION FOR ADMISSION *PRO HAC VICE* OF STEPHEN A. BECK

I, Alex M. Kashurba, declare under penalty of perjury that the statements herein are true

and correct. I understand that false statements made herein are subject to the penalties of 18 Pa.

C.S.A. § 4904 relating to unsworn falsification to authorities.

1.    I am an Associate at the law firm of Chimicles Schwartz Kriner & Donaldson-

    Smith LLP located at 361 W. Lancaster Avenue, Haverford, Pennsylvania 19041.

    I represent the Plaintiff, David Irvin, in the above-captioned matter. I make this

    verification in support of the motion for *pro hac vice* admission of Stephen A.

    Beck because I believe Mr. Beck to be a reputable and competent attorney who

    will aid in the prosecution of this case.

2.    I was admitted to the Pennsylvania Bar in 2014, and my state bar number is

    319003.

3.    I am a member in good standing of the New Jersey and Pennsylvania Bars. I am

    not presently, nor ever have been, the subject of any disbarment or suspension

    proceeding before these or any Court.

1

4.     I am not presently acting as a sponsor in any other cases in the State Courts of

Pennsylvania.

Dated: July 17, 2024                    Respectfully submitted,

                                        By:   */s/ Alex M. Kashurba*
                                              Alex M. Kashurba

2

ENTERED & FILED
PROTHONOTARY OFFICE
LEBANON, PA

2024 JUL 19 P 12: 52

**IN THE COURT OF COMMON PLEAS
LEBANON COUNTY, PENNSYLVANIA**

DAVID IRVIN, on behalf of himself and all
others similarly situated,

       Plaintiff,

v.

CABELA'S L.L.C., ET AL, et al.,

       Defendant.

Case No. 2023-01668

## VERIFICATION OF STEPHEN A. BECK
## IN SUPPORT OF MOTION FOR ADMISSION *PRO HAC VICE*

I, Stephen A. Beck, Esquire, declare under penalty of perjury that the statements herein

are true and correct. I understand that false statements made herein are subject to the penalties of

18 Pa.C.S.A. § 4904 relating to unsworn falsification to authorities.

1.     I am an associate in the law firm Bursor & Fisher, P.A in Miami, Florida.

2.     I was admitted to the Florida Bar in 2018, and my state bar number is 1010183.

3.     I am a member in good standing of the Florida Bar. I presently am not, and have

       never been, the subject of any disbarment or suspension proceeding before this

       or any Court.

4.     I have never been denied admission *Pro Hac Vice*, and there are no pending cases

       in Pennsylvania State Court in which I have applied for admission *Pro Hac Vice*. I

       am presently admitted *Pro HacVice* in the U.S. District of Utah, and Northern

       District of California.

5.     I shall comply and be bound by the applicable statutes, case law and procedural

1

rules of the Commonwealth of Pennsylvania, including the Pennsylvania Rules of Professional Conduct.

6.      I shall submit to the jurisdiction of the Pennsylvania Courts and the Pennsylvania Disciplinary Board for purposes of my appearance in this matter.

7.      I consent to my sponsor, Alex M. Kashurba, Esq., as an agent of service of process for all actions that may arise out of the practice of law in this case.

Respectfully submitted,

Stephen A. Beck

# EXHIBIT A



SUPREME COURT OF PENNSYLVANIA
## PENNSYLVANIA INTEREST ON
## LAWYERS TRUST ACCOUNT BOARD

July 16, 2024

STEPHEN A. BECK, Esq.
BURSOR & FISHER, P.A.
701 BRICKELL AVENUE, SUITE 1420
MIAMI, FL 33131

SENT TO STEVEN A. SCHWARTZ VIA Email: SAS@CHIMICLES.COM

Dear Attorney BECK:

This letter serves as the fee payment certification referenced in 204 Pa Code §81.503 and acknowledges receipt of the $375.00 fee paid by Online Payment on this date related to your pursuit for admission *pro hac vice* in the case identified as DAVID IRVIN v. CABELA'S L.L.C., ET AL, et al.,, no. 2023-01668, filed in Court of Common Pleas of Lebanon County.

You should refer to Pa Rule of Civil Procedure 1012.1, local court rules, and other regulations of 204 Pa Code §81.501 et. seq. concerning additional requirements related to seeking *pro hac vice* admission.

Sincerely,

*Stephanie S. Libhart*

Stephanie S. Libhart
Executive Director

cc: STEVEN ALAN SCHWARTZ, Esq.

   sas@chimicles.com

Pennsylvania Judicial Center
601 Commonwealth Ave., Ste. 2400
PO Box 62445, Harrisburg, PA 17106-2445
717/238-2001 · 888/PA-IOLTA (724-6582) · 717/238-2003 FAX
paiolta@pacourts.us · www.paiolta.org

Administering Pennsylvania's Interest On Lawyers Trust Account (IOLTA) Program

**IN THE COURT OF COMMON PLEAS
LEBANON COUNTY, PENNSYLVANIA**

| | |
|---|---|
| DAVID IRVIN, on behalf of himself and all others similarly situated, <br><br>             Plaintiff, <br><br>   v. <br><br> CABELA'S L.L.C. and BPS DIRECT, L.L.C., <br><br>             Defendants. | No. 2023-01668 |

## <u>ORDER</u>

AND NOW, this _____ day of _____, 2024, upon consideration of the Motion for Admission *Pro Hac Vice* of Stephen A. Beck, it is hereby ORDERED and DECREED that said Motion is GRANTED.

BY THE COURT:

_____ , J.

# EXHIBIT 24

Exhibit A-24



## IN THE COURT OF COMMON PLEAS
## LEBANON COUNTY, PENNSYLVANIA

ENTERED & FILED
PROTHONOTARY OFFICE
LEBANON, PA

2024 JUL 23  A 11: 15

DAVID IRVIN, on behalf of himself
and all others similarly situated,

            Plaintiff,

    v.

CABELA'S L.L.C. and BPS DIRECT, L.L.C.,

            Defendants.

No. 2023-01668

## ORDER

AND NOW, this **22ⁿᵈ** day of **July**, 2024, upon consideration of the Motion

for Admission *Pro Hac Vice* of Stephen A. Beck, it is hereby ORDERED and DECREED that

said Motion is GRANTED.

BY THE COURT:

_____, J.

Pursuant to Pa. R. Civil P. 236
All parties are hereby notified
this date: 7/23/24
Prothonotary, Lebanon PA

Alex Kashurba, Esq. - 361 W. Lancaster Ave, Haverford, PA 19041 -mail

Erin Leffler, Esq - 2 Commerce Square 2001 Market Street Suite 3000

Philadelphia, Pa 19103 - Mailed

# EXHIBIT 25

Exhibit A-25

# ORIGINAL

ENTERED & FILED
PROTHONOTARY OFFICE
LEBANON, PA

2024 AUG -1 P 1: 10

**SHOOK HARDY & BACON L.L.P.**
Erin L. Leffler, Esq. (PA ID 204507)
Two Commerce Square
2001 Market Street, Suite 3000
Philadelphia, PA 19103
Phone: 215-278-2555
Fax: 215-278-2594
eleffler@shb.com

*Attorneys for Defendants Cabela's L.L.C. and BPS Direct, L.L.C.*

| | |
|---|---|
| DAVID IRVIN, on behalf of himself and all others similarly situated,<br><br>        Plaintiff,<br><br>        v.<br><br>CABELA'S L.L.C. and BPS DIRECT, L.L.C.,<br><br>        Defendants. | COURT OF COMMON PLEAS LEBANON COUNTY, PENNSYLVANIA CIVIL DIVISION<br><br>Case No. 2023-01668 |

## MOTION FOR THE ADMISSION *PRO HAC VICE* OF JENNIFER MCLOONE, ESQUIRE, ON BEHALF OF DEFENDANTS

Defendants Cabela's L.L.C. and BPS Direct, L.L.C., by and through their attorneys, hereby moves pursuant to Pennsylvania Bar Admission Rule 301 and Pennsylvania Rule of Civil Procedure 1012.1 for the Admission *Pro Hac Vice* of Jennifer McLoone, Esquire, for the purpose of assisting in the defense of this lawsuit and, in support thereof, avers as follows:

1. Ms. McLoone is a Partner with the law firm of Shook, Hardy & Bacon L.L.P., Citigroup Center, 201 South Biscayne Blvd., Suite 3200, Miami, FL 33131.

2. Ms. McLoone is a member in good standing of the bar of the State of Florida (Admitted in 2006; Bar No. 0029234). Ms. McLoone is admitted in the following Federal jurisdictions: the U.S. District Court for the Middle District of Florida (Admitted in 2009); U.S. District Court for the Southern District of Florida (Admitted in 2007); U.S. District Court for the

Northern District of Florida (Admitted in 2007); U.S. Court of Appeals, 3rd Circuit (2024); and U.S. Court of Appeals, 11th Circuit (2008).

3.    There are neither any disciplinary or other proceedings pending against Ms. McLoone nor have there been any.

4.    Ms. McLoone is fully familiar with the facts and background of this litigation and the efficient administration, prosecution, and resolution of this case will be materially advanced by the admission *pro hac vice* of Ms. McLoone.

6.    Pursuant to Pa.R.C.P. 1012.1(c) and 1012.1(d)(2), all required verifications are attached hereto and incorporated as if set forth fully herein.  (*See* Verification of Jennifer McLoone, Esquire and Verification of Erin L. Leffler, Esquire attached respectively as Exhibit "A" and Exhibit "B").

7.    The information required by Section 81.504 of the Pennsylvania Interest on Lawyer Trust Account Board Regulations for *Pro Hac Vice* Admission ("IOLTA Regulations") has been provided.

8.    The fee required by Section 81.505(a) of the IOLTA Regulations was paid on July 31, 2024. (*See* The Supreme Court of Pennsylvania IOLTA letter attached as Exhibit "C" hereto).

9.    Ms. McLoone agrees to be bound by the Pennsylvania Rules of Court, the Local Rules of the Philadelphia County Court of Common Pleas and the Pennsylvania Rules of Professional Conduct.

10.    No good cause for denial exists.

**WHEREFORE**, the undersigned counsel for Defendants Cabela's L.L.C. and BPS Direct, L.L.C. respectfully request that this Court enter an Order in the form attached hereto admitting Jennifer McLoone *pro hac vice* to practice before this Court for all discovery, motions, and trial in this matter.

Respectfully submitted,

Dated: July 31, 2024

By:＿＿＿*/s/ Erin L. Leffler*＿＿＿＿＿＿＿
Erin L. Leffler (PA Bar No. 204507)
SHOOK, HARDY & BACON L.L.P.
Two Commerce Square
2001 Market Street, Suite 3000
Philadelphia, PA 19103
(215) 278-2555
eleffler@shb.com

*Attorneys for Defendants Cabela's L.L.C. and BPS Direct, L.L.C.*

3

## CERTIFICATE OF SERVICE

I, Erin L. Leffler, hereby certify that on July 31, 2024, I caused a true and correct copy of

the foregoing Motion for the Admission *Pro Hac Vice* of Jennifer McLoone, Esquire on behalf of

Defendants Cabela's L.L.C. and BPS Direct, L.L.C. to be filed with the Court and served by e-

mail on the following counsel of record:

> Steven A. Schwartz, Esquire
> Alex M. Kashurba, Esquire
> Marissa Pembroke, Esquire
> Chimicles Schwartz Kriner & Donaldson-Smith LLP
> 361 W. Lancaster Avenue
> Haverford, PA 19041
> sas@chimicles.com
> amk@chimicles.com
> mnp@chimicles.com
>
> Joshua D. Arisohn, Esquire (to seek *pro hac vice* admission)
> Philip L. Fraietta, Esquire (admitted *pro hac vice*)
> Bursor & Fisher, P.A.
> 1330 Avenue of the Americas
> New York, NY 10019
> jarisohn@bursor.com
> pfraietta@bursor.com
>
> Stephen A. Beck, Esquire (to seek *pro hac vice* admission)
> Bursor & Fisher, P.A.
> 701 Brickell Avenue, Suite 1420
> Miami, FL 33131-2800
> sbeck@bursor.com
>
> *Attorneys for Plaintiff*

_/s/ Erin Leffler_
Erin L. Leffler, Esquire

***Attorney for Defendants Cabela's L.L.C. and BPS
Direct, L.L.C.***

# EXHIBIT A

**SHOOK HARDY & BACON L.L.P.**
Erin L. Leffler, Esq. (PA ID 204507)
Two Commerce Square
2001 Market Street, Suite 3000
Philadelphia, PA 19103
Phone:  215-278-2555
Fax:  215-278-2594
eleffler@shb.com

*Attorneys for Defendants Cabela's L.L.C. and BPS Direct, L.L.C.*

| | |
|---|---|
| DAVID IRVIN, on behalf of himself and all others similarly situated,<br><br>    Plaintiff,<br><br>    v.<br><br>CABELA'S L.L.C. and BPS DIRECT, L.L.C.,<br><br>    Defendants. | COURT OF COMMON PLEAS LEBANON COUNTY, PENNSYLVANIA CIVIL DIVISION<br><br>Case No. 2023-01668 |

## <u>VERIFICATION OF JENNIFER MCLOONE, ESQUIRE</u>

I, Jennifer McLoone, hereby verify as follows:

1.    I am a partner with the law firm of Shook, Hardy & Bacon L.L.P., Citigroup Center, 201 South Biscayne Blvd., Suite 3200, Miami, FL 33131.

2.    I am a member in good standing of the bar of the State of Florida (Admitted in 2006; Bar No. 0029234). I am admitted in the following Federal jurisdictions: the U.S. District Court for the Middle District of Florida (Admitted in 2009); U.S. District Court for the Southern District of Florida (Admitted in 2007); U.S. District Court for the Northern District of Florida (Admitted in 2007); U.S. Court of Appeals, 3rd Circuit (2024); and U.S. Court of Appeals, 11th Circuit (Admitted in 2008).

3.      I am neither currently subject to any disciplinary proceedings in any jurisdiction nor have I ever been.

4.      My application for *pro hac vice* admission has never been denied in any jurisdiction in which it was presented.

5.      I have not applied for admission *pro hac vice* in any case pending in the Commonwealth of Pennsylvania.

6.      I agree to work with Erin L. Leffler, local counsel from the law firm of Shook, Hardy & Bacon L.L.P., Two Commerce Square, 2001 Market Street, Suite 3000, Philadelphia, Pennsylvania 19103, in this matter, and hereby consent to her appointment as the agent upon whom service of process shall be made for all actions, including disciplinary actions, that may arise out of my *pro hac vice* appearance in this matter.

7.      I will comply with and be bound by the applicable statutes, case law, and procedural rules of the Commonwealth of Pennsylvania, including the Pennsylvania Rules of Professional Conduct.

8.      I shall submit to the jurisdiction of the Pennsylvania courts and the Pennsylvania Disciplinary Board with respect to acts and omissions occurring during the appearance in the matter for which admission *pro hac vice* is being sought.

9.     I hereby affirm that the statements contained herein are true and understand that false statements made herein are subject to the penalties of 18 Pa.C.S. § 4904, relating to unsworn falsification to authorities.

Respectfully Submitted,


Dated: July 30, 2024                    By: _____
                                            Jennifer McLoone

# EXHIBIT B

**SHOOK HARDY & BACON L.L.P.**
Erin L. Leffler, Esq. (PA ID 204507)
Two Commerce Square
2001 Market Street, Suite 3000
Philadelphia, PA 19103
Phone: 215-278-2555
Fax: 215-278-2594
eleffler@shb.com

*Attorneys for Defendants Cabela's L.L.C. and BPS Direct, L.L.C.*

| | |
|---|---|
| DAVID IRVIN, on behalf of himself and all others similarly situated, | COURT OF COMMON PLEAS LEBANON COUNTY, PENNSYLVANIA CIVIL DIVISION |
| Plaintiff, | |
| v. | Case No. 2023-01668 |
| CABELA'S L.L.C. and BPS DIRECT, L.L.C., | |
| Defendants. | |

### VERIFICATION OF ERIN L. LEFFLER, ESQUIRE, IN SUPPORT OF THE MOTION FOR *PRO HAC VICE* ADMISSION OF JENNIFER MCLOONE, ESQUIRE

I, ERIN L. LEFFLER, hereby verify as follows:

1.      I am a partner with the law firm of Shook, Hardy & Bacon L.L.P. and counsel of record for Defendants Cabela's L.L.C. and BPS Direct, L.L.C. in the above-referenced matter.

2.      I am admitted to the bar of the Commonwealth of Pennsylvania and hereby move for the admission of Jennifer McLoone, Esquire *pro hac vice* in this matter.

3.      I believe that Ms. McLoone is a highly reputable and competent attorney and as such, I recommend her admission.

4.      I am currently acting as a sponsor for twenty attorneys in six cases in the Commonwealth of Pennsylvania.

5.      If applicable, the proceeds from the settlement of a cause of action in this matter where this candidate is admitted *pro hac vice* shall be received, held, distributed, and accounted for in accordance with Rule 1.15 of the Pennsylvania Rules of Professional Conduct, including the IOLTA provisions thereof.

6.      I verify that the facts set forth in the foregoing motion are true and correct to the best of my knowledge. I understand that false statements herein are subject to the penalties set forth in 18 Pa.C.S. § 4904 relating to unsworn falsifications to authorities.

Respectfully submitted,

Dated:  July 31, 2024

_____

Erin L. Leffler, Esquire

2

# EXHIBIT C



SUPREME COURT OF PENNSYLVANIA
# PENNSYLVANIA INTEREST ON
# LAWYERS TRUST ACCOUNT BOARD

July 31, 2024

JENNIFER  MCLOONE, Esq.
SHOOK, HARDY & BACON LLP
201 SOUTH BISCAYNE BLVD.
SUITE 3200
MIAMI, FL 33131

SENT TO ERIN LEFFLER VIA Email: ELEFFLER@SHB.COM

Dear Attorney MCLOONE:

This letter serves as the fee payment certification referenced in 204 Pa Code §81.503 and acknowledges receipt of the $375.00 fee paid by Online Payment on this date related to your pursuit for admission *pro hac vice* in the case identified as Irvin v. Cabela's LLC and BPS Direct LLC, no. 2023-01668, filed in Court of Common Pleas of Lebanon County.

You should refer to Pa Rule of Civil Procedure 1012.1, local court rules, and other regulations of 204 Pa Code §81.501 et. seq. concerning additional requirements related to seeking *pro hac vice* admission.

