## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JAMES ROBERT MARTIN | : | |
| 1517 Black Gap Road | : | |
| Fayetteville, PA 17222 | : | |
| | : | CIVIL ACTION |
| Plaintiff, | : | |
| v. | : | No.: |
| | : | |
| TA OPERATING, LLC d/b/a TRAVEL | : | |
| CENTERS OF AMERICA | : | |
| 24601 Center Ridge Road | : | |
| Westlake, OH 44145-5634 | : | **JURY TRIAL DEMANDED** |
| | : | |
| Defendant. | : | |
| | : | |

## CIVIL ACTION COMPLAINT

Plaintiff, James Martin (hereinafter referred to as "Plaintiff"), by and through his undersigned counsel, hereby avers as follows:

## INTRODUCTION

1.    Plaintiff has initiated this action to redress violations by TA Operating, LLC d/b/a TravelCenters of America (hereinafter referred to as "Defendant") of the Americans with Disabilities Act, as amended ("ADA" - 42 U.S.C. §§ 12101 *et. seq*.), the Family and Medical Leave Act ("FMLA" - 29 U.S.C. §2601 et seq.), Title VII of the Civil Rights Act of 1964 ("Title VII" – 42 U.S.C. §§ 200(d) et. seq), Section 1981 of the Civil Rights Act of 1866 ("Section 1981" – 42 U.S.C. § 1981), and the Pennsylvania Human Relations Act ("PHRA").[1]  Plaintiff was unlawfully terminated by Defendant, and he suffered damages more fully described/sought herein.

---

[1] Plaintiff intends to amend his instant lawsuit to include claims under the PHRA once his administrative remedies are fully exhausted with the Pennsylvania Human Relations Commission ("PHRC").

## JURISDICTION AND VENUE

2.     This Court has original subject matter jurisdiction over the instant action pursuant to 28 U.S.C. §§ 1331 and 1343(a)(4), because it arises under the laws of the United States and seeks redress for violations of federal laws.  There lies supplemental jurisdiction over Plaintiff's state-law claims because they arise out of the same common nucleus of operative facts as Plaintiff's federal claims asserted herein.

3.     This Court may properly maintain personal jurisdiction over Defendant because its contacts with this state and this judicial district are sufficient for the exercise of jurisdiction over Defendant to comply with traditional notions of fair play and substantial justice, satisfying the standard set forth by the United States Supreme Court in *Int'l Shoe Co. v. Washington,* 326 U.S. 310 (1945), and its progeny.

4.     Pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2), venue is properly laid in this district because Defendant is deemed to reside where it is subjected to personal jurisdiction, rendering Defendant a resident of the Middle District of Pennsylvania.

5.     Plaintiff filed a Charge of discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC") and also dual-filed said charge with the Pennsylvania Human Relations Commission ("PHRC").  Plaintiff has properly exhausted his administrative proceedings before initiating this action by timely filing and dual-filing his Charges with the EEOC and PHRC, and by filing the instant lawsuit within 90 days of receiving right-to-sue letters from the EEOC.

## PARTIES

6.     The foregoing paragraphs are incorporated herein their entirety as if set forth in full.

7.     Plaintiff is an adult who resides at the above-captioned address.

8.     TA Operating, LLC d/b/a TravelCenters of America operates travel centers providing retail services to the general public in 44 states, including the Petro Stopping Center in Carlise, Pennsylvania, where Plaintiff was employed.  Defendant is headquartered at the above-captioned location.

9.     At all times relevant herein, Defendant acted by and through its agents, servants and employees, each of whom acted at all times relevant herein in the course and scope of their employment with and for Defendant.

## FACTUAL BACKGROUND

10.     The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

11.     Plaintiff was employed by Defendant for approximately 15 months as a Profit Center Manager ("PCM"), from in or about July of 2024, until his unlawful termination/constructive termination (discussed further *infra*) on or about September 26, 2025.

12.     Throughout his employment with Defendant, Plaintiff worked out of Defendant's Carlise, Pennsylvania Petro Stopping Center.

13.     Plaintiff was primarily supervised by General Manager, Christina Deichler (hereinafter "Deichler") and generally by District Manager, Steve Schwartz (hereinafter "Schwartz").

### -Disability Discrimination-

14.     Plaintiff has and continues to suffer from ADA-qualifying disabilities, including but not limited to epilepsy and seizure-related complications (among other health issues).

