**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| DISABILITY RIGHTS PENNSYLVANIA, | : | |
| | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. _____ |
| | : | |
| PENNSYLVANIA DEPARTMENT OF CORRECTIONS and LAUREL HARRY, in her official capacity as Secretary of the Pennsylvania Department of Corrections, | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| Defendants. | : | |

## COMPLAINT

### I.    Introduction

1.    This action seeks to stop the cruel and unusual punishment of, and discrimination against, prisoners in the Pennsylvania Department of Corrections (DOC) diagnosed with type 1 diabetes. Hundreds of prisoners with type 1 diabetes[1] are denied basic medical care that is the standard of care for people with type 1 diabetes, placing them at substantial risk of serious harm, including immediate risks of loss of consciousness, seizures, coma, and sudden death, and longer-term risks of blindness, amputations, kidney failure, and premature death.

---

[1] Hereinafter referred to as "T1D Prisoners."

2.     The American Diabetes Association developed industry-defining guidelines for providing clinically adequate treatment in detention facilities consistent with the standard of care. Those guidelines are set forth in *Diabetes Management in Detention Facilities: A Statement of the American Diabetes Association* (hereinafter "the ADA Statement"), attached as Appendix A.[2] The DOC's policies, procedures, and practices do not come close to meeting those guidelines or the standard of care. Instead, they rely on antiquated and no longer acceptable treatment modalities and medications.

3.     Despite its knowledge of prisoners' type 1 diabetes and the medical standard of care, the DOC does not provide them with clinically indicated care and disability accommodations, including by refusing to modify its blanket policy against the use of insulin pumps and continuous glucose monitors (CGMs), even for individuals for whom this diabetes technology is clinically indicated. Defendants' failure to provide T1D Prisoners with minimally adequate treatment violates their rights under the Eighth Amendment to the United States Constitution, Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132, and the Rehabilitation

---

[2] Also available here: Diabetes Management in Detention Facilities: A Statement of the American Diabetes Association

Act, 29 U.S.C. § 794.

4.     The DOC also prohibits T1D Prisoners from participating in certain programming and work opportunities that are available to other prisoners, solely on the basis of their disability, and otherwise discriminates against T1D Prisoners through improper imposition of disciplinary sanctions (including isolation) and dangerous uses of force, in violation of Title II of the Americans with Disabilities Act and the Rehabilitation Act.

5.     Defendants DOC and Laurel Harry, the Secretary of the Department, (referred to jointly as "Defendants" or "the DOC") know that their substandard care of T1D Prisoners can and does cause grave harm to their physical health. Despite that knowledge, Defendants are deliberately indifferent to the effects of the DOC's plainly inadequate treatment of these prisoners. Defendants' deliberate indifference and discriminatory treatment violates the Eighth Amendment and discriminates against T1D Prisoners on the basis of their disabilities, in violation of Title II of the Americans with Disabilities Act and the Rehabilitation Act.

6.     Plaintiff, Disability Rights Pennsylvania (DRP), is a non-profit organization designated by the Commonwealth of Pennsylvania pursuant to federal legislation to advocate for and protect the rights of Pennsylvanians with disabilities, including those with type 1 diabetes. DRP

3

seeks injunctive relief requiring Defendant Harry to cease violating the Eighth Amendment, provide T1D Prisoners in the DOC with minimally adequate medical care, and protect them against dangerous and unconstitutional conditions of confinement. In addition, DRP seeks injunctive relief to compel Defendants to cease discriminating against T1D Prisoners on the basis of disability and to comply with Title II of the Americans with Disabilities Act and the Rehabilitation Act.

## II. Jurisdiction and Venue

7. This Court has jurisdiction over these claims pursuant to 28 U.S.C. §§ 1331 and 1343 and 42 U.S.C. § 12132.

8. Plaintiff's claims are authorized by 42 U.S.C. § 1983 and 28 U.S.C. §§ 2201 and 2202.

9. Venue is appropriate in this district pursuant to 28 U.S.C. § 1391(b)(1)–(2) given that the DOC's principal office is located in this district and many of the events and omissions that give rise to the Complaint occurred in this District.

## III. Parties

10. Plaintiff DRP is a non-profit Pennsylvania corporation. DRP and its constituents, individuals with diabetes, have been injured by Defendants' violations of federal law that are the subject of this Complaint.

4

11. The Commonwealth of Pennsylvania designated DRP as the protection and advocacy system pursuant to the federal Protection and Advocacy of Individual Rights Act (PAIR Act), 29 U.S.C. § 794e. This statute mandates that DRP work to protect the rights of all Pennsylvanians with disabilities not otherwise covered by the Protection and Advocacy for Individuals with Mental Illness Act (PAIMI Act), 42 U.S.C. §§ 10801 *et seq.* and the Developmental Disabilities Assistance and Bill of Rights Act of 2000 (DD Act), 42 U.S.C. §§ 15001 *et seq*.

12. The PAIR Act applies to all individuals with disabilities who are not diagnosed with developmental disabilities or mental illness as defined by the DD and PAIMI Acts. 29 U.S.C. § 794e(a)(1)(B).

13. The PAIR Act authorizes DRP to investigate incidents of abuse and neglect of individuals with disabilities when the incidents are reported or there is probable cause to believe that the incidents occurred. 42 U.S.C. § 15043(a)(2)(B) (incorporated by reference in the PAIR Act, 29 U.S.C. § 794e(f)(2)).

14. Additionally, the PAIR Act gives DRP the authority to "pursue legal, administrative, and other appropriate remedies or approaches to ensure the protection of, and advocacy for, the rights of" individuals covered by the Act. 29 U.S.C. § 794e(f)(3).

15. Individuals with disabilities covered by the PAIR Act are substantially involved in DRP's governance, such as by serving on DRP's board.

16. DRP annually establishes goals and priorities based on public input. *Id.* § 794e(f)(5)(A).

17. DRP has a grievance procedure to ensure individuals with disabilities have full access to DRP's services. *Id.* § 794e(f)(6).

18. DRP provides information and referral services, individual representation, education, and other services to individuals with PAIR-eligible disabilities on an array of issues, including, *inter alia*, abuse and neglect; access to community-based services; access to health care; unnecessary institutionalization; and discrimination in housing, employment, government services, prisons and jails, and public accommodations.

19. DRP has spent time, money, and resources assisting T1D Prisoners who are harmed by Defendants' unlawful practices, including as described below. These expenditures of time, money, and resources diverted DRP staff from other activities for their constituents.

20. DRP's constituents include T1D Prisoners who have been or will be harmed by Defendants' illegal policies, practices, and procedures.

21.    DRP's constituents include T1D Prisoners within the DOC who are at serious risk of coercion, intimidation, and abuse if they come forward individually.

22.    Before resorting to litigation, DRP undertook an investigation into the DOC's care and treatment of T1D Prisoners. Through its access authority, it obtained the names of all T1D Prisoners incarcerated in the DOC. According to the DOC, as of May 12, 2025, there were 190 T1D Prisoners in custody at State Correctional Institutions (SCIs). DRP sent a letter to at least one T1D Prisoner at each of the Commonwealth's 23 SCIs, informing them of its investigation, seeking information, and requesting permission to review their DOC records, including grievances, requests for reasonable accommodation, and medical records. Based on the written responses it received, DRP personnel then scheduled calls with 22 individuals, and requested the records of 29 individuals. DRP personnel then reviewed and evaluated these records with the aid of a medical doctor with expertise in correctional medicine and significant experience treating incarcerated individuals with type 1 diabetes, as well as an endocrinologist with expertise in diabetes treatment in detention settings.

23.    DRP has read and responded to numerous letters received from Pennsylvania prisoners with diabetes and scheduled legal calls with

7

numerous T1D Prisoners to gather information about their experiences and serious concerns about deficiencies in the diabetes care provided to them by the DOC.

24.    The following nine T1D Prisoners' experiences illustrate Defendants' inadequate policies and practices for diabetes care, and Defendants' routine and ongoing neglect of the needs of T1D Prisoners:

- Prisoner #1 has had type 1 diabetes for 32 years. He is currently incarcerated at SCI Waymart. He is prescribed short-acting insulin, which fails to keep his blood glucose at clinically acceptable levels. Prisoner #1's blood glucose is unpredictable, and he regularly experiences severe episodes of both hypoglycemia and hyperglycemia. Prisoner #1 has repeatedly been hospitalized for diabetic ketoacidosis (DKA) after the DOC failed to give him necessary basal insulin doses on multiple occasions. He has also been hospitalized for hypoglycemia. The DOC fails to provide him with appropriate insulin coverage for the carbohydrates he consumes. Prisoner #1 requested to use an insulin pump and CGM but was denied on the basis that it was "[n]ot medically necessary as glucose can be adequately controlled with the treatment regimen ordered." Prisoner #1's A1C at the time was 9.8, indicating his blood glucose

8

was not "adequately controlled."

- Prisoner #2 has had type 1 diabetes for 43 years. She is currently incarcerated at SCI Muncy. Prisoner #2 has developed many complications from her diabetes, including gastroparesis, retinopathy with macular edema, chronic kidney disease, foot drop, neuropathy, and Hyperlipidemia. She has a kidney transplant. Prisoner #2 has repeatedly requested to use an insulin pump, as her blood glucose is poorly managed on insulin injections, but the DOC has repeatedly denied these requests. She has made the requests to both medical staff and the DOC's Americans with Disabilities Act Coordinator, both of whom denied them: medical staff on the basis that insulin pumps are not allowed in the DOC, and the Americans with Disabilities Act Coordinator on the basis that the use of an insulin pump is a clinical decision which should be made by facility medical staff. Prisoner #2 has also requested various modifications of the DOC's policies and procedures to allow her equal access to the prison's program, including the ability to take her insulin shots outside of the pre-scheduled times so that she could have an opportunity to participate in visits that is equal to what is offered to prisoners without diabetes. These requests for accommodation have been denied by the DOC.

9

Prisoner #2 does not have access to fast-acting glucose in her cell, which has resulted in her losing consciousness on multiple occasions during episodes of hypoglycemia.

