<u>INDENTURE OF LEASE</u>

THIS INDENTURE OF LEASE (this "Lease") is made this __23rd__ day of ____June____, 2022, by and between **CHAMBERSBURG MZL LLC**, a Delaware limited liability company having its office for the transaction of business at c/o KPR Centers LLC, 254 West 31st Street, 4th Floor, New York, NY 10001 (hereinafter called "Landlord") and **PRIMANTI CORPORATION** d/b/a **PRIMANTI BROS.**, a Delaware corporation having its office for the transaction of business at 2100 Wharton Street #503, Pittsburgh, PA 15203 (hereinafter called "Tenant").

<u>**WITNESSETH:**</u>

<u>**ARTICLE I**</u>
<u>**DESCRIPTION OF PREMISES**</u>

Landlord, in consideration of the rent to be paid and the covenants and agreements to be performed by Tenant, does hereby lease unto Tenant, and Tenant does hereby lease and take from Landlord, those certain premises, containing approximately **4,800** square feet of floor area (hereinafter referred to as the "Demised Premises"), being situated in the shopping center owned by Landlord in Chambersburg, Pennsylvania, more commonly known as **Chambersburg Crossing** (the "Shopping Center"), said Demised Premises being further shown as the free standing building identified as Unit 15 on the plan attached hereto and incorporated herein as **Exhibit A**.  The use and occupation by Tenant of the Demised Premises shall include the use, in common with others entitled thereto, of the parking facilities within the Shopping Center designed by the Landlord, on an unassigned and un-reserved basis, for the accommodation and parking of automobiles of Tenant's customers while shopping in the Shopping Center, and other common areas and facilities of the Shopping Center, all as hereinafter provided.  The employees of the Tenant shall park their vehicles only within those portions of the parking area as may be designated from time to time by Landlord.  Landlord reserves the right from time to time, and at Landlord's sole discretion, to alter, reduce or redesign the parking area, or the ingress or egress of the parking area; provided, however, that Landlord shall not in the exercise of such rights unreasonably interfere with Tenant's Demised Premises. Landlord shall not, in any event, alter, remove, reduce, redesign, or make additions, alterations, improvements or installations in or to the common areas immediately surrounding the Demised Premises if such alteration would reduce the number of parking spaces below the number of parking spaces required by applicable laws, as the same may be modified by any variance or other relief obtained by Landlord and subject to any existing nonconformities, materially adversely affect the visibility of or access to the Demised Premises, impede traffic flow or otherwise materially adversely affect Tenant's business or the conduct thereof from the Demised Premises.

The Demised Premises are let and taken subject, however, to the following:

(a)     any matters of record affecting the Demised Premises, including without limitation that certain Operation and Easement Agreement dated February 27, 2006, and recorded in the Franklin County Recorder of Deeds Office in Deed Book 3064 at Page 166, as amended by that certain First Amendment to Operation and Easement Agreement dated November 27, 2006 and made January 2, 2007 and recorded in Deed Book 3393, page 226 (the "OEA");

(b)　　any state of facts an accurate survey or inspection of the Shopping Center may show;

(c)　　present and future building codes and restrictions and regulations, zoning laws, and all laws, ordinances, regulations and orders of governmental authorities;

(d)　　rights, if any, of others and Landlord relating to water, gas, electric and other utility lines, wire, poles, pipes and conduits and the maintenance thereof; and

(e)　　rights, if any, of the public in and to any streets or other ways, or portions thereof, included in the Demised Premises.

In addition, Tenant shall have the use of the area shown on **Exhibit A-1** attached hereto for an outdoor seating area (the "Outdoor Seating Area"), provided: (i) Tenant shall obtain Landlord's prior written approval of the design and layout of, and the materials to be used in, the Outdoor Seating Area and the surrounding railings and bollards and canopies, (ii) Tenant shall, at its sole cost and expense, obtain and maintain all licenses, permits and approvals (including any Health Department Permits) required for Tenant's use of the Outdoor Seating Area and shall comply with all applicable laws, orders and regulations relating to the use of the Outdoor Seating Area, (iii) Tenant's use of the Outdoor Seating Area shall be pursuant to all of the terms and conditions of this Lease, (iv) Tenant shall maintain the Outdoor Seating Area in a neat, clean and orderly condition and shall remove or otherwise secure all tables, chairs, umbrellas and other furniture at the close of business each day, (v) Tenant acknowledges that the Outdoor Seating Area shall be delivered to Tenant in "as is" condition as of the date hereof, without representation or warranty by Landlord, and that Landlord shall have no obligation to do or undertake any work to make the Outdoor Seating Area ready or usable for Tenant's use and occupancy, all of which work shall be Tenant's obligation, (vi) in no event shall Tenant's use of the Outdoor Seating Area interfere with ingress and egress to or visibility of other premises or interfere with the operation of the Center, (vii) Tenant's use of the Outdoor Seating Area is subject to all existing leases and matters of record including without limitation the OEA, (viii) prior to using the Outdoor Seating Area, Tenant shall provide to Landlord a certificate of insurance evidencing that the insurance required to be maintained by Tenant pursuant to this Lease covers the Outdoor Seating Area, (ix) Tenant shall release, defend, indemnify, and hold Landlord harmless from any and all claims, demands, suits, judgments, and liability arising in connection with the use of the Outdoor Seating Area and rights granted to Tenant hereunder, and (x) immediately following the earlier to occur of (a) Landlord's revocation of Tenant's rights under this Section, or (b) the expiration or earlier termination of this Lease, Tenant shall remove from the Outdoor Seating Area all personal property and repair any damage caused by such removal.  Tenant shall be responsible for all maintenance, cleaning and repairs in the Outdoor Seating Area at its sole cost. If Tenant shall fail to maintain, clean and/or repair the Outdoor Seating Area consistent with Landlord's standard of maintenance for the Shopping Center, then, after notice and reasonable opportunity to cure, Landlord shall have the right to complete any required maintenance, cleaning or repairs and the costs thereof shall be payable by Tenant to Landlord as Additional Rent hereunder. At Tenant's option, Tenant may engage an architect to lay out the Outdoor Seating Area which may result in the loss of no more than six parking spaces on the southeast side of the Demised Premises, in which event Tenant shall relocate the four existing handicap spaces to the front (south side) of the Demised

Premises and shall maintain all ADA requirements, provided that the foregoing shall be subject to Tenant obtaining Landlord's approval (which shall not be unreasonably withheld), as well as all necessary municipal approvals and all approvals required under the OEA. Notwithstanding clause (i) of this paragraph, Landlord acknowledges and agrees that Tenant shall be entitled to initially operate an unenclosed patio in the Outdoor Seating Area, and at a later date, make such alterations as may be necessary (subject to and in accordance with the terms of this Lease) to allow Tenant to build-out and use Tenant's standard enclosed patio configuration in the Outdoor Seating Area, which includes an overhead canopy, patio enclosures, structural steel elements, electric lighting, and amplified sound for live and recorded audio.  Any such live or recorded audio (a) shall in no event unreasonably interfere with other tenants or occupants of the Shopping Center, (b) shall comply with all applicable laws, codes, and ordinances and the OEA, and (c) shall be maintained at a commercially reasonable sound level.  In the event Landlord receives reasonable complaints from any other tenant or occupant of the Shopping Center, Landlord reserves the right, in its sole discretion, to require Tenant to implement mitigation measures in order to address any such complaints, failing which Landlord may revoke Tenant's right to provide audio outside the Demised Premises.

Landlord hereby acknowledges that Tenant shall have the exclusive use of four (4) parking spaces as identified on **Exhibit A-2** for use by Tenant's customers for to-go orders and for use by third-party delivery services.  In connection therewith, Tenant may, at its sole cost and subject to Landlord's prior written approval not to be unreasonably withheld, conditioned or delayed, install Tenant's standard signage identifying such parking spaces. Tenant is responsible for complying with all applicable laws, codes and ordinances, and all matters of record, including without limitation the OEA, in connection with Tenant's use of such exclusive parking spaces.  Tenant shall defend, indemnify, and hold Landlord harmless from any and all claims, demands, suits, judgments, and liability arising in connection with such exclusive parking spaces and to-go/third party delivery rights. Notwithstanding anything herein to the contrary, in the event that any party in good faith claims that Tenant's use of the exclusive parking spaces violates the terms of any lease or recorded or unrecorded agreement, Landlord reserves the right upon written notice to Tenant to revoke Tenant's right to use the exclusive parking spaces and declare Tenant's rights with respect thereto null and void; provided, however, that Landlord agrees that it shall use commercially reasonable, good-faith efforts to resolve such claim in a manner that allows for Tenant's continued use of the parking spaces on such terms and conditions as shall be acceptable to Landlord, Tenant, and the party asserting the claim, but provided further that Landlord shall not be obligated to incur any material cost or grant any material concession to such party in order to maintain Tenant's right to use the parking spaces. Promptly following the earlier to occur of (a) Landlord's revocation of Tenant's rights under this paragraph, or (b) the expiration or earlier termination of the Lease, Tenant will remove the exclusive parking signs and repair any damage caused by such removal.

## ARTICLE II
## TERM OF LEASE; CONDITIONS OF PREMISES

Section 2.1.  Term of Lease.  The term of this Lease (the "Original Term") shall commence on the Premises Delivery Date and shall end on the last day of the one hundred forty-fourth (144th) month after the Rent Commencement Date, with two (2) five (5) year options to extend.  The Original Term, as the same may be extended, is hereinafter referred to as the "Term."

Section 2.2.  Rent Commencement Date.  It is agreed and understood that Base Rent (as defined in Section 3.1) and Additional Rent (as defined in Section 9.1), under this Lease shall commence on the date hereinafter referred to as the "Rent Commencement Date".  The Rent Commencement Date shall be the earlier of (a) one hundred fifty (150) days from the later of (i) the "Premises Delivery Date" (as defined in Section 2.5), (ii) Tenant's receipt of Tenant's Permits (as defined in Section 2.6), provided Tenant timely applies for Tenant's Permits and thereafter diligently pursues obtaining same in accordance with Section 2.6, and in no event to exceed one hundred eighty (180) days following the date of this Lease, and (iii) Landlord's approval of Tenant's Plans (as defined in Section 2.4), provided Tenant submits Tenant's Plans to Landlord within sixty (60) days following the date of this Lease and thereafter diligently pursues obtaining Landlord's approval thereof, or (b) the date Tenant opens for business to the public. Notwithstanding the foregoing, (a) Tenant shall not be obligated to open for business during the period from November 15 to January 15 (the "Blackout Period"), and (b) if the Rent Commencement Date otherwise would occur during the Blackout Period, the Rent Commencement Date shall be deemed to be the day immediately following the expiration of the Blackout Period; provided, however, that if Tenant elects to open for business during the Blackout Period, Tenant shall commence paying Base Rent and Additional Rent as of such date of Tenant's opening for business.

Section 2.3.  Condition of Premises.  The Demised Premises are leased in "as is" condition, without representation or warranty by Landlord, except as otherwise expressly set forth in this Lease.  Landlord agrees that, subject to the provisions of Sections 2.4 and 7.3 hereof, Tenant shall have the right, at Tenant's sole risk and expense, to make such alterations, renovations or improvements as Tenant from time to time deems expedient or necessary.

Section 2.4.  Tenant's Construction.  All initial work to prepare the Demised Premises for Tenant's occupancy is to be performed by Tenant (hereinafter defined as "Tenant's Initial Work") in accordance with **Exhibit B**.  Within sixty (60) days after the execution and delivery of this Lease, Tenant shall submit to Landlord the plans and specifications for Tenant's Initial Work ("Tenant's Plans"), which Tenant's Plans shall be subject to the prior written approval of Landlord as further described in **Exhibit B**, not to be unreasonably withheld or delayed.

Tenant's Initial Work and the construction, installation, and operation of all of Tenant's trade fixtures and equipment shall be performed, constructed, installed and operated in accordance and in full compliance with all applicable governmental requirements, including without limitation all applicable laws, statutes, codes ordinances and governmental rules, regulations and orders, as well as reasonable and non-discriminatory rules and regulations established by Landlord and communicated to Tenant in writing in advance.  Tenant's Initial Work shall be performed without unreasonable interference and disruption to Landlord or other tenants.

At all times prior to the Rent Commencement Date, Tenant shall be governed by and subject to all the provisions, covenants and conditions of this Lease.

Any general contractor to be used by Tenant to perform Tenant's Initial Work must be reputable, licensed, and insured.  All contractors performing Tenant's Initial Work must first provide a certificate of liability insurance covering the Landlord prior to

4

beginning Tenant's Initial Work. With respect to any work affecting the sprinkler systems, alarm systems and/or the roof, Tenant and Tenant's general contractor shall only employ or utilize Landlord's designated contractors for such areas.

If, for whatever reason, any mechanic's or other lien shall be filed against the Demised Premises or the Shopping Center, purporting to be for labor or materials furnished or to be furnished at the request of Tenant, then Tenant shall, at its expense, cause such lien to be discharged of record by payment, bond or otherwise as allowed by law, within thirty (30) days after notice of the filing thereof.  If Tenant shall fail to cause such lien to be discharged of record within such thirty (30) day period, Landlord, in addition to any other rights and remedies, may, but shall not be obligated to, cause such lien to be discharged by payment, bond or otherwise, without investigation as to the validity thereof or as to any offsets or defenses thereto, and Tenant shall, upon written demand, promptly within thirty (30) days reimburse Landlord for all amounts paid and costs incurred, including reasonable attorney's fees and interest thereon at the rate of 8% annually from the respective dates of Landlord's payment in having such lien discharged of record and, further, Tenant shall otherwise indemnify and save Landlord harmless from any claim or damage resulting therefrom.

Section 2.5.  Premises Delivery Date.   The "Premises Delivery Date" shall be the date on which Landlord shall deliver the keys to the Demised Premises to Tenant or Tenant's representative. Tenant shall not have access to, nor enter, the Demised Premises prior to the later to occur of: (i) Landlord's receipt of a fully executed Lease and (ii) the Premises Delivery Date.

Section 2.6.  Permit Contingency.  Tenant shall apply for all governmental permits necessary for the performance of Tenant's Initial Work ("Tenant's Permits") within ten (10) business days following Landlord's approval of Tenant's Plans (the "Permit Application Deadline") and shall diligently pursue each permit at its sole cost and expense. Tenant shall use commercially reasonable efforts to obtain Tenant's Permits as expeditiously as possible. Landlord will reasonably cooperate with Tenant at no cost to Landlord and will execute any necessary application for Tenant's Permits.  Tenant shall notify Landlord promptly upon Tenant's receipt of approval or rejection of Tenant's Permits.  In the event Tenant fails to receive Tenant's Permits within ninety (90) days following the Permit Application Deadline (the "Permit Contingency Period"), Tenant shall give Landlord written notice of such failure within five (5) days of the expiration of said Permit Contingency Period (the "Failure Notice"). Provided that Tenant has been pursuing Tenant's Permits diligently and in good faith, Tenant may extend the Permit Contingency Period for an additional thirty (30) days. If Tenant fails to receive Tenant's Permits prior to the expiration of the Permit Contingency Period, as extended, despite Tenant continuing to pursue Tenant's Permits diligently and in good faith, Tenant shall give Landlord a Failure Notice within five (5) days of the expiration of said Permit Contingency Period, as extended, and Tenant may extend the Permit Contingency Period for an additional thirty (30) days. If Tenant fails to receive Tenant's Permits prior to the expiration of the Permit Contingency Period, as extended, Tenant shall give Landlord a Failure Notice within five (5) days of the expiration of said Permit Contingency Period, as extended. Each Failure Notice shall state whether Tenant is electing to exercise any available option to extend the Permit Contingency Period. If Tenant does not elect to exercise such option, or nor further options are available, Landlord, by written notice to Tenant within ten (10) days after Landlord's receipt of the applicable Failure Notice, shall have the option, in its sole discretion, to: (i) pursue Tenant's Permits, on Tenant's behalf

5

and at Tenant's cost, by giving Tenant written notice of such intent ("Landlord's Assumption Notice"), or (ii) elect not to pursue Tenant's Permits ("Landlord's Refusal Notice"). In the event Landlord shall elect to pursue Tenant's Permits and shall not obtain approval of the same within an additional sixty (60) days after the date of Landlord's Assumption Notice, Landlord or Tenant shall have the option to terminate this Lease by providing the other with written notice thereof within thirty (30) days after the expiration of said sixty (60)-day period. In the event Landlord shall not elect to pursue Tenant's Permits, Landlord or Tenant shall have the option to terminate this Lease by providing the other with written notice thereof within thirty (30) days after the date of Landlord's Refusal Notice. The date on which either party receives such notice shall be the date at which the Lease becomes null and void and of no further force and effect. Tenant's failure to terminate this Lease within any of aforesaid periods shall deem Tenant's termination option with respect to Tenant's Permits null and void.

Section 2.7. Tenant Improvement Allowance. Within thirty (30) days following the date on which all of the following conditions have been satisfied: (i) Tenant's Initial Work shall have been completed in accordance with the provisions of this Lease; (ii) Tenant shall have requested the Tenant Improvement Allowance in writing and delivered to Landlord the Tenant's Initial Work Completion Documents (as hereinafter defined); (iii) Tenant shall have opened for business to the public in the Demised Premises and shall have commenced paying full Base Rent and Additional Rent as provided in this lease; (iv) Tenant shall have furnished a copy of the Certificate of Occupancy to Landlord; (v) Tenant shall not be in default hereunder; and (vi) Tenant shall have executed and delivered to Landlord an original Form W-9, the Vendor Set Up Sheet provided by Landlord, the Certificate of Insurance as outlined in Section 6.3 and an instrument acknowledging that Tenant has opened for business, and setting forth the Rent Commencement Date and Expiration Date, Landlord shall promptly pay over to Tenant the sum of up to Four Hundred Fifty Thousand and 00/100 Dollars ($450,000.00) to reimburse Tenant for the actual, verifiable third party costs incurred by Tenant in connection with Tenant's Initial Work (the "Tenant Improvement Allowance"). In the event Tenant owes Landlord any sums under or pursuant to this Lease (other than current amounts that are not delinquent) at such time as Landlord is obligated pursuant to the provisions of this Section 2.8 to pay such Tenant Improvement Allowance, Landlord shall have the right to offset said amount from the Tenant Improvement Allowance. Notwithstanding anything to the contrary set forth in this Lease, if the Tenant Improvement Allowance is not claimed by Tenant within twelve (12) full calendar months following the Rent Commencement Date, then Tenant forfeits all rights to collect the unclaimed portion of such Tenant Improvement Allowance.

Section 2.8. Certain Representations. Landlord warrants that (a) the Demised Premises is served with high-speed broad band internet; (b) all utilities serving the Demised Premises are separately metered to the Demised Premises; and (c) all exclusive use provisions and use restrictions set forth in leases of other tenants in the Shopping Center and matters of record affecting the Demised Premises as of the date of this Lease are set forth in **Exhibit D** attached hereto. Further, Landlord warrants that there are currently, and covenants that during the Term there shall be, except to the extent required by applicable law or legal authorities or in connection with a casualty or condemnation, a minimum of twenty (20) parking spaces per 1,000 square feet of the Demised Premises as it exists as of the date of this Lease in the area identified on **Exhibit A-5** attached hereto (the "Required Parking Area").

6

## **ARTICLE III**
## **RENT**

Section 3.1.  Base Rent.  From the Rent Commencement Date, Tenant agrees to pay to Landlord, at Landlord's office or at such place as Landlord may from time to time designate in writing, or at Landlord's request, by ACH debit of immediately available funds pursuant to instructions to be provided by Landlord, fixed minimum rent (the "Base Rent") of:

| Years | PSF | Annual | Monthly |
|---|---|---|---|
| Years 1-12: | $30.21 | $145,000.00 | $12,083.33 |

The phrase "Base Rent" shall mean the fixed minimum rent above specified without any set-offs or deductions whatsoever and shall be payable and without any prior demand being made therefore on the first day of each month in advance.

If the Rent Commencement Date shall occur or this Lease shall terminate on any day other than the first day of a calendar month, the rent and such other charges for such calendar month shall be prorated as provided in Section 3.2 below.

