**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| STEPHANIE SHAPLLO | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | No.: |
| v. | : | |
| | : | |
| THE PENNSYLVANIA STATE | : | |
| UNIVERSITY o/a PENN STATE | : | |
| HEALTH | : | |
| | : | |
| Defendant. | : | JURY TRIAL DEMANDED |

## COMPLAINT

Comes now, the Plaintiff, Stephanie Shapllo, R.N., by her attorney, Obinna I. Abara, Esquire, and hereby files this complaint in civil action, of which the following is a statement:

## I. PARTIES

1.      Plaintiff, Stephanie Shapllo, R.N. (hereinafter "Plaintiff"), is an individual resident of the state of Pennsylvania, residing in Marysville, Pennsylvania. At all times relevant to this action, Plaintiff was an employee of Defendant by virtue of a contract of employment between the parties, and acted in fully proper, lawful and professional manner within the scope of her employment relationship, and in complete fulfillment and discharge of her contractual duties to Defendant.

2.      Plaintiff is a qualified individual with a disability as defined by the *Americans with Disabilities Act* ("ADA"), 42 U.S.C. §12101, *et seq.,* the *Pennsylvania Human Relations Act*

("PHRA"), 43 P.S. §955(a); and the *Codified Ordinances of the City of Harrisburg, Pennsylvania* (hereinafter "Harrisburg Codified Ordinances"). Likewise, she is an employee and a person with non-job-related "handicaps or disabilities" as defined by the PHRA and the Harrisburg Codified Ordinances (§4-101.6).

3.      Defendant, The Pennsylvania State University o/a Penn State Health (hereinafter "Defendant"), is a 501(c)(3) nonprofit organization, incorporated in the Commonwealth of Pennsylvania with a principal place of business  at 100 Crystal A Drive, Hershey, Pennsylvania, 17033 and, at all times relevant to this Complaint, acted by and through its directors, officers, principals, employees, agents and assigns, acting within the scope of their office, employment, agency and/or assignment.

4.      Defendant is a "healthcare provider" as defined by the Pennsylvania *Medical Care Availability and Reduction of Error Act* ("MCARE") 40 Pa. C.S.A § 1303.103, and is an integrated academic health system serving patients and communities across 15 counties in central Pennsylvania. Defendant's integrated system includes 2,000+ physicians and direct care providers at nearly 200 outpatient practices—one of these outpatient practices is Penn State Health Progress Outpatient Center Cardiology where Plaintiff worked as a Registered Nurse (R.N.) at all times relevant to this action.

5.      Defendant is a "public body" as defined by the *Pennsylvania Whistleblower Act* ("PWA"), 43 P.S. § 1421 *et seq*., as it receives a substantial amount of funding from the Commonwealth of Pennsylvania—including but certainly not limited to, Medicaid reimbursements. Additionally, the Pennsylvania General Assembly passed state budgets for  2024-2025 and 2025-2026 that included level funding for Defendant's general support appropriation; in both fiscal years, the Commonwealth of Pennsylvania provided Defendant with millions of dollars

in funding.

6.      Defendant is an "employer" as defined by the PWA, ADA, the PHRA and the Codified Ordinances, and employs well over 15 people.

## II. JURISDICTION AND VENUE

7.      This Honorable Court has jurisdiction over this action by virtue of 28 U.S.C. §1331, this being an action arising under the laws of the United States—42 U.S.C. §§ 12111 and 28 U.S.C. §1343. Furthermore, jurisdiction over the PWA claim is predicated upon 43 P.S. §1424; jurisdiction over the PHRA claim is predicated upon 43 P.S. §962 (c); and jurisdiction over the Codified Ordinances of the City of Harrisburg, Pennsylvania claim is predicated upon the Codified Ordinances §4-109.6, and this Court's supplemental jurisdiction.

8.      All of the actions complained of herein took place within the Middle District of Pennsylvania—Defendant's Penn State Health Progress Outpatient Center Cardiology operates therein, at 20 Capital Dr, Harrisburg, PA 17110.

## III. FACTS

9.      On or about June 16, 2025, Plaintiff was hired by Defendant as a Registered Nurse (R.N.) and as such is considered an employee or individual authorized to provide services in a medical facility.

10.      At all times relevant to this Complaint, Plaintiff successfully performed her job duties to Defendant's satisfaction.

