**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ABIGAIL RAUGH** | : | |
| 753 Gravel Hill Road | : | NO. |
| Palmyra, PA 17078 | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| **REDEVELOPMENT** | : | |
| **AUTHORITY** | : | |
| **OF THE COUNTY OF LEBANON** | : | |
| 1220 Mifflin Street | : | |
| Lebanon, PA 17046 | : | **JURY TRIAL DEMANDED** |
| | : | |
| Defendant. | : | |

## COMPLAINT

**AND NOW**, Plaintiff, Abigail Raugh, ("Plaintiff"), by and through her undersigned counsel, for her Complaint against Redevelopment Authority of the County of Lebanon, ("Defendant"), alleges as follows:

## INTRODUCTION

1.    Plaintiff brings this action to redress violations by Defendant of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*, and the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. § 951, *et seq*. As a result, Plaintiff has suffered damages as set forth herein.

## PARTIES

1

2.     Plaintiff, Abigail Raugh, is a citizen of the United States and Pennsylvania, where she currently maintains an address at 753 Gravel Hill Road, Palmyra, Lebanon County, Pennsylvania.

3.     Defendant, Redevelopment Authority of the County of Lebanon., is a government body organized and existing under the laws of the Commonwealth of Pennsylvania with a principal place of business located at 1220 Mifflin Street, Lebanon, Pennsylvania.

## JURISDICTION AND VENUE

4.     Paragraphs 1 through 3 are hereby incorporated by reference as though the same were set forth at length herein.

5.     On or about February 9, 2026, Plaintiff filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC"), which was dually filed with the Pennsylvania Human Relations Commission ("PHRC"), thereby satisfying the requirements of 42 U.S.C. § 2000e-5(b) and (e), and 43 P.S. § 959(a). Plaintiff's EEOC Charge was docketed as EEOC Charge No. 530-2025-02952. Plaintiff's EEOC Charge was filed within one hundred and eighty (180) days of the unlawful employment practice.

6.     By correspondence dated February 27, 2026, Plaintiff received a Notice of Right to Sue from the EEOC regarding her charge, advising Plaintiff that he had ninety (90) days to file suit against Defendant.

2

7.    Plaintiff filed the instant action within the statutory time frame applicable to her federal claims.

8.    Although one (1) year has not passed since Plaintiff dual filed her Charge with the EEOC and the PHRC, courts in this Circuit have adopted a flexible approach to the PHRA exhaustion by permitting plaintiffs to maintain PHRA claims if the one (1) year deadline expires during the court proceedings. *O'Malley v. Dowd Marketing, Inc.*, No. 17-cv-1419, 2018 WL 6313616, at *10-11 (M.D. Pa. Nov. 15, 2018) (citations omitted).

9.    Plaintiff has therefore exhausted her administrative remedies and has complied with all conditions precedent to maintain this action.

10.    This is an action authorized and instituted pursuant to the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et seq.*, the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq*, and the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. § 951, *et seq*.

11.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, as it is an action arising the laws of the United States.

12.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367, as those claims arise out of the same common nucleus of operative fact as her federal claims.

13.    The venue in this district is proper pursuant to 28 U.S.C. § 1391(b), as the unlawful practices of which Plaintiff is complaining were committed in the Commonwealth of Pennsylvania in this judicial district.

## FACTUAL BACKGROUND

14.    Paragraphs 1 through 13 are hereby incorporated by reference as though the same were fully set forth at length herein.

15.    By way of background, Plaintiff suffered on-the-job injuries in a motor vehicle crash, resulting in Right Trapezius Strain and Post-Concussion Syndrome, conditions that affected her entire body.

16.    Plaintiff's injuries are disabilities within the meaning of the ADA and PHRA because they substantially limit one or more major life activities, including but not limited to walking, stamina, concentration, driving, and memory.

17.    In or around March 2022, Plaintiff started working for Defendant as a full-time Client Services Representative based out of the latter's Headquarters location in Lebanon.

18.    Upon information and believe, for the first few years of Plaintiff's employment, Defendant was known as "Brick Property Services," until Defendant later acquired the company under its current name.

4

19.     Plaintiff was promoted in the Fall of 2023 to Assistant Property Manager, covering approximately eight (8) different locations within Lebanon County and within an three (3) mile radius.

