**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| CAREIM WILLIAMS,<br><br>Plaintiff<br>v.<br><br>PENN STATE HEALTH AND PENNSYLVANIA PSYCHIATRIC INSTITUTE,<br><br>Defendants | : | Civil Action No.<br><br>JURY TRIAL DEMANDED |

## COMPLAINT

## PARTIES

1. Plaintiff, Careim Williams ("Ms. Williams" or "Plaintiff"), currently resides at 1775 Kings Arms Court, New Cumberland, Cumberland County, Pennsylvania 17070.

2. Defendant, Penn State Health ("Penn State Health" or "Defendant"), is a Pennsylvania non-profit corporation with offices located at 100 Crystal A Drive, Hershey (Derry Township), Dauphin County, PA 17033.

3. Defendant, Pennsylvania Psychiatric Institute ("PPI"), was and is a non-profit Pennsylvania corporation with offices located at 2501 N. 3rd Street, Harrisburg, Dauphin County, PA 17110 and with offices located at 100 Crystal A Drive, Hershey (Derry Township), Dauphin County, PA 17033.

4. On or about January 1, 2024, PPI became an affiliate of Penn State Health.

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction over this action because Ms. Williams's claims arise under the following federal statutes: the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, *et seq.*, as amended ("ADA") and Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. §2000(e) *et seq*. ("Title VII").

6. This is a civil action involving claims in excess of $75,000, exclusive of interest and costs. Jurisdiction is based on 28 U.S.C. §1331 (federal question).

7. Ms. Williams exhausted her administrative remedies by filing three Charges against Penn State Health and PPI (collectively, "Defendants") with the Equal Employment Opportunity Commission ("EEOC") at Charge Nos. 530-2024-04276, 530-2024-09415, and 530-2025-03110.

8. The EEOC issued three right-to-sue notices to Ms. Williams fewer than 90 days before her filing of this Complaint.

9. Venue over this action lies with the United States District Court for the Middle District of Pennsylvania.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

10. On or about May 4, 2020, Ms. Williams was hired by PPI as a full-time Behavioral Health Specialist II. After PPI's affiliation with Penn State Health, Ms. Williams became an employee of Penn State Health.

11. On or about July 17, 2023, Ms. Williams was hired by Penn State Health as a part-time Unit Desk Clerk.

12. At all relevant times, Ms. Williams was a member of two or more protected classes including disabled/disability and race/color (African American/Black).

13. At all relevant times, Ms. Williams was a qualified employee and was able to perform the essential functions of her jobs with or without accommodation.

14. Defendants knew or should have known about Ms. Williams's race/color and her legally protected disabilities including:

(a) physical impairments that substantially limited one or more major life activities including her periodic inability to work without accommodation;

(b) a disabling work injury to her neck sustained on September 14, 2023;

(c) a brain tumor with related symptoms including chronic headaches;

(d) a record of such impairments; and/or

(e) being regarded as having such impairments.

15. On September 14, 2023, while working for PPI, Ms. Williams sustained a work injury to her neck.

16. At various times after the work injury, and continuing until September 25, 2024 (when she was wrongfully terminated), Ms. Williams was on approved medical leave from PPI.

17. At various relevant times from approximately May 4, 2020, to September 25, 2024 (when she was wrongfully terminated), Ms. Williams was employed by Defendant, Penn State Health, in a full-time position (Behavioral Health Specialist II) and in a PRN position by both Defendants (Unit Desk Clerk).

**ALLEGATIONS RELATED TO PLAINTIFF'S FIRST EEOC CHARGE**

18. In the spring of 2023, while working as a Behavioral Health Specialist II for PPI, Ms. Williams began to be subject to harassment, discrimination, and retaliation by certain employees, supervisors, and Human Resources.

19. In April 2023, Ms. Williams emailed her direct Supervisor, Josette Shoppe, and reported certain discriminatory and harassing conduct by the on-duty House Supervisor, Amanda Fazekas.

20. Shortly thereafter, Ms. Shoppe met with Ms. Williams to discuss her email and her concerns.

21. During their meeting, Ms. Williams confirmed that:

(a) She had witnessed Ms. Fazekas discussing Ms. Williams's confidential medical information (including her chronic headaches) with other employees.

(b) Ms. Fazekas made harassing comments to Ms. Williams about her related symptoms while questioning their validity.

