**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| SS, INDIVIDUALLY AND AS PARENT AND NATURAL GUARDIAN OF RS, A MINOR,<br><br>Plaintiff,<br><br>v.<br><br>DALLASTOWN AREA SCHOOL DISTRICT, EUGENE BYERS, WELLSPAN YORK HOSPITAL, CITY OF YORK, ALLEN J. HENTY, individually and in his official capacity, SYDNEY BENNETT, individually and in her official capacity, and JOHN DOE 1, individually and in his official capacity,<br><br>Defendants. | Case No.<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT IN CIVIL ACTION

AND NOW, comes Plaintiff, SS, individually and as parent and natural guardian of RS, a minor, by and through her attorneys, George R. Farneth II, Esquire and The Farneth Law Group, LLC, and Nicholas A. Miller, Esquire and Brenlove & Fuller, LLC, and files this Complaint in Civil Action, averring as follows:

## THE PARTIES

1. Plaintiff, SS is the parent and natural guardian of RS, a minor, and is an adult resident of York County, Pennsylvania.

2. Defendant, Dallastown Area School District ("DASD") is a public school district located in York County, Pennsylvania that maintains its principal place of business at 700 New School Lane, Dallastown, Pennsylvania 17313 which is in the Middle District of Pennsylvania.

3. Defendant Eugene Byers ("Byers") is an adult resident of York County, Pennsylvania, which is in the Middle District of Pennsylvania.

4. At all pertinent times hereto, Byers was an agent, servant, employee and/or representative of DASD.

5. Defendant Wellspan York Hospital ("Wellspan") is a medical facility that offers emergency and behavioral health services that maintains its principal place of business at 1001 S. George Street, York, PA 17405, which is in the Middle District of Pennsylvania. Plaintiff is asserting a professional liability claim against Wellspan and she has obtained an appropriate Certificate of Merit relative to that claim.

6. Defendant, City of York ("York") is a governmental entity duly existing under the laws and statutes of the Commonwealth of Pennsylvania, with its principal place of business located at 101 S. George Street, York, York County, Pennsylvania which is in the Middle District of Pennsylvania.

7. At all times pertinent hereto, York was authorized to and did own, operate, manage, supervise, direct, control, and maintain a police department which, at all times pertinent hereto, was and is known as the York Police Department which is believed to employee police officers, Detectives, Lieutenants, Chiefs, Commanders, and/or other personnel ("Police") which, at all times pertinent hereto, maintained a principal place of business located at 101 S. George Street, York, York County, Pennsylvania which is in the Middle District of Pennsylvania.

8. At all times pertinent hereto, the purpose, duty, and obligation of the Police was and is to enforce the laws, statutes, and ordinances of the Commonwealth of Pennsylvania and to protect and preserve the persons, property, and constitutional rights of individuals within the geographical and legal jurisdiction of York.

9. Defendant Allen J. Henty ("Henty") is an adult resident of Pennsylvania who was, at all times pertinent hereto, an officer with the Police and an employee of York who, at all times pertinent hereto, its principal place of business located at 101 S. George Street, York, York County, Pennsylvania which is in the Middle District of Pennsylvania.

10. Pursuant to a Memorandum of Understanding between Wellspan and the Police, Henty also served as a Hospital Resource Officer at Wellspan.

11. Defendant Sydney Bennett ("Bennett") is an adult resident of Pennsylvania who was, at all times pertinent hereto, an officer with the Police and an employee of York who, at all times pertinent hereto, its principal place of business located at 101 S. George Street, York, York County, Pennsylvania which is in the Middle District of Pennsylvania.

12. Pursuant to a Memorandum of Understanding between Wellspan and the Police, Bennett also served as a Hospital Resource Officer at Wellspan.

13. Defendant John Doe 1 ("Doe") is believed to be an adult resident of Pennsylvania who was, at all times pertinent hereto, an officer with the Police and an employee of York who, at all times pertinent hereto, its principal place of business located at 101 S. George Street, York, York County, Pennsylvania which is in the Middle District of Pennsylvania.

14. Plaintiff believes that, Pursuant to a Memorandum of Understanding between Wellspan and the Police, Doe also served as a Hospital Resource Officer at Wellspan.

15. Henty, Bennett, and Doe will sometimes hereinafter be collectively referred to as the "Officers."

16. At all times pertinent hereto, DASD was acting by and through its authorized agents, servants, employees, and representatives, including but not limited to Byers and Katie

Linebaugh ("Linebaugh") and Gary Thrush ("Thrush"), who were then and there acting in furtherance of the business operations and interests of DASD.

17. At all times pertinent hereto, York and Police were acting by and through their authorized agents, servants, employees, and representatives, including but not limited to Henty, Bennett, and Doe, who were then and there acting exclusively, in substantial part, or partially within the course and scope of their employment and/or agency relationship with York and Police and/or under color of state law and as state actors in furtherance of the business operations and interests of York and Police.

18. At all times pertinent hereto, Wellspan was acting by and through its authorized agents, servants, employees, and representatives, including but not limited to Henty, Bennett, and Doe, who were then and there acting in furtherance of the business operations and interests of Wellspan.

19. DASD, Byers, Wellspan, York, Henty, Bennett, and Doe will sometimes hereinafter be collectively referred to as "Defendants."

## JURISDICTION AND VENUE

20. This action is brought pursuant to 42 U.S.C. §1983.

21. This Court has original jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343 and 1367.

22. This Court has pendent jurisdiction over Plaintiff's state and common law claims in accordance with 28 U.S.C. § 1367.

23. Venue is proper in this Court under 28 U.S.C. § 1391(b)(1), in that the Defendants resided in and/or maintained their principal places of business in the Middle District of

Pennsylvania; and 28 U.S.C. § 1391(b)(2), in that the events and Defendants' acts and omissions that give rise to SS's claims occurred in the Middle District of Pennsylvania.

## FACTS

24. RS is an 11-year-old autistic child with severe ADHD and a chromosomal abnormality.

25. During the herein described events, RS was a student at DASD.

26. During his 2023-24 school year at DASD, RS was exposed to constant negative peer interactions and bullying to the extent that DASD personnel, instead of punishing the children bullying RS, recommend that RS take a van to school, rather than a bus.

27. Prior to the 2024-25 school year, DASD recommended that RS be placed into the Behavior Intervention Classroom at Dallastown Area Intermediate School ("DAIS").

28. In May 2024, SS toured that classroom with RS and agreed to place RS in that classroom.

29. In August 2024, DASD personnel contacted SS and told her that RS would instead be placed into the Emotional Support Classroom.

30. DASD personnel claimed the switch was due to a staffing change without any consideration as to whether or not such placement was appropriate to RS.

31. RS immediately began experiencing challenges at the new DASD school and even though SS was in constant contact with the school about the challenges RS was facing, DASD was completely unprepared to assist RS in navigating his new environment.

32. In fact, DASD has a history of being utterly obtuse when it comes to special education students.

33. Just one such example was the ill-fated attempt by DASD to raise funds for its special education programming by selling shirts that said "Broken Crayons Still Color."

34. The insinuation that neurodivergent children are somehow "broken" is not only insulting but demonstrates how little DASD knows about such children and their needs.

35. Without appropriate knowledge, DASD could not set up a proper program to meet the educational needs of any child, much less RS.

36. On September 13, 2024, RS came home in distress, and SS wrote the following email to DASD:

> "I'm a little concerned at the moment because RS came home and said that the aid in the classroom told him that he was worst student he had ever met and that he didn't know how RS had made it to the 4th grade. Could you look into the veracity of this for me? If it's true, I'm really disturbed that that happened and think it's the kind of thing that sets Rowan back."

