**DEREK SMITH LAW GROUP, PLLC**
CATHERINE W. LOWRY, ESQUIRE
Attorney ID No. 316291
1628 Pine Street
Philadelphia, PA 19103
(267) 857-0832
catherine@dereksmithlaw.com
*Attorneys for Plaintiff Jane Doe*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JANE DOE,<br><br>Plaintiff,<br><br>v.<br><br>SCHUYLKILL COUNTY; GEORGE HALCOVAGE (in his individual capacity); GARY BENDER (in his individual capacity); ANTHONY KERN (in his individual capacity); and ELAINE GILBERT (in her individual capacity);<br><br>Defendants. | Civil Action No.<br><br>PLAINTIFF DEMANDS A TRIAL BY JURY |

**COMPLAINT**

Plaintiff, Jane Doe, by and through her attorneys, Derek Smith Law Group, PLLC, by way of this Complaint, states:

**NATURE OF THE CASE**

1. This action arises from unlawful discrimination and a hostile work environment created by Defendants against Plaintiff based on her sex/gender, as well as unlawful retaliation in response to Plaintiff's reports and opposition to Defendants' discriminatory conduct.

2. Plaintiff brings this action charging that Defendants violated her rights pursuant to Title VII of the Civil Rights Act of 1964 (“Title VII”), and the Pennsylvania Human Relations

Act, as amended, 43 P.S. §§ 951, et seq. ("PHRA").

3. Plaintiff seeks damages to redress the injuries she has suffered as a result of Defendants' actions.

## JURISDICTION AND VENUE

4. This Court has original subject matter jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331, which confers upon district courts jurisdiction over all civil actions arising under the Constitution, laws, and treaties of the United States.

5. This Court has jurisdiction over Plaintiff's claims arising under Title VII of the Civil Rights Act of 1964 pursuant to 42 U.S.C. § 2000e-5(f)(3).

6. This Court has supplemental jurisdiction over Plaintiff's claims arising under the Pennsylvania Human Relations Act, 43 P.S. §§ 951, et seq., pursuant to 28 U.S.C. § 1367(a), as those claims are so related to Plaintiff's federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

7. Venue is proper in the Middle District of Pennsylvania pursuant to 42 U.S.C. § 2000e-5(f)(3), in that the unlawful employment practices alleged herein were committed within this district, the employment records relevant to such practices are maintained and administered within this district, and Plaintiff would have continued to work within this district but for the alleged unlawful employment practices. Venue is also proper pursuant to 28 U.S.C. § 1391(b), in that Defendant Schuylkill County is a political subdivision situated within this district, the individual Defendants reside within this district, and a substantial part of the events and omissions giving rise to Plaintiff's claims occurred within this district.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

8. On January 17, 2024, Plaintiff timely filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC"), designated Charge No. 530-2024-02742, alleging sex/gender discrimination, sexual harassment, hostile work environment, and retaliation in violation of Title VII.

9. Plaintiff's Charge was simultaneously dual-filed with the Pennsylvania Human Relations Commission ("PHRC") pursuant to the work-sharing agreement between the EEOC and the PHRC, alleging the same conduct in violation of the PHRA.

10. More than one year has elapsed since Plaintiff's Charge was filed with the PHRC. The PHRC has not entered into a conciliation agreement to which Plaintiff is a party, and Plaintiff has not received notice that the PHRC has dismissed the complaint or otherwise obtained relief on her behalf. Plaintiff is therefore entitled to bring this action pursuant to 43 P.S. § 962(c)(1).

11. More than one hundred eighty (180) days have elapsed since Plaintiff's Charge was filed with the EEOC on January 17, 2024. Plaintiff, through counsel, requested that the EEOC terminate its processing of the Charge and issue a Notice of Right to Sue by letters dated July 24, 2026, September 2, 2026, and September 16, 2026. As of the date of this Complaint, the EEOC has not issued a Notice of Right to Sue.

12. Plaintiff is entitled to commence this action notwithstanding the EEOC's failure to issue a Notice of Right to Sue. *See* 42 U.S.C. § 2000e-5(f)(1); *Occidental Life Ins. Co. v. EEOC*, 432 U.S. 355, 361 (1977) (charging party need only permit the EEOC 180 days to investigate before demanding a right-to-sue letter and proceeding to federal court); *Gooding v. Warner-Lambert Co.*, 744 F.2d 354, 358 (3d Cir. 1984) (issuance and receipt

of a Notice of Right to Sue is not a jurisdictional prerequisite to suit under Title VII); *Fort Bend Cnty. v. Davis*, 139 S. Ct. 1843, 1851 (2019) (Title VII's administrative exhaustion requirements are mandatory claim-processing rules, not jurisdictional).

13. Plaintiff has exhausted all administrative remedies and satisfied all conditions precedent to the institution of this action.

**PARTIES**

14. Plaintiff Jane Doe (hereinafter referred to as “Plaintiff”) proceeds herein under the pseudonym "Jane Doe" because public identification would cause her severe emotional harm and because of the need to protect the identity of victims of sexual harassment and sexual assault.

15. Plaintiff is an adult female individual residing in the Commonwealth of Pennsylvania.

16. At all times material hereto, Plaintiff was employed by a Pennsylvania limited liability company engaged in the business of providing commercial cleaning services (the "Cleaning Contractor").

17. At all times material hereto, the Cleaning Contractor provided cleaning services to the Schuylkill County Courthouse pursuant to a written agreement with Schuylkill County.

18. Plaintiff has omitted the name of the Cleaning Contractor from this Complaint because identification of that entity would reveal Plaintiff's identity. Defendants are aware of the identity of the Cleaning Contractor, which was identified in the proceedings before the EEOC. Plaintiff will disclose the identity of the Cleaning Contractor to the Court and to Defendants in such manner as the Court may direct.

19. Defendant Schuylkill County (hereinafter "Defendant SC”) is a county and political subdivision of the Commonwealth of Pennsylvania, with its principal offices located at 401 N. Second Street, Pottsville, Pennsylvania 17901.

20. At all times material hereto, Defendant SC employed fifteen (15) or more employees for each working day in each of twenty (20) or more calendar weeks in the current or preceding calendar year.

21. At all times material hereto, Defendant SC has continuously been an employer engaged in an industry affecting commerce within the meaning of 42 U.S.C. § 2000e(b), (g), and (h).

22. At all times material hereto, Defendant SC was an "employer" within the meaning of 43 P.S. § 954(b), which expressly includes the Commonwealth and any political subdivision thereof, and further employed four or more persons within the Commonwealth of Pennsylvania.

23. At all times material hereto, Defendant SC was a "person" within the meaning of 43 P.S. § 954(a), which expressly includes the Commonwealth of Pennsylvania and all political subdivisions, authorities, boards and commissions thereof.

24. At all times material hereto, Defendant SC exercised control over the manner and means by which Plaintiff performed her work, as set forth more fully below, and Defendant SC and the Cleaning Contractor were joint employers of Plaintiff within the meaning of Title VII and the PHRA.