Sincerely,

Stephanie S. Libhart
Executive Director

cc:  ERIN LOUCKS LEFFLER, Esq.

     eleffler@shb.com

Pennsylvania Judicial Center
601 Commonwealth Ave., Ste. 2400
PO Box 62445, Harrisburg, PA 17106-2445
717/238-2001 · 888/PA-IOLTA (724-6582) · 717/238-2003 FAX
paiolta@pacourts.us · www.paiolta.org

Administering Pennsylvania's Interest On Lawyers Trust Account (IOLTA) Program

| | |
|---|---|
| DAVID IRVIN, on behalf of himself and all others similarly situated, | COURT OF COMMON PLEAS LEBANON COUNTY, PENNSYLVANIA CIVIL DIVISION |
| Plaintiff, | |
| v. | Case No. 2023-01668 |
| CABELA'S L.L.C. and BPS DIRECT, L.L.C., | |
| Defendants. | |

## <u>ORDER</u>

**AND NOW**, this _____ day of _____, 2024, it is hereby **ORDERED**

**AND DECREED** that the Motion for Admission *Pro Hac Vice* of Jennifer McLoone, Esquire, is

**GRANTED**, and that Jennifer McLoone, Esquire, of the law firm Shook, Hardy & Bacon L.L.P.,

Citigroup Center, 201 South Biscayne Blvd., Suite 3200, Miami, FL 33131, is hereby admitted

*Pro Hac Vice* on behalf of Defendants Cabela's L.L.C. and BPS Direct, L.L.C. for the purposes of

this matter.

**BY THE COURT:**


_____ **J.**

# EXHIBIT 26

ORIGINAL

Exhibit A-26

**IN THE COURT OF COMMON PLEAS**
**LEBANON COUNTY, PENNSYLVANIA**

ENTERED & FILED
PROTHONOTARY OFFICE
LEBANON PA

DAVID IRVIN, ON BEHALF OF HIMSELF
AND ALL OTHERS SIMILARLY SITUATED

2024 AUG -5 P 1: 42

        :
        :
        :   NO. 2023-01668

    v.

CABELA'S, LLC AND BPS DIRECT, LLC

**STATUS CONFERENCE ORDER**

**AND NOW, this** _2nd_ **day of** _AUGUST_ , 2024 the

Court enters the following Status Conference Order:

1. It appears that an Amended Civil Complaint was filed on ___March 22, 2024___ .

2. A jury trial has been requested in this matter.

3. This case has been designated as a Standard Track case. Accordingly, Trial in this matter shall be conducted within eighteen (18) months.

4. The deadline for discovery in the above referenced case shall be April 22, 2025.

5. The deadline for disclosure of Plaintiff's expert reports shall be April 22, 2025.

6. The deadline for disclosure of all defense expert reports shall be May 22, 2025.

7. The deadline for the filing of dispositive motions will be May 22, 2025.

8. A Pretrial Conference shall be scheduled for July of 2025. A Pretrial Memorandum shall be submitted to the Court thirty (30) days prior to the Pretrial Conference.

9. Trial in this matter shall be scheduled for the Civil Trial Term in September, 2025.

BY THE COURT:

_____ P.J.
JOHN C. TYLWALK

cc: Steven A. Schwartz, Esquire ~Mailed
    Erin L. Leffler, Esquire ~ Mailed
    Court Administration ~ 5/0
    Judith L. Huber, Esquire, Law Clerk ~ 5/0
    Judge's Chambers ~ 5/0

Pursuant to Pa. R. Civl P. 236
All parties are hereby notified
this date: 8/6/24 /kb
Prothonotary, Lebanon PA

# EXHIBIT 27

Exhibit A-27

ORIGINAL

ENTERED & FILED
PROTHONOTARY OFFICE
LEBANON, PA

2024 AUG -6 P 3:57

DAVID IRVIN, on behalf of himself and all
others similarly situated,

Plaintiff,

v.

CABELA'S L.L.C. and BPS DIRECT, L.L.C.,

Defendants.

COURT OF COMMON PLEAS
LEBANON COUNTY, PENNSYLVANIA
CIVIL DIVISION

Case No. 2023-01668

## ORDER

AND NOW, this 2nd day of August, 2024, it is hereby **ORDERED AND DECREED** that the Motion for Admission *Pro Hac Vice* of Jennifer McLoone, Esquire, is **GRANTED**, and that Jennifer McLoone, Esquire, of the law firm Shook, Hardy & Bacon L.L.P., Citigroup Center, 201 South Biscayne Blvd., Suite 3200, Miami, FL 33131, is hereby admitted *Pro Hac Vice* on behalf of Defendants Cabela's L.L.C. and BPS Direct, L.L.C. for the purposes of this matter.

**BY THE COURT:**

JOHN C. TYLWALK                                    P.J.

Pursuant to Pa. R. Civil P. 236
All parties are hereby notified
this date: 8/7/24
Prothonotary, Lebanon PA

## DISTRIBUTION LIST

ERIN LEFFLER ESQUIRE – 2001 MARKET STREET SUITE 3000 PHILADELPHIA PA 19103 –
MAILED

STEPHEN A. BECK ESQUIRE – 701 BRICKELL AVENUE SUITE 1420 MIAMI FL. 33131-2800 –
MAILED

STEVEN A. SCHWARTZ ESQUIRE – 361 W. LANCASTER AVE HAVERFORD PA 19041 –
MAILED

PHILIP L. FRAIETTA ESQUIRE – 1330 AVENUE OF THE AMERICAS NEW YORK NY 10019 –
MAILED

# EXHIBIT 28

ORIGINAL

**IN THE COURT OF COMMON PLEAS**
**LEBANON COUNTY, PENNSYLVANIA**

ENTERED & FILED
PROTHONOTARY OFFICE
LEBANON, PA

2024 SEP 27 P 2: 15

| | |
|---|---|
| DAVID IRVIN, on behalf of himself<br>and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CABELA'S L.L.C. and BPS DIRECT, L.L.C.,<br><br>Defendants. | No. 2023-01668 |

## PLAINTIFF'S NOTICE OF SUPPLEMENTAL AUTHORITY

Plaintiff David Irvin ("Plaintiff") respectfully submits this Notice of Supplemental Authority regarding Defendants Cabela's L.L.C. and BPS Direct, L.L.C.'s (collectively, "Defendants") pending motion to dismiss. Plaintiff brings to the Court's attention a recent Order entered on September 24, 2024, by Judge Anthony T. Verwey in *DiGregorio v. Brownells, Inc.*, Case No. 2024-03864-TT, attached hereto as **Exhibit 1**. *DiGregorio* is Pennsylvania state court decision denying a defendant's motion to dismiss the plaintiff's claims brought under Pennsylvania's Uniform Firearms Act, 18 Pa. Stat. and Cons. Stat. Ann. § 6111(i) and Pennsylvania's Wiretapping and Electronic Surveillance Control Act ("WESCA"), 18 Pa. Stat. and Cons. Stat. Ann. § 5701, related to unauthorized disclosures of gun purchasing information of Pennsylvania consumers to Listrak.

Dated: September 24, 2024

Respectfully submitted,

By: _Steven A. Schwartz_
Steven A. Schwartz

**CHIMICLES SCHWARTZ KRINER
& DONALDSON-SMITH LLP**
Steven A. Schwartz (PA I.D. No. 50579)
361 W. Lancaster Avenue
Haverford, PA 19041
Tel: (610) 642-8500
Fax: (610) 649-3633
E-Mail: sas@chimicles.com

**BURSOR & FISHER, P.A.**
Joshua D. Arisohn*
Philip L. Fraietta*
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Tel: (646) 837-7150
Fax: (212) 989-9163
E-Mail: jarisohn@bursor.com
        pfraietta@bursor.com

**BURSOR & FISHER, P.A.**
Stephen A. Beck (*pro hac vice*)
701 Brickell Ave., Suite 1420
Miami, FL 33131-2800
Telephone: (305) 330-5512
Facsimile: (305) 676-9006
E-Mail: sbeck@bursor.com

*\*Pro Hac Vice Application Forthcoming
Attorneys for Plaintiff and the Putative Class*

Exhibit A

https://chestercountypa.sharepoint.com/sites/CourtJudges/Shared Documents/General/Pre-Trial/ord/obj/DiGregorio v. Brownells 24-03864.kmb.docx

NICK DIGREGORIO, on behalf of himself : IN THE COURT OF C
and all others similarly situated

      vs. : CHESTER COUNTY

       : CIVIL ACTION – LA

BROWNELLS, INC. : NO. 2024-03864-TT

Steven A. Schwartz, Esquire, Attorney for Plaintiff
Jennifer B. Hagedorn, Esquire, Attorney for Defendant

## O R D E R

AND NOW, this $\underline{24^{\text{th}}}$ day of $\underline{September}$ 2024, upon

consideration of Defendant's Preliminary Objections to Plaintiff's First Amended Class Action

Complaint and Plaintiff's response thereto, it is hereby **ORDERED** and **DECREED** that the

Objections are **OVERRULED** and Defendant shall file an Answer to Plaintiff's First Amended

Class Action Complaint within twenty (20) days of the date this Order is docketed.[1]

                     BY THE COURT:

                     ANTHONY T. VERWEY        J.

---

[1] Plaintiff filed his putative class action based on Defendant's actions in assisting/conspiring with Listrak to intercept Plaintiff's and class members' communications including those that contained personally identifiable information and protected information about firearms purchases. The First Amended Class Action Complaint contains the following Counts: I – Violation of the Pennsylvania Wiretapping and Electronic Surveillance Control Act (WESCA); and II – Violation of the Uniform Firearms Act (UFA).

     In its first Objection, Defendant asserts that Plaintiff lacks standing based on the decision issued in a previous case filed by Plaintiff in the Eastern District of Pennsylvania (prior federal action). In his response, Plaintiff makes valid arguments that he does have standing based on Pennsylvania's traditional standing requirements.

     Defendant also filed Objections in the nature of a demurrer to both Counts. The question presented by a demurrer is whether, on the facts averred, the law says with certainty that no recovery is possible. *Werner v. Plater-Zyberk*, 799 A.2d 776 (Pa.Super. 2002), *app. den.* 806 A.2d 862. Upon review of the First Amended Class Action Complaint it cannot be said with certainty that no recovery is possible. In addition, it appears that some of Defendant's arguments are more properly pled as affirmative defenses in New Matter.

     Finally, Defendant argues that the court should consider exhibits which were filed in the prior federal action and Defendant's privacy policy. If Defendant wishes the court to consider certain exhibits, it should reference those exhibits and their relevance in its affirmative defenses. The same holds true for Defendant's privacy policy. **2024-03864-TT**

# EXHIBIT 29

Exhibit A-29

ORIGINAL

## IN THE COURT OF COMMON PLEAS
## LEBANON COUNTY, PENNSYLVANIA

ENTERED & FILED
PROTHONOTARY OFFICE
LEBANON, PA

2024 NOV 25 P 4: 24

| | |
|---|---|
| DAVID IRVIN, on behalf of himself and all others similarly situated, | |
| Plaintiff, | No. 2023-01668 |
| v. | |
| CABELA'S L.L.C. and BPS DIRECT, L.L.C., | |
| Defendants. | |

## PLAINTIFF'S UNCONTESTED MOTION TO DESIGNATE CASE AS COMPLEX AND SET CLASS CERTIFICATION BRIEFING SCHEDULE

Plaintiff David Irvin ("Plaintiff"), by and through undersigned counsel, pursuant to Leb. Co. R.C.P. 52-205.7, respectfully submits this Uncontested Motion to Designate this Case as Complex and Set Class Certification Briefing Schedule. In support thereof, Plaintiff states as follows:

1. On December 21, 2023, Plaintiff filed a complaint against Cabela's L.L.C. and BPS Direct, L.L.C. (collectively, "Defendants") in the Court of Common Pleas of Lebanon County, Case No. 2023-01668.

2. On March 1, 2024, Defendants filed preliminary objections to Plaintiff's complaint.

3. On March 21, 2024, Plaintiff filed an amended complaint against Defendants, bringing claims under Pennsylvania's Wiretap Act and Uniform Firearms Act ("FAC").

4. On April 11, 2024, Defendants filed preliminary objections to Plaintiff's FAC.

5. On May 1, 2024, Plaintiff opposed Defendants' preliminary objections.

6.      On August 2, 2024, the Court held oral arguments for Defendants' preliminary objections and set a case schedule for this matter.

7.      As of the filing of this uncontested motion the Court has not ruled on Defendants' preliminary objections.

8.      The Parties have been actively engaged in discovery throughout the pendency of this action.  Plaintiff and Defendants have each exchanged discovery requests and Plaintiff has subpoenaed relevant data from third party, Meta, Inc. ("Facebook").  However, Plaintiff requires additional time to complete discovery and move for class certification.

9.      The Parties propose the following schedule:

    a.      **June 17, 2025**: Plaintiff's deadline to move for class certification;

    b.      **June 17, 2025**: Plaintiff's deadline to disclose experts in support of class certification;

    c.      **July 17, 2025**: Defendants' deadline to oppose class certification;

    d.      **July 17, 2025**: Defendants' deadline to disclose experts in opposition to class certification;

    e.      **August 7, 2025**: Plaintiff's deadline to file his reply in support of class certification;

    f.      **September 4, 2025**: hearing on Plaintiff's motion for class certification;

    g.      **September 30, 2025**: deadline for discovery;

    h.      **November 4, 2025**: deadline for filing of dispositive motions;

    i.      **February 2026**: a pretrial conference shall be scheduled.  A Pretrial Memorandum shall be submitted to the Court thirty (30) days prior to the Pretrial Conference;

    j.    **March 2026**: trial shall be scheduled for the Civil Trial Term.

10.    Given the upcoming case deadlines, Plaintiff respectfully requests that the Court designate this matter as complex, and extend the current case schedule to allow the Parties additional time to complete discovery and complete briefing on class certification.

11.    The Parties have conferred in good faith in proposing the aforementioned schedule. This request is made in good faith and not for the purpose of delay.

Dated: November 22, 2024

Respectfully submitted,

By:    */s/ Steven A. Schwartz*
Steven A. Schwartz (PA I.D. No. 50579)
**CHIMICLES SCHWARTZ KRINER & DONALDSON-SMITH LLP**
361 W. Lancaster Avenue
Haverford, PA 19041
Tel: (610) 642-8500
Fax: (610) 649-3633
E-Mail: sas@chimicles.com

**BURSOR & FISHER, P.A.**
Joshua D. Arisohn (*pro hac vice*)
Philip L. Fraietta (*pro hac vice*)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Tel: (646) 837-7150
Fax: (212) 989-9163
E-Mail: jarisohn@bursor.com
        pfraietta@bursor.com

**BURSOR & FISHER, P.A.**
Stephen A. Beck (*pro hac vice*)
701 Brickell Ave., Suite 2100
Miami, FL 33131-2800
Telephone: (305) 330-5512
Facsimile: (305) 676-9006
E-Mail: sbeck@bursor.com

*Attorneys for Plaintiff and the Putative Class*

**IN THE COURT OF COMMON PLEAS
LEBANON COUNTY, PENNSYLVANIA**

DAVID IRVIN, on behalf of himself
and all others similarly situated,

                    Plaintiff,

    v.

CABELA'S L.L.C. and BPS DIRECT, L.L.C.,

                    Defendants.

No. 2023-01668

## <u>ORDER</u>

AND NOW, this _____ day of _____, 2024, upon consideration of Plaintiff's

Unopposed Motion to Designate Case as Complex and Set Class Certification Briefing Schedule,

it is hereby ORDERED and DECREED that said Motion is GRANTED.

BY THE COURT:

_____
John C. Tylwalk, J.

# EXHIBIT 30

Exhibit A-30

# ORIGINAL

## IN THE COURT OF COMMON PLEAS
## LEBANON COUNTY, PENNSYLVANIA

DAVID IRVIN, on behalf of himself
and all others similarly situated,

      Plaintiff,

v.

CABELA'S L.L.C. and BPS DIRECT, L.L.C.,

      Defendants.

No. 2023-01668

ENTERED & FILED
PROTHONOTARY OFFICE
LEBANON PA
2024 NOV 27 P 4: 11.

### ORDER

AND NOW, this **27TH** day of **November**, 2024, upon consideration of Plaintiff's

Unopposed Motion to Designate Case as Complex and Set Class Certification Briefing Schedule,

it is hereby ORDERED and DECREED that said Motion is GRANTED.

BY THE COURT:

John C. Tylwalk, J.

CC: Erin L. Leffler // Two Commerce Square, 2001 Market Square,
Suite 300, Philadelphia, PA 19103

Steven A. Schwartz // 361 W. Lancaster Ave., Haverford, PA 19041

Joshua D. Arisohn, Phillip L. Fraietta // 1330 Avenue of the Americas,
32nd Floor, New York, NY 10019

Stephen A. Beck // 701 Brickell Ave., Suite 2100, Miami, FL 33131

Pursuant to Pa. R. Civil P. 236
All parties are hereby notified
this date: 12/02/2024 SB
Prothonotary, Lebanon PA

# EXHIBIT 31

# ORIGINAL

IN THE COURT OF COMMON PLEAS OF LEBANON COUNTY
PENNSYLVANIA

## CIVIL DIVISION

| | | |
|---|---|---|
| DAVID IRVIN, on behalf of himself | : | NO. 2023-01668 |
| And all others similarly situated, | : | |
| Plaintiff | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| CABELA'S L.L.C. and | : | |
| BPS DIRECT, L.L.C., | : | |
| Defendants | : | |

**ENTERED & FILED**
**PROTHONOTARY OFFICE**
**LEBANON, PA**
**2025 FEB 10 ∙ A 8: 37**

## **ORDER OF COURT**

AND NOW, this 7th day of February, 2025, upon consideration of

Defendants' Preliminary Objections to the Amended Complaint, Plaintiff's

response thereto, the briefs submitted by the parties, and after Oral Argument, it

is hereby Ordered as follows:

1. Defendants' Preliminary Objection to standing with regard to Defendant

   BPS Direct, L.L.C. is OVERRULED;

2. Defendants' Preliminary Objection to standing to pursue the claims set

   forth in the Amended Complaint is OVERRULED; and

3. Defendants' Preliminary Objection to the request for injunctive relief is

   SUSTAINED, in part, and OVERRULED, in part, in accordance with the

   Opinion accompanying this Order.