15.     As a result of Plaintiff's aforesaid health conditions, he (at times) suffered from seizures, uncontrollable movements, and loss of consciousness, which sometimes limits his ability

to perform some daily life activities such as driving, exercising, and working (among other daily life activities).

16.    Despite his aforesaid health conditions and limitations, Plaintiff was able to perform his job duties well; however, he (at times) required some reasonable medical accommodations.

17.    At all relevant times hereto, Defendant's management was aware of his aforesaid serious health conditions, as he disclosed the same during his initial interview with then Restaurant Manager, Heather Porter (hereinafter "Porter"), including showing her his medical alert bracelet.

18.    Plaintiff also discussed his health conditions and showed his medical alert bracelet to Deichler at a later date.

19.    Additionally, on or about January 31, 2025, Defendant notified emergency services that Plaintiff had suffered a seizure, with Deichler being present at the time the ambulance was called.

20.    Defendant's management, including but not limited to Deichler, however, exhibited clear frustration and hostility with Plaintiff's need for reasonable medical accommodations almost from the start, with Deichler reaching out to Plaintiff mere hours after he was transported by ambulance to the hospital on or about January 31, 2025, to impatiently inquire when he would be back to work.

21.    Thereafter, on or about May 11, 2025, a colleague transported Plaintiff to UPMC Carlisle Hospital as Plaintiff was displaying symptoms of a seizure.  Plaintiff was treated and released the same day to return to work.

22.    In or about late June of 2025, Plaintiff presented Defendant's management/Human Resources with medical documentation merely indicating that he *may* need the reasonable medical

accommodation of a day or so off from work for recovery if he had any further episodes in the future.

23.    Plaintiff's requests were initially rejected and impeded (despite being very reasonable) with Defendant claiming that Plaintiff's medical documentation was incomplete without further explanation.  Plaintiff requested clarification but was never provided with any further instruction.

24.    Notably, throughout this timeframe, Deichler repeatedly threatened to terminate Plaintiff's employment and attempted to issue him written discipline for largely manufactured and/or petty issues as a result of his health conditions and/or any restrictions that his doctors might have implemented.

25.    Then, on or about August 1, 2025, Plaintiff collapsed at work, suffered a seizure, and was transported again to UPMC Carlisle hospital.

26.    Plaintiff was initially cleared to return to work by the Emergency Room ("ER") doctor on or about August 4, 2025, but Plaintiff's neurologist recommended that Plaintiff remain out of work on medical leave, at which time Plaintiff applied and was approved for FMLA leave.[2]

27.    Thereafter, on or about September 12, 2025, Plaintiff provided Defendant's management with a medical note from his neurologist, dated September 11, 2025, which provided:

> To Whom it May Concern:
>
> James Martin can return to work with restrictions: No driving or use of Heavy Machinery for at least six months. He will be re-evaluated at that

---

[2] It is well established that medical leave is a reasonable accommodation under the Americans with Disabilities Act ("ADA"). *See e.g. Daniel v. T-Mobile USA, Inc*., 2019 U.S. Dist. LEXIS 80003, at *36 (E.D. Pa. 2019)(explaining medical leave is often a "reasonable accommodation" under the ADA and explaining that even up to a 6-month medical leave can be a reasonable accommodation); *Shannon v. City of Phila.*, 1999 U.S. Dist. LEXIS 18089, at *22 (E.D. Pa. 1999)(denying summary judgment and explaining a medical leave for 3-6 months of time is often a "reasonable accommodation").

time. Also note, his FMLA for intermittent time off that was completed August 7, 2025, needs to remain in effect.

Sincerely,

William Bossert, MD

28.     Nonetheless, Plaintiff's return to work was delayed pending approval of his accommodation(s), which were reasonable and could easily have been granted.

29.     Via email dated September 18, 2025, from Relations Coordinator, Kyra Arroyo (hereinafter "Arroyo"), Plaintiff was given "accommodation approval" and permitted to resume working.

30.     Yet Plaintiff would only be allowed to work for about a week more before being indefinitely removed from his job (involuntarily) as explained *infra*.

31.     Specifically, Plaintiff was completely shocked when he received a letter dated September 26, 2025, which stated *inter alia*:

Dear James,

We have received your request for an accommodation along with the completed paperwork completed by your health care provider. Your provider indicates that you are to refrain from operating a motor vehicle for a period of up to 6 months, to be reassessed at that time. TA permitted you to return to work as a Restaurant Profit Center Manager with this restriction in place and with the understanding that you would not be driving during this period of restriction.