- Prisoner #3 has had type 1 diabetes for 39 years. He is currently incarcerated at SCI Rockview. He is prescribed an antiquated short-acting insulin that is ineffective at managing his blood glucose levels. His request to receive rapid-acting insulin consistent with today's standard of care has been denied, without clinically based justification, resulting in repeated incidents of severe hypoglycemia and hyperglycemia. He has requested fast-acting glucose supplies to treat hypoglycemia, but the DOC denied the request. While in DOC custody, Prisoner #3 has also faced unlawful disability discrimination based on his diabetes. He applied to participate in the DOC's Forestry Unit Program, a vocational training program. The DOC rejected his application solely on the basis of his diabetes, without the legally required individualized assessment of his ability to participate in the program (including with reasonable accommodations).

- Prisoner #4 has had type 1 diabetes for 14 years. She is currently incarcerated at SCI Cambridge Springs. During her incarceration, Prisoner #4 has had multiple instances of low blood sugar which

10

caused her to lose consciousness. She requested to use a CGM and insulin pump to help address her hypoglycemia but was denied by the DOC. She thus remains at substantial risk of experiencing further episodes of hypoglycemia that may result in seizure, loss of consciousness, or death. Her average blood glucose is significantly higher than it should be, putting her at substantial risk of developing dangerous and irreversible complications from her diabetes. The DOC has withheld necessary insulin doses from Prisoner #4 without clinical justification. It has also failed to make necessary adjustments to her insulin doses, such as when she was prescribed Prednisone, a medication known for raising blood glucose levels and increasing insulin needs. As a result, Prisoner #4 was and is at substantial risk of developing DKA and serious long-term health complications.

- Prisoner #5 has had type 1 diabetes for 50 years. He is currently incarcerated at SCI Huntingdon. Prisoner #5 experiences both hypoglycemia and hyperglycemia, but the DOC has failed to take the steps necessary to get his blood glucose to clinically acceptable levels. It has not assessed him for use of a CGM or insulin pump, despite evidence that he would benefit from the use of this technology. For example, Prisoner #5 has hypoglycemia

11

unawareness which increases his risk of experiencing dangerous hypoglycemic episodes. The use of CGM and insulin pump technology would greatly reduce this risk. His average blood glucose over the past two years has hovered around 250, which is significantly higher than clinical goals and puts Prisoner #5 at risk of worsening his already existing diabetic retinopathy, which is a precursor to blindness.

- Prisoner #6 has had type 1 diabetes for 30 years. He is currently incarcerated at SCI Mercer. The DOC inadequately manages his diabetes, as evidenced by a recent A1C of 13, putting him at substantial risk of developing complications from his diabetes, including blindness, amputation of a limb, and premature death. The DOC ignored the prescribing decisions of Prisoner #6's community endocrinologist and instead chose to prescribe him antiquated short-acting insulin and a clinically inappropriate dose of long-acting insulin. In the community, he received rapid-acting insulin. Medical staff has prescribed Prisoner #6 specialized footwear due to persistent wounds on his feet that fail to heal, but the DOC failed to provide him with this medical equipment.

- Prisoner #7 was diagnosed with type 1 diabetes prior to his

12

incarceration. He was incarcerated at SCI Phoenix until he was released on parole in 2025. While he was incarcerated, the DOC stopped all bolus insulin coverage for Prisoner #7's consumed carbohydrates because he experienced severe hypoglycemia, particularly in the overnight hours. This denial of insulin was not medically appropriate, and because of it, his blood sugars became extremely uncontrolled, increasing his risk of developing devastating complications from his diabetes.

- Prisoner #8 has had type 1 diabetes for 32 years. He is currently incarcerated at SCI Greene. He is prescribed antiquated short-acting and intermediate-acting insulins that have failed to adequately manage his blood glucose levels. His records show extremely elevated blood glucose levels for long periods of time, without the timely provision of insulin in response. His average glucose levels are extremely high, putting him at substantial risk of developing diabetes-related health complications. He has been denied insulin without clinical justification, resulting in dangerous hyperglycemia. In one incident, the DOC withheld all insulin from him, and Defendants ignored the resulting hyperglycemia. Doctors treating him at an outside facility for another medical condition identified his elevated

13

blood glucose and sent him directly to the emergency room, where he was given rapid-acting insulin that likely saved him from DKA, coma, and even death. He has also experienced numerous dangerous hypoglycemic incidents. In one case, he lost consciousness due to severely low blood glucose, requiring emergency medical response. Shortly after that incident, the provision of fast-acting glucose supplies to treat his hypoglycemia was inexplicably discontinued for more than a month. He has never been assessed for an insulin pump or CGM, despite indications that they would provide clinical benefit for his diabetes management.

- Prisoner #9 has had type 1 diabetes for 20 years. She is currently incarcerated at SCI Muncy. When Prisoner #9 entered the DOC on an insulin pump and CGM, the DOC immediately removed this medically prescribed technology, and the DOC then withheld her required basal insulin dose for over 24 hours, putting her at substantial risk of developing DKA. Prisoner #9 does not receive any insulin for her carbohydrates consumed, resulting in regularly elevated blood glucose levels. Prisoner #9 has requested to be put back on a CGM and to be prescribed rapid-acting insulin, which was the insulin she was prescribed in the community. The DOC has

14

denied these requests, and Prisoner #9 therefore remains at substantial risk of developing complications from her diabetes.

25.    Defendant DOC is an agency of the Commonwealth of Pennsylvania. The DOC is responsible for operating the Commonwealth's 23 SCIs. In so doing, it must ensure that T1D Prisoners are provided with adequate medical services, including by creating and implementing policies that comply with the medical standard of care. The DOC must also modify policies as necessary to ensure that T1D Prisoners have equal access to prison programming. The DOC receives federal funding.

26.    The DOC contracts with a private third-party health care provider (currently Wellpath) to provide some of the medical care to those incarcerated at its facilities, but by law retains the ultimate authority over, and legal responsibility for, the health care, treatment, disability accommodations, and conditions of confinement of DOC prisoners.

27.    Defendant Laurel Harry is the Secretary of the Pennsylvania DOC, and she is responsible for overall oversight, operation, and administration of the Commonwealth's prison system. As Secretary, she is charged with creating and implementing policies that ensure T1D Prisoners receive constitutionally adequate medical treatment. Defendant Harry is

15

sued solely in her official capacity for acts and omissions under color of state law.

## IV.  Factual Allegations

28.    The DOC is the Commonwealth entity tasked with imprisoning individuals sentenced to serve state time. On any given day, there are approximately 38,000 prisoners in custody at the DOC's 23 SCIs. Approximately 190 of them, or 0.5% of the DOC prisoner population, are diagnosed with type 1 diabetes.

### A.    Type 1 Diabetes and Standards of Care, Including in Detention Settings

29.    Type 1 diabetes is an auto-immune condition affecting approximately 2 million Americans. The immune systems of individuals with type 1 diabetes mistakenly attack beta cells in their pancreases. These cells are needed to produce insulin, a hormone that helps the body convert blood glucose into energy. Once a person's immune system attacks enough of their beta cells, their pancreas can no longer make insulin, causing them to develop diabetes. Without insulin, glucose accumulates in their bloodstream because it cannot enter their cells. This is called hyperglycemia or high blood glucose, or in colloquial terms, "high blood sugar."

30.    High blood sugar can cause lethargy, general malaise, extreme

16

thirst, frequent urination, coma, DKA, and sudden death. DKA is a life-threatening complication of diabetes which results from insulin deficiency and causes the body to break down fat for fuel, creating high levels of acidic blood chemicals called ketones.

31.    Over time, high blood sugar can cause serious diabetes-related health complications, including, but not limited to: neuropathy, kidney disease, eye disease and blindness, cardiovascular disease, nerve damage, reduced circulation, limb loss, hearing loss, stroke, and oral and skin complications.

32.    The *Standards of Care in Diabetes* is the current clinical practice guidance of the American Diabetes Association, and it is the *de facto* standard-setting document for the care and treatment of diabetes in the United States. Upon information and belief, Defendants are aware of the American Diabetes Association guidelines and, according to the DOC's contract with its medical provider, Wellpath, those guidelines were meant to inform the DOC's system for diabetes care.

33.    The American Diabetes Association's Statement *Diabetes Management in Detention Facilities* (Appendix A) explains how clinical practice guidance should be adhered to in a carceral setting. It represents the collective opinions of the country's leading diabetes experts regarding

how incarcerated individuals with diabetes should be cared for. Failure to adhere to clinical guidelines set forth in the ADA Statement represents a deviation from the medical standard of care.

34.    To appropriately manage their diabetes and overall health, individuals with type 1 diabetes must take daily insulin, either via injections or an insulin pump, regularly monitor their blood glucose levels, track what they are eating, and ensure they receive periodic monitoring and screening for the complications of diabetes. In the prison setting, the system must implement policies, procedures, and training as necessary to ensure that every patient has access to each of these components of the diabetes management regimen, consistent with individualized circumstances and needs.

### 1.    Insulin Types Necessary for Effective Glucose Management

35.    Individuals with type 1 diabetes require the administration of insulin every day to survive. Insulin can be administered via injection, inhaler, or an insulin pump. If taking insulin via injection, individuals with type 1 diabetes generally require two different types of insulin: a long-acting basal insulin and a rapid-acting bolus insulin.

36.    Long-acting insulin remains active in the body for as long as 40 hours, and mimics what the pancreas does in a person without diabetes,

18

which is to produce a continuous, low-level of active insulin. This is referred to as "basal" or background insulin. Use of long-acting insulin is the standard of care for people with type 1 diabetes.

37.   Rapid-acting insulins mimic how the human body releases insulin after eating or drinking for people with a functioning pancreas. Rapid-acting insulins begin working to reduce blood sugar levels approximately five to fifteen minutes after they are injected, and they reach their peak effectiveness after approximately 45 to 75 minutes. Rapid-acting insulin is the standard of care for people with type 1 diabetes because it is generally the most effective bolus insulin at preventing a sharp rise in blood sugar after consuming carbohydrates. It works more quickly than other types of bolus insulin to bring down elevated blood sugar levels. Use of rapid-acting insulin decreases the risk of developing diabetic complications.

38.   Intermediate-acting insulin is another type of basal insulin. Intermediate-acting insulin is called Neutral Protamine Hagedorn (NPH). Intermediate-acting basal insulin is no longer considered the standard of care, because individuals can achieve better control of their blood sugar levels when using a long-acting basal insulin.