Section 3.2.  Adjustment for Partial Months Within the Term.  Payments due under the terms of this Lease for partial months within the Term shall be prorated in the same ratio that the number of days during which Tenant occupies the Demised Premises in any such month bears to the number of days in said month, without allowance for weekends or holidays.  Tenant's obligation to pay rent or to make any other payments or to fulfill any other obligations under this Lease shall terminate on the day following the date on which Tenant vacates the Demised Premises at the expiration or earlier termination of the Term, and all monetary obligations created by this Lease shall be prorated through the date on which Tenant shall have so vacated the Demised Premises.

Section 3.3.  Sales Reporting.  The term "gross sales" shall mean all gross sales, whether for cash or on credit, made by Tenant directly or indirectly, or by others (such as assignees, subtenants, or concessionaires), it being agreed by the Tenant that sales of such others shall be itemized separately in the statements hereinafter referred to and that nothing herein contained shall in any way affect the covenant herein elsewhere contained prohibiting an assignment hereof or underletting to, or use, occupation, or improvement by, others of the Demised Premises or any part thereof without the Landlord's written consent at, from or through the use of the Demised Premises whether payment therefore or delivery of merchandise or services be made at or from some other place, in any lease year during the term of this Lease.  Not included in gross sales shall be any and all sales or gross receipts taxes imposed by any governmental authority having jurisdiction, merchandise returned by customers for whom refunds are given by Tenant, or merchandise used by the Tenant.

Within, and no later than, thirty (30) days after the close of Tenant's fiscal year during the Term hereof, Tenant shall submit to Landlord a statement of all gross sales made at or from the Demised Premises during the previous year.  Said forms shall be in such form and detail as Landlord may reasonably require and shall be signed by a responsible officer of Tenant.

Section 3.4.  Extension Options.  Provided Tenant is not in default beyond any applicable grace period in the performance of any term of this Lease, Tenant shall have the option, exercised by written notice to Landlord, given not less than twelve (12) months prior to the expiration of the Original Term or first Extended Term, as applicable, to extend the term of the Lease for two (2), five (5) year periods (each, an "Extended Term") commencing upon the expiration of the Original Term or first Extended Term, as applicable, under the same terms and conditions of the Lease, except that the Base Rent for each Extended Term shall be per the following schedule:

First Extended Term:

| Years | PSF | Annual | Monthly |
|---|---|---|---|
| Years 13-17: | $33.23 | $159,500.00 | $13,291.67 |

Second Extended Term:

| Years | PSF | Annual | Monthly |
|---|---|---|---|
| Years 18-22: | $36.55 | $175,450.00 | $14,620.83 |

Any such extension shall be added to the Term of this Lease.  There shall be no further extension options following the second Extended Term as stated above.

Section 3.5.  Tenant's Pro Rata Share.  "Tenant's Pro Rata Share," as used herein, shall equal the proportion which the gross floor area of the Demised Premises bears to the gross floor area of the floor area in the Shopping Center less any areas for which, as applicable, "Real Estate Taxes," "Common Area Maintenance Charges" and/or "Insurance Expenses" (each as hereinafter defined) are paid or allocated separately.  Tenant's Pro Rata Share, as used in this Lease, shall be subject to recalculation in accordance with changes or reallocations in the square footage of the Shopping Center or within the phases of shopping center of which the Shopping Center is a part, for any charges or costs which shall be paid or allocated separately and/or due to Landlord's method of calculation Real Estate Taxes, Common Area Maintenance Charges or Insurance Expenses between or amongst various phases of the Shopping Center.  In addition, Landlord reserves the right to create pools of similarly situated tenants for the purpose of allocating certain Common Area Maintenance Charges that benefit only the tenants in such pool ("Specialized Costs"). For the purpose of allocating Specialized Costs for any pool of which Tenant is a member, Tenant's Pro Rata Share shall be a fraction, the numerator of which shall be the leasable area of the Demised Premises, and the denominator of which shall be the leasable area of the premises of all tenants in such pool.

**ARTICLE IV**
**REAL ESTATE TAXES**

Section 4.1.  Real Estate Taxes and Assessments.  Landlord shall pay to the local tax authorities and other governmental agencies throughout the Term of this Lease and any renewal thereof, all real estate taxes and all assessments which may be levied against the Shopping Center and the land and buildings comprising the same.  Tenant agrees to pay to the local tax authorities and other governmental agencies, throughout the Term of this Lease and any renewal thereof, all personal property taxes which may be levied against

8

Tenant's merchandise, trade fixtures and other personal property in and about the Demised Premises.

Section 4.2. Payment of Real Estate Taxes by Tenant. Beginning on the Rent Commencement Date, in addition to the Base Rent payable as provided in Article III hereof, Tenant shall pay to Landlord, as Additional Rent, a sum equal to Tenant's Pro Rata Share of Real Estate Taxes due with respect to each tax year (or portion thereof) during each year of the Term hereof, on the first day of each month during the Term hereof and a pro rata sum for any partial month, all as hereinafter provided. The term "Real Estate Taxes" shall mean all taxes, assessments and betterments levied, assessed or imposed at any time by any governmental authority upon or against the Shopping Center and land on which the Shopping Center is situated, or any part thereof, and on any buildings and other improvements therein or thereon, in addition to reasonable consulting fees incurred in connection with any tax assessment appeal or similar contest, and shall include any payments for taxes for any portion of the Shopping Center or the development of which the Shopping Center is a part, made under or pursuant to any agreement, declaration, underlying or ground lease (excluding ground lease rent), or other instrument. Tenant's Pro Rata Share of Real Estate Taxes shall be calculated based on the face value of such Real Estate Taxes, but including the full amount of any discount or other reduction actually obtained by Landlord for prompt, early, or full payment, and excluding any interest, late fees, or mark-up (except to the extent resulting from Tenant's failure to timely pay its Pro Rata Share thereof).

Tenant shall pay to Landlord, on account of the estimated amount of Tenant's Pro Rata Share of the Real Estate Taxes, monthly installments (subject to an increase or decrease based on the immediately preceding year's experience) on the first day of each month during the Term hereof, or if Landlord and Tenant mutually agree, an advance payment of Real Estate Taxes for a reasonable time period determined by Landlord, which time period shall not exceed six (6) months, based upon the billing practices of the local taxing authority. Any sums collected from Tenant by Landlord in advance for such Real Estate Tax payments shall be held in escrow by Landlord and applied to payment of said taxes when due.

Notwithstanding the foregoing, if the Demised Premises or parcel upon which the Demised Premises are located becomes a separate tax lot, Tenant will be responsible for 100% of the costs of its tax lot and shall pay such taxes directly to the taxing authority and shall provide proof of payment to Landlord upon request.

Section 4.3. Taxes in Lieu of or in Addition to Real Estate Taxes. If, at any time during the Term hereof, the present system of ad valorem taxation of real property shall be changed so that in lieu of, or in addition to, Real Estate Taxes set forth above there shall be assessed on Landlord a capital levy or other tax on the Base Rent, Percentage Rent and/or any Additional Rent (the "Gross Rents") received with respect to the Shopping Center, or if there shall be assessed on Landlord a federal, state, county, municipal, or other local income, franchise, excise or similar tax, assessment, levy or charge measured by or based, in whole or in part, upon any such Gross Rents, then any and all of such taxes, assessments, levies or charges, to the extent that the same would be payable if the Shopping Center were the only property of Landlord subject to same, and if the income from the Shopping Center were the only taxable income of Landlord during the years in question, shall be deemed to be included within the term "Real Estate Taxes."

9

**ARTICLE V**
**COMMON AREAS**

Section 5.1. Common Area Maintenance. Landlord shall make available from time to time within the Shopping Center such Common Area (including, but not limited to, parking areas, driveways, truck ways, delivery passages, common truck loading areas, access and egress passages, walkways and sidewalks) as Landlord shall reasonably deem appropriate. Landlord shall operate, manage, equip, hire police details as necessary (as Landlord shall reasonably deem appropriate), light (until 9:30 p.m. on all days except such Sundays and holidays on which businesses are not usually open), repair and maintain such Common Areas and landscaped areas for their intended purposes, all in such manner as Landlord shall, in its reasonable discretion, determines, keeping all parking areas clean and reasonably free of snow and ice, provided that Tenant shall use commercially reasonable efforts to reasonably assist Landlord in clearing the entrances to the Demised Premises and sidewalks in front of the Demised Premises of snow and ice during periods of inclement weather (but any failure of Tenant to so assist shall not be a default hereunder). Landlord shall not be liable for any inconvenience or interruption of business or other consequences resulting from the making of repairs, replacements, improvements, alterations or additions, or from the doing of any other work to or upon any of such Common Areas, or from delay or failure to perform such maintenance or other work with respect to such Common Areas where such delay or failure is attributable to labor troubles, material shortages or any other causes beyond Landlord's reasonable control. It is agreed that the use of said Common Areas shall at all times be subject to such reasonable and non-discriminatory rules and regulations as the Landlord may promulgate uniformly for all the Landlord's tenants in the Shopping Center, in common with others, including but not limited to the designation by Landlord of areas in which such Shopping Center tenants (including Tenant herein) and their employees are to park. The rules and regulations of the Shopping Center as of the date of this Lease are attached hereto as **Exhibit E**. Any amendments to such rules and regulations shall be communicated to Tenant in writing.

Landlord may, from time to time, change the size, location and nature of any Common Area in the Shopping Center; provided, however, that, provided Tenant is not in default hereunder beyond notice and the expiration of any applicable cure period, and is open for business for the use permitted hereunder (other than temporary closures for renovations, due to casualty or events of force majeure, or other temporary cessation of operations), and except to the extent required by applicable law or legal authorities or in connection with a casualty or condemnation, Landlord shall not construct any building or permanent structure in the No Build Area after the date of this Lease, except roadway, driveway and parking elements, traffic control and directional signage, landscaping, cart storage structures, lighting, and other similar design elements. As used herein, the term "No Build Area" shall refer to portion of the Shopping Center identified as such on **Exhibit A-3**.

Landlord shall provide a dumpster enclosure and area for Tenant's grease container in the area identified as "Dumpster Area" on **Exhibit A-4** attached hereto.

Section 5.2. Charge for Common Area Maintenance. Beginning on the Rent Commencement Date, Tenant covenants and agrees to pay unto the Landlord, as Additional Rent, Tenant's Pro Rata Share of the annual cost of operating, managing, altering, repairing, restoring, renovating, cleaning, painting, maintaining, removing trash from and

making improvements to (a) the buildings, roof, parking and Common Areas, (b) the plumbing, sanitary sewage and electric system therein, and the sprinkler and other fire protection and fire protection alarm systems therein; and the lighting, insuring, and the policing of the Common Areas, and (c) payments under any easement, license, operating agreement, declaration, restrictive covenant, underlying or ground lease (excluding ground lease rent), or instrument pertaining to the sharing of costs by the Shopping Center with any parties within the Shopping Center, areas adjacent to the Shopping Center and/or areas that are part of the common development which includes the Shopping Center is a part, and any other costs associated with Common Area Maintenance as described in Section 5.1 above, together with an administrative fee of fifteen percent (15%) of all of said Tenant's fraction of the foregoing charges, exclusive of the cost of taxes, insurance premiums and utilities (collectively, "Common Area Maintenance Charges").

In no event shall Common Area Maintenance Charges include the following: (i) expenses not fully chargeable pursuant to generally accepted accounting principles as a current expense in the year the expenditure is incurred or any cost or expenses that, in accordance with generally accepted accounting principles, constitutes a capital expenditure or is otherwise required to be capitalized; (ii) structural repairs and replacements; (iii) loan payments of any type; (iv) costs of electricity or other utilities for other tenants in the Shopping Center; (v) depreciation or amortization of any improvements; (vi) leasing costs for the Shopping Center; (vii) rents payable with respect to any leasing office space or any ground or underlying lease affecting the Shopping Center; (viii) costs of investigating, monitoring or remediating hazardous substances; (ix) costs recoverable by Landlord pursuant to its insurance policies; (x) any costs as a result of Landlord's negligence or Landlord's default under the Lease; (xi) legal fees to settle disputes with other tenants; (xii) the cost of any special service provided to a tenant or paid to a tenant in the Shopping Center, which is not provided generally to the other tenants of the Shopping Center or is available to Tenant only for an additional direct charge (in addition to Tenant's payment of its Pro Rata Share of Common Area Maintenance Charges); (xiii) any, managerial, administrative or supervisory fees in excess of fifteen percent (15%) of other Common Area Maintenance Charges (exclusive of taxes, insurance premiums and utilities); (xiv) any payments on account of taxes in excess of the gross amount thereof, as reduced by the maximum possible discount for early payment, and exclusive of any interest, penalties or other amounts for late payment; (xv) reserves of any kind; (xvi) merchants' association fees, advertising costs or contributions for promotion of the Shopping Center; (xvii) costs, fines or penalties incurred by Landlord due to violations of any applicable law, governmental requirement or order; (xviii) any penalties or interest incurred by Landlord as a result of its failure to pay for any expenses in a timely manner, (xix) costs of correcting initial construction defects; or (xx) costs of compliance with any laws or ordinances.

Section 5.3.  Payment of Common Charges.  Tenant agrees to pay to Landlord Tenant's Pro Rata Share of the Common Area Maintenance Charges.  Tenant shall pay to Landlord on account of its estimated Pro Rata Share monthly installments (subject to increase or decrease based on the immediately preceding year's experience) on the first day of each month during the Term hereof and a pro rata sum for any partial month.  Within one hundred and twenty (120) days after the close of the first and each subsequent calendar year or, at Landlord's option, the close of Landlord's fiscal year, during the Term and any extensions of the Term, and following the termination of this Lease, Landlord shall submit to Tenant a statement of the Common Area Maintenance Charges for said calendar or fiscal year or portion thereof.  Such statements shall contain documentation reasonably supporting the Common Area Maintenance Charges and a calculation of Tenant's Pro Rata

11

Share hereunder. If such statement indicates that the amount paid by Tenant on its account for said calendar or fiscal year is less than Tenant's actual Pro Rata Share of the Common Area Maintenance Charges for said calendar or fiscal year, then Tenant shall pay the amount owing to Landlord within thirty (30) days of receipt of such statement. Should such statement indicate that Tenant has overpaid its Pro Rata Share of Common Area Maintenance Charges for said calendar or fiscal year, then such overpayment shall be, at Landlord's option, (a) applied as a credit to Tenant's Common Area Maintenance Charges for the following calendar or fiscal year, or (b) refunded together with Landlord's annual statement. For the first and last partial calendar or fiscal year of this Lease, Tenant will pay Tenant's Pro Rata Share of Common Area Maintenance Charges for the entire year multiplied by a fraction, the numerator of which is the number of days in the calendar or fiscal year subsequent to the Rent Commencement Date, or prior to the date of Lease termination, as the case may be, and the denominator of which is three hundred sixty-five (365).

Tenant shall not engage a third-party auditor to perform its reconciliations. Upon acceptance of the reconciliation by Landlord and Tenant, or if Tenant does not dispute Landlord's statement of the Common Area Maintenance Charges within six (6) months following Tenant's receipt of such statement, Tenant shall not be entitled to any refund, difference or re-calculation. If Tenant timely disputes Landlord's statement of the Common Area Maintenance Charges or in good faith reasonably requests further documentation or substantiation thereof, Landlord shall reasonably cooperate by providing Tenant with copies of such further documentation or substantiation to the extent in Landlord's possession or control.

## ARTICLE VI
## INSURANCE AND INDEMNIFICATION

Section 6.1. Landlord's Insurance. At all times Landlord shall insure all buildings in the Shopping Center for at least their full reasonable replacement value and shall also provide Landlord's normal liability coverages for the Shopping Center's parking and Common Areas and rental insurance and all other types of insurance in amounts as Landlord deems necessary or desirable for insuring the Shopping Center, Tenant shall pay to Landlord, as Additional Rent, Tenant's Pro Rata Share of the reasonable cost of the insurance to be maintained by Landlord under this Article. Tenant's Pro Rata Share shall be paid monthly as a part of Common Area Maintenance Charges.

Section 6.2. Tenant's Insurance. Tenant shall, upon the Premises Delivery Date, obtain and thereafter maintain, throughout the Term and any extensions thereof, at its own cost and expense, (i) general liability insurance (containing standard extended coverage endorsements, so-called) covering the Demised Premises insofar as used by customers, employees, servants or invitees of the Tenant, naming Tenant and Landlord as insured parties, with such companies as are reasonably sound, licensed to do business in the state where the Shopping Center is located, and rated no lower than A VIII, in amounts not less than One Million Dollars ($1,000,000) combined single limit for bodily injury and property damage with a Two Million Dollar ($2,000,000) general aggregate, (ii) comprehensive auto liability, including owned, non-owned and hired vehicles, for any occurrence in or about the Premises and/or Common Areas, in amounts not less than One Million Dollars ($1,000,000), (iii) workers' compensation insurance with statutory limits including employers liability with limits of (x) $500,000 each accident, (y) $500,000 disease – each employee, and (z) $500,000 disease – policy limit, covering all of Tenant's employees

12

working in the Demised Premises, (iv) umbrella liability policy covering general liability, auto liability, and employers liability in amounts not less than Five Million Dollars ($5,000,000), (v) liquor liability insurance in an amount of at least Two Million Dollars ($2,000,000) per occurrence, and (vi) property insurance written on a causes of loss - special form basis insuring Tenant's personal property, improvements, betterments, alterations, and plate glass for their replacement cost, and also providing business interruption coverage including loss of income. Tenant shall name Landlord, its lenders, officers, agents, and employees, Katz Properties Management LLC, KPR Centers LLC, and any other entities as Landlord may deem appropriate from time to time as additional insureds as their interests may appear, on a primary and non-contributory basis on all policies carried and required to be carried by Tenant hereunder, other than workers' compensation insurance. Tenant shall increase the limits of such policies at Landlord's request from time to time consistent with commercially reasonable standards applicable to similar properties in the surrounding area of the Demised Premises, but not more than once during the Term.

Section 6.3. <u>Certificates of Insurance</u>. At or prior to the Premises Delivery Date of this Lease, Tenant shall provide Landlord with certificates of insurance certifying that all insurance required to be carried by the Tenant under the terms of this Lease is in full force and effect and, to the extent available, bearing the endorsement that Landlord shall receive not less than thirty (30) days' prior written notice of the expiration or other termination thereof and no policy for any such insurance will be canceled without at least thirty (30) days' prior written notice to Landlord.

Section 6.4. <u>Waiver of Subrogation</u>. Landlord and Tenant hereby waive any rights each may have against the other on account of any loss or damage occasioned to Landlord or Tenant, as the case may be, their respective property, the Demised Premises or its contents or to other portions of the Shopping Center, arising from any risk to the insured against under any applicable property casualty insurance actually maintained by Landlord or Tenant or which is required to be maintained under the terms of this Lease and the parties each, on behalf of their respective insurance companies insuring the property of either Landlord or Tenant against any such loss, waive any right of subrogation that it may have against Landlord or Tenant, as the case may be. Landlord and Tenant shall obtain such endorsements to all policies of insurance as may be necessary to give full effect to the above waivers.

Section 6.5. <u>Indemnification</u>. Subject to Section 6.4, Tenant shall save Landlord harmless and exonerate and indemnify Landlord from and against any and all claims, liabilities or penalties asserted by or on behalf of any person, firm, corporation, or public authority on account of injury, death, damage or loss to person or property arising out of the use or occupancy of the Demised Premises by Tenant or by any person claiming by, through or under Tenant (including, without limitation, all patrons, employees and customers of Tenant), or arising out of any delivery to or service supplies to the Demised Premises, or on account of or based upon anything whatsoever done on the Demised Premises, except if the same were caused by negligence, fault or misconduct of Landlord, its agents, servants, or employees. In respect of all of the forgoing, Tenant shall indemnify Landlord from and against all costs, expenses (including reasonable attorneys' fees), and liabilities incurred in or in connection with any such claim, action or proceeding brought thereon; and, in case of any action or proceeding brought against Landlord, shall resist or defend such action or proceeding and employ counsel thereof reasonably satisfactory to Landlord. In no event shall Landlord be liable for consequential damages. Tenant's

13

obligations under this Section 6.5 shall survive the expiration or other termination of this Lease. Subject to Section 6.4, Landlord shall save Tenant harmless and exonerate and indemnify Tenant from and against any and all claims, liabilities or penalties asserted by or on behalf of any person, firm, corporation, or public authority on account of bodily injury, personal injury, or death or damage to the property of third persons occasioned by events occurring on or about the Common Areas, to the extent occasioned by or arising out of any wrongful act or omission of Landlord or Landlord's agents or employees. Except to the extent arising as a result of a breach by Tenant of Article XIV or Section 17.2, in no event shall either party be liable to the other for consequential, punitive, or special damages.