11.      At all times relevant to this Complaint, Plaintiff suffered from a variety of Neurological and Autoimmune Conditions, including Ehlers-Danlos Syndrome, Postural Orthostatic Tachycardia Syndrome (POTS), Chiari Malformation, Polyneuropathy and Chronic Fatigue. These conditions cause joint hypermobility, increased heart rate, severe migraines,

3

chronic pain and loss of balance.

12. In June 2025, during Defendant's hiring process, Plaintiff self-identified as a disabled person by checking a box on Defendant's job application form.

13. Throughout Defendant's training process, Plaintiff informed Defendant about her disability status on multiple occasions. Plaintiff had multiple conversations with her direct Supervisor, Ms. Adriene Hare, wherein she explicitly notified Defendant that she needed to take time off work to receive disability-related medical treatments.

14. In response, Defendant informed Plaintiff of its Paid Time Off ("PTO") policy, which enabled full-time employees to be eligible for PTO if the full-time employee reported to work for a minimum of 4 hours on the same day.

15. From June 2025 to October 2025, Plaintiff submitted absence requests in compliance with Defendant's PTO policy to attend her disability-related medical appointments. Plaintiff's electronically submitted PTO requests expressly made mention of her protected disability status as the reason for requiring time off, and the requests were directly reviewed and approved by Hare.

16. In mid-October 2025, Hare raised a concern about how much PTO Plaintiff was using to attend her medical appointments. Hare stated that she was unaware that Plaintiff was using "so much" PTO and she insisted that the practice could not continue.

17. As Hare was the individual who had been reviewing and approving each of Plaintiff's PTO requests she was aware of how much PTO Plaintiff was using, and that the PTO was being used to attend disability-related medical appointments, as noted in each request.

18. As a direct result of no longer being permitted to utilize PTO to attend her medical treatments, Plaintiff understood that she would have to request disability-related accommodations

4

to continue attending her medical appointments.

19. On November 2, 2025, Plaintiff submitted a request for Defendant to grant her disability-related accommodations.

20. Plaintiff's request included the following reasonable accommodations:

a) time off for doctor appointments, medical therapy and testing; and

b) maximum 1 day off per week to recover from symptom flareups, only if needed—flareups were uncommon for Plaintiff, but were very severe when they occurred.

21. As a licensed R.N., Plaintiff was aware that medical assistants (MAs) in Pennsylvania were not permitted to exercise independent clinical judgment, assessments, or interpretations. Plaintiff was further aware that while Pennsylvania allows physicians to delegate tasks to competent MAs, the law prohibits MAs from making independent clinical decisions, triaging symptoms, or adjusting prescription plans, as these tasks require a licensed professional. These laws restrict MAs—who are generally classified as unlicensed assistive personnel—to performing only non-invasive, routine technical support services under the direct supervision of a licensed physician, physician assistant, or nurse practitioner.

22. Shortly after Plaintiff submitted her request for ADA-accommodations, she discovered a serious violation of the laws that prohibit MAs from using clinical judgment.

23. On November 7, 2025, Plaintiff learned that MAs at Defendant's Penn State Health Progress Outpatient Center Cardiology facility were illegally using clinical judgment by independently making medical decisions on whether to grant or deny patient prescription requests without consulting any licensed physicians or nurse practitioners at the facility.

24.     Upon reviewing a patient's file, Plaintiff discovered that two days prior, on November 5, 2025, an MA named Holly (last name unknown) intentionally cancelled a prescription refill request that a licensed nurse practitioner had ordered for the patient. The licensed nurse practitioner had put in a 90-day prescription refill request for the patient's heart medication, but Holly reversed this and told the patient that he could only have a prescription refill for 30 days.

25.     Cancelling the 90-day prescription and replacing it with a 30-day one without consulting any licensed physicians or nurse practitioners constituted an illegal activity because Holly had made an unequivocally "medical" decision as an individual that was unlicensed and unqualified to do so. Unlike nurses and doctors, as an MA, Holly lacked the proper skills, education, training and certification to make medical decisions and/or exercise the clinical judgement required to autonomously alter a patient's medical treatment.

26.     The physical hazard posed to the patient's health could have been fatal, hence, Plaintiff immediately recognized Holly's actions as a form of illegal activity that posed a serious risk of physical injury and/or death to a member of the public.

27.     In addition, Plaintiff discovered that Holly had intentionally labelled the patient's chart as "non-compliant," which had the potential of causing serious negative repercussions on the patient's future care, outcomes, and the patient-provider relationship. The non-compliant label should only be added to a patient chart under the express direction of a licensed medical provider, yet Holly had used her own independent judgment instead of complying with patient safety protocol.