20.     Plaintiff's "home location" was Brock Drive in Lebanon, PA.

21.     On or about April 23, 2025, Plaintiff was involved in an on-the-job auto incident in Defendant's vehicle, for which Plaintiff was deemed to be not-at-fault.

22.     Plaintiff injured her upper back and neck and was ultimately diagnosed with a severe concussion and post-concussion syndrome.

23.     Plaintiff subsequently sought, and was granted, workers' compensation claims through Defendant.

24.     Plaintiff's doctor initially took her out of work for approximately one week, and Plaintiff returned with restrictions on or about May 1, 2025.

25.     Those restrictions included limiting Plaintiff's push/pull/weights, time off for appointments, and limitations on driving and screen time.

26.     Plaintiff was also attending regular physical therapy and doctor's visits, sometimes during work hours when scheduling necessitated.

27.     Plaintiff's restrictions gradually lessened as she treated over the next few months, though Plaintiff continued to have issues related to her post-concussion diagnosis.

28.     Defendant initially worked within Plaintiff's restrictions.

29.    During this time, Plaintiff continued to have access to Defendant's car (after her driving restrictions were lifted) and flexibility to schedule medical appointments related to the auto incident, including during work hours while remaining on the clock.

30.    Plaintiff timely gave her medical notes to Defendant's Resource Manager, Yanoliz Rivera Santiago ("Ms. Santiago").

31.    On or about May 5, 2025, Plaintiff was promoted to be Defendant's Property Manager.

32.    Plaintiff's new position included managing five (5) properties totaling approximately two hundred (200) units during this time, and she was expected to travel to one each day between Monday – Thursday, and then on Friday Plaintiff would go to her home base at DiMatteo Plaza ("DMP") location in Cleona, PA.

33.    Plaintiff's job duties included driving to multiple property locations throughout the week, tenant processes, and managing company property access and checks.

34.    When Plaintiff became a Property Manager, she regularly clocked into work when Plaintiff left home and began driving Cherry to Orchard Place ("COP") on Tuesdays.

35.     By way of background, Defendant's Senior Property Manager Patricia Stine ("Ms. Stine") instructed Plaintiff to do this in an in-person conversation in conjunction with Plaintiff's May 2025 promotion.

36.     Ms. Stine told Plaintiff that because other people would first travel to their assigned home location, clock in, and then go to COP, Plaintiff could simply clock in when Plaintiff left her home to go to COP, since Plaintiff's home location DMP was in the opposite direction.

37.     Defendant paid for Plaintiff's travel time and provided travel vouchers to provide mileage reimbursement.

38.     Additionally, during this time, Defendant's CEO, Daniel Lyons ("Mr. Lyons"), indicated to Plaintiff that she was to use Defendant's vehicles while staying clocked in to travel to workers' compensation medical appointments.

39.     On or around August 8, 2025, Plaintiff's post-concussion syndrome symptoms worsened, and her medical provider, James Rochester, MD ("Dr. Rochester") placed her off work for one (1) week.

40.     Dr. Rochester then placed Plaintiff out of work for two (2) additional weeks due to the continued effects of her post-concussion syndrome.

41.      Plaintiff provided Dr. Rochester's notes to Ms. Santiago, who, upon information and belief, was supposed to keep Ms. Stine updated on Plaintiff's restrictions and scheduling.

42. On or about September 3, 2025, Plaintiff returned to work and was sent back to physical therapy by Dr. Rochester.

43. Her restrictions included four (4) hour shifts, five (5) days a week; screen time breaks; and limiting continuous driving to twenty (20) minutes or less, with a fifteen (15) minute break afterward.

44. Upon returning to work, Plaintiff checked with Ms. Stine if Plaintiff was to continue clocking in while leaving her home to travel to COP, which Plaintiff had previously done.

45. Ms. Stine checked with Defendant's CEO, Daniel Lyons ("Mr. Lyons") and answered in the affirmative.

46. However, Plaintiff was also no longer offered the option to have one of Defendant's work vehicles.

47. On or about September 8, 2025, Plaintiff messaged Ms. Stine that due to her restrictions, the schedule Ms. Stine had unilaterally set up for Plaintiff upon her return at COP meant that Plaintiff could not follow her restrictions and that she would be unable to make it to the property on time the following day as a result.