(c) Some of Ms. Fazekas's harassing comments were witnessed by employees.

(d) Ms. Williams believed Ms. Fazekas's comments violated her rights to confidentiality and created a hostile work environment.

(e) Ms. Williams believed that Ms. Fazekas was discriminating against her due to her disability and race.

22. On April 8, 2023, Ms. Williams emailed Human Resources and urgently requested an opportunity to discuss her complaints.

23. On April 14, 2023, Ms. Williams had a telephone conference with Alicia Thomas, PPI's HR Generalist.

24. During their conversation, Ms. Williams provided detailed accounts of Ms. Fazekas's harassing conduct and her sharing of Ms. Williams's confidential medical information, creating a hostile work environment.

25. Ms. Williams also reaffirmed her belief that Ms. Fazekas was discriminating against her based on her disability and race.

26. In response to Ms. Thomas's inquiry, Ms. Williams confirmed that she had previously reported her concerns in person and via email to her Supervisor, Josette Shoppe, and to Human Resources.

27. Ms. Thomas claimed that PPI seriously considers these types of allegations, adding that she would follow up with Ms. Williams's Supervisor, Josette Shoppe, and would investigate her concerns and allegations.

28. At that time, PPI's Discrimination and Compliance Policy expressly stated that after an employee complains about any type of discrimination or harassment, PPI was required to conduct an immediate investigation and to report the outcome to the affected employee.

29. PPI never informed Ms. Williams that it had conducted the required investigation and never reported any outcome.

30. Ms. Fazekas knew Ms. Williams had complained about her harassing and discriminatory conduct, and continued with the pattern of harassment and retaliatory actions.

31. Later in April 2023, Ms. Fazekas questioned why Ms. Williams had requested an early lunch.

32. In response, Ms. Williams explained that she wasn't feeling well and needed to eat when taking her medication.

33. Ms. Fazekas questioned whether Ms. Williams had another headache, emphasizing that Ms. Williams had picked up another shift and appeared fine despite her complaining of being sick.

34. Since Ms. Fazekas had approved other employees' requests, Ms. Williams asked why she was treating her so differently.

35. Shortly thereafter, on April 25, 2023, Ms. Williams once again emailed Alicia Thomas of HR and reported Ms. Fazekas's worsening harassment, hostility, and discriminatory and retaliatory conduct.

36. On April 27, 2023, Ms. Williams spoke with Ms. Thomas, reaffirmed her concerns, and inquired whether there was any follow-up action on her previous complaints.

37. In response, Ms. Thomas advised that she would speak with her Supervisor, Wanda Geesy, HR Director, and someone would be in contact with Ms. Williams.

38. Later in April or early May 2023, Ms. Williams contacted Ms. Fazekas and informed her that she would be 15 to 30 minutes late for work due to having medical issues.

39. In response, Ms. Fazekas repeatedly demanded that Ms. Williams specify the medical condition that prevented her from arriving on time, claiming that she was required to inform Ms. Williams's Supervisor (Ms. Shoppe).

40. Ms. Williams confirmed that she would be pleased to disclose her medical condition to her Supervisor or HR if required.

41. Although PPI's policy did not require employees to specify any reason for reporting a lateness, Ms. Fazekas claimed that Ms. Williams was required to report her condition in the event Ms. Fazekas ultimately decided to reassign Ms. Williams to another unit.

42. Feeling intimidated by Ms. Fazekas, Ms. Williams explained she had a headache and her hand had been injured from a dog bite.

43. Later that same day, Ms. Williams arrived several minutes late to a staff report room with roughly seven to 10 employees in attendance.

44. As soon as Ms. Williams arrived, Ms. Fazekas essentially stated, "I wasn't expecting you this early. Every time you claim you have a headache, you usually arrived 30 minutes late. And how were you able to get your hand looked at from a dog bite that quickly?"

45. Ms. Fazekas then confirmed that she had reassigned Ms. Williams to another unit and had replaced her with another employee. Ms. Fazekas's adverse

action caused Ms. Williams to lose a monetary bonus for previously agreeing to work an additional shift.

46. When Ms. Williams questioned Ms. Fazekas's decision as not being customary procedure, Ms. Fazekas stated she was her supervisor and she had decided to change Ms. Williams's assignment.

47. In response, Ms. Williams confirmed she would be reporting Ms. Fazekas's conduct to HR because she was discriminating against her based on her disability and was openly disclosing her confidential medical condition and information to the meeting attendees.