37. The aid referenced was Byers.

38. In response to her September 12, 2024 email, SS received an email back from the Linebaugh in which she stated she was sure that her aides would not have said those comments to RS but would follow up with them.

39. It is unknown if Linebaugh ever followed up with the aides, one of whom was Byers.

40. On September 16, 2024, Linebaugh emailed SS that RS had a very hard day and completed almost no work.

41. SS responded to Linebaugh's September 16, 2024 email as follows:

> It's hard for me to hear that RS is having such hard days. Prior to addressing that though, I feel the need to address the alleged comments made by the aide. I know you're working hard at school and we're working hard at home to support him and to help him achieve his potential, but if there are other people simultaneously

> tearing him down or making him doubt his potential then how are we supposed to make progress? RS is really sensitive to people's criticisms of him; it causes him to shut down. He already believes he can't do it-and now he has an adult reinforcing that belief. If true, I think the comments that were made were an egregious setback to starting the year off right. (And is has since come to my attention that the one comment I reported was not an isolated incident).
>
> Upon initial observation, Rowan can sometimes mask as a neurotypical child—which has caused us to face invalidation by well-meaning people over the years. But the other collateral consequence of that is that people assume his struggles are simply behavioral (rather being more nuanced—yes, there are behavioral issues, but they are deeply intertwined with his various diagnoses). To assume a kid is just a "bad kid" or "bad student" is not seeing him as a whole, multi-faceted person who is deserving of help.
>
> Social/emotional components were just added to Rowan's IEP at the end of last year, and we really haven't had any time to see whether they make a difference. I often wonder if Rowan would be in a better place had his IEP been dissected sooner. Could Rowan have been set up better for 4th grade if these components had been implemented earlier? Intelligence is not the issue. We all know he's intellectually capable. So what is really standing in the way?
>
> I don't know if I'm ready to sign the IEP/NOREP until we dive deeper into that question and make sure everyone is on the same page with building this kid up. He's clearly struggling—but very little has worked over the years to create real change.
>
> Thank you for your time and attention to this matter.

42. Even though DAIS denied that Byers made the statements in question, it did not appear that either Thrush or anyone at DAIS launched any investigation into the statements while Byers continued to harass, bully, and intimidate RS unabated.

43. Byers' conduct and the statements he made toward and about RS caused trouble with RS's peers, who bullied RS and excluded him from activities.

44. Further, Byers' conduct and statements toward and about RS caused RS to "shut down" while at school and refuse to perform work, for which RS was punished.

45. All of this was reported to DASD, yet DASD did nothing to prevent the increasingly hostile environment that RS was forced to suffer through each day.

46. Due to hostile educational environment that DASD and Byers created, on or around November of 2024, RS began to suffer exponentially increased anxiety.

47. In fact, RS's anxiety became so severe that he began regularly picking at his skin, which eventually led to scars all over his legs and the loss of two of his fingernails.

48. Eventually, On December 12, 2024, RS came home from DAIS and completely "shut down."

49. While he was initially unwilling to talk, RS eventually told SS that he thought he was in big trouble, but RS did not tell SS anything more.

50. On December 13, 2024, SS spoke to Thrush who was the school's principal to find out what happened.

51. Thrush stated that RS was not in trouble but that he was informed of an inappropriate interaction between RS and Byers at the end of the day.

52. Thrush further stated that DASD would be doing an internal investigation and that Byers would no longer be working with RS.

53. Additionally, Thrush requested that SS not discuss anything about the December 12, 2024 incident with anyone else.

54. Later that day, RS told SS what happened with Byers.

55. On December 12, 2024, RS was standing at dismissal time when he should have been seated.

56. Byers picked up and violently threw RS's binder and yelled at RS "[W]hen I'm done with you, you're going to be shitting your pants."[1]

57. On Decembers 19, 2024, Thrush and the Assistant Director of Special Education sent an email to the parents with students in the Emotional Support Classroom, telling them that Byers was being transitioned to a new role within DASD.

58. Despite highly his highly despicable, inappropriate, and damaging conduct toward RS, Byers was not terminated or otherwise disciplined by DASD.

59. The incident with Byers was extraordinarily traumatic for RS, who began to exhibit signs of sudden onset Obsessive Compulsive Disorder ("OCD").

60. In early January 2025, SS raised concerns with Linebaugh that RS was showing signs of OCD at home and Linebaugh confirmed that RS was also showing similar signs at school.

61. With the new symptoms came a new wave of bullying by RS's peers, and on January 21, 2025, RS refused to go to school due to the persistent peer bullying he had been suffering.

62. SS was in constant contact with DASD regarding the bullying RS was suffering but little to nothing was ever done about it.

63. On January 29, 2025, RS was formally diagnosed with OCD by a psychiatrist.

64. During that appointment, even at such a young age, RS talked about suicidal ideation because of his interactions with Byers.

65. RS admitted that had tried cutting himself with knives but could not break the skin because he only had access to butter knives.

---

[11] While DASD confirmed that this incident occurred, DASD believed Byers yelled "pissing your pants," rather than "shitting your pants."

66. From February to early March 2025, the peer bullying of RS went on unabated, even though it was continually reported to DASD by SS.

67. On March 5, 2025, the peer bullying caused such distress to RS that he flipped a chair in his classroom after which he was sent to the office.

68. While at the office, RS began banging his head with such force that he had to be evaluated for a concussion.

69. The unabated bullying from his peers and the bullying conduct of Byers caused RS such mental anguish and distress that he could not go back to DAIS.

70. On April 21, 2024, RS began an intensive outpatient treatment program through Wellspan.

71. Despite that treatment, RS's mental health continued to decline.

72. On May 8, 2025, RS's Wellspan outpatient therapist recommended that he receive inpatient mental health services.

73. SS was told that to be admitted for such inpatient mental health services through Wellspan, admission had to go through the emergency department of Wellspan.

74. SS questioned the need to go through the emergency department but was informed by the Wellspan therapist that admission to inpatient mental health services was by way of the emergency department, that the therapist had been in contact with the Crisis team at Wellspan, and that SS and RS would not be sitting in the emergency department all day.

75. SS and RS promptly left for Wellspan.

76. While they were en route to Wellspan, RS was not in any acute crisis.

77. SS and RS even stopped at Panera Bread and enjoyed lunch together.

78. From the moment SS and RS entered the Wellspan emergency department, SS attempted to make the staff aware of RS's neurodivergence and needs.

79. Not only did the Wellspan staff not listen, at no time did they seem concerned that RS's neurodivergence may change his treatment needs.

80. Instead of allowing RS to keep on the clothes he felt comfortable in, they made him put on scrubs that caused him discomfort due to his extreme sensory issues.

81. Instead of any meaningful discussions with SS as to what items RS uses for soothing, and why, the Wellspan staff took all of RS's belongings away and stored them in a locker.

82. RS and SS were told that they could not leave the small room, which did not even have a working television.

83. SS continuously asked for updates from the Wellspan staff but received none.

84. Although SS continuously attempted to advocate to the Wellspan staff for RS's specific needs, all her attempts fell on deaf ears.

85. The emergency room environment began to cause RS to exhibit adverse behavior.

86. After approximately 6 hours from first being placed into the emergency department room, RS began to exhibit "stimming"[2] by hitting his head against the wall.

87. At no time did RS hit his head in such a way as to cause self-harm, but SS was concerned it could get worse and expressed her concerns to a nurse.