25. In the alternative, and pursuant to Fed. R. Civ. P. 8(d)(2) and (3), in the event Plaintiff is determined not to have been an employee or joint employee of Defendant SC, Plaintiff avers that she performed services for Defendant SC pursuant to contract, and that Defendant SC is subject to 43 P.S. § 955(d) as a "person" within the meaning of 43 P.S. § 954(a).

26. On January 17, 2023, the United States District Court for the Middle District of Pennsylvania approved and entered a Consent Decree between the United States

Department of Justice and Defendant SC in *Doe v. Schuylkill County*, No. 3:21-cv-477 (M.D. Pa.)(the "Doe Action").

27. A true and correct copy of the Consent Decree, entered at ECF No. 197 in the Doe Action, is attached hereto as Exhibit 1 and incorporated herein by reference (the "Consent Decree").

28. The Consent Decree was in full force and effect at all times material hereto.

29. The Consent Decree defines "supervisor" to mean "(a) any employee who possesses the authority to direct the work activities of one or more other employees and (b) any employee who has the authority to hire, fire, promote, transfer, or discipline another employee." Consent Decree at ¶ 5.

30. At all times material hereto, Defendant George Halcovage (hereinafter "Defendant Halcovage") was an elected Commissioner of Defendant SC.

31. At all times material hereto, Defendant Halcovage, in his capacity as Commissioner, possessed the authority to direct the work activities of persons performing services for Defendant SC, to vote upon and influence the award of Defendant SC's service contracts, including the cleaning services contract under which Plaintiff performed her work, and to access Defendant SC's Courthouse and offices.

32. At all times material hereto, Defendant Halcovage was a supervisor within the meaning of the Consent Decree and exercised supervisory authority over Plaintiff's work.

33. At all times material hereto, Defendant Gary Bender (hereinafter "Defendant Bender") was the County Administrator for Defendant SC.

34. At all times material hereto, Defendant Bender possessed supervisory authority over employees of Defendant SC, including Defendant Gilbert, and possessed authority with

respect to the administration and award of Defendant SC's service contracts, including the cleaning services contract under which Plaintiff performed her work.

35. At all times material hereto, Defendant Bender was a supervisor within the meaning of the Consent Decree.

36. At all times material hereto, Defendant Anthony Kern (hereinafter "Defendant Kern") was the Human Resources Director for Defendant SC.

37. At all times material hereto, Defendant Kern, in his capacity as Human Resources Director, was an agent of Defendant SC, was charged under the Consent Decree with receiving reports of prohibited harassment and retaliation, and possessed the authority to promote, transfer, or discipline employees of Defendant SC.

38. At all times material hereto, Defendant Elaine Gilbert (hereinafter "Defendant Gilbert") was the Equal Employment Opportunity Officer for Defendant SC.

39. At all times material hereto, Defendant Gilbert, in her capacity as Equal Employment Opportunity Officer, was an agent of Defendant SC, and was charged under the Consent Decree with receiving and investigating complaints of prohibited harassment and retaliation and with ensuring that such investigations were not conducted under the direct or indirect supervision of the alleged harasser.

40. At all times material hereto, Defendant Gilbert reported to and was supervised by Defendant Bender.

41. At all times material hereto, Defendants Halcovage, Bender, Kern, and Gilbert were each a "person" within the meaning of 43 P.S. § 954(a).

42. At all times material hereto, Defendants Halcovage, Bender, Kern, and Gilbert were each an employee of Defendant SC within the meaning of 43 P.S. §§ 954(c) and 955(e).

43. At all times material hereto, each of the individual Defendants was an agent of Defendant SC and acted in a supervisory role within Defendant SC.

44. At all times material hereto, Defendants Halcovage and Bender exercised supervisory authority with respect to the terms and conditions under which Plaintiff performed her work.

45. Each of the individual Defendants is sued in his or her individual capacity.

## MATERIAL FACTS

### A. Plaintiff's Work at Defendant SC's Courthouse and Defendant SC's Control Over That Work

46. For approximately fifteen years prior to 2022, the Cleaning Contractor provided cleaning services to Defendant SC's Courthouse pursuant to successive contracts with Defendant SC.

47. Plaintiff performed cleaning services at Defendant SC's Courthouse as an employee of the Cleaning Contractor beginning in or about January 2022.

48. The Cleaning Contractor's contract with Defendant SC for the cleaning of Defendant SC's Courthouse ran from January 1, 2022, through December 31, 2023.

49. In connection with the bid that resulted in the Cleaning Contractor's January 1, 2022, through December 31, 2023, contract with Defendant SC, the Cleaning Contractor submitted the bid security required by Defendant SC's bid instructions.

50. At all times material hereto, Plaintiff was compensated by the Cleaning Contractor as a W-2 employee.

51. At all times material hereto, the Cleaning Contractor employed approximately eight individuals, including Plaintiff and several others who performed cleaning services at Defendant SC's Courthouse.

52. Plaintiff performed her work on Defendant SC's premises, at Defendant SC's Courthouse located at 401 N. Second Street, Pottsville, Pennsylvania.

53. The offices and areas within the Courthouse that Plaintiff was required to clean were determined by Defendant SC, and neither Plaintiff nor the Cleaning Contractor selected which offices or areas Plaintiff cleaned.

54. By way of example, cleaning of the Commissioners' Suite within the Courthouse was included within the scope of Defendant SC's contract with the Cleaning Contractor, and Plaintiff began performing that work in or about 2023.

55. Defendant SC determined the days and hours during which the cleaning of each office was to be performed.

56. By way of example, Defendant SC's annual holiday schedule established the days on which Defendant SC's offices were closed and cleaning services were not performed.

57. By way of further example, certain offices were required to be cleaned during Defendant SC's business hours, while other offices were required to be cleaned outside of Defendant SC's business hours.

58. Defendant SC issued Plaintiff an electronic access card, which Plaintiff used to access certain offices within the Courthouse.

59. Other offices, including the Commissioners' Suite and the District Attorney's office, could be entered by Plaintiff and other employees of the Cleaning Contractor only when they were admitted by an official or employee of Defendant SC.

60. The Commissioners' Suite was cleaned after 5:00 PM on Tuesdays and Fridays, and on at least some of those occasions Defendant Bender or Defendant Halcovage personally admitted Plaintiff and other employees of the Cleaning Contractor into the Commissioners' Suite.

61. Defendant SC provided the trash bags used in performing the cleaning services and provided a storage area within the Courthouse in which Plaintiff stored the Cleaning Contractor's cleaning supplies and equipment throughout the term of the contract.

62. Officials and employees of Defendant SC directed Plaintiff in the performance of her day-to-day work at the Courthouse.

63. By way of example, and not by way of limitation, Plaintiff was instructed to leave the trash bag in trashcans that contained no food, stains, or spills, in order to save Defendant SC money.

64. By way of further example, on one occasion, Defendant Halcovage instructed Plaintiff to dust Defendant Bender's desk because Defendant Bender would appreciate it.

65. Plaintiff did as Defendant Halcovage instructed and dusted Defendant Bender's desk.

66. Upon information and belief, on at least one occasion Defendant Bender reviewed Defendant SC's video surveillance footage in order to investigate whether an employee of the Cleaning Contractor had taken an item of food missing from within the Courthouse, and determined that the item had been taken by another contractor of Defendant SC.