**BY THE COURT:**

_____, P.J.

JOHN C. TYLWALK

JCT/jah

Cc: **Steven A. Schwartz, Esquire/Chimicles Schwartz Kriner & Donaldson-Smith
    LLP/361 West Lancaster Avenue/Haverford, PA  19041** — Mailed
    **Erin L. Leffler, Esquire/Two Commerce Square/2001 Market Street, Suite
    3000/Philadelphia, PA  19103** — Mailed
    **Michelle Howard/Court Administration** — I/O
    **Judith Huber, Esquire/Law Clerk** — I/O

Pursuant to Pa. R. Civil P. 236
All parties are hereby notified
this date: 02|11|702 6513
Prothonotary, Lebanon PA

ENTERED & FILED
PROTHONOTARY OFFICE
LEBANON, PA

2025 FEB 10 A 8:37

IN THE COURT OF COMMON PLEAS OF LEBANON COUNTY
PENNSYLVANIA

CIVIL DIVISION

DAVID IRVIN, on behalf of himself         :        NO. 2023-01668
And all others similarly situated,        :
    Plaintiff          :
          :
          :
  v.                             :
          :
CABELA'S L.L.C. and                        :
BPS DIRECT, L.L.C.,                        :
    Defendants         :

**APPEARANCES:**

**STEVEN A. SCHWARTZ, ESQUIRE**   **FOR PLAINTIFF**
**CHIMICLES SCHWARTZ KRINER**
**  & DONALDSON-SMITH LLP**

**ERIN L. LEFFLER, ESQUIRE**    **FOR DEFENDANTS**
**SHOOK, HARDY & BACON, LLP**

**OPINION, TYLWALK, P.J., FEBRUARY 7, 2025.**

  This is a class action brought by Plaintiff against Defendants Cabela's L.L.C.

("Cabela's") and BPS Direct, L.L.C. ("BPS") on behalf of all Pennsylvania residents

who visited and/or purchased firearms from cabelas.com and/or basspro.com.

Plaintiff alleges that the Defendants conspired with Meta Platforms ("Facebook")

1

to intercept communications sent and received by Plaintiff and other class members, including protected information about firearms purchases, without consent in violation of the Pennsylvania Wiretapping and Electronic Surveillance Control Act, 18 Pa.C.S.A. §5701 *et seq* ("Wiretap Act"), and the Uniform Firearms Act of 1995, 18 Pa.C.S.A. §6101 et seq ("Firearms Act").  Plaintiff contends that the disclosure was a violation of the privacy interests of himself and other class members and seeks compensatory damages, including statutory damages, punitive damages, injunctive relief, and attorney's fees and expenses/costs of suit.

Plaintiff originally brought suit in federal court;[1] however, that action was dismissed as to multiple defendants.  With regard to Plaintiff, the federal court's Order provided:

2. We dismiss all plead claims for injunctive relief with prejudice;

3. We dismiss ... David Irvin's claims for damages without prejudice to their filing amended Complaints on or before January 5, 2024 if they can specifically plead standing based on the sharing of highly sensitive personal information such as a medical diagnosis or financial data from banks or credit cards;

(Preliminary Objections, Exhibit "B")

---

[1] The federal litigation, *Irvin v. Cabela's L.L.C. et al.,* was originally filed in the U.S. District Court for the Middle District of Pennsylvania, docketed at No. 1:23-cv-00530-CCC (M.D.Pa.).  The matter was transferred to the U.S. District Court for the Eastern District and docketed at *In re: BPS Direct, LLC and Cabela's LLC, Wiretapping Litigation*, No. 2:22-cv-04709 (E.D.Pa.).

After Plaintiff filed this action, Defendant filed preliminary objections challenging Plaintiff's standing and Plaintiff filed an Amended Complaint. Defendants have filed Preliminary Objections to the Amended Complaint challenging Plaintiff's standing on three bases: (1) Plaintiff lacks standing to represent a class of individuals who made a purchase on basspro.com because Plaintiff himself did not do so; (2) Plaintiff lacks standing to pursue his claims because he has failed to allege facts demonstrating that he was adversely affected by Defendants' conduct; and (3) Plaintiff lacks standing to pursue injunctive relief.

A class action is a procedural device designed to promote efficiency and fairness in handling large numbers of similar claims. The requirements for certifying a class action are set forth in the Pennsylvania Rules of Civil Procedure. Pennsylvania Rule of Civil Procedure 1702 outlines five prerequisites for a class action:

> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the defenses of the class;
>
> (4) the representative parties will fairly and adequately assert and protect the interests of the class under the criteria set forth in 1709; and

(5) a class action provides a full and efficient method for adjudication of the controversy under the criteria set forth in Rule 1708.

Pa.R.C.P. No. 1702.

The rules require a hearing on class certification. Pa.R.C.P. 1707.  The parties in this matter have elected to proceed with the issue of class certification via briefs and an Order approving their proposed briefing schedule was entered on November 27, 2024.  Thus, we address only Plaintiff's standing with regard to the claims against BPS and under the Wiretap Act and the Firearms Act and make no findings with respect to the propriety of this matter proceeding as a class action.

The issue of standing goes to a party's capacity to sue. ***C.G. v. J.H.***, 172 A.3d 43 (Pa. Super. 2017).  Pa.R.C.P. No. 1028 provides that a party may raise the lack of capacity to sue by preliminary objection.   Thus, a challenge to standing is properly pleaded by way of preliminary objection. ***In Interest of K.N.L.,*** 284 A.3d 121 (Pa. 2022).  The test on preliminary objections is whether it is clear and free from doubt from all of the facts pleaded that the pleader will be unable to prove facts legally sufficient to establish his right to relief. ***Bower v. Bower***, 531 Pa. 54, 57 (Pa. 1992). When considering preliminary objections, all material facts set forth in the challenged pleading are admitted as true, as well as all inferences reasonably deducible therefrom. ***Haun v. Community Health System, Inc.***, 14

4

A.3d 120, 123 (Pa. Super. 2011).   Where any doubt exists as to whether the preliminary objections should be sustained, the doubt must be resolved in favor of overruling the preliminary objections. ***Pennsylvania State Lodge, FOP v. Dept. of Conservation and Natural Resources,*** 909 A.2d 413, 416 (Pa. Commw. 2006).

Lack of standing is a ground for a preliminary objection in a class action. ***Citizens For State Hosp. v. Com.,*** 553 A.2d 496 (Pa. Commw. 1989), *aff'd*, 600 A.2d 949 (Pa. 1992).   If the named plaintiffs in a class action do not have standing, they cannot maintain a class action.   ***Nye v. Erie Ins. Exchange,*** 470 A.2d 98 (Pa. 1983).   A plaintiff in a class action who has not suffered an injury from the challenged conduct of a defendant cannot maintain a class action against that defendant. ***Id***.

### Standing to Sue Defendant BPS DIRECT LLC

Defendants first argue that Plaintiff lacks standing to bring claims on behalf of class members who visited basspro.com.  They argue that cabela's.com and basspro.com are separate websites and that Plaintiff cannot maintain suit against BPS as he does not allege that he ever visited basspro.com or purchased any product from that website.

In the Amended Complaint, Plaintiff avers:

6. ... On December 2, 2021, Plaintiff Irvin purchased a Henry Big Boy Classic Centerfire Lever-Action Rifle - .45 Colt from cabelas.com. ... Plaintiff Irvin also has an active Facebook account which he has maintained since approximately 2007. ...

7. Defendant Cabela's L.L.C. is a Pennsylvania company headquartered in Springfield, Missouri. Cabela's owns and operates cabela's com, through subsidiary of BPS Direct, L.L.C.

8. Defendant BPS Direct, L.L.C., doing business as Bass Pro Shops, is a Delaware corporation headquartered in Springfield, Missouri. BPS owns and operates basspro.com, through which it sells sporting goods, including firearms. BPS also assists in the operation of the cabelas.com website and is the parent company of Cabela's.

9. The basspro.com and cabelas.com websites are largely the same. Both are operated, at least in part, by BPS. Both offer the same products, including the same firearms, for sale and offer the same sale promotions. Both websites also function identically in unlawfully assisting Facebook in intercepting information about consumers (sic) firearms purchases.

10. Pursuant to the systematic process described herein, Defendants, through cabelas.com and basspro.com, assisted Facebook with intercepting Plaintiff's communications, including those that contained personally identifiable information and protected information about their firearms purchases. Defendants assisted these interceptions without Plaintiff's knowledge, consent or express written authorization. By failing to receive the requisite consent, Defendants breached confidentiality and unlawfully disclosed Plaintiff's personally identifiable information and protected information about his firearms purchases.

(Amended Complaint, Para. 6-10)

These allegations are sufficient to establish Plaintiff's standing to sue BPS.

Plaintiff alleges that he utilized Cabela's website to purchase his firearm and was

injured when Cabela's disseminated that information to Facebook.  BPS is the

parent company of Cabela's and assists in the operation of Cabela's website,

thereby participating in the alleged injurious conduct.  BPS owns and operates

basspro.com and Plaintiff has established that he was harmed by the conduct of

BPS.  Therefore, we will overrule this Preliminary Objection.

### STANDING AS TO CLAIMS UNDER WIRETAP ACT/FIREARMS ACT

Defendants point out that Pennsylvania recognizes two types of standing:

statutory standing and traditional standing.  To have statutory standing, the

statute must expressly prescribe the individuals who have standing to pursue a

particular action thereunder.  ***Gennock v. Kirkland's, Inc.***, 299 A.3d 900 (Pa. Super.

2023) (unpublished, non-precedential decision), *appeal denied* 307 A.3d 1202 (Pa.

2023).  Unless a statute has an express provision stating who has standing to

pursue an action, there is no statutory standing.  ***Id***.

Both the Wiretap Act and the Firearms Act provide a cause of action for

parties who are injured by the disclosures of information deemed to be private

under their provisions.

Section  6111 of the Firearms Act provides, in part:

(i)     Confidentiality.--All information provided by the potential purchaser,
        transferee or applicant, including, but not limited to, the potential
        purchaser, transferee or applicant's name or identity, furnished by a

7

potential purchaser or transferee under this section or any applicant for a license to carry a firearm as provided by section 6109 shall be confidential and not subject to public disclosure. In addition to any other sanction or penalty imposed by this chapter, any person, licensed dealer, State or local governmental agency or department that violates this subsection shall be liable in civil damages in the amount of $1,000 per occurrence or three times the actual damages incurred as a result of the violation, whichever is greater, as well as reasonable attorney fees.

18 Pa.C.S.A. §6111(i)

Section 5725 of the Wiretap Act provides, in part:

§ 5725. Civil action for unlawful interception, disclosure or use of wire, electronic or oral communication

(a) Cause of action.--Any person whose wire, electronic or oral communication is intercepted, disclosed or used in violation of this chapter shall have a civil cause of action against any person who intercepts, discloses or uses or procures any other person to intercept, disclose or use, such communication; and shall be entitled to recover from any such person:

(1) Actual damages, but not less than liquidated damages computed at the rate of $100 a day for each day of violation, or $1,000, whichever is higher.

(2) Punitive damages.

(3) A reasonable attorney's fee and other litigation costs reasonably incurred.

18 Pa.C.S.A. § 5725(a)(1)-(3).

However, the mere technical violation of a statute that provides a civil action for violation of its provisions does not confer statutory standing. Instead, a statute must include an express provision setting forth who may bring suit for a

8

violation. *Gennock v. Kirkland's Inc.*, *supra*. When a statute includes no such provision, the plaintiff must still establish the requirements of traditional standing. As neither the Wiretap Act nor the Firearms Act specify the parties entitled to bring suit under their provisions, Plaintiff must satisfy the traditional requirements of standing under Pennsylvania law.

Defendants rely heavily on the reasoning set forth in the federal court's decision in support of its objections to Plaintiff's standing. The federal courts' standing requirements originate from Article III, Section 2, Clause 1 of the United States Constitution.[2] In *TransUnion LLC v. Ramirez,* 594 U.S. 413 (2021), the United States Supreme Court interpreted Article III's standing doctrine as requiring the plaintiff to demonstrate (1) an injury in fact – that they suffered or will suffer a concrete injury, (2) causation – that the alleged injury is fairly traceable to the challenged conduct, and (3) redressability – that the court can redress the alleged injury if it grants the plaintiff's requested relief.

In the federal litigation involving these parties, Plaintiff asserted claims which, for the most part, were identical to those asserted here. In both matters,

---

[2] Article III confines the federal judicial power to the resolution of cases and controversies. *TransUnion LLC v. Ramirez,* 594 U.S. 413, 423 (2021). Under Article III, an injury in law is not an injury in fact. Only plaintiffs who have been concretely harmed by a defendant's statutory violation may sue that private defendant over that violation in federal court. *Id.* at 427.

Plaintiff contends that the dissemination of protected information was a violation of his right to privacy. The federal court opined that Plaintiff failed to allege the factors necessary to establish standing because Plaintiff only alleged the disclosure of basic personal information, such as his name, address, Facebook user ID, and the type of firearm he purchased. Because it did not consider the disclosure of a gun purchase to be the type of highly offensive/objectionable conduct which constitutes an invasion of historically protected privacy interests, the court held that Plaintiff did not allege that he suffered a "concrete" injury by Defendants' conduct. See *In Re BPS Direct, LLC and Cabela's, LLC*, 705 F. Supp. 3d 333 (E.D. Pa. 2023). The federal judge suggested that, to establish standing, Plaintiff would have to allege that the defendants captured and divulged his highly sensitive personal information such as medical diagnosis/financial data from banks or credit cards. *Id*.

After dismissal by the federal court, Plaintiff filed this action. He argues that, although the claims did not satisfy the requirements of federal standing, he has standing under Pennsylvania law to pursue these claims.

State courts have general jurisdiction and are not bound by the same case or controversy requirement as federal courts. A state court may define injury more broadly than federal courts. In its Opinion, the federal court noted that

10

"[u]nlike federal courts, [Pennsylvania state courts] are open to resolve all controversies impacting the rights of Pennsylvanians and are vested by Article V., section 1 of the Pennsylvania Constitution with all judicial authority." *In re BPS Direct, LLC*, 703 F. Supp. 3d at 364 n. 209, citing *Firearm Owners Against Crime v. Papenfuse*, 261 A.3d 467, 496 n. 6 (Pa. 2021). "[State court judges'] standing considerations account for many varied disputes that would fall short of constituting cases and controversies in federal court." *Id.*

The Supreme Court of Pennsylvania has observed:

[I]n contrast to the federal approach, notions of case or controversy and justiciability in Pennsylvania have no constitutional predicate, do not involve a court's jurisdiction, and are regarded as prudential concerns implicating courts' self-imposed limitations. ... Generally speaking, in our Commonwealth, standing is granted more liberally than in federal courts.

Most critically, the federal standing analysis does not control our resolution of the standing issue because we are not bound by the dictates of Article III of the United States Constitution.

Our inquiry is whether the putative plaintiff has demonstrated that she is aggrieved, by establishing a substantial, direct and immediate interest in the outcome of the litigation.

*Allegheny Reproductive Health Center v. Pennsylvania Dept. of Human Services*, 309 A.3d 808, 832 (Pa. 2024) (internal citations omitted).

To establish traditional standing in Pennsylvania, a plaintiff must be

11

negatively impacted in some real and direct fashion. *Young v. Wetzel*, 260 A.3d 281, 287 (Pa. Commw. 2021). The court must determine whether the litigant has a substantial, direct and immediate interest in the matter. *Id.* To have a substantial interest, the concern in the outcome must surpass the common interest of all citizens in procuring obedience to the law. *Id.* A direct interest is an interest that mandates demonstration that the matter caused harm to the party's interest. *Id.* An immediate interest is one in which the causal connection is not remote or speculative. *Id.* In Pennsylvania, bare statutory violations do not establish a concrete injury. *William Penn Parking Garage, Inc. v. Pittsburgh*, 346 A.2d 269 (Pa. 1975).

> The "core concept" of standing is that the litigant must be "adversely affected" in some way. ... [T]he prerequisites to standing are satisfied where the complaining party's interest is substantial, direct, and immediate, meaning that the party's interest surpasses that of the general public in procuring obedience to the law, the harm alleged was caused by the matter complained of, and the harm is not remote and speculative.

*Trust Under Will of Ashton*, 260 A.3d 81, 88 (Pa. 2021). The keystone to standing is that the person must be negatively impacted in some real and direct fashion.

*Pittsburgh Palisades Park, LLC v. Commonwealth,* 888 A.2d 655, 660 (Pa. 2005).

Defendants argue that Plaintiff lacks standing in this matter for the same reason for the dismissal in the federal action – that Plaintiff has failed to allege

that he has been adversely affected by Defendants' behavior. Plaintiff counters that he suffered an invasion of his right to privacy because Defendants' alleged violations of the Wiretap Act and the Firearms Act were sufficiently offensive to establish a claim for the tort of intrusion upon seclusion.

> Invasion of privacy by intrusion upon seclusion encompasses the physical or sensory penetration of a person's zone of seclusion in an attempt to collect private information concerning that person's affairs. The invasion may be by physical intrusion into a place where the plaintiff is secluded, by the use of defendant's senses to oversee or overhear the plaintiff's private affairs, or by some other form of investigation or examination into the plaintiff's private concerns. Examples of such a physical intrusion into a place in which plaintiff has secluded themselves would be the defendant's forcing their way into the plaintiff's room in a hotel or insisting over the plaintiff's objection in entering their home. It may also be by the use of the defendant's senses, with or without mechanical aids, to oversee or overhear the plaintiff's private affairs as by looking into their upstairs windows with binoculars or intercepting their conversations.

2 **Summ. Pa. Jur. 2d Torts** §22:10 (2d ed.) To prevail on a claim for intrusion upon seclusion, a plaintiff must show that (1) there was an intentional intrusion, (2) upon plaintiff's solitude or seclusion, or plaintiff's private affairs or concerns, and (3) the intrusion was substantial and highly offensive. *Id*.

The United States District Court for the Western District of Pennsylvania dealt with facts which were nearly identical to those alleged in the instant matter in *Petris v. Sportsman's Warehouse, Inc.*, 736 F. Supp. 3d 260 (W.D.Pa. 2024).

In that case, the plaintiff brought a class action against a sporting goods store, alleging it had disclosed personal information related to a private gun purchase to third parties, including Facebook, in violation of the Wiretap Act and the Firearms Act, after the plaintiff had purchased a firearm on the store's website. The plaintiff alleged the defendant's conduct had caused him to suffer concrete harm to his privacy interests, including intrusion upon seclusion and public disclosure of private information. The defendant filed a motion to dismiss, arguing that the plaintiff failed to allege facts sufficient to confer federal standing.