It has come to our attention that despite this restriction, you are driving to and from the work site on your days of work. This conduct presents an unacceptable safety risk to yourself, other employees and our customers and is unacceptable.

After careful consideration of this issue, we have determined that we are unable to accommodate your return to work at this time and while you are under the no-driving restriction because of your failure to comply with that restriction. Accordingly, you will be placed on an unpaid leave of absence as an accommodation. This unpaid personal leave will be scheduled 9/27/2025 through 2/7/2026. At the end of this leave you will be required to provide a return-to-work note from your medical provider advising of your ability to return to work and if any medical restrictions that may still apply.

32.     As a result of the aforesaid September 26, 2025 letter, Plaintiff was effectively terminated and/or constructively terminated.

33.    Specifically, Plaintiff was removed from work for nearly half a year (at a minimum with no assurance of being allowed to return with certainty) and with no compensation, causing Plaintiff to seek new employment to survive, sustain, and to have an income.

34.    Plaintiff's job removal (and constructive termination) was blatantly and indefensibly discriminatory and/or retaliatory for many reasons:

a.    Plaintiff's physician knew he worked at a service station and truck stop. The medical note was a limitation on Plaintiff driving work-related vehicles and/or operating heavy machinery within the company during work hours (not applicable to Plaintiff's personal vehicle). Plaintiff's doctor clarified this via a call with Defendant's team. Yet, Plaintiff was still pretextually removed from his job;

b.    There was already significant animosity towards Plaintiff, as he had been denied or impeded with accommodation requests, and getting subjected to pretextual admonishment. Moreover, Plaintiff's complaints about discriminatory treatment were being ignored and/or not properly investigated or resolved (discussed in more detail *infra*). Thus, Defendant was looking for any excuse to remove Plaintiff from the workplace (however absurd);

c.    Even if Defendant truly thought Plaintiff should not be driving, all its management had to do was direct Plaintiff not to drive at all (not place Plaintiff out of work indefinitely). Because Plaintiff financially needed his position, he would have obtained a ride or taken alternative transportation just to remain working. Hence, Plaintiff's removal from work entirely was absolutely unnecessary;

d.    Defendant's aforementioned September 26, 2025 letter is direct evidence of actual or perceived discrimination because of Plaintiff's disabilities or perceived impacts

of his disabilities (expressing concerns with Plaintiff being perceived as a safety risk due to his health);

e.  Driving to and from work was not a job duty or essential function of Plaintiff's role or job position within Defendant, as he had only been required to drive once for the company for training over a year prior. Thus, it was transparently discriminatory to claim Plaintiff's return to work could no longer be accommodated; and

f.  Plaintiff was denied any interactive dialogue or process before a decision was made to remove him from work for such a prolonged period of time in an effort to presumably force his separation from lack of income or benefits.

35.  Plaintiff did not drive or operate machinery in his management role. Plaintiff merely worked physically within Defendant's business location (performing an in-location supervisory role).  However, because Plaintiff's medical personnel knew he worked within a truck stop and service center, it was merely noted he should not operate heavy machinery or vehicles of the business.

36.  Despite Plaintiff clarifying and getting medical clarification (and offering more), Plaintiff was nonetheless placed on involuntary leave and effectively terminated.

37.  Defendant failed to properly accommodate Plaintiff by terminating him directly for requesting/utilizing reasonable medical accommodations (*i.e.*, medical leave and/or the ability to refrain from driving/operating heavy machinery at work – which Plaintiff had never been required to operate during his tenure with Defendant).

38.  Plaintiff believes and therefore avers that he was subjected to discrimination, a hostile work environment, retaliation, and effectively terminated/constructively terminated because of: (1) his known and/or perceived health problems; (2) his record of impairment; (3) his

requested accommodations (*i.e.*, medical leave and the ability to refrain from driving machinery at work); and (4) Defendant's failure to properly accommodate him (discussed *supra*).

39.    Plaintiff also believes and therefore avers that his disabilities were motivating and/or determinative factors in Defendant's termination and/or constructive termination of his employment.