39.   Short-acting insulin is another type of bolus insulin. It is often called "regular insulin," or "R." Short-acting insulin is no longer considered

the standard of care for the treatment of type 1 diabetes, because rapid-acting insulin works faster, allowing individuals with type 1 diabetes to maintain better control of their blood sugars.

40.    The DOC, by policy and practice, does not utilize the rapid-acting insulins that are the standard of care for treatment of T1D Prisoners. The DOC also frequently and improperly withholds basal insulin without appropriate clinical justification. The DOC regularly, and without regard to patients' prior diabetes management plans or current clinical indication, utilizes intermediate or short-acting insulins that are inconsistent with the standard of care as set forth by the American Diabetes Association and other expert entities.

### 2. Diabetes Technology: Insulin Pumps and Continuous Glucose Monitors (CGMs)

41.    Insulin can be administered via an insulin pump, a wearable medical device that contains a reservoir of rapid-acting insulin which is continuously "pumped" into the wearer's body via a small canula placed under their skin. Although small needles are used to both fill the reservoir and insert the canula beneath the skin, these needles are disposed of after insertion, and no sharps remain on the user.

42.    An insulin pump can be paired with a CGM, which is a wearable device that measures glucose in the user's interstitial fluid via a small

sensor inserted under their skin. CGMs can also be worn without use of an insulin pump. When an insulin pump is paired with a CGM, it is considered a kind of "closed loop system" and functions as an artificial pancreas because it uses an algorithm to automatically adjust insulin delivery based on blood glucose levels.

43.     The DOC, by policy and practice, does not allow the use of CGMs for T1D Prisoners, absent one known exception. The DOC, by policy and practice, does not allow the use of insulin pumps for any T1D Prisoners. Instead, the DOC disregards patients' prior diabetes management plans and current clinical indications, utilizing multiple daily injections and blood glucose testing via fingerstick only. This disregard of patients' prior diabetes care and current clinical need with respect to insulin pumps and CGMs violates the standard of care as set forth by the American Diabetes Association and other expert entities.

### 3.     *Dietary Planning and Needs for Effective Diabetes Management*

44.     Individuals with type 1 diabetes can eat foods that were once considered "off-limits" for them if they track how many carbohydrates they consume and take a corresponding bolus of rapid-acting insulin. Individuals determine the appropriate bolus insulin dose using what is known as their individualized "insulin-to-carb ratio." To use an insulin-to-carb ratio, an

individual with diabetes must know how many carbohydrates are in the food they eat.

45.   Consuming meals or snacks without administration of *any* insulin to cover carbohydrates consumed is not the standard of care for management of type 1 diabetes.

46.   The DOC, by policy and practice, does not allow carbohydrate counting or utilize insulin-to-carb ratios for treatment of T1D Prisoners. The DOC fails to provide T1D Prisoners with insulin doses that are calculated based on their individual carbohydrate intake and insulin-to-carb ratio. The DOC's practice is inconsistent with the standard of care and puts T1D Prisoners at unacceptable risk of out-of-range blood sugar levels, causing dangerous short-term consequences as well as serious long-term health complications.

### 4.   Blood Glucose Monitoring

47.   Under the standard of care, all bolus insulin dosing decisions should be made based on an individual's blood sugar level and the amount of carbohydrates consumed. Unless a person's blood glucose level is within their target range, they must take a correction dose of insulin. An insulin correction factor is used to calculate the amount of insulin needed to bring blood glucose into target range.

22

48.    People with type 1 diabetes need contemporaneous blood glucose data to calculate clinically appropriate insulin boluses. This data is obtained in one of two ways: either the individual wears a CGM, or they test their blood sugar via a fingerstick glucometer.

49.    The DOC, by policy and practice, does not monitor blood glucose levels with sufficient frequency, nor at the times such monitoring is clinically indicated, to facilitate effective glucose control consistent with medical guidelines. The DOC, without regard to patients' prior diabetes management plans or current clinical indication, utilizes infrequent, prescheduled blood sugar testing times. It does not allow the use of CGMs consistent with clinical need, absent one known exception. Its practices are inconsistent with the standard of care as set forth by the American Diabetes Association and other expert entities and puts T1D Prisoners at unacceptable risk of out-of-range blood sugar levels, causing dangerous short-term consequences as well as serious long-term health complications.

>      5.    *Serious Short- and Long-Term Health Complications from Inadequately Managed Diabetes*

50.    When blood sugars are inadequately managed, devastating and irreversible complications result. According to the Centers for Disease Control and Prevention (CDC), in 2021, diabetes was the eighth leading

cause of death in the United States. According to the CDC, many diabetes complications "share the same risk factors, and one complication can make other complications worse."

51.    Inadequately managed diabetes can lead to neuropathy, kidney disease, eye disease and blindness, cardiovascular disease, nerve damage, reduced circulation, limb loss, hearing loss, stroke, memory loss, high blood pressure, high cholesterol, osteoporosis, increased risk of infection, depression, oral and skin complications, coma, and death. It can also exacerbate other illnesses and infections. Clinical guidelines advise that to avoid these complications, people with type 1 diabetes should keep blood glucose levels within a target range established by an individualized treatment plan and consistent with the standard of care.

52.    To track their patients' blood glucose management over time, health care providers use hemoglobin A1C (hereinafter "A1C") tests, which provide a picture of average blood glucose levels in recent months. The higher a person's A1C level, the more likely it is that they will develop diabetic complications. Maintaining an A1C level of 7.0 or below has been shown to greatly reduce the risk of someone developing serious health complications from their diabetes.

53.    Periodic screening and monitoring for all of the complications

associated with diabetes is vitally important. Required screening and monitoring includes: yearly diabetic eye exams; regular foot checks; urine and blood screening for signs of kidney disease; regular blood pressure checks; bone scans, dental exams; and lipid screening.

54.    The DOC, by policy and practice, fails to comply with the necessary screening and monitoring practices for health complications of diabetes. The practices it utilizes are inconsistent with the standard of care as set forth by the American Diabetes Association and other expert entities, placing T1D Prisoners at unacceptable risk of dangerous short-term consequences as well as serious long-term health complications.

**B.    The Pennsylvania Department of Corrections' Policies and Practices for the Care of Type 1 Diabetes Fall Woefully Below the Established Standard of Care and Put T1D Prisoners at Substantial Risk of Serious Harm**

55.    Defendants, through their deficient diabetes care policies and practices, cause serious harm to T1D Prisoners. Despite the existence of the ADA Statement, Defendants continue to engage in antiquated and clinically inappropriate methods of treating T1D Prisoners, such as by using less effective and disfavored insulins. T1D Prisoners are suffering serious health consequences as a direct result.

56.    Defendants routinely ignore T1D Prisoners' requests for diabetes treatment that meets the standard of care, and that aligns with the

course of treatment they were prescribed in the community. For example, Prisoner #9 explained to a physician assistant that she needed access to fast-acting glucose supplies to protect against hypoglycemia; to be put back on a CGM, which she had used prior to her incarceration; and to be prescribed rapid-acting insulin, which was the insulin she was prescribed in the community. In response, the physician assistant noted the following in her medical file, without clinical reasoning and instead with apparent reference to Defendants' rigid, outdated, and deficient policies: "I explained that her insulins would not change[.] . . . She will probabably [sic] not get her dexcom [CGM] back."

57.    Defendants' actions demonstrate that they view diabetes treatment as a "one size fits all approach"—with that approach being inconsistent with the established standard of care. In fact, diabetes treatment must follow the standard of care and be appropriately individualized to be adequate and effective.

      1.    *The DOC's Insulin Policies and Practices Fail to Meet Minimum Standards of Care and Result in Harm and Risks of Harm to T1D Prisoners*

58.    The DOC's systemwide insulin policy and practices are inadequate and do not enable T1D Prisoners to achieve appropriate glycemic control, falling below the established standard of care and putting

26

T1D Prisoners at substantial risk of serious harm.

        a.    Use of Outdated, Less Effective, and Disfavored Insulins

59. The ADA Statement instructs that upon entering a detention system, T1D Prisoners should be maintained on their current insulin regimen "to prevent severe hypoglycemia or hyperglycemia[.]" As such, the detention system's formularies must include the types of insulin commonly prescribed in the community and consistent with the standard of care.

60. The DOC does not maintain T1D Prisoners on the insulin regimens they were on in the community. It removes rapid-acting insulin from their treatment and instead prescribes them short-acting insulin. The DOC is aware that ceasing to use rapid-acting insulin in T1D Prisoners' treatment regimens puts these prisoners at risk of suffering serious harm. It periodically checks T1D Prisoners' A1C levels, and knows their levels are elevated and that they typically increase in the months after they are first incarcerated. This A1C data is objective evidence known to the DOC of the harm risk.

61. For example, before his current incarceration, Prisoner #6 had established care with an endocrinologist in the community. At that time, he was prescribed between 30 and 35 units of long-acting insulin, along with a rapid-acting insulin. As of August 2025, the DOC prescribes him only 21

units total of long-acting insulin, which is far lower than what he was prescribed by his treating endocrinologist in the community. The DOC discontinued his rapid-acting insulin. Prisoner #6 is experiencing dangerously high blood glucose levels, which put him at risk of DKA, diabetic coma, and death. At no time has the DOC assessed whether it is clinically appropriate to restart Prisoner #6 on rapid-acting insulin or increase his long-acting insulin dose.

62.   The ADA Statement confirms that all individuals with type 1 diabetes, including those who are incarcerated, should be treated with *rapid-acting* insulin at all mealtimes, or they should be treated with rapid-acting insulin administered via an insulin pump. Rapid-acting insulin is the standard of care for all individuals with type 1 diabetes because it starts working faster, peaks quicker, and offers better post-meal glucose control.

63.   Upon information and belief, the DOC's formulary does not include rapid-acting insulin, which is an essential component of diabetes management and is the standard of care. The vast majority of T1D Prisoners for whom rapid-acting insulin is clinically indicated do not have access to such insulin while incarcerated.