## ARTICLE VII
## REPAIRS AND ALTERATIONS

Section 7.1.  Landlord Alterations and Additions to Shopping Center.  Subject to all other terms and conditions of the Lease and the rights granted to and restrictions made in favor of Tenant hereunder, including the No Build Area described in Section 5.1, Landlord reserves the right at any time and from time to time without the same constituting breach of Landlord's covenant of quiet enjoyment or an actual or constructive eviction, and without incurring any liability to Tenant or otherwise affecting Tenant's obligations under this Lease, to make such changes, alterations, additions, improvements, repairs or replacements in or to the Shopping Center, including Common Areas but excluding the Demises Premises, as Landlord in its sole but reasonable discretion deems advisable. Landlord shall not use the roof, foundation or exterior walls of the Demised Premises for signs or in connection with additional construction.  Nothing contained in this Section shall be deemed to relieve Tenant of any duty, obligation or liability of Tenant with respect to making any repairs, replacements or improvements or complying with any law, order or requirement of any governmental or other authority, or to relieve Landlord of any duty, obligation or liability arising under any other provision of this Lease.  Landlord shall, in making any such changes, alterations, additions, improvements, repairs or replacements, use commercially reasonable efforts to avoid (or if unavoidable, to minimize) any disruption to Tenant's use, operation, and quiet enjoyment of the Demised Premises.

Section 7.2.  Repairs to Demised Premises.  Tenant covenants and agrees, at its expense, to maintain and repair the Demised Premises, including, without limitation, all plumbing to outside connections with Landlord's systems, plumbing fixtures, drains, hot water heater and its accessories, all lighting and electrical systems (including light fixtures, light shields, ballasts bulbs, outlets, switched and circuit breakers to the main panel), all interior and exterior doors and door closers, mechanisms and locks, exterior signs and door lights, in as good order and repair as the same are in at the Premises Delivery Date, or shall be put in during the Term, damage by fire, unavoidable casualty and ordinary wear and tear only excepted.  Tenant shall also replace any glass storefronts which may be damaged or broken with glass of the same quality, maintain all floor coverings, wall coverings and paint within the interior of the Demised Premises, make any repairs to the roof of the Demised Premises made necessary by employees or agents of Tenant or by trespassers or persons breaking into the Demised Premised or made necessary by required repairs to the maintenance of the HVAC equipment, keep the Demised Premises and area clean and neat and keep the sidewalk in front of the Demised Premises free of dirt, ice and snow, and keep the sidewalk in front of the Demised Premises free of litter and refuse.  Tenant is required to properly dispose of all trash and refuse from the Demised Premises at its expense.

14

Tenant is required to keep canopy and sign lights lit during such hours as Tenant is open for business, in addition to keeping Tenant's façade signage lit from dusk until at least 11:00 p.m.  Tenant agrees that it will take complete responsibility, from the Premises Delivery Date through the Original Term and any extension thereto, for manufacturer recommended routine preventative maintenance, repairs and replacement of HVAC equipment and further agrees to have the air-conditioning and heating systems thoroughly inspected and serviced at least twice in each calendar year—once during the spring season and once during the fall season of each year—and that it will (a) furnish certificates of the same to Landlord after each inspection, and (b) pay for such service calls including the cost of parts and labor, related to the maintenance of said system.  Landlord, upon prior notice to Tenant and opportunity to cure (except in the event of emergency), and at the expense of Tenant, may elect to perform any inspections, servicing, repairs or maintenance not performed by Tenant as required under this Section 7.2, or to repair any damage or injury to the Demised Premises or caused by moving property of Tenant in or out of the Demised Premises or by installation or removal of equipment or other property, or by misuse by, or neglect, or improper conduct of, Tenant or Tenant's servants, employees, agents, or licensees.  Except as otherwise herein above set forth, exterior (including the roof) repairs or replacements, and any repairs or replacements due to defects in the structural members of the Demised Premises, whether interior or exterior, shall be made by and at the expense of Landlord.

Section 7.3.    Tenant Alterations.  Tenant shall not make any structural or nonstructural alterations to the Demised Premises or alterations to the storefront of the Demised Premises without obtaining the prior written consent of Landlord.  Tenant shall have the right, however, at its expense, from time to time to redecorate the Demised Premises and to make such nonstructural alterations and leasehold improvements in such parts thereof as it shall deem expedient or necessary for its purposes; provided, however, that any such redecoration or leasehold improvements (a) shall not impair the structural strength or integrity of the Demised Premises or the base building systems, (b) shall not diminish its value, (c) shall be done in a good and workmanlike manner, and (d) with respect to any work affecting the sprinkler systems, alarm systems and/or the roof, Tenant and Tenant's general contractor shall only employ or utilize Landlord's designated contractors for such areas.  Prior to commencement of any alterations or improvements, Tenant shall furnish to Landlord certificates evidencing that any contractors performing work on behalf of Tenant have procured such worker's compensation, general liability, personal and property damage insurance as Landlord may reasonably require, naming Landlord and any additional parties specified by Landlord as additional insureds, and Tenant shall save the Landlord harmless on account of the filing of any mechanics' liens or an account of any other cause arising from the making of any such alterations or improvements.

Landlord shall not be liable for any loss of damage to any fixtures, equipment or other property installed or located in the Demised Premises or for any work performed therein by Tenant or Tenant's agents, employees, or contractors.  Landlord shall execute and deliver, at Tenant's expense, upon request of Tenant, such instrument or instruments embodying the approval of Landlord which may reasonably be required by any public or quasi-public authority for the purpose of obtaining any license or permit for the making of such alterations, changes and/or installations in, to or upon the Demised Premises as may be permitted hereunder.  Any redecoration, alterations, changes, improvements and installations which may be so constructed or added shall, at the end of the Term of this Lease, or any extension thereof, at the election of the Landlord, be considered as

improvements and become a part of the Shopping Center, and Tenant shall have no right to remove the same without Landlord's prior written consent; provided, however, that Tenant shall in any event be entitled to remove any item or alteration bearing any trademark, service mark, branding, or trade dress of Tenant (whether or not registered or capable of registration), but Tenant shall repair any damage caused thereby. Tenant shall be responsible for paying to Landlord the entire amount of any real estate taxes attributable to any alterations, additions, or improvements made by Tenant pursuant to this Article.

## ARTICLE VIII
## USE OF PREMISES

Section 8.1.  Use of Premises.  Tenant covenants and agrees that, during the Term of this Lease, the Demised Premises will be used only for the purpose of the operation of a restaurant, subject to local code, subject to existing shopping center exclusives and restrictions, and subject to rules and regulations of the Shopping Center and for no other purposes whatsoever without the prior written approval of the Landlord. Tenant agrees not to violate the exclusive use provisions and restrictions of any other tenant currently operating in the Shopping Center which are attached to this Lease as **Exhibit D**, their successors and assigns pursuant to existing leases and any renewals and extensions thereof, and the use provisions of any future tenant that do not conflict with Tenant's use provisions, provided Landlord provides written notice thereof to Tenant.  In the event Tenant violates any such provision, Tenant shall immediately cease such conduct. If Tenant is determined to be in violation of such use provisions and fails to cease such violation after notice and opportunity to cure in no event to exceed ten (10) days, Landlord shall have all rights and remedies, including, without limitation, the right to immediately terminate this Lease.

Section 8.2.  Change of Name.  Tenant agrees to operate initially under the trade name referred to in the Lease and not to change the name of the business operated in the Demised Premises or to conduct business at the Demised Premises under any additional advertised name without the prior written consent of Landlord, not to be unreasonably withheld, conditioned or delayed.  Notwithstanding anything to the contrary, it is agreed between the parties, provided Tenant delivers written notice to Landlord, that Tenant may change its trade name without prior consent of the Landlord, provided that the trade name is the trade name used by all or substantially all stores operated by Tenant under its current trade name nationwide, and provided that such trade name will not conflict with trade names of any other tenants in the Shopping Center.

Section 8.3.  Exclusive Use.  Provided that Tenant has been operating in the Demised Premises as a "Primanti Bros." restaurant, that no Event of Default shall be continuing, and excluding existing leases and uses permitting the tenant or occupant thereunder to engage in the Tenant's Exclusive Use without any waiver, consent, or approval, Landlord agrees that during the Term, it shall not enter into a lease for space in any portion of the Shopping Center (including any outparcel) owned or controlled by Landlord or any affiliate of Landlord, directly or indirectly, that permits the operation of such tenant's premises for Tenant's Exclusive Use, whether in whole or in part, or permit any existing tenant or occupant of any portion of the Shopping Center (including any outparcel) owned or controlled by Landlord or any affiliate of Landlord, directly or indirectly, to engage in Tenant's Exclusive Use.  As used herein, "Tenant's Exclusive Use" shall mean: (i) offering sandwiches stuffed with French fries, (ii) a full-service restaurant that sells alcohol and whose primary business is the sale of sandwiches, (iii) a full-service

16

restaurant that has more than 20 beer taps, or (iv) a Roosters, Aroogas, BJ's Brewhouse, Bubba's 33, Panini's, Millers Ale House, Winking Lizard, Buffalo Wild Wings, Quaker Steak and Lube, or any similar local or regional sports bar or casual dining "bar and grill" concept. Upon Landlord's violation of the provisions of this Section 8.3, Tenant shall notify Landlord, and if such violation is not cured within sixty (60) days after such notice, Tenant shall have the right to pay (in lieu of Base Rent) fifty percent (50%) of the Base Rent due hereunder ("Alternate Rent"), beginning on the expiration of such cure period until the earlier of (i) the date such violation ceases or (ii) one hundred eighty (180) days after the expiration of such cure period. If such violation continues for one hundred eighty (180) days after the expiration of such cure period, Tenant shall, as its sole remedy, at Tenant's option, either (a) terminate this Lease on thirty (30) days' written notice provided within thirty (30) days after the expiration of such one hundred eighty (180) day period, and, upon such termination, the parties shall be released from all liabilities accruing thereafter, except for such obligations that expressly survive the termination of this Lease, or (b) resume paying full Base Rent due hereunder.  In the event Tenant does not terminate this Lease within the required thirty (30) day period, Tenant shall be deemed to have elected option (b). Notwithstanding the foregoing, Landlord shall have no liability for any violation of the provisions of this Section 8.3, except, however, where Landlord has caused and/or knowingly participated in such violation, provided that Landlord shall use commercially reasonable efforts to remedy such violation not caused and/or knowingly participated in by Landlord.

Section 8.4.  Prohibited Uses.  Provided that Tenant is open for business in accordance with the use permitted hereunder and that no Event of Default shall be continuing, Landlord shall not enter into a lease for space in the Shopping Center or any outparcel owned or controlled, directly or indirectly, by Landlord or any affiliate of Landlord, that permits the operation of such tenant's premises for any of the following: any unlawful use, funeral establishment, used car lot, pawn shop, thrift store (excluding Goodwill or any other nationally or regional recognized second hand shop, i.e. Uptown Cheapskate/ Plato's closet/ PlayitAgain Sports), shooting gallery, adult bookstore or facility selling, renting or displaying pornographic or adult books, magazines, literature, films, pictures, videotapes, video discs or other adult paraphernalia or merchandise of any kind (excluding first class bookstores such as Barnes and Noble), unemployment agency, food stamp center, check cashing business (provided that check cashing is permitted in a banking institution such as Bank of America), dance hall, bar featuring exotic dancing or entertainment with any sexual content, bingo hall, or flea market. The foregoing restriction shall not apply to any existing leases and uses permitting the tenant or occupant thereunder to engage in such use without any waiver, consent, or approval.

Section 8.5.  Tenant's Use Covenants.  Tennant shall use commercially reasonable efforts to minimize all obnoxious fumes, odors, smells, exhausts or gases from the Demised Premises; provided, however, that Landlord acknowledges that Tenant's operation of the Demised Premises as a restaurant will necessarily result in the production and migration of fumes, odors, smells, and exhaust from the Demised Premises and agrees that the production of fumes, odors, smells, and exhaust of a type and in a volume and concentration customary for comparable commercial food preparation and restaurant operations shall not, without more and otherwise in compliance with this Lease, be deemed to be a violation of this Section.  In furtherance of the foregoing provisions and without limitation thereof, Tenant shall properly vent and exhaust odors from the Demised Premises to accomplish the same in a manner which shall comply with all applicable laws, and shall keep and maintain the Demised Premises and all exhaust ducts and filter systems

17

in a clean and operational condition so that no fumes or odors will emanate unreasonably from the Demised Premises into any portion of the Shopping Center. Notwithstanding the foregoing, in no event will Tenant be required to install an exhaust scrubber. In addition, Tenant shall, at Tenant's sole cost and expense, remove all garbage from the Demised Premises and provide such safeguards as, in Landlord's reasonable judgment, are necessary or advisable to prevent the accumulation of garbage or refuse from becoming a nuisance or otherwise interfering with the safety, comfort or enjoyment of the Shopping Center by Landlord, tenants or any other occupants of the Shopping Center or their invitees.

Tenant shall, from time to time during the Term hereof, at Tenant's expense, redecorate the Demised Premises and refinish, renew and/or replace the fixtures, furnishings, decorations and equipment therein as in the reasonable judgment of Tenant may be necessary to preserve and maintain the appearance of the Demised Premises as a first-class restaurant.

Tenant agrees to use reasonable diligence to provide for adequate sanitation inside the Demised Premises, around its dumpsters, and to minimize any odors, insect or rodent infestation, access by animals, and the like. Tenant shall repair and maintain in good working order all grease traps and equipment and shall properly and legally discard or permit to be recycled all oil or grease wastes which may originate in the course of the operation of Tenant's business, as reasonably necessary to prevent an accumulation of grease to build up in Tenant's equipment at the Demised Premises. Tenant's disposal and removal of trash, food waste, cardboard and oil and grease waste shall be, in accordance with governmental regulations, at Tenant's cost, including any and all governmental fees.

Section 8.6.  Consent of Use Contingency.  Landlord and Tenant acknowledge that that certain lease between Landlord and Giant Food Stores, LLC ("Giant") dated as of July 10, 2006 (as amended, the "Giant Lease"), provides that Giant has the exclusive right within the Shopping Center to engage in the retail sale of items of food for off premises consumption and to engage in the retail sale of alcoholic beverages (the "Giant Exclusive"). Promptly following the date of this Lease, Landlord shall use commercially reasonable efforts to obtain Giant's written consent as to Tenant's use of the Demised Premises for the Giant Exclusive, which consent shall be substantially in the form attached hereto as Exhibit F (the "Giant Consent").  In the event Landlord fails to obtain the Giant Consent within sixty (60) days following the date of this Lease, notwithstanding anything to the contrary contained herein, Landlord or Tenant may terminate this Lease upon thirty (30) days' written notice to the other party, which such notice shall be delivered within thirty (30) days following the expiration of such sixty (60) day period. Landlord shall provide to Tenant a copy of the Giant Consent promptly upon Landlord's receipt thereof.  Tenant acknowledges and agrees to be bound by the provisions of the Giant Consent and Tenant shall be liable to Landlord for any damages sustained by Landlord under the Giant Consent as a result of Tenant's breach of the Lease or the Giant Consent, as applicable. Notwithstanding anything herein to the contrary, in no event shall Tenant use the Demised Premises for the Giant Exclusive prior to Landlord's receipt of the Giant Consent.

## ARTICLE IX
## TENANT'S ADDITIONAL COVENANTS

Section 9.1.  Payment of Rents and Charges.  Tenant covenants with Landlord and agrees to pay Base Rent, Real Estate Taxes, Common Area Maintenance Charges and any and all sums due to Landlord under the terms of this Lease (hereinafter defined as "Additional Rent") at the times, in the manner and the following address: **Chambersburg MZL LLC, c/o KPR Centers LLC, 254 West 31st Street, 4th Floor, New York, NY 10001**, or at Landlord's request, by ACH debit of immediately available funds pursuant to instructions to be provided by Landlord.

Section 9.2.  Charges for Utilities, Licenses and Permits.  Tenant agrees to pay from the Premises Delivery Date, all charges for water, sewer, gas, electricity, telephone and all other utilities and services used or consumed on the Demised Premises, and for all licenses, fees, deposits and permits for the same.

Section 9.3.  Compliance with Laws.  Throughout the Term of this Lease, Tenant, at its sole cost and expense, will promptly comply with all present and future laws, ordinances, orders, rules, regulations and requirements of all federal, state and municipal governments, departments, commissions, boards and officers and all orders, rules and regulations of the National Board of Fire Underwriters, the local Board of Fire Underwriters or any other body or bodies exercising similar functions, and with the requirements of all public liability, fire, and other policies of insurance at any time in force with respect to the Demised Premises whether or not such law, ordinance, order, rule, regulation or requirement shall interfere with the use and enjoyment of the Demised Premises.  Notwithstanding the foregoing, Tenant shall not be required to make structural alterations to the Demised Premises, unless such alterations are required as a result of the Tenant's use of, or alterations to, the Demised Premises.  If the use or occupancy of the Demised Premises by Tenant shall increase the costs of fire, casualty or extended coverage insurance on the Demised Premises (a schedule or "make up" of rates for the Demised Premises or Shopping Center, being conclusive evidence of the facts therein stated and of the several items and charges in such insurance rates then applicable to the Shopping Center), then Tenant shall pay to Landlord upon demand the additional cost of any such insurance; provided, however, if the use or occupancy of the Demised Premises by Tenant shall make void or voidable any insurance on the Demised Premises, then, at the option of Landlord, this Lease may be terminated.

Landlord makes no warranties or representations regarding indoor air quality or condition within the Demised Premises or the Shopping Center. Furthermore, Landlord shall have no responsibility regarding indoor air quality or condition (through rent offset by Tenant or otherwise), such responsibility being solely that of Tenant.  Tenant has conducted or has had the opportunity to conduct all testing regarding indoor air quality and condition, and hereby releases Landlord for any claim therefor.

Section 9.4.  Property or Persons on the Demised Premises.  Tenant acknowledges that any and all merchandise, fixtures and property of every kind, nature and description which may be in or upon the Demised Premises or Shopping Center during the Term hereof shall be at the sole risk and hazard of Tenant or those claiming through or under Tenant, and that Landlord shall not be liable for any death, injury or damage to persons or property resulting from  any reasons whatsoever including, theft, fire, explosion, steam, gas, electricity, electrical disturbance, water, rain or snow,  from any other part of

19

the interior of the Demised Premises, or from the plumbing, heating or air conditioning systems or service, or from any of the Common Areas of the Shopping Center.

Section 9.5.  Operation of Demised Premises.  Tenant covenants that it will (a) open for business as a "Primanti Bros." restaurant fully fixtured, stocked and staffed within one hundred eighty (180) days following the Rent Commencement Date (subject to Tenant's right not to open for business during the Blackout Period as set forth in Section 2.2), and (b) not conduct any auction sale or going out of business sale unless such activity is in compliance with laws set forth in the Commonwealth of Pennsylvania.

After initially opening for business as required hereunder, Tenant shall not thereafter be required to continuously operate its business from the Demised Premises so long as Tenant pays the Rent and timely performs its obligations required hereunder; provided, however, that if the Demised Premises shall be closed for business to the public and shall remain closed for a period of three hundred sixty (360) consecutive days for any reason except (i) during any periods when the Demised Premises shall be without an essential service, such as heat or electricity, or when Tenant is prevented from operating by any causes beyond the control of Tenant, or (ii) when repairs, renovations or alterations at the Demised Premises make it impractical (in Tenant's commercially reasonable discretion) to conduct business thereon, then, in any such event, Landlord shall have the right to terminate this Lease by giving written notice of such termination (the "Recapture Termination Notice") to Tenant, and this Lease shall expire and come to an end on the date (the "Recapture Termination Date") that is the thirtieth (30th) day following Tenant's receipt of such Recapture Termination Notice with the same force and effect as if said day had originally been set forth as the expiration date of this Lease, and following the termination of this Lease on the Recapture Termination Date, neither party shall have any further rights or obligations as Landlord or Tenant pursuant to the Lease (except for those that specifically survive the termination / expiration of the Term of the Lease, such as Tenant's obligation to pay all required Rent through the Recapture Termination Date).  Tenant may not more than once during the Term void a Recapture Termination Notice given pursuant to this paragraph by reopening the Demised Premises prior to the Recapture Termination Date.