28.     Plaintiff immediately engaged in protected whistleblower activity by reporting the serious incident to the physician/cardiologist responsible for the patient's care, in accordance with

6

the patient safety plan of the medical facility.

29.     Plaintiff obtained the cardiologist's direction to get the patient his 90-day prescription refill and was able to resolve all safety issues by consulting with the licensed cardiologist, as per protocol.

30.     Plaintiff further engaged in protected whistleblower activity by reporting the patient safety concern to management and filing a separate complaint through NAVEX—a third party that facilitates the safe reporting of unethical and illegal activities.

31.     After blowing the whistle on the November 5, 2025 incident, Plaintiff overheard a conversation between one of Defendant's supervisors and another MA employee, in which the Supervisor cautioned "you better tiptoe around that one"—making reference to Plaintiff and her perceived propensity to report noncompliant behaviors and safety violations.

32.     On or about November 8, 2025, Defendant verbally notified Plaintiff of its decision to deny her request for ADA-related accommodations. Margaret Kane, a member of Defendant's HR team, notified Plaintiff of the decision during a telephone call, in which Kane aggressively questioned Plaintiff's medical condition and accused Plaintiff of not needing accommodation.

33.     Defendant failed to engage in any good faith discussion regarding alternative accommodation options with Plaintiff.

34.     Plaintiff avers Defendant's interference with her ADA-related rights was a form of retaliation for the complaint she had recently made regarding the unlawful practices of MAs at the subject facility.

35.     On November 11, 2025, upon reviewing patient files, Plaintiff learned that Holly had autonomously wrote a medical prescription for another patient on April 15, 2025. Holly had

autonomously used her own clinical judgment to write a prescription for metformin for a patient without consulting with any licensed practitioners. Not only was this a serious violation that put patient safety at risk, but metformin was not classified as a cardiological drug, hence it was not a drug that the Cardiology Clinic was permitted to prescribe.

36.    Yet again, Plaintiff immediately engaged in protected whistleblower activity by reporting the April 15, 2025 incident to the physician/cardiologist responsible for the patient's care, in accordance with the patient safety plan of the medical facility.

37.    Upon reporting the unlawful activity to the cardiologist, the cardiologist informed Plaintiff that he/she did not order the metformin prescription for the patient and was unaware of Holly's decision to issue the prescription in the cardiologist's name.

38.    Plaintiff also reported the April 15, 2025 incident to senior management during her next regularly scheduled shift, on November 13, 2025.

39.    On November 13, 2025, Plaintiff began typing the complaint she intended to submit to senior management. Plaintiff was actively in the process of drafting her complaint with respect to the violations she discovered on November 11, 2025, when Defendant published its written decision to deny Plaintiff's disability accommodations;

40.    Mere minutes after Defendant published its denial decision on November 13, 2025, and whilst Plaintiff was still drafting her complaint, Defendant placed Plaintiff on Administrative Leave and ushered her out of the medical facility.

41.    After being escorted out on November 13, 2025, Plaintiff was not permitted to return to Defendant's facility nor was she able to access the whistleblower complaint that she was drafting using Defendant's computer equipment.

42.    The following day, on November 14, 2025, Defendant terminated Plaintiff's

8

employment for alleged "insubordination and failure to meet expectations".

## IV: ADMINISTRATIVE EXHAUSTION

43.    On or about December 11, 2025, Plaintiff reported the health and safety hazards posed by Defendant's violations to the Occupational Safety and Health Administration ("OSHA"). In her OSHA complaint, Plaintiff expounded on the serious public health and safety risks caused by the MAs unlawful actions and raised concerns about whistleblower retaliation.

44.    On January 7, 2026, OSHA issued a rejection letter stating that Plaintiff's complaint was outside of its jurisdiction for whistleblower protections.

45.    On or about March 18, 2026, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Charge was dual filed with the Philadelphia Human Relations Commission ("PHRC"). In her Charge, Plaintiff alleged that during the week of October 30, 2025, she requested accommodation for her disability and Defendant refused to accommodate her request. She further alleged that the Defendant had unlawfully subjected her to disability discrimination and retaliation in violation of the ADA.