48. Plaintiff explained that the driving time from her home to COP was approximately twenty-five (25) minutes, which was beyond her stated restrictions.

49. Plaintiff reminded Ms. Stine that based on her restrictions, Plaintiff would need to then take a fifteen (15) break prior to driving again and thus would need to modify the schedule to fit into her restrictions.

50. Ms. Stine then indicated that Plaintiff was no longer allowed to clock in when she left her home, but when Plaintiff arrived at COP instead.

51. This was the first time Plaintiff heard about this change.

52. This change was only made once Plaintiff returned to work with restrictions.

53. Plaintiff believes that Defendant made this change to circumvent her driving restrictions and in retaliation for her continued need for accommodations.

54. Upon information and belief, Defendant did this because it believed if Plaintiff was not clocked in while driving to COP like had been allowed previously, then it did not violate her restrictions.

55. In so doing, Defendant violated Plaintiff's restrictions and began to change the terms and conditions of her employment.

56. At no time did anyone from Defendant indicate to Plaintiff that her restrictions were unduly burdensome, or that she could not do the essential functions of her job.

57. On or about September 10, 2025, Plaintiff submitted a formal complaint to Ms. Santiago.

58.     Plaintiff told Ms. Santiago about the issues with Ms. Stine, her restrictions, and the change in policy as Plaintiff understood it.

59.     Plaintiff also told Ms. Santiago that the change in policy felt punitive and retaliatory in response to her accommodation requests and medical conditions, as it did not occur until just after Plaintiff returned with restrictions.

60.     Plaintiff also told Ms. Santiago that on September 9, 2025, Ms. Stine scheduled five (5) back-to-back recertification appointments in such a way that left Plaintiff unable to take her required screen time breaks under her restrictions, again failing to honor her restrictions in a way that impacted her health.

61.     On September 15, 2025, Defendant's Chief Financial Officer Brenda Raver ("Ms. Raver") emailed Plaintiff regarding mileage reimbursement and asked why Plaintiff traveled from DMP to COP and back again.

62.     Ms. Raver told Plaintiff she was no longer allowed to use her home as a starting point to clock in and that "when [Plaintiff] start[ed], [Plaintiff] [was] to use DMP to COP and then COP back to DMP for [the] days Plaintiff travel[ed] to COP."

63.     As already established, Plaintiff did this because all other employees would clock in at their home base and then travel to their property for the day, and since Plaintiff was no longer allowed to clock in when leaving her home to travel to COP, Plaintiff followed the standard policy.

10

64. Plaintiff also needed to pick up items occasionally at DMP and was thus now traveling there when needed to begin her day to go to other properties.

65. Ms. Raver then informed Plaintiff that she was a floater and explained that "[there is] no mileage to travel to and from [her] appointed work location."

66. Upon information and belief, Plaintiff believes this to be untrue, as this was not the case before she went out on medical leave.

67. Upon information and belief, other similarly situated employees were not under these same guidelines.

68. After seeing this change only after her return from medical leave, Plaintiff decided to email Mr. Lyons regarding the issue.

69. Plaintiff noted in relevant part, "I feel that recently, in the past two weeks since [Plaintiff] [has] returned, unfair decisions have been made regarding [her] mileage and time worked as it relates to COP. Previous property managers were not treated in this manner and current staff are not held to the same standard you are placing on [Plaintiff]. [Plaintiff] use[s] [her] personal vehicle to travel to various locations for work, and [Plaintiff] should be reimbursed for those miles and time."

70. On or about October 8, 2025, Plaintiff emailed Ms. Stine regarding a work dilemma.

71. Ms. Stine expressed that she believed that Plaintiff was working from 8:30 a.m. – 4:30 p.m.

72. Plaintiff then reminded Ms. Stine of her ongoing workers' compensation restrictions.

73. At this time, Plaintiff was limited to thirty-five (35) hour work weeks.

74. At this time, Plaintiff's schedule as was written was beyond her work week restrictions.

75. Plaintiff expressed her confusion regarding the schedule to Ms. Stine, indicating that the schedule Ms. Stine had set for Plaintiff violated her restrictions.