48. Due to Ms. Fazekas's pervasive, recurring harassment and discriminatory and retaliatory actions, Ms. Williams submitted another complaint to HR.

49. In May 2023, after the latest incident involving Ms. Fazekas, Ms. Williams contacted Wanda Geesy, HR Director, and confirmed that PPI had failed to investigate her complaints and report the outcome as required by its policy. Ms. Williams also stated that she would be contacting the EEOC about filing her complaints.

50. In response, Ms. Geesy advised she would be escalating Ms. Williams's concerns to Tiffany Downs, Director of Nursing, because she supervised both Ms. Williams's Supervisor, Josette Shoppe, and Ms. Fazekas.

51. One week later in May 2023, Ms. Williams was summoned to a meeting with Ms. Downs and Ms. Shoppe.

52. Ms. Downs stated that both she and Ms. Shoppe were informed by Ms. Fazekas that Ms. Williams had been argumentative in response to being reassigned to another unit. Ms. Downs further opined that Ms. Williams's conduct violated PPI's policy and warranted disciplinary action.

53. In response, Ms. Williams disagreed with the threatened discipline and emphasized that Ms. Fazekas's and HR's actions were discriminatory and were in retaliation to her recent complaints.

54. On June 5, 2023, in response to her request, Ms. Williams met with Ms. Geesy, HR Director. Ms. Thomas of HR also attended the meeting.

55. Ms. Williams reaffirmed her prior complaints including Ms. Fazzekas's, Ms. Shoppe's, Ms. Downs's, and HR's retaliatory actions and their failure to investigate those complaints.

56. On June 22, 2023, Ms. Williams met with Ms. Downs. Ms. Downs opined that she was confident there was no discrimination against Ms. Williams, having spoken with Ms. Geesy and Ms. Thomas of HR.

57. Based on her conversation with HR, Ms. Downs informed Ms. Williams that she was aware Ms. Williams had complained of her and Ms. Shoppe's discriminatory and retaliatory actions in disciplining Ms. Williams.

58. Ms. Downs claimed that Ms. Williams was making false allegations, her complaints were becoming excessive, and PPI had zero tolerance for her retaliation and false reporting.

59. Ms. Downs reaffirmed Ms. Williams's write-up and confirmed that:

(a) She could be terminated if she engaged in further conduct.

(b) Her previous complaints were now resolved.

(c) She must inform Ms. Thomas of HR that no further action was required on her complaints and her write-up.

(d) Ms. Downs would be monitoring her future conduct and any progress.

60. After receiving Ms. Downs's directive, Ms. Williams contacted Ms. Thomas of HR, confirmed her meeting with Ms. Downs, and stated that she did not want to make any further complaints concerning her disciplinary write-up.

61. In response, Ms. Thomas confirmed that she would be closing her files and would no longer investigate Ms. Williams's complaints.

62. PPI had an Employee Development Program, in which employees had the right to select and complete a level of development, earning a $4,000 compensation bonus as well as the opportunity for a promotion.

63. When Ms. Williams expressed interest in enrolling in the program, Ms. Downs confirmed that she was not permitted to participate due to her disciplinary write-up.

64. On April 19, 2024, Ms. Williams filed a Charge (530-2024-04276) with the Equal Employment Opportunity Commission (EEOC). Attached as **Exhibit P-1** is a copy of Ms. Williams's initial Charge.

**ALLEGATIONS RELATED TO PLAINTIFF'S SECOND EEOC CHARGE**

65. On or about August 7, 2024, after being on medical leave for her work injury, Ms. Williams asked Defendants whether she could return to her two jobs with requested accommodation of her known disabilities and restrictions, as supported by her provider.

66. On August 13, 2024, a claim manager from Penn State Health's third-party administrator, AbsenceOne/Sedgwick ("Sedgwick"), acknowledged receipt of Ms. Williams's email (and fax) requesting accommodation.

67. The Sedgwick representative specifically confirmed that Penn State Health had received Ms. Williams's request to return to work to both jobs with restrictions.

68. Penn State Health refused or failed to engage in an interactive process to determine whether Ms. Williams could return to her jobs and whether she could be reasonably accommodated.

69. At all relevant times, Ms. Williams was a qualified employee who received excellent performance evaluations and was able to perform the essential functions of her job with or without accommodation.