88. At that point, the nurse said that RS would be moved to a different room for his own safety, which SS thought would be a quiet room with activities.

89. Instead, RS was taken down the hall and surrounded by armed guards.

---

[2] Stimming is short for "self-stimulating behavior," and refers to repetitive physical movements, sounds, or actions used to regulate emotions, manage sensory input, or express excitement.

90. RS was then placed into what appeared to be a 4x4 cell and the door to the cell was closed and locked.

91. After a few minutes, RS yelled that he needed to go to the bathroom, but nobody would let him out of the locked cell, so RS urinated in the corner.

92. When the Crisis Coordinator finally came to speak to SS, RS began to slam his head against glass pane on the cell door so hard that SS feared he would permanently harm himself.

93. SS asked the observation nurse what was going to be done.

94. The observation nurse claimed she did not have the authority to unlock and open the door.

95. Eventually, more staff came to watch the ongoing commotion of RS repeatedly slamming his head against the glass and yet nobody did anything until SS finally yelled that "someone needs to open the fucking door so that I can hug my child."

96. At that point, the Wellspan staff, instead of assisting RS, told SS that if she did not leave the observation area, they would call the police on her.

97. Even though SS did as she was instructed and left the observation room voluntarily and quickly regained her composure, SS was approached by the Officers in a family meeting room and was told that she was no longer welcome on the hospital property.

98. The Officers, who were each clad in Police uniforms, carried their badges, and acted with police authority.

99. When SS told the Officers that she had a minor child at the hospital and that she was the only available legal guardian, SS was told by one of the Officers that "being a visitor at the hospital is a privilege, not a right."

100. Although SS had not yet signed any form committing RS for inpatient mental health treatment, the Officers prohibited her from retrieving RS so she could take him home.

101. SS then attempted to leave Wellspan but was stopped by the Officers and told SS that she was not free to leave until she provided the Officers with her personal information.

102. The Officers acted with such lack of concern and empathy, and seemed to enjoy the distress they were causing SS to such an extreme, that their actions and behavior were either the condoned internal practices of the Police or the Police utterly failed to provide its officers with the proper training related to the constitutionality of separating parents from their children.

103. At no time did SS give any indication that she was ready to, nor did she attempt to or engage in any criminal conduct.

104. Thus, the Officers had no probable cause or authority to detain SS.

105. Upon obtaining SS's information, the Officers escorted SS to her car and saw to it that she left the hospital property.

106. SS was not given any information about RS and she did not see him again, until a bed became available at Wellspan Phillhaven.

107. At that point, SS was finally able to see RS at Wellspan Phillhaven and check on his wellbeing.

108. From the moment she was escorted out of Wellspan until she was finally able to see RS at Wellspan Phillhaven SS was in an absolute panic and was unable to sleep.

109. Prior to going to Wellspan, RS had told SS that he believed he needed to go to the hospital and that he needed more care.

110. SS tied to explain the experience would be like a “mental health camp,” and RS had a willingness and commitment toward his health that was shattered by his traumatic experience at Wellspan.

111. At no time did Wellspan meet any medically acceptable standards of care in the treatment of RS and his mental health condition.

112. In a clinical setting, particularly for an 11-year-old with RS’s neurodivergence, psychological and behavioral history, the standard of care centers on trauma-informed care and the principle of least restrictive intervention.

113. Facilities providing such care should adopt protocols that generally reflect the guidelines established by the American Academy of Pediatrics (“AAP”) and the Joint Commission regarding pediatric behavioral health in emergency settings.

114. When a child is admitted to an emergency department, such as at Wellspan, for psychiatric stabilization, the goal is to ensure safety while minimizing further traumatization.

115. An emergency department is a high-stimulus environment filled with fluorescent lights, alarms, and people constantly moving.

116. All these things can exacerbate a child’s emotional deregulation.

117. The first step that should be taken when a child seeking psychiatric stabilization has his emotional deregulation exacerbated is the de-escalation of stimuli, which includes:

a. Moving the affected child to a “quiet room” or a low-stimulation area and can include dimming lights and reducing noise; and

b. Unless an item poses a direct, immediate risk of self-harm or harm to others, “transitional objects” such as weighted blankets, fidgets, noise-cancelling headphones or other comfort items should be utilized.

118. Before moving to any chemical or physical interventions, staff should be trained in specific behavioral techniques such as:

a. Verbal de-escalation, or using a calm, low voice and simple, direct language;

b. Redirection, or the shifting of the child's focus to a preferred activity or topic; and

c. Collaborative Problem Solving, meaning that the staff works with the child and/or parent(s) to identify the cause of the immediate distress.

119. When a child's emotional deregulation is exacerbated to the point of headbanging, or a form of self-injurious stimming, proper protocol should shift to immediately ensuring the safety of the child by:

a. Providing protection without restraint by staff placing a soft barrier, such as a pillow or foam mat, between the child's head and the hard surface; or

b. If a facility is properly prepared for such matters, they would have temporary soft-shell helmets to prevent concussion or lacerations without requiring the child to be physically held down.

120. Further, hospitals and facilities must follow a strict hierarchy to manage aggression or self-harm such as:

a. Managing or mitigating environmental behavior, as stated above;

b. Chemical restraint, where if a child is an immediate danger to themselves, a physician may order and administer an as-needed medication, such as a fast-acting sedative, to help the child regain control. This is generally preferred over physical restraint as it is often less traumatizing for children; and

c. As a last resort, a time-limited, physical or mechanical restraint that is continuously monitored by a staff member, and requires a specific physician's order that must be renewed frequently.

121. A child with a known diagnosis should have the parent(s) directly involved in what calms their child as they are the absolute "experts" on that subject.

122. Regardless of what is used as an intervening measure, proper protocol encourages keeping at least one parent present to help regulate the child so long as it is safe to do so.

123. In accordance with the national pediatric standards, removing a child from their primary caregiver and placing them in a locked isolation room as a first step to intervene in the child's escalating behavioral emergency should not happen absent a dire emergency.

124. Under Pennsylvania's Mental Health Procedures Act and Department of Human Services bulletins, specifically OMHSAS-24-01, seclusion and restraint are classified as emergency safety interventions, not therapeutic techniques, and are strictly "measures of last resort."

125. Using measures as a "first step" before attempting de-escalation, environmental changes, or pharmacological assistance is a breach of the least restrictive environment requirement.

126. For an autistic child in crisis, the parent is often the primary stabilizing force and, the parent should be included in de-escalation efforts.

127. Pennsylvania and AAP guidelines suggest that a primary caregiver accompany a patient to a quiet area and remain present during transitions to reduce anxiety.

128. Physically taking a child away from their mother, especially a child who is already deregulated from a previous trauma and is neurodivergent, is absolutely considered to be counter-therapeutic.

129. This creates a "flight or fight" response that often causes the very aggression the hospital is trying to manage.

130. Pennsylvania's PAAutism.org resources for emergency department personnel emphasize that staff should obtain information from caregivers on successful interventions and use a "de-escalation toolbox" filled with fidgets, headphones, and various other comfort items to attempt to de-escalate any potentially harmful behavior.

131. Denying comfort items or not having or using a "de-escalation toolbox," without a specific safety justification and then punishing a child for the resulting "stimming" is an absolute failure to provide disability-appropriate care.