67. Defendant SC thus used its own surveillance systems to investigate and evaluate the workplace conduct of the individuals performing cleaning services within the Courthouse, including Plaintiff.

68. Defendant SC compensated the Cleaning Contractor for the cleaning services Plaintiff performed, and the Cleaning Contractor in turn compensated Plaintiff for performing that work.

69. At all times material hereto, Defendant SC exercised control over the manner and means by which Plaintiff performed her work.

**B. Defendant Halcovage's Sexual Harassment of Plaintiff**

70. Prior to the conduct alleged herein, Defendant Halcovage had been the subject of multiple reports of sexual harassment made by women who worked within Defendant SC's Courthouse.

71. Following those reports, Defendant SC conducted an internal investigation, and on June 30, 2020, publicly announced that Defendant Halcovage had violated Defendant SC's Sexual Harassment Policy, Conduct and Disciplinary Action Policy, and Physical and Verbal Abuse Policy. A true and correct copy of Defendant SC's announcement is attached hereto as Exhibit 2 and incorporated herein by reference.

72. In or about March 2021, four female employees of Defendant SC who had reported Defendant Halcovage's conduct commenced the Doe Action in this Court against Defendant SC, Defendant Halcovage, and Defendant Bender, among others, alleging that Defendant Halcovage had sexually harassed them and that Defendant SC, Defendant Bender, and others had retaliated against them for reporting his conduct.

73. On May 12, 2022, the United States intervened in the Doe Action and filed its Complaint of Plaintiff-Intervenor, alleging that Defendant SC had subjected employees to severe and pervasive sexual harassment because of sex in violation of Title VII and had retaliated against them. Doe Action, ECF No. 139.

74. The claims of the United States against Defendant SC were resolved by the Consent Decree.

75. The Consent Decree did not address or affect the claims of the four female employees who commenced the Doe Action, and those claims remained pending throughout 2023.

76. Pursuant to the Consent Decree, Defendant SC agreed that it must enforce the restrictions it had already imposed upon Defendant Halcovage, as described in letters from Defendant SC. Consent Decree ¶ 16.

77. By letter dated May 13, 2021, Defendant SC advised Defendant Halcovage that his access to the Courthouse would continue to be limited to Monday through Friday between the hours of 8:00 AM and 5:00 PM. A true and correct copy of that letter is attached hereto as Exhibit 3 and incorporated herein by reference.

78. As of the entry of the Consent Decree on January 17, 2023, the restrictions described in Exhibit 3 remained in effect, and Defendant SC was thereby obligated to enforce them.

79. Defendant Bender received a copy of the May 13, 2021, letter.

80. Shortly after Plaintiff began cleaning the Commissioners' Suite in or about 2023, Defendant Halcovage began speaking with Plaintiff about her family.

81. Defendant Halcovage would ask Plaintiff about her grandmother, with whom he attended church, and would mention Plaintiff's late father and how proud her father would be of her.

82. Plaintiff's late father's first name was George, as is Defendant Halcovage's.

83. Defendant Halcovage made the comment "You need to listen to this George now," thereby invoking the name of Plaintiff's late father and positioning himself as a father figure to Plaintiff.

84. Upon information and belief, Defendant Halcovage invoked Plaintiff's late father and her family in order to cultivate Plaintiff's trust, emotional attachment, and sense of obligation toward him, so that Plaintiff would be less likely to perceive his subsequent conduct as improper or to report it.

85. Over time, Defendant Halcovage began to comment on how hard a worker Plaintiff was and that Plaintiff was wise beyond her years.

86. Thereafter, Defendant Halcovage's comments escalated to remarks regarding Plaintiff's physical appearance, including how good-looking and how beautiful Plaintiff was.

87. Defendant Halcovage's comments regarding Plaintiff's physical appearance included calling Plaintiff a "knockout" and telling her "[y]ou have me completely blown away. I mean look at you. Come on look at you."

88. Upon information and belief, Defendant Halcovage escalated his comments incrementally in order to test Plaintiff's willingness to tolerate personal and sexualized attention from him without objecting or reporting him.

89. Defendant Halcovage also repeatedly made comments to Plaintiff regarding his power and influence within Defendant SC, which caused Plaintiff to understand that Defendant Halcovage had the authority to affect her continued work and income.

90. By way of example, Defendant Halcovage told Plaintiff that he was "well known" and that he "know[s] everybody."

91. On a Friday in or about October 2023, Plaintiff entered Defendant Halcovage's office to empty his trash.

92. Defendant Halcovage was seated in his office with Al Groskowski.

93. While speaking with Mr. Groskowski, Defendant Halcovage held up an iPad to Plaintiff bearing a note that read "what is your cell phone number for future concerns," or words to that effect.

94. Given the circumstances, and Defendant Halcovage's position of authority within Defendant SC, Plaintiff provided him with her cell phone number.

95. Defendant Halcovage texted Plaintiff later that same day.

96. Defendant Halcovage's text message addressed nothing related to Plaintiff's work.

97. Around that same time, Defendant Halcovage requested to become Plaintiff's Facebook friend.

98. Plaintiff accepted the friend request because of Defendant Halcovage's authority as a Commissioner of Defendant SC, including his authority to influence the award of Defendant SC's cleaning services contracts, and because Plaintiff feared that refusing would jeopardize her continued work and income.

99. After further consideration, Plaintiff changed her Facebook privacy settings to limit the information Defendant Halcovage could access on her account.

100. A few days later, when Plaintiff was in Defendant Halcovage's office, he questioned why he could not see certain content on Plaintiff's Facebook account.

101. Defendant Halcovage pulled up Plaintiff's Facebook account on his cell phone and showed Plaintiff that his access had been limited.

102. Uncomfortable, Plaintiff laughed and told Defendant Halcovage she was not sure why he could not see her full Facebook account.

103. Defendant Halcovage then pressed Plaintiff and commented that she was technologically savvy.

104. Plaintiff, uncomfortable and unsure how to proceed, told Defendant Halcovage she would fix the issue, which was untrue.

105. Plaintiff never changed her settings, because Defendant Halcovage having full access to her Facebook information made her uncomfortable and emotionally distressed.

106. Also, in or about that time, Plaintiff was again in Defendant Halcovage's office when Defendant Halcovage told Plaintiff that he did not know how to use Snapchat.

107. During this same interaction, Defendant Halcovage commented that Plaintiff "was a smoke show."

108. Defendant Halcovage then handed Plaintiff his cell phone and instructed Plaintiff to add herself on Snapchat.

109. Plaintiff did as Defendant Halcovage instructed, again because of Defendant Halcovage's authority as a Commissioner of Defendant SC and because Plaintiff feared that refusing would jeopardize her continued work and income.

110. At no time did Defendant Halcovage identify any business or work-related purpose for communicating with Plaintiff by Snapchat.

111. Snapchat is a mobile messaging application in which messages, photographs, and videos exchanged between users are, by default, deleted after being viewed and are not retained in the ordinary course as a record of the communication.