The court noted that it was required to consider whether the injury-in-fact alleged by the plaintiff had traditionally been regarded as providing a basis for a lawsuit. The court observed that privacy torts had become "well-ensconced in the fabric of American law," but that the plaintiff was only required to show that a harm existed, and not required to plead or establish the elements of a traditional cause of action. The court found that the harm alleged by the plaintiff was more akin to the right to privacy in communications embodied in the common law and the Wiretap Act rather than the two common-law torts of intrusion into seclusion and public disclosure of private information. It concluded that when information is intercepted and shared with third parties, it amounts to a clear de facto injury,

14

*i.e.,* the unlawful disclosure of legally protected information, which is enough to confer standing under federal requirements:

> In the instant case, Petris has adequately alleged a harm to his privacy interests. The common-law right of privacy and WESCA give Petris the right to control the flow of information concerning his person, which includes his firearm purchase. As alleged, Sportsman's Warehouse surreptitiously disclosed Petris's personal information related to his firearm purchase, which is not information "open to public inspection," to third parties without his consent. Such information is prohibited from being amassed. ... Additionally, the disclosure amounted to a high degree of dissemination as it reportedly shared Petris's personal information with social media and digital marketing services. With that level of dissemination, Petris has sufficiently alleged that he was personally harmed as he did not have a meaningful opportunity to control the unauthorized dissemination of his firearm purchase. Accordingly, as pled, Petris purportedly suffered a harm with a close relationship to the harm associated with the historically recognized right to privacy.
>
> ... Here, the Firearms Act explicitly prohibits the disclosure of information furnished by purchasers in firearms transactions. ... Additionally, the information at issue is personally identifiable. If true, Petris's name, address, Facebook ID, and other information are all now connected to the firearm he purchased and shared with two prominent social media and digital marketing platforms. Under these circumstances, the Court can plausibly infer that Petris suffered a concrete harm.
>
> ...
>
> As to Sportsman's Warehouse's contention that Petris's alleged harm cannot be concrete because none of the information related to the firearm purchase constitutes highly sensitive personal information, the Court disagrees. ... As explained above, there are other kinds of privacy rights at issue in this case besides the public disclosure of private information and intrusion upon seclusion. Here, Petris's right to privacy embraces his ability

15

to control the information that concerns him. It does not require that the information amount to highly sensitive personal information. The common law traditionally extended protection to a record that was not open to public inspection. ... Even if the common law necessitated that the information shared amounted to highly sensitive personal information, FOPA suggests that Congress may view information related to a firearm purchase as private.

Finally, Petris must also meet the particularization requirement for his alleged harm to qualify as an injury in fact. Concreteness alone is not enough. ... Petris's purported injury, however, is particularized, as his Amended Complaint relates to the capture and disclosure of his protected personal information to third parties. ... These specific allegations described in the Amended Complaint show that Petris properly alleges that he has been personally injured.

With the concreteness and particularization requirements met, Petris has sufficiently established standing by alleging an invasion of the historically recognized right to privacy. As such, Petris overcomes Sportsman's Warehouse's Motion as to his privacy claims under WESCA and the Firearms Act.

*Petris*, 736 F. Supp. 3d at 269-270, 272.

Although ***Petris*** was analyzed under federal standing requirements, we believe the District Court's reasoning is applicable here and comports with the requirements of standing under Pennsylvania law. As in ***Petris***, the facts alleged in the Amended Complaint in this action support a finding that Defendants' disclosures to Facebook violated Plaintiff's right to control protected personal information regardless of whether that information is deemed to be highly sensitive as required for the tort of intrusion into seclusion. By statute, the

information disclosed to Facebook by Defendants was to remain confidential.

Plaintiff had a legally- recognized  privacy interest in his personally identifiable

information.  The right to keep private information confidential is recognized by

the common law and embodied in the Wiretap Act as well as the Firearms Act.

Plaintiff was aggrieved when the disclosure of this protected information was

allegedly made without his consent.  For these reasons, Plaintiff has established

his standing to pursue these claims.

### STANDING TO PURSUE INJUNCTIVE RELIEF

In his prayer for relief, Plaintiff asks for "injunctive relief as pleaded or as the

Court may deem proper." (Amended Complaint, p. 23 at (i)).  Defendants argue

that Plaintiff lacks standing to seek an injunction.

There are six requirements necessary for the issuance of a preliminary

injunction in Pennsylvania:  (1) the injunction is necessary to prevent immediate

and irreparable harm that cannot be adequately compensated by damages; (2)

greater injury would result from refusing the injunction than from granting is, and

concomitantly, the issuance of an injunction will not substantially harm other

interested parties in the proceedings; (3) the preliminary injunction will properly

restore the parties to their status as it existed immediately prior to the alleged

wrongful conduct; (4) the party seeking injunctive relief has a clear right to relief

17

and is likely to prevail on the merits; (5) the injunction is reasonably suited to abate the offending activity; and, the preliminary injunction will not adversely affect the public interest. *CKHS, Inc. v. Prospect Medical Holdings, Inc.*, ___ A.3d ___, 2024 WL 258808 (Pa. 2025).

The District Court for the Eastern District dismissed Plaintiff's request for injunctive relief with prejudice in the parties' previous federal litigation. On this point, we agree with the decision of that court:

> We find our Website Users are not likely to suffer future injury from Bass or Cabela's conduct. Website Users allege Bass and Cabela's used a third party to track their movements on the websites without their knowledge. Website Users brought this lawsuit and are presumably aware of the alleged risks associated with browsing Cabela's and Bass's websites. Website Users' activity on Bass and Cabela's websites is entirely voluntary and we assume Website Users will act rationally in light of the information they possess. They may visit Cabela's or Bass's website again, but they will do so with the knowledge session replay is capturing their movements. Pleading a lack of self-restraint may elicit sympathy but it will not typically invoke the jurisdiction of a federal court. Website Users will not be deceived against in the future.

*In re BPS Direct, LLC,* 703 F. Supp. 3d at 366-367. In the matter before us, Plaintiff does not allege that he will visit Defendants' websites or be purchasing any firearms on those websites. Thus, he does not have standing to seek injunctive relief as he does not allege the risk of any future harm.

18

In order to establish a claim for a permanent injunction, a party must establish his or her clear right to relief. However, unlike a claim for a preliminary injunction, the party need not establish either irreparable harm or immediate relief and a court may issue a final injunction if such relief is necessary to prevent a legal wrong for which there is no adequate redress at law. *Pestco, Inc. v. Associated Products, Inc.*, 880 A.2d 700 (Pa. Super. 2005). At this stage, it is unclear whether, if Plaintiff's claims are proven, there is an adequate remedy at law for these claims or whether the issuance of a permanent injunction would be an appropriate remedy in the event Plaintiff is successful on his claims. Therefore, the question of the propriety of permanent injunctive relief must await a resolution on the merits. Therefore, we will reserve the issue of Plaintiff's right to pursue a permanent injunction until the record is fully developed for disposition.

# EXHIBIT 32

Exhibit A-32

ORIGINAL

**IN THE COURT OF COMMON PLEAS**
**OF LEBANON COUNTY, PENNSYLVANIA**

**CIVIL ACTION – LAW**

ENTERED & FILED
PROTHONOTARY OFFICE

2025 MAR -6 P 12: 43

|  |  |  |
|---|---|---|
| DAVID IRVIN, on behalf of himself and<br>all others similarly situated,<br>　　　Plaintiff | : | |
| | : | |
| | : | |
| | : | |
| v. | : | NO. 2023-01668 |
| | : | |
| CABELA'S, LLC and BPS DIRECT, LLC,<br>　　　Defendants | : | |
| | : | |

**ORDER OF COURT**

AND NOW, to wit, this 5th day of March, 2025, pursuant to the Case Management Plan, it

is hereby ORDERED that a Pretrial Conference shall be held on the 3rd day of July, 2025 at 1:30

p.m. in Courtroom No. 1.  All counsel and unrepresented parties are directed to participate in

person, unless alternate arrangements have been made.

Each party shall submit a Pretrial Statement to the Court prior to the Pretrial Conference,

which statement shall include the information set forth in Pa.R.C.P. 212.2 and Leb.Co.R.C.P.

212.2.

It is further ORDERED that a Civil Jury Trial in the above-captioned matter is scheduled to

be held commencing on September 8, 2025 at 8:30 a.m. in Courtroom 1.

**BY THE COURT,**

_____, P.J.
**JOHN C. TYLWALK**

/ms
cc:   **Steven A. Schwartz, Esq,** 361 W. Lancaster Avenue, Haverford, PA 19041 /mailed
　　　**Erin L. Leffler, Esq,** 2001 Market Street, Suite 3000, Philadelphia, PA 19103 /mailed
　　　Court Administration / I /0

Pursuant to Pa. R. Civil P. 236
All parties are hereby notified
this date: 3-10-25 JBP
Prothonotary, Lebanon PA

# EXHIBIT 33

Exhibit A-33

ORIGINAL

ENTERED & FILED
PROTHONOTARY OFFICE.
LEBANON, PA

2025 MAR 24 P 1: 58

## IN THE COURT OF COMMON PLEAS
## LEBANON COUNTY, PENNSYLVANIA

DAVID IRVIN, on behalf of himself and
all others similarly situated,

Plaintiff,

v.

CABELA'S L.L.C. and BPS DIRECT, L.L.C.,

Defendants.

No. 2023-01668

### JOINT STIPULATION TO
### STAY CASE DEADLINES PENDING MEDIATION

Plaintiff David Irvin ("Plaintiff") and Defendants Cabela's L.L.C. and BPS Direct, L.L.C. ("Defendants" and together with Plaintiff, the "Parties"), by and through undersigned counsel, pursuant to Leb. Co. R.C.P. 52-205.7, respectfully submit this Joint Stipulation to Stay Case Deadlines Pending Mediation. The Parties have discussed resolution in good faith and have agreed to mediate this matter with Bennett G. Picker, Esq., a well-respected class action mediator, on July 16, 2025, which was the first mutually-available date. In support of this motion, the Parties state as follows:

1. On December 21, 2023, Plaintiff filed a complaint against Cabela's L.L.C. and BPS Direct, L.L.C. (collectively, "Defendants") in the Court of Common Pleas of Lebanon County, Case No. 2023-01668.

2. On March 1, 2024, Defendants filed preliminary objections to Plaintiff's complaint.

3. On March 21, 2024, Plaintiff filed an amended complaint against Defendants, bringing claims under Pennsylvania's Wiretap Act and Uniform Firearms Act ("FAC").

4. On April 11, 2024, Defendants filed preliminary objections to Plaintiff's FAC.

5.     On May 1, 2024, Plaintiff opposed Defendants' preliminary objections.

6.     On August 2, 2024, the Court held oral arguments for Defendants' preliminary objections and set a case schedule for this matter.

7.     On November 27, 2024, the Court granted Plaintiff's uncontested motion and issued the following case schedule:

     a.     **June 17, 2025**: Plaintiff's deadline to move for class certification;

     b.     **June 17, 2025**: Plaintiff's deadline to disclose experts in support of class certification;

     c.     **July 17, 2025**: Defendants' deadline to oppose class certification;

     d.     **July 17, 2025**: Defendants' deadline to disclose experts in opposition to class certification;

     e.     **August 7, 2025**: Plaintiff's deadline to file his reply in support of class certification;

     f.     **September 4, 2025**: hearing on Plaintiff's motion for class certification;

     g.     **September 30, 2025**: deadline for discovery;

     h.     **November 4, 2025**: deadline for filing of dispositive motions;

     i.     **February 2026**: a pretrial conference shall be scheduled. A Pretrial Memorandum shall be submitted to the Court thirty (30) days prior to the Pretrial Conference;

     j.     **March 2026**: trial shall be scheduled for the Civil Trial Term.

8.     The Parties have been actively engaged in discovery throughout the pendency of this action. Plaintiff and Defendants have each exchanged discovery requests and Plaintiff has subpoenaed relevant data from third party, Meta, Inc. ("Facebook").

9.    On February 7, 2025, the Court overruled Defendants' Preliminary Objections.

10.    On March 5, 2025, the Court issued an order setting a civil jury trial in this case for September 8, 2025.

11.    Although this order appears to be in conflict with the previously submitted case schedule, the Parties now seek to stay all deadlines in order to attend a mediation to try and resolve the claims in this action.

12.    The Parties have conferred and agreed to attend a mediation with Bennett G. Picker, Esq., a well-respected class action mediator, on July 16, 2025. This was the first mutually-agreeable date amongst the Parties and Mr. Picker.

13.    To avoid having to unnecessarily incur costs, attorneys' fees, and avoid unnecessarily burdening this Court, the Parties respectfully request that the Court stay all deadlines to allow the Parties to attempt to reach a resolution of this action.

14.    The Parties have conferred in good faith in proposing the stay of current case deadlines pending mediation. The Parties will submit a status update to the Court within 5 business days following the mediation. If the Parties are unable to reach a resolution, they will work in good faith to submit a modified case schedule. This request is made in good faith and not for the purpose of delay.

Dated: March 21, 2025                    Respectfully submitted,

                                        By:    /s/ Steven A. Schwartz
                                            Steven A. Schwartz
                                        **CHIMICLES SCHWARTZ KRINER**
                                        **& DONALDSON-SMITH LLP**
                                        Steven A. Schwartz (PA I.D. No. 50579)
                                        361 W. Lancaster Avenue
                                        Haverford, PA 19041
                                        Tel: (610) 642-8500
                                        Fax: (610) 649-3633
                                        E-Mail: sas@chimicles.com

**BURSOR & FISHER, P.A.**
Philip L. Fraietta*
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Tel: (646) 837-7150
Fax: (212) 989-9163
E-Mail: pfraietta@bursor.com

**BURSOR & FISHER, P.A.**
Stephen A. Beck (*pro hac vice*)
701 Brickell Ave., Suite 2100
Miami, FL 33131-2800
Telephone: (305) 330-5512
Facsimile: (305) 676-9006
E-Mail: sbeck@bursor.com

*Pro Hac Vice Application Forthcoming*

*Attorneys for Plaintiff and the Putative Class*


By: _ /s/ Erin L. Leffler _____ ___
           Erin L. Leffler
**SHOOK, HARDY & BACON L.L.P.**
Erin L. Leffler
Two Commerce Square
2001 Market St., Suite 3000
Philadelphia, PA 19103
Tel: (215) 278-2555
E-Mail: eleffler@shb.com

*Attorney for Defendants*

4

## IN THE COURT OF COMMON PLEAS
## LEBANON COUNTY, PENNSYLVANIA

| | |
|---|---|
| DAVID IRVIN, on behalf of himself and all others similarly situated, | No. 2023-01668 |
| Plaintiff, | |
| v. | |
| CABELA'S L.L.C. and BPS DIRECT, L.L.C., | |
| Defendants. | |

## [PROPOSED] ORDER

**AND NOW**, this _____ day of _____, 2025, upon consideration of the

Joint Stipulation to Stay Case Deadlines Pending Mediation, and for good cause shown, it is hereby

**ORDERED** that the Stipulation is **GRANTED**, and this action is stayed until July 22, 2025.


BY THE COURT,


_____, P.J.
JOHN C. TYLWALK

1

# EXHIBIT 34

ORIGINAL

Exhibit A-34

ENTERED & FILED
PROTHONOTARY OFFICE
LEBANON, PA

2025 MAR 27  A 10: 13

**IN THE COURT OF COMMON PLEAS
LEBANON COUNTY, PENNSYLVANIA**

DAVID IRVIN, on behalf of himself and
all others similarly situated,

        Plaintiff,

    v.

CABELA'S L.L.C. and BPS DIRECT, L.L.C.,

        Defendants.

No. 2023-01668

## [PROPOSED] ORDER

**AND NOW**, this ___25th___ day of ___March___, 2025, upon consideration of the

Joint Stipulation to Stay Case Deadlines Pending Mediation, and for good cause shown, it is hereby

**ORDERED** that the Stipulation is **GRANTED**, and this action is stayed until July 22, 2025.

Counsel shall file a Status update with the Court on or before
July 22, 2025.

        BY THE COURT,

        _____, P.J.
        JOHN C. TYLWALK

CC: Steven Schwartz || 361 W. Lancaster Ave., Haverford, PA  Hall

Erin Leffler || Two Commerce Square, 2001 Market St,

Ste 3000, Philadelphia, PA 19103

Pursuant to Pa. R. Civil P. 236
All parties are hereby notified
this date: 03/27/2025 SR
Prothonotary, Lebanon PA

1

# EXHIBIT 35

ORIGINAL

Exhibit A-35
Prothonotary, Leb Co, PA
FILED: '25 JUL 23 PM 2:34

# IN THE COURT OF COMMON PLEAS
# LEBANON COUNTY, PENNSYLVANIA

DAVID IRVIN, on behalf of himself
and all others similarly situated,

                Plaintiff,

    v.

CABELA'S L.L.C. and BPS DIRECT, L.L.C.,

                Defendants.

No. 2023-01668

## JOINT STATUS UPDATE AND STIPULATION TO
## CONTINUE STAY PENDING MEDIATION

Plaintiff David Irvin ("Plaintiff") and Defendants Cabela's L.L.C. and BPS Direct, L.L.C. ("Defendants" and together with Plaintiff, the "Parties"), by and through undersigned counsel, pursuant to Leb. Co. R.C.P. 52-205.7 and this Court's March 25, 2025 Order, respectfully submit this Joint Status Update and Stipulation to Continue Stay following the Parties July 16, 2025 mediation. On July 16, 2025, the Parties had a productive mediation session and discussed resolution in good faith with Bennett G. Picker, Esq., a well-respected class action mediator. Although the Parties did not reach a resolution, another mediation session is scheduled for September 16, 2025. This was the first mutually available date among the Parties and the mediator. The Parties believe this additional time will allow them to resolve all remaining issues as they continue to negotiate settlement in good faith, and respectfully request that the Court continue its stay of all case deadlines. To avoid having to unnecessarily incur costs, attorneys' fees, and avoid unnecessarily burdening this Court, the Parties respectfully request that the Court continue its stay of all case deadlines to allow the Parties to attempt to reach a resolution of this action.

The Parties have conferred in good faith in this request. The Parties will submit a status update to the Court within 5 business days following the September 16, 2025 mediation. If the Parties are unable to reach a resolution, they will work in good faith to submit a modified case schedule. This request is made in good faith and not for the purpose of delay.

Dated: 7/22/2025

Respectfully submitted,

By:     _Steven A. Schwartz_     _____
             Steven A. Schwartz
**CHIMICLES SCHWARTZ KRINER
& DONALDSON-SMITH LLP**
Steven A. Schwartz (PA I.D. No. 50579)
361 W. Lancaster Avenue
Haverford, PA 19041
Tel: (610) 642-8500
Fax: (610) 649-3633
E-Mail: sas@chimicles.com

**BURSOR & FISHER, P.A.**
Philip L. Fraietta*
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Tel: (646) 837-7150
Fax: (212) 989-9163
E-Mail: pfraietta@bursor.com

**BURSOR & FISHER, P.A.**
Stephen A. Beck (*pro hac vice*)
701 Brickell Ave., Suite 2100
Miami, FL 33131-2800
Telephone: (305) 330-5512
Facsimile: (305) 676-9006
E-Mail: sbeck@bursor.com

*Pro Hac Vice Application Forthcoming*

*Attorneys for Plaintiff and the Putative Class*

By:     _/s/ Erin L. Leffler_     _____
             Erin L. Leffler
**SHOOK, HARDY & BACON L.L.P.**
Erin L. Leffler
Two Commerce Square
2001 Market St., Suite 3000
Philadelphia, PA 19103
Tel: (215) 278-2555
E-Mail: eleffler@shb.com

*Attorney for Defendants*

H0130918.                                    2

# EXHIBIT 36

ORIGINAL

Exhibit A-36
Prothonotary, Leb Co. PA
FILED: '25SEP24 PM12:44

**IN THE COURT OF COMMON PLEAS**
**LEBANON COUNTY, PENNSYLVANIA**

DAVID IRVIN, on behalf of himself
and all others similarly situated,

                Plaintiff,

      v.