## -Retaliation for Reporting Race and/or Sexual Orientation Discrimination on Behalf of an African American, Lesbian Employee-

40.    Separately and apart from the disability discrimination, hostile work environment, and retaliation that Plaintiff was subjected to during his employment with Defendant (discussed *supra*), Plaintiff also observed and complained about several discriminatory and derogatory comments/conduct by Deichler and other non-Black/Hispanic employees regarding an African American, lesbian employee.

41.    Toward the last several months of his employment with Defendant, Plaintiff received two unfounded complaints from a Caucasian assistant manager and two non-Black/Hispanic employees, that a Black (African American), lesbian employee, Latoya Harris (hereinafter "Harris") was purportedly (1) selling drugs in the restaurant; and (2) being aggressive and violent and shoulder checking the non-Black/Hispanic employees bodily, respectively – two common racial stereotypes of African Americans being drug dealers and/or that Harris was an "angry Black woman,".

42.    Notably, Harris was the only African American and lesbian employee in Plaintiff's department on second shift. Notably,

43.    In investigating the above complaints against his direct report, Harris, Plaintiff found the complaints to be completely manufactured, false, and unfounded as evidenced by

extensive video footage, which actually demonstrated that Harris routinely made a wide berth round the two non-Black/Hispanic employees, ostensibly to avoid any conflict.

44.     Plaintiff complained of what he perceived to be direct racial and sexual orientation discrimination to Deichler (Caucasian), in or about May/June of 2025. However, instead of properly investigating his concerns, Deichler hostilely and discriminatorily stated, "What is that Black, gay, lesbian going to do?"

45.     Deichler, herself, also exhibited extreme prejudice and dislike toward Harris, routinely referring to her as a "Black, gay, lesbian" and as having the "attitude of a Black woman," while questioning why Plaintiff was defending Harris against the aforesaid unsubstantiated complaints.  Plaintiff responded to Deichler that he was doing what was right.

46.     Plaintiff further advised Deichler that she and the other non-Black/Hispanic employees were discriminating against Harris based on her race and/or sexual orientation, which was outright illegal, and that Harris would likely file a lawsuit.

47.     In response to Plaintiff advocating on behalf of Harris, Deichler began laughing as if it were a big joke and dismissed Plaintiff's concerns.

48.     Plaintiff also advised Harris to complain to Team Member Relations ("TMR"), and to also report it to Defendant's parent company's (British Petroleum ("BP")) Ethics Point Hotline.

49.     Because Plaintiff's aforesaid complaints on behalf of Harris went unaddressed, and the non-Black/Hispanic employees continued to make unfounded accusations against Harris, in or about June of 2025, Plaintiff reached out to Schwartz, who set up a call with TMR representative, Taura Jefferson (African American).

50.     Schwartz demanded that they set up a resolution, and Jefferson said there would be a resolution at the end of that business day, but it never transpired.

51.     Then, in retaliation for Plaintiff advocating for his African American, lesbian employee, he was effectively demoted, with Deichler stripping him of all managerial powers, and he was delegated primarily to line cook duties.

52.     Plaintiff's former direct reports were then advised to contact Deichler only.

53.     Notably, just a few weeks later, in or about July of 2025, Harris was discriminatorily and pretextually fired for a purported "no call no show," despite that she had informed Plaintiff that she would not be in, which he approved.

54.     Then, in close proximity to complaining of and objecting to racial and/or gender orientation discrimination on behalf of Harris to Defendant's management, Plaintiff was abruptly terminated and/or constructively terminated on or about September 26, 2025, for completely pretextual reasons (discussed further *infra*).

55.     Plaintiff believes and therefore avers but for his complaints of race and/or sexual orientation discrimination on behalf of an African American, lesbian employee, he would not have been terminated and/or constructively terminated from his position with Defendant.

## COUNT I
### Violations of the Americans with Disabilities Act, as Amended ("ADA")
(1] Actual/Perceived/Record of Disability Discrimination; [2] Failure to Accommodate; [3] Retaliation; and [4] Hostile Work Environment)

56.     The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

57.     Plaintiff suffered from qualifying health conditions under the ADA which affected his ability (at times) to perform some daily life activities.

58.     Despite Plaintiff's aforementioned health conditions and limitations, he was still able to perform the duties of his job well with Defendant, however, Plaintiff did require reasonable medical accommodations at times.

59.     Plaintiff kept Defendant informed of his serious medical conditions and need for medical treatment and other accommodations.