64.   For example, Prisoner #3 is prescribed an antiquated short-acting insulin. Despite Prisoner #3's request to be prescribed rapid-acting

28

insulin to manage his blood glucose levels, he remains on short-acting insulin, increasing the likelihood that he will experience DKA, diabetic coma, or pre-mature death.

        b.     Failure to Provide Bolus Insulin to Cover Carbohydrate Intake

65. The ADA Statement directs that T1D Prisoners "should have access to medication at dosing frequencies that are consistent with their treatment plan and medical direction[,]" meaning a facility should not eliminate entire doses of insulin if that is what was prescribed by the individual's doctor in the community. In direct violation of this standard of care, the DOC often eliminates entire meal-time insulin doses without clinical indication, and despite T1D Prisoners' repeated reports that they require these insulin doses to manage their blood glucose effectively.

66. According to the ADA Statement, doses of pre-meal insulin should be "varied based on meal content (mostly based on insulin-to-carbohydrate ratio) and blood glucose levels (also called correction factor)." The ADA Statement directs that detention systems should not rely solely on sliding scale insulin (a correction dose for an elevated blood sugar level, without accounting for current carbohydrate intake). The ADA Statement directs that insulin boluses should be administered 15 minutes *prior* to eating to comply with the standard of care.

29

67.    Upon information and belief, in violation of this standard of care, DOC medical staff fail to conduct individualized assessments of patients for determining bolus insulin doses and do not utilize insulin-to-carb ratios. As a result, bolus insulin doses are not calibrated for each T1D Prisoner's metabolic needs, and these bolus insulin doses do not result in clinically appropriate blood glucose levels. It is common for the DOC to wait until after a meal is consumed to provide an insulin dose, rather than to give it 15 minutes before a meal. The DOC is aware that its insulin bolus practices are deficient and put T1D Prisoners at risk of harm, given that it collects daily blood glucose data from each T1D Prisoner, and the systemwide data overwhelmingly demonstrates that T1D Prisoners' blood glucose levels are not maintained at clinically appropriate levels.

68.    For example, Prisoner #6 receives bolus insulin only twice per day. He receives a set dose of short-acting insulin, and this dose is not adjusted based on carbohydrate intake. Even worse, he receives insulin only if his blood glucose is greater than 140; if it is under 140, he receives no bolus insulin at all, regardless of whether he plans to consume carbohydrates. He does not receive any bolus insulin at lunchtime. His blood glucose levels are thus extremely high by late in the day. This insulin regimen is not effective, as evidenced by Prisoner #6's elevated A1C levels

30

and his persistent high blood sugars. Prisoner #6 has had an A1C level as high as 13, which corresponds to an average blood glucose of 326 (far above recommended target glucose ranges), and puts him at substantial risk of developing debilitating serious complications from his diabetes.

69.   Prisoner #7 received only a sliding scale dose of short-acting insulin at mealtimes (again, with no consideration of carbohydrate intake), and only if his blood glucose was greater than 200. As such, he received no insulin coverage for any of the carbohydrates he consumed at any meal. His prison medical records reflect that his blood sugars became increasingly uncontrolled as a result.

70.   The DOC did not consider prescribing insulin coverage for carbohydrates for either Prisoner #6 or Prisoner #7, despite this being the standard of care for type 1 diabetes, and despite its knowledge that their blood glucose levels were at medically unsafe levels, putting them at substantial short-term risk of DKA, coma, and sudden death and long-term risks of serious health complications.

c.   Failure to Ensure All T1D Prisoners Receive Adequate Basal Insulin

71.   The ADA Statement confirms that all individuals with type 1 diabetes who are not using an insulin pump, including those who are incarcerated, should be treated with at least one daily injection of long-

acting basal insulin. Long-acting basal insulin is the standard of care for individuals with type 1 diabetes because it results in better glucose control compared to an intermediate-acting insulin. Despite this, the DOC still prescribes intermediate-acting insulin to T1D Prisoners.

72.    The DOC withholds entire basal insulin doses from T1D Prisoners without clinical indication, even though all individuals with type 1 diabetes need daily basal insulin to survive and maintain their health. As a result of this practice, numerous T1D Prisoners have gone into DKA and been hospitalized.

73.    For example, Prisoner #1 was hospitalized for DKA multiple times after the DOC withheld his daily dose of basal insulin because he was not eating. During these hospitalizations, the hospital doctors documented specific instructions about how Prisoner #1's diabetes should be managed to avoid future episodes of DKA. They repeatedly told the DOC medical providers that they should not withhold his long-acting basal insulin dose. In the discharge notes, his treating hospital doctor warned the DOC: "Because of type 1 diabetes diagnosis, need long-acting insulin (Semglee) every single day as ordered. . . . *Skipping Semglee doses altogether will significantly increase risk for diabetic ketoacidosis*." (emphasis added). Prisoner #1 was again hospitalized for DKA the

32

following month. When he was discharged, his hospital doctor gave the following instructions to the DOC: "Given type 1 diabetes diagnosis, [patient] needs Semglee every day . . . *Cannot hold dose*." (emphasis added). Despite clear instructions from the hospital doctors to the DOC that Prisoner #1 must receive a daily dose of basal insulin, Prisoner #1 was *again* hospitalized six days later for DKA, after the DOC again failed to give him *any* basal insulin because he had been experiencing nausea and felt unable to eat. According to medical records, upon admission to the emergency room, he told the doctor "[T]hey do not give you insulin if you do not eat."

74.    Defendants have refused to provide basal insulin to other T1D Prisoners based on their being sick, having a low blood sugar, or needing to fast for a medical test. There is no situation where it is safe or medically appropriate to entirely withhold basal insulin. Defendants' failure to ensure that all T1D Prisoners receive daily basal insulin is dangerous and puts these individuals at substantial risk of DKA, diabetic coma, and death.

75.    In one incident, Prisoner #8 was denied all insulin without clinical justification, resulting in a dangerous hyperglycemic episode that was ignored by DOC medical staff. Finally, doctors at an outside facility who were treating Prisoner #8 for another medical issue discovered his

33

extremely elevated blood glucose and sent him directly to the emergency room, where he was given rapid-acting insulin that likely saved him from DKA, coma, and even death.

76.    The DOC's insulin practices do not comply with the ADA Statement and do not meet the standard of care for type 1 diabetes, and they place T1D Prisoners at substantial risk of suffering serious harm.

    2.    *The DOC's Bans on Standard-of-Care Diabetes Technology Result in Harm and Risks of Harm to T1D Prisoners*

77.    The DOC's systemwide diabetes technology policies do not enable T1D Prisoners to achieve clinically appropriate glycemic control, falling woefully below the established standard of care and putting these prisoners at substantial risk of serious harm.

78.    The ADA Statement instructs that T1D Prisoners using diabetes technology such as CGMs and insulin pumps "should retain uninterrupted access to these tools upon their introduction to the detention system unless an individualized case-by-case assessment shows that doing so would pose a safety or security risk." For T1D Prisoners who do not enter the facility with an insulin pump, insulin pump therapy should be considered as an option for them, as should a CGM, since "[a] CGM can be an important tool to monitor glucose levels and to proactively prevent severe

hypoglycemia episodes." Additionally, insulin pumps and CGMs "are effective means of implementing intensive diabetes management with the goal of achieving near-normal levels of glucose."

79. The ADA Statement instructs that when assessing a request for an insulin pump or CGM, detention systems should conduct individualized, case-by-case assessments of security and other considerations, similar to what is customarily done for other types of assistive devices (*e.g.*, canes and walkers).

80. The DOC has a blanket ban on using insulin pumps to treat T1D Prisoners, as documentation demonstrates. For example, Prisoner #2's treating doctor at the prison wrote in her medical record, "the BHCS [Bureau of Health Care Services] does not permit insulin pumps at this time."

81. The DOC also does not permit the use of CGMs, absent a single known exception. Even when T1D Prisoners enter the DOC on an insulin pump or CGM, the DOC immediately removes the devices.

82. When individuals request to use a CGM or insulin pump while in the DOC, the DOC denies these requests without making an individualized determination about whether the use of diabetes technology is clinically indicated to achieve control of the individual's diabetes.

83.    Upon information and belief, the DOC has allowed only one individual to use a CGM. Even for her, however, the DOC has repeatedly denied her requests to be considered for an insulin pump, because, as one of her treating providers candidly noted, that "is not something we can get approved."

84.    The DOC ignores ample evidence that CGMs and insulin pumps *can* safely be used in a carceral setting. Indeed, the fact that one DOC prisoner has been allowed to use a CGM and continues to do so successfully demonstrates that CGMs can safely be used in a carceral setting. Likewise, multiple T1D Prisoners currently incarcerated in the DOC were allowed to use insulin pumps and CGMs while incarcerated in their local county jail, demonstrating that these devices *can* safely be used in a carceral setting.

85.    Upon information and belief, multiple county jails in Pennsylvania, including those in Adams, Blair, and Philadelphia counties, allow individuals with diabetes to use insulin pumps and CGMs while they are incarcerated. Prisoner #9 was allowed to use both an insulin pump and a CGM while in the Blair County jail.

86.    Upon information and belief, multiple other states' Department of Corrections allow prisoners to use CGMs and/or insulin pumps. For

36

example, the Department of Corrections in Washington state allows prisoners with insulin-dependent diabetes to use both CGMs and insulin pumps as clinically indicated.

87.    Upon information and belief, Wellpath, the DOC's contracted medical provider, cares for individuals using insulin pumps and CGMs at other detention facilities where it provides the medical care, demonstrating that these devices *can* safely be used in a carceral setting.

88.    The DOC is aware it houses numerous T1D Prisoners at high risk for dangerous hypoglycemia and who repeatedly lose consciousness or experience seizures from it, given that these incidents are documented in medical records; many individuals have been hospitalized. Yet the DOC fails to assess T1D Prisoners for the use of CGMs and insulin pumps that could address these serious medical risks. For example, Prisoner #4 has had multiple instances of low blood sugar which caused her to lose consciousness. She filed a grievance about the DOC medical staff's refusal to provide her with an insulin pump and CGM, writing:

> My condition is severe and difficult to control. My sugar often drops so low I am unresponsive. This is affecting my overall health and that could be prevented with the use of a continuous glucose monitor and pump. They help regulate diabetes by providing more appropriate doses of insulin.

89.    Prisoner #4's grievance was denied by the DOC, and she has

not been assessed for the use of an insulin pump or CGM. Prisoner #4 remains at substantial risk of experiencing an episode of hypoglycemia resulting in seizure, loss of consciousness, or death.