Tenant will not do or suffer any waste or damage, disfigurement or injury to any portion of the Demised Premises.  Tenant agrees that if the Demised Premises utilizes a septic system, not a public sewer, Tenant will refrain from releasing any floor care products, including without limitation floor strippers and waxes, into the septic system.

Section 9.6.  Subletting or Assignment.  Tenant hereby covenants with the Landlord that Tenant will not mortgage, pledge or encumber this Lease, nor assign this Lease, nor sublet any part of the Demised Premises, without on each occasion obtaining the prior written consent of Landlord which shall not be unreasonably withheld.  Tenant shall provide to Landlord the name and address of the proposed assignee or subtenant, reasonably satisfactory information about the nature, business and business history of the proposed assignee or subtenant, banking, financial or other credit information and references about the proposed assignee or subtenant.  The assignee or subtenant shall not violate any exclusive granted to other tenants in the Shopping Center nor violate any terms and conditions herein.  (As used herein, the term "assign" or "assignment" shall be deemed to include, without limitation, any transfer of Tenant's interest in this Lease by operation of law, the merger or consolidation of Tenant with or into any other firm or corporation, or the transfer or sale of a controlling block of stock or otherwise).  The consent by Landlord

20

to any such assignment or subletting shall not constitute a waiver of the necessity of such consent with respect to any subsequent assignment or subletting. In the event of any assignment or subletting, Tenant shall, upon request of Landlord, pay a fee to Landlord for its expenses in connection therewith which shall be equal to fifty percent (50%) of the then current monthly gross rent (Base Rent plus Additional Rent), but in no event more than Two Thousand and 00/100 Dollars ($2,000.00), and shall remain liable for the payment of any and all rents and other payments and charges which may become due hereunder and for the performance of all other covenants, agreements, and conditions on the part of Tenant to be performed hereunder.  No such assignment or subletting shall be valid or effective unless and until the assignee or subtenant, respectively, shall covenant in writing with Landlord, to the reasonable satisfaction of Landlord, to be bound directly to Landlord for the performance of all Tenant covenants herein contained.  If for any assignment or subletting Tenant receives rent or other consideration in excess of the rent called for hereunder (which shall not in any event be construed to include any payment received in consideration of any personal property, trade fixtures, or Tenant's liquor license), Tenant shall pay to Landlord as Additional Rent 50% of the excess received by Tenant promptly after its receipt.

Notwithstanding the above provisions of this Section, there shall be no restriction on Tenant becoming a public corporation or for a proposed assignment of this Lease or sublet of the Demised Premises to a public corporation the outstanding voting stock of which is registered in accordance with the provisions of the Securities Act of 1933, as amended, and "listed" on the New York Stock Exchange or another recognized, national security exchange (and for the purposes hereof, the term "voting stock" shall refer to shares of stock regularly entitled to vote for the election of directors of the corporation).  Tenant shall have the right, upon registration in accordance with the Securities Act of 1933, as amended, and upon the satisfaction of all other requirements of law applicable thereto, to "list" such stock on any exchange and offer such stock for sale to the public.

If Tenant shall desire to assign this Lease or sublet the Demised Premises, Landlord shall have the option, to be exercised within thirty (30) days after written notice to Landlord of such proposed assignment or subletting, of terminating this Lease.  If Landlord elects to terminate this Lease, the rights and obligations of the parties shall cease as of the date set forth in a written notice from Landlord to Tenant, which date shall not be less than thirty (30) days after the date of such notice.  In the event of any such termination, all Base Rent and Additional Rent shall be adjusted as of the date of such termination.

Notwithstanding the foregoing, Tenant shall remain liable for all its lease obligations, including, but not limited to, monetary obligations.

Notwithstanding anything to the contrary contained in this Section and provided Tenant is not in default hereunder beyond any applicable notice and cure period and Landlord receives at least ten (10) days' prior written notice, Tenant may assign this Lease without Landlord's consent for only the permitted use hereunder (provided any such use does not violate any exclusive use or use restriction then in effect) to (i) any corporation, limited liability company, partnership or other business entity that controls, is controlled by, or is under common control with Tenant; (ii) any corporation, limited liability company, partnership or other business entity resulting from the merger or consolidation with Tenant; or (iii) any entity that acquires all or substantially all of Tenant's assets including, without limitation, all of Tenant's assets related to its business at the Premises (each of (i) through (iii) is individually referred to herein as a "Permitted Transfer" and

21

collectively referred to herein as, "Permitted Transfers").  Any assignee shall expressly assume in writing the obligations of Tenant hereunder; provided, however, except as otherwise set forth herein, Tenant shall remain liable under this Lease following such assignment.  Tenant shall provide to Landlord a fully executed copy of the assignment of this Lease within ten (10) business days of such assignment.  In no event shall Tenant strategically structure a Permitted Transfer, or use a series or combination of Permitted Transfers, to intentionally circumvent Tenant's obligation to obtain the prior written consent of Landlord to a transfer that would otherwise require Landlord's consent under this Lease, it being understood and agreed that Tenant shall act reasonably and in good faith with respect to effectuating any Permitted Transfers.

Notwithstanding anything to the contrary contained in this Section, Tenant shall be released from all liability under this Lease first arising or accruing subsequent to any Permitted Transfer, provided that the transferee and/or guarantor thereunder has a net worth of at least Three Million Dollars ($3,000,000.00) at the time of such transfer.

Section 9.7.   Access by Landlord.  Tenant shall permit the Landlord and its agents or representatives to enter at reasonable times to view or examine the Demised Premises, or any wires, pipes, fixtures or appurtenances thereof, and to make repairs or alterations to preserve the Demised Premises if the Landlord should elect to do so; and at any time within twelve (12) months prior to the expiration of this Lease, to show the Demised Premises to other prospective lessees, with reasonable prior notice.

Section 9.8.   Duties Upon Termination of Term.  Tenant shall, at or prior to the expiration of the Term hereof, remove all goods, trade fixtures and other personal property of Tenant and of all persons claiming through or under Tenant, and to peaceably yield up to the Landlord the Demised Premises and all keys, locks and fixtures (other than trade fixtures of Tenant) connected therewith in as good repair, order and condition as the same were in as of the Premises Delivery Date or were put in during the Term, damage by fire or from other unavoidable casualty only excepted; and, at the election of the Landlord as aforesaid in Section 7.3 above, to deliver to Landlord all alterations, improvements or additions made to and upon the same, in as good repair, order and condition as the same were in as of the Premises Delivery Date or were put in during the Term, damage by fire or from other unavoidable casualty only excepted.

Section 9.9.   Construction Liens, Permits, Etc.  Tenant covenants and agrees to pay promptly when due the entire cost of any work to the Demised Premises undertaken by Tenant and to bond against or discharge any liens for labor or materials within thirty (30) days after written request by Landlord; to obtain and deliver to Landlord unconditional final lien releases from all lien claimants providing work or materials in connection with any such work in the form attached hereto as **Exhibit B-1**; to procure all necessary permits before undertaking such work; and to do all such work in a good an workmanlike manner, employing materials of good quality and laborers skilled in their trades who will work in harmony with Landlord's laborers and employees.

## ARTICLE X
## SIGNS

Tenant shall, at its expense and in conformity with applicable laws and ordinances and the requirements and restrictions set forth in **Exhibit C**, erect and thereafter replace,

such signs, icons, and awnings with graphics on the Demised Premises, as Tenant may elect; provided, however, that Tenant shall have obtained the prior written approval of Landlord, not to be unreasonably withheld, conditioned or delayed, regarding the installation, kind, design, size, and location thereof.  In addition, Tenant may, at its expense and in conformity with applicable laws and ordinances, install one (1) double-sided panel on the Shopping Center's main pylon sign in the location shown on **Exhibit C-1** attached hereto; provided, however, that Tenant shall have obtained the prior written approval of Landlord, not to be unreasonably withheld, conditioned or delayed, regarding the installation, kind, design, and size of such panel.  Landlord hereby approves Tenant's signage as shown on **Exhibit C-2** attached hereto.  Tenant shall, at its expense, be responsible for the removal of its façade and any panel on any pylon signage prior to the date on which Tenant vacates the Demised Premises at the expiration or earlier termination of the Term.  Tenant shall repair any damage caused by such removal at its expense.  In the event Tenant shall fail to remove any such signage and/or fail to repair any damage caused thereby, Landlord shall have the right to complete such removal and/or repairs and Tenant shall reimburse Landlord for the costs associated therewith within ten (10) days of Tenants receipt of an invoice therefor.

## ARTICLE XI
## DAMAGE TO AND RESTORATION OF DEMISED PREMISES

Section 11.1.  Taking of the Demised Premises.  If the entire Demised Premises shall be appropriated or taken under the power of eminent domain by any public or quasi-public authority or under threat of and in lieu of condemnation (hereinafter, "taken" or "taking"), this Lease shall terminate as of the date of such taking, and Rent and other charges shall be adjusted as of the date of such termination and Landlord and Tenant shall have no further liability or obligation, except for any provisions hereunder that expressly survive the expiration or earlier termination of this Lease. If any or all of the buildings or common areas of the Shopping Center are so taken (whether or not the Demised Premises are so taken) so that, in the sole judgment of Landlord, the Shopping Center cannot be operated as an integral unit, then this Lease shall cease and terminate from the time possession thereof is required for public use. If fifteen percent (15%) or more of the floor area of the Demised Premises is taken, or if by reason of any taking, regardless of the amount so taken, the remainder of the Demised Premises is not one undivided space or, in Tenant's reasonable determination, is not reasonably fit for the use permitted hereunder, either party shall have the right to terminate this Lease as of the date the portion of the Demised Premises is taken by giving notice to the other party within 45 days after receipt by Tenant from Landlord of written notice that said Demised Premises have been or will be so taken. If this Lease is not terminated as provided above, it shall continue in full force and effect and, at Landlord's cost and expense and as soon as reasonably possible after the taking, Landlord shall restore the Demised Premises remaining to a complete architectural unit of like quality and character as existed as of the date of this Lease (subject to changes necessary to comply with then-existing legal requirements), provided that Landlord shall not be required to expend any amount in excess of the amount paid to Landlord as a result of such taking or as consideration for a voluntary conveyance in lieu thereof (less all reasonable, direct, out-of-pocket, third-party expenses, costs, legal fees and court costs incurred by Landlord in connection with such award or consideration). In the event of a partial taking that does not result in the termination of this Lease, Base Rent shall be adjusted according to the portion of the Demised Premises taken.

Section 11.2.  Casualty Damage.

(a)     Restoration of the Shopping Center. Unless this Lease is terminated as provided in this Section 11.2, if all or any part of the Shopping Center is damaged or destroyed, in whole or in part (and whether or not the part damaged or destroyed includes the Demised Premises), by fire or other casualty insured against, or required to be insured against pursuant to this Lease, Landlord shall promptly cause the same to be restored to the condition existing immediately prior to such casualty (subject to changes necessary to comply with then-existing legal requirements); provided that Landlord shall have no obligation to restore any portion of the Shopping Center unless required pursuant to the applicable lease or occupancy agreement for such portion.

(b)     Restoration of Demised Premises. Unless this Lease is terminated as provided in this Section 11.2, Landlord shall cause the repair and restoration of the Demised Premises to substantially the same condition as existed as of the date of this Lease, and Tenant shall cause the repair and restoration of Tenant's alterations and improvements thereto, in each case to the extent of the insurance proceeds paid to Landlord or Tenant, as applicable (or, if either party fails to carry the required insurance, then to the extent of the insurance proceeds that would have been payable had such party maintained the required insurance) (less all reasonable expenses, costs, and legal fees incurred by such party in connection with such proceeds). If the insurance proceeds available to Landlord are, in Landlord's reasonable determination, insufficient to fully fund Landlord's repair and restoration obligations, unless Landlord commits to fully funding any shortfall, Landlord shall give Tenant notice thereof and either party shall be entitled to terminate this Lease upon written notice to the other party within 30 days of Landlord's notice to Tenant of such determination.

(c)     Generally. Provided that this Lease has not been terminated as provided in this Section 11.2, all repair and restoration shall be commenced as promptly as circumstances reasonably permit and thereafter diligently pursued to completion, provided that Tenant shall not be required to commence its repair and restoration until such time as Landlord has substantially completed any repair and restoration of the Demised Premises to be completed by Landlord. Except for modifications required by applicable legal requirements, repair and restoration shall be made to substantially the condition existing immediately prior to such casualty, subject to any other mutual agreement of the parties.

(d)     Major Destruction. Landlord may terminate this Lease by providing written notice to Tenant (1) if the Demised Premises are rendered wholly untenantable, (2) if a major casualty occurs any time during the Term, or (3) if (without limiting any right of Tenant to terminate as provided in the final sentence of Section 11.2(b)), following any casualty damage to the Shopping Center or the Demised Premises, any mortgagee of Landlord requires that the insurance proceeds payable as the result thereof be applied to the payment of the mortgage debt.  Either party may terminate this Lease by providing written notice to the other or if a casualty occurs during the last year of the Term, provided that the Lease shall not be considered to be in the final year of any Term if Tenant has already exercised a Renewal Term that has not yet commenced, and provided further that Tenant shall have the right to preserve this Lease, at its option, by exercising any unexercised Renewal Term within 30 days following receipt of notice from Landlord electing to terminate the Lease. For the purposes hereof, a "major casualty" shall mean (i) the Demised Premises is damaged or destroyed by fire or any casualty which cannot, despite diligent, good faith efforts be repaired or restored within 240 days following the

24

date on which such damage occurs, (ii) the Demised Premises or Shopping Center be damaged and the cost to repair the same shall be more than twenty-five percent (25%) of the cost of replacement thereof; or (iii) if any or all of the buildings or common areas of the Shopping Center are damaged (whether or not the Demised Premises are damaged) to such an extent that, in the sole judgment of Landlord, the Center cannot be operated as an integral unit. Landlord will provide Tenant with written notice reasonably estimating the amount of time required for Landlord to complete its repair and restoration of the Demised Premises, and if Landlord does not reasonably anticipate that it can complete its repair and restoration obligations within 365 days from the date of the casualty, Tenant shall be entitled to terminate this Lease upon notice to Landlord given within 30 days of Landlord's notice. Further, Tenant may terminate this Lease if Landlord fails to complete its repair and restoration obligations within such 365-day period, which termination shall be effective upon 30 days' notice to Landlord (during which period Landlord may void such termination by completing its repair and restoration obligations).

(e)    Uninsured Damage. If damage or destruction is caused by a peril not required to be insured against hereunder and for which insurance proceeds are not available, Landlord (without limiting any right of Tenant to terminate as provided in the final sentence of Section 11.2(b)) may terminate this Lease by 30 days' written notice to Tenant of its election so to do and this Lease shall be deemed to have terminated as of such date unless Tenant agrees in writing to pay for the costs of reconstruction.

(f)    Release of Liability. In the event of termination under any of the provisions of this Section 11.2, both Landlord and Tenant shall be released from any liability or obligation under this Lease, except for any provisions hereunder that expressly survive the expiration or earlier termination of this Lease. In the event of the termination of this Lease under this Section 11.2, the Rent and other charges hereunder shall be adjusted as of the date of such termination. In no event shall Tenant be entitled to share in Landlord's insurance proceeds or to take any action which would result in a reduction of Landlord's insurance proceeds.

(g)    Abatement of Rent. In the event of casualty, all Rent shall be abated proportionately with the degree to which Tenant's use of the Demised Premises is impaired, commencing from the date of destruction until repair and restoration is complete. Tenant shall continue the operation of its business at the Demised Premises during any such period to the extent reasonably practicable from the standpoint of Tenant's prudent business management. Tenant shall not be entitled to any compensation or damages from Landlord for loss of use of the whole or any part of the Premises.

## ARTICLE XII
## SUBORDINATION OF LEASE

This Lease shall, without any further writing or other evidence, be subject and subordinate to any mortgage or mortgages which may now or hereafter be placed by the Landlord upon the Demised Premises or the Shopping Center. Tenant agrees that it will within ten (10) business days after request of Landlord, execute, acknowledge and deliver any and all instruments deemed necessary or desirable by Landlord, in a form reasonably acceptable to Tenant, to give effect to, or notice of, such subordination. Any such agreement shall be expressly binding upon the successors and assigns of Tenant and of any such mortgagee, and upon anyone purchasing at a foreclosure sale. Tenant agrees that its

failure to execute, acknowledge and deliver any such instrument shall, at Landlord's option, constitute an Event of Default.

In the event of acquisition of title to the Demised Premises by the holder of any such mortgage, through foreclosure proceedings or otherwise, Tenant will recognize the holder of such mortgage as if it were named as Landlord hereunder, and will attorn to the holder of the same, provided that such holder or successor in title agree that Tenant's use and quiet enjoyment of the Demised Premises shall not be disturbed so long as Tenant is not in default hereunder.

If the holder of any mortgage covering the Demised Premises shall have given prior written notice to Tenant that it is the holder of a mortgage and such notice includes the address at which notices to such mortgagee are to be sent (which notice may be given as part of a Subordination, Nondisturbance and Attornment Agreement), then Tenant agrees to give such holder notice simultaneously with any notice given to Landlord to correct any default of Landlord as hereinabove provided, and agrees that the holder of such mortgage shall have the right, within a reasonable time after receipt of said notice, to correct or remedy such default before Tenant may take any action under this Lease by reason of such default.

## ARTICLE XIII
## NOTICES

Any notice from Landlord to Tenant or from Tenant to Landlord shall be deemed duly served upon receipt if mailed by certified mail, return receipt requested, or by nationally recognized carrier such as FedEx or UPS, addressed, if to the Tenant, to **Primanti Corporation, 2100 Wharton Street, #720, Pittsburgh, PA 15203**, or if to the Landlord, to **Chambersburg MZL LLC, c/o KPR Centers LLC, 254 West 31st Street, 4th Floor, New York, NY 10001** or in either case, in such other manner or to such other address as may be specified by notice in writing to the other party, and the customary certified mail receipt or confirmed received receipt from a nationally recognized carrier such as FedEx or UPS, for example, shall be conclusive evidence of such service. In addition, provided that a copy is also sent by mail or courier, all notices from Landlord to Tenant may be sent by e-mail to the following e-mail address: _____. A copy of all notices to Tenant shall be sent to Tucker Arensberg, PC, Attn: Peter A. Spangler, 1500 One PPG Place, Pittsburgh, PA 15222 (if by email, to PSpangler@tuckerlaw.com). Any such notice given to Tenant shall be considered given on the date such e-mail is delivered. Any party may change it address for notice by giving notice of such change in the manner provided herein.

## ARTICLE XIV
## NO HAZARDOUS MATERIALS

Tenant agrees it shall not cause or permit to occur any violation of any federal, state or local law, ordinance or regulation now or hereafter enacted, related to environmental conditions on, under or about the Demised Premises and/or the Shopping Center arising from Tenant's use or occupancy of the Demised Premises, including but not limited to soil and groundwater conditions. It is further agreed Tenant shall not permit the use, generation, release, manufacture, refining, production, processing, storage, or disposal

26

of any hazardous substances on, under or about the Demised Premises and/or the Shopping Center, or the transpiration to or from the Demised Premises and/or the Shopping Center of any hazardous substance. Notwithstanding the foregoing, Tenant may keep upon the Demised Premises such cleaning supplies as are customarily used in the operation and maintenance of similar businesses and properties, provided that such cleaning supplies (i) are used at all times for the purposes for which, and in the manner in which, they are intended to be used by their respective manufacturers and in accordance with legal requirements; (ii) are not kept upon the Demised Premises in any greater quantities than reasonably necessary for the normal conduct of Tenant's business; and (iii) are used, stored and disposed of by Tenant, its employees, agents, contractors and invitees in a lawful manner evidencing reasonable care under the circumstances, given the properties thereof.