46.    On May 12, 2026, Plaintiff made a good faith request for an expedited Right to Sue letter from the EEOC so that the ADA-issues could be brought together with the whistleblower issues to federal court. Although the EEOC has not yet delivered the Right to Sue letter, Plaintiff substantially complied with her administrative exhaustion duties.

## V: STATEMENT OF CLAIMS

### COUNT I:
### FAILURE TO ACCOMMODATE PURSUANT TO THE ADA, PHRA, AND HARRISBURG CODIFIED ORDINANCES

47.    The foregoing paragraphs are incorporated by reference as if the same were fully

set forth herein and made a constituent part hereof.

48.     Plaintiff was an employee and a qualified person with a disability pursuant to the ADA, PHRA, and the Harrisburg Codified Ordinances because she had physical and neurological impairments that substantially limited one or more of her major life activities, including, but not limited to, lifting, standing, bending, digestive function, cardiac function, respiratory function and performing manual tasks.

49.     Plaintiff was qualified to perform her job as a Registered Nurse (R.N.), either with or without accommodations.

50.     Throughout the relevant time period, starting from Plaintiff's hire date in June 2025, until she was wrongfully discharged on November 14, 2025, Defendant knew that the Plaintiff was disabled, qualified, and required accommodation due to her disability.

51.     On or about November 2, 2025, the Plaintiff properly requested disability-related accommodations.

52.     Defendant could have provided such accommodations for the Plaintiff without significant difficulty, expense, or undue hardship.

53.     Defendant verbally denied Plaintiff's request for disability-related accommodations on or about November 8, 2025, and further denied Plaintiff's request for disability-related accommodations in writing, on November 13, 2025.

54.     The Defendant failed to engage in the interactive process in good faith.

55.     The Defendant's failure to accommodate the Plaintiff in her position and failure to engage in the interactive process, constitute disability discrimination pursuant to the ADA, PHRA, and the Codified Ordinances.

56.     As a direct and proximate result of Defendant's failure to engage in the interactive

process and to accommodate Plaintiff in her position, Plaintiff suffered the following injuries and damages, including:

a.      Severe and continuing emotional and psychological distress;

and

b.      Various physical ailments, including but not limited to loss of sleep, and loss of appetite, all of which could be permanent in nature

**COUNT II:**
**RETALIATION AGAINST PLAINTIFF PURSUANT TO THE ADA, PHRA, AND THE HARRISBURG CODIFIED ORDINANCES**

57.     The foregoing paragraphs are incorporated by reference as if the same were fully set forth herein and made a constituent part hereof.

58.     Plaintiff engaged in protected activity pursuant to the ADA, PHRA, and the Harrisburg Codified Ordinances by asserting rights guaranteed by the Acts and the Ordinances, including her right to reasonable accommodation and her right to be treated in a non-discriminatory manner in spite of her disability, record of impairment, and/or Defendant's perception thereof.

59.     Defendant subjected Plaintiff to adverse employment action by 1) placing Plaintiff on Administrative leave and escorting her out of the facility on November 13, 2025; and 2) terminating her employment on November 14, 2025.

60.     The temporal proximity between the time when Plaintiff submitted her disability accommodation request and when Defendant subjected her to adverse employment actions, establishes the causal connection between the events.

61.     Defendant's response to Plaintiff's request for accommodation (i.e. placing her on administrative leave and terminating her employment) would have been materially adverse to a

11

reasonable worker and could well have dissuaded a reasonable worker from making or supporting a request for accommodation or otherwise advocating for their rights under the ADA, PHRA, and the Harrisburg Codified Ordinances.

62.    Defendant's response constituted illegal retaliation in violation of Plaintiff's rights pursuant to Section V of the ADA, Section 955(d) of the PHRA, and Section 4-105.1 of the Harrisburg Codified Ordinances.

63.    As a direct and proximate result of the Defendant's disability-related retaliation, the Plaintiff suffered the following injuries and damages, including:

   a. Loss of income;

   b. Loss of benefits;

   c. Loss of status and injury to professional and personal reputation and standing;

   d. Severe and continuing emotional and psychological distress; and

   e. Various physical ailments, including but not limited to loss of sleep, and loss of appetite, all of which could be permanent in nature.

## COUNT III:
## VIOLATION OF PENNSYLVANIA WHISTLEBLOWER ACT
## 43 Pa. C.S.A. § 1423

64.    The foregoing paragraphs are incorporated by reference as if the same were fully set forth herein and made a constituent part hereof.