76. Plaintiff noted to Ms. Stine that flexibility in scheduling, which Defendant had previously offered in the form of more flexible hours, would have been helpful for Plaintiff as an accommodation, allowing her to still get work done whilst working within her restrictions.

77. Ms. Stine then began to micro-manage Plaintiff after her request for accommodations and flexibility, continually checking in with her and voicing her displeasure with Plaintiff herself.

78. Throughout October 2025, the terms and conditions of Plaintiff's employment continued to change in a materially adverse way, and her working conditions grew increasingly intolerable.

79. These changes amounted to adverse employment actions.

80. Plaintiff's mileage reimbursements for her medical appointments, and the ability to remain clocked in during the same, which Plaintiff had been offered

for multiple months, were suddenly taken away, costing Plaintiff time and compensation.

81.    Mr. Lyons informed Plaintiff of the change via email, stating that it was a "business consideration."

82.    Mr. Lyons stated that Defendant was "under [no] obligation to provide these benefits," but had only done so "out of empathy" for Plaintiff.

83.    After Plaintiff's driving restrictions were lifted, Defendant stopped paying for her mileage to attend worker's compensation ordered medical visits, even though Defendant had been doing so previously.

84.    Defendant also stopped counting certain drive time as "compensable" for Plaintiff, even though it had been compensable before her medical leave and ask for accommodations.

85.    Plaintiff believes that Defendant did this out of frustration and retaliation that Plaintiff was still undergoing treatment for her medical conditions, and that Defendant had not expected Plaintiff to have restrictions for as long as she did.

86.    On or about October 28, 2025, Plaintiff reported to her home base office to pick up some items she needed for her workday.

87.    Ms. Stine, who was present on the property, entered Plaintiff's office and then began to raise her voice and asked Plaintiff, "Why are you not at your

property? You are to report directly to your property first thing in the morning. This is absolutely not acceptable…"

88.    Ms. Stine then walked away and went into her own office.

89.    Plaintiff calmly walked over into Ms. Stine's office to discuss her valid reasons for being at the property, noting that Mr. Lyons was aware that Plaintiff was present at the location.

90.    In response, Ms. Stine berated Plaintiff and stated, "[Mr. Lyons] is not your supervisor, I am your supervisor and you will listen to me. You do not do anything without my approval. I will send an email to [Mr. Lyons] and you do not do anything without my approval. This will stop right now, and I know the real reason why you are here on Tuesday mornings. Get out of my office and go to the property right now."

91.    Plaintiff then left the office, distraught.

92.    Plaintiff believes that this interaction with Ms. Stine was in retaliation for Plaintiff's continued need for accommodations.

93.    Plaintiff became tired with the changing rules, Defendant's treatment of her, and the issues she was facing with her restrictions.

94.    Plaintiff was also concerned with the impact on her health.

95.    As such, on or about November 10, 2025, Plaintiff submitted her resignation.

96. Plaintiff's last day of work was on or about November 21, 2025.

97. Plaintiff's resignation was a constructive discharge for the aforementioned reasons.

## COUNT I
## AMERICANS WITH DISABILITIES ACT
42 U.S.C. § 12101, *et seq*.
## DISABILITY DISCRIMINATION, FAILURE TO ACCOMMODATE, AND RETALIATION

98. Paragraphs 1 through 97 are hereby incorporated by reference as though the same were set forth herein.

99. Defendant had fifteen (15) or more employees for each working day in each of twenty (20) or more calendar weeks in the then-current or preceding calendar years applicable to Plaintiff's claims.

100. Defendant is therefore an "employer" as defined and covered by the ADA.

101. At all times relevant hereto, Plaintiff was an employee of Defendant within the meaning of the ADA.

102. Pursuant to the ADA and as described within, Plaintiff is a qualified individual with one or more disabilities.

103. Despite her disability, Plaintiff would have been able to perform the essential functions of her job with or without a reasonable accommodation.

104.   Plaintiff requested a reasonable accommodation for her disability in the form of: a modified schedule; driving and screen time restrictions; and time off for her disabilities so that she could perform the essential functions of her position.

105.   Defendant failed to engage in an interactive process in good faith with Plaintiff to determine a reasonable accommodation for her disability.

106.   Defendant refused to provide Plaintiff with a reasonable accommodation for her disability and failed to honor her restrictions.