70. Penn State Health knew about Ms. Williams's disabilities and did not make a good-faith effort to accommodate those impairments, which could have been reasonably accommodated.

71. Despite Ms. Williams's good-faith attempts to return to work, Penn State Health refused to respond to her repeated requests to return to work with accommodation.

72. On September 9, 2024, Ms. Williams received a voicemail from Sedgwick's manager, who confirmed that they were still waiting to hear back from Penn State Health regarding her requested return to work with accommodation.

73. In a certified mail letter purportedly dated September 11, 2024, Penn State Health threatened to terminate Ms. Williams's position effective September 25, 2024, if she did not timely respond and request ADA accommodation. Attached as **Exhibit P-2** is a copy of Penn State Health's letter, authored by Rebecca Myers, Manager, Benefits and Absence Management.

74. Penn State Health's September 11, 2024, letter was pretextual in that:

(a) The postmark date on the envelope was September 17, 2024, which Ms. Williams received by certified mail on or about September 24, 2024. Attached as **Exhibit P-3** is a copy of the envelope verifying the postmark date.

(b) Penn State Health knew they had failed to respond to Ms. Williams's request for accommodation and schemed to fire her by providing tardy notice of her intended, wrongful termination.

(c) Penn State Health ultimately fired Ms. Williams on September 25, 2024, without addressing her requested accommodation.

75. On or about September 13, 2024, Penn State Health issued Ms. Williams a negative, pretextual performance evaluation despite her being on medical leave.

76. According to Penn State Health's policy, performance evaluations can only be given: (a) after the employee returns from leave, and (b) after the employee has worked consecutively for at least 90 days during the performance cycle. Attached as **Exhibit P-4** is a copy of Penn State Health's policy. *See* page 4, ¶5.

77. In addition to violating its own policy regarding performance evaluations, Ms. Williams's purportedly poor performance evaluation was pretextual, false, retaliatory, and at variance with all prior, excellent performance evaluations during her employment.

78. On September 13, 2024, Ms. Williams met with her Manager, Tiffany Downs, concerning her inexplicably poor evaluation.

79. During their meeting, Ms. Williams reminded Ms. Downs that she had assisted in her prior excellent performance evaluation and had approved her most recent evaluation completed by her Supervisor, Josette Shoppe, in August 2023 (shortly before Ms. Williams was approved for medical leave).

80. During their September 13, 2024, meeting, Ms. Williams also asked Ms. Downs when her requested accommodation would be addressed.

81. In response, Ms. Downs indicated that HR and the Leave Coordinator, Rebecca Myers, were handling Ms. Williams's request to return to work with restrictions.

82. Even though Ms. Downs was copied on Ms. Myers's September 11, 2024, letter threatening Ms. Williams's termination (Exhibit P-2), she did not disclose that pending adverse action during her meeting with Ms. Williams.

83. In addition to violating Penn State Health's policy, Ms. Downs's anomalous evaluation was pretextual and was retaliatory because Ms. Williams had previously complained to her supervisors and to Human Resources about various discriminatory and retaliatory actions including Ms. Downs's actions.

84. On September 15, 2024, Ms. Williams spoke with Ms. Myers by phone and exchanged emails regarding Ms. Williams's payment of health insurance during her medical leave.

85. Despite their multiple communications in September 2024, Ms. Myers failed to disclose to Ms. Williams that she would be receiving a September 11, 2024, letter threatening her termination.

86. On September 18, 2024, Ms. Williams met with Tyler Case, Executive Director of HR, to discuss her September 13, 2024, evaluation and to review her personnel file.

87. During their meeting, Mr. Case also failed to disclose Ms. Williams's threatened termination and Ms. Myers's September 11, 2024, letter (which falsely claimed that a copy had been placed in her personnel file).

88. When Ms. Williams reviewed her personnel file in Mr. Case's presence, she did not see any disciplinary letter from Ms. Myers.

89. During Ms. Williams's meeting with Mr. Case, he also failed to address Ms. Downs's violating policy by evaluating Ms. Williams while she was on medical leave.

90. Penn State Health's actions and refusal to respond to Ms. Williams's repeated requests for accommodation in August and September 2024 further support pretext based on:

(a) Penn State Health's and its third-party administrator's timely receipt of Ms. Williams's restrictions;

(b) the close temporal proximity between Ms. Williams's request for accommodation and Penn State Health's adverse actions;

(c) Penn State Health's ongoing antagonism and refusal to respond to Ms. Williams's requested accommodation; and

(d) Penn State Health's disingenuous actions and subsequent attempts to create a false narrative.