132. If a seclusion room is used, it requires a written physician's order and continuous face to face monitoring.

133. A seclusion room cannot be used for the "convenience of stall" or as punishment for non-compliance.

134. Per 55 Pa. Code §13.8 "[i]n mental health facilities children under 14 years of age shall be continuously monitored within or just outside the seclusion area by mental health personnel, the room shall not be locked or otherwise secured, and soft inanimate objects shall be made available to the patient to permit the venting of aggression."

135. As a sole, direct, proximate, factual, and legal result of the Defendants' individual and collective conduct as aforesaid, RS has suffered, and will continue to suffer, the following severe, serious, and potentially permanent injuries:

a. Physical injuries;

b. Emotional and psychological trauma and related injuries;

c. Acute emotional dysregulation;

d. An aggravation of his preexisting psychiatric symptoms;

e. Weight gain as a result of additional medication, which has affected his activity level, and overall health,

f. Anxiety;

g. Anger;

h. Fear;

i. Depression;

j. Headaches;

k. Trouble Sleeping;

l. Severe Trauma;

m. PTSD;

n. Low self-esteem; and

o. Other severe, serious, and potentially permanent injuries that will be developed in discovery and proven at trial.

136. As a sole, direct, proximate, factual, and legal result of the Defendants' individual and collective conduct as aforesaid, RS has suffered, and will continue to suffer, the following severe, serious, and potentially permanent damages, losses, and harm:

a. RS has suffered and will continue to suffer severe anxiety, depression, embarrassment, humiliation, emotional distress, mental anguish, psychological trauma, nightmares, flashbacks, inconvenience, and a loss of life's pleasures;

b. RS may be obliged to receive and undergo medical and psychological care and treatment and spend significant sums of money to restore his physical and emotional health, if possible;

c. RS was deprived of and lost his civil and constitutional rights, including but not limited to life, liberty, and the pursuit of happiness;

d. RS has suffered a violation of his rights under the Fourth Amendment to the United States Constitution, as applied to the states by the Fourteenth Amendment;

e. RS's privacy was invaded;

f. RS has been rendered suspicious and fearful of the mental and behavioral health treatment he requires to thrive;

g. RS has been rendered suspicious and fearful of the educational resources he requires to thrive and his education has been severely affected;

h. RS's general health, strength and vitality have been greatly impaired, thereby depriving him of the normal joys of life; and

i. RS has suffered other severe, serious and significant injuries, damages and losses that will be developed in discovery and proven at trial.

137. As a sole, direct, proximate, factual, and legal result of the Defendants' individual and collective conduct as aforesaid, SS has suffered, and will continue to suffer, the following severe, serious, and potentially permanent injuries:

a. Anxiety;

b. Anger;

c. Fear;

d. Depression;

e. Headaches;

f. Trouble Sleeping;

g. PTSD;

h. Low self-esteem; and

i. Other severe, serious, and potentially permanent injuries that will be developed in discovery and proven at trial.

138. As a sole, direct, proximate, factual, and legal result of the Defendants' individual and collective conduct as aforesaid, SS has suffered, and will continue to suffer, the following severe, serious, and potentially permanent damages, losses, and harm:

a. She has suffered and will continue to suffer severe anxiety, depression, embarrassment, humiliation, emotional distress, mental anguish, psychological trauma, nightmares, flashbacks, inconvenience, and a loss of life's pleasures;

b. She may be obliged to receive and undergo medical and psychological care and treatment and spend significant sums of money to restore her physical and emotional health;

c. She was deprived of and lost her civil and constitutional rights, including but not limited to life, liberty, and the pursuit of happiness;

d. She has suffered a violation of her rights under the Fourth Amendment to the United States Constitution, as applied to the states by the Fourteenth Amendment, to be free from unreasonable and malicious prosecution, false arrest and false prosecution;

e. Her privacy was invaded;

f. Her earning capacity and power have been impaired by way of the disruptions caused by the increased care RS now needs;

g. She will have to expend additional sums of money for RS's care and health;

k. Her general health, strength and vitality have been greatly impaired, thereby depriving her of the normal joys of life; and

l. She has suffered other severe, serious and significant injuries, damages and losses that will be developed in discovery and proven at trial.

**COUNT I**

**PLAINTIFF, SS, AS PARENT AND NATURAL GUARDIAN OF RS, A MINOR v. DEFENDANT, DALLASTOWN AREA SCHOOL DISTRICT**

**DISABILITY DISCRIMINATION AND HOSTILE ENVIRONMENT**

139. SS incorporates herein by reference as though fully set forth at length the averments set forth in paragraphs 1 through 138 above.

140. RS is a qualified individual with a disability within the meaning of Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act.

141. DASD is a public entity and a recipient of federal financial assistance within the meaning of Title II of the ADA and Section 504.

142. At all times pertinent hereto, RS was enrolled as a student at DAIS, a school operated by DASD and was entitled to equal access to DASD's programs, services, activities, and facilities on the same basis as RS's neurotypical peers.

143. Because of RS's disability, including visible and known characteristics of autism, ADHD, and OCD, his school peers, and even school staff, targeted RS for disability-based harassment, including but not limited to repeated verbal assaults and exclusions while at school and on school buses.

144. The harassment and bullying was severe, pervasive, and objectively unreasonable in that it occurred on a frequent and ongoing basis over an extended period of time, over SS's objections and voiced concerns, and occurred not just under the actual or constructive supervision of school staff, but by school staff, to the extent that it traumatically undermined and detracted from RS's school experience to the point that RS was effectively denied equal access to the District's educational resources and opportunities.

145. As a result of the above disability-based harassment, RS experienced fear and anxiety about attending school, avoided school, and was, in practice, unable to access the school environment on equal terms with his peers.

146. SS repeatedly informed DASD officials about the specific bullying and harassing behavior RS experienced, but DASD failed to take reasonable and necessary action to investigate and stop the bullying and harassment and protect RS.

147. Despite the actual knowledge that disability-based bullying and harassment targeted at RS was substantially likely to, and in fact did, repeatedly occur to such an extent that it deprived RS of equal access to the DASD school environment, DASD failed to take reasonable and necessary action to investigate and stop the bullying and harassment and protect RS.

148. Instead, DASD was more interested in denying the bullying and harassment was occurring, particularly at the hands of one of its staff members, and protecting, rather than disciplining Byers instead of protecting RS.

149. The clearly unreasonable response of disciplining RS for what were disability-related reactions to ongoing peer and school staff bullying and harassment served to preserve and perpetuate the hostile environment that severely injured RS and SS.

150. DASD's failure to act, and its maintenance of a school environment in which disability-based bullying and harassment of RS was allowed to continue unchecked, constitutes deliberate indifference to a known, substantial risk that RS would be excluded from participation in, denied the benefits of, and subjected to discrimination in DASD's services, programs, activities, and facilities because of RS's disability.

151. DASD's deliberate indifference is a form of intentional discrimination under §504 and Title II.

152. The discrimination and hostile environment averred herein are independent of, and in no way challenge or seek redress for, the adequacy of the content of RS's special education services, IEP, or educational programming.

153. Instead, this claim challenges the DASD's operation of its school as a public facility and program in a manner that denied RS equal access to a safe, non-hostile environment on the basis of disability, in the same way that a disabled adult employee, parent, or visitor could challenge being subjected to a disability-based hostile environment or denied safe access to the building.

154. The relief sought by way of this claim does not include any modification or enforcement of RS's IEP, compensatory education, or other remedies unique to the IDEA, but is limited to remedies available under the ADA and § 504 for discrimination in access to a public entity's programs, services, activities, and facilities.