112. Upon information and belief, Defendant Halcovage instructed Plaintiff to add herself on Snapchat because he intended to send Plaintiff communications of a sexual nature and to solicit such communications from Plaintiff.

113. At the time Defendant Halcovage instructed Plaintiff to add herself on Snapchat, Defendant Halcovage was a defendant in the Doe Action, which remained pending.

114. Upon information and belief, Defendant Halcovage was aware, as a defendant in the Doe Action, that written communications may be used as evidence in support of allegations of sexual harassment.

115. Upon information and belief, Defendant Halcovage therefore selected Snapchat as a means of communicating with Plaintiff because the application does not preserve a record of the communications exchanged through it, and in order to make it more difficult for Plaintiff to report his conduct or to substantiate any report she might make.

116. Thereafter, on numerous occasions, Defendant Halcovage contacted Plaintiff via Snapchat.

117. Defendant Halcovage's Snapchat messages included requests that Plaintiff send him a photograph.

118. When Plaintiff did not respond, Defendant Halcovage would follow up by Snapchat, telling Plaintiff he was "looking forward to her photo," and complimenting how gorgeous Plaintiff was.

119. Defendant Halcovage also contacted Plaintiff on numerous occasions through Facebook Messenger, text message, and by telephone.

120. Defendant Halcovage's comments and conduct caused Plaintiff extreme distress.

121. Defendant Halcovage thereafter began telling Plaintiff that she could trust him, that she should trust him, and that he would help her.

122. By way of example, Defendant Halcovage told Plaintiff that he owned a private insurance company and could offer competitive rates to Plaintiff's employer, thereby presenting himself to Plaintiff as a person willing and able to confer financial benefits upon Plaintiff and her employer.

123. On separate occasions, Defendant Halcovage represented to Plaintiff that he had already intervened on her behalf within Defendant SC.

124. Specifically, Defendant Halcovage mentioned to Plaintiff Defendant Bender's review of the surveillance footage concerning the missing item of food and implied that he had directed Defendant Bender to review the footage in order to clear the Cleaning Contractor's name.

125. Defendant Halcovage also told Plaintiff that he had informed Defendant Bender that Plaintiff had gone above and beyond by dusting his desk, and that Defendant Bender had expressed appreciation.

126. Upon information and belief, Defendant Halcovage made these offers and representations, and took credit for these events, in order to cultivate Plaintiff's trust, gratitude, and dependence upon him, to position himself as a person able to protect and advance her interests within Defendant SC, and so that Plaintiff would not report his unwanted, unwelcome, and unlawful comments and conduct.

127. On one occasion when Plaintiff entered Defendant Halcovage's office to empty his trash, Defendant Halcovage was seated at his desk and his trashcan was positioned beneath the desk.

128. Plaintiff was uncomfortable reaching for Defendant Halcovage's trashcan because doing so would require her to reach toward his groin area.

129. Plaintiff was uncomfortable because of Defendant Halcovage's numerous prior comments regarding her physical appearance and because Defendant Halcovage had repeatedly contacted her outside of working hours regarding matters unrelated to her work.

130. Plaintiff asked Defendant Halcovage whether he had any trash.

131. Defendant Halcovage replied that he did have trash.

132. Defendant Halcovage moved his chair back only slightly and did not move away from his desk, leaving Plaintiff without sufficient room to reach the trashcan without reaching toward his body.

133. Because Plaintiff could see that there was no food, stain, or spill in the trashcan, and consistent with Defendant SC's instruction, Plaintiff approached Defendant Halcovage while holding open a larger trash bag, and Defendant Halcovage placed the papers from his trashcan into the bag Plaintiff was holding.

134. While doing so, Defendant Halcovage touched Plaintiff's vaginal area with his hands.

135. Defendant Halcovage's contact with Plaintiff's vaginal area was intentional and was not incidental to the transfer of papers into the trash bag.

136. Defendant Halcovage's conduct was a further escalation of his course of conduct, by which he progressively tested Plaintiff's willingness to tolerate increasingly intrusive sexual conduct without objecting or reporting him.

137. Defendant Halcovage's conduct caused Plaintiff discomfort, caused her to feel violated, and caused her severe emotional distress.

138. On multiple occasions during 2023, prior to December 1, 2023, Defendant Halcovage kept Plaintiff in his office past 5:00 PM while Defendant Bender remained elsewhere within the Commissioners' Suite. On these occasions, when Defendant Bender left for the day, he walked past Defendant Halcovage's office without looking in, while Defendant Halcovage said words to the effect of "see you tomorrow," "see you later," or

"see you next week" to Defendant Bender, and Defendant Bender responded only with a grunt or similar acknowledgment, without addressing Plaintiff's presence alone with Defendant Halcovage after hours.

139. In or about late October 2023, Defendant Halcovage requested a copy of the bid packet the Cleaning Contractor was preparing for cleaning contracts to commence in January 2024.

140. Defendant Halcovage requested that Plaintiff meet him at a local Dunkin' Donuts.

141. Plaintiff agreed to meet Defendant Halcovage outside the Courthouse because of Defendant Halcovage's authority as a Commissioner of Defendant SC, including his authority to influence the award of Defendant SC's cleaning services contracts, and because Plaintiff feared that refusing would jeopardize her continued work and income.

142. Plaintiff met Defendant Halcovage at the Dunkin' Donuts and provided him with a copy of the bid packet.

143. Defendant Halcovage, in his capacity as a Commissioner of Defendant SC, voted upon the entry of the Consent Decree and was aware that it had been entered, and therefore had actual knowledge of its terms and of the restrictions upon his access to the Courthouse.

144. On a subsequent occasion, in or about late October or early November 2023, after 5:00 PM, Defendant Halcovage returned copies of the bid packet to Plaintiff in Defendant SC's Human Resources office, and upon information and belief retained the original.

145. At the time Defendant Halcovage returned the bid packet to Plaintiff, he was not permitted to be present in the Courthouse under the restrictions described above.

146. In or about November 2023, Defendant Halcovage contacted Plaintiff and again asked for the bid packet.

147. Plaintiff, having forgotten that she had previously provided Defendant Halcovage with a copy of the bid packet, told him that she did not have it with her but would try to get it to him.

148. The next day, Defendant Halcovage again contacted Plaintiff about the bid packet.

149. Plaintiff told Defendant Halcovage that she was in the parking lot of a Staples store, where she had been working on the bid packet, and Defendant Halcovage told Plaintiff that he was leaving the Courthouse and would meet her there.

150. Upon information and belief, Defendant Halcovage's requests for the bid packet on these two occasions were a pretext employed to create opportunities for contact with Plaintiff.

151. When Defendant Halcovage arrived at the Staples, he did not get out of his car.

152. Plaintiff, apprehensive because of Defendant Halcovage's authority as a Commissioner of Defendant SC and its bearing upon her continued work and income, approached Defendant Halcovage's vehicle, and Defendant Halcovage instructed Plaintiff to "get in [his] car," or words to that effect.

153. While Plaintiff was in Defendant Halcovage's car, Defendant Halcovage made comments to Plaintiff including telling her how “beautiful” she was.