CABELA'S L.L.C. and BPS DIRECT, L.L.C.,

                Defendants.

No. 2023-01668

## JOINT STATUS UPDATE AND STIPULATION TO
## CONTINUE STAY PENDING MEDIATION

Plaintiff David Irvin ("Plaintiff") and Defendants Cabela's L.L.C. and BPS Direct, L.L.C. ("Defendants" and together with Plaintiff, the "Parties"), by and through undersigned counsel, pursuant to Leb. Co. R.C.P. 52-205.7, respectfully submit this Joint Status Update and Stipulation to Continue Stay following the Parties July 16, 2025 mediation and July 22, 2025 Joint Status Update. On July 16, 2025, the Parties had a productive mediation session and discussed resolution in good faith with Bennett G. Picker, Esq., a well-respected class action mediator. Although the Parties did not reach a resolution, another mediation session was scheduled for September 16, 2025. However, the Parties required additional time to exchange relevant discovery and legal authority to facilitate settlement negotiations and rescheduled their upcoming mediation to October 27, 2025. This additional time will allow the Parties to resolve all remaining issues as they continue to negotiate settlement in good faith. To avoid having to unnecessarily incur costs, attorneys' fees, and avoid unnecessarily burdening this Court, the Parties respectfully request that the Court continue its stay of all case deadlines to allow the Parties to attempt to reach a resolution of this action.

1

The Parties have conferred in good faith in this request. The Parties will submit a status update to the Court within 5 business days following the October 27, 2025 mediation. If the Parties are unable to reach a resolution, they will work in good faith to submit a modified case schedule. This request is made in good faith and not for the purpose of delay.

Dated: September 23, 2025

Respectfully submitted,

By:  *Steven A. Schwartz*
      Steven A. Schwartz
**CHIMICLES SCHWARTZ KRINER**
**& DONALDSON-SMITH LLP**
Steven A. Schwartz (PA I.D. No. 50579)
361 W. Lancaster Avenue
Haverford, PA 19041
Tel: (610) 642-8500
Fax: (610) 649-3633
E-Mail: sas@chimicles.com

**BURSOR & FISHER, P.A.**
Philip L. Fraietta*
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Tel: (646) 837-7150
Fax: (212) 989-9163
E-Mail: pfraietta@bursor.com

**BURSOR & FISHER, P.A.**
Stephen A. Beck (*pro hac vice*)
701 Brickell Ave., Suite 2100
Miami, FL 33131-2800
Telephone: (305) 330-5512
Facsimile: (305) 676-9006
E-Mail: sbeck@bursor.com

*\*Pro Hac Vice Application Forthcoming*

*Attorneys for Plaintiff and the Putative Class*

By:    */s/ Erin L. Leffler*
            Erin L. Leffler

**SHOOK, HARDY & BACON L.L.P.**
Erin L. Leffler
Two Commerce Square
2001 Market St., Suite 3000
Philadelphia, PA 19103
Tel: (215) 278-2555
E-Mail: eleffler@shb.com

*Attorney for Defendants*

# EXHIBIT 37

Exhibit A-37

ORIGINAL

## IN THE COURT OF COMMON PLEAS
## LEBANON COUNTY, PENNSYLVANIA

Prothonotary, Leb Co, PA
FILED: '25 NOV 4 AM 11:21

|  |  |
|---|---|
| DAVID IRVIN, on behalf of himself and all others similarly situated, | No. 2023-01668 |
| Plaintiff, | |
| v. | |
| CABELA'S L.L.C. and BPS DIRECT, L.L.C., | |
| Defendants. | |

### JOINT STATUS UPDATE AND PROPOSED SCHEDULE

Plaintiff David Irvin ("Plaintiff") and Defendants Cabela's L.L.C. and BPS Direct, L.L.C. ("Defendants" and together with Plaintiff, the "Parties"), by and through undersigned counsel, pursuant to Leb. Co. R.C.P. 52-205.7, respectfully submit this Joint Status Update following the Parties September 22, 2025 Joint Status Update. The Parties had a mediation scheduled for October 27, 2025, with Bennett G. Picker, Esq., an experienced class action mediator. However, the Parties were unable to reach a settlement.

Therefore, the Parties propose the following schedule:

**12/19/25**: Deadline for Plaintiff to file amended pleadings;

**01/30/26**: Deadline for Defendants to respond to Plaintiff's amended pleadings;

**09/03/26**: Deadline to move for class certification;

**09/03/26**: Deadline for Plaintiff's expert disclosures in support of class certification;

**10/09/26**: Deadline for Defendant to oppose class certification;

**10/09/26**: Deadline for Defendant's expert disclosures in opposition to class certification;

**10/30/26**: Deadline for Plaintiff's reply in support of class certification;

**12/03/26**: Hearing on Plaintiff's motion for class certification;

**01/29/27**: Deadline for discovery;

**04/23/27**: Deadline for filing of dispositive motions;

**September 2027**: a pretrial conference shall be scheduled.  A Pretrial Memorandum shall be submitted to the Court thirty (30) days prior to the Pretrial Conference;

**October 2027**: trial shall be scheduled for the Civil Trial Term.

The Parties have conferred in good faith in proposing the aforementioned schedule.  This request is made in good faith and not for the purpose of delay.


Dated:  November 3, 2025

Respectfully submitted,

By:      *Steven A. Schwartz*
         Steven A. Schwartz

**CHIMICLES SCHWARTZ KRINER
& DONALDSON-SMITH LLP**
Steven A. Schwartz (PA I.D. No. 50579)
361 W. Lancaster Avenue
Haverford, PA 19041
Tel: (610) 642-8500
Fax: (610) 649-3633
E-Mail: sas@chimicles.com

**BURSOR & FISHER, P.A.**
Philip L. Fraietta*
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Tel: (646) 837-7150
Fax: (212) 989-9163
E-Mail: pfraietta@bursor.com

**BURSOR & FISHER, P.A.**
Stephen A. Beck (*pro hac vice*)
701 Brickell Ave., Suite 2100
Miami, FL 33131-2800
Telephone: (305) 330-5512
Facsimile: (305) 676-9006
E-Mail: sbeck@bursor.com

*Pro Hac Vice Application Forthcoming*

*Attorneys for Plaintiff and the Putative Class*

By:     _/s/ Erin L. Leffler_
                  Erin L. Leffler

**SHOOK, HARDY & BACON L.L.P.**
Erin L. Leffler
Two Commerce Square
2001 Market St., Suite 3000
Philadelphia, PA 19103
Tel: (215) 278-2555
E-Mail: eleffler@shb.com

*Attorney for Defendants*

# EXHIBIT 38

ORIGINAL

IN THE COURT OF COMMON PLEAS
LEBANON COUNTY, PENNSYLVANIA

ENTERED & FILED
PROTHONOTARY OFFICE
LEBANON, PA.

2025 DEC 24  A 10: 20

| | |
|---|---|
| DAVID IRVIN, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CABELA'S L.L.C. and BPS DIRECT, L.L.C.,<br><br>Defendants. | No. 2023-01668 |

## JOINT MOTION TO CONTINUE CASE SCHEDULE

Plaintiff David Irvin ("Plaintiff") and Defendants Cabela's L.L.C. and BPS Direct, L.L.C. ("Defendants" and together with Plaintiff, the "Parties"), by and through undersigned counsel, pursuant to Leb. Co. R.C.P. 52-205.7, respectfully submit this Joint Motion to Continue the Case Schedule.

Defendants recently retained new counsel. Newly retained counsel for Defendants require additional time to familiarize themselves with the factual and legal issues presented and the procedural posture of this action.

Therefore, the Parties request a continuance of the current case schedule and propose the following deadlines:

**02/17/26**: Deadline for Plaintiff to file amended pleadings;

**03/31/26**: Deadline for Defendants to respond to Plaintiff's amended pleadings;

**11/02/26**: Deadline to move for class certification;

**11/02/26**: Deadline for Plaintiff's expert disclosures in support of class certification;

**12/08/26**: Deadline for Defendant to oppose class certification;

1

**12/08/26**: Deadline for Defendant's expert disclosures in opposition to class certification;

**12/29/26**: Deadline for Plaintiff's reply in support of class certification;

**02/01/27**: Hearing on Plaintiff's motion for class certification;

**03/30/27**: Deadline for discovery;

**06/22/27**: Deadline for filing of dispositive motions;

**October 2027**: a pretrial conference shall be scheduled. A Pretrial Memorandum shall be submitted to the Court thirty (30) days prior to the Pretrial Conference;

**November 2027**: trial shall be scheduled for the Civil Trial Term.

The Parties have conferred in good faith in proposing the aforementioned schedule. This request is made in good faith and not for the purpose of delay.

Dated: December 19, 2025

Respectfully submitted,

By:     *Steven A. Schwartz*
          Steven A. Schwartz
**CHIMICLES SCHWARTZ KRINER
& DONALDSON-SMITH LLP**
Steven A. Schwartz (PA I.D. No. 50579)
361 W. Lancaster Avenue
Haverford, PA 19041
Tel: (610) 642-8500
Fax: (610) 649-3633
E-Mail: sas@chimicles.com

**BURSOR & FISHER, P.A.**
Philip L. Fraietta (*pro hac vice*)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Tel: (646) 837-7150
Fax: (212) 989-9163
E-Mail: pfraietta@bursor.com

**BURSOR & FISHER, P.A.**
Stephen A. Beck (*pro hac vice*)
701 Brickell Ave., Suite 2100
Miami, FL 33131-2800
Telephone: (305) 330-5512
Facsimile: (305) 676-9006
E-Mail: sbeck@bursor.com

*Attorneys for Plaintiff and the Putative Class*

2

**SKADDEN, ARPS,**
**SLATE,  MEAGHER & FLOM LLP**

By: */s/ Meredith C. Slawe*
     Meredith C. Slawe (PA I.D. No. 201489)
     One Manhattan West
     New York, New York 10001
     (212) 735-3000
     Meredith.Slawe@skadden.com

     *Attorneys for Defendants*

# EXHIBIT 39

Exhibit A-39

ORIGINAL

ENTERED & FILED
PROTHONOTARY OFFICE
LEBANON, PA.

IN THE COURT OF COMMON PLEAS
LEBANON COUNTY, PENNSYLVANIA

CIVIL DIVISION 2025 DEC 26  A 10: 20

No. 2023-01668

DAVID IRVIN, on behalf of himself and all
others similarly situated,

        Plaintiff,

        v.

CABELA'S L.L.C. and BPS DIRECT, L.L.C.,

        Defendants.

**SUBSTITUTION OF COUNSEL**

TO: PROTHONOTARY

Please substitute the appearance of **Michael W. McTigue Jr.**, whose Attorney Identification Number is 69548, and **Meredith C. Slawe**, whose Attorney Identification Number is 201489. Please be advised Erin L. Leffler, Jennifer McLoone (admitted *pro hac vice*), and Anna Gadberry (admitted *pro hac vice*) from the law firm of Shook, Hardy & Bacon L.L.P. will no longer be representing defendants, and are simultaneously withdrawing pursuant to Pa.R.C.P. 1012(b)(2)(ii). I certify that this change is not intended to, nor will it, delay this proceeding to the best of my knowledge, information and belief.

DATED:      December 24, 2025      Respectfully submitted,

                                **SKADDEN, ARPS,**
                                  **SLATE, MEAGHER & FLOM LLP**

                                By: */s/ Meredith C. Slawe*

                                Michael W. McTigue Jr. (PA I.D. No. 69548)
                                Michael.McTigue@skadden.com
                                Meredith C. Slawe (PA I.D. No. 201489)
                                Meredith.Slawe@skadden.com
                                One Manhattan West
                                New York, New York 10001
                                Telephone: (212) 735-3000
                                Facsimile: (212) 735-2000

                                *Attorneys For Defendants*

**IN THE COURT OF COMMON PLEAS,
LEBANON COUNTY, PENNSYLVANIA**

| | |
|---|---|
| DAVID IRVIN, on behalf of himself and all others similarly situated, | CIVIL DIVISION<br><br>No. 2023-01668 |
| Plaintiff, | |
| v. | |
| CABELA'S L.L.C. and BPS DIRECT, L.L.C., | |
| Defendants. | |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing SUBSTITUTION OF

COUNSEL was served via email on December 24, 2025 upon the following:

> Steven A. Schwartz
> 361 W. Lancaster Ave
> Haverford, PA 19041
> sas@chimicles.com
>
> Philip L. Fraietta
> 1330 Avenue of the Americas, 32nd Floor
> New York, NY 10019
> pfraietta@bursor.com
>
> Stephen A. Beck
> 701 Brickell Ave., Suite 2100
> Miami, FL 33131-2800
> sbeck@bursor.com

DATED:    December 24, 2025          Respectfully submitted,

By: */s/ Meredith C. Slawe*

# EXHIBIT 40

Exhibit A-40

ORIGINAL

IN THE COURT OF COMMON PLEAS
OF LEBANON COUNTY, PENNSYLVANIA

CIVIL ACTION – LAW

ENTERED & FILED
PROTHONOTARY OFFICE
LEBANON, PA.

2025 DEC 31  A 8: 55

DAVID IRVIN, on behalf of himself and    :
all others similarly situated,           :
      Plaintiff                          :
                            :
      v.                                 :    No. 2023-01668
                            :
CABELA'S L.L.C. and BPS DIRECT, L.L.C.,  :
      Defendant                          :

**ORDER**

AND NOW, to wit, this 26th day of December, 2025, upon consideration of Joint Motion to Continue Case Schedule, it is hereby ORDERED that the previously established case management deadlines are modified/extended as follows:

1.  The deadline for Plaintiff to file amended pleadings is February 17, 2026;

2.  The deadline for Defendants to respond to Plaintiff's amended pleadings is March 31, 2026;

3.  The deadline to move for class certification is November 2, 2026;

4.  The deadline for Plaintiff's expert disclosures in support of class certification is November 2, 2026;

5.  The deadline for Defendant to oppose class certification is December 8, 2026;

6.  The deadline for Defendant's expert disclosures in opposition to class certification is December 8, 2026;

1

7. The deadline for Plaintiff's reply in support of class certification is December 29, 2026;

8. The deadline for hearing on Plaintiff's motion for class certification is February 1, 2027;

9. The deadline for discovery is March 30, 2027; and

10. The deadline for filing of dispositive motions is June 22, 2027.

It is further ORDERED and DECREED that a Pretrial Conference shall be scheduled to be held in October 2027, with a Civil Jury Trial to be held during the Civil Jury Trial term commencing in December 2027.

Each party shall submit a Pretrial Statement to the Court at least thirty (30) days prior to the Pretrial Conference, which statement shall include the information set forth in Pa.R.C.P. 212.2 and Leb.Co.R.C.P. 212.2.

BY THE COURT,

_____, P.J.
JOHN C. TYLWALK

/mlh

cc:    Steven A. Schwartz, Esq.//Chimicles, Schwartz, Kriner & Donaldson-Smith LLP, 361 W. Lancaster Avenue, Haverford, PA  19041-Mail
Meredith C. Slawe, Esq.//Skadden, Arps, Slate, Meagher & Flom LLP, One Manhattan West, New York, NY  10001-Mail
Erin L. Leffler, Esq.//Two Commerce Square, 2001 Market Street, Suite 3000, Philadelphia, PA 19103-Mail
Court Administration -ꞮꞮ0

Pursuant to Pa. R. Civil P. 236
All parties are hereby notified
this date: 1-6-26 ꞇꞇꞓ
Prothonotary, Lebanon PA

2

# EXHIBIT 41

Exhibit A-41

ORIGINAL

ENTERED & FILED
PROTHONOTARY OFFICE
LEBANON, PA.

2026 FEB 18  P 2:17

## IN THE COURT OF COMMON PLEAS OF
## LEBANON COUNTY, PENNSYLVANIA

| | |
|---|---|
| DAVID IRVIN and DAVID ANTHONY, individually and on behalf of all others similarly situated, | CIVIL DIVISION |
| | Case No. 2023-01668 |
| Plaintiffs, | **SECOND AMENDED CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| CABELA'S L.L.C. and BPS DIRECT, L.L.C., | |
| Defendants. | |

Plaintiffs David Irvin and David Anthony (collectively, "Plaintiffs"), individually and on behalf of all other similarly situated (the "Class members") bring this case against Cabela's L.L.C. ("Cabela's") and BPS Direct, L.L.C. ("BPS") (collectively, "Defendants"), which operate, control and manage the websites cabelas.com and basspro.com, respectively. Plaintiffs bring this action based upon personal knowledge of the facts pertaining to themselves, and on information and belief as to all other matters, by and through the investigation of undersigned counsel.

### NATURE OF THE ACTION

1.    This is a class action lawsuit brought on behalf of all Pennsylvania residents who have visited and/or purchased firearms from cabelas.com and/or basspro.com.

2.    Defendants aid, employ, agree, and conspire with Meta Platforms, Inc. ("Facebook") to intercept communications sent and received by Plaintiffs and Class Members, including communications containing protected information about firearms purchases. Plaintiffs bring this action for legal and equitable remedies resulting from these illegal actions.

1

## JURISDICTION AND VENUE

3.      The Court has subject matter jurisdiction over this action pursuant to Pa. Cons. Art. 5, §5(b) and 42 Pa. C.S.A. § 931(b).

4.      The Court has personal jurisdiction over Defendants pursuant to 42 Pa. C.S.A. 5301(a)(2).

5.      Venue is proper pursuant to Pa. R. Civ. P. 2179(a)(2)-(4) because Defendants regularly conduct business in this county, the causes of action arose out of conduct in this county, and the transaction or occurrence out of which the causes of action arose took place in this county.

## THE PARTIES

6.      Plaintiff David Irvin is an adult citizen of the Commonwealth and is domiciled in Fredericksburg, Pennsylvania. On December 2, 2021, Plaintiff Irvin purchased a Henry Big Boy Classic Centerfire Lever-Action Rifle - .45 Colt from cabelas.com. When accessing the website and completing the purchase, Plaintiff Irvin was located in Pennsylvania. Plaintiff Irvin also has an active Facebook account which he has maintained since approximately 2007. Plaintiff Irvin accesses his Facebook account from multiple devices, including his laptop and smartphone.