60.     Plaintiff requested very reasonable accommodations from Defendant, including but not limited intermittent and/or block medical leave to care for and treat his aforesaid disabilities, as well as the ability to refrain from driving machinery at work.

61.     Plaintiff was subjected to hostility and animosity by Defendant's management as a result of his aforesaid health conditions and requested accommodations through disparate and discriminatory treatment, as well as pretextual admonishment and/or discipline.

62.     Plaintiff was then abruptly terminated and/or constructively terminated on or about September 26, 2025, for completely pretextual reasons.

63.     Defendant failed to properly accommodate Plaintiff by terminating and/or constructively him directly for requesting/utilizing reasonable medical accommodations (*i.e.*, medical leave and/or the ability to refrain from driving machinery at work).

64.     Plaintiff believes and therefore avers that he was subjected to discrimination, a hostile work environment, retaliation, and effectively terminated and/or constructively terminated because of: (1) his known and/or perceived health problems; (2) his record of impairment; (3) his requested accommodations (*i.e.*, medical leave and the ability to refrain from driving machinery at work); and (4) Defendant's failure to properly accommodate him (discussed *supra*).

65.     Plaintiff believes and therefore also avers that his disabilities were motivating and/or determinative factors in Defendant's termination and/or constructive termination of his employment.

66.     Defendant's actions as aforesaid constitute violations of the ADA.

## COUNT II
## <u>Violations of the Family and Medical Leave Act ("FMLA")</u>
### (Retaliation & Interference)

67.    The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

68.    Plaintiff was an eligible employee under the definitional terms of the FMLA, 29 U.S.C. § 2611(a)(i)(ii).

69.    Plaintiff requested leave for medical reasons from Defendant, his employer, with whom he had been employed for at least twelve months pursuant to the requirements of 29 U.S.C.A § 2611(2)(i).

70.    Plaintiff had at least 1,250 hours of service with Defendant during his last full year of employment.

71.    Defendant is engaged in an industry affecting commerce and employs fifty (50) or more employees for each working day during each of the twenty (20) or more calendar work weeks in the current or proceeding calendar year, pursuant to 29 U.S.C.A § 2611(4)(A)(i).

72.    Plaintiff was entitled to receive leave pursuant to 29 U.S.C.A § 2612 (a)(1) for a total of twelve (12) work weeks of leave on a block or intermittent basis.

73.    Defendant committed interference and retaliation violations of the FMLA by: (1) terminating Plaintiff for requesting and/or exercising his FMLA rights and/or for taking FMLA-qualifying leave; (2) considering Plaintiff's FMLA leave needs in making the decision to terminate him; (3)  terminating Plaintiff to intimidate him and/or prevent him from taking FMLA-qualifying leave in the future; and (4) making negative comments and/or taking actions towards him that would dissuade a reasonable person from exercising his rights under the FMLA.

74.    These actions as aforesaid constitute violations of the FMLA.

## COUNT III
## Violations of Title VII
### (Wrongful Termination & Retaliation)

75.    The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

76.    Plaintiff observed and complained about several discriminatory and derogatory comments/conduct by Deichler and non-Black/Hispanic employees regarding an African American, lesbian employee.

77.    Plaintiff objected directly to Deichler and several other members of management regarding the aforementioned discriminatory and derogatory race and/or gender orientation comments on behalf of the African American, lesbian employee throughout his employment with Defendant.

78.    In close proximity to his termination and/or constructive termination, Plaintiff also complained to multiple levels of Defendant's management including Deichler that her discriminatory comments toward the African American lesbian employee were offensive and illegal.

79.    However, instead of properly investing and/or addressing his concerns of race and gender orientation discrimination on behalf of the African American, lesbian employee, Defendant's management retaliatorily removed Plaintiff's managerial duties, and he was effectively demoted to a line cook.

80.    Shortly after complaining of and objecting to race and/or gender orientation discrimination on behalf of the African American, lesbian employee to Defendant, Plaintiff was abruptly terminated and/or constructively terminated on or about September 26, 2025, for completely pretextual reasons.

81.    Plaintiff believes and avers but for his complaints of race and/or sexual orientation discrimination and advocacy on behalf of an African American, lesbian employee, he would not have been terminated and/or constructively terminated from his position with Defendant. [3]

82.    These actions as aforesaid constitute violations of Title VII.

### COUNT IV
### Violations of 42 U.S.C. Section 1981
### (Wrongful Termination & Retaliation)

83.    The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

84.    Plaintiff observed and complained about several discriminatory and derogatory comments/conduct by Deichler and non-Black/Hispanic employees regarding an African American employee.