90.     Prisoner #8 also should have been, but was not, assessed for use of these diabetes management devices. He lost consciousness due to severely low blood glucose that was not monitored, requiring emergency medical response. (Shortly after that incident, the provision of fast-acting glucose supplies to treat hypoglycemia was discontinued for more than a month.) A hypoglycemic episode where a quickly dropping blood glucose level is not timely identified is a strong indication that a CGM may provide essential medical benefit to an individual, including to prevent similar episodes in the future. But Prisoner #8 has never been assessed for a CGM.

91.     Prisoner #6 has a history of inadequately managed diabetes. DOC medical staff have documented that Prisoner #6 would benefit from the use of a CGM and pump, but according to their notes in his medical records, they cannot be provided due to "DOC protocols." Prisoner #6 remains at risk of worsening his already existing diabetic complications, experiencing DKA resulting in a diabetic coma, and pre-mature death.

92.     The DOC's systemwide ban on the use of CGMs and insulin

38

pumps does not meet the standard of care and places T1D Prisoners at substantial risk of serious harm.

### 3. The DOC's Policies and Practices Regarding Diabetic Diets and Access to Food Fail to Meet the Standard of Care

93.     The DOC's systemwide dietary policy and practices fail to enable T1D Prisoners to achieve clinically appropriate glycemic control, fall below the established standard of care, and place these prisoners at substantial risk of serious harm.

94.     According to the ADA Statement, detention facilities should offer incarcerated individuals nutritionally balanced menus that are "appropriate for people with diabetes, its complications, and associated comorbidities[.]" The nutritionally balanced meals should provide information about the carbohydrate content of each item served so that individuals with diabetes can calculate and receive an appropriate insulin dose.

95.     Defendants do not provide T1D Prisoners with a specific carbohydrate count for each item served on their tray, so T1D Prisoners cannot calibrate their insulin dose based on what they plan to consume at meals.

96.     Since 2023, Defendants have denied Prisoner #2 the ability to

39

engage in carbohydrate counting, because the DOC stopped providing her with information about the carbohydrate content of meals. Prisoner #2's A1C has steadily increased, putting her at substantial risk of developing new complications from her diabetes and worsening her already existing complications. The risks of continued inadequate glycemic control are enormous for her. She may require a *second* kidney transplant due to diabetes-related renal failure, her retinopathy may worsen to the point that she will go blind, and her neuropathy and poor circulation will likely eventually result in amputation.

97.    Because the DOC maintains a systemwide policy and practice preventing the use of insulin-to-carb ratios and carbohydrate counting, insulin doses are not responsive to what T1D Prisoners consume. For example, Prisoner #3 is prescribed a carbohydrate-controlled diet but because he receives clinically inappropriate insulin doses, he nonetheless experiences recurring hypoglycemia.

98.    The DOC's dietary practices do not comply with the ADA Statement's directives and do not meet the standard of care for type 1 diabetes. These practices place T1D Prisoners at substantial risk of suffering serious harm.

40

> 4.    *The DOC's Failure to Ensure Timely Access to Fast-Acting Glucose Places T1D Prisoners at Substantial Risk of Extremely Dangerous Hypoglycemic Episodes*

99.    The ADA Statement directs that snacks containing fast-acting carbohydrates must be available so that T1D Prisoners can prevent and treat hypoglycemia as needed. The availability of snacks should not be dependent on a person having the funds to purchase food from the commissary; instead, "[t]hese snacks should be prescribed and readily available." Glucose gel or tablets can also be provided for this purpose. Every T1D Prisoner in the facility should have ready access to glucose tablets, fruit juice, or other glucose-containing foods.

100.    Defendants lack a systemwide policy to ensure that all T1D Prisoners have ready access to fast-acting carbohydrates to treat and prevent low blood sugar, which places T1D Prisoners at substantial risk of serious harm from untreated low blood sugar, including seizures, loss of consciousness, and death.

101.    DOC medical staff fail to prescribe glucose tablets or gel as a "keep on person" medication to T1D Prisoners who need them. Some T1D Prisoners are not approved by the DOC for a "snack bag" on the basis that they purchase too much high carbohydrate food from the commissary. This ignores the fact that many of these "sugary" purchases are made because

41

T1D Prisoners are not allowed to keep fast-acting glucose supplies on their person or in their cell. For example, during a period when he was regularly experiencing multiple episodes of hypoglycemia each day, Prisoner #3's "snack bag" was discontinued. According to his medical records, this change was "due to [Prisoner #3]'s commissary purchases of multiple cookies, candies, ramen, pop tarts and sugar sweetened oatmeal." Prisoner #3 was making these sugary commissary purchases to prevent and treat episodes of low blood sugar, as he did not otherwise have a sufficient supply of fast-acting glucose with him.

102.   Prisoner #2 is not prescribed glucose tablets or gel as a "keep on person" medication despite needing them. She gets a "snack bag," but she is not allowed to save the food in her cell and use it to treat low blood sugar; anything that is not immediately consumed is taken by correctional officers and disposed of. Prisoner #2 has had multiple episodes where her blood glucose has dropped so low that she was disoriented and/or has lost consciousness. For example, she was recently found unresponsive in her cell and required an emergency medical response. Such an incident can be avoided if ready access to fast-acting glucose supplies is provided.

103.   The DOC's failure to ensure that all T1D Prisoners have timely access to fast-acting carbohydrates does not comply with the ADA

42

Statement's directives and does not meet the standard of care for type 1 diabetes. This systemic failure places T1D Prisoners at substantial risk of suffering serious harm.

> 5. *The DOC's Policies and Practices for Monitoring Blood Sugar Levels Fail to Meet the Standard of Care and Place T1D Prisoners at Substantial Risk of Extremely Dangerous Hypoglycemic and Hyperglycemic Episodes That are Not Timely Treated*

104. The DOC's systemwide blood sugar monitoring policies and practices fail to enable T1D Prisoners to achieve clinically appropriate glycemic control, fall below the established standard of care, and place these prisoners at substantial risk of experiencing serious harm.

105. According to the ADA Statement, T1D Prisoners should be allowed to test their blood sugar prior to meals, at bedtime, prior to physical activity, when low blood glucose is suspected, and after treating low blood glucose. Alternatively, individuals should be able to use a CGM that allows for continuous monitoring of blood glucose levels.

106. The DOC does not allow T1D Prisoners to check their blood sugar as needed. The DOC fails to ensure the provision of blood glucose checks before all meals, before bedtime, and before physical activity. At some SCIs, T1D Prisoners' blood glucose is checked only twice per day. For example, Prisoner #6's blood glucose is checked only two times per

43

day; his insulin doses are not responsive to his metabolic needs because there is not enough blood glucose data collected to determine what those needs are. As such, Prisoner #6's diabetes is inadequately managed and his A1Cs are persistently elevated, putting him at risk of long-term complications, as well as DKA, diabetic coma, and sudden death.

107.　When an individual has episodes of severe hypoglycemia, recurrent episodes of mild to moderate hypoglycemia, or recurrent or unexplained hyperglycemia, the ADA Statement directs that medical staff should reevaluate the individual's diabetes management plan and arrange for more frequent blood glucose monitoring (including through provision of a CGM), and use the data gained from this additional monitoring to inform insulin dose adjustments.

108.　In the DOC, when a T1D Prisoner is experiencing recurrent episodes of hypoglycemia or hyperglycemia, DOC medical providers do not gather the additional blood glucose data required to make insulin adjustments calculated to achieve clinically appropriate glycemic control. For example, Prisoner #5 reported to medical staff that he was experiencing low blood sugars every afternoon during a time of day when his blood glucose was not tested. Despite this report, medical staff failed to order additional checks of Prisoner #5's blood glucose, choosing instead to

44

drastically reduce his basal insulin dose. Prisoner #5 then began to have recurrent hyperglycemia, putting him at substantial risk of developing new diabetes complications and of worsening his existing diabetic retinopathy.

109.   Even when there is objective clinical evidence that a T1D Prisoner's insulin regimen is not working, DOC medical staff fail to order post-meal checks of T1D Prisoners' blood sugars, a necessary step to determine appropriate insulin adjustments. For example, when Prisoner #1 was hospitalized for DKA, a doctor from the hospital stated that he should receive "glucose checks post prandial [after meals] in [the DOC] facility to avoid swings in glucose." Yet the DOC failed to provide Prisoner #1 post-meal blood sugar checks. When his A1C was next checked, it was 9.8, putting Prisoner #1 at risk of developing further complications from his diabetes, including additional episodes of DKA and premature death.

110.   The DOC's blood sugar monitoring practices do not comply with the ADA Statement's directives and do not meet the standard of care for type 1 diabetes. These practices disregard T1D Prisoners' serious medical needs and place them at substantial risk of suffering serious harm.

6.   *Defendants Fail to Adequately Train Staff on Recognizing the Signs and Symptoms of Out-of-Range Blood Sugars and Proper Treatment Responses, Putting T1D Prisoners at Substantial Risk of Dangerous, Unnecessary Force*

111.   Defendants have failed to adequately train staff regarding the

45

treatment of T1D Prisoners, which puts T1D Prisoners at serious risk of harm. When a person with diabetes experiences an extremely low or high blood sugar, they can become disoriented or confused and may become unable to appropriately respond to questions or directives. It is thus essential that staff receive training to recognize the signs and symptoms of hypoglycemia and hyperglycemia, and on how to safely and appropriately respond in such circumstances. When a T1D Prisoner experiences an out-of-range blood sugar, their behavior and ability to respond to commands is impacted. Correctional officers do not understand this, and their inappropriate responses to these incidents demonstrate this lack of understanding. Without adequate training on diabetes management and needs, staff treat such individuals as if they are intentionally violating facility rules or are under the influence of illicit drugs, leading to incidents of improper discipline or uses of force rather than clinically necessary treatment for the out-of-range blood glucose. Correctional officers also issue citations to T1D Prisoners for failing to respond when they are disoriented due to low blood sugar. For example, Prisoner #4 has received multiple citations for failing to exit her cell when commanded during a serious hypoglycemic episode. These citations resulted in her being disciplined and placed on "locked-in" status in her cell for up to one week.

Being on "locked-in" status means a prisoner cannot come out of their cell for yard time, make video calls to loved ones, or socialize in the dayroom.