Tenant further agrees it shall indemnify, defend and hold harmless, Landlord, the manager of the property and their respective officers, directors, beneficiaries, shareholders, patrons, agent and employees from all fines, suits, procedures, claims and actions of every kind and costs associated therewith (including attorneys' and consultants' fees) arising out of or in any way connected with any deposit, spill, discharge or other release of hazardous substance that occurs during the Term of this Lease at or from the Demised Premises and/or the Shopping Center which arises at any time from Tenant's use or occupancy of the Demised Premises or from Tenant's failure to provide all information, make all submissions and take all steps required by all authorities under the laws and all other environmental laws.  Tenant's obligations and liabilities under this Article shall survive the termination of this Lease.

Landlord represents and warrants to Tenant that, to Landlord's knowledge, the Demised Premises shall as of the Premises Delivery Date be free of any hazardous substances in violation of applicable laws including mold, asbestos, pests or bacterial conditions, and in the event any of those conditions exist as of the Premises Delivery Date as evidenced to Landlord's reasonable satisfaction, Landlord shall, at its sole cost and expense, remove or resolve the hazardous substances to Tenant's reasonable satisfaction.

## ARTICLE XV
## BREACH BY TENANT; TERMINATION OF LEASE

If the Tenant or any guarantor of this Lease shall neglect or fail to perform or observe any of the covenants herein contained, in the case of a default in the payment of any Base Rent or Additional Rent (collectively, "Rent"), or any amounts due pursuant to any Article herein for a period of ten (10) days after written notice thereof that the same are due, or in the case of a default in any other covenant for a period of thirty (30) days after notice in writing from the Landlord, or if the estate hereby created shall be taken on execution or other process of law, or if any assignment shall be made of the property of Tenant (or any guarantor of this Lease) for the benefit of creditors, or if the Tenant (or any guarantor of this Lease) files a petition in bankruptcy, is adjudicated insolvent, or bankrupt, petitions or applies to any tribunal for any receiver or trustee, commences any proceeding for any reorganization, arrangement, readjustment of debt, dissolution or liquidation, or if there is commenced against the Tenant (or any guarantor of this Lease), any such proceeding which remains undismissed for a period of sixty (60) days, or if the Tenant (or any guarantor of this Lease), by any act, indicates its consent to, approval of, or acquiescence in, any such proceedings, or the appointment of any receiver or trustee, or suffers any such receivership or trusteeship to continue undischarged for a period of sixty

(60) days, or if Tenant shall fail to open the Demised Premises for the conduct of Tenant's business fully stocked and staffed within one hundred eighty (180) days following the Rent Commencement Date, subject to the Blackout Period and the delays resulting from events of force majeure (including any COVID-related restrictions) (singularly, an "Event of Default") then in any of the said cases the Landlord lawfully may, immediately or at any time thereafter and with demand or notice, exercise any remedy of Landlord under this Lease and/or may enter into and upon the Demised Premises, or any part thereof and repossess the same as of the Landlord's former estate, and expel the Tenant and those claiming through or under the Tenant, and remove the effects of both or either without being deemed guilty of any manner of trespass and without prejudice to any remedies for arrears of rent or preceding breach of covenant.  Upon any Event of Default or entry as aforesaid, at Landlord's option, the Tenant's estate and possession and/or this Lease shall terminate and the Landlord, in addition to its remedies set forth above, shall have all other remedies which it may be entitled to at law or in equity.  Tenant hereby waives and surrenders all rights and privileges which it might have under or by reason of any present or future law to redeem the Demised Premises or to have continuance of this Lease for the Term hereby granted after being disposed or ejected therefrom by process of law or under the terms of this Lease.

## ARTICLE XVI
## LANDLORD'S REMEDIES

Section 16.1. Damages and Indemnification. If this Lease shall be terminated as provided in Article XV hereof, Tenant shall forthwith pay to Landlord, in addition to all sums which were due prior to the date of such termination, all loss of Rent due for the remainder of the Term hereby leased suffered by reason of such termination, if any, for each month during the remainder of the Term hereof to be paid at the end of each month. For the purposes of computing damages payable hereunder, Additional Rent shall be the product of the total of (a) Tenant's Pro Rata Share of Common Area Maintenance Charges and expenses and Shopping Center insurance expenses due from or paid by Tenant in respect of the year in which such termination occurs, and (b) Tenant's Pro Rata Share of Real Estate Taxes due from or paid by Tenant in respect of the year during which such termination occurs, times the number of years remaining in the Term hereof, it being assumed that the amount of such charges and expenses and real estate taxes so payable for the said calendar year during which termination occurs would have remained constant for each subsequent year of the full term hereby granted. In addition, Landlord may, at its option and without prejudice to its right to collect all accrued liabilities, declare immediately due and payable a sum equal to the amount by which the Rent for the remainder of the Term hereof exceeds the fair rental value of the Demised Premises for the remainder of the Term hereby granted discounted to present value.

Section 16.2. Additional Expenses of Landlord. Tenant also agrees (a) to indemnify and save Landlord harmless from and against all reasonable expenses which Landlord may incur by reason of such termination and the cost of putting the Demised Premises in good order to prepare the same for rental to other tenants (which shall not include specialty tenant fit out costs for a new tenant or similar tenant-specific work above building standard), and (b) that Landlord may (i) re-let the Demised Premises, or any portion thereof, either in the name of Landlord or otherwise for a period which may, at Landlord's option, be less than or exceed the period which would otherwise have constituted the balance of the Term, and (ii) grant concessions or free rent. Any suit brought to collect the amount of deficiency for

28

any month shall not prejudice in any way the right of Landlord to collect any deficiency for any subsequent month by a similar proceeding. Landlord may make such alterations, repairs, replacements and decorations to the Demised Premises as Landlord, in Landlord's sole judgment, considers advisable or necessary for the purpose of re-letting the Demised Premises, and the making of such alterations, repairs, replacements or decorations shall not operate or be construed to release Tenant from liability hereunder.

Notwithstanding any other provision herein, Landlord shall make commercially reasonably efforts to mitigate its damages if an Event of Default occurs. Mitigation of damages does not include the obligation to engage in litigation.  Tenant agrees that Landlord's agreement to use commercially reasonable efforts to relet the Demised Premises shall not be deemed to impose any obligation on Landlord to relet the Demised Premises (i) for any purposes which would be inconsistent with the uses customarily found in a similar retail shopping center or which would be detrimental to the tenant mix in the Shopping Center or which would breach any covenant of Landlord respecting radius, location, use or exclusivity in any other lease or agreement relating to the Shopping Center, or (ii) to any lessee who is not reputable or who is not financially capable of performing the duties and obligations imposed upon such lessee under the applicable lease or who does not have experience in successfully operating a business of the type and size which such lessee proposes to conduct in the Demised Premises.  Tenant further agrees that (a) the agreement by Landlord to use reasonable efforts to relet the Demised Premises shall not impose any obligation on Landlord to relet the Demised Premises in preference to the leasing by Landlord of any other space in the Shopping Center, (b) the failure of Landlord to re-let the Demised Premises or any portion thereof or, if the Demised Premises are relet, the failure of Landlord to collect the rent due under such reletting, shall not release or affect Tenant's liability for damages, (c) Landlord will have satisfied its obligation to mitigate damages if Landlord endeavors, in good faith, to re-lease the Demised Premises, and (d) Landlord may reject any offer to lease the Demised Premises at a rate which is less than the rate being charged for comparable space in the Shopping Center or on terms that are less favorable than those contained in this Lease or which (in Landlord's reasonable judgment) is not in the best interests of the Shopping Center.

Section 16.3. Costs of Collection; Tenant's Property. In the event of any default by Tenant hereunder, Tenant will reimburse Landlord for all expenses and reasonable attorneys' fees incurred by Landlord in collecting any amount due from Tenant, curing any default of Tenant or in obtaining possession of, or in re-letting the Demised Premises; and Tenant shall pay all attorneys' fees and expenses arising out of any litigation in which Landlord shall become involved by reason of default, act, failure to act or negligence of Tenant or anyone acting under Tenant, in which it is finally determined that Tenant or anyone acting under Tenant shall have been so negligent. Tenant further agrees that if, on termination of this Lease by expiration or otherwise, Tenant (having had a reasonable opportunity in which to do so) shall fail to remove any of its property from the Demised Premises, the same shall be conclusively deemed to have been abandoned and Landlord shall be authorized, at its sole option, and in Tenant's name and on behalf, either (a) to cause such property to be removed and placed in storage for the account of and at the expense of Tenant, or (b) to sell such property at public or private sale, with or without notice, and to apply the proceeds thereof, after the payment of all expenses of removal, storage and sale, to the indebtedness, if any, of Tenant to Landlord, the surplus, if any, to be paid to Tenant.

29

Section 16.4. Restraint of Violations. In addition to all other remedies provided in this Lease, Landlord shall be entitled to restrain by injunction or otherwise, any violation, or any attempted or threatened violation, of any of the covenants, conditions, or provisions of this Lease.

Section 16.5.  No Surrender of Demised Premises. No act or thing done by Landlord during the Term hereof shall be deemed an acceptance of a surrender of the Demised Premises and no agreement to accept such surrender shall be valid, unless in writing signed by Landlord.  The delivery of keys to any employee of Landlord or to Landlord's agents shall not operate as a termination of this Lease or a surrender of the Demised Premises.

**Section 16.6.  Additional Landlord Remedies.  UPON THE OCCURRENCE OF ANY EVENT OF DEFAULT, AND ALSO WHEN THE TERM HEREBY CREATED SHALL HAVE EXPIRED, TENANT HEREBY IRREVOCABLY AUTHORIZES AND EMPOWERS ANY PROTHONOTARY OR ANY ATTORNEY OF ANY COURT OF RECORD TO APPEAR FOR TENANT, WITHOUT INCURRING LIABILITY TO TENANT FOR SO DOING, IN ANY ACTION AND TO CONFESS JUDGMENT IN EJECTMENT IN ANY COMPETENT COURT AGAINST TENANT AND AGAINST ALL PERSONS CLAIMING BY, THROUGH OR UNDER TENANT, FOR THE RECOVERY BY LANDLORD OF POSSESSION OF THE DEMISED PREMISES, FOR WHICH THIS LEASE SHALL BE HIS SUFFICIENT WARRANT; WHEREUPON, IF LANDLORD SO DESIRES, A WRIT OF POSSESSION WITH CLAUSES FOR COSTS MAY ISSUE FORTHWITH WITH OR WITHOUT ANY PRIOR WRIT OR PROCEEDING WHATSOEVER.  SUCH AUTHORITY SHALL NOT BE EXHAUSTED BY ANY ONE OR MORE EXERCISES THEREOF, BUT JUDGMENT MAY BE CONFESSED FROM TIME TO TIME AS OFTEN AS ANY EVENT OF DEFAULT SHALL HAVE OCCURRED OR BE CONTINUING, AND SUCH POWERS MAY BE EXERCISED DURING AS WELL AS AFTER THE EXPIRATION OR TERMINATION OF THE TERM.**

**TENANT ACKNOWLEDGES THAT THE GRANT TO LANDLORD OF THE RIGHT TO CONFESS JUDGMENT AGAINST TENANT AS ABOVE PROVIDED IS THE GRANT TO LANDLORD OF A POWER OF ATTORNEY GOVERNED BY 20 PA.C.S. §§ 5601 - 5612, AS THE SAME MAY FROM TIME TO TIME BE AMENDED (THE "POA ACT").  IN CONNECTION WITH EACH SUCH GRANT, TENANT AGREES AS FOLLOWS:  (a) THE POWER OF ATTORNEY IS COUPLED WITH AN INTEREST AND, AS SUCH, LANDLORD, IN EXERCISING ANY OF ITS RIGHTS UNDER THE POWER OF ATTORNEY, IS NOT A FIDUCIARY OF TENANT; (b) TENANT ACKNOWLEDGES AND INTENDS THAT LANDLORD SHALL, TO THE EXTENT EXERCISABLE, EXERCISE ITS RIGHTS UNDER THE POWER OF ATTORNEY HEREIN GRANTED FOR THE SOLE BENEFIT OF LANDLORD, WITHOUT REGARD TO THE BEST INTERESTS OF TENANT AND WITH NO DUTY OF LOYALTY TO TENANT; (c) ANY RIGHTS TENANT MAY HAVE UNDER THE POA ACT ARE HEREBY FOREVER WAIVED AND RELINQUISHED BY TENANT; AND (d) WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, TO THE FULLEST EXTENT PERMITTED BY LAW, (i) THE POWER OF ATTORNEY SHALL NOT BE CONSTRUED IN ACCORDANCE WITH THE PROVISIONS OF THE POA ACT, AND (ii) LANDLORD SHALL HAVE NONE OF THE DUTIES**

30

DESCRIBED IN 20 PA.C.S. § 5601.3(b) (AS THE SAME MAY FROM TIME TO TIME BE AMENDED).

SECTION 16.6 OF THIS LEASE PROVIDES FOR THE CONFESSION OF JUDGMENT AGAINST TENANT IN EJECTMENT. IN CONNECTION THEREWITH, TENANT, KNOWINGLY, VOLUNTARILY, INTENTIONALLY AND UPON ADVICE OF SEPARATE COUNSEL, UNCONDITIONALLY WAIVES ANY AND ALL RIGHTS IT MAY HAVE TO PRIOR NOTICE AND AN OPPORTUNITY FOR HEARING UNDER THE RESPECTIVE CONSTITUTIONS AND LAWS OF THE UNITED STATES AND THE COMMONWEALTH OF PENNSYLVANIA. WITHOUT LIMITATION OF THE FOREGOING, TENANT HEREBY SPECIFICALLY WAIVES ALL RIGHTS TENANT HAS OR MAY HAVE TO NOTICE AND OPPORTUNITY FOR A HEARING PRIOR TO EXECUTION UPON ANY JUDGMENT CONFESSED AGAINST TENANT BY LANDLORD HEREUNDER, AND TENANT HEREBY RELEASES ANY ATTORNEY THAT CONFESSES JUDGMENT AGAINST TENANT HEREUNDER FROM ANY LIABILITY FOR SO DOING.

TENANT (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF LANDLORD HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT LANDLORD WILL NOT SEEK TO EXERCISE OR ENFORCE ITS RIGHTS TO CONFESS JUDGMENT HEREUNDER, AND (II) ACKNOWLEDGES THAT THE EXECUTION OF THIS LEASE BY LANDLORD HAS BEEN MATERIALLY INDUCED BY, AMONG OTHER THINGS, THE INCLUSION IN THIS LEASE OF SAID RIGHTS TO CONFESS JUDGMENT AGAINST TENANT. TENANT FURTHER ACKNOWLEDGES THAT IT HAS HAD THE OPPORTUNITY TO DISCUSS SAID PROVISION WITH TENANT'S INDEPENDENT LEGAL COUNSEL AND THAT THE MEANING AND EFFECT OF SUCH PROVISIONS HAVE BEEN FULLY EXPLAINED TO TENANT BY SUCH COUNSEL, THAT TENANT VOLUNTARILY AGREES TO THE INCLUSION OF SAID PROVISIONS IN THIS LEASE AND THIS LEASE, AND THAT AS EVIDENCE OF SUCH FACTS AN AUTHORIZED OFFICER OF TENANT SIGNS IN THE SPACE PROVIDED BELOW.

**Primanti Corporation**

By: _____
Name: Peter J. Chiappa
Title: CFO

Section 16.8. Tenant Affidavit.    In any confession of judgment against Tenant hereunder, Landlord shall cause to be filed in such action an affidavit setting forth the facts necessary to authorize the entry of judgment and if a true copy of this Lease (and of the truth of the copy, such affidavit shall be sufficient proof) be filed in such action, it shall not be necessary to file the original as a warrant of attorney, notwithstanding any law, rule of court, custom or practice to the contrary. Tenant releases to Landlord, and to any and all attorneys who may appear for Tenant, all procedural errors in any proceedings taken by Landlord, whether by virtue of the powers of attorney contained in this Lease or not, and all liability therefor. Tenant expressly waives the benefits of all laws, now or hereafter in force, exempting any property within the Demised Premises or elsewhere from distraint,

31

levy or sale.  Tenant further waives the right to any notice to remove as may be specified in the Pennsylvania Landlord and Tenant Act of April 6, 1951, as amended, or any similar or successor provision of law, and agrees that five (5) days' notice shall be sufficient in any case where a longer period may be statutorily specified, and/or

Section 16.9.  Successors and Assignees.    Any successor to Landlord and any assignee of Landlord's interest in this Lease shall have the right to confess judgment against Tenant as permitted under this Article XVI and to exercise all other rights and remedies of Landlord under this Lease.  The foregoing shall apply regardless of whether (a) Landlord's right to confess judgment or exercise such other rights and remedies is expressly referenced or assigned in the instrument of assignment; or (b) the assignment complies with applicable laws relating to the manner or form in which assignments must be executed.  Tenant hereby waives any right to open or strike any judgment or to object to the exercise of any other right or remedy on account of any alleged deficiency in the instrument of assignment or noncompliance of the instrument of assignment with applicable laws.

## ARTICLE XVII
## ADDITIONAL RIGHTS OF LANDLORD

Section 17.1.  Cumulative Remedies. The specified remedies to which Landlord may resort under the terms of this Lease are cumulative, are not intended to be exclusive of any other remedies or means of redress to which Landlord may be lawfully entitled in case of any breach of threatened breach by Tenant of any provision of this Lease, and are in addition to any now or hereafter existing in law, in equity, or by statute.

Section 17.2. Holdover. If the Tenant remains in the Demised Premises beyond the expiration of this Lease, such holding over shall be without right and shall not be deemed to create any tenancy, but the Tenant shall be a tenant at sufferance only and Landlord shall be entitled to collect, in addition to any other remedies or amounts due under the terms of this Lease, an amount equal to 150% of the Base Rent as compensation for such holdover. In addition, Tenant shall pay Landlord for all damages sustained by reason of Tenant's holding over in excess of thirty (30) days.

Section 17.3.  Interest Due on Tenant Defaults. If Tenant fails to pay the full amount of any Base or Additional Rent, or to make any other payment required after any applicable grace period, or fails to perform any act required of Tenant hereunder after any applicable grace period, Landlord shall have the right to collect the amount of such overdue payment or to perform such act on behalf of Tenant and to collect from Tenant interest on the amount of such payment or the cost of such performance on behalf of Tenant, as of the expiration date of applicable grace periods, computed at a rate per annum equal to the sum of the "prime rate" so-called charged by The Bank of America or its successor from time to time on ninety (90) day commercial loans to substantial and responsible commercial borrowers plus four percent (4%).  Tenant shall also be obligated to pay to Landlord all interest so charged against interest charges not paid by Tenant.

32

## ARTICLE XVIII
## QUIET ENJOYMENT

Upon Tenant's paying the rents and other charges due hereunder, and performing and observing all of the other agreements, conditions and covenants to be performed and observed hereunder, Tenant shall and may peaceably and quietly have, hold and enjoy the Demised Premises during the Term hereof without any manner of hindrance or interference from Landlord or from any other person claiming under or through Landlord, subject, however, to the terms of this Lease (including, without limitation, those title matters set forth in Article I hereof and any mortgage which may be superior to this Lease).

## ARTICLE XIX
## INABILITY TO PERFORM

Landlord and Tenant shall be excused for the period of any delay in the performance of any of their respective obligations hereunder when prevented from so doing by a cause or causes beyond the applicable party's reasonable control, including all labor disputes, civil commotion, war, war-like operations, invasion, rebellion, hostilities, military or usurped power, sabotage, governmental regulations or controls, fire or other casualty, inability to obtain any material, services or financing, or through acts of God, provided that nothing contained in this Article or elsewhere in this Lease shall be deemed to excuse or permit any delay in the payment of the Rent, or any delay in the cure of any default which may be cured by the payment of money.

## ARTICLE XX
## LIMITATION OF LANDLORD'S LIABILITY

The term "Landlord" as used in this Lease, so far as covenants or obligations to be performed by Landlord are concerned, shall be limited to mean and include only the owner or owners at the time in question of the Demised Premises, and in the event of any transfer or transfers of title to said property, the Landlord (and in case of any subsequent transfers or conveyances, the then grantor) shall be concurrently, freed and relieved from and after the date of such transfer or conveyance, without any further instrument or agreement, of all liability as respects the performance of any covenants or obligations on the part of the Landlord contained in this Lease thereafter to be performed, it being intended hereby that the covenants and obligations contained in this Lease on the part of Landlord, shall, subject as aforesaid, be binding on the Landlord, its successors and assigns, only during and in respect of their respective successive periods of ownership of said leasehold interest or fee, as the case may be. Tenant, its successors and assigns, shall not assert nor seek to enforce any claim for breach of this Lease against any of Landlord's assets other than Landlord's interest in the Shopping Center and in the rents, issues and profits thereof, and Tenant agrees to look solely to such interest for the satisfaction of any liability or claim against Landlord under this Lease, it being specifically agreed that in no event whatsoever shall Landlord (which term shall include, without limitation, any trustees, beneficiaries, officers, directors, or stockholders of Landlord) ever be personally liable for any such liability.