65.    The cause of action in this Count arises under Pennsylvania law, to wit, an action at law for violation of 43 Pa.C.S.A. § 1423, *et seq*, based upon Plaintiff's internal reporting of, and being about to further report, incidents regarding patient safety and care as aforesaid.

66.    On November 7, 2025, the Plaintiff made a good faith internal report of

12

wrongdoing, as described hereinabove; this constituted protected activity under the Act.

67. Shortly after making the November 7, 2025 good faith report, Plaintiff overheard a discussion between a Supervisor and an MA, showing animus toward the Plaintiff for engaging in the protected reporting activity, thus demonstrating a causal connection between Plaintiff's protected activity and Defendant's subsequent retaliation.

68. On November 11, 2025, Plaintiff made a second good faith internal report of wrongdoing, as described hereinabove; this constituted protected activity under the Act.

69. Shortly after Plaintiff made her second internal report of wrongdoing, Defendant subjected Plaintiff to adverse employment action by placing her on Administrative leave (whilst she was actively engaging in further activity explicitly protected by the Act) and terminating her employment.

70. The temporal proximity between the times Plaintiff engaged in the protected activities and when Defendant subjected her to adverse employment actions demonstrates causation.

71. The Defendant's termination of the Plaintiff for reporting internally and/or being about to report the aforementioned information violated the Pennsylvania Whistleblower Act, 43 Pa.C.S.A. § 1423.

72. As a direct and proximate result of Defendant's whistleblower retaliation, the Plaintiff has suffered the following injuries and damages, including:

      a. Loss of income;

      b. Loss of benefits;

      c. Loss of status and injury to professional and personal reputation and standing;

d.      Severe and continuing emotional and psychological distress;

and

e.      Various physical ailments, including but not limited to loss of

sleep, and loss of appetite, all of which could be permanent in nature.

**COUNT IV:**
**VIOLATION OF THE MCARE ACT**
**40 Pa. C.S.A § 1303.308(c)**

73.      The foregoing paragraphs are incorporated by reference as if the same were fully

set forth herein and made a constituent part hereof.

74.      The cause of action in this Count arises under Pennsylvania law, to wit, an action

at law for violation of 40 Pa.C.S.A. §1303.308(c), *et seq*, based upon Plaintiff's internal reporting

of, and being about to further report, serious events regarding patient safety and care as aforesaid.

75.      Defendant is a "medical facility" as defined under the MCARE Act because it is a

hospital licensed under the Health Care Facilities Act. *See* 40 Pa.C.S.A. §1303.103.

76.      Plaintiff is a "healthcare worker" under the MCARE Act as she is a registered

nurse employed by Defendant with the authorization to provide services in a medical facility. *See*

40 Pa.C.S.A. §1303.302.

77.      Plaintiff reported that MAs employed by Defendant had been unlawfully

approving, denying and/or significantly altering prescription requests at the subject facility, and

that this form of malpractice had significantly compromised patient safety (thereby constituting

"serious events" under the MCARE Act).

78.      Plaintiff believed, in good faith, that the compromise to patient safety created by

the serious events was significant enough to require reporting.

79.      Plaintiff engaged in protected activity when she reported the serious events to the

14

cardiologists and administration of Defendant, in accordance with the patient safety plan of the medical facility, and was about to report the activity further.

80. The temporal proximity between the times Plaintiff engaged in the protected activities and when Defendant subjected her to adverse employment actions demonstrates causation.

81. Defendant retaliated against Plaintiff by placing her on Administrative Leave and terminating her employment, in violation of the Pennsylvania Whistleblower Act § 1423 and the MCARE Act §1303.308(c).

82. Defendant's violation of the MCARE Act affords Plaintiff access to the remedies listed under the Pennsylvania Whistleblower Act, 43 Pa.C.S.A. § 1424.

83. As a direct and proximate result of the Defendant's MCARE Act violations, the Plaintiff suffered the following injuries and damages, including:

a. Loss of income;

b. Loss of benefits;

c. Loss of status and injury to professional and personal reputation and standing;

d. Severe and continuing emotional and psychological distress; and

e. Various physical ailments, including but not limited to loss of sleep, and loss of appetite, all of which could be permanent in nature

**COUNT V**
**WRONGFUL DISCHARGE AND VIOLATION OF THE PUBLIC POLICY**
**EXCEPTION TO THE PENNSYLVANIA AT-WILL EMPLOYMENT DOCTRINE**

84. The foregoing paragraphs are incorporated by reference as though set forth fully.

85. The unlawful termination of Plaintiff described in the aforementioned Counts, were also violative of Pennsylvania's clearly-established Public Policy Exception to the At-Will employment doctrine.