107.   Defendant retaliated against Plaintiff because she made a good faith request for a reasonable accommodation for her disability.

108.   Plaintiff suffered an adverse employment action, *inter alia*, by Defendant both materially and adversely changing the terms and conditions of her employment and constructively discharging her employment under circumstances that could give rise to an inference of intentional discrimination on the basis of her disability.

109.   By reasons of the foregoing, Defendant, through its agents, officers, servants, and/or employees, has violated the ADA.

110.   As a result of Defendant's deliberate, unlawful, and malicious acts as set forth above, Plaintiff has suffered loss of employment, earnings, raises, other significant economic benefits, and emotional pain and suffering.

## COUNT II
## PENNSYLVANIA HUMAN RELATIONS ACT

16

43 P.S. § 951, *et seq.*
## DISABILITY DISCRIMINATION, FAILURE TO ACCOMMODATE, AND RETALIATION

111.    Paragraphs 1 through 110 are hereby incorporated by reference as though the same were fully set forth at length herein.

112.    Defendant had four (4) or more employees at all times applicable to Plaintiff's claims.

113.    Defendant is therefore an "employer" as defined and covered by the PHRA.

114.    At all times relevant hereto, Plaintiff was an employee of Defendant within the meaning of the PHRA.

115.    Pursuant to the PHRA and as described within, Plaintiff is a qualified individual with one or more disabilities.

116.    Despite her disability, Plaintiff would have been able to perform the essential functions of her job with or without a reasonable accommodation.

117.    Plaintiff requested a reasonable accommodation for her disability in the form of: a modified schedule; driving and screen time restrictions; and time off for her disabilities so that she could perform the essential functions of her position.

118.    Defendant failed to engage in an interactive process in good faith with Plaintiff to determine a reasonable accommodation for her disability.

17

119. Defendant refused to provide Plaintiff with a reasonable accommodation for her disability and failed to honor her restrictions.

120. Defendant retaliated against Plaintiff because she made a good faith request for a reasonable accommodation for her disability.

121. Plaintiff suffered an adverse employment action, *inter alia*, by Defendant both materially and adversely changing the terms and conditions of her employment and constructively discharging her employment under circumstances that could give rise to an inference of intentional discrimination on the basis of her disability.

122. By reasons of the foregoing, Defendant, through its agents, officers, servants, and/or employees, has violated the PHRA.

123. As a result of Defendant's deliberate, unlawful, and malicious acts as set forth above, Plaintiff has suffered loss of employment, earnings, raises, other significant economic benefits, and emotional pain and suffering.

**WHEREFORE,** as a result of the unlawful conduct of Defendant, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendant, and grant him the maximum relief allowed by law, including but not limited to:

A. Back wages, front pay, lost benefits, and compensatory damages in an amount to be determined at trial;

B. Punitive damages in an amount to be determined at trial;

C. Plaintiff's costs, disbursements, and attorneys' fees incurred in prosecuting this action;

E. Pre-judgment interest in an appropriate amount;

F. Such other and further relief as is just and equitable under the circumstances; and,

G. Any verdict in favor of Plaintiff be molded by the Court to maximize the financial recovery available to Plaintiff in light of the caps on certain damages as set forth by applicable law.

## JURY DEMAND

124.    Plaintiff hereby demands a trial by jury as to all issues so triable.


Respectfully submitted,

**MARZZACCO INJURY LAW**

By:    */s/ Kendyl L. Swank*
Kendyl L. Swank, Esq.
945 East Park Drive, Suite 103
Harrisburg, PA 17111
TEL: 717-231-1640
FAX: 717-231-1650
kswank@klnivenlaw.com
*Attorney for Plaintiff*


Dated: May 20, 2026

## <u>DEMAND TO PRESERVE EVIDENCE</u>

The Defendant is hereby demanded to preserve all physical and electronic information pertaining in any way to Plaintiff's employment, to Plaintiff's potential claims and his claims to damages, to any defenses to same, including but not limited to, electronic data storage, employment files, files, memos, job descriptions, text messages, emails, spreadsheets, images, cache memory, payroll records, paystubs, time records, timesheets, and any other information and/or data which may be relevant to any claim or defense in this litigation.