91. After Ms. Williams's wrongful termination on September 25, 2024, Penn State Health continued to engage in a pattern and practice of deception, discrimination, and retaliation.

92. On October 1, 2024, Ms. Williams received Sedgwick's letter dated September 25, 2024, stating that she may be able to return to work with restrictions (even though Penn State Health had recently terminated Ms. Williams). Attached as **Exhibit P-5** is a copy of Sedgwick's September 25, 2024, letter.

93. On or about October 5, 2024, Ms. Williams received Sedgwick's letter dated October 4, 2024, stating that her FMLA claim was closed because Penn State Health had confirmed her termination effective as of September 24, 2024. Attached as **Exhibit P-6** is a copy of Sedgwick's October 4, 2024, letter.

94. After Ms. Williams was wrongfully terminated by Penn State Health, she promptly contacted the EEOC, which assisted her in preparing her second Charge against PPI (which was then affiliated with Penn State Health).

95. On October 7, 2024, the EEOC served Ms. Williams's second Charge on PPI, which was docketed at 530-2024-09415. A copy of Ms. Williams's second Charge is attached as **Exhibit P-7**.

96. Penn State Health thereafter mailed Ms. Williams a letter backdated to October 15, 2024, belatedly purporting to provide accommodation on a temporary basis for a new light-duty assignment as a Unit Secretary for a period of up to 45 days at her current rate of pay. Attached as **Exhibit P-8** is a copy of Penn State Health's letter purportedly dated October 15, 2024, which Tyler Case, Executive Director of HR, emailed to her on October 21, 2024 (several days after Penn State Health was served with Ms. Williams's second Charge).

97. On or about October 29, 2024, Ms. Williams received Mr. Case's October 15, 2024, letter by regular mail.

98. Mr. Case's falsely dated October 15, 2024, letter was mailed in an envelope with a postmark dated October 22, 2024. Attached as **Exhibit P-9** is a copy of the envelope confirming the postmark date.

99. After receiving Ms. Williams's second Charge, Penn State Health tried to create the false narrative that it was accommodating her after her termination.

100. Penn State Health's September 11, 2024, termination letter and its October 15, 2024, letter (purporting to offer a light-duty position) were false, conflicting, shifting, implausible, and pretextual in that:

(a) Penn State Health engaged in a pattern and practice of deception, discrimination, and retaliation with the false dating and tardy delivery of its letters.

(b) Penn State Health engaged in a pattern and practice of severe or pervasive and unwelcome harassment.

(c) Penn State Health's post-termination "job offer" gave the illusion of a job opportunity when, in fact, it failed to restore Ms. Williams to the Unit Desk Clerk position that she had held at the time she sustained her work-related injury on September 14, 2023.

(d) Penn State Health's "job offer" of purported reinstatement was pretextual because it failed to restore her to her full-time position of Behavioral Health Specialist II with the same terms, conditions, privileges, and compensation.

(e) Penn State Health's "job offer" of purported reinstatement was pretextual in that it failed to restore Ms. Williams to her other position as Unit Desk Clerk with the same terms, conditions, privileges, and compensation.

(f) The purported job was a temporary position with no guarantees of long-term employment and with a reduced pay rate.

(g) The purported job disregarded Ms. Williams's requested accommodation and her restrictions of working no more than 25 hours weekly.

(h) Penn State Health unilaterally proposed a 40-hour work week in response to Ms. Williams's requested accommodation and then provided shifting, inconsistent, and implausible responses to her legitimate questions about the purported job.

(i) After Penn State Health offered the contrived job, they claimed their offer was prompted by their **recent** receipt of Ms. Williams's medical records supporting her requested accommodation.

(j) In truth, Penn State Health's third-party administrator, Absence-One/Sedgwick, confirmed in writing that Penn State Health had received Ms. Williams's restrictions and had refused to authorize her to return to her job in August 2024.

101. As alleged more fully above, Penn State Health discriminated against Ms. Williams by refusing to accommodate her restrictions and disabilities and by

treating her less favorably than her comparators with respect to her compensation, terms, conditions, and privileges of employment.