155. As a direct, proximate, factual, and legal result of DASD's disability-based discrimination, hostile environment, and deliberate indifference, RS has suffered, and will continue to suffer the aforementioned severe, serious, and permanent injuries, damages, losses, and harm.

WHEREFORE, Plaintiff, SS, as parent and natural guardian of RS, a minor, demands judgment in her favor against Defendant, Dallastown Area School District for compensatory damages, attorneys' fees, expenses, and such other relief as this Court deems appropriate.

**COUNT II**

**PLAINTIFF, SS, INDIVIDUALLY AND AS PARENT AND NATURAL GUARDIAN OF RS, a MINOR v. DEFENDANTS, CITY OF YORK, ALLEN J. HENTY, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY, SYDNEY BENNETT, INDIVIDUALLY AND IN HER OFFICIAL CAPACITY, JOHN DOE 1, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY, AND WELLSPAN YORK HOSPITAL**

**VIOLATION OF 42 U.S.C. § 1983**
**THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION**
**SUBSTANTIVE DUE PROCESS – INTERFERENCE WITH FAMILIAL INTEGRITY**

156. SS incorporates herein by reference as though fully set forth at length the averments set forth in paragraphs 1 through 155 above.

157. The Fourteenth Amendment protects the fundamental liberty interest of parents in the care, custody, and control of their children, which may not be infringed absent compelling justification and adherence to constitutional standards.

158. By causing and effecting the removal and separation of RS from SS and excluding SS from RS's presence and the medical decision making for RS, without court order and in the face of a true emergency that was directly, proximately, factually, and legally caused by Wellspan's severe deviation from the standard of care, the Officers and Wellspan arbitrarily, capriciously, and

illegally interfered with SS's fundamental parental liberty interest and SS's and RS's right to remain together.

159. At all times pertinent hereto, the Officers were in uniform, wore badges, identified themselves as police officers, and used police authority.

160. At all times pertinent hereto, the Officers acted under color of law for the purposes of 42 U.S.C. § 1983.

161. At all times pertinent hereto, no reasonable officer could believe that it was lawful to separate a parent from their child under the circumstances set forth above.

162. York and Police are liable for the actions of the Officers as the conduct of the Officers themselves indicated that they were acting in accordance with Police policy and/or custom.

163. Further, the conduct and actions of the Officers indicate an utter failure on behalf of York and Police to properly train and supervise the Officers, particularly as relates to the constitutional standards that are required to be met to separate a child from their parents.

164. Such a failure to properly train or supervise the Officers demonstrated deliberate indifference on behalf of York and Police to the known risk that Officers would violate constitutionally protected parental and familial rights as recognized by the Courts.

165. York's and Police's policies, customs, and failures in the training and supervision of the Officers were the moving force behind the herein described violations of SS's and RS's constitutional rights.

166. Wellspan acted jointly and in concert with the Officers, willfully participating in, and initiating, the unconstitutional separation of SS and RS, and thereby acted under color of law for purposes of 42 U.S.C. § 1983.

167. In fact, Wellspan maintained and utilized the Officers as Hospital Resource Officers, essentially directing, controlling, and assuming legal responsibility for the Officers' actions.

168. Based upon the foregoing, it is readily apparent that Wellspan maintained policies, customs, and/or practices of summoning law enforcement to remove parents and to affect the separation of parents and minor patients based on hospital preferences and convenience, rather than on constitutionally adequate findings or emergencies.

169. Wellspan knowingly and foreseeably used the coercive power of the state, through the Police and the Officers, to accomplish the separation and exclusion of RS and SS as Wellspan could not lawfully undertake acting solely as a private actor and, as a result, it engaged in joint state action under color of law.

170. Wellspan's policies, customs, and/or deliberate indifference to the constitutional limits on such conduct were the moving force behind the violations of SS's and RS's constitutional rights.

171. The conduct of the Officers and Wellspan was conscience shocking, arbitrary, and lacked any reasonable justification considering the clearly established principles governing emergency intrusions and child-protective interventions.

172. Based on the facts as averred above, the Officers' and Wellspan's actions were intentional, malicious, willful, wanton, reckless, objectively unreasonable, and undertaken with deliberate and reckless indifference to SS's and RS's health, safety, well-being, and federally protected rights and warrants the imposition of punitive damages against them.

173. As a direct, proximate, factual, and legal result of the Officers' and Wellspan's unconstitutional conduct as aforesaid, SS and RS have suffered, and will continue to suffer the aforementioned severe, serious, and permanent injuries, damages, losses, and harm.

WHEREFORE, Plaintiff, SS, individually and as parent and natural guardian of RS, a minor, demands judgment in her favor against Defendants, City of York, Allen J. Henty, individually and in his official capacity, Sydney Bennett, individually and in her official capacity, John Doe 1, individually and in his official capacity, and Wellspan York Hospital, for compensatory damages, punitive damages, attorneys' fees, expenses, and such other relief as this Court deems appropriate.

## COUNT III

## PLAINTIFF, SS, INDIVIDUALLY AND AS PARENT AND NATURAL GUARDIAN OF RS, A MINOR v. DEFENDANTS, CITY OF YORK, ALLEN J. HENTY, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY, SYDNEY BENNETT, INDIVIDUALLY AND IN HER OFFICIAL CAPACITY, JOHN DOE 1, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY, AND WELLSPAN YORK HOSPITAL

## VIOLATION OF 42 U.S.C. § 1983

## THE FOURTH AMENDMENT TO THE UNITED STATES CONSTITUTION UNREASONABLE SEIZURE

174. SS incorporates herein by reference as though fully set forth at length the averments set forth in paragraphs 1 through 173 above.

175. The Fourth Amendment to the Constitution protects an individual's right to be free from unreasonable seizure.

176. The physical removal and/or effective separation of RS from SS and the forcible exclusion of SS from the hospital where RS was located, constituted seizures within the meaning of the Fourth Amendment.

177. This removal and/or effective separation was effectuated by the Officers who were, at all times pertinent hereto, acting under color of law for the purposes of 42 U.S.C. § 1983.

178. The seizures were accomplished without warrant, probable cause, or exigent circumstances.

179. If any exigent circumstances existed, they were caused by Wellspan and its staff and cannot be used to justify the violation of SS's and RS's Fourth Amendment rights.

180. The seizures were therefore unreasonable and in violation of the Fourth Amendment rights of SS and RS.

181. At all times pertinent hereto, no reasonable officer could have believed that their actions were lawful considering the circumstances.

182. York and Police are liable for the actions of the Officers as the conduct of the Officers themselves indicated that the Officers were acting in accordance with Police policy or custom.

183. Further, the conduct and actions of the Officers indicated an utter failure on behalf of York and Police to properly train and supervise the Officers regarding the constitutional standards that are required to seize a minor child or to preclude a parent from seeing their minor child.

184. That failure to properly train and supervise the Officers demonstrates deliberate indifference on behalf of York and Police to the known risk that officers would violate constitutionally protected rights against unreasonable seizure.

185. York and Police policies, customs, and failures in the training and supervision of the Officers were the moving force behind the herein described violations of SS's and RS's constitutional rights.

186. Wellspan acted jointly and in concert with the Officers, willfully participating in, and initiating, the unconstitutional separation of SS and RS, and thereby acted under color of law for purposes of 42 U.S.C. § 1983.

187. In fact, Wellspan maintained and utilized the Officers as Hospital Resource Officers, essentially directing, controlling, and assuming legal responsibility for the Officers' actions.