154. Plaintiff eventually provided Defendant Halcovage with the bid packet.

155. Defendant Halcovage then discussed with Plaintiff the rates he believed would be appropriate and that would lead to Defendant SC accepting the bid.

156. The next day, Defendant Halcovage returned a copy of the bid packet to Plaintiff.

157. On or about November 28, 2023, Defendant Halcovage sent Plaintiff a Snapchat message asking whether she was in the Courthouse yet.

158. Plaintiff delayed responding for as long as she could.

159. Plaintiff ultimately responded because Defendant Halcovage messaged her numerous times and telephoned her.

160. Plaintiff feared that a failure to respond to Defendant Halcovage would jeopardize her continued work and income.

161. Upon arriving at the Courthouse at approximately 4:45 PM, Plaintiff went into the Commissioners' Suite.

162. When Plaintiff arrived, she observed Defendant Kern leaving the Human Resources office and walking toward the elevator outside the Commissioners' Suite.

163. Other than Defendant Kern, all employees, including Defendant Bender, had left for the day.

164. Plaintiff made eye contact with Defendant Kern.

165. Upon information and belief, Defendant Kern observed that Plaintiff was speaking with another person within the Commissioners' Suite, and was able to see from his position that the person was Defendant Halcovage.

166. Defendant Kern did not enter the Commissioners' Suite to determine who was present, whether Plaintiff was all right, or to ensure that Plaintiff was not alone with Defendant Halcovage.

167. At all times material hereto, Defendant Kern possessed the authority to direct the work activities of one or more employees of Defendant SC and was therefore a supervisor within the meaning of the Consent Decree.

168. Under the Consent Decree, "[s]upervisors must promptly report to [Defendant SC's] EEO Officer any prohibited forms of harassment and/or retaliation they observe, hear about, or learn about through an employee complaint or otherwise," and supervisors who fail to do so are subject to discipline as permitted by law. Consent Decree ¶ 12.

169. Under the Consent Decree, the term "'[p]rohibited forms of harassment' is not confined only to harassment so severe or pervasive as to create a hostile work environment under Title VII," so that Defendant SC would have the "opportunity to learn of and address harassment before it creates a hostile work environment." Consent Decree ¶ 3.

170. Defendant Kern did not report to Defendant SC's EEO Officer that he had observed Defendant Halcovage alone with Plaintiff in the Commissioners' Suite at the end of the business day, after all other employees had departed.

171. After Defendant Kern exited the Courthouse, Defendant Halcovage said to Plaintiff, "look at all the things you have in your hand."

172. Plaintiff, who was holding a sound bar used to play music, responded that she liked to play music while she cleaned.

173. Plaintiff mentioned that she placed the sound bar in her bra because she was concerned Defendant Halcovage would think she was not cleaning if her hands were full.

174. Defendant Halcovage then instructed Plaintiff to place the sound bar in her bra in front of him.

175. Plaintiff declined numerous times, to which Defendant Halcovage repeatedly responded "just do it" and "my daughters do it all the time."

176. Plaintiff ultimately and reluctantly complied, as Defendant Halcovage would not accept her refusals.

177. Plaintiff was so distraught over what was occurring that she believes she blacked out.

178. Plaintiff only vaguely recalls Defendant Halcovage discussing the upcoming cleaning contract bids and suggesting that Plaintiff speak with Defendant Bender regarding the bid.

179. Plaintiff believes that on this same occasion, or at or around the time Defendant Halcovage was requesting the bid packet from her, Defendant Halcovage told her, "I see you on camera," or words to that effect.

180. Defendant Halcovage's conduct on November 28, 2023 described above occurred after 5:00 PM, at a time when Defendant Halcovage was not permitted access to Defendant SC's Courthouse under the restrictions described above.

**C. Plaintiff's Reports of Harassment and Defendants' Retaliation**

181. On Friday, December 1, 2023, Plaintiff sent an email to Defendant Bender, Defendant Kern, and Defendant SC's two other Commissioners, Gary Hess and Barron Hetherington, reporting that she had "been subject to sexual harassment and sexual assault by [Defendant] Halcovage."

182. On the same day, December 1, 2023, the Cleaning Contractor submitted to Defendant SC its bid for the cleaning services contract to commence January 1, 2024.

183. Prior to submitting the bid on December 1, 2023, Plaintiff told Defendant Halcovage that she was unable to obtain the certified check required as bid security. Defendant Halcovage told Plaintiff to submit the bid regardless, stated that his insurance company might be able to obtain the check, and stated that he would speak with Defendant Bender about securing the contract for Plaintiff without it. Defendant Halcovage also told Plaintiff that he did not believe a certified check should be required for a bid of this kind.

184. On or about Monday, December 4, 2023, Defendant Gilbert contacted Plaintiff and requested to meet with her to discuss her report of sexual harassment and sexual assault by Defendant Halcovage.

185. Defendant Gilbert reported to and was supervised by Defendant Bender.

186. Defendant Bender reported to and was supervised by Defendant SC's Commissioners, including Defendant Halcovage.

187. Under the Consent Decree, "[i]ndividuals who investigate complaints of prohibited forms of harassment and/or retaliation shall not be under the direct or indirect supervision of the alleged harasser or retaliator." Consent Decree ¶ 12.

188. Defendant Gilbert was under the indirect supervision of Defendant Halcovage and therefore should not have conducted the investigation of Plaintiff's reports.

189. On December 5, 2023, Plaintiff met with Defendant Gilbert and provided her with a written statement detailing Defendant Halcovage's comments and conduct.

190. During that meeting, Plaintiff provided Defendant Gilbert with all information Defendant Gilbert requested that Plaintiff was able to provide.

191. Later on December 5, 2023, Plaintiff went to the Commissioners' Suite to perform her scheduled cleaning.

192. Defendant Bender was the only person present.

193. Defendant Bender and Plaintiff had a conversation during which Plaintiff told Defendant Bender that she was upset about what Defendant Halcovage had done.

194. Plaintiff began to cry as she recounted what Defendant Halcovage had done and said to her.

195. Defendant Bender responded, "[y]ou have every right to feel that way."

196. Plaintiff then asked Defendant Bender, "[w]hy did you let him here still?"

197. Defendant Bender replied, "[h]e is elected by the people," "I'm sorry that this happened. I feel guilty. I can't believe this happened under my nose," "[Defendant Halcovage] has a sickness," and "it will never happen again."

198. In 2020, Defendant Bender had been notified of the prior allegations of sexual harassment against Defendant Halcovage upon their receipt and had directed the conduct of Defendant SC's internal investigation into those allegations. See Exhibit 2.

199. On December 11, 2023, Defendant Gilbert telephoned Plaintiff and asked her additional questions about Defendant Halcovage's comments and conduct.

200. Defendant Gilbert used language that caused Plaintiff to believe that Defendant Gilbert and Defendant SC did not believe her and were not taking her report seriously.

201. Plaintiff became emotionally distressed and ended the call.

202. Plaintiff thereafter emailed Defendant Gilbert, Defendant Kern, Defendant Bender, and Commissioner Hess, raising concerns regarding Defendant Gilbert's choice

of language, her concern that the investigation would not be fully and fairly conducted, and the fact that Defendant Gilbert reported to Defendant Halcovage.