7.      Plaintiff David Anthony is an adult citizen of the Commonwealth and is domiciled in Germansville, Pennsylvania. On April 5, 2024, Plaintiff Anthony purchased a Stoeger M3K Freedom Series 3-Gun Extended Capacity Semi-Auto Shotgun from cabelas.com. When accessing the website and completing the purchase, Plaintiff Anthony was located in Pennsylvania. Plaintiff Anthony also has an active Facebook account which he has maintained at all relevant times. Plaintiff Anthony accesses his Facebook account from multiple devices, including his laptop and smartphone.

2

8.    Defendant Cabela's L.L.C. is a Pennsylvania company headquartered in Springfield, Missouri. Cabela's owns and operates cabelas.com, through which it sells sporting goods, including firearms. Cabela's is a wholly-owned subsidiary of BPS Direct, L.L.C.

9.    Defendant BPS Direct, L.L.C., doing business as Bass Pro Shops, is a Delaware corporation headquartered in Springfield, Missouri. BPS owns and operates basspro.com, through which it sells sporting goods, including firearms. BPS also assists in the operation of the cabelas.com website and is the parent company of Cabela's.

10.    The basspro.com and cabelas.com websites are largely the same. Both are operated, at least in part, by BPS. Both offer the same products, including the same firearms, for sale and offer the same sale promotions. Both websites also function identically in unlawfully assisting Facebook in intercepting information about consumers firearms purchases.

11.    Pursuant to the systematic process described herein, Defendants, through cabela's.com and basspro.com, assisted Facebook with intercepting Plaintiffs' communications, including those that contained personally identifiable information and protected information about their firearms purchases. Defendants assisted these interceptions without Plaintiffs' knowledge, consent or express written authorization. By failing to receive the requisite consent, Defendants breached confidentiality and unlawfully disclosed Plaintiffs' personally identifiable information and protected information about their firearms purchases.

## FACTUAL ALLEGATIONS

**1.    Facebook and the Facebook Tracking Pixel**

12.     Facebook is the largest social networking site on the planet, touting 2.9 billion monthly active users.[1]  Facebook describes itself as a "real identity platform,"[2] meaning users are allowed only one account and must share "the name they go by in everyday life."[3]  To that end, when creating an account, users must provide their first and last name, along with their birthday and gender.[4]

13.     Facebook generates revenue by selling advertising space on its website.[5]

14.     Facebook sells advertising space by highlighting its ability to target users.[6] Facebook can target users so effectively because it surveils user activity both on and off its site.[7] This allows Facebook to make inferences about users beyond what they explicitly disclose, like their "interests," "behavior," and "connections."[8]  Facebook compiles this information into a generalized dataset called "Core Audiences," which advertisers use to apply highly specific filters and parameters for their targeted advertisements.[9]

---

[1] Sean Burch, *Facebook Climbs to 2.9 Billion Users, Report 29.1 Billion in Q2 Sales*, YAHOO (July 28, 2021), https://www.yahoo.com/now/facebook-climbs-2-9-billion-202044267.html
[2] Sam Schechner and Jeff Horwitz, *How Many Users Does Facebook Have? The Company Struggles to Figure It Out*, WALL. ST. J. (Oct. 21, 2021).
[3] FACEBOOK, COMMUNITY STANDARDS, PART IV INTEGRITY AND AUTHENTICITY, https://www.facebook.com/communitystandards/integrity_authenticity.
[4] FACEBOOK, SIGN UP, https://www.facebook.com/
[5] Mike Isaac, *Facebook's profit surges 101 percent on strong ad sales.*, N.Y. TIMES (July 28, 2021), https://www.nytimes.com/2021/07/28/business/facebook-q2-earnings.html.
[6] FACEBOOK, WHY ADVERTISE ON FACEBOOK, https://www.facebook.com/business/help/205029060038706.
[7] FACEBOOK, ABOUT FACEBOOK PIXEL, https://www.facebook.com/business/help/742478679120153?id=1205376682832142.
[8] FACEBOOK, AD TARGETING: HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.
[9] FACEBOOK, EASIER, MORE EFFECTIVE WAYS TO REACH THE RIGHT PEOPLE ON FACEBOOK, https://www.facebook.com/business/news/Core-Audiences.

15.    Advertisers can also build "Custom Audiences."[10]  Custom Audiences enable advertisers to reach "people who have already shown interest in [their] business, whether they're loyal customers or people who have used [their] app or visited [their] website."[11] Advertisers can use a Custom Audience to target existing customers directly, or they can use it to build a "Lookalike Audiences," which "leverages information such as demographics, interests, and behavior from your source audience to find new people who share similar qualities."[12]  Unlike Core Audiences, Custom Audiences require an advertiser to supply the underlying data to Facebook.  They can do so through two mechanisms: by manually uploading contact information for customers, or by utilizing Facebook's "Business Tools," which collect and transmit the data automatically.[13] One such Business Tool is the Facebook Tracking Pixel.

16.    The Facebook Tracking Pixel is a piece of code that advertisers, like Defendants, can integrate into their website.  Once activated, the Facebook Tracking Pixel "tracks the people and type of actions they take."[14]  When the Facebook Tracking Pixel captures an action, it sends a record to Facebook.   Once this record is received, Facebook processes it, analyzes it, and assimilates it into datasets like the Core Audiences and Custom Audiences.

---

[10]    FACEBOOK,    ABOUT    CUSTOM    AUDIENCES, https://www.facebook.com/business/help/744354708981227?id=2469097953376494.
[11]    FACEBOOK,    ABOUT    EVENTS    CUSTOM    AUDIENCE, https://www.facebook.com/business/help/366151833804507?id=300360584271273.
[12]    FACEBOOK,    ABOUT    LOOKALIKE    AUDIENCES, https://www.facebook.com/business/help/164749007013531?id=401668390442328.
[13]    FACEBOOK,    CREATE    A    CUSTOMER    LIST    CUSTOM    AUDIENCE, https://www.facebook.com/business/help/170456843145568?id=2469097953376494; FACEBOOK,    CREATE    A    WEBSITE    CUSTOM    AUDIENCE, https://www.facebook.com/business/help/1474662202748341?id=2469097953376494.
[14] FACEBOOK, RETARGETING, https://www.facebook.com/business/goals/retargeting.

17.     Advertisers control what actions—or, as Facebook calls it, "events"—the Facebook Tracking Pixel will collect, including the website's metadata, along with what pages a visitor views and what buttons a visitor clicks.[15]  Advertisers can also configure the Facebook Tracking Pixel to track other events.  Facebook offers a menu of "standard events" from which advertisers can choose, including what content a visitor views or purchases.[16]  An advertiser can also create their own tracking parameters by building a "custom event."[17]

18.     Advertisers control how the Facebook Tracking Pixel identifies visitors.  The Facebook Tracking Pixel is configured to automatically collect "HTTP Headers" and "Pixel-specific Data."[18]  HTTP Headers collect "IP addresses, information about the web browser, page location, document, referrer and persons using the website."[19]  Pixel-specific Data includes "the Pixel ID and cookie."[20]

**B.      Defendants' Websites and the Facebook Pixel**

19.     Defendants' websites cabelas.com and basspro.com are largely mirror images of one another.  Both host code for the Facebook Tracking Pixel and are configured to transmit three distinct events to Facebook:[21]

---

[15]  *See* FACEBOOK, FACEBOOK PIXEL, ACCURATE EVENT TRACKING, ADVANCED, https://developers.facebook.com/docs/facebook-pixel/advanced/; *see also* FACEBOOK, BEST PRACTICES FOR FACEBOOK PIXEL SETUP, https://www.facebook.com/business/help/218844828315224?id=1205376682832142.

[16]  FACEBOOK, SPECIFICATIONS FOR FACEBOOK PIXEL STANDARD EVENTS, https://www.facebook.com/business/help/402791146561655?id=1205376682832142.

[17]  FACEBOOK, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS, https://www.facebook.com/business/help/964258670337005?id=1205376682832142.

[18]  FACEBOOK, FACEBOOK PIXEL, https://developers.facebook.com/docs/facebook-pixel/.

[19]  *Id.*

[20]  *Id.*

[21]  This data derives from a tool created and offered by Facebook.

**Figures 1 and 2:**



20.    PageView transmits the Uniform Resource Locator ("URL") accessed, which shows what webpage the visitor visited:

**Figures 3 and 4:**



21.    Defendants' URLs contain detailed information disclosing what products users have browsed. For example, if a user searches for "Vortex scope," the URL displayed is "basspro.com/SearchDisplay#q=Vortex%20scope," and if that user then clicks on the "Vortext Diamondback Rifle Scope," the URL changes to "basspro.com/shop/en/vortex-diamondback-rifle-scope."

22.    ViewContent shows similar information to PageView, but specifically tracks when users access pages for particular products.

23.    Microdata transmits the title and description of the webpage:

## Figures 5 and 6:

| One pixel found on www.cabelas.com | One pixel found on www.basspro.com |
|---|---|

**Facebook Pixel**
Pixel ID: 841232062592664 click to copy
Troubleshoot Pixel
View Analytics

▷ ⊚ PageView

▷ ⊚ ViewContent

▽ ⚡ Microdata Automatically Detected

**CUSTOM PARAMETERS SENT**
**Schema.org:** Show
**DataLayer:** []
**OpenGraph:** {}
**JSON-LD:** Show
**Meta:** Hide

{"title":"Savage Arms AXIS II XP TrueTimber VSX Bolt-Actio
n Rifle | Cabela's","meta:description":"This Bass Pro Shop
s and Cabela's exclusive Savage Arms® AXIS II XP TrueTimbe
r VSX Bolt-Action Rifle offers hunters even better out-of-
the-box performance at the same affordable price. The Axis
II XP features","meta:keywords":" "}

**EVENT INFO**
**URL Called:** Show
**Load Time:** 16.61 ms
**Pixel Location:** Show

---

**Facebook Pixel**
Pixel ID: 1923188964632693 click to copy
Troubleshoot Pixel
View Analytics

▷ ⊚ PageView

▷ ⊚ ViewContent

▽ ⚡ Microdata Automatically Detected

**CUSTOM PARAMETERS SENT**
**Schema.org:** Show
**DataLayer:** []
**OpenGraph:** {}
**JSON-LD:** Show
**Meta:** Hide

{"title":"Savage Arms AXIS II XP TrueTimber VSX Bolt-Actio
n Rifle with Threaded Barrel | Bass Pro Shops","meta:descr
iption":"The Savage Arms® AXIS II XP TrueTimber VSX Bolt-A
ction Rifle features a 16.13\" heavy barrel with a 5/8-24
threaded muzzle designed for use with a suppressor. The Ac
cuTrigger® is adjustable and","meta:keywords":" "}

**EVENT INFO**
**URL Called:** Show
**Load Time:** 15.17 ms
**Pixel Location:** Show

24.    Another event titled "Button Click Automatically Detected" registers when users add a product, such as a firearm, to their online shopping cart and when they checkout:

## Figures 7 and 8:

| One pixel found on www.cabelas.com | One pixel found on www.basspro.com |
|---|---|

**Facebook Pixel**
Pixel ID: 841232062592664 click to copy
Troubleshoot Pixel
View Analytics

▽ ⚙ Button Click Automatically Detected

**CUSTOM PARAMETERS SENT**
**formFeatures:** []
**buttonText:** ORDER ONLINE
**buttonFeatures:** Hide

{"classList":"btn primary chartcomposerprimary left pdp_ch
art_addtocart_button","destination":"javascript: if (typeo
f onBehalfutilitiesJS == 'undefined') {setCurrentId('SKU_L
ist_Widget_Add2CartButton_3074457345623326
621', '3074457345623326621_Quantity_Input','https://www.ca
belas.com/shop/en/FirearmsResidencyCheckview','3074457345623
3326120');} else if (onBehalfutilitiesJS.csrProceedCheck
()) {setCurrentId('SKU_List_Widget_Add2CartButton_30744573
45623326621_table');FirearmsDisplayJS.orderFirearmsOnlineW
rapper('3074457345623326621', '3074457345623326621_Quantit
y_Input','https://www.cabelas.com/shop/en/FirearmsResidency
Checkview','3074457345623326120');} else {MessageHelper.di
splayErrorMessage(MessageHelper.messages['ERROR_CSR_USER_P
ROCEED']);}","id":"SKU_List_Widget_Add2CartButton_30744573
45623326621_table","imageUrl":"","innerText":"ORDER ONLIN
E","numChildButtons":0,"tag":"a","type":null,"name":""}

**pageFeatures:** Hide

{"title":"Savage Arms AXIS II XP TrueTimber VSX Bolt-Actio
n Rifle | Cabela's"}

---

**Facebook Pixel**
Pixel ID: 1923188964632693 click to copy
Troubleshoot Pixel
View Analytics

▽ ⚙ Button Click Automatically Detected

**CUSTOM PARAMETERS SENT**
**formFeatures:** []
**buttonText:** ORDER ONLINE
**buttonFeatures:** Hide

{"classList":"btn primary chartcomposerprimary left pdp_ch
art_addtocart_button","destination":"javascript: if (typeo
f onBehalfutilitiesJS == 'undefined') {setCurrentId('SKU_L
ist_Widget_Add2CartButton_3074457345623326
620', '3074457345623326620_Quantity_Input','https://www.ba
sspro.com/shop/en/FirearmsResidencyCheckview','3074457345623
3324136');} else if (onBehalfutilitiesJS.csrProceedCheck
()) {setCurrentId('SKU_List_Widget_Add2CartButton_30744573
45623326620_table');FirearmsDisplayJS.orderFirearmsOnlineW
rapper('3074457345623326620', '3074457345623326620_Quantit
y_Input','https://www.basspro.com/shop/en/FirearmsResidency
Checkview','3074457345623324136');} else {MessageHelper.di
splayErrorMessage(MessageHelper.messages['ERROR_CSR_USER_P
ROCEED']);}","id":"SKU_List_Widget_Add2CartButton_30744573
45623326620_table","imageUrl":"","innerText":"ORDER ONLIN
E","numChildButtons":0,"tag":"a","type":null,"name":""}

**pageFeatures:** Hide

{"title":"Savage Arms AXIS II XP TrueTimber VSX Bolt-Actio
n Rifle with Threaded Barrel | Bass Pro Shops"}

25.     This event registers, for example, when a purchaser clicks "ORDER ONLINE," "ADD TO CART," "CHECKOUT," "CONTINUE," "REVIEW ORDER," and "PLACE ORDER."

26.     The Button Click event also transmits content that purchasers enter into form fields:

**Figures 9 and 10:**




27.     This includes form fields that must be completed prior to purchase:

**Figure 11:**



28.     This event data, jointly and independently, permit an ordinary person to identify what a consumer has viewed and/or purchased on Defendants' websites.

29.     The Facebook Tracking Pixel uses both first- and third-party cookies. A first-party cookie is "created by the website the user is visiting"—*i.e.*, cabelas.com or basspro.com.[22] A third-party cookie is "created by a website with a domain name other than the one the user is currently visiting"—*i.e.*, Facebook.[23]

30.     When viewing Defendants' websites, the Facebook Tracking Pixel compels the user's browser to send nine cookies to Facebook:

---

[22] PC MAG, FIRST-PARTY COOKIES, https://www.pcmag.com/encyclopedia/term/first-party-cookie. This is confirmable by using developer tools to inspect a website's cookies and track network activity.

[23] PC MAG, THIRD-PARTY COOKIES, https://www.pcmag.com/encyclopedia/term/third-party-cookie. This is also confirmable by tracking network activity.

**Figure 12:**

| Name | Value | Domain |
|------|-------|--------|
| xs | 156%3AKGXBbut-SjxSCw%3A2%3A1639601808%... | .facebook.com |
| wd | 1313x646 | .facebook.com |
| usida | eyJ2ZXIiOjEsImIkIjoiQXJvZndreDE1OTA1ZmsiLCJ0... | .facebook.com |
| c_user | 679395441 | .facebook.com |
| datr | jVa6YcoeBSLOAo0a9bvz1mtE | .facebook.com |
| presence | C%7B%22t3%22%3A%5B%5D%2C%22utc3%22%... | .facebook.com |
| dpr | 1.4630000591278076 | .facebook.com |
| sb | jVa6YaHou2Nev98LSBnWYOo7 | .facebook.com |
| fr | 0ZzdZn9Ygh60Xbk36.AWVC5uksSXTsGC3302SbE... | .facebook.com |

31.    The c_user cookie contains that visitor's unencrypted Facebook ID.  A Facebook ID is personally identifiable information.  Anyone can identify a Facebook profile—and all personal information publicly listed on that profile—by appending the Facebook ID to the end of Facebook.com.

32.    The fr cookie contains, at least, an encrypted Facebook ID and browser identifier.[24] The datr cookies also identifies a browser.[25]  Facebook, at a minimum, uses the fr and c_user cookies to identify users by their Facebook IDs and corresponding Facebook profiles.[26]

33.    Through the Facebook Tracking Pixel's code, these cookies combine the identifiers with the event data, allowing Facebook to know, among other things, what webpages visitors to Defendants' websites are visiting and what products they are purchasing.[27]

34.    Defendants also use "Advanced Matching."  With Advanced Matching, Defendants' Pixels "look[s] for recognizable form field and other sources on your website that

---

[24] DATA PROTECTION COMMISSIONER, FACEBOOK IRELAND LTD, REPORT OF RE-AUDIT (Sept. 21, 2012), http://www.europe-v-facebook.org/ODPC_Review.pdf.
[25] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.
[26] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.
[27] FACEBOOK, GET STARTED, https://developers.facebook.com/docs/meta-pixel/get-started.

contain information such as first name, last name and email." [28]   That information is recorded, "along with the event, or action, that took place."[29]   This information is also "hashed,"[30] meaning it is "[a] computed summary of digital data that is a one-way process."  In other words, it "cannot be reversed back into the original data."[31]

**Figure 13:**

> You can use Advanced Matching to help:
>
> - Increase the number of attributed conversions. We can match more of the conversions that happen on your website to people on Meta. This helps you understand the impact of your ads on website conversions.
>
> - Increase your Custom Audience size. We're able to better match your website visitors to people on Meta and increase the size of your Custom Audience.
>
> - Decrease the cost per conversion. Conversion-optimized campaigns become more efficient because we can better identify and deliver ads to the types of people likely to take the actions you care about.

35.    Defendants disclose this information to Facebook so it can better match visitors to their Facebook profiles.

36.    As part of Advanced Matching, Defendants enabled "Automatic Advanced Matching."  That means Defendants configured the pixel to scan form fields containing a user's email address, first name, last name, phone number, gender, zip code, city and state.[32]   The highlighted line, along with the line three below it, shows that Defendants enabled Automatic Matching.