85.    Plaintiff objected directly to Deichler and several other members of management regarding the aforementioned discriminatory and derogatory race comments on behalf of the African American employee throughout his employment with Defendant.

---

[3] Witnesses to discrimination are protected under § Title VII from retaliation. *See e.g.* 42 U.S.C. § 2000e-3(a) ([P]rotected activity can consist of either: (1) opposing any practice made an unlawful employment practice by this subchapter or (2) making a charge, testifying, assisting, or participating in any manner in an investigation, proceeding, or hearing.); *Crawford v. Metro. Gov't of Nashville & Davidson Cty*., 555 U.S. 271, 279 n.3 (2009) ("[E]mployees will often face retaliation not for opposing discrimination they themselves face, but for reporting discrimination suffered by others."); *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 175 (2d Cir. 2005) (holding Title VII's anti-retaliation clause's protections extended to an employee who was named as a voluntary witness in a Title VII suit); *Abbott v. Crown Motor Co.*, 348 F.3d 537, 542-543 (6th Cir. 2003) ("Title VII broadly protects an employee's participation "in any manner in an investigation, proceeding, or hearing under . . . [Title VII]."); *Crevier-Gerukos v. Eisia Inc.*, 2013 U.S. Dist. LEXIS 202912, at *19-20 (S.D. Cal. 2013) (denying Defendant's motion for reconsideration of denial of summary judgment where there was sufficient evidence in the record to support a claim of retaliation under the anti-retaliation participation clause of Title VII as Defendant was aware that employee had been named a witness in support of co-worker's discrimination suit); *EEOC v. Cal. Psych. Transitions, Inc.*, 725 F. Supp. 2d 1100 (E.D. Cal. 2010), (holding assistance employee provided to co-worker in filing EEOC Charge was protected activity under Title VII).

86.     In close proximity to his termination and/or constructive termination, Plaintiff complained to multiple levels of Defendant's management including Deichler that her discriminatory comments toward the African American employee were offensive and illegal.

87.     However, instead of properly investing and/or addressing his concerns of race discrimination on behalf of the African American employee, Defendant's management retaliatorily removed Plaintiff's managerial duties, and he was effectively demoted to a line cook.

88.     Shortly after complaining of and objecting to race discrimination on behalf of the African American employee to Defendant, Plaintiff was abruptly terminated and/or constructively terminated on or about September 26, 2025, for completely pretextual reasons.

89.     Plaintiff believes and therefore avers but for his complaints of race discrimination on behalf of an African American employee, he would not have been terminated and/or constructively terminated from his position with Defendant.

90.     These actions as aforesaid constitute violations of 42 U.S.C. § 1981.

**WHEREFORE**, Plaintiff prays that this Court enter an Order providing that:

A.     Defendant is to promulgate and adhere to a policy prohibiting discrimination and retaliation in the future against any employee(s);

B.     Defendant is to compensate Plaintiff, reimburse Plaintiff, and make Plaintiff whole for any and all pay and benefits Plaintiff would have received had it not been for Defendant's illegal actions, including but not limited to back pay, front pay, salary, pay increases, bonuses, insurance, benefits, training, promotions, reinstatement, and seniority;

C.     Plaintiff is to be awarded liquidated and/or punitive damages, as permitted by applicable law, in an amount believed by the Court or trier of fact to be appropriate to punish

Defendant for its willful, deliberate, malicious and outrageous conduct and to deter Defendant or other employers from engaging in such misconduct in the future;

D.      Plaintiff is to be accorded other equitable and legal relief as the Court deems just, proper, and appropriate (including but not limited to damages for emotional distress/pain and suffering);

E.      Plaintiff is to be awarded the costs and expenses of this action and reasonable attorneys' fees as provided by applicable federal and state law; and

F.      Plaintiff is to be given a jury trial as demanded in the caption of this Complaint.


Respectfully submitted,

**KARPF, KARPF & CERUTTI, P.C.**


By:     _____
        Ari R. Karpf, Esq. (91538)
        8 Interplex Drive, Suite 210
        Feasterville-Trevose, PA 19053
        akarpf@karpf-law.com
        (215) 639-0801

Dated: March 3, 2026