112.   Defendants' failure to ensure staff have appropriate training places T1D Prisoners in serious and unacceptable danger, including for unnecessary and violent uses of force. For example, Prisoner #1 was tased when he experienced an episode of hypoglycemia and became unresponsive as a result. Staff reportedly deployed the taser against him because he did not "allow [them] to handcuff [him] by keeping [his] arms and hands in front of [him]." In this situation, Prisoner #1 required treatment to address the hypoglycemia. Instead, without adequate training and procedures in place, security staff responded with use of force that was unnecessary and caused him further harm.

> 7.    *Defendants Fail to Properly Respond to T1D Prisoners' Refusal of Insulin and Blood Glucose Monitoring, Putting Them at Substantial Risk of Worsening Hyperglycemia and Resulting Diabetic Complications*

113.   The DOC's routine failure to properly respond to medication or treatment refusals puts T1D Prisoners at substantial risk of suffering serious harm.

114.   It is not uncommon for T1D Prisoners to refuse scheduled insulin injections in whole or in part (meaning they may be agreeable to taking a portion of the prescribed dose, but not the entire amount). T1D

47

Prisoners may also refuse scheduled blood glucose checks. Such refusals may be due to any of several clinical reasons and require clinically indicated follow-up.

115.    The DOC recognizes that treatment refusals require clinical intervention. Its own written policy states that when a patient refuses insulin or blood glucose checks, medical staff must document the refusal in the medical chart and a physician must then interview the individual to "determine if the refusal might be reversed by education, counseling, or mental health intervention. . . . [T]he inmate's family may be contacted to talk with the inmate regarding the need for treatment. The physician shall advise the inmate of the effects of his/her continued refusal to cooperate with treatment[.]" When a T1D Prisoner's "refusal to accept treatment poses a potential medical emergency, then . . . the physician shall admit the inmate to the infirmary as a medical admission[,]" and within 72 hours, a meeting of the inmate's treatment staff will occur in order to develop an appropriate treatment plan to address the issue. Additionally, the policy directs that the individual's counselor and appropriate mental health staff should meet with them "to attempt to resolve the problem through daily counseling."

116.    Upon information and belief, the DOC routinely fails to comply

with its own medication refusal policy and the standard of care as to medication refusals. T1D Prisoners are rarely seen by physicians or counselors when they refuse treatment. Medical staff do not engage in counseling and education of the sort calculated to facilitate the patient's adherence to diabetes treatment plans.

117. Because the DOC routinely fails to engage T1D Prisoners about medication non-adherence, these individuals are at increased risk of deteriorating health and the development of dangerous complications, such as DKA.

118. For example, during one period when Prisoner #1 was refusing his prescribed insulin, he was housed in a psychiatric observation cell (due to having previously engaged in a suicidal gesture). His medical record indicates that nursing staff's plan for how to address his suicidal ideation and/or insulin refusal (it is not clear which) was to "continue to monitor" him. There is no indication in his medical record that nursing staff provided Prisoner #1 counseling or support as to insulin adherence, nor is there any indication that he was seen by a physician or placed at a higher level of medical observation and care. Without clinical intervention, less than 48 hours later, Prisoner #1 was taken to the emergency room in DKA.

49

> ### 8. *The DOC's Policies and Practices for Screening for Diabetes Complications and Access to Specialists Fail to Meet the Standard of Care and Place T1D Prisoners at Substantial Risk of Serious Harm*

119. The DOC's systemwide policies and practices for screening for diabetes complications and ensuring access to specialist care fall woefully below the established standard of care, putting T1D Prisoners at substantial risk of experiencing serious harm.

### a. Denial of Access to Endocrinology Specialists

120. The ADA Statement recognizes that many detention facilities have individuals "providing diabetes care who do not have primary care or diabetes care training." The ADA Statement therefore directs that facilities should have a system to refer T1D Prisoners to a healthcare professional with expertise in diabetes, particularly for situations when the facility is unable to adjust insulin doses to achieve adequate glycemic control.

121. The DOC does not have a system to refer T1D Prisoners to endocrinologists, and it does not make such referrals. Upon information and belief, physician assistants or nurse practitioners without specialized training in diabetes management are responsible for adjusting T1D Prisoners' insulin doses. Occasionally, a medical doctor may adjust doses, but not one who is an endocrinologist or who has expertise in diabetes management.

122.  Even when T1D Prisoners begin to develop serious health complications due to inadequately managed diabetes, the DOC persists in its failure to provide them with care from endocrinology specialists. For example, despite Prisoner #6's dangerously high A1Cs and the complications that have resulted from them, including multiple infected teeth, a pilonidal cyst, and persistent wounds on his feet, the DOC has never arranged an appointment or consulted with an endocrinologist about his diabetes management. Prisoner #6 therefore remains at substantial risk of suffering continuing and increasing harm, including amputations and premature death.

123.  When T1D Prisoners do not receive adequate care and are hospitalized, the hospitalist or a consulting endocrinologist appropriately makes treatment recommendations, but these recommendations are routinely ignored, putting T1D Prisoners at substantial risk of suffering further harm. For example, on multiple occasions when he was hospitalized, Prisoner #1's treating doctors recommended to the DOC that he be referred to an endocrinologist for follow-up care. According to Prisoner #1's medical file, the DOC's Assistant State Medical Director reviewed these notes and apparently ignored them. No referral was ever made to an endocrinologist and Prisoner #1's blood glucose remained

51

inadequately managed; he experienced multiple additional episodes of DKA and hypoglycemia with loss of consciousness after the DOC failed to make this medical referral.

124.  In July 2024, when Prisoner #2 had an A1C of 8.5, she was seen by the Allegheny Health Network for a tele-neurology appointment. The notes from that visit state that it is critical that Prisoner #2 "manage her diabetes to prevent progression of neuropathy and disability, last A1C was 8.5. She has not been following with Endocrinology and it is imperative she do so[.]" Prisoner #2's prison medical record reflects that this document was emailed to Wellpath, but there is no indication it took steps to get her an appointment with an endocrinologist, despite the warning that it was "imperative."

> b.    Inadequate Screening and Treatment for Diabetes-Related Complications

125.  The ADA Statement instructs that "[a]ll people with a diagnosis of diabetes should receive routine screening for diabetes-related complications, as detailed in the [American Diabetes Association] Standards of Care[,] . . . [and] appropriate referrals to consultant specialists, such as optometrists and ophthalmologists, nephrologists, podiatrists, and cardiologists, [should] be made on an as-needed basis."

126.  The DOC fails to ensure that T1D Prisoners receive medical

screenings for diabetes complications of the type and at the frequency required by medical standards, including foot evaluations for neuropathy, eye examinations for retinopathy, screenings for cardiovascular disease, screenings for autoimmune diseases, and assessments for gastroparesis. When screenings indicate that follow-up care is required, the DOC fails to ensure that T1D Prisoners see appropriate medical specialists, such as endocrinologists, nephrologists, and ophthalmologists.

127.   Upon information and belief, unless and until a T1D Prisoner has an active wound on their foot, the DOC does not provide a comprehensive annual foot evaluation, which is the standard of care as set forth in the ADA Statement. The DOC's provision of foot care for T1D Prisoners, who are at heightened risk of lower limb infections and amputations, is inadequate.

128.   Many T1D Prisoners cannot wear the state-issued shoes or boots without developing open wounds on their feet, but the DOC routinely fails to provide them with specialized, properly fitting footwear. This increases their likelihood of developing wounds that will not heal, eventually resulting in an amputation. For example, due to persistent wounds on Prisoner #6's feet, Wellpath identified the clinical need for special shoes but the DOC never provided them to him. As a result, Prisoner #6 remains at

risk of developing a wound that will not heal and of requiring an eventual amputation of his toe, foot, or leg.

129.   Upon information and belief, the DOC does not ensure provision of diabetic eye exams and timely ophthalmologic care to T1D Prisoners who need it. Upon information and belief, retinal photography is not utilized. Such failures violate the ADA Statement's guidance on screening and treating retinopathy, a serious and common complication that results from diabetes.

130.   The DOC fails to act on abnormal lab test results for T1D Prisoners. For example, when lab results show abnormal kidney function, the DOC fails to ensure timely follow-up with a nephrologist and clinically indicated treatment to prevent or slow kidney failure.

131.   For example, Prisoner #4 has repeatedly had blood work results which show she has Hyponatremia, or low blood sodium. Hyponatremia is associated with kidney disease. Upon information and belief, the DOC has not performed any clinically necessary follow-up diagnostic testing to assess Prisoner #4's kidney function, nor has it referred her to a nephrologist.

132.   Upon information and belief, the DOC does not provide T1D Prisoners with adequate screenings or treatment interventions for

54

cardiovascular disease or other common diabetes-related complications.

133.   Upon information and belief, the DOC does not screen T1D Prisoners who exhibit signs and symptoms of other autoimmune conditions that commonly co-occur with type 1 diabetes for these conditions. These conditions include parathyroid diseases, celiac disease, gastritis, skin diseases, and rheumatic diseases. Because concomitant autoimmune illnesses can affect diabetes management, the standard of care is to screen for these conditions when they are suspected.

134.   The DOC's practices for screening for diabetes complications and ensuring access to needed specialist care do not comply with the ADA Statement's directives and do not meet the standard of care for type 1 diabetes. These practices disregard T1D Prisoners' serious medical needs and place them at substantial risk of suffering serious harm.

C.   **Defendants Know or Are Deliberately Indifferent to the Harms and Substantial Risks of Harms Caused by the Substandard Medical Care Provided to Prisoners with Type 1 Diabetes**

135.   Defendants have been and continue to be deliberately indifferent to the harmful effects and the substantial risk of serious harm to T1D Prisoners caused by the DOC's inadequate systemwide diabetes policies and practices.

136.   Within its central office, the DOC has a Bureau of Health Care Services (BHCS). The BHCS is responsible for drafting the Department's medical care policies and procedures and supervising and monitoring their implementation. The BHCS oversees and audits the Commonwealth's contract with Wellpath, the DOC's current medical provider. The BCHS is responsible for supervising and training DOC nurses, who are DOC employees. The BHCS is tasked with ensuring that the SCIs and their medical staff deliver medical care consistent with community standards.

137.   The DOC's policy on the provision of health care is outlined in Policy Number 13.1.1: Management and Administration of Health Care. The policy is approved and signed by Defendant Harry.

138.   The DOC employs a Chief of Medical Services who is directly responsible for overseeing all medical policies for the DOC, including the provision of care for T1D Prisoners. This individual serves as the Department's medical liaison to the contracted physicians based at the SCIs.