## ARTICLE XXI
## NOTICE OF LEASE

33

Tenant agrees that it will not record this Lease or any notice or memorandum thereof. Tenant shall, upon request of Landlord, execute and deliver a memorandum of this Lease in such recordable form as may be permitted by applicable statute.

## ARTICLE XXII
## ESTOPPEL CERTIFICATES

Tenant shall, at any time and from time to time, upon not less than ten (10) business days' prior written request by Landlord, to execute, acknowledge and deliver to Landlord a statement in writing certifying that this Lease is unmodified and in full force and effect (or, if there have been modifications, that the same are in full force and effect as modified and stating the modifications), that to the knowledge of Tenant no uncured defaults exist hereunder (or if any such defaults exist, specifying the same), and the dates to which the rent and other charges due hereunder have been paid in advance, if any, it being intended that any such statement delivered pursuant to this Article may be relied upon by any prospective purchaser or mortgagee of, or assignee of any mortgage upon, the Shopping Center. Tenant agrees that if it shall fail at any time to execute, acknowledge and deliver any such instrument within ten (10) business days after request, then Landlord may, in addition to all other available remedies, charge Tenant $250 per day thereafter until Tenant delivers such instrument.

Notwithstanding the foregoing, Tenant shall not be entitled to any monetary demand upon Landlord as a response to the Tenant reviewing and executing an estoppel request including, but not limited to, any prior reconciliations for Common Area expenses and/or utility reimbursements.

## ARTICLE XXIII
## MISCELLANEOUS PROVISIONS

Section 23.1 Guarantee. Intentionally Omitted.

Section 23.2. Counterparts; Captions and Headnotes. This Lease may be executed in one or more counterparts, all of which are identical, and any one of which is to be deemed to be complete in itself and may be introduced in evidence or used for any purpose. For the convenience of the parties a signature on this Lease delivered by facsimile, scanned document, electronic signature application or email transmission shall be as effective as an original for all purposes. The captions and headnotes throughout this Lease are for convenience or reference only, and shall in no way be held or deemed to define, limit, explain, describe, modify or add to the interpretation, construction or meaning of any provision of this Lease.

Section 23.3. Partial Invalidity of Unenforceability. The invalidity of one or more of the provisions of this Lease shall not affect the remaining portions of this Lease; and, if any one or more of the provisions of this Lease should be declared invalid by final order, decree or judgment of a court of competent jurisdiction, this Lease shall be construed as if such invalid provisions had not been included in this Lease.

34

Section 23.4. Non-Waiver Provision. No assent, express or implied, by either party to any breach of any agreement or condition herein contained on the part of the other to be performed or observed, and no waiver, express or implied, of any such agreement or condition, shall be deemed to be a waiver of or assent to any succeeding breach of the same of any other agreement or condition; the acceptance by the Landlord of rent or other payment hereunder or silence by the Landlord as to any breach shall not be construed as waiving any of the Landlord's rights hereunder unless such waiver shall be in writing. No payment by the Tenant or acceptance by the Landlord of a lesser amount than shall be due to Landlord from Tenant shall be deemed to be anything but payment on account, and the acceptance by the Landlord of a check for a lesser amount with an endorsement or statement thereon or upon a letter accompanying such check that said lesser amount is payment in full shall not be deemed an accord and satisfaction, and the Landlord may accept such check without prejudice to recover the balance due or to pursue any other remedy.

Section 23.5. Governing Law. This Lease shall be governed by and construed and enforced in accordance with the laws of the state in which the Demised Premises are located.

Section 23.6. Landlord-Tenant Relationship. The Landlord and Tenant are not creating a joint venture or partnership by the provisions of the Lease and they are and at all times shall remain in the relationship of Landlord and Tenant.

Section 23.7. Construction of Certain Terms. As used in this Lease, the word "person" shall mean and include where appropriate, any individual, corporation, partnership or other entity; the plural shall be substituted for the singular, and the singular for the plural, where appropriate; and words of any gender shall mean and include any other gender.

Section 23.8. Execution. The covenants and agreements of this Lease shall, subject to the terms of this Lease to the contrary, be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, as the case may be.

Section 23.9. Confidentiality. Tenant shall not disclose any information herein without Landlord's prior written consent, except for disclosures made to Tenant's tax, accounting, or other professional advisors and for any disclosures that may be required by law. Further, Tenant may disclose this Lease and the terms hereof to Tenant's lenders, and potential future lender, and any person or entity engaged in a due diligence review of Tenant and its assets in operations relating to a potential merger, acquisition, or similar transaction, provided any such persons or entities agree to keep this Lease and the terms hereof confidential.

Section 23.10. Respective Obligations and Expense. Unless specifically set forth herein to the contrary, all obligations of Landlord shall be at Landlord's sole cost and expense and all obligations of Tenant shall be at Tenant's sole cost and expense.

Section 23.11. Time of the Essence. Time shall be of the essence with respect to all obligations of the parties hereunder.

Section 23.12. Broker. Tenant warrants and represents to Landlord that it has caused or incurred no claims for brokerage commissions or finder's fees in connection with the

35

execution of this Lease except Bennett Williams Realty, Inc., whose fees shall be paid by Landlord per a separate agreement. Tenant shall indemnify and hold Landlord harmless against and from all liabilities arising from any claim or demand by any other broker or agent in connection with this Lease who claims entitlement to a fee or commission on account services rendered to Tenant including without limitation the cost of a reasonable attorney's fees in connection therewith.

Section 23.13. OFAC. Tenant represents and warrants to Landlord (i) that neither Tenant nor any person or entity that directly owns a ten percent (10%) or greater equity interest in Tenant nor any of its officers, directors or managing members (collectively, "Tenant and Others in Interest") is a person or entity with whom U.S. persons or entities are restricted from doing business under regulations of the Office of Foreign Asset Control ("OFAC") of the Department of the Treasury (including those named on OFAC's Specially Designated and Blocked Persons List) or under any statute, executive order (including Executive Order 13224 signed on September 24, 2001 (the "Executive Order") and entitled "Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism"), or other governmental action, (ii) that Tenant and Others in Interest's activities do not violate the International Money Laundering Abatement and Financial Anti-Terrorism Act of 2001 or the regulations or orders promulgated thereunder (as amended from time to time, the "Money Laundering Act"), and (iii) that throughout the Term Tenant will comply with the Executive Order and the Money Laundering Act.

Section 23.14. Sale of Parcel. In the event the Demised Premises or parcel upon which the Demised Premises are located is sold to a third party who is not the Operator (as defined in the OEA) under the OEA, Tenant shall (i) acknowledge that all maintenance and insurance for the Common Areas are performed by the Operator under the OEA and not the Landlord; (ii) pay its pro rata share of Common Area maintenance required under the OEA to the Operator under the OEA and shall work directly with the Operator in accordance with the terms of the OEA in connection therewith; (iii) if the Demised Premises or parcel upon which the Demised Premises are located becomes a separate tax lot, Tenant will be responsible for 100% of the costs of its tax lot and shall pay such taxes directly to the taxing authority; and (iv) upon Landlord's request, reasonably cooperate with Landlord as may be reasonably appropriate, necessary or required by Landlord and/or any governmental authority, public utility or company, for the purpose of effectuating such sale, including without limitation the creation of a new reciprocal easement agreement, restrictive covenant and/or amendment to the Lease.

*[signatures on next page]*

IN WITNESS WHEREOF, the parties hereto have executed this Lease under seal as of the date and year first above written.

LANDLORD:

**CHAMBERSBURG MZL LLC**

Sign Name: _____

Print Name: ___Daniel Kaufthal_____

Its: ___Authorized Signatory_____

Witness: _____

Date:___June 23rd, 2022_____

TENANT:

**PRIMANTI CORPORATION**

Sign Name: _____

Print Name: ___Peter H. Chiappu___

Its:___CFO_____

Witness:_____

Date: ___6/2/22_____

IN WITNESS WHEREOF, the parties hereto have executed this Lease under seal as of the date and year first above written.

LANDLORD:

**CHAMBERSBURG MZL LLC**

Sign Name: _____

Print Name: _____

Its: _____

Witness: _____

Date:_____


TENANT:

**PRIMANTI CORPORATION**

Sign Name: _____

Print Name: _____

Its:_____

Witness:_____

Date: _____

37

**EXHIBIT A**

**DEMISED PREMISES – SPACE "15" (below)**



## EXHIBIT A-1
## OUTDOOR SEATING AREA



**EXHIBIT A-2**

**EXCLUSIVE PARKING SPACES**



## EXHIBIT A-3
## NO BUILD AREA



**EXHIBIT A-4**

**DUMPSTER AREA**



**EXHIBIT A-5**

**REQUIRED PARKING AREA**



## EXHIBIT B

## TENANT'S INITIAL WORK

Complete architectural plans, drawings, and specifications and complete engineered mechanical, structural and electrical working drawings for the Tenant's Initial Work, all in such form and in such detail as required for issuance of a building permit and as generally required by industry-standard practices of landlords of first-class shopping centers in Chambersburg, Pennsylvania ("Tenant's Plans"), shall be presented to Landlord for written approval prior to the commencement of the Tenant's Initial Work. Tenant's Initial Work shall be promptly commenced by Tenant and pursued diligently to completion by Tenant in accordance with Section 2.4 of the Lease, in a good and workmanlike manner, in compliance with all applicable laws and requirements of public authorities and with all applicable requirements of the insurance carrier furnishing insurance to the Shopping Center, and except as may be shown on the Tenant's Plans, using materials, finishes and installations that meet or exceed the quality of building standard. With respect to any work affecting the sprinkler systems, alarm systems and/or the roof, Tenant and Tenant's general contractor shall only employ or utilize Landlord's designated contractors for such areas.

Tenant's architect and/or contractor shall obtain a building permit for the Tenant's Initial Work. Tenant shall not commence construction or installation of any portion of the Tenant's Initial Work until all necessary permits and approvals required for the construction and installation of such portion of the Tenant's Initial Work have been obtained and copies of any and all such permits, licenses, and approvals have been provided to Landlord.  Promptly upon the commencement of the Tenant's Initial Work, Tenant shall furnish Landlord with a construction schedule setting forth the commencement date and projected completion date of the Tenant's Initial Work.

Tenant shall use commercially reasonable efforts to minimize construction noises, dust, vibration, odor and other interference during standard operating hours of the Shopping Center and shall not unreasonably interfere with other tenant's use of their premises or common areas during standard operating hours of the Shopping Center, in performing the Tenant's Initial Work. If Landlord gives Tenant notice of complaints from other tenants that Landlord believes, in good faith, are reasonable complaints regarding unreasonable interference with such person's use of its premises during standard operating hours of the Shopping Center as a result of the Tenant's Initial Work, Tenant shall immediately cease such applicable construction during standard operating hours of the Shopping Center.  Tenant shall, as part of the Tenant's Initial Work, make any and all improvements to the Demised Premises that are necessary to cause the same to comply with all applicable laws to the extent such compliance work is triggered by the Tenant's Initial Work.

Tenant shall indemnify and hold harmless Landlord against any and all liability, claims, mechanics liens, judgments, or demands, including demands arising from injuries to or death of persons (Tenant's employees, Tenant's contractor, employees of Tenant's contractor(s) and employees of all subcontractors and sub-subcontractors of Tenant's contractor included) and damage to property, or any other loss, loss of rent, damage, or expense, arising directly or indirectly out of the obligations herein undertaken by Tenant or out of the operations conducted by Tenant and/or its contractor(s), subcontractors or sub-subcontractors, except to the extent caused by the negligence or willful misconduct of Landlord, and will make good to and reimburse Landlord for any expenditures, including actual attorneys' fees, which such person may incur by reason of such matters and, if requested by such person, will defend such person against the above-described matters at the sole cost and expense of Tenant.

Landlord, its officers, agents, and/or employees shall have the right at all reasonable times, following reasonable prior notice during the construction of the Tenant's Initial Work to enter upon the Demised Premises and inspect the Tenant's Initial Work to determine that the same is in conformity with

44

the Tenant's Plans and all requirements of the Lease, provided such access does not unreasonably interfere with Tenant's Initial Work.  The foregoing notwithstanding, Landlord is under no obligation to supervise, inspect, or inform Tenant of the progress of construction of the Tenant's Initial Work and Tenant shall not rely upon Landlord therefor.

Within ten (10) days following the completion of the Tenant's Initial Work, Tenant shall notify Landlord of the completion thereof and shall provide Landlord an opportunity to inspect the same.  Within ten (10) business days following Tenant's notice, Landlord (or its representative) shall walk-through and inspect the Tenant's Initial Work, and shall either approve such work or advise Tenant in writing of any defects or uncompleted items that fail to conform to the Tenant's Plans.  Tenant shall, at Tenant's sole cost and expense, promptly repair such defects or uncompleted items so as to be in material compliance with the Tenant's Plans and in compliance with the Lease.  Landlord's approval of the Tenant's Initial Work, or Landlord's failure to advise Tenant of any defects or uncompleted items in the Tenant's Initial Work, shall not relieve Tenant of responsibility for constructing and installing the Tenant's Initial Work substantially in accordance with the Tenant's Plans, the Lease, and in conformance with all applicable laws. No lack of approval by Landlord of the Tenant's Initial Work shall in any way affect Tenant's ability to occupy the Demised Premises and conduct its business therein.

Upon completion of the Tenant's Initial Work, Tenant shall: (a) obtain and deliver to Landlord a certificate of occupancy for the Tenant's Initial Work from the governmental agency having jurisdiction thereof; (b) deliver to Landlord receipted invoices (or invoices with canceled checks attached) from Tenant's contractor(s) showing evidence of full payment of the Tenant's Initial Work; (c) deliver to Landlord a full set of reproducible as-built drawings and electronic CAD files for the Tenant's Initial Work (including all change orders) to the extent applicable, including, without limitation, architectural drawings, structural drawings, mechanical drawings, including plumbing, fire sprinkler, electrical and life safety; (d) deliver to Landlord the building permit or permits for the Tenant's Initial Work with any required final approvals; (e) complete Landlord's punch list items provided by Landlord to Tenant in accordance with this Exhibit B; (f) deliver to Landlord copies of all written construction and equipment warranties related to the portions of the Tenant's Initial Work involving building systems or those portions of the Demised Premises Landlord is required to maintain or repair under the Lease; (g) deliver to Landlord unconditional final lien releases from all lien claimants providing work or materials in connection with the Tenant's Initial Work in the form attached hereto as **Exhibit B-1** (collectively, the "Tenant's Initial Work Completion Documents").

Tenant shall repair any damage to the Shopping Center arising out of the construction of the Tenant's Initial Work to the extent caused by Tenant, its agents, contractor(s), subcontractors, or material suppliers.  All such repairs shall be made at Tenant's sole cost and expense.

**EXHIBIT B-1**

**FINAL WAIVER OF LIEN**
**(UNCONDITIONAL)**

**PROJECT:**                    **Insert Project Title**

**PROJECT ADDRESS:**        **Insert Project Address**

**OWNER:**                     **Insert Full Legal Owner Name**

**CONTRACTOR:**            **Insert Full Legal Contractor Name**

The undersigned has been engaged to furnish labor, services and material for the premises owned by **Insert Full Legal Owner Name** ("Owner") in the **Insert Shopping Center Name** and located on or about **Insert Project Address** (the "Premises").

The undersigned, in consideration of the sum of **$Insert Dollar Amount and Cents (Insert Written Dollar Amount and XX/100 Dollars),** upon the receipt, does hereby WAIVE and RELEASE any and all lien, right of lien or claim of whatsoever kind or character on the Premises, including, without limitation, all buildings, improvements, etc., on account of any and all labor or material, or both, furnished for or incorporated into the Premises by the undersigned, up to and including **Insert Date** but does not cover any specified retainage specifically set forth in the undersigned's written invoice.

Further, the undersigned hereby COVENANTS and REPRESENTS that all of the subcontractors, supplies, mechanics, and laborers engaged by the undersigned have been paid in full or shall be immediately paid from the proceeds of this current payment for all work done and/or materials furnished to said property through the date shown above.  The undersigned hereby AGREES to INDEMNITY, DEFEND and HOLD HARMLESS the Owner **and KPR Centers LLC**, from any and all claims by any party whatsoever based upon work done and/or materials furnished in connection with this construction by the undersigned and his subcontractors or suppliers through the date shown above.

Date as of:_____**, 202**        Insert Full Legal Contractor Name
                                                                            (Contractor name)


_____                    _____
Witness                                                                (Sign Name)


                                                                            _____
                                                                            (Print Name)


                                                                            _____
                                                                            (Title)

46

## **EXHIBIT C**

## **SIGNAGE REQUIREMENTS**

### **General Criteria**

The purpose of this Sign Criteria is to define and specify the exterior signage criteria for all tenants at the Shopping Center in order to produce a coordinated, complementary graphic image for the entire center.

Each Tenant is allowed one Primary Sign to be mounted on the sign band above the Tenant's storefront.  The cost of fabrication and installation shall be the responsibility of the Tenant.  Sign design, fabrication and installation shall be in full compliance with the requirements and specifications of this Sign Criteria and with all requirements of the local governmental authority having jurisdiction.

Sign Text:  The text of the Primary Sign shall be limited to Tenant's Trade Name only. No reference shall be made to any merchandise sold or activity conducted on the Premises.  The Primary Sign shall be limited to one line of text.

Sign Location:  The Primary Sign shall be mounted on the sign band above Tenant's storefront and shall be centered with respect to both width and height.

### **Approval**

Tenant shall submit one set of signage drawings and specification to Landlord meeting the requirements set forth herein.  Tenant must receive Landlord's written approval prior to the fabrication and installation of any sign.

a)  Layout of text for Primary Sign must be to scale, showing all sign dimensions, style and exact color of letters.  Also, layout and colors of any logo to be included.  Color of raceway and letter sides to be shown.

b)  Construction and installation details and specification, including all materials to be used.

### **Specific Primary Sign Criteria**

Type of Sign:  Internally-illuminated sign with individual metal-edged letters mounted on a raceway.  All letters to have plastic faces, closed back, and single white neon 15 millimeter tubing.  No flashing or moving signs permitted.

Raceway to be 8" by 8" and painted to match color of Tenant's sign band. Raceway will be exposed and must be installed with a minimal amount of fasteners to minimize number of penetrations to sign band.  Tenant shall be responsible for electrical connection to raceway.

Style of Letters:  Selected by Tenant subject to Landlord's approval.

## EXHIBIT C-1
## PYLON SIGNAGE LOCATION





**EXHIBIT C-2**

**TENANT'S APPROVED STOREFRONT SIGNAGE**







## EXHIBIT D

## RESTRICTIONS AND TENANT EXCLUSIVE USES

**Chipotle, recorded Agreement of Restrictions Instrument Number 202023150**

53. EXCLUSIVE. (A) Landlord agrees that during the term of this Lease, but only for so long as Tenant is open for business (subject to closures due to force majeure, casualty, condemnation and alterations), using the Leased Premises for the Exclusive Use (as hereinafter defined) and is not otherwise in default of any of the provisions of this Lease, Landlord will not hereafter enter into a new lease in the Shopping Center with a tenant, who is a Chipotle competitor whose primary use is the sale of burritos, fajitas or tacos, including, but not limited to Moe's, Qdoba, California Tortilla and Baja Fresh, as well as any full service sit down Mexican themed restaurant (the "Exclusive Use"). The aforementioned restriction shall not apply to: (i) any existing tenants at the Shopping Center or their subtenants, assigns or replacements; (ii) any existing leases at the Shopping Center as same may be renewed, extended, modified or amended (except that no such modification shall grant a tenant the right to engage in the Exclusive Use where such tenant did not previously have that right); or (iii) any store measuring 20,000 sq. ft. or more. As used herein, "primary use" means that the sale of burritos, fajitas or tacos constitutes fifteen percent (15%) or more of a tenant's gross sales of food items.