86. The serious events Plaintiff reported were directly related to public policy provisions that are well-defined and clearly mandated by law. As a matter of public health and safety protocol, under the MCARE Act, healthcare workers have a statutory duty to report serious events or incidents that threaten public health or safety. 40 Pa. C.S.A § 1303.308(a).

87. The unlawful behaviors Plaintiff discovered were severe in that they unequivocally had the potential to prove fatal for members of the public. Patients could have suffered irreversible health consequences due to unlicensed professionals autonomously exercising clinical judgement absent physician supervision. Hence, Plaintiff's good faith report of Defendant's serious violations was in direct compliance with her obligations under MCARE's clearly defined public policy. 40 Pa. C.S.A § 1303.308(a).

88. Throughout her employment with Defendant, Plaintiff also discovered numerous clerical errors in prescriptions entered by Courtney Apgar—another MA using clinical judgment without doctor supervision—and commonly made verbal complaints to Defendant's administration due to her perceived scope of the adverse impact on public health and safety.

89. Due to her employment Plaintiff had personal knowledge that the prescription refill queue received an average of 30 requests per day – which equated to approximately 900 patient refill requests per month. Plaintiff was unaware of how many of these requests had already

16

resulted in serious harm or death. However, potentially thousands of patients had been exposed to the risk of physical injury or death in the six months immediately prior to Plaintiff's termination.

90.     Plaintiff personally caught all the incidents described in this complaint, but was subsequently terminated for reporting her concerns, and was unable to investigate further to find out how many instances conclusively resulted in members of the public sustaining injury or death.

91.     Defendant's termination of Plaintiff's employment for reporting public health and safety concerns was a violation of the public policy exception to the Pennsylvania at-will employment doctrine, as Defendant terminated Plaintiff for fulfilling her statutory duty to report public health and safety risks under the MCARE Act; as a result, Defendant's termination of Plaintiff's employment constituted a wrongful discharge under Pennsylvania employment law.

92.     As a direct and proximate result of Defendant wrongfully discharging Plaintiff, Plaintiff suffered the following injuries and damages, including:

            a.      Loss of income;

            b.      Loss of benefits;

            c.      Loss of status and injury to professional and personal reputation
        and standing;

            d.      Severe and continuing emotional and psychological distress;
        and

            e.      Various physical ailments, including but not limited to loss of
        sleep, and loss of appetite, all of which could be permanent in nature.

**WHEREFORE,** Plaintiff seeks the following relief:

    a.      A trial by jury;

b.      Finding that the actions of Defendant constituted discrimination and retaliation against Plaintiff in violation of her rights under the ADA, the Codified Ordinances and the Pennsylvania Human Relations Act;

c.      Finding the actions of Defendant constituted whistleblower retaliation against Plaintiff in violation of her rights under the Pennsylvania Whistleblower Act and the MCARE Act;

d.      Finding the actions of Defendant constituted a wrongful discharge and a violation of the public policy exception to the Pennsylvania at-will employment doctrine;

e.      Award to Plaintiff for all the emoluments of employment to which she would have been entitled had it not been for Defendant's discriminatory and retaliatory conduct as set forth herein;

f.      Award to the Plaintiff for compensatory damages for the losses she sustained and the emotional distress he suffered as a result of Defendant's discriminatory employment treatment;

g.      Award to the Plaintiff and her counsel all costs and attorney's fees which they have incurred and will incur in the prosecution of this action.

## JURY DEMAND

Plaintiff demands trial by jury.

**ABARA LAW FIRM, PLLC.**

*/s/ Obinna I. Abara*
Obinna I. Abara, Esquire
Attorney I.D. No.: 204964
180A Old Swede Rd., #333
Douglassville, PA 19518
oabara@abaralaw.com
(215) 360-3260

DATE: May 13, 2026

18

**VERIFICATION**

I hereby verify that the statements contained in this **Complaint** are true and correct to the best of my knowledge, information and belief.  I understand that false statements herein are made subject to the penalties of Title 18 Pa. C.S.A. §4904, relating to unsworn falsification to authorities.

5/13/2026

_____
Date

ID 56LBzXAtfQxLK6SAqM48rEF3

STEPHANIE SHAPLLO, PLAINTIFF