**ALLEGATIONS RELATED TO PLAINTIFF'S THIRD EEOC CHARGE**

102. On or about January 20, 2025, Ms. Williams filed a third Charge against Penn State Health, which was docketed at EEOC Charge No. 530-2025-03110. Attached as **Exhibit P-10** is a copy of Ms. Williams's third Charge (without the Charge's exhibits).

103. Before filing her third EEOC Charge, Ms. Williams had engaged in prior "protected activity" in that:

(a) At various times in 2023, Ms. Williams complained to her direct Supervisor, Human Resources, and the HR Director of repeated incidents of harassment, discrimination, and retaliation based on her disability and race/color.

(b) She requested reasonable job accommodation for her known disabilities, and Defendants refused or failed to engage in an interactive process and to reasonably accommodate her.

(c) She filed her first and second Charges with the EEOC.

(d) As alleged more fully above, Penn State Health engaged in a pattern of deception, discrimination, harassment, and retaliation.

104. After Ms. Williams engaged in protected activity, Penn State Health retaliated against her by issuing a pretextual performance review in violation of its

policy, by refusing or failing to address her requested accommodation, by terminating her, and by offering her a bogus temporary position (in excess of her restricted work hours and with a reduction in her pay rate). See attached Exhibit P-8.

105. During Ms. Williams's lengthy employment with Defendants, she was never disciplined for any reason and received excellent performance evaluations until she engaged in protected activity.

106. Defendants violated Title VII by discriminating against Ms. Williams, an African American, and by retaliating against her after she engaged in protected activity.

107. Defendants violated the ADA by failing to accommodate Ms. Williams's job restrictions and by failing to restore Ms. Williams to her pre-leave positions as Behavioral Health Specialist II and Unit Desk Clerk (and failed to restore her to other positions with equivalent terms, conditions, privileges, and compensation).

108. Defendants further violated the ADA by impermissibly comingling her medical information in her personnel file and by failing to treat her medical records as confidential by placing those records in a separate medical file.

109. Defendants' Decision-makers knew about Ms. Williams's complaints and EEOC Charges concerning harassment, disability and racial discrimination,

and her requests for ADA accommodation, and retaliated against her after she engaged in those protected activities.

110. Ms. Williams received various adverse actions (collectively, "Adverse Actions") during her employment, including:

(a) She received a write-up in May 2023, after she complained about harassment, discrimination, and retaliation.

(b) She received a pretextual performance evaluation, which was false and in violation of Defendants' policy.

(c) She was denied reasonable accommodation and the right to return to her pre-leave positions.

(d) She was wrongfully discharged from her two jobs.

(e) She received other Adverse Actions as alleged more fully above including in paragraphs 45, 59, 62, and 63.

111. Defendants' Decision-makers had no legitimate non-discriminatory, non-retaliatory reason for their Adverse Actions against Ms. Williams.

112. In addition to the foregoing, Defendants' Decision-makers displayed their bad faith, discriminatory animus, and pretextual actions against Ms. Williams in that:

(a) They violated their discrimination policy by not investigating her complaints of harassment, discrimination, and retaliation in March, April, and May 2023.

(b) Defendants violated their policy by issuing Ms. Williams a pretextual performance evaluation.

(c) After Ms. Williams filed her EEOC Charges, and after she requested accommodation, Defendants illegally took Adverse Actions against her.

(d) Defendants harassed, discriminated, and retaliated against Ms. Williams for no legitimate, lawful reason.

113. Ms. Williams, an African American and disabled person entitled to Title VII protections and ADA accommodation, was treated less favorably than her non-disabled, white comparators with respect to the compensation, terms, conditions, and privileges of employment.

## EEOC'S REASONABLE CAUSE DETERMINATION

114. On March 30, 2026, after conducting on investigation of Ms. Williams's three Charges against Penn State Health and PPI, the EEOC, by its District Director, Jamie R. Williamson, entered its Determination, "... finding reasonable cause that unlawful employment practices [had] occurred." Attached as **Exhibit P-11** is a copy of the EEOC's Determination.

**COUNT I**
**DISABILITY HARASSMENT/DISCRIMINATION/REFUSAL TO ACCOMMODATE**
**<u>Careim Williams v. Penn State Health and PPI</u>**

115. Ms. Williams incorporates by reference herein paragraphs 1 through 114 above.

116. All of Defendants' illegal actions and inactions, as alleged herein, were done or not done by its Decision-makers, acting with actual, apparent, or ostensible authority.