188. Based upon the foregoing, it is readily apparent that Wellspan maintained policies, customs, and/or practices of summoning law enforcement to remove parents and to affect the separation of parents and minor patients based on hospital preferences and convenience, rather than on constitutionally adequate findings or emergencies.

189. Wellspan knowingly and foreseeably used the coercive power of the state, through the Police and the Officers, to accomplish the separation and exclusion of RS and SS as Wellspan could not lawfully undertake acting solely as a private actor and, as a result, it engaged in joint state action under color of law.

190. Wellspan's policies, customs, and/or deliberate indifference to the constitutional limits on such conduct were the moving force behind the violations of SS's and RS's constitutional rights.

191. The conduct of the Officers and Wellspan was conscience shocking, arbitrary, and lacked any reasonable justification in light of the clearly established principles governing emergency intrusions and child-protective interventions.

192. Based on the facts as averred above, the Officers' and Wellspan's actions were intentional, malicious, willful, wanton, reckless, objectively unreasonable, and undertaken with

deliberate and reckless indifference to SS's and RS's health, safety, well-being, and federally protected rights and warrants the imposition of punitive damages against them.

193. As a direct, proximate, factual, and legal result of the Officers' and Wellspan's unconstitutional conduct as aforesaid, SS and RS have suffered, and will continue to suffer the aforementioned severe, serious, and permanent injuries, damages, losses, and harm.

WHEREFORE, Plaintiff, SS, individually and as parent and natural guardian of RS, a minor, demands judgment in her favor against Defendants, City of York, Allen J. Henty, individually and in his official capacity, Sydney Bennett, individually and in her official capacity, John Doe 1, individually and in his official capacity, and Wellspan York Hospital, for compensatory damages, punitive damages, attorneys' fees, expenses, and such other relief as this Court deems appropriate.

**COUNT IV**

**PLAINTIFF, SS, INDIVIDUALLY AND AS PARENT AND NATURAL GUARDIAN OF SS, A MINOR v. DEFENDANTS, CITY OF YORK, ALLEN J. HENTY, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY, SYDNEY BENNETT, INDIVIDUALLY AND IN HER OFFICIAL CAPACITY, JOHN DOE 1, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY, AND WELLSPAN YORK HOSPITAL**

**VIOLATION OF 42 U.S.C. 1983**

**THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION**
**INTERFERENCE WITH INTIMATE FAMILY ASSOCIATIONS**

194. SS incorporates herein by reference as though fully set forth at length the averments set forth in paragraphs 1 through 193 above.

195. The First Amendment to the Constitution protects an individual's right to be free from state action that interferes with a right for intimate associations such as family relationships.

196. The physical removal and/or effective separation of RS from SS and the forcible exclusion of SS from the hospital where RS was located, constituted state action that interfered with SS's and RS's right to their familial association with one another.

197. The interference with SS's and RS's First Amendment Rights of familial association was effectuated by the Officers who were, at all times pertinent hereto, acting under color of law for the purposes of 42 U.S.C. § 1983.

198. At all times pertinent hereto, no reasonable officer could have believed that their actions were lawful considering the circumstances.

199. York and Police are liable for the actions of the Officers as the conduct of the Officers themselves indicated that the Officers were acting in accordance with Police policy or custom.

200. Further, the conduct and actions of the Officers indicated an utter failure on behalf of York and Police to properly train and supervise the Officers regarding the constitutional standards that are required for the state to interfere with a person's right to associate as a family under the First Amendment.

201. That failure to properly train and supervise the Officers demonstrates deliberate indifference on behalf of York and Police to the known risk that officers would violate constitutionally protected rights against unreasonable seizure.

202. York and Police policies, customs, and failures in the training and supervision of the Officers were the moving force behind the herein described violations of SS's and RS's constitutional rights.

203. Wellspan acted jointly with and in concert with the Officers, willfully participating in, and initiating, the violation of SS's and RS's rights to associate as a family, and thereby acted under color of law for purposes of 42 U.S.C. § 1983.

204. In fact, Wellspan maintained and utilized the Officers as Hospital Resource Officers, essentially directing, controlling, and assuming legal responsibility for the Officers' actions.

205. Based upon the foregoing, it is readily apparent that Wellspan maintained policies, customs, and/or practices of summoning law enforcement to remove parents and to affect the separation of parents and minor patients based on hospital preferences and convenience, rather than on constitutionally adequate findings or emergencies.

206. Wellspan knowingly and foreseeably used the coercive power of the state, through the Police and the Officers, to accomplish the separation and exclusion of RS and SS as Wellspan could not lawfully undertake acting solely as a private actor and, as a result, it engaged in joint state action under color of law.

207. Wellspan's policies, customs, and/or deliberate indifference to the constitutional limits on such conduct were the moving force behind the violations of SS's and RS's constitutional rights.

208. The conduct of the Officers and Wellspan was conscience shocking, arbitrary, and lacked any reasonable justification in light of the clearly established principles governing emergency intrusions and child-protective interventions.

209. Based on the facts as averred above, the Officers' and Wellspan's actions were intentional, malicious, willful, wanton, reckless, objectively unreasonable, and undertaken with

deliberate and reckless indifference to SS's and RS's health, safety, well-being, and federally protected rights and warrants the imposition of punitive damages against them.

210. As a direct, proximate, factual, and legal result of the Officers' and Wellspan's unconstitutional conduct as aforesaid, SS and RS have suffered, and will continue to suffer the aforementioned severe, serious, and permanent injuries, damages, losses, and harm.

WHEREFORE, Plaintiff, SS, individually and as parent and natural guardian of RS, a minor, demands judgment in her favor against Defendants, City of York, Allen J. Henty, individually and in his official capacity, Sydney Bennett, individually and in her official capacity, John Doe 1, individually and in his official capacity, and Wellspan York Hospital, for compensatory damages, punitive damages, attorneys' fees, expenses, and such other relief as this Court deems appropriate.

**COUNT V**

**PLAINTIFF, SS, AS PARENT AND NATURAL GUARDIAN OF RS, A MINOR v. DEFENDANT, EUGENE BYERS**

**<u>COMMON LAW ASSAULT</u>**

211. SS incorporates herein by reference as though fully set forth at length the averments set forth in paragraphs 1 through 210 above.

212. An assault is an act intended to put another person in reasonable apprehension of an immediate battery, and which succeeds in causing an apprehension of such battery.

213. By violently throwing RS's binder and verbally threatening him with physical violence, Byers acted with the intent to cause RS fear and harm.

214. Byers' actions as averred herein were specifically designed and intended to harass, annoy, intimidate, and put RS in fear of imminent and severe bodily harm.

215. Byers' actions as averred herein constituted an assault and a reckless disregard for RS's health, safety, and wellbeing and did put RS in fear of imminent and severe bodily harm.

216. Based on the facts as averred above, Byers' actions, especially considering that he is a trained teacher's aide, were intentional, malicious, willful, wanton, reckless, objectively unreasonable, and undertaken with deliberate and reckless indifference to RS's health, safety, and well-being and warrants the imposition of punitive damages against Byers.

217. As a direct, proximate, factual, and legal result of Byers' conduct as aforesaid, RS has suffered, and will continue to suffer the aforementioned severe, serious, and permanent injuries, damages, losses, and harm.

WHEREFORE, Plaintiff, SS, as parent and natural guardian of RS, a minor demands judgment in her favor against Defendant, Eugene Byers for compensatory damages, punitive damages, attorneys' fees, expenses, and such other relief as this Court deems appropriate.