203. Plaintiff further requested "that someone else, someone who does not report to [Defendant] Halcovage, investigate [her] complaints and concerns."

204. Defendant Gilbert responded the following day and apologized for her statements and questions.

205. Defendant Gilbert advised Plaintiff that she would leave Plaintiff's request for a different investigator "up to [Defendant] Bender and/or [Defendant] Kern."

206. No third party investigator retained by Defendant SC ever contacted Plaintiff regarding her reports of sexual harassment and sexual assault.

207. Plaintiff has never received any communication from Defendant SC advising her of the outcome or disposition of her reports of sexual harassment and sexual assault.

208. Upon information and belief, Defendant SC's investigation of Plaintiff's reports of sexual harassment and sexual assault was never completed.

209. Upon information and belief, Defendant SC originally anticipated that the decision regarding the cleaning services contract would be made on or about December 13, 2023.

210. Prior to December 13, 2023, Defendant Bender advised Plaintiff that a decision regarding the cleaning services contract would be made the following week.

211. On December 14, 2023, having received no decision, Plaintiff emailed Defendant Bender and Commissioners Hess and Hetherington, requesting that Defendant Bender advise her when she could expect to learn whether the bid had been accepted so that she could plan and prepare her staff.

212. Defendant Bender did not respond to Plaintiff's December 14, 2023, email.

213. On Tuesday, December 19, 2023, Plaintiff again emailed Defendant Bender and Commissioners Hess and Hetherington, noting that the Commissioners' agenda for the following day listed a request that the Commissioners approve "a contract for Diversified Maintenance-RWS LLC, for the cleaning of the Schuylkill County Courthouse from January 1, 2024, to December 31, 2024, at $143,412.32," stating that she assumed her bid had not been accepted, and asking Defendant Bender to let her know.

214. Defendant Bender did not respond to Plaintiff's December 19, 2023, email.

215. On the evening of Tuesday, December 19, 2023, Plaintiff went to the Commissioners' Suite at approximately 5:45 PM to perform her scheduled cleaning.

216. Defendant Bender was not present, the lights within the Commissioners' Suite were off, and the door was locked.

217. As a result, Plaintiff and another employee of the Cleaning Contractor were unable to perform the scheduled cleaning of the Commissioners' Suite.

218. On the morning of December 20, 2023, Plaintiff emailed Defendant Bender reporting that she had been unable to access the Commissioners' Suite the previous evening and again requesting a response regarding the status of the bid.

219. In that email, Plaintiff wrote that the absence of any response had left her and the Cleaning Contractor's employees feeling "anxious, stressed, and ignored," that she "was never made to feel this way before reporting" Defendant Halcovage's behavior toward her, and that she was "beginning to regret [her] decision of speaking up."

220. Plaintiff never received a response from Defendant Bender.

221. Upon information and belief, Defendant Bender failed to respond to Plaintiff's December 14, December 19, and December 20, 2023, emails because of Plaintiff's reports of and opposition to Defendants' unlawful conduct.

222. On December 20, 2023, Defendant SC awarded the cleaning services contract for Defendant SC's Courthouse to Diversified Maintenance-RWS, LLC, and rejected the Cleaning Contractor's bid.

223. As a result of the rejection of the Cleaning Contractor's bid, Plaintiff's work at Defendant SC's Courthouse ended on or about December 31, 2023, and Plaintiff lost the compensation she had earned from performing that work.

224. Nineteen (19) days elapsed between Plaintiff's December 1, 2023, report of sexual harassment and sexual assault and Defendant SC's rejection of the Cleaning Contractor's bid.

225. Upon information and belief, Defendants' decision to reject the Cleaning Contractor's bid and to award the cleaning services contract to another vendor was made because of Plaintiff's reports of and opposition to Defendants' unlawful conduct.

226. The Commissioners' agenda for December 20, 2023 listed a request, made by Public Works Director Kevin Mahall, that the Commissioners approve the award of the cleaning services contract to Diversified Maintenance-RWS, LLC for the period January 1, 2024 through December 31, 2025, at a total contract price of $143,412.32. A true and correct copy of the December 20, 2023 agenda is attached hereto as Exhibit 4 and incorporated herein by reference.

227. At the December 20, 2023 Commissioners' Work Session, Defendant Halcovage stepped out of the meeting before the vote on the cleaning services contract and was

recorded as absent from the roll call vote on that item. Commissioner Hess moved to approve the award of the contract to Diversified Maintenance-RWS, LLC, and Commissioner Hetherington seconded the motion. Commissioner Hess and Commissioner Hetherington each voted to approve the award. A true and correct copy of the minutes of the December 20, 2023 Commissioners' Work Session is attached hereto as Exhibit 5 and incorporated herein by reference.

228. Commissioner Hess and Commissioner Hetherington were each recipients of Plaintiff's December 1, 2023 report that she had been subjected to sexual harassment and sexual assault by Defendant Halcovage.

**D. Damages**

229. The foregoing allegations are illustrative and not exhaustive of the discrimination and retaliation to which Defendants subjected Plaintiff.

230. As a result of Defendants' conduct, Plaintiff has suffered and continues to suffer loss of the compensation and income she earned from performing cleaning services at Defendant SC's Courthouse, together with future pecuniary losses.

231. As a result of Defendants' conduct, Plaintiff has suffered and continues to suffer emotional pain, physical pain, humiliation, embarrassment, degradation, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

232. Defendants' conduct was intentional, willful, and undertaken with knowledge of Defendants' obligations under Title VII, the PHRA, and the Consent Decree.

**COUNT I**
**DISCRIMINATION**
**42 U.S.C. § 2000e-2(a)**
**(against Defendant SC)**

233. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

234. This claim is authorized and instituted pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., as amended, for relief based upon the unlawful employment practices of Defendant SC. Plaintiff complains of Defendant SC's violation of Title VII's prohibition against discrimination in employment based, in whole or in part, upon an individual's sex.

235. 42 U.S.C. § 2000e-2(a) provides that it shall be an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

236. At all times material hereto, Defendant SC was Plaintiff's employer or joint employer within the meaning of Title VII.

237. Defendant SC engaged in unlawful employment practices prohibited by Title VII by intentionally discriminating against Plaintiff with respect to the terms, conditions, and privileges of her work because of her sex.

238. Defendant SC subjected Plaintiff to adverse actions, including subjecting her to unwelcome sexual conduct as a condition of performing her work, conditioning the continuation of her work upon her tolerance of that conduct, and rejecting the bid under which she performed that work.

239. Plaintiff's sex was a determinative factor in Defendant SC's decisions.

240. Defendant SC cannot show any legitimate nondiscriminatory reason for its employment practices, and any reasons proffered by Defendant SC for its actions against Plaintiff are pretextual and can readily be disbelieved. Any argument that the Cleaning Contractor's bid was rejected for lack of bid security is pretextual, in that Defendant Halcovage himself instructed Plaintiff to submit the bid without it and represented that he would resolve the issue.

241. Alternatively, Plaintiff's sex played a motivating part in Defendant SC's decisions even if other factors may also have motivated its actions against Plaintiff.