---

[28] https://www.facebook.com/business/help/611774685654668?id=1205376682832142
[29]  FACEBOOK,  ABOUT  ADVANCED  MATCHING  FOR  WEB, https://www.facebook.com/business/help/611774685654668?id=1205376682832142.
[30] DEFINITION OF HASH, https://www.pcmag.com/encyclopedia/term/hash
[31]  *Id.*
[32]  Facebook provides a corresponding look-up table: FACEBOOK, ADVANCED MATCHING, https://developers.facebook.com/docs/meta-pixel/advanced/advanced-matching.

**Figure 14:**

```
33 fbq.registerPlugin("841232062592664", {__fbEventsPlugin: 1, plugin: function(fbq, instance, config) { fbq.loadPlugin(
34 fbq.loadPlugin("identity");
35 instance.optIn("841232062592664", "InferredEvents", true);
36 fbq.loadPlugin("jsonld_microdata");
37 instance.optIn("841232062592664", "MicrodataJsonLd", true);
38 config.set("841232062592664", "automaticMatching", {"selectedMatchKeys":["em","fn","ln","ph","ge","zp","ct","st"]});
39 fbq.loadPlugin("inferredevents");
40 fbq.loadPlugin("identity");
41 instance.optIn("841232062592664", "AutomaticMatching", true);
42 fbq.loadPlugin("iwlbootstrapper");
43 instance.optIn("841232062592664", "IWLBootstrapper", true);
44 fbq.loadPlugin("iwlparameters");
45 fbq.loadPlugin("estruleengine");
46 instance.optIn("841232062592664", "IWLParameters", true);
```

37.    Defendants know that Facebook will match the Advanced Matching parameters with a customer's subsequent activity, thereby helping them "[i]ncrease the number of attributed conversions," "[i]ncrease [their] Custom Audience size," and "[d]ecrease the cost per conversion."[33]

38.    By compelling a visitor's browser to disclose the Advanced Matching parameters and event data for videos, Defendants knowingly disclose information sufficiently permitting an ordinary person to identify a specific individual's website activity, including what webpages they visit and what products they purchase.

**C.    Defendants Never Received Consent from Plaintiffs and Class Members to Assist Facebook with Intercepting Their Communications**

39.    Defendants never received consent from users to intercept their electronic communications.

40.    Plaintiffs and Class members did not consent to Defendants' privacy policies prior to Facebook intercepting their electronic communications.  Even if applicable, that privacy policy fails to disclose that Defendants assist Facebook with intercepting communications that contain sensitive information.

---

[33]    FACEBOOK, ABOUT ADVANCED MATCHING FOR WEB, https://www.facebook.com/business/help/611774685654668?id=1205376682832142.

41.     Likewise, Facebook never receives consent from users to intercept and collect electronic communications containing their sensitive and unlawfully disclosed information.  In fact, Facebook expressly warrants the opposite.

42.     When first signing up, a user assents to three agreements: the Terms of Service,[34] the Cookies Policy,[35] and the Data Policy.[36]

43.     Facebook's Terms of Service begins by stating that "[p]rotecting people's privacy is central to how we've designed our ad system."[37]  The Terms of Service then prohibits anyone from using Facebook's Products in a manner that is "unlawful, misleading, discriminatory or fraudulent."[38]

44.     Facebook's Data Policy recognizes that there may be "[d]ata with special protections,"  meaning information that "could be subject to special protections under the laws of your country."[39]  The Data Policy goes on to describe how Facebook collects information from its "Meta Business Tools," including "our social plug-ins (such as the Like button), Facebook Login, our APIs and SDKs, or the Meta pixel."[40]  Specifically, Facebook acknowledges that "[p]artners receive your data when you visit or use their services or through third parties they work with."[41]

45.     Facebook then offers an express representation: **"We require each of these partners to have lawful rights to collect, use and share your data before providing any data**

---

[34] FACEBOOK, TERMS OF SERVICE, https://www.facebook.com/legal/terms/update.
[35] FACEBOOK,  COOKIES  &  OTHER  STORAGE  TECHNOLOGIES, https://www.facebook.com/policies/cookies/.
[36] FACEBOOK, DATA POLICY, https://www.facebook.com/about/privacy/update.
[37] FACEBOOK, TERMS OF SERVICE, https://www.facebook.com/legal/terms/update..
[38] *Id.*
[39] FACEBOOK, DATA POLICY, https://www.facebook.com/about/privacy/update.
[40] FACEBOOK, DATA POLICY, https://www.facebook.com/about/privacy/update.
[41] *Id.*

**to us.**[42]  Facebook does acknowledge collecting "data with special protections" to personalize ads, but critically, only sensitive information that users "choose to provide."[43]

46.    Facebook's Cookies Policy ratifies those representations, stating "the Data Policy will apply to our processing of the data that we collect via cookies."[44]

47.    Facebook's other representations reinforce these warranties.  In its Advertising Policy, Facebook states "[w]e do not use sensitive personal data for ad targeting."[45]  And in a blog post titled "About Restricted Meta Business Tools Data," Facebook asserts it has "policies around the kinds of information businesses can share with us."[46]  Facebook does not "want websites or apps sending us sensitive information about people."[47]  Sensitive information includes, among other things, "any information defined as sensitive under applicable laws, regulations and applicable industry guidelines."[48]

48.    These representations are repeated frequently.  Facebook created a "Help Center" to better explain its practices to users.  In an article titled, "How does Facebook receive information from other businesses and organizations?," Facebook reiterates its promise to "prohibit businesses or organizations from sharing sensitive information with us," and if Facebook "determine[s] that a business or an organization is violating our terms, we'll take action against that business or

---

[42] *Id.*

[43] *Id.*

[44]    FACEBOOK,    COOKIES    &    OTHER    STORAGE    TECHNOLOGIES, https://www.facebook.com/policies/cookies/.

[45] FACEBOOK, ADVERTISING POLICY, https://www.facebook.com/policies/ads/.

[46]    FACEBOOK,    ABOUT    RESTRICTED    META    BUSINESS    TOOLS    DATA, https://www.facebook.com/business/help/1057016521436966?id=188852726110565

[47] *Id.*

[48] *Id.*

organization."[49] In another article, titled, "How does Meta work with data providers?," Facebook repeats this promise, stating "[b]usinesses that advertise on Facebook are required to have any necessary rights and permissions to use this information, as outlined in our Custom Audience Terms that businesses must agree to."[50]

49.    Based on these representations, Facebook never receives consent from users to intentionally intercept and monetize electronic communications disclosing sensitive information that the law protects.

50.    Moreover, upon information and belief, Defendants have never entered into an agreement with Facebook that would obligate Facebook to keep disclosed information confidential.

51.    By assisting Facebook with intercepting information about consumers' firearm purchases, Defendants violated the Pennsylvania Wiretap Act and Uniform Firearms Act. Defendants also invaded the personal privacy of Plaintiffs and putative class members by disclosing this sensitive and protected information.

## CLASS ALLEGATIONS

52.    Plaintiffs, pursuant to Rules 1702, 1708 and 1709 of the Pennsylvania Rules of Civil Procedure, assert this action individually and on behalf of the following Class: All persons in Pennsylvania who have a Facebook account and who purchased a firearm from either cabelas.com, basspro.com, or both (the "Class").

---

[49] FACEBOOK, HOW DOES FACEBOOK RECEIVE INFORMATION FROM OTHER BUSINESSES AND ORGANIZATIONS, https://www.facebook.com/help/2230503797265156.
[50] HOW DOES META WORK WITH DATA PROVIDERS?, https://www.facebook.com/help/494750870625830?ref=dp.

53. Subject to additional information obtained through further investigation and discovery, the above-described Class may be modified or narrowed as appropriate, including through the use of multi-state subclasses.

54. **Numerosity.** Consistent with Pennsylvania Rule of Civil Procedure 1702(1), the Class is so numerous that joinder of all members is impracticable. While Plaintiffs do not know the exact number of members of the Class, Plaintiffs believe the Class contains at least hundreds of thousands of individuals, and the members can be identified through Defendants' records. Class Members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, internet postings, social media and/or published notice.

55. **Commonality.** Consistent with Pennsylvania Rule of Civil Procedure 1702(2), common questions of law and fact exist as to all Class Members. These common questions of law or fact predominate over any questions affecting only individual members of the Class. Common questions include, but are not limited to the following:

    a. whether Defendants collected users' PII, website activities and firearms purchases;

    b. whether Defendants unlawfully disclosed and continue to disclose their users' PII, website activities and firearms purchases in violation of Pennsylvania Wiretapping Act, 8 Pa. Cons. Stat. § 5701, *et seq.*;

    c. whether Defendants unlawfully disclosed and continue to disclose its users' PII, website activities and firearms purchases in violation of Uniform Firearms Act, 18 Pa.C.S. § 6111(i); and

    d. whether Defendants disclosed its users PII, website activities and firearms purchases without consent.

56. **Typicality.** Consistent with Pennsylvania Rule of Civil Procedure 1702(3), Plaintiffs' claims are typical of the claims of the Class they seek to represent because Plaintiffs

and all Class Members have suffered similar injuries as a result of the same practices alleged herein. Plaintiffs have no interests adverse to the interests of the other Class Members, and Defendants have no defenses unique to any Plaintiff.

57.  **Adequate Representation.** Consistent with Pennsylvania Rule of Civil Procedure 1702(4) and 1709, Plaintiffs have and will continue to fairly and adequately represent and protect the interests of the Class and have retained as their counsel attorneys competent and experienced in class actions and complex litigation, including litigation to remedy privacy violations. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of Class Members, and they have the resources to do so.

58.  **Predominance.** Consistent with Pennsylvania Rule of Civil Procedure 1708(a)(1), common questions of law and fact predominate over any questions affecting only individual class members. For example, Defendants' liability and the fact of damages is common to all members of the Class.

59.  **Superiority and Manageability.** Consistent with Pennsylvania Rule of Civil Procedure 1708(a)(2), a class action is superior to other available means for the fair and efficient adjudication of this dispute. The injury suffered by each Class Member, while meaningful on an individual basis, may not be of such magnitude as to make the prosecution of individual actions against Defendants economically feasible. Even if Class Members could afford individual litigation, those actions would put immeasurable strain on the court system. Moreover, individual litigation of the legal and factual issues of the case would increase the delay and expense to all parties and the court system. A class action, however, presents far fewer management difficulties and provides the benefit of single adjudication, economy of scale and comprehensive supervision by a single court.

60. **Risk of Inconsistent, Varying, or Prejudicial Adjudications.** Consistent with Pennsylvania Rule of Civil Procedure 1708(a)(3), a class action will minimize the risk of inconsistent, varying or prejudicial adjudications. If Plaintiffs' and Class members' claims were tried separately, Defendants would be confronted with incompatible standards of conduct and divergent court decisions.

61. **Litigation Already Commenced.** Consistent with Pennsylvania Rule of Civil Procedure 1708(a)(4), to Plaintiffs' knowledge, there are no other cases that have been brought against Defendants, or that are currently pending against Defendants, where Pennsylvania consumers seek to represent a class of Pennsylvania residents based on conduct alleged in this Complaint.

62. **Appropriateness of Forum.** Consistent with Pennsylvania Rule of Civil Procedure 1708(a)(5), the most appropriate forum to concentrate the litigation is this County because Defendants conducts business in this county, the conduct at issue took place in part in this county and a substantial number of Class members were injured in this County.

63. **Support for Class Certification.** Consistent with Pennsylvania Rule of Civil Procedure 1708(a)(6) and (7), there is support for a class to be certified because of the relatively low amount recoverable by each Class member and the expenses of individual litigation.

64. **The General Applicability of Defendant's Conduct.** Consistent with Pennsylvania Rule of Civil Procedure 1708(b)(2), Defendants' conduct is generally applicable to the class as a whole, making relief appropriate with respect to each Class member.

**CLAIMS FOR RELIEF**

**COUNT I**
**Violation of the Pennsylvania Wiretapping Act**
**18 Pa. Cons. Stat. § 5701, *et seq.***

65.     Plaintiffs repeat the allegations contained in the paragraphs above as if fully set forth herein.

66.     Plaintiffs bring this Count individually and on behalf of the members of the Class.

67.     The Pennsylvania Wiretapping Act prohibits (1) the interception or procurement of another to intercept any wire, electronic, or oral communication; (2) the intentional disclosure of the contents of any wire, electronic, or oral communication that the discloser knew or should have known was obtained through the interception of a wire, electronic, or oral communication; and (3) the intentional use of the contents of any wire, electronic, or oral communication that the discloser knew or should have known was obtained through the interception of a wire, electronic, or oral communication.  18 Pa. Cons. Stat. § 5703.

68.     Any person who intercepts, discloses, or uses or procures any other person to intercept, disclose, or use, a wire, electronic, or oral communication in violation of the Act is subject to a civil action for (1) actual damages, not less than liquidated damages computed at a rate of $100 per day for each violation or $1,000, whichever is higher; (2) punitive damages; and (3) reasonable attorneys' fees and other litigation costs incurred.  18 Pa. Cons. Stat. § 5725(a).

69.     "Intercept" is defined as the "[a]ural or other acquisition of the contents of any wire, electronic or oral communication through the use of any electronic, mechanical or other device." 18 Pa. Cons. Stat. § 5702.  "Electronic, mechanical or other device," in turn, means "[a]ny device or apparatus … that can be used to intercept a wire, electronic or oral communication[.]"  *Id.*

70.     The following constitutes a device within the meaning of 18 Pa. Cons. Stat. § 5702:

a.  The computer codes and programs that Defendants used to track Plaintiffs' and Class members' communications while navigating the websites;

b.  Plaintiffs' and Class members' web browsers;

c.  Plaintiffs' and Class members' computing devices;

d.  Defendants' web servers;

e.  The web servers from which Facebook received the Plaintiffs' and Class members' communications while they were using a web browser to access Defendants' websites;

f.  The plan Defendants carried out to effectuate their tracking of Plaintiffs' and Class members' communications while using a web browser to access the websites.

71.    At all relevant times, Defendants procured Facebook to track and intercept Plaintiffs' and other Class members' internet communications while navigating their websites. Defendants sent these communications to Facebook without authorization or consent from Plaintiffs or Class members.

72.    Defendants, when procuring Facebook to intercept Plaintiffs' communications, intended Facebook to learn the meaning of the content the visitor requested.

73.    Plaintiffs and Class members had a justified expectation under the circumstances that their electronic communications would not be intercepted.

74.    Plaintiffs and Class members were not aware that their electronic communications were being intercepted by Facebook.

## COUNT II
### Violation of the Uniform Firearms Act
### 18 Pa.C.S. § 6111(i)

75.    Plaintiffs repeat the allegations contained in the paragraphs above as if fully set forth herein.

76.    Plaintiffs bring this Count individually and on behalf of the members of the Class.

77.    Section 6111(i) of the Uniform Firearms Act ("UFA") provides the following:

> **(i) Confidentiality.**--All information provided by the potential purchaser, transferee or applicant, including, but not limited to, the potential purchaser, transferee or applicant's name or identity, furnished by a potential purchaser or transferee under this section or any applicant for a license to carry a firearm as provided by section 6109 shall be confidential and not subject to public disclosure.  In addition to any other sanction or penalty imposed by this chapter, any person, licensed dealer, State or local governmental agency or department that violates this subsection shall be liable in civil damages in the amount of $1,000 per occurrence or three times the actual damages incurred as a result of the violation, whichever is greater, as well as reasonable attorney fees.

78.    Plaintiffs are both a "purchaser" under the UFA because they purchased a firearm from Defendants.  On December 2, 2021, Plaintiff Irvin purchased a Henry Big Boy Classic Centerfire Lever-Action Rifle - .45 Colt from cabelas.com.  Similarly, Plaintiff Anthony purchased a Stoeger M3K Freedom Series 3-Gun Extended Capacity Semi-Auto Shotgun from cabelas.com.

79.    Defendants disclosed to Facebook information that Plaintiffs provided to it in connection with their purchase of these firearms.  Specifically, Defendants disclosed Plaintiffs' name, address, Facebook ID, and the type of gun that they purchased, among other items.

22

## COUNT III
### Violation of the Electronic Communications Privacy Act
### 18 U.S.C. § 2511(1), *et seq.*

80.    Plaintiffs repeat the allegations contained in the paragraphs above as if fully set forth herein.

81.    Plaintiffs bring this Count individually and on behalf of the members of the Class.

82.    The Electronic Communications Privacy Act ("ECPA") prohibits the intentional interception of the content of any electronic communication.  18 U.S.C. § 2511.

83.    The ECPA protects both sending and receiving communications.

84.    18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

85.    The transmission of Plaintiffs' personally identifying information ("PII") to Defendants' websites qualifies as a "communication" under the ECPA's definition in 18 U.S.C. § 2510(12).

86.    The transmission of PII from Plaintiffs and Class members to Defendants' Website, with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

87.    The ECPA defines "contents," when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication."  18 U.S.C. 18 U.S.C. § 2510(8).

23

88.     The ECPA defines an interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

89.     The ECPA defines "electronic, mechanical, or other device," as "any device…which can be used to intercept a[n]…electronic communication[.]"  18 U.S.C. § 2510(5).

90.     The following instruments constitute "devices" within the meaning of the ECPA:

   a.   The computer codes and programs Defendants and Facebook used to track Plaintiffs' and Class members' communications while they were navigating the websites;

   b.   Plaintiffs' and Class members' browsers;

   c.   Plaintiffs' and Class members' mobile devices;

   d.   Defendants' and Facebook's web and ad servers;

   e.   The plan Defendants and Facebook carried out to effectuate the tracking and interception of Plaintiffs' and Class members' communications while they were using a web browser to navigate the websites.

91.     Plaintiffs' and Class members' interactions with Defendants' websites are electronic communications under the ECPA.

92.     By utilizing and embedding the tracking technology provided by Facebook on its websites, Defendants intentionally intercepted, endeavored to intercept, and/or procured another person to intercept the electronic communications of Plaintiffs and Class members in violation of 18 U.S.C. § 2511(1)(a).

24

93.     Specifically, Defendants intercepted—in real time—Plaintiffs' and Class members' electronic communications via the tracking technology provided by Facebook on its websites, which tracked, stored and unlawfully disclosed Plaintiff's and Class Members' PII to Facebook.

94.     Defendants intercepted communications that include, but are not necessarily limited to, communications to/from Plaintiffs and Class members regarding PII, including their identities and information related to their firearms purchases.  This confidential information is then monetized for targeted advertising purposes, among other things.