139.   The DOC is aware of the established standard of care for type 1 diabetes. Upon information and belief, the DOC's contract with its current medical provider, Wellpath, states that Wellpath relies upon national

56

guidelines when formulating its own working guidelines and specifically relies on the American Diabetes Association's guidelines.

140.  Through Defendants' oversight and monitoring of the delivery of healthcare and their creation of healthcare policies, Defendants are aware of the established standard of care for type 1 diabetes and have actual knowledge that the DOC's practices fall woefully below the standard of care and put T1D Prisoners at direct risk of suffering serious harm. Defendants are similarly aware that many of these prisoners have already suffered serious harm.

141.  T1D Prisoners routinely complain to the DOC's contracted medical provider about their inadequate care and treatment. They regularly raise issues during their medical appointments and submit sick call slips requesting changes in their diabetes treatment to protect their health, including, but not limited to: access to rapid-acting insulin, more frequent blood sugar testing, the ability to dose insulin based on carbohydrate consumption, diabetic eye examinations, diabetic footwear, an appointment with an endocrinologist, and access to insulin pumps and CGMs. For example, Prisoner #1 has repeatedly spoken to medical staff about his dangerous episodes of hypoglycemia with loss of consciousness and his concern that these episodes stem from inappropriate insulin doses.

Prisoner #3 has submitted sick call slips about his need for insulin adjustments due to episodes of hyperglycemia and about Defendants' failure to provide him with a medically appropriate diet. Prisoner #4's parents wrote two detailed letters to both the Superintendent and Medical Director of SCI Cambridge Springs, explaining the standard of care for type 1 diabetes and the risks Prisoner #4 and other T1D Prisoners face unless Defendants provide adequate care. In one letter, they wrote,

> The care provided for [t]ype 1 diabetics at Cambridge Springs is inconsistent and ineffective resulting in unregulated, frequent high and low blood sugar levels. [Prisoner #4] has experienced several severe low blood sugar conditions in the morning that required emergency intervention with glucagon injections. . . . [S]he reports that medical staff do not understand how to treat her condition resulting in these dramatic swings in blood sugar levels. Poorly treated [t]ype 1 diabetes often results in severe complications that require extensive medical treatments.

Prisoner #6 has submitted sick call slips requesting a CGM and seeking care for the various infections and wounds he has developed as a direct result of his inadequately managed diabetes.

142.  Defendants have reviewed numerous grievances filed by T1D Prisoners regarding their inadequate diabetic care, including, but not limited to: the need for access to rapid-acting insulin, more frequent blood sugar testing, the ability to take insulin outside of the scheduled "insulin line" times, the ability to dose insulin based on carbohydrate consumption, and

the need for access to insulin pumps and CGMs. For example, Prisoner #1 has filed and continues to file grievances about the inadequate medical care he receives, and his grievances are illustrative of those that Defendants regularly receive from other T1D Prisoners. Among other issues, Prisoner #1 has grieved Defendants': (1) failure to take him to an endocrinologist; (2) inappropriate responses to episodes of hypoglycemia, including one instance where Prisoner #1 was tased while unresponsive because he did not "allow [correctional officers] to handcuff [him] by keeping [his] arms and hands in front of [him]"; (3) failure to appropriately treat his diabetic complications, including kidney disease and neuropathy; (4) failure to provide him with any bolus insulin coverage despite his elevated blood glucose levels and carbohydrate consumption; (5) failure to provide him with adequate supplies for treating episodes of hypoglycemia; and (6) failure to provide him with an insulin pump and CGM.

143. Defendants also receive requests for reasonable accommodation under the Americans with Disabilities Act that are filed by T1D Prisoners. These requests for accommodation include, but not limited to, requests for: access to CGMs and insulin pumps, access to "keep on person" fast-acting carbohydrates, and a modification of the schedule for mealtimes and/or insulin line. For example, Defendants have received

reasonable accommodation requests from both Prisoners #1 and #2 requesting that the DOC modify its policy banning the use of insulin pumps and CGMs. Many other T1D Prisoners have made similar requests. Defendants have also received requests from Prisoner #2 and other T1D Prisoners for modifications in the DOC's policies regarding access to food and insulin administration times.

144.  Defendants know and are deliberately indifferent to the fact that T1D Prisoners routinely experience dangerously high and low blood sugars, often resulting in hospitalizations or the need for other emergency care.

145.  Defendants know and are deliberately indifferent to the fact that T1D Prisoners' limited contacts with medical professionals with expertise in diabetes management (which occur primarily when they are hospitalized for DKA or in the aftermath of extreme hypoglycemia) are insufficient to treat prisoners with diabetes and that such deficiency in professional care results in further deterioration of their physical health.

146.  Defendants know and are deliberately indifferent to the fact that T1D Prisoners are not provided adequate insulin regimens, leading to prolonged periods of elevated A1C levels that result in serious health

complications, including blindness, cardiovascular disease, kidney disease, amputations, and premature death.

147. Defendants know and are deliberately indifferent to the fact that the DOC has failed to take adequate steps to help T1D Prisoners with elevated A1C levels achieve clinically appropriate control of their diabetes.

148. Defendants know and are deliberately indifferent to the fact that T1D Prisoners suffer grievously without adequate medical treatment, experiencing unnecessary pain from the resulting health complications.

149. Defendants know and are deliberately indifferent to the fact that their practices of not providing short-acting insulin doses at clinically appropriate times and calibrated to carbohydrate intake is not the standard of care for individuals with type 1 diabetes and increase the risk of dangerously high or low blood sugars.

150. Defendants know and are deliberately indifferent to the fact that all T1D Prisoners need but are not provided ready access to fast-acting carbohydrates to prevent and/or treat an episode of hypoglycemia.

151. Defendants know and are deliberately indifferent to the fact that T1D Prisoners need but are not provided rapid-acting insulin to achieve clinically appropriate glucose control, yet they do not assess individuals for

61

the use of it, even when it is readily apparent that T1D Prisoners' blood glucose cannot be controlled on short-acting insulin.

152.   Defendants know and are deliberately indifferent to the fact that many T1D Prisoners need CGMs and insulin pumps to achieve medically appropriate glucose levels, yet they deny such treatment methods even when patients previously used them with positive result.

**D.   The DOC Discriminates Against Prisoners with Type 1 Diabetes in Violation of Applicable Disability Law**

153.   Defendants wrongfully discriminate against T1D Prisoners, including by denying them meaningful access to the DOC's programs, services, and activities. Defendants also refuse to modify existing policies and procedures as necessary to accommodate T1D Prisoners' disability-related needs. Defendants further impose improper and harmful disciplinary sanctions and engage in dangerous use of force against T1D Prisoners based on behaviors that are manifestations of diabetes-related symptoms that instead require treatment.

*1.   The DOC's Policies and Procedures Deny T1D Prisoners Meaningful Access to Prison Programs, Services, and Activities*

154.   Because the DOC refuses to accommodate the individual needs of T1D Prisoners for food or diabetes care outside of the prison's regular schedule for meals and medical care, T1D Prisoners suffer unequal

treatment based on their disability. This includes the discriminatory denial of contact visits, legal calls, and recreational, educational, vocational, and treatment programming.

155.   For example, Prisoner #2 is denied access to contact visits or scheduled legal calls as compared to prisoners without diabetes. Prisoner #2 has requested that the DOC accommodate her diabetes and allow her to receive insulin and equal access to the prison's other programming. The DOC has refused to do so, and thus Prisoner #2 must "choose" between getting the insulin she needs to survive and having a contact visit or legal call. Prisoner #6 has had a similar issue and, in response, the DOC refused to modify procedures so he could receive insulin or test his blood glucose while also getting to participate in programs offered at the prison.

156.   Defendants deny T1D Prisoners the opportunity to participate in certain prison programs, solely because of their disability. For example, Prisoner #3 applied to participate in SCI Rockview's Forestry Unit Program, which is a vocational training program that focuses on forestry and related fields. The DOC rejected Prisoner #3's application "based on the medical condition that this individual is insulin dependent diabetic." Upon information and belief, the DOC did not conduct an individualized assessment of Prisoner #3's ability to participate in the program, with or

63

without reasonable accommodations, and instead denied his participation in the program solely (and automatically) because he has diabetes.

### 2. The DOC Fails to Provide Reasonable Modifications to Their Policies and Procedures as Necessary to Accommodate the Disability Needs of T1D Prisoners

157. T1D Prisoners are not allowed to keep diabetes technology, such as CGMs, insulin pumps, or glucometers, on their person or in their cell. Without this technology, some T1D Prisoners experience uncontrolled blood glucose. If their blood glucose runs low, their ability to participate in yard time is limited due to the denial of access to these modern treatment devices, as exercise can cause and further exacerbate low blood sugar. If their blood glucose is elevated due to a denial of access to these modern treatment devices, their ability to participate in meals is limited, as food can cause and further exacerbate high blood sugar.

158. Defendants refuse to conduct individualized assessments of T1D Prisoners who request a policy modification that would enable them to manage their diabetes effectively such that they have equal access to the prison's programs, services, and activities. Instead, Defendants deny these requests by citing to DOC "policy."

159. For example, Prisoner #1 requested to be put on an insulin pump and CGM as a reasonable accommodation for his type 1 diabetes. In

64

response, the DOC's Americans with Disabilities Act Coordinator wrote: "Your request has been denied. Not medically necessary as glucose can be adequately controlled with the treatment regimen ordered." Prisoner #1's glucose was *not* "adequately controlled with the treatment regimen ordered[,]" as evidenced by his A1C of 9.8, and the fact that he repeatedly experienced dangerously high and low blood sugars. Upon information and belief, the individual serving as the DOC's Americans with Disabilities Act Coordinator at that time had no medical training; nor does the individual currently serving in that role.

160.   Due to the DOC's refusal to modify its policy banning the use of diabetes technology, T1D Prisoners deny themselves meals to better manage their blood glucose levels or skip yard time so they do not experience low blood sugar. Prisoner #2's request for an insulin pump was denied without individualized assessment of whether a policy modification was necessary to provide her with equal access to the prison's program. Prisoner #2 request was denied because, as her treating doctor wrote in her medical record, "the BHCS [Bureau of Health Care Services] does not permit insulin pumps at this time." As a result, Prisoner #2 must refrain from fully participating in the SCI's dining and yard programs.