**Comcast**

Section 8.3. Exclusive Use. Provided that Tenant is operating in the Demised Premises in accordance with its permitted use, and excluding existing leases and uses as further described on **Exhibit E** (provided, however, that Landlord agrees to withhold its consent to a proposed change in use by an existing tenant which proposed change in use would otherwise violate the exclusive use, so long as Landlord has the right to do so under the terms of any such lease without being in breach or default under the terms of any such lease), the Landlord agrees that during the Term, it shall not lease space in the Shopping Center to any tenant whose business is the provider of multichannel video services or comparable services for the delivery of video programming (e.g. cable, satellite, or Internet-based video services), wired or wireless Internet access services, wireline or wireless telephone services and home security systems the "Tenant Exclusive"). If

**Five Below**

34. Exclusive. (A) Landlord agrees that during the term of this Lease, provided that Tenant sells the "Exclusive Items" (as such term is defined herein) Landlord will not hereafter enter into a new lease in the Developer's Tract with a tenant whose principal permitted use is primarily for the retail sale of teen and pre-teen oriented variety and general merchandise at price points that are primarily Ten Dollars ($10.00) or less (the "Exclusive Items") provided, however this limitation shall not prevent Landlord from leasing space within the Developer's Tract to a dollar store, Dollar Tree or similar tenant (the "Exclusive Use"). The aforementioned restriction shall not apply to: (i) any existing tenants at the Developer's Tract or their successors, assigns or replacements who have leases that presently either permit such a use or expansion to include such use or by their terms preclude Landlord from enforcing this exclusive against such tenant; (ii) any existing leases at the Developer Tract as same may be renewed, extended, modified or amended (except that no such modification shall grant a tenant the right to engage in the Exclusive Use where such tenant did not previously have that right); or (iii) any store measuring 25,000 sq. ft. or more.

51

**Giant (Exclusive Uses)**

15.02    Exclusive Uses.

(a)    Tenant's Exclusive Uses.

(i)    Subject to the terms of this Article 15, Landlord covenants and agrees that during the Term of this Lease, Tenant shall have the exclusive right within the Shopping Center and on any other property (a "Landlord Other Property") within three (3) miles from the perimeter of the Shopping Center   which is now or hereafter owned, leased, occupied, or controlled, directly or indirectly, by Landlord, or a Landlord Affiliate, as defined in Paragraph 15.02(a)(ii) below, to:

(A)    operate a grocery store or supermarket;

(B)    engage in the retail sale of items of food for off premises consumption (whether by humans or animals);

(C)    engage in the retail sale of alcoholic beverages (including distilled spirits, beer and wine), if, and at such time as, the operator of a private retail establishment (such as a food store) may lawfully sell alcoholic beverages in the Commonwealth of Pennsylvania (the "Dawn of Civilization") (prior to the Dawn of Civilization, Landlord shall have the right to permit a Pennsylvania Liquor Control Board operated liquor store to occupy space and conduct operations within the Shopping Center or on any Landlord Other Property provided that such operations are not located within, or a part of, any private party's business operations, and such Pennsylvania Liquor Control Board operations may continue subsequent to the Dawn of Civilization);

(D)    sell drugs or other products which are required by law to be dispensed by a registered pharmacist; and

(E)    engage in the sale of gasoline (provided, however, that Tenant's gasoline exclusive shall expire if and when Tenant surrenders the Fueling Station to Landlord in accordance with Paragraph 37.01(e))

(items (A) through (E) being referred to herein as the "Tenant's Exclusive Uses").

52

**Giant (Prohibited Uses)**

(b)    Specific Prohibited Uses. In addition to those uses prohibited under the OEA, Landlord and Tenant covenant and agree that neither the Outparcels, Tenant's Building, nor any other premises in the Shopping Center shall be used for the following "prohibited uses":

(i)    adult or sexually explicit or oriented stores, including bookstores or video stores or any business featuring the display of male and/or female dancers or so-called "strip tease" or "adult entertainment" establishments;

(ii)    massage parlors;

(iii)    any business involving the sale, leasing, storage, servicing, repair, or washing of automobiles, trucks, boats, recreational vehicles and/or mobile homes;

(iv)    automotive parts stores, except that automotive parts stores shall be permitted which:

(A)    do not provide any automotive or other vehicular servicing other than the installation of tires or performance accessories, and

(B)    do not permit customers to change oil or other fluids, or perform other vehicular servicing, within the store or Common Area, and

(C)    properly store all waste batteries, waste tires and other used merchandise within the automotive parts store, and then properly dispose of same in accordance with applicable laws, and

(D)    conduct business in a manner which is consistent with the appearance and conduct of a first class shopping center, and

(E)    are located at least two hundred fifty (250) feet from the nearest perimeter wall of the Tenant's Building or upon an Outparcel;

(v)    lounges, bars, taverns, nightclubs, discos and other establishments of like type, except that any restaurants permitted in accordance with the provisions of Paragraph 15.02 may include a bar or bars as an incidental part of their restaurant business;

(vi)    theatres;

(vii)    churches;

(viii)    bingo parlors;

(ix)    bowling alleys;

(x)    skating rinks;

53

       (xi)     game or video/arcade rooms or amusement centers (except as incidental to another use;

       (xii)    billiard or pool halls;

       (xiii)   cafeterias;

       (xiv)   schools, except that specialty schools such as schools which provide instruction for specific vocations and learning centers (such as Sylvan or Huntington) which contain not more than two thousand five hundred (2,500) square feet of Gross Leasable Area, and any such specialty schools which contain more than two thousand five hundred (2,500) square feet of Gross Leasable Area and are located more than one hundred (100) feet from the nearest demising wall of the Premises shall be permitted;

       (xv)    health spas, fitness centers, karate, gymnasiums, exercise studios, or similar businesses, except that foregoing businesses which contain not more than two thousand five hundred (2,500) square feet of demised space and which are located more than one hundred fifty (150) feet from the nearest demising wall of the Tenant's Building shall be permitted;

       (xvi)   meeting halls or other places of public assembly;

       (xvii)  auditoriums;

       (xviii)  dance halls;

       (xix)   lottery sales, except as an incidental part of a permitted business; or off-track betting businesses;

       (xx)    outdoor plant nurseries (except that a nursery located within a store, such as a floral shop or as a component of a home improvement center such as Lowe's or Home Depot, shall be permitted);

       (xxi)   auction houses or flea markets;

       (xxii)  except for such use associated with a PETsMART or a Petco store, animal or veterinary clinics;

       (xxiii)  so called "head shops" or businesses which sell drug related paraphernalia;

       (xxiv)  hotels, motels, tourist courts, or sleeping apartments/lodging rooms or living quarters;

       (xxv)   laundries, laundromats or any dry cleaning businesses (other than a business devoted solely to the drop-off and pick-up of dry cleaning);

       (xxvi)  mortuaries or funeral parlors;

       (xxvii)  a business operation which regularly or with significant frequency sells merchandise of the types or qualities now commonly known as "odd lot", "close out", "clearance", "discontinued", "cancellation", "second", "factory reject", "sample", "floor model", "demonstrator", "obsolescent", "over-stock", "distressed", "bankruptcy", "fire sale" or "damaged" except that a Famous Footwear, Dollar Tree, T. J. Maxx or Marshall's store or similar operations consistent with a first class shopping center, shall be permitted;

(xxviii) any purpose or business which is noxious or unreasonably offensive because of the emission of noise, smoke, dust or odors;

(xxix)  any "nonretail business", which term shall mean and include, without limitation, mail-order catalog store operations, banks, finance company businesses, shoe repair shops, barber shops, beauty shops, and real estate brokerage, stock brokerage and insurance brokerage businesses, provided that:

(A)  no more than seven thousand five hundred (7,500) square feet in the aggregate of Gross Leasable Area in the Shopping Center (the "Maximum Permissible Nonretail Area") may be utilized for the operation of the following nonretail businesses:  mail-order catalog store operations, banks, finance company businesses, shoe repair shops, barber shops, hair cuttery or hair salons; beauty or nail salons, and office uses typically found in first class shopping centers, including but not limited to, real estate brokerage, stock brokerage and insurance brokerage businesses (the "Permitted Nonretail Businesses"), and

(B)  no more than two thousand five hundred (2,500) square feet of the Maximum Permissible Nonretail Area for such Permitted Nonretail Businesses may be located within one hundred (100) feet of the nearest demising wall of the Tenant's Building, and

(C)  notwithstanding the foregoing, the Gross Leasable Area of any bank, finance company businesses, real estate brokerage, stock brokerage and insurance brokerage businesses, located upon an Outparcel shall be excluded from the calculation of the Maximum Permissible Nonretail Area.

(xxx)  any office or storage operations except office and storage operations which are a part of the conduct of a retail business in the Shopping Center or are a Permitted Nonretail Business.

(xxxi)  prohibited uses set forth in the OEA.

**Great Clips**

(M-1) Exclusive.

Landlord agrees that during the term of this Lease, but only for so long as Tenant is open for business, using the Leased Premises for the Exclusive Use (as hereinafter defined) and is not otherwise in default of any of the provisions of this Lease, Landlord will not hereafter enter into a new lease in the Shopping Center with a tenant whose principal permitted use is the operation of a unisex discount hair salon (the "Exclusive Use").  The aforementioned restriction shall not apply to:  (i) any existing tenants at the Shopping Center or their successors, assigns or replacements; (ii) any existing leases at the Shopping Center as same may be renewed, extended, modified or amended (except that no such modification shall grant a tenant the right to engage in the Exclusive Use where such tenant did not previously have that right); (iii) any full service hair salon or day spa with incidental hair services or a nail salon offering incidental hair services; and (iv) the Target Tract.  Furthermore, the rights contained in this Article are intended

55

**Kohl's**

SECTION 16.6. Landlord further covenants and agrees that no space within the Developer's Tract (nor any other land within one (1) mile of Tenant's Tract now owned or hereafter acquired by Landlord or its affiliates, including without limitation, Kimco Realty Corporation or its affiliates) shall be used by any occupant to operate a department store with over 40,000 square feet of Floor Area of which more than 20% is used for the sale of apparel. For purposes of this section, one-half of the aisle space adjacent to any apparel display or fixture shall be included in the floor area total. If Landlord shall be in breach of this covenant and shall fail to cure such breach within 30 days after receipt of written notice from Tenant, Tenant shall have the option to either (i) terminate this Lease by giving Landlord written notice of termination at any time after the expiration of such 30-day period and prior to the cessation of the violation giving rise to Tenant's rights hereunder or (ii) seek such injunctive or other relief as may be available at law or in equity to force the cessation of the offending activity. If Landlord fails to cure the violation within the time set forth herein, in addition to Tenant's right to so terminate this Lease or seek injunctive or other relief, and without waiving Tenant's right to terminate this Lease or seek injunctive relief at a later date should such violation continue, so long as such violation shall continue, the annual fixed rent otherwise due under this Lease shall be reduced to one-half of the annual fixed rent otherwise due under this Lease. This Section 16.6 shall not apply to (i) the Target Tract or any land acquired by Landlord or its affiliates hereafter, which land (or a premises located on such land) was encumbered by an existing use in violation of this Section 16.6, which use pre-dated Landlord or Landlord's affiliates' ownership of such land; provided, however, that if Landlord re-gains control of such land or the premises, as the case may be, which was encumbered by an existing use in violation of this Section 16.6 during the Term of this Lease, the restrictions contained in this Section 16.6 shall apply to such land or the premises, as the case may be or (ii) one (1) national sporting goods store, such as a Dick's Sporting Goods or Sports Authority provided such sporting goods store operates in substantially the same manner in which such store operates the majority of its stores on the date of this Lease.

56

**Michael's**

    16.4    Exclusive Use.

        16.4.1    Limitation on Use. Neither Landlord nor any entity controlled by Landlord will use, lease (or permit the use, leasing or subleasing of) or sell any space in or portion of the Shopping Center or any property contiguous to the Shopping Center owned or controlled now or at any time hereafter by Landlord or any affiliate of Landlord, to any "craft store", store selling arts and crafts, art supplies, craft supplies, picture frames or picture framing services, framed art, artificial flowers and/or plants, artificial floral arrangements and/or plant arrangements, wedding or party goods (except apparel), scrapbooking/memory book store, or a store selling scrapbooking/memory book supplies, accessories, and/or decorations or other papercrafting (e.g. making greeting cards, gift bags, tags, and other related or similar items) supplies, accessories and/or decorations associated with the foregoing, or providing classes on any of the foregoing or any combination of the foregoing categories, or any store similar to Tenant in operation or merchandising. This Section 16.4.1 shall not apply (i) to any lessee whose lease was fully executed on the Effective Date hereof and is identified on Exhibit I as an "Existing Lease Not Subject to Tenant's Exclusive;" provided, however, that this exception shall not apply if (a) Landlord permits or agrees to an expansion of the premises for any such permitted use which violates Tenant's exclusive, or (b) Landlord permits or agrees to the change of a permitted use by any such lessee or its successors or assigns, or (c) Landlord permits or agrees to an assignment or sublease of such existing lease if Landlord may avoid the granting of such permission by virtue of the provisions of the existing lease, or (d) Landlord has the right, by virtue of the provisions of the existing lease, to cause said lessee to honor the exclusive granted to Tenant by giving said existing lessee notice of this exclusive or otherwise; or (ii) to any lessee for which the sale of a product or service covered by the exclusive granted to Tenant hereunder is merely incidental to such lessee's primary use, unless the total space which such lessee devotes to the products or services which violates the exclusive contained in this Section 16.4.1 exceeds the lesser of (a) ten percent (10%) of the Leasable Square Feet or (b) one thousand five hundred (1,500) Leasable Square Feet (inclusive of allocable aisle space and linear shelf space); provided, however, this subpart (ii) shall not apply to framing services, it being the intention that no other lessee or occupant of the Shopping Center shall be permitted to offer custom framing services, even on an incidental basis unless such picture framing is incidental to the operation of a high end art gallery where the picture framing is limited to the art works sold by such art gallery; or (iii) to the parcel labeled "Target Parcel" on Exhibit B during any period of time in which neither Landlord nor any affiliate of Landlord owns or controls the Target Parcel unless Landlord or any affiliate of Landlord acquires fee title to or regains control over the use of such Target Parcel, at which time the Target Parcel shall be subject to the exclusive granted to Tenant in this Section 16.4.1 (it is understood and agreed to by the parties that the occupants of such Target Parcel as of such acquisition date shall be treated as an "Existing Lease Not Subject to Tenant's Exclusive) . A floral shop selling fresh flowers and/or fresh floral arrangements shall not be deemed a violation of this Section 16.4.1. A typical greeting card store and a typical stationary store as such stores exist as of the Effective Date shall also not be deemed a violation of this Section 16.4.1. A typical Giant grocery store or other national grocery store/supermarket shall not be deemed a violation of this Section 16.4.1 so long as such store operates as a typical national grocery store/supermarket as of the Effective Date. Tenant hereby represents and warrants to Landlord that Tenant will, upon the request of Bed Bath & Beyond, enter into an agreement with Bed, Bath & Beyond with respect to the application of each party's respective exclusive for the Shopping Center against the other party if such agreement exists at the time of the request. Tenant also agrees to provide its national agreement, if such agreement exists at the time of the request, with Linens 'N Things upon the request of Landlord or Linens 'N Things.

**MOD Pizza, recorded Declaration of Restrictions Instrument Number 202026092**

Landlord will not enter into a new lease, sublease, or otherwise permit any dine-in restaurant serving principally pizza, which shall be defined as the sale of pizza not exceeding ten percent (10%) of gross sales ("Tenant's Exclusive Use"). Landlord further agrees to withhold its consent to a requested change of use in any existing lease to the extent landlord is permitted to do so under the applicable lease, if it would violate this Section. If Landlord

**Panera, recorded Declaration of Restrictions Instrument Number 202200487**

Landlord agrees that during the term of this Lease, but only for so long as Tenant or its permitted successor and/or assign pursuant to Article 18 hereof is open for business as required hereunder [excluding (i) temporary permitted closures not to exceed sixty (60) days in the aggregate per Lease Year without Landlord's consent for repairs, remodeling, or in connection with a proposed assignment or subletting; (ii) period(s) of closure for casualty and/or condemnation restoration to the extent expressly described in Articles 13 and 14 respectively; or (iii) temporary closure not to exceed thirty (30) days in the aggregate per Lease Year] (see also Article 52), using the Leased Premises for the Exclusive Use (as hereinafter defined) and is not otherwise in default of any of the provisions of this Lease beyond any applicable notice and cure period expressly set forth herein, Landlord will not hereafter enter into a new lease in the Developer's Tract with (a) a tenant whose principal permitted use is the operation of a first class bakery/cafe restaurant which offers for sale at retail for on-premises or off-premises consumption premium quality breads, bagels, pastries, salads, muffins, cookies, sandwiches and/or soups (the "Exclusive Use"), including by way of example and not in limitation, the operation of a Corner Bakery, Atlanta Bread, Schlotsky's, Xando, Crispers, La Madeline or Cosi. The aforementioned restriction shall not apply to: (i) Kohl's Department Store or any replacement thereof occupying at least 18,000 square feet; (ii) any existing tenants at the Shopping Center or their successors, assigns or replacements (except that such successors, assigns or replacements shall not have the right to engage in the Exclusive Use where the existing tenant did not previously have that right, and Landlord agrees that in the event Landlord's consent is required and may be withheld for a proposed change of use, and the existing tenant, its successors, assigns or replacements request Landlord's consent to a change of use to the Exclusive Use, Landlord will not grant its consent to such a change of use); (iii) any existing leases at the Shopping Center as same may be renewed, extended, modified or amended (except that no such modification shall grant a tenant the right to engage in the Exclusive Use where such tenant did not previously have that right); (iv) a supermarket; (v) a donut shop or similar type use; (vi) any store measuring 15,000 square feet or more; (vii) the tenant commonly known as "Starbucks Coffee", and its successors and/or assigns for substantially the same use; and (viii) the sale of any restricted items on an incidental basis. For purposes of this Article, incidental shall mean no more than fifteen (15%) percent of such tenant's Gross Sales are attributable to those items.

In addition, Landlord shall not lease space to a gym or health club within three hundred feet (300') of the Leased Premises.

Notwithstanding the foregoing, Landlord shall specifically have the right to enter into a lease for space in the Shopping Center with a tenant whose principal permitted use is a coffee house whose sales also include the Exclusive Use on an incidental basis. By way of example, Landlord shall have the right to enter into a lease with Starbuck's Coffee, Java City, Pete's Coffee, or It's A Grind.

**PetSmart (Exclusive Use)**

**Primary Business Use**

Tenant's Primary Business:  The retail sale of (i) pets (including but not limited to fish, birds, reptiles, dogs, cats and other small animals), (ii) food, accessories and other products relating to pets and animals, including equestrian products and apparel related thereto, (iii) services related to pets and animals, such as grooming, indoor boarding and pet day care, animal training and obedience classes, pet adoption and veterinary services, (iv) products relating to nature and the environment, (v) educational products and services related to any of the foregoing and (vi) office and storage uses incidental to the foregoing.