117. Alternatively, Defendants' supervisors and managers had discriminatory animus toward Ms. Williams, and their recommended actions were imputed to Defendants under principles of *respondeat superior*.

118. As alleged more fully above, Defendants harassed and discriminated against Ms. Williams based on her disabilities.

119. As alleged more fully above, Defendants failed or refused to engage in an interactive process concerning Ms. Williams's disabilities including her requests for accommodation.

120. Defendants failed or refused to accommodate Ms. Williams's disabilities and treated her less favorably than her comparators with respect to the compensation, terms, conditions, and privileges of employment.

121. Defendants had no legitimate, non-discriminatory reason for their Adverse Actions.

122. Ms. Williams's disabilities were a motivating factor in Defendant's Adverse Actions against her, as alleged above.

123. As a result of Defendants' unlawful conduct and Adverse Actions, Ms. Williams has sustained lost wages, front pay, lost bonuses, lost retirement and employee benefits, lost PTO and medical and disability insurance, unpaid medical expenses, and other unliquidated losses and damages in excess of $75,000, plus interest and costs.

124. As a further result of Defendants' unlawful conduct and Adverse Actions, Ms. Williams has suffered emotional pain, suffering, inconvenience, mental anguish, depression, anxiety, related conditions, and loss of life's enjoyment in an unliquidated amount in excess of $75,000, plus interest and costs.

125. As a further result of Defendants' and their Decision-makers' acting with malice or callous or reckless indifference to Ms. Williams's federally protected rights, she is entitled to punitive damages in excess of $75,000, plus interest and costs.

126. Additionally, as a result of Defendants' unlawful conduct and Adverse Actions, Ms. Williams is entitled to attorneys' fees in excess of $75,000, plus interest and costs.

**WHEREFORE**, Plaintiff, Careim Williams, demands that judgment be entered in her favor and against Defendants, including the following relief:

A. reinstatement to her prior positions or comparable positions with Defendants;

B. compensation for back pay, front pay, lost retirement, lost medical and disability insurance, unpaid medical expenses, and other lost employee compensation and benefits including lost PTO and bonuses;

C. compensatory, punitive, and statutory damages in amounts to be determined at trial;

D. attorneys' fees, costs, and interest; and

E. such other relief as the Court deems appropriate.

**COUNT II**
**DISABILITY RETALIATION**
**<u>Careim Williams v. Penn State Health and PPI</u>**

127. Ms. Williams incorporates by reference herein paragraphs 1 through 126 above.

128. As alleged more fully above, Ms. Williams engaged in "protected activities."

129. Defendants discriminated and retaliated against Ms. Williams after she engaged in protected activities including by taking the Adverse Actions alleged above.

130. There was a causal connection between Ms. Williams's protected activities and Defendants' Adverse Actions.

131. Ms. Williams had a reasonable, good faith belief that she had a right to be protected from discrimination and that her rights had been violated.

132. As a result of Defendants' unlawful conduct, Ms. Williams has sustained lost wages, lost bonuses, front pay, lost retirement and employee benefits, lost PTO and medical and disability insurance, unpaid medical expenses, and other unliquidated losses and damages in excess of $75,000, plus interest and costs.

133. As a further result of Defendants' unlawful conduct and Adverse Actions, Ms. Williams has suffered emotional pain, suffering, inconvenience, mental anguish, depression, anxiety, related conditions, and loss of life's enjoyment in an unliquidated amount in excess of $75,000, plus interest and costs.

134. Additionally, as a result of Defendants' unlawful conduct, Ms. Williams is entitled to attorneys' fees in excess of $75,000, plus interest and costs.

**WHEREFORE**, Plaintiff, Careim Williams, demands that judgment be entered in her favor and against Defendants, including the following relief:

A. reinstatement to her prior positions or comparable positions with Defendants;

B. compensation for back pay, front pay, lost retirement, lost medical and disability insurance, unpaid medical expenses, and other lost employee compensation and benefits including lost PTO and bonuses;

C. compensatory and statutory damages in amounts to be determined at trial;

D. attorneys' fees, costs, and interest; and

E. such other relief as the Court deems appropriate.

**COUNT III**
**RACIAL HARASSMENT AND DISCRIMINATION (Title VII)**
**Careim Williams v. Penn State Health and PPI**

135. Ms. Williams incorporates by reference herein paragraphs 1 through 134 above.

136. As alleged more fully above, Defendants discriminated against Ms. Williams based on her race (African American) and color (Black).