**COUNT VI**

**PLAINTIFF, SS, AS PARENT AND NATURAL GUARDIAN OF RS v.
DEFENDANT, EUGENE BYERS**

**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

218. SS incorporates herein by reference as though fully set forth at length the averments set forth in paragraphs 1 through 217 above.

219. As a result of Byers' extreme and outrageous conduct, RS has suffered, and will continue to suffer the aforementioned severe, serious, and permanent injuries, damages, losses, and harm, including severe emotional distress.

220. Based on the facts as averred above, Byers' actions, especially considering that he is a trained teacher's aide, were intentional, malicious, willful, wanton, reckless, objectively

unreasonable, and undertaken with deliberate and reckless indifference to RS's health, safety, and well-being and warrants the imposition of punitive damages against Byers.

WHEREFORE, Plaintiff, SS, as parent and natural guardian of RS, a minor, demands judgment in her favor against Defendant, Eugene Byers for compensatory damages, punitive damages, attorneys' fees, expenses, and such other relief as this Court deems appropriate

**COUNT VII**

**PLAINTIFF, SS, AS PARENT AND NATURAL GUARDIAN OF RS, A MINOR v. DEFENDANT, WELLSPAN YORK HOSPITAL**

**PROFESSIONAL NEGLIGENCE/CORPORATE LIABILITY/VICARIOUS LIABILITY**

221. SS incorporates herein by reference as though fully set forth at length the averments set forth in paragraphs 1 through 220 above.

222. At all times pertinent hereto, Wellspan was a hospital and comprehensive health care facility that provided medical, nursing, and ancillary services to the public.

223. At all times pertinent hereto, Wellspan held out to the public, including SS, that it was a skilled and competent hospital that would provide patients, including RS, with quality medical care and treatment.

224. Based upon the representations made by Wellspan as to the skill and competence of its medical and nursing staff, at all times pertinent hereto, SS relied on Wellspan, and its staff to render full, complete, accurate, and competent medical care and treatment to RS that met or exceeded all applicable standards of care.

225. Wellspan, for good and valuable compensation and other consideration that Plaintiff agreed to pay, did pay, and/or that was paid on behalf of RS, undertook and agreed to care for RS and to perform all reasonable and necessary medical and other procedures and to use all

requisite, reasonable, necessary, and proper skills and judgment in rendering such medical care and treatment.

226. Healthcare professionals, including hospitals, physicians, nurses, and administrative staff are integral to maintaining a high standard of ethical conduct when caring for patients such that they must adhere to principles, and they must act in a manner that prioritizes the well-being, dignity and rights of every patient they treat.

227. The Code of Ethics in healthcare, including those that are based on the Hippocratic Oath, serves as a critical guide to uphold the moral integrity of the profession and helps to ensure that healthcare providers deliver care that is patient-centered, compassionate, just, and consistent with the highest ethical standards.

228. As part of the Code of Ethics, communication in healthcare is critical to ensure the best possible care and support for patients.

229. Clear, compassionate, and effective communication is the cornerstone of trust between healthcare professionals and patients that ensures patients are fully informed and feel empowered to make decisions about their healthcare.

230. Elevating patient concerns through the appropriate chain of command further guarantees that issues are addressed effectively and in a timely manner and involves initially discussing problems with the direct care provider or staff member and, if unresolved, escalating the problems to higher levels of management or supervisors.

231. This structured approach helps maintain accountability, enhances communication, and ensures that patient needs are prioritized and addressed properly throughout the healthcare system.

232. For the reasons averred herein. Wellspan violated the Code of Ethics as a result of the healthcare providers who cared for RS failing, inter alia, to properly and thoroughly communicate by and between themselves and SS, failing to promptly provide to RS the emergency care and treatment his condition required, failing to escalate the issues and problems averred herein to higher levels of management and/or supervisors, removing SS from the facility, and causing significant harm to RS.

233. As a hospital and comprehensive health center, Wellspan owed RS a direct, non-delegable duty to exercise reasonable care for his safety and well-being while a patient at its facility, including the duty to establish, implement, and enforce policies, procedures, and systems reasonably designed to ensure the provision of safe and appropriate medical and nursing care.

234. Under Pennsylvania law, Wellspan had a corporate/institutional duty, *inter alia*, to do the following:

a. To ensure that all medical personnel who provided care and treatment to RS were competent to provide that care;

b. To supervise, direct, and control everyone who practiced medicine within its walls, particularly as relates to patient care and safety;

c. To formulate, adopt, and enforce adequate rules, policies, and procedures to ensure quality care for patients; and

d. To formulate, adopt, and follow an appropriate treatment plan for RS.

235. For the reasons set forth above, Wellspan breached each of those duties as it relates to RS and SS.

236. At all times pertinent hereto, Wellspan, by and through its authorized agents, servants, employees, representatives, staff members, and ostensible agents including, but not limited to, members of Wellspan's medical and nursing staff who examined and participated in the

care and treatment of RS in May 2025, failed to properly monitor, diagnose and treat RS's condition and SS's concerns which constituted a violation of the standard of care.

237. At all times pertinent hereto, Wellspan and its leadership failed to protect their patient, RS, from a medical and nursing staff that was obviously incapable of providing adequate care for RS.

238. RS's severe, serious, and permanent injuries, damages, losses, and harm were the direct, proximate, factual, and legal result of the individual and collective carelessness, recklessness, negligence, malpractice, and deviation from the standard of care by Wellspan, by and through its authorized agents, servants, employees, representatives, staff members, and ostensible agents including, but not limited to, members of RS's medical and nursing staff who examined and participated in the care and treatment of or were otherwise involved with RS in May 2025 for the reasons set forth herein:

a. In holding its facility and staff out to the public, including SS and RS, as skilled and competent healthcare providers;

b. In failing to ensure that a comprehensive examination and evaluation of RS was performed upon his arrival at Wellspan and at reasonable intervals thereafter;

c. In failing to ensure proper and thorough assessments and evaluations of RS's condition were timely completed, particularly considering his medical history, condition and SS's concerns;

d. In failing to adequately assess, reassess, and accommodate RS's known neurodevelopmental and sensory needs;

e. In failing to use appropriate verbal, environmental, and behavioral de-escalation techniques in treating RS;

f. In failing to utilize the least restrictive clinically appropriate interventions in treating RS;

g. In using techniques that significantly escalated RS's symptoms and severely increased the risk of harm to RS;

h. In failing to protect RS from the self-injurious behavior Wellspan and its staff caused by and through their failure to adequately diagnose and treat his condition;

i. In failing to consult with RS' treating physicians who possessed far superior knowledge and information regarding RS, his condition, and his treatment needs;

j. In failing to properly monitor, assess, and address RS' basic physical and emotional needs;

k. In failing to timely develop and modify as necessary an appropriate treatment plan for RS;

l. In failing to ensure the performance of appropriate and timely evaluations of RS, the establishment of any appropriate treatment plan for RS, and the adjustment of his treatment plan as necessary;

m. In failing to ensure that its medical and nursing staff diagnosed timely and treated RS's condition and his symptoms;

n. In failing to ensure that RS received the medical care and treatment his condition required;

o. In failing to ensure that its medical and nursing staff acted timely upon the changes in RS's condition;

p. In failing to ensure timely and proper communication between RS's physicians and the nursing staff;

q. In failing to ensure that RS's physicians timely requested and obtained detailed information about RS's condition from his treating physicians;

r. In failing to ensure the timely and proper treatment of RS's symptoms, including pharmacological and non- pharmacological interventions;