242. Defendant SC acted with the intent to discriminate.

243. Defendant SC acted upon a continuing course of conduct.

244. As a result of Defendant SC's violations of Title VII, Plaintiff has suffered damages, including but not limited to past and future lost wages and compensation, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation, emotional distress, and other harm, both tangible and intangible.

**COUNT II**
**HOSTILE WORK ENVIRONMENT**
**42 U.S.C. § 2000e-2**
**(Plaintiff against Defendant SC)**

245. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

246. Title VII prohibits hostile work environment harassment, defined as unwanted comments or conduct regarding a plaintiff's protected characteristics that have the purpose or effect of unreasonably interfering with the terms and conditions of the plaintiff's employment. *Harris v. Forklift Systems*, 510 U.S. 17, 21 (1993).

247. An employer is strictly liable for supervisor harassment that culminates in a tangible employment action. *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998).

248. An employer is liable for harassment where the employer knew or should have known of the harassment and failed to take prompt remedial action. *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1486 (3d Cir. 1990).

249. Employer liability also exists where the employer failed to provide a reasonable avenue for complaint. *Huston v. Procter & Gamble Paper Prods. Corp.*, 568 F.3d 100, 105 (3d Cir. 2009).

250. At all times material hereto, Defendant Halcovage was Plaintiff's supervisor, in that he possessed the authority to effect a significant change in the terms and conditions under which Plaintiff performed her work.

251. Defendant Halcovage subjected Plaintiff to unwelcome conduct because of her sex, including repeated comments regarding her physical appearance, repeated contact outside of working hours for no work-related purpose, requests that she send him photographs, directing her to place an object in her brassiere in his presence, and intentionally touching her vaginal area.

252. The conduct was severe or pervasive enough to make a reasonable person in Plaintiff's position believe that the conditions under which she performed her work were altered and that her working environment was intimidating, hostile, or abusive.

253. Plaintiff subjectively regarded the conduct as unwelcome and unwanted.

254. The conduct was emotionally damaging and humiliating and unreasonably interfered with Plaintiff's performance of her work.

255. Defendant SC knew or should have known of Defendant Halcovage's conduct, in that Defendant SC had previously determined that Defendant Halcovage violated its Sexual Harassment Policy, had imposed restrictions upon his presence within the Courthouse, was a defendant in a pending civil action alleging that he had sexually harassed women who worked within the Courthouse, and was subject to the Consent Decree.

256. Defendant Kern observed Defendant Halcovage alone with Plaintiff in the Commissioners' Suite after the close of the business day and failed to report the same to Defendant SC's EEO Officer as the Consent Decree required.

257. Defendant Bender similarly observed Defendant Halcovage keep Plaintiff in his office after 5:00 PM on multiple occasions and failed to report the same to Defendant SC's EEO Officer as the Consent Decree required.

258. Defendant SC failed to exercise reasonable care to prevent and correct the harassing conduct, and failed to provide Plaintiff a reasonable avenue for complaint, in that Defendant SC did not afford Plaintiff the opportunity to complain in writing, did not advise her of the option to complain outside of Defendant SC, permitted the investigation of her reports to be conducted by an individual under the indirect supervision of the alleged harasser, and never advised Plaintiff of the disposition of her reports.

259. Defendant SC acted upon a continuing course of conduct.

260. As a result of Defendant SC's violations of Title VII, Plaintiff has suffered damages, including but not limited to past and future lost wages and compensation, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation, emotional distress, and other harm, both tangible and intangible.

**COUNT III**
**RETALIATION**
**42 U.S.C. § 2000e-3(a)**
**(against Defendant SC)**

261. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

262. 42 U.S.C. § 2000e-3(a) provides that it shall be an unlawful employment practice for an employer to discriminate against any of his employees because she has opposed any practice made an unlawful employment practice by this subchapter, or because she has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

263. A cause of action for retaliation lies whenever the employer responds to protected activity in such a way that might have dissuaded a reasonable worker from making or supporting a charge of discrimination. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).

264. Informal complaints and protests constitute protected activity under the opposition clause of 42 U.S.C. § 2000e-3(a). *Moore v. City of Philadelphia*, 461 F.3d 331, 343 (3d Cir. 2006).

265. A plaintiff need not prove the merits of the underlying discrimination complaint, but only that she was acting under a good faith, reasonable belief that a violation existed. *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1085 (3d Cir. 1996).

266. Retaliation need not be job-related to be actionable, and an employer may retaliate by taking actions not directly related to employment or by causing harm outside the workplace. *White*, 548 U.S. at 61-62.

267. On December 1, 2023, Plaintiff engaged in protected activity by reporting to Defendant Bender, Defendant Kern, and Defendant SC's other Commissioners that she had been subjected to sexual harassment and sexual assault by Defendant Halcovage.

268. Plaintiff thereafter engaged in further protected activity by meeting with Defendant SC's EEO Officer, by providing a written account of Defendant Halcovage's conduct, and by objecting to the manner in which the investigation of her reports was being conducted.

269. Plaintiff acted under a reasonable, good faith belief that her right to be free from discrimination on the basis of sex had been violated.

270. Defendant SC subjected Plaintiff to materially adverse actions after her protected activity, including failing to respond to her inquiries regarding the bid, rejecting the bid under which she performed her work, and thereby ending her work at the Courthouse.

271. Defendant SC's actions were materially adverse because they were serious enough to dissuade a reasonable worker from engaging in protected activity.

272. There was a causal connection between Plaintiff's protected activity and Defendant SC's materially adverse actions, including the unusually suggestive temporal proximity between Plaintiff's December 1, 2023 report and Defendant SC's rejection of the bid nineteen days later, and the fact that Commissioner Hess and Commissioner Hetherington, who moved and seconded the motion to award the contract to Diversified Maintenance-RWS, LLC and who cast the votes approving that award, were among the individuals who received Plaintiff's December 1, 2023 report.

273. Defendant SC cannot show any legitimate nondiscriminatory reason for its actions, and any reasons proffered by Defendant SC are pretextual and can readily be

disbelieved. Any argument that the Cleaning Contractor's bid was rejected for lack of bid security is pretextual, in that Defendant Halcovage himself instructed Plaintiff to submit the bid without it and represented that he would resolve the issue.

274. Defendant SC acted upon a continuing course of conduct.

275. As a result of Defendant SC's violations of Title VII, Plaintiff has suffered damages, including but not limited to past and future lost wages and compensation, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation, emotional distress, and other harm, both tangible and intangible.

**<u>COUNT IV</u>**
**DISCRIMINATION**
**43 P.S. § 955(a)**
**(against Defendant SC)**

276. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

277. 43 P.S. § 955(a) provides that it shall be an unlawful discriminatory practice for any employer, because of the sex of any individual or independent contractor, to refuse to hire or employ or contract with, or to bar or to discharge from employment such individual or independent contractor, or to otherwise discriminate against such individual or independent contractor with respect to compensation, hire, tenure, terms, conditions or privileges of employment or contract.

278. At all times material hereto, Defendant SC was an employer within the meaning of 43 P.S. § 954(b), and was Plaintiff's employer or joint employer.