95.     By intentionally disclosing or endeavoring to disclose Plaintiffs' and Class members' electronic communications to Facebook, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

96.     By intentionally using, or endeavoring to use, the contents of Plaintiffs' and Class members' electronic communications, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendants violated 18 U.S.C. § 2511(1)(d).

97.     Defendants intentionally intercepted the contents of Plaintiffs' and Class members' electronic communications for the purpose of committing a criminal or tortious act in violation of the Constitution or laws of the United States or of any state, namely, invasion of privacy, among others.

98.     The party exception in 18 U.S.C. § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State.

25

99. Defendants used the electronic communications to increase its profit margins. Defendants specifically used the tracking technology provided by Facebook to track and utilize Plaintiffs' and Class members' PII for financial gain.

100. Defendants were not acting under the color of law to intercept Plaintiffs' and Class members' wire or electronic communications.

101. Plaintiffs and Class members did not authorize Defendants to acquire the content of their communications for purposes of invading Plaintiffs' and Class members' privacy. Plaintiffs and Class members had a reasonable expectation that Defendants would not redirect their communications to Facebook without their knowledge or consent.

102. The foregoing acts and omission therefore constitute numerous violations of 18 U.S.C. § 2511(1), *et seq.*

103. As a result of each and every violation thereof, on behalf of themselves and the Class, Plaintiffs seek statutory damages of $10,000, or $100 per day for each violation of 18 U.S.C. § 2510, *et seq.*, under 18 U.S.C. § 2520.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seeks judgment against Defendants, as follows:

a. Determining that this action is a proper class action;

b. For an order certifying the Class, naming Plaintiffs as representatives of the Class, and naming Plaintiffs' attorneys as Class Counsel to represent the Class;

c. For an order declaring that Defendants' conduct violates the statute referenced herein;

d.   For an order finding in favor of Plaintiffs and the Class on the counts asserted herein;

e.   Awarding compensatory damages, including statutory damages where available, to Plaintiffs and the Class members against Defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial;

f.   For punitive damages, as warranted, in an amount to be determined at trial;

g.   Ordering Defendants to disgorge revenues and profits wrongfully obtained;

h.   For prejudgment interest on all amounts awarded;

i.   For injunctive relief as pleaded or as the Court may deem proper;

j.   For an order awarding Plaintiffs and the Class their reasonable attorneys' fees and expenses and costs of suit; and

k.   Granting Plaintiffs and the Class members such further relief as the Court deems appropriate.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all claims so triable in this action.

Dated:  February 17, 2026

Respectfully submitted,

By:   _Steven A. Schwartz_
**CHIMICLES SCHWARTZ KRINER**
**& DONALDSON-SMITH LLP**
Steven A. Schwartz (PA I.D. No. 50579)
Alex M. Kashurba (PA I.D. No. 319003)
361 W. Lancaster Avenue
Haverford, PA 19041
Tel: (610) 642-8500
Fax: (610) 649-3633
E-Mail: sas@chimicles.com
        amk@chimicles.com

**BURSOR & FISHER, P.A.**
Philip L. Fraietta (*Pro Hac Vice Forthcoming*)
1330 Avenue of the Americas, 32 Fl.

New York, NY 10019
Tel: (646) 837-7150
Fax: (212) 989-9163
E-Mail: pfraietta@bursor.com

**BURSOR & FISHER, P.A.**
Stephen A. Beck (Admitted *Pro Hac Vice)*
701 Brickell Ave., Suite 2100
Miami, FL 33131-2800
Telephone: (305) 330-5512
Facsimile: (305) 676-9006
E-Mail: sbeck@bursor.com

*Attorneys for Plaintiffs and the Putative Class*

# EXHIBIT 1

# PROTHONOTARY OF LEBANON COUNTY

**Barbara A. Smith**
*Prothonotary*

**Cassidy L. Kleinfelter**
*First Deputy*

**Ian M. Ehrgood**
*Solicitor*

**Juliemar R. LaBarbera**
*Second Deputy*



| DAVID IRVIN VS CABELA'S L.L.C. et al. | CASE NUMBER 2023-0-1668 |
|---|---|

## Case Participants

**Plaintiff**

DAVID IRVIN

ADDRESS UNKNOWN
, 0

**Attorney**

MELISSA PEMBROKE

CHIMICLES SCHWARTZ KRINER
& DONALDSON-SMITH LLP
361 W LANCASTER AVE
HAVERFORD, PA 19041
610-642-8500

**Attorney**

PHILIP L. FRAIETTA

BURSOR & FISHER, P.A.
1330 AVENUE OF THE
AMERICAS
NEW YORK, NY 10019
646-837-7150

**Attorney**

MEREDITH C. SLAWE

SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
ONE MANHATTAN WEST
NEW YORK, NY 10001
212-735-3000

**Defendant**

CABELA'S L.L.C.

SPRINGFIELD, MI 0

**Attorney**

STEVEN A. SCHWARTZ

361 W. LANCASTER AVE
HAVERFORD, PA 19041
6106428500

**Attorney**

STEPHEN A. BECK

**Payor**

CHIMICLES

**Defendant**

BPS DIRECT, L.L.C.

SPRINGFIELD, MI 0

**Attorney**

ALEX M KASHURBA

CHIMICLES SCHWARTZ KRINER
& DONALDSON-SMITH LLP
361 W LANCASTER AVE
HAVERFORD, PA 19041
610-642-8500

**Attorney**

MICHAEL W. MCTIGUE, JR.

SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
ONE MANHATTAN WEST
NEW YORK, NY 10001
212-735-3000

## Attorney Relationships

| Attorney | Plaintiff |
|---|---|
| STEVEN A. SCHWARTZ | DAVID IRVIN |
| **Attorney** | **Plaintiff** |
| MELISSA PEMBROKE | DAVID IRVIN |
| **Attorney** | **Plaintiff** |
| ALEX M KASHURBA | DAVID IRVIN |

## Attorney Relationships

| Attorney | Plaintiff |
|---|---|
| PHILIP L. FRAIETTA | DAVID IRVIN |

| Attorney | Plaintiff |
|---|---|
| STEPHEN A. BECK | DAVID IRVIN |

| Attorney | Defendant |
|---|---|
| MICHAEL W. MCTIGUE, JR. | CABELA'S L.L.C. |

| Attorney | Defendant |
|---|---|
| MEREDITH C. SLAWE | CABELA'S L.L.C. |

| Attorney | Defendant |
|---|---|
| MICHAEL W. MCTIGUE, JR. | BPS DIRECT, L.L.C. |

| Attorney | Defendant |
|---|---|
| MEREDITH C. SLAWE | BPS DIRECT, L.L.C. |

## Prothonotary Docket Entries

| Entry | Pages |
|---|---|
| 02/18/2026 02:17 PM<br>SECOND AMENDED COMPLAINT, FILED. | 28 |
| 12/31/2025 08:55 AM<br>PROTHONOTARY CERTIFICATE OF SERVICE. FILED. PARTIES NOTIFIED PURSUANT TO RULE 236 ON: 01/06/2026 | 0 |
| 12/31/2025 08:55 AM<br>ORDER FOR CONTINUANCE, FILED.<br>PRETRIAL CONFERENCE TO BE HELD IN OCTOBER 2027; TRIAL TO BE HELD IN DECEMBER 2027 | 2 |
| 12/26/2025 10:20 AM<br>PRAECIPE FOR WITHDRAW OF APPEARANCE & PRAECIPE FOR ENTRY OF APPEARANCE, FILED.<br>MICHAEL MCTIGUE, JR., ESQ. & MEREDITH SLAWE, ESQ. FOR ERIN LEFFLER, ESQ., JENNIFER MCLOONE, ESQ., AND ANNA GADBERRY, ESQ. OBO DEFENDANTS | 2 |
| 12/24/2025 10:20 AM<br>JOINT MOTION TO CONTINUE CASE SCHEDULE, FILED. | 3 |
| 11/04/2025 11:21 AM<br>JOINT STATUS UPDATE AND PROPOSED SCHEDULE, FILED. | 3 |
| 09/24/2025 12:44 PM<br>JOINT STATUS UPDATE AND STIPULATION TO CONTINUE STAY PENDING MEDIATION, FILED. | 3 |
| 07/23/2025 02:34 PM<br>JOINT STATUS UPDATE AND STIPULATION TO CONTINUE STAY PENDING MEDIATION, FILED. | 2 |
| 03/27/2025 10:13 AM<br>PROTHONOTARY CERTIFICATE OF SERVICE. FILED. PARTIES NOTIFIED PURSUANT TO RULE 236 ON: 03/27/2025 | 0 |

## Prothonotary Docket Entries

| | |
|---|---|
| 03/27/2025 10:13 AM<br>ORDER, FILED. MATTER IS STAYED UNTIL 07/22/2025<br>COUNSEL TO FILE STATUS UPDATE ON OR BEFORE 07/22/2025 | 1 |
| 03/24/2025 01:58 PM<br>JOINT STIPULATION TO STAY CASE DEADLINES PENDING MEDIATION, FILED. PROPOSED ORDER | 5 |
| 03/06/2025 12:43 PM<br>PROTHONOTARY CERTIFICATE OF SERVICE. FILED. PARTIES NOTIFIED PURSUANT TO RULE 236 ON: 03/10/2025 | 0 |
| 03/06/2025 12:43 PM<br>ORDER SCHEDULING PRETRIAL CONFERENCE, FILED. 07/03/2025 1:30PM CR #1<br>CIVIL JURY TRIAL SCHEDULED 09/08/2025 8:30AM CR #1 | 1 |
| 02/10/2025 08:37 AM<br>PROTHONOTARY CERTIFICATE OF SERVICE. FILED. PARTIES NOTIFIED PURSUANT TO RULE 236 ON: 02/11/2025 | 0 |
| 02/10/2025 08:37 AM<br>OPINION AND ORDER RE PRELIMINARY OBJECTIONS FILED. | 21 |
| 11/27/2024 04:11 PM<br>PROTHONOTARY CERTIFICATE OF SERVICE. FILED. PARTIES NOTIFIED PURSUANT TO RULE 236 ON: 12/02/2024 | 0 |
| 11/27/2024 04:11 PM<br>ORDER, FILED. MOTION TO DESIGNATE CASE AS COMPLEX AND SET CLASS CERTIFICATION BRIEFING SCHEDULE IS GRANTED | 1 |
| 11/25/2024 04:24 PM<br>PLAINTIFF'S UNCONTESTED MOTION TO DESIGNATE CASE AS COMPLEX AND SET CLASS CERTIFICATION BRIEFING SCHEDULE, FILED. PROPOSED ORDER | 4 |
| 09/27/2024 02:15 AM<br>PLAINTIFF'S NOTICE OF SUPPLEMENTAL AUTHORITY, FILED. | 4 |
| 09/16/2024 01:15 PM<br>MAIL RETURNED, FILED.<br>PHILIP FRAIETTA, ESQ. | 2 |
| 09/16/2024 01:04 PM<br>MAIL RETURNED, FILED.<br>STEPHEN BECK, ESQ. | 2 |
| 08/06/2024 03:57 PM<br>PROTHONOTARY CERTIFICATE OF SERVICE. FILED. PARTIES NOTIFIED PURSUANT TO RULE 236 ON: 08/07/2024 | 0 |
| 08/06/2024 03:57 PM<br>ORDER RE MOTION FOR ADMISSION PRO HAC VICE IS GRANTED, FILED. JENNIFER MCLOONE, ESQ, OBO DEFENDANTS | 2 |
| 08/05/2024 01:42 PM<br>PROTHONOTARY CERTIFICATE OF SERVICE. FILED. PARTIES NOTIFIED PURSUANT TO RULE 236 ON: 08/06/2024 | 0 |

## Prothonotary Docket Entries

08/05/2024 01:42 PM   1
STATUS CONFERENCE ORDER SETTING FILING DEADLINES, FILED.

08/01/2024 01:10 PM   14
MOTION FOR ADMISSION PRO HAC VICE, FILED. JENNIER MCLOONE, ESQ. PROPOSED
ORDER

07/23/2024 11:15 AM   0
PROTHONOTARY CERTIFICATE OF SERVICE. FILED. PARTIES NOTIFIED PURSUANT TO
RULE 236 ON: 07/23/2024

07/23/2024 11:15 AM   1
ORDER RE MOTION FOR ADMISSION PRO HAC VICE IS GRANTED, FILED.
STEPHEN A. BECK, ESQ.

07/19/2024 12:51 PM   10
MOTION FOR ADMISSION PRO HAC VICE, FILED. STEPHEN A. BECK, ESQ. PROPOSED
ORDER

06/14/2024 01:57 PM   2
PRAECIPE TO ENTER APPEARANCE, FILED. MARISSA PEMBROKE, ESQ. OBO DAVID
IRWIN. CERTIFICATE OF SERVICE

06/10/2024 01:19 PM   20
PLAINTIFF'S NOTICE OF SUPPLEMENTAL AUTHORITY, FILED.

06/07/2024 04:25 PM   0
PROTHONOTARY CERTIFICATE OF SERVICE. FILED. PARTIES NOTIFIED PURSUANT TO
RULE 236 ON: 06/11/2024

06/07/2024 04:25 PM   1
ORDER, FILED. MOTION TO CONSOLIDATE HEARINGS IS SUSTAINED. CASE
MANAGEMENT CONFERENCE SHALL BE HELD ON 08/02/2024 2:30PM CR #1, IMMEDIATELY
FOLLOWING ARGUMENT ON DEFENDANT'S PRELIMINARY OBJECTIONS

05/28/2024 11:25 AM   18
PLAINTIFF'S RESPONSE AND BRIEF IN OPPOSITION TO DEFENDANTS' PRELIMINARY
OBJECTIONS TO PLAINTIFF'S FIRST AMENDED COMPLAINT, FILED.

05/28/2024 11:25 AM   5
UNOPPOSED MOTION TO CONSOLIDATE HEARINGS, FILED. CERTIFICATE OF SERVICE.
PROPOSED ORDER

05/15/2024 12:40 PM   0
PROTHONOTARY CERTIFICATE OF SERVICE. FILED. PARTIES NOTIFIED PURSUANT TO
RULE 236 ON: 05/16/2024

05/15/2024 12:40 PM   1
ORDER RE MOTION FOR ADMISSION PRO HAC VICE IS GRANTED, FILED.
PHILIP FRAIETTA, ESQ. ENTERED OBO DAVID IRWIN

05/13/2024 12:33 PM   15
MOTION FOR ADMISSION PRO HAC VICE, FILED. PHILIP FRAIETTA, ESQ. PROPOSED
ORDER

05/07/2024 01:34 PM   0
PROTHONOTARY CERTIFICATE OF SERVICE. FILED. PARTIES NOTIFIED PURSUANT TO
RULE 236 ON: 05/07/2024

(c) CountySuite Prothonotary, Teleosoft, Inc.

# Prothonotary Docket Entries

| | |
|---|---|
| 05/07/2024 01:34 PM | 15 |
| STIPULATED PROTECTIVE ORDER, FILED. | |
| 05/06/2024 04:01 PM | 2 |
| PRAECIPE TO ENTER APPEARANCE, FILED. ALEX KASHURBA, ESQ OBO DAVID IRVIN. CERTIFICATE OF SERVICE | |
| 05/03/2024 03:24 PM | 16 |
| JOINT MOTION FOR ENTRY OF STIPULATED PROTECTIVE ORDER, FILED. | |
| 05/01/2024 11:18 AM | 19 |
| PLAINTIFF'S RESPONSE AND BRIEF IN OPPOSITION TO DEFENDANTS' PRELIMINARY OBJECTIONS TO PLAINTIFF'S FIRST AMENDED COMPLAINT, FILED. CERTIFICATE OF SERVICE | |
| 04/26/2024 03:01 PM | 0 |
| PROTHONOTARY CERTIFICATE OF SERVICE. FILED. PARTIES NOTIFIED PURSUANT TO RULE 236 ON: 04/26/2024 | |
| 04/26/2024 03:01 PM | 1 |
| ORDER LISTING CASE FOR ARGUMENT, FILED. LISTED FOR ORAL ARGUMENT ON 6/7/24 2PM. BRIEFING SCHEDULE | |
| 04/23/2024 12:49 PM | 3 |
| PRAECIPE FOR DISPOSITION, FILED. CERTIFICATE OF SERVICE | |
| 04/12/2024 01:45 PM | 48 |
| DEFENDANTS' PRELIMINARY OBJECTIONS TO PLAINTIFF'S AMENDED CLASS ACTION COMPLAINT, FILED. MEMORANDUM. CERTIFICATE OF SERVICE. PROPOSED ORDER | |
| 03/22/2024 01:34 PM | 25 |
| AMENDED COMPLAINT, FILED. | |
| 03/21/2024 03:46 PM | 0 |
| PROTHONOTARY CERTIFICATE OF SERVICE, FILED.  PARTIES NOTIFIED PURSUANT TO RULE 236.  DATE SERVED: 03/21/2024 | |
| 03/21/2024 03:46 PM | 1 |
| ORDER RE CASE DESIGNATION AND SCHEDULING CASE MANAGEMENT CONFERENCE, FILED. STANDARD TRACK. CONFERENCE 06/10/2024 1:30PM CR #1 | |
| 03/04/2024 03:15 PM | 1 |
| CASE CORRESPONDENCE, FILED. PRELIMINARY OBJECTIONS MUST HAVE PRAECIPE FOR DISPOSITION | |
| 03/01/2024 02:50 PM | 96 |
| DEFENDANTS' PRELIMINARY OBJECTIONS TO PLAINTIFF'S COMPLAINT, FILED. MEMORANDUM. CERTIFICATE OF SERVICE. PROPOSED ORDER | |
| 02/12/2024 12:43 PM | 3 |
| ACCEPTANCE OF SERVICE AND STIPULATION TO EXTEND TIME FOR DEFENDANTS TO RESPOND TO PLAINTIFF'S CLASS ACTION COMPLAINT, FILED. CERTIFICATE OF SERVICE. | |
| 02/12/2024 12:43 PM | 2 |
| PRAECIPE TO ENTER APPEARANCE, FILED. ERIN LEFFLER, ESQ. OBO DEFENDANTS. CERTIFICATE OF SERVICE. | |

## Prothonotary Docket Entries

| | |
|---|---|
| 12/21/2023 03:06 PM | 0 |
| SHERIFF SERVICE | |
| 12/21/2023 03:06 PM | 25 |
| COMPLAINT IN CIVIL ACTION LAW FILED. | |
| 12/21/2023 03:06 PM | 1 |
| PRAECIPE TO ENTER APPEARANCE, FILED. OBO PLTF | |

| | |
|---|---|
| **Total Number of Pages:** | **432** |

(c) CountySuite Prothonotary, Teleosoft, Inc.