161.   The DOC also fails to provide the reasonable accommodation

65

of allowing and ensuring T1D Prisoners' access to food or glucose tablets or gel on their person and/or in their cells. In the SCIs that entirely prohibit "keep on person" glucose tablets or gel, Defendants refuse to modify this policy for those who need it.

### 3. The DOC Discriminates Against T1D Prisoners by Disciplining Them for Behaviors That are Manifestations of Their Diabetes

162. Upon information and belief, the DOC disciplines T1D Prisoners for behaviors caused by their hypoglycemia and/or hyperglycemia. Correctional officers wrongly construe T1D Prisoners' failures to respond to directives as defiance in instances where their ability to process information and/or follow directions is diminished by their out-of-range blood sugar symptoms. As a result, correctional officers often issue disciplinary sanctions in circumstances where they should be rendering aid and/or alerting medical staff to an emergency situation. T1D Prisoners are therefore subjected to discipline and/or use force for failure to comply with an order that they have not understood or with which they cannot physically comply due to their disability.

163. Because correctional officers often fail to modify DOC disciplinary policies and procedures as necessary to ensure that T1D Prisoners are not sanctioned for behaviors that are a manifestation of their

66

diabetes, they may be punished and even subjected to isolation by reason of their disability. Prisoner #4 has been placed on "locked-in" status on multiple occasions for her failure to fully comply with commands when she was disoriented due to hypoglycemia. "Locked-in" status means that a prisoner cannot leave their cell for normal daily activities like dayroom, recreation, visits, or phone time. Prisoner #4 was disciplined despite being in a medical state where she could not understand correctional officers' commands and/or could not comply with those commands. These same failures by Defendants also place T1D Prisoners at increased risk of inappropriate and dangerous uses of force. For example, Prisoner #1 was tased while experiencing an episode of hypoglycemia due to his inability to comply with an order to hold his hands in front of him so he could be handcuffed.

## V.    Claims for Relief

**Count I**
**Plaintiff DRP v. Defendant Harry**
**Cruel and Unusual Punishment in Violation of the**
**Eighth Amendment, as Secured by 42 U.S.C. § 1983**

164.   Plaintiff incorporates by reference Paragraphs 1 through 163 of this Complaint.

165.  Defendant Harry is deliberately indifferent to the serious medical needs of prisoners with type 1 diabetes, resulting in substantial risks of serious harms, including death.

166.  Through the policies, practices, and procedures enacted by the DOC and by its contracted medical provider, Defendant Harry systemically violates the Eighth Amendment rights of prisoners with type 1 diabetes. Such policies, practices, and procedures include, without limitation:

- failing to prescribe insulin types and doses that meet the metabolic needs of T1D Prisoners;

- refusing to provide all T1D Prisoners with rapid-acting insulin doses to cover the carbohydrates they consume, and forcing many to rely only on a sliding scale short-acting dose;

- refusing to provide all T1D Prisoners with insulin at all meals and snacks;

- refusing to enable carbohydrate counting;

- summarily removing prisoners from prescribed insulin pumps and CGMs upon their admission to the DOC without a medical basis;

- refusing to medically assess individuals who might need insulin pump and CGM therapy;

- refusing to provide meals and snacks appropriate for the dietary

needs of T1D Prisoners;

- refusing to allow all T1D Prisoners ready access to glucose tablets or other forms of rapid-acting carbohydrates;

- refusing to provide glucose monitoring as needed, including at all meals and before bedtime;

- failing to provide appropriate training in diabetes care for facility staff;

- failing to follow the standard for care for medication and treatment refusals;

- denying T1D Prisoners care from an endocrinologist with expertise in diabetes;

- failing to conduct medically necessary assessments for complications of diabetes;

- refusing access to necessary medical specialists to treat complications from diabetes; and

- failing to follow the standard of care for type 1 diabetes in prisons, as articulated by the American Diabetes Association in its position statement, *Diabetes Management in Detention Facilities*.

167.  Defendant Harry knows or is deliberately indifferent to the fact that these acts and omissions create a substantial risk that T1D Prisoners

in DOC custody will experience serious and potentially painful diabetic complications, up to and including blindness, amputations, and death.

**Count II**
**Plaintiff DRP v. Defendants**
**Pennsylvania Department of Corrections and Secretary Harry**
**Violation of Title II of the Americans with Disabilities Act,**
**42 U.S.C. §§ 12101 *et seq.***

168. Plaintiff incorporates by reference Paragraphs 1 through 163 of this Complaint.

169. DRP's constituents are individuals with type I diabetes and thus have a physical impairment that substantially limits the operation of their endocrine systems and pancreases. As such, they are qualified persons with a disability as defined by Title II of the Americans with Disabilities Act and its implementing regulations. 42 U.S.C. §§ 12102(1)(A), 12102(2)(B); 28 C.F.R. §§ 35.108(a)(1)(i), 35.108(b)(1)(i), 35.108(b)(2), 35.108(c)(1)(ii), 35.108(d)(2)(iii)(H).

170. DRP's constituents are individuals with disabilities who, with or without reasonable modifications to rules, policies, or practices, are eligible for receipt of rehabilitative, recreational, and other services and to participate in the programs and activities of the DOC. They are, therefore, qualified individuals with a disability within the meaning of the Americans with Disabilities Act. *Id.* § 12131(2).

70

171.  Defendant DOC, which is administered by Defendant Harry, is a public entity subject to the requirements of Title II of the Americans with Disabilities Act. *Id.* § 12131(1)–(8).

172.  In the course of Defendants' obligations to provide medical care and other services and evaluations to prisoners, as well as through interactions between Defendants' staff and the contracted medical provider, Wellpath, Defendants know or should know that many of the individuals incarcerated in the DOC have diabetes.

173.  Defendants' policies, practices, and procedures systemically violate the right of T1D Prisoners to be free from discrimination on the basis of disability. Such policies, practices and procedures include, without limitation:

- refusing to modify the DOC's blanket policy banning the use of insulin pumps and CGMs;

- failing to modify prison procedures, routines and schedules to allow T1D Prisoners to receive their insulin and meals at times contemplated to improve their blood glucose control;

- denying T1D Prisoners the opportunity to participate in prison program, services, and activities on the basis of having diabetes;

71

- refusing to modify policies regarding access to food, glucose tablets, insulin, and blood glucose checks, where such reasonable accommodations are necessary for T1D Prisoners to have meaningful access to prison programs, services, and activities; and

- improperly imposing disciplinary sanctions or using undue force against T1D Prisoners for behaviors related to their experiencing hypoglycemia or hyperglycemia that instead require medical treatment.

**Count III**
**Plaintiff DRP v. Defendant**
**Pennsylvania Department of Corrections**
**Violation of the Rehabilitation Act,**
**29 U.S.C. § 794**

174. Plaintiff incorporates by reference Paragraphs 1 through 163 of this Complaint.

175. DRP's constituents are people with type 1 diabetes and thus have a physical impairment that substantially limits the operation of their endocrine system and pancreas. As such, they are qualified persons with a disability as defined by Title II of the Americans with Disabilities Act and its implementing regulations and are therefore considered individuals with a disability under the Rehabilitation Act. 29 U.S.C. § 794; *Id.* § 705(20)(B).

176. Defendant DOC is a recipient of federal funds. The Rehabilitation Act requires all state governments receiving federal funds, including Defendant DOC as an executive level department of state government, to reasonably accommodate qualified individuals with disabilities in their facilities, program activities, and services. *Id.* § 794.

177. Defendant DOC's policies, practices, and procedures systemically violate the right of T1D Prisoners to be free from discrimination on the basis of their disability. Such policies, practices and procedures include, without limitation:

- refusing to modify the DOC's blanket policy banning the use of insulin pumps and CGMs;

- failing to modify prison procedures, routines and schedules to allow T1D Prisoners to receive their insulin and meals at times contemplated to improve their blood glucose control;

- denying T1D Prisoners the opportunity to participate in prison program, services, and activities on the basis of having diabetes;

- refusing to modify policies regarding access to food, glucose tablets, insulin, and blood glucose checks, where such reasonable accommodations are necessary for T1D

73

Prisoners to have meaningful access to prison programs, services, and activities; and

- improperly imposing disciplinary sanctions or using undue force against T1D Prisoners for behaviors related to their experiencing hypoglycemia or hyperglycemia that instead require medical treatment.

## VI.   **<u>Relief</u>**

Plaintiff respectfully requests that this Court:

      a.    Exercise jurisdiction over this action;

      b.    Issue appropriate declaratory and injunctive relief to remedy the constitutional and statutory violations set forth in this Complaint;

      c.    Award reasonable attorneys' fees, litigation expenses, and costs pursuant to 42 U.S.C. §§ 1988(b) and 12205; and

      d.    Grant all other relief as may be appropriate.

Date: March 19, 2026        **Respectfully Submitted**,

By:  */s/* Alexandra Hermann
Alexandra Hermann (PA I.D. No.329343)
Disability Rights Pennsylvania
1800 John F. Kennedy Boulevard
Suite 900
Philadelphia, PA 19103

Office: 215-238-8070
Fax: 215-772-3126
ahermann@disabilityrightspa.org

/s/ Rhonda Brownstein

Rhonda Brownstein (PA I.D. No. 46866)
Disability Rights Pennsylvania
1800 John F. Kennedy Boulevard
Suite 900
Philadelphia, PA 19103
Office: 215-238-8070
Fax: 215-772-3126
rbrownstein@disabilityrightspa.org

/s/ Ella Schaltenbrand

Ella Schaltenbrand (PA I.D. No. 330635)
Disability Rights Pennsylvania
429 Fourth Ave.
Suite 1404
Pittsburgh, PA 15219
Office: 412-391-5225
Fax: 833-699-2110
eschaltenbrand@disabilityrightspa.org

*and*

/s/ Aaron J. Fischer*

Aaron J. Fischer (CA I.D. No. 247391)
Law Office of Aaron J. Fischer
1400 Shattuck Avenue Ste. 12 - # 344
Berkeley, CA 94709
Office: 510-806-7366
Fax: 510-694-6314
ajf@aaronfischerlaw.com
*Application for admission *pro hac vice*
  forthcoming

*Counsel for Plaintiff*

75