**Exclusive**

B.      Exclusive Rights. From and after the date hereof and continuing throughout the Term of the Lease, Tenant shall have the exclusive right in the Shopping Center to conduct any portion of Tenant's Primary Business described in clauses (i), (ii) and (iii) of Tenant's Primary Business set forth in Paragraph C of the Fundamental Lease Provisions ("Tenant's Exclusive"). Tenant's Exclusive shall not apply to the Target tract, a full-line grocery store occupying at least fifty thousand (50,000) square feet of Gross Floor Area or any retailer occupying in excess of fifty thousand (50,000) square feet of Gross Floor Area provided such retailer is not a direct competitor of Tenant (i.e., such retailer does not (i) primarily sell pets, pet food and/or pet products and accessories; or (ii) provide pet services of any kind including but not limited to veterinary services, grooming, obedience training, pet day care and/or boarding).  All other tenants or other occupants of any portion of the Shopping Center (excluding any occupancy agreements in effect as of the date of this Lease) shall be prohibited from engaging in any portion of Tenant's Primary Business described in clauses (i), (ii) and (iii) of Paragraph C of the Fundamental Lease Provisions, except on a basis that is incidental to an otherwise permitted use. For purposes of this Paragraph, the term "incidental" shall mean that the use occupies the lesser of (x) two hundred fifty (250) square feet of Gross Floor Area (one thousand (1,000) square feet of Gross Floor Area in the case of a grocery store occupying less than fifty thousand (50,000) square feet of Gross Floor Area but more than twenty-five thousand (25,000) square feet of Gross Floor Area); or (y) five percent (5%) of the sales area in the subject premises. The existing

**Red Robin, Declaration of Restrictions recorded Instrument Number 202104059**

(G)    **Prohibited Uses.**  In addition to the prohibited uses set forth in the OEA, Landlord will not lease, sell or permit to be used any portion of the Shopping Center, other than the Leased Premises, for operation of more than one other casual dining restaurant with a liquor license, similar to a Red Robin restaurant, as conducted on the date of this Lease, such as, for purposes of illustration only, Island's, Cheeseburger in Paradise, Champp's, Chili's, Applebee's, Uno's, Max & Irma's, Fuddrucker's, Bennigan's, Ground Round, Houlihan's or Ruby Tuesday's. Notwithstanding the foregoing, (i) the following restaurant operations are permitted at the Shopping Center:  Macaroni Grill or a substantially similar operation and Outback Steakhouse or a substantially similar operation; and (ii) operation of a TGI Friday's or substantially similar derivation thereof shall be permitted at the Shopping Center at any time that there are not already in operation two casual dining restaurants with liquor licenses, similar to a Red Robin restaurant, as conducted on the date of this Lease.

**Rue 21**

　　　NONE.

**Spirit Halloween**

　　　NONE.

**Staple's (Exclusive Use)**

*Section 5.2.1  Exclusive Use.*  No part of the Center shall be used for the sale or leasing of equipment (including computers and telecommunications equipment), furniture or supplies for business or office (including home office) use, or the provision of business or office services (including copying, printing, telecommunications, packing, shipping and business equipment repair services) (collectively, the "Exclusive Goods and Services") and no property located within one mile of the Center owned by Landlord or by an entity under common control with Landlord shall be used for the operation of a so-called "office supply superstore" as such retailing concept is generally defined and acknowledged within the retail industry.  Landlord shall not advertise any other office supply superstore (as such retailing concept is generally defined and acknowledged within the retail industry) within the Center or on any Center-specific internet web site or page; and

60

**Staple's (Prohibited Use)**

*Section 5.2.2 Prohibited Uses.* No part of the Center shall be used for any of the following: (i) tanning, health, exercise or racquet club or spa (provided, however, this restriction shall not prohibit (x) the operation of one (1) tanning operation and/or (y) one (1) health or exercise club (such as, by way of example only, Curves) that does not exceed 2,000 square feet of space and provided such operations are not located within 100 feet of the Premises), gymnasium, bowling alley, skating rink, miniature golf or other sports or recreational facility; (ii) school (provided, however, this restriction shall not prohibit the operation of one (1) school or educational facility (such as, by way of example only, Sylvan Learning Center) that does not exceed 2,000 square feet of space and provided such operation is not located within 100 feet of the Premises), library, reading room, or house of worship; (iii) movie theatre, auditorium, meeting hall, hotel or motor inn, or any residential use or day-care facility; (iv) massage parlor, adult bookstore, adult entertainment facility, a so-called "head" shop, off-track betting, gambling, gaming, or check cashing facility; (v) car wash, automobile repair work or automotive service or gas station, tire store, automobile body shop, automobile, motorcycle, boat, trailer or truck leasing or sales, or laundromat (provided, however, the laundromat restriction shall not prohibit the operation of one (1) laundromat exclusively for drop-off and pick-up service by the

ultimate consumer and which (w) is not coin-operated, (x) does not perform any on-site dry cleaning services, (y) does not exceed 2,000 square feet of space, and (z) is not located within 100 feet of the Premises); (vi) tavern or bar (unless operated incidental to, in conjunction with, and under the same name as, a restaurant permitted hereunder), amusement park, carnival, banquet facility, dance hall, disco, nightclub, or other entertainment facility including video game, virtual reality or laser tag room or facility, pool hall, arcade, indoor children's recreational facility or other amusement center; (vii) any manufacturing, warehouse or office use (except incidental to a retail operation); (viii) funeral parlor, animal raising or storage (except incidental to a full-line retail pet supply operation), pawn shop, flea market or swap meet, junk yard; (ix) drilling for and/or removal of subsurface substances, dumping, disposal, incineration or reduction of garbage or refuse, other than in enclosed receptacles intended for such purposes; (x) any facility related to the occult sciences, such as palm readers, astrologers, fortune tellers, tea leaf readers or prophets, frozen food locker or sales facility, milk distribution center, medical, dental or hospital related center or offices, nursing home, old age center, or governmental facility (other than a post office), recruiting center or employment center; or (xi) any use which constitutes a public or private nuisance or produces objectionable noise or vibration; and

*Section 5.2.3 Restricted Uses.* No premises within the Center shall be used for a restaurant (except (i) on the Outlots shown on **Exhibit A**, (ii) no more than 2 "in-line" restaurants, each of which does not exceed 2,500 square feet of space and is not located within 100 feet of the Premises, or (iii) otherwise at least 300 feet from the Premises) or any other use which places a burden on parking substantially disproportionate to that imposed by a typical retail use as generally acknowledged by the retail industry.

**Subway**

39. Exclusive.  Landlord agrees that during the term of this Lease, but only for so long as Tenant is open for business, using the Leased Premises for the Exclusive Use (as hereinafter defined) and is not otherwise in default of any of the provisions of this Lease, Landlord will not hereafter enter into a new lease at the Shopping Center as shown on Exhibit "A" with any restaurant that sells primarily sandwiches including, but not limited to,  of the tenants commonly known as "Quizno's", "Potbelly" or "Blimpies" (the "Excluded Tenants").  The aforementioned restriction shall not apply to:  (i) any existing tenants at the Shopping Center which currently have the right to operate as an Excluded Tenant, or their successors, assigns or replacements; or (ii) any existing leases at the Shopping Center which currently have the right to operate as Excluded Tenants, as same may be renewed, extended, modified or amended (except that no such renewal, extension, modification or amendment shall grant a tenant the right to operate as an Excluded Tenant where such tenant did not previously have that right); or (iii) any store measuring 3,500 sq. ft. or more and less than 20% of its gross sales derived from sandwiches; or (iv) a restaurant tenant whose sale of subs is not a primary use (e.g. an Italian Restaurant selling pizza along with some hot subs), and derives less than 20% of its gross sales from sandwiches; or (v) any restaurants operating in free standing buildings situated in the Shopping Center .

**Target Operation and Easement Agreement 2006**

5.1    Uses

5.1.1    The Shopping Center shall be used only for retail sales, offices, Restaurants or other permitted commercial purposes.  "Business Office" shall mean an office which does not provide services directly to consumers; "Retail Office" shall mean an office which provides services directly to consumers, including but not limited to financial institutions, real estate, stock brokerage and title companies, travel and insurance agencies, and medical, dental and legal clinics.  No more than ten percent (10%) of the total Floor Area on the Developer Tract may be used for Retail Office and/or Business Office purposes; provided, however, that office space used by an Occupant for administrative purposes, and which is not open to the general public, shall not be considered Retail Office or Business Office for the purpose of this limitation.

5.1.2    No use shall be permitted in the Shopping Center which is inconsistent with the operation of a first-class retail shopping center.  Without limiting the generality of the foregoing, the following uses shall not be permitted:

62

(A) Any use which emits an obnoxious odor, noise or sound which can be heard or smelled outside of any Building in the Shopping Center.

(B) An operation primarily used as a storage warehouse operation and any assembling, manufacturing, distilling, refining, smelting, agricultural or mining operation.

(C) Any "second hand" store, "surplus" store, or pawn shop, provided, however, this subsection will not prohibit the operation of retailers commonly known as "Plato's Closet" or "Play It Again Sports", so long as these retailers are operating substantially similar first-class consignment businesses.

(D) Any mobile home park, trailer court, labor camp, junkyard, or stockyard; provided, however, this prohibition shall not be applicable to the temporary use of construction trailers during periods of construction, reconstruction or maintenance.

(E) Any dumping, disposing, incineration or reduction of garbage; provided, however, this prohibition shall not be applicable to garbage compactors located near the rear of any Building.

(F) Any fire sale, bankruptcy sale (unless pursuant to a court order) or auction house operation.

(G) Any central laundry, dry cleaning plant or laundromat; provided, however, this prohibition shall not be applicable to nominal supportive facilities for on-site service oriented to pickup and delivery by the ultimate consumer.

(H) Any automobile, truck, trailer or recreational vehicle sales, leasing, display or body shop repair operation.

(I) Any bowling alley or skating rink.

(J) Any movie theater or live performance theater.

(K) Any hotel, motel, short or long term residential use, including but not limited to: single family dwellings, townhouses, condominiums, other multi-family units, and other forms of living quarters, sleeping apartments or lodging rooms.

(L) Any veterinary hospital or animal raising or boarding facility; provided, however, this prohibition shall not be applicable to pet shops. Notwithstanding the forgoing exception, any veterinary or boarding services provided in connection with the operation of a pet shop shall only be incidental to such operation; the boarding of pets as a separate customer service shall be prohibited; all kennels, runs and pens shall be located inside the Building; and the combined incidental veterinary and boarding facilities shall occupy no more than fifteen percent (15%) of the Floor Area of the pet shop.

(M) Any mortuary or funeral home.

(N) Any establishment selling or exhibiting pornographic or "obscene" materials (except incidental to the operations of a first-class national book or video retailer with not less than 50 stores) or any massage parlor;

(O) Any establishment selling or exhibiting drug-related paraphernalia or which exhibits either live or by other means to any degree, nude or partially clothed dancers or wait staff.

64

(P)     Any bar, tavern, Restaurant or other establishment whose reasonably projected annual gross revenues from the sale of alcoholic beverages for on-premises consumption exceeds thirty percent (30%) of the gross revenues of such business.

(Q)     Any health spa, fitness center or workout facility; any massage parlors or similar establishments, provided, however, this restriction shall not prohibit the operation of one (1) first-class gym, health club, exercise or dance studio that does not exceed 3,000 square feet of Floor Area.

(R)     Any flea market, amusement or video arcade, pool or billiard hall, car wash or dance hall, provided, however, this restriction shall not prohibit the presence of video games and pool tables that are an incidental part of another acceptable business under this OEA and are located at least 500 feet from the Target Tract.

(S)     Any training or educational facility, including but not limited to: beauty schools, barber colleges, reading rooms, places of instruction or other operations catering primarily to students or trainees rather than to customers; provided, however, this prohibition shall not be applicable to on-site employee training by an Occupant incidental to the conduct of its

business at the Shopping Center or to one (1) educational facility not to exceed 3,000 square feet of Floor Area.

(T)     Any gambling facility or operation, including but not limited to: off-track or sports betting parlor; table games such as blackjack or poker; slot machines, video poker/blackjack/keno machines or similar devices; or bingo hall. Notwithstanding the foregoing, this prohibition shall not be applicable to government sponsored gambling activities or charitable gambling activities, so long as such activities are incidental to the business operation being conducted by the Occupant.

65

5.1.5    The following use and occupancy restrictions shall be applicable to the Developer Tract:

(A)    No Restaurant shall be located thereon within three hundred (300) feet of the Building Area located on the Target Tract.

(B)    No toy store exceeding five thousand (5,000) square feet of Floor Area shall be permitted.

(C)    No drug store exceeding ten thousand (10,000) square feet of Floor Area shall be permitted, and no store of any size selling or offering for sale any pharmaceutical products requiring the services of a licensed pharmacist

shall be permitted; provided, however, that a pharmacy that is operating ancillary to a Giant supermarket or another National Supermarket use will be permitted, but such use may not include a drive-through or a separate entry.

(D)    No pet shop shall be located thereon within three hundred (300) feet of the Building Area located on the Target Tract.

(E)    No gas/service station and/or other facility that dispenses gasoline, diesel or other petroleum products as fuel shall be permitted provided, however, Giant supermarket or another National Supermarket shall have the right to operate one (1) gas/service station at the location identified on the Site Plan.

(F)    No liquor store offering sale of alcoholic beverages for off-premises consumption within five hundred (500) feet of the Building Area on the Target Tract shall be permitted, nor shall any liquor store offering off-premises sale of alcoholic beverages exceeding 10,000 square feet of Floor Area be permitted.

66

## EXHIBIT E

## RULES AND REGULATIONS

1. No overnight parking for tenant vehicles unless with prior written approval by Landlord.

2. Tenant shall not permit its employees, vendors or customers to park, load, unload, deliver, or otherwise occupy the Fire Lanes.

3. All deliveries are to be made to designated service or receiving areas and Tenant shall require all deliveries to be made in the rear of the plaza.

4. Tractor-trailers, which must be unhooked or parked, must use steel plates under dolly wheels to prevent damage to asphalt paving surface. In addition, wheel blocking must be available for use. No parking or storing of such trailers, especially overnight, will be permitted in the Shopping Center.

5. Tenant shall not dispose of the following items in sinks or commodes: plastic products (plastic bags, straws, boxes); sanitary napkins; tea bags; cooking fats, cooking oils; any meat scraps or cutting residue; petroleum products (gasoline, naphtha, kerosene, lubricating oils); paint products (thinner, brushes); or any other item which the same are not designed to receive.

6. Tenant shall not permit or suffer any advertising medium to be placed on the sidewalks, columns, facade or on the parking lot areas or light poles. No permission, expressed or implied, is granted to exhibit or display any banner, pennant, sign and trade or seasonal decoration of any size, style or material within the Shopping Center, outside the Premises.

7. Tenant shall not permit or suffer the use of any advertising medium which can be heard, seen or experienced outside (or through the walls to neighboring tenants) of the Premises, including, without limiting the generality of the foregoing, flashing lights, searchlights, loudspeakers, phonographs, radios or television. No radio, television, or other communication antenna equipment or device is to be mounted, attached, or secured to any part of the roof, exterior surface, or anywhere outside the Premises, unless Landlord has previously provided written consent.

8. Tenant shall not permit or suffer any portion of the Premises to be used for lodging, babysitting or extended stay purposes.

9. Tenant shall not, in or on any part of the Common Area:

   a. Vend, peddle or solicit orders for sale or distribution of any merchandise, device, service, periodical, book, pamphlet or other matter whatsoever
   b. Exhibit any sign, placard, banner, notice or other written material, except for activities as approved in writing by Landlord.
   c. Distribute any circular booklet, handbill, placard or other material, except for activities as approved in writing by the Landlord
   d. Solicit membership in any organization, group or association or contribution for any purpose.
   e. Create a nuisance.

67

    f.    Throw, discard or deposit any paper, glass or extraneous matter of any kind except in designated receptacles, or create litter or hazards of any kind.

    g.    Deface, damage or demolish any sign, light standard or fixture, landscaping materials or other improvement within the Shopping Center, or the property of customers, business invitees or employees situated within the Shopping Center.

    h.    Install any permanent or temporary furniture including but not limited to chairs, tables, couches, furniture, plants, benches, advertising boards, distribution hubs, or the like without Landlord's prior written consent which is revocable at any given time for any reason.

10. Tenant shall not place any furnishings or cabinets adjacent to or in the way of mechanical or electrical access Panels or over air-conditioning outlets to prevent operating personnel from servicing such units as routine or emergency access may require. Cost of moving such furnishings for Landlord's access will be at Tenant's cost. Tenant shall comply with parking rules and regulations as may be posted and/or distributed from time to time and shall never instruct their employees or agents to park in front of another tenant's parking field

11. Prior written approval, which shall be at Landlord's sole discretion, must be obtained for installation of window shades, blinds, drapes or any other window treatment of any kind whatsoever.

12. Tenant shall keep the signs, exterior lights and display window lights of the Premises lighted each and every day of the Term during the hours designated by the Landlord which shall extend to at least the period of time that the last tenant in the shopping center is open and operating each night

13. No animals shall be brought into or kept in or about the Shopping Center at any time other than as handicap aids.

14. Tenant shall be responsible for all of Tenant's contractors, agents, delivery personnel, invitees or the like entering and servicing the property including but not limited to electricians, plumbers, construction workers, general contractors, HVAC personnel so as to not encumber or damage the property in any manner.  By way of example, a HVAC contractor shall not cause damage to the roof while servicing Tenant's heating or air conditioning units.   In the event of damage caused by Tenant's invitees, Tenant shall promptly take responsibility as if Tenant caused such casualty directly.

15. Tenant shall promptly report to Landlord's management company any adverse condition caused by Tenant or Tenant's invitees in the Common Areas.  Tenant shall also promptly assist Landlord with any information, video, statements or the like related to these situations where an adverse condition or incident has been created or occurred.

16. In the event any violation of any of the above rules and regulations continues after five (5) days following written notice to Tenant of such violation, beginning on such fifth day Tenant shall be in default of the Lease.

17. Except as otherwise provided herein, Landlord reserves the right to modify or rescind any of these rules and regulations and to make such other or further reasonable rules and regulations as it deems in its reasonable judgement shall from time to time be necessary or advisable for the operation of the Shopping Center, which rules and regulations shall be binding upon Tenant upon their notification of said further rules and regulations.

**EXHIBIT F**

**GIANT WAIVER**



<u>LEASE CONSENT</u>

| | |
|---|---|
| Store No. | Giant #6443 |
| City, State: | Chambersburg, Pennsylvania |
| Lease Date: | July 10, 2006 |
| Landlord (current): | Chambersburg MZL LLC |
| Tenant (current): | The GIANT Company LLC, formerly known as Giant Food Stores, LLC |
| Lease Restriction: | Section 15.02(b)(ii) of the Lease |

| | |
|---|---|
| Proposed User: | Primanti Brothers |
| Proposed Use: | See Exhibit A hereto |
| Proposed Use Location: | See Exhibit B hereto |
| Proposed Use Size: | Approximately 4,800 square feet |

With respect to the Lease referred to above (as may have been previously amended and supplemented), and specifically the Lease Restriction referred to above, for good and valuable consideration the receipt and sufficiency of which is hereby acknowledged, Tenant hereby consents to the Proposed Use at the shopping center where the Tenant is located upon the following terms and conditions (the "Consent"):

1. Landlord countersigns this Lease Consent which shall constitute Landlord's agreement to all terms and conditions contained herein.
2. The Proposed User (and its successors and assigns) shall have the right to utilize the Proposed Use Location solely for the Proposed Use and/or uses substantially similar to the Proposed Use and/or other uses not restricted by the Lease Restriction.
3. The Proposed Use Location shall not be relocated or expanded.
4. Except as described in Exhibit A, in no event shall Completely Prohibited Food be offered for sale from the Proposed Use Location. "Completely Prohibited Food" shall mean each and all of the following: perishables (including without limitation milk and/or other dairy products), fruit, vegetables and/or other produce, baked goods or bakery items, meat, poultry, fish, delicatessen items and all prepared and unprepared frozen foods. Notwithstanding the foregoing, as an incidental part of the Proposed Use, the sale of individual servings of the foregoing items for immediate consumption shall be permitted.

Except for the Consent expressly granted herein, none of the covenants, terms and conditions contained in the Lease shall be waived, supplemented or modified hereby, and all of said covenants and conditions shall remain in full force and effect. Any failure of Tenant to complain of any act or omission on the part of Landlord, or anyone claiming, by, through or under Landlord (however long the same may continue), shall not be deemed to be a waiver of any rights hereunder.

Executed as of _____.

| LANDLORD: | TENANT: |
|---|---|
| Chambersburg MZL LLC | The GIANT Company LLC |
| | |
| By: _____ | By: _____ |
| Name: | Name:  Todd S. Robinson |
| Title: | Title:  Director of Real Estate Development |

EXHIBIT A

The Proposed User may use the Proposed Use Location (Space 15 - SITE) for the operation of a Primanti Brothers restaurant offering dine-in, take-out, and catering. The Proposed User is permitted to sell food and beverages (alcoholic and non-alcoholic); however, alcohol sales shall only be permitted in single serving sizes for on-premises consumption or take-out and shall be ancillary to the sale of food and shall not exceed forty-five percent (45%) of the business conducted therein.

EXHIBIT B