137. As alleged more fully above, Defendants engaged in a pattern and practice of harassment against Ms. Williams, and such harassment was severe and/or pervasive and unwelcome.

138. Ms. Williams's Caucasian co-workers were treated more favorably with respect to their compensation, terms, conditions, and privileges of employment.

139. Defendants had no legitimate, non-discriminatory reason for their Adverse Actions against Ms. Williams.

140. As a result of Defendants' unlawful conduct and Adverse Actions, Ms. Williams has sustained lost wages, lost bonuses, lost retirement and employee

benefits, medical expenses, front pay, and other unliquidated losses and damages in excess of $75,000, plus interest and costs.

141. As a further result of Defendants' unlawful conduct and Adverse Actions, Ms. Williams has suffered emotional pain, suffering, inconvenience, mental anguish, depression, anxiety, related conditions, and loss of life's enjoyment in an unliquidated amount in excess of $75,000, plus interest and costs.

142. As a further result of Defendants' and their Decision-makers' acting with malice or callous or reckless indifference to Ms. Williams's federally protected rights, she is entitled to punitive damages in excess of $75,000, plus interest and costs.

143. Additionally, as a result of Defendants' unlawful conduct and Adverse Actions, Ms. Williams is entitled to attorneys' fees in excess of $75,000, plus interest and costs.

**WHEREFORE**, Plaintiff, Careim Williams, demands that judgment be entered in her favor and against Defendants, including the following relief:

A. reinstatement to her prior positions or comparable positions with Defendants;

B. compensation for lost bonuses, back pay, front pay, lost retirement and benefits, medical expenses, and other lost employee compensation and benefits;

C. compensatory and punitive damages in amounts to be determined at trial;

D. attorneys' fees, costs, and interest; and

E. such other relief as the Court deems appropriate.

**COUNT IV**
**RACIAL RETALIATION (Title VII)**

144. Ms. Williams incorporates by reference herein paragraphs 1 through 143 above.

145. As alleged more fully above, Ms. Williams engaged in protected activities.

146. Defendant discriminated and retaliated against Ms. Williams after she engaged in protected activities by taking the Adverse Actions alleged above.

147. There was a causal connection between Ms. Williams's protected activities and Defendants' pretextual Adverse Actions.

148. Ms. Williams had a reasonable, good faith belief that she had a right to be protected from discrimination and that her rights had been violated.

149. As a result of Defendants' unlawful conduct, Ms. Williams has sustained lost wages, lost bonuses, lost retirement and employee benefits, medical expenses, front pay, and other unliquidated losses and damages in excess of $75,000, plus interest and costs.

150. As a further result of Defendants' unlawful conduct and Adverse Actions, Ms. Williams has suffered emotional pain, suffering, inconvenience, mental anguish, depression, anxiety, related conditions, and loss of life's enjoyment in an unliquidated amount in excess of $75,000, plus interest and costs.

151. As a further result of Defendants' and their Decision-makers' acting with malice or callous or reckless indifference to Ms. Williams's federally protected rights, she is entitled to punitive damages in excess of $75,000, plus interest and costs.

152. Additionally, as a result of Defendants' unlawful conduct, Ms. Williams is entitled to attorneys' fees in excess of $75,000, plus interest and costs.

**WHEREFORE**, Plaintiff, Careim Williams, demands that judgment be entered in her favor and against Defendants, including the following relief:

A. reinstatement to her prior positions or comparable positions with Defendant;

B. compensation for lost bonuses, back pay, front pay, lost retirement and benefits, medical expenses, and other lost employee compensation and benefits;

C. compensatory and punitive damages in amounts to be determined at trial;

D. attorneys' fees, costs, and interest; and

E. such other relief as the Court deems appropriate.

Respectfully submitted,

KEEFER WOOD ALLEN & RAHAL, LLP

Dated: 08/26/2026

By: s/ Bradford Dorrance
Bradford Dorrance
PA I.D. #32147
417 Walnut Street, 3rd Floor
Harrisburg, PA 17101
bdorrance@keeferwood.com
(717) 255-8014 (phone)

(Attorneys for Plaintiff)