s. In failing to understand the severity of RS's condition;

t. In allowing its physicians and nurses to violate the Code of Ethics in healthcare, including those that are based on the Hippocratic Oath;

u. In failing to fully, properly, and timely advise and warn SS of the nature and severity of RS's medical condition;

v. In failing to acknowledge, evaluate, and address SS's concerns relative to RS;

w. In neglecting and mistreating RS as averred herein;

x. In failing to protect RS from reasonably foreseeable harm because of his condition;

y. In causing RS to suffer an increased risk of harm, including potential death;

z. In causing RS to suffer an increased risk of complications;

aa. In failing to order and/or ensure that its staff ordered consultations from medical providers who possessed the education, training, knowledge, skill, and expertise necessary to and who were better able to properly care for and treat RS;

bb. In failing to transfer RS to a hospital that was better equipped and able to timely diagnose and treat RS's condition;

cc. In causing RS to endure great pain, suffering, swelling, weakness, decreased mobility, decreased strength, physical limitations, inconvenience, embarrassment, and mental anguish;

dd. In failing to properly supervise, direct, and/or monitor the medical care and treatment its physicians, nurses, and other medical staff members provided to RS;

ee. In failing to ensure that its medical and nursing staff possessed the requisite education, training, knowledge, skill, and expertise that was necessary to properly care for and treat RS;

ff. In failing to inform SS and RS that the physicians, nurses, and other medical providers and staff members who cared for RS lacked the education, training, knowledge, skill, and expertise necessary to properly care for and treat him;

gg. In failing to hire, employ and maintain administrative, medical, nursing, and therapeutic staff that possessed the requisite education, knowledge, training, skill, and expertise to properly diagnose, treat, and manage RS's condition;

hh. In failing to properly educate, train, instruct, and supervise its administrative, medical, nursing, and therapeutic staff members, including those that were responsible for providing RS's medical care and treatment;

ii. In failing to properly supervise, direct, and/or monitor the medical care and treatment the physicians, nurses, and other medical staff members provided and/or failed to provide to RS;

jj. In failing to adequately staff its facility to meet the needs of patients, including RS;

kk. In failing to ensure that its medical and nursing staff developed, implemented, and followed an appropriate comprehensive support plan for the care and

treatment of RS to include measurable objectives and outcomes to meet RS's needs;

ll. In failing to properly and thoroughly assess, evaluate, and comprehend RS's condition, particularly considering his medical history and condition;

mm. In failing to formulate, adopt and enforce adequate rules, regulations, policies, and procedures to ensure RS received all the medical care, treatment, and procedures that were necessary under the circumstances;

nn. In failing to formulate, adopt and enforce adequate rules, regulations, policies, procedures, and protocols that would have ensured that adequate medical care and treatment was provided to RS, particularly considering his symptoms and diagnoses;

oo. In failing to follow and require that the administrative, medical, nursing, and therapeutic staff members who cared for RS followed and complied with any rules, regulations, policies, procedures, and protocols Wellspan may have formulated and adopted relative to patients like RS;

pp. In failing to require that their agents, servants, employees, representatives, staff members, and other health care providers and ostensible agents report the deficient, negligent, inadequate, and substandard medical care and treatment RS received from their nurses, therapists, and other medical staff members to supervisory and/or administrative staff who might have contacted consultants, specialists, and/or experts to ensure that RS received the quality medical care and treatment to which he was entitled;

qq. In failing to control the conduct of their staff members, physicians, nurses, and other medical providers who cared for RS, thereby rendering Wellspan negligent under principles of respondeat superior, with the negligence of their agents, servants, employees, representatives, staff members, physicians, nurses, and other health care providers being automatically imputed to it;

rr. In holding out to the public, including SS and RS, their staff members, physicians, nurses, and other medical providers who cared for RS as being their agents, servants, employees, and/or representatives, even if otherwise independent contractors, thereby rendering Wellspan liable under principles of ostensible agency, particularly with respect to the acts and/or omissions as more specifically set forth herein; and

ss. In failing to adhere to and provide medical care and treatment to RS in accordance with the standard of care within the medical community in which they practice as averred herein.

239. At all relevant times, physicians, nurses, and other health care providers who evaluated, treated, monitored, or otherwise rendered care to RS were practicing medicine and/or

furnishing health care services within the walls of, and/or, under the auspices, control, or supervision of Wellspan.

240. Wellspan knew or, in the exercise of reasonable care as a hospital entity, should have known of the policies, procedures, practices, and conduct of the physicians, nurses, and other staff who rendered care to RS as well as of the systemic deficiencies and risks created by such policies, procedures, practices, and conduct.

241. Notwithstanding its non-delegable duties and obligations as set forth above, Wellspan was corporately and institutionally negligent and careless in that it failed to uphold the proper standard of care owed directly to RS as per the above stated failures.

242. The above-described acts and omissions of Wellspan constitute corporate and institutional negligence and represent breaches of the direct, non-delegable duties owed by Wellspan to RS under Pennsylvania law.

243. As a direct, proximate, factual, and legal result of Byers' conduct as aforesaid, RS has suffered, and will continue to suffer the aforementioned severe, serious, and permanent injuries, damages, losses, and harm.

244. Based on the facts as averred above, the actions of Wellspan, by and through its medical and nursing staffs, were intentional, malicious, willful, wanton, reckless, objectively unreasonable, and undertaken with deliberate and reckless indifference to RS's health, safety, and well-being and warrants the imposition of punitive damages against Wellspan.

WHEREFORE, SS, as parent and natural guardian of RS, demands judgment in her favor against the Wellspan York Hospital together with punitive damages, compensatory damages, interest, attorneys' fees and cost, and such other relief as this Court deems appropriate.

**COUNT VIII**

**SS, AS PARENT AND NATURAL GUARDIAN OF RS v. WELLSPAN YORK HOSPITAL**

**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

245. SS incorporates herein by reference as though fully set forth at length the averments set forth in paragraphs 1 through 244 above.

246. The foregoing paragraphs are hereby incorporated as if fully set forth herein.

247. By and through his aforesaid conduct of its agents and employees, Wellspan acted toward RS in an extreme and outrageous manner.

248. As a result of Wellspan's conduct, which was extreme and outrageous, RS suffered, and continues to suffer, severe emotional distress.

249. Wellspan's conduct was knowing, intentional, willful, malicious, and reckless, and/or with a wanton disregard for RS's rights and RS suffers, and continues to suffer severe, serious, and potentially permanent injuries, damages, losses, and harm and warrant the imposition of punitive damages in favor Plaintiff.

WHEREFORE, SS, as parent and natural guardian of RS, demands judgment in her favor against the Wellspan York Hospital together with punitive damages, compensatory damages, interest, attorneys' fees and cost, and such other relief as this Court deems appropriate.

Respectfully submitted,

**THE FARNETH LAW GROUP, LLC**

Dated: August 28, 2026

By: *<u>/s/George R. Farneth II, Esquire</u>*
George R. Farneth II, Esquire
445 Fort Pitt Blvd., Suite 160
Pittsburgh, PA 15219
Tel: (412) 863-7092
Fax: (412) 586-4713
Email: grf@farnethlaw.com
PA ID #53914
WV ID #10749

**BRENLOVE & FULLER, LLC**

By: */s/ Nicholas A. Miller, Esquire*
Nicholas A. Miller, Esq.
401 Washington Avenue
Bridgeville, PA 15017
PA ID: 204141
412-221-0640 x 112
nmiller@brenlovefuller.com

*Attorneys for Plaintiff*