279. Defendant SC engaged in an unlawful discriminatory practice by discriminating against Plaintiff with respect to the terms, conditions, and privileges of her work because of her sex, and by subjecting her to a hostile work environment because of her sex.

280. As a result of Defendant SC's violations of the PHRA, Plaintiff has suffered damages, including but not limited to past and future lost wages and compensation, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation, emotional distress, and other harm, both tangible and intangible.

**COUNT V**
**RETALIATION**
**PHRA § 955(d)**
**(against All Defendants)**

281. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

282. 43 P.S. § 955(d) provides that it shall be an unlawful discriminatory practice for any person, employer, employment agency or labor organization to discriminate in any manner against any individual because such individual has opposed any practice forbidden by this act, or because such individual has made a charge, testified or assisted, in any manner, in any investigation, proceeding or hearing under this act.

283. Section 955(d) is not limited to employers, and forbids retaliation by "any person" against "any individual."

284. At all times material hereto, Defendant SC was a "person" within the meaning of 43 P.S. § 954(a), which expressly includes the Commonwealth of Pennsylvania and all political subdivisions thereof.

285. At all times material hereto, each of the individual Defendants was a "person" within the meaning of 43 P.S. § 954(a) and an employee of Defendant SC.

286. At all times material hereto, Plaintiff was an "individual" within the meaning of 43 P.S. § 955(d).

287. Plaintiff opposed practices forbidden by the PHRA by reporting Defendant Halcovage's conduct to Defendant Bender, Defendant Kern, and Defendant SC's other Commissioners, by participating in the investigation of her reports, and by objecting to the manner in which that investigation was conducted.

288. Defendants discriminated against Plaintiff because of her opposition to practices forbidden by the PHRA, including by failing to respond to her inquiries regarding the bid, by rejecting the bid under which she performed her work, by failing to investigate her reports through a neutral investigator, and by never advising her of the disposition of her reports.

289. As a result of Defendants' violations of the PHRA, Plaintiff has suffered damages, including but not limited to past and future lost wages and compensation, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation, emotional distress, and other harm, both tangible and intangible.

**COUNT VI**
**AIDING AND ABETTING**
**PHRA § 955(e)**
**(against Individual Defendants)**

290. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

291. 43 P.S. § 955(e) provides that it shall be an unlawful discriminatory practice for any person, employer, employment agency, labor organization or employee, to aid, abet, incite, compel or coerce the doing of any act declared by this section to be an unlawful discriminatory practice, or to obstruct or prevent any person from complying with the provisions of this act or any order issued thereunder, or to attempt, directly or indirectly, to commit any act declared by this section to be an unlawful discriminatory practice.

292. At all times material hereto, each of the individual Defendants was an agent of Defendant SC and acted in a supervisory role within Defendant SC.

293. Defendant Halcovage aided and abetted the unlawful discriminatory practices alleged herein through his own acts of sexual harassment of Plaintiff, including by offering to help Plaintiff obtain bid security and to secure the contract for her without it, by failing to report his own conduct as the Consent Decree required, and by cultivating Plaintiff's trust and dependence upon him in order to prevent her from reporting his conduct.

294. Defendant Bender aided and abetted the unlawful discriminatory practices alleged herein by failing to take prompt and appropriate remedial action upon learning of Defendant Halcovage's conduct, by failing to refer Plaintiff's reports to a neutral investigator, by failing to respond to Plaintiff's inquiries regarding the bid, and by repeatedly observing Defendant Halcovage keep Plaintiff in his office after 5:00 PM without intervening or reporting the same

295. Defendant Kern aided and abetted the unlawful discriminatory practices alleged herein by failing to report to Defendant SC's EEO Officer that he had observed Defendant Halcovage alone with Plaintiff in the Commissioners' Suite after the close of the business day, and by failing to take prompt and appropriate remedial action upon learning of Defendant Halcovage's conduct.

296. Defendant Gilbert aided and abetted the unlawful discriminatory practices alleged herein by conducting the investigation of Plaintiff's reports notwithstanding that she was under the indirect supervision of the alleged harasser, contrary to the Consent Decree, by failing to afford Plaintiff the opportunity to complain in writing or outside of Defendant SC, and by failing to refer Plaintiff's reports to a neutral investigator.

297. In the alternative, and pursuant to Fed. R. Civ. P. 8(d)(2) and (3), the individual Defendants aided and abetted the acts declared unlawful by 43 P.S. § 955(d).

298. As a result of the individual Defendants' violations of the PHRA, Plaintiff has suffered damages, including but not limited to past and future lost wages and compensation, pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, humiliation, emotional distress, and other harm, both tangible and intangible.

## JURY DEMAND

Plaintiff requests a jury trial on all issues to be tried.

## DEMAND TO PRESERVE EVIDENCE

The Defendants are hereby demanded to preserve all physical, documentary, and electronically stored information pertaining in any way to Plaintiff, to her work at Defendant SC's Courthouse, to the Cleaning Contractor, to the claims and damages alleged herein, and to any defenses to the same, including but not limited to: video surveillance footage of the Courthouse, including the Commissioners' Suite, for November 28, 2023 and all other dates on which Plaintiff performed services at the Courthouse; electronic access control records for Plaintiff, employees of the Cleaning Contractor, and Defendant Halcovage; all communications between Defendant Halcovage and Plaintiff in any form, and all devices and accounts used to send them; all documents concerning Plaintiff's December 1, 2023 report and any investigation of it; all documents concerning the solicitation, evaluation, and award of the Courthouse cleaning contract commencing January 1, 2024, including all bids received and all Board of Commissioners records concerning the award; all documents concerning Defendant SC's

contracts with the Cleaning Contractor; all documents concerning restrictions on Defendant Halcovage's Courthouse access and Defendant SC's enforcement of them; all documents concerning any camera, monitoring, or surveillance equipment or feeds located in or accessible from Defendant Halcovage's office; all documents concerning Defendant SC's compliance with the Consent Decree; and all prior complaints of sexual harassment or retaliation against Defendant Halcovage.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendants, jointly and severally, and award the following relief:

a. A declaratory judgment that the actions, conduct, and practices of Defendants complained of herein violate the laws of the United States and the Commonwealth of Pennsylvania;

b. An award of damages for all lost wages, compensation, and benefits, past and future, including back pay and front pay, in an amount to be determined at trial;

c. An award of compensatory damages for emotional pain, humiliation, embarrassment, degradation, inconvenience, loss of enjoyment of life, and other non-pecuniary losses, in an amount to be determined at trial;

d. An award of liquidated damages;

e. An award of pre-judgment and post-judgment interest

f. An award of reasonable attorneys' fees, costs, and disbursements;

g. Such other and further relief as this Court deems just and proper.

Respectfully Submitted,
**DEREK SMITH LAW GROUP, PLLC**
*Attorneys for Plaintiff Jane Doe*

By: /s/ Catherine W. Lowry, Esq.
Catherine W. Lowry, Esq.

1628 Pine Street
Philadelphia, Pennsylvania 19103
Catherine@dereksmithlaw.com
(267) 857-0832

Dated: September 23, 2026