IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **LOGAN CHETAITIS,**<br>419 Royal Drive,<br>Manchester, PA 17345<br><br>*and*<br><br>**TYLER ZELLER,**<br>4621 Fahringer Drive,<br>York, PA 17406<br><br>*and*<br><br>**CHRISTOPHER IRWIN,**<br>145 Devonshire Court,<br>Mount Wolf, PA 17347<br><br>*Plaintiffs*,<br><br>v.<br><br>**NORTHERN YORK COUNTY REGIONAL POLICE COMMISSION,**<br>One Regional Way<br>York, PA 17404<br><br>*and*<br><br>**DAVID L. LASH, individually.**<br>1675 Butter Rd.<br>Dover PA 17315<br><br>*Defendants*. | CIVIL ACTION<br><br>NO.<br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT**

**AND NOW**, come Plaintiffs Mr. Logan Chetaitis ("Mr. Chetaitis"), Mr. Tyler Zeller ("Mr. Zeller"), and Mr. Christopher Irwin ("Mr. Irwin") (collectively, "Plaintiffs"), by and through their undersigned counsel, and file this Complaint against Defendants Northern York County Regional

Police Commission (the "Commission") and David L. Lash ("Lash") (collectively, "Defendants"), and aver as follows:

## INTRODUCTION

1. On September 17, 2025 ("September 17"), Detective Sergeant Cody Becker ("Mr. Becker"), Detective Mark Baker ("Mr. Baker"), and Detective Isaiah Emenheiser ("Mr. Emenheiser") were slaughtered by a violent and heavily armed assailant clad in camouflage fatigues and carrying an AR-15 rifle.

2. The danger was not unknown. Defendant Police Chief David Lash knew that the man the detectives were being sent to confront was violent, unstable, and armed. Yet despite that knowledge, Lash sent Mr. Becker, Mr. Baker, and Mr. Emenheiser into a predictably dangerous encounter without the planning, tactical resources, equipment, staffing, and precautions that the known threat demanded.[1]

3. To Plaintiffs—fellow officers and brothers-in-arms of the three police officers who lost their lives—the events of September 17, 2025, were not merely an unforeseeable tragedy. Plaintiffs believed that their colleagues' deaths were preventable and that catastrophic failures to comply with the mandatory departmental Code of Conduct and General Orders had needlessly exposed their fellow officers to a foreseeable and deadly threat.

4. Plaintiffs believed that Lash's subsequent refusal to authorize an investigation into the violation into the departments Code of Conduct and General Orders was consistent with a longstanding pattern of misconduct and disregard for departmental accountability.

[1] Plaintiffs assert no wrongful-death, survival, negligence, or derivative claim arising from the officers' deaths and seek no recovery on behalf of the officers, their estates, or their families. The circumstances of the September 17, 2025 ambush are alleged solely to establish the content, context, public importance, and good-faith basis of Plaintiffs' protected speech, as well as Defendants' retaliatory motive. Plaintiffs seek damages only for the injuries they personally sustained from that retaliation.

5. That pattern included violations of the Northern York County Regional Police Department's ("NYCRPD" or the "Department") Code of Conduct and mandatory General Orders; the improper expenditure and waste of public funds and departmental resources; favoritism and undisclosed or inadequately addressed conflicts of interest; arbitrary and selective disciplinary practices; manipulation of promotional and personnel decisions; failure to address known deficiencies in staffing and protective equipment; and retaliation against officers who reported misconduct or questioned departmental leadership.

6. Plaintiffs believed that these practices constituted substantial violations of the Department's formally adopted standards of professional and ethical conduct, which were designed to protect the public, departmental personnel, and the integrity of police operations.

7. Rather than confront these allegations and permit an honest examination of what had gone wrong, Defendants turned their attention to the officers who were reporting this wrongdoing. Once Plaintiffs spoke out they became targets of retaliation.

8. One Plaintiff was terminated on pretextual grounds, a second was demoted and suspended on pretextual grounds, and a third was subjected to harassment, surveillance, and deliberate interference with his professional career.

9. Plaintiffs Zeller and Chetaitis bring this action pursuant to 42 U.S.C. § 1983 for retaliation in violation of the Speech and Petition Clauses of the First Amendment based on their public speech reporting Chief Lash's wrongdoing.

10. All three Plaintiffs assert claims, pursuant to the Pennsylvania Whistleblower Law, 43 P.S. §§ 1421–1428, for retaliation based on Plaintiffs' good-faith reports of wrongdoing and waste.

11. Defendants subjected all three Plaintiffs to retaliation, including unjust pretextual discharge, discipline and/or demotion, heightened and selective scrutiny of their reports and work, investigations of supposed inaccuracies, adverse evaluations and discipline, threats, ostracism, loss of opportunities, and other materially adverse treatment described below.

12. Defendants did not impose comparable scrutiny or punishment on favored employees who engaged in similar or more serious conduct but had not reported wrongdoing.

## **JURISDICTION AND VENUE**

13. This Court has federal-question jurisdiction under 28 U.S.C. §§ 1331 and 1343 because Mr. Zeller and Mr. Chetaitis assert claims under 42 U.S.C. § 1983 and the First and Fourteenth Amendments to the United States Constitution.

14. This Court has supplemental jurisdiction over Plaintiffs' Pennsylvania Whistleblower Law claims pursuant to 28 U.S.C. § 1367(a), including the state-law claim asserted by Plaintiff Christopher Irwin, who does not independently assert a federal cause of action. These claims arise from the same nucleus of operative facts as the federal claims asserted by Plaintiffs Zeller and Chetaitis and form part of the same case or controversy under Article III of the United States Constitution.

15. Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202. Injunctive relief and damages are authorized by 42 U.S.C. § 1983 and applicable law.

16. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (b)(2) because Defendants reside in this District and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in York County, Pennsylvania.

## **PARTIES**

17. Plaintiff Tyler Zeller is an adult individual residing at 4621 Fahringer Drive, York, Pennsylvania 17406. He is currently employed as a police officer with the Northern York County Regional Police Department.

18. Plaintiff Logan Chetaitis is an adult individual residing at 419 Royal Drive, Manchester, Pennsylvania 17345. He is a former police officer with the Northern York County Regional Police Department.

19. Plaintiff Christopher Irwin is an adult individual residing at 145 Devonshire Court, Mount Wolf, Pennsylvania 17347. He is currently employed as a police officer with the Northern York County Regional Police Department.

20. Defendant Northern York County Regional Police Commission is a regional governmental entity created pursuant to Pennsylvania's Intergovernmental Cooperation Law and the Composite Charter of the Northern York County Regional Police Commission, with its principal place of business at One Regional Way, York, Pennsylvania 17404.

21. The Commission serves as NYCRPD's governing body and possesses final policymaking authority over NYCRPD personnel and discipline, including the authority to approve the hiring, firing, suspension, promotion, demotion, and discipline of personnel and otherwise to manage NYCRPD employees, including Chief Lash.

22. Defendant David L. Lash is an adult individual residing at 1675 Butter Road, Dover, Pennsylvania 17315. At all times relevant to this Complaint, Lash served as NYCRPD's Chief of Police. He is sued in his individual capacity. Lash exercised command authority over NYCRPD operations and personnel and personally participated in, directed, recommended, or implemented the retaliation alleged below.

23. At all relevant times, Lash acted under color of state law and within the course or apparent scope of his governmental authority.

## FACTUAL ALLEGATIONS

### NYCRPD Governance and Defendants' Authority

24. The Commission is a regional governmental body composed of representatives appointed by NYCRPD's participating municipalities and serves as NYCRPD's governing body.

25. The Composite Charter assigns the Commission responsibility and jurisdiction over actions customary and appropriate to providing police services and grants it express authority over personnel decisions and discipline.

26. The Commission therefore had authority to receive Plaintiffs' reports, protect the reporting officers, investigate Lash and other command personnel independently, preserve evidence, correct policy violations, and prevent retaliation.

27. Lash possessed final or delegated authority over operational decisions, deployment of NYCRPD personnel, requests for outside assistance, internal command practices, equipment use, report review, evaluations, recommendations for discipline, and other matters to be established in discovery.

### The September 17 Armed Suspect Operation

28. On September 16, 2025, NYCRPD received a report that a camouflaged man armed with an AR-15-style rifle was watching a former girlfriend's residence at night.

29. A trail-camera photograph identified the man as Matthew Ruth ("Ruth") and depicted him carrying the AR-15-style rifle across his chest.

30. Law enforcement searched for Ruth for hours, including with a drone, but did not locate him. Police knew that Ruth was armed, had evaded detection, and presented a continuing threat.

31. Police obtained an arrest warrant for stalking, nighttime loitering or prowling, and related offenses. Police also obtained information concerning Ruth's prior violence, mental-health history, prior domestic violence, possession of firearms, suspicious acquisition of handcuffs, and other facts increasing the risk to officers and civilians.

32. The stalking victim had also reported that she suspected Ruth of previously attempting to burn her vehicle. On the morning of September 17, Detective Emenheiser spoke with Ruth's coworkers and supervisors and learned of abnormal behavior in the days preceding the incident.

33. Later that day, officers searched Ruth's residence but did not locate him.

34. Meanwhile, the mother and daughter who occupied the farmhouse Ruth had been surveilling were relocated because members of law enforcement feared for their safety.

35. Despite the accumulating information that Ruth was armed with a rifle, had a history of violence, had exhibited abnormal behavior, was dressed in camouflage, had evaded law enforcement, and remained unaccounted for, NYCRPD, at Lash's direction, sent detectives and a sheriff's deputy back to the farmhouse without activating the York County Quick Response Team ("QRT"), SWAT, or an equivalent tactical resource.

36. NYCRPD does not have its own QRT. Instead, it relies on a regional team composed of police officers from multiple jurisdictions, including departments that are not members of NYCRPD.

37. Lash was briefed on the material threat information and personally approved the officers' deployment without QRT assistance.

38. At 5:40 a.m. on September 17, 2025—hours before Mr. Becker, Mr. Baker, and Mr. Emenheiser were sent to confront Ruth—Sergeant Kulak emailed Lash and other command staff, including Mr. Zeller, information gathered overnight concerning the threat Ruth posed. At 6:17 a.m. that same morning, Lash replied to that same command distribution, ignoring these threats and addressing only a separate incident without directing any additional protective measures, tactical resources, or precautions for the officers who would be deployed to confront Ruth later that day. A true and correct copy of this email correspondence is attached hereto as **Exhibit A**.

39. Throughout his tenure as Chief, Lash had made it clear to members of NYCRPD that he did not want outside law-enforcement agencies operating within his jurisdiction.

40. Lash expressed this preference even though NYCRPD depended on outside agencies for specialized tactical resources, including the York County QRT.

41. Consistent with that expressed preference, Lash did not request QRT or equivalent tactical assistance before officers approached the farmhouse on September 17.

42. At approximately 2:08 p.m., officers approached and opened the door of the farmhouse Ruth had been surveilling.

43. Ruth was concealed inside with a suppressed AR-15-style rifle and immediately fired at the officers when the door was opened.

44. Mr. Becker, Mr. Baker, and Mr. Emenheiser were killed. A fourth NYCRPD detective and a York County sheriff's deputy were seriously wounded.

45. Ruth was subsequently shot and killed by another officer present at the scene.

**<u>NYCRPD's Code of Conduct, Mandatory General Orders, and PLEAC Accreditation</u>**

46. At all times relevant hereto, the Northern York County Regional Police Department operated pursuant to a formally adopted Code of Conduct and a comprehensive system of General Orders governing the professional conduct of its officers, the exercise of supervisory authority, the planning and execution of police operations, and the protection of the public and departmental personnel.

47. NYCRPD General Order 1.8.1, entitled "Procedures to Follow Relating to Code of Conduct and Departmental Appearance," expressly provides that the Department follows a Code of Conduct requiring all employees to maintain "a high standard of personal integrity and ethical conduct in their relationship with other employees and community members." A true and correct copy of General Order 1.8.1 is attached hereto as **Exhibit B**.

48. General Order 1.8.1 further provides that NYCRPD has adopted the Law Enforcement Code of Ethics, identified as General Order 1.1.2, based upon the Code of Ethics issued by the International Association of Chiefs of Police. Section III.B expressly requires sworn personnel to abide by the Department's rules, regulations, policies, procedures, General Orders, and Standards of Conduct, in addition to the prescribed Code of Ethics. The Order further provides that violations of the Code may result in discipline.

49. NYCRPD's Code of Conduct expressly incorporates the Department's General Orders and operational requirements into the professional and ethical obligations imposed upon its sworn personnel. Compliance with those orders is not merely encouraged or recommended; it is an affirmative obligation of departmental employment.

50. General Order 1.8.1 further declares that NYCRPD's primary responsibility is to the communities it serves, identifies accountability as a core departmental value, and provides that

the Department's rules, orders, and regulations establish professional standards governing employee conduct.

51. Consistent with these express requirements, NYCRPD has adopted an extensive body of General Orders governing virtually every significant aspect of police operations, including high-risk warrant service, tactical-team consultation, supervisory responsibilities, protective equipment, the use of force, reporting misconduct, and intervention to prevent violations of departmental policy.

52. These General Orders establish mandatory standards of conduct governing the Department's officers and supervisors, including its Chief of Police. They are designed to ensure the lawful and professional exercise of police authority, safeguard the constitutional and other legal rights of the public, protect the safety and welfare of officers, and prevent foreseeable injury or death.

53. NYCRPD General Order 1.8.5, entitled "Violation of General Orders, Rules, Regulations or Directives," expressly prohibits officers from committing acts or omissions constituting violations of departmental rules, regulations, General Orders, guidelines, directives, memoranda, or orders. A true and correct copy of General Order 1.8.5 is attached hereto as **Exhibit C**.

54. General Order 1.8.5 further imposes an affirmative duty upon departmental members to report violations of departmental rules and General Orders to the Chief of Police, expressly providing that "[i]t shall be the duty of all members of the Department to report to the Chief any violation" of departmental rules, regulations, or General Orders that comes to their attention.

55. The Department therefore expressly recognizes that compliance with its orders is mandatory and that violations must be reported rather than ignored or concealed.

56. That internal reporting obligation did not require officers to investigate the Chief, prepare complaints concerning the Chief for the civilian Commission, or communicate alleged governmental misconduct directly to the Commission. Indeed, as alleged below, Department policy generally prohibited such direct communications absent authorization.

57. NYCRPD General Order 1.8.4, governing the duty to intervene, likewise requires members to act to prevent or stop conduct that is unethical, contrary to training standards, or violative of law or departmental policy.

58. Collectively, the Code of Conduct and General Orders constitute a formally adopted system of professional and ethical obligations designed to protect both the public and the Department and its personnel, within the meaning of the Pennsylvania Whistleblower Law, 43 P.S. § 1422.

**<u>NYCRPD's Accreditation and Representations Concerning Compliance</u>**

59. To demonstrate its adherence to recognized professional policing standards, NYCRPD voluntarily sought and obtained accreditation through the Pennsylvania Law Enforcement Accreditation Commission ("PLEAC"), the accreditation body associated with the Pennsylvania Chiefs of Police Association.

60. PLEAC accreditation requires participating police agencies to adopt and maintain written policies addressing applicable accreditation standards and to demonstrate compliance through documentary proofs, periodic assessments, and continuing accreditation reviews.

61. NYCRPD initially obtained accreditation on May 12, 2022, and underwent formal reassessment in April 2025. On May 5, 2025, PLEAC's assessment team issued a written reassessment report recommending renewal of NYCRPD's accreditation.

62. That report concluded that NYCRPD complied with all 100 accreditation standards applicable to its operations, with the remaining 37 standards classified as inapplicable by function. No waivers of applicable standards were requested.

63. The reassessment report identified Defendant Chief David Lash as NYCRPD's Chief of Police and Plaintiff Sergeant Christopher Irwin as the Department's Accreditation Manager.

64. Mr. Irwin was directly responsible for maintaining the Department's accreditation files, reviewing operational and administrative records, identifying failures to comply with applicable standards, and documenting the Department's continuing compliance with its General Orders and PLEAC requirements.

65. In its 2024 Annual Compliance Survey submitted to PLEAC, NYCRPD represented that its Accreditation Manager reviewed departmental reports, case files, search warrants, evidence records, patrol logs, training records, and other operational documents to determine whether departmental activities complied with applicable standards. A true and correct copy of the 2024 Annual Compliance Survey is attached hereto as **Exhibit D**.

66. The Department further represented that its Chief of Police monitored the accreditation process, reviewed departmental records to verify compliance, and received reports of compliance problems for corrective action.

67. NYCRPD expressly represented to PLEAC that, upon discovery of noncompliance with an accreditation standard, supervisory personnel would formulate a corrective-action plan, the issue would be reported to the Chief of Police, and the Accreditation Manager would notify PLEAC within 30 days.

68. NYCRPD also represented that its supervisors regularly reviewed the activities of officers under their command to ensure compliance with applicable PLEAC standards and departmental requirements.

69. These representations were made as part of a formal accreditation process requiring NYCRPD to demonstrate continuing compliance with the professional standards and General Orders governing its operations.

70. In its 2024 Annual Compliance Survey, prepared by Mr. Irwin and reviewed by the Department's Chief Executive Officer, Lash, NYCRPD expressly represented that accreditation had caused it to adopt updated policies and procedures, continuously review those policies, improve professional services, and reduce the risk of liability.

71. Indeed, when specifically asked to identify instances in which accreditation had been a positive factor in addressing lawsuits or potential lawsuits against the agency, NYCRPD responded that accreditation improved citizen contacts and outcomes through updated standards, policies, and procedures, and had decreased the Department's risks and liability cases.

72. NYCRPD further reported that accreditation had reduced its police and public-safety liability insurance premiums by approximately $9,000, confirming that the Department itself regarded accreditation and adherence to professional standards as meaningful measures of risk reduction and accountability.

73. The Department's own statements therefore acknowledge that its General Orders and accreditation requirements are substantive safeguards intended to govern actual police conduct, prevent misconduct, improve officer and public safety, and reduce the risk of unlawful or negligent police operations.

74. NYCRPD's reliance upon accreditation was especially significant because Chief Lash was personally familiar with the accreditation program, had participated in the Department's reassessment, and had served on the Pennsylvania Law Enforcement Accreditation Commission.

75. During the April 30, 2025 reassessment, Chief Lash personally described accreditation as providing the structure necessary to develop a culture of policing the right way and characterized the program as the professional gold standard. A true and correct copy of PLEAC's May 5, 2025 Re-Assessment Report is attached hereto as **Exhibit E**.

76. PLEAC's reassessment report likewise specifically commended Mr. Irwin's work as Accreditation Manager, describing it as "impeccable and worthy of imitation." The report confirmed Irwin's central responsibility for demonstrating the Department's compliance with its professional standards.

77. Accordingly, Chief Lash understood that the Department's General Orders and accreditation standards imposed substantive obligations governing police operations, and that compliance was to be monitored, documented, and enforced.

**Mandatory Requirements for High-Risk Operations**

78. Among the General Orders incorporated into NYCRPD's Code of Conduct was General Order 1.2.7, governing the execution of search warrants on occupied structures and other high-risk services.

79. General Order 1.2.7 requires investigating officers and supervisors to assess the risks associated with a contemplated operation, including intelligence concerning a suspect's history of violence, possession of weapons, and other circumstances bearing upon the safety of participating officers. A true and correct copy of General Order 1.2.7 is attached hereto as **Exhibit F**.

80. The Order further requires supervisory approval, appropriate selection of personnel based upon training and experience, and pre-execution planning and briefing.

81. General Order 1.2.7 expressly provides that the York County QRT Commander "shall be consulted" whenever circumstances suggest a high-risk entry or a high-risk service involving particularly dangerous subjects.

82. The requirement to consult the QRT Commander is mandatory. Although the ultimate deployment of QRT personnel may depend upon the circumstances, the Department's written order does not leave consultation to the unfettered discretion of a supervisor when the specified high-risk conditions exist.

83. General Order 2.2.2 separately recognizes "the need for specialized tactical teams for high-risk events" and identifies the York County QRT as "the primary agency for our jurisdiction.". A true and correct copy of General Order 2.2.2 is attached hereto as **Exhibit G**.

84. These provisions were adopted to ensure that dangerous police operations are evaluated and conducted with appropriate planning, intelligence, supervision, specialized personnel, and protective resources, thereby reducing foreseeable risks to officers and the public.

**<u>Chief Lash's Conduct on September 17, 2025</u>**

85. The presence of an armed suspect, together with the nature of the contemplated operation, presented precisely the type of heightened danger addressed by General Order 1.2.7 and the Department's related tactical-response policies.

86. Mr. Irwin was aware of the applicable General Orders and PLEAC standards by virtue of his position as Accreditation Manager and his responsibility for reviewing departmental compliance with those requirements.

87. On September 17, 2025, Mr. Irwin personally heard Chief Lash authorize officers to proceed with the operation against Ruth without notifying or consulting the York County QRT Commander.

88. Despite the known threat presented by an armed suspect and the mandatory consultation requirements of General Order 1.2.7, Chief Lash authorized the operation without first securing the consultation required by the Department's own General Orders.

89. Chief Lash's authorization constituted a substantial departure from the Department's mandatory operational requirements and from the professional and ethical standards incorporated into NYCRPD's Code of Conduct.

**Irwin's Report of Wrongdoing and Lash's Refusal to Investigate**

90. Following the deaths of the three officers, Mr. Irwin sought to fulfill his responsibilities as Accreditation Manager by identifying the applicable PLEAC standards and departmental General Orders that required examination in light of the circumstances surrounding the fatal operation.

91. On October 1, 2025, Mr. Irwin sent Lieutenant Gregg Anderson ("Lieutenant Anderson") an email requesting a review of the General Orders and departmental policies applicable to the September 17, 2025, line-of-duty deaths of Mr. Becker, Mr. Baker, and Mr. Emenheiser. Mr. Irwin forwarded that same email later that day to Lieutenant John Migitulski, who was then serving as NYCRPD's Criminal Investigations Lieutenant.

92. In particular, Mr. Irwin raised concerns regarding General Order 1.2.7, which required consultation with the York County QRT Commander under specified high-risk circumstances, and General Order 2.2.2, addressing the Department's specialized tactical-response resources.

93. Mr. Irwin was urging an investigation regarding the Department's requirements for operational planning, supervisory responsibility, and officer protection, including the applicable provisions of General Orders 2.2.2.

94. Mr. Irwin believed that the failure to comply with these requirements constituted substantial violations of the Department's formally adopted professional and ethical standards designed to protect the public, safeguard officers, and ensure accountability in police operations, rather than merely technical or minimal deviations from departmental policy.

95. Later in October 2025, Mr. Irwin he met with Lieutenant Anderson to discuss the operational and policy violations he had identified in connection with the officers' deaths.

96. Mr. Irwin advised Lieutenant Anderson of the specific standards and General Orders implicated by the operation, including those governing high-risk warrant service, tactical-team consultation, operational planning, supervisory responsibility, and compliance with departmental policy.

97. During Mr. Irwin's meeting with Lieutenant Anderson, Lash entered the room and stated, in substance, that the only matter requiring review was whether the officer who had shot and killed Ruth had been justified in using deadly force.

98. Lash refused to authorize an internal investigation into the planning, authorization, supervision, and violation of the Code of Conduct and General Orders.

99. Lash insisted that there would be no internal investigation addressing whether NYCRPD personnel, including Lash himself, had violated the Department's General Orders, Code of Conduct, or applicable PLEAC standards.

100. Lash insisted that the investigation be limited to the justified use of deadly force.

101. Whether the use of deadly force against Ruth was legally justified did not resolve whether Lash and other supervisory personnel had complied with the Department's obligations to assess the threat, consult the QRT Commander, provide appropriate tactical planning, and otherwise comply with the Code of Conduct and General Orders.

102. By restricting the investigation to the justification for the use of deadly force, Lash intentionally prevented any meaningful internal examination of his own operational decisions and the potential violations of the Department's General Orders and Code of Conduct that Irwin had identified.

103. Lash's refusal was particularly significant because NYCRPD had expressly represented to PLEAC that compliance problems would be reported to the Chief, addressed through corrective action, and, when applicable, reported to the Accreditation Commission within 30 days.

104. As Accreditation Manager, Irwin had a good-faith basis to believe that the Department's failure to comply with mandatory high-risk operational requirements, followed by its refusal to examine those violations after the deaths of three officers, constituted serious wrongdoing rather than a technical or minimal policy deviation.

**Zeller and Chetaitis Take Action to Expose Misconduct and Report Violations of Law and Departmental Policy**

105. Zeller and Chetaitis were personally devastated by the deaths of their fellow officers on September 17, 2025. Both had endured years of what they believed to be Chief Lash's arbitrary, authoritarian, and retaliatory leadership.

106. But the deaths of three colleagues, followed by Lash's refusal to undertake a meaningful investigation into the failures of command, planning, and compliance with mandatory safety procedures that Plaintiffs believed contributed to those deaths, marked a turning point.

107. They could no longer remain silent in the face of misconduct they believed endangered their fellow officers and undermined the integrity of the Department.

108. Recognizing that meaningful accountability required independent scrutiny of Lash's conduct, they determined that their concerns had to be brought directly to the Board of Commissioners, rather than through Lash himself.

109. Yet the very General Orders they sought to uphold presented a formidable obstacle. General Order 1.8.5.4 broadly prohibited public criticism of supervisory orders and departmental leadership, while General Order 1.8.5.51 prohibited officers from communicating directly with the Board of Commissioners unless authorized by the Chief or the Board. *See* **Exhibit C**.

110. Together with the requirement that violations of departmental rules be reported to the Chief, these provisions effectively channeled complaints about Lash's own misconduct through Lash himself, creating an obvious conflict of interest and discouraging independent oversight.

111. General Orders 1.8.5.4 and 1.8.5.51 broadly restricted officers from publicly criticizing departmental leadership and from communicating directly with the Commission without authorization, without regard to whether an officer's speech addressed matters of public concern. To the extent those General Orders prohibited officers from speaking on matters of public concern—including the preventable deaths of three officers, failures of command and officer safety, and the misuse of public funds—they violated the First Amendment and therefore could not constitutionally be enforced to punish such speech or petitioning activity.

112. Officers had no realistic alternative means of bringing Lash's misconduct to light. Requiring complaints about the Chief's own misconduct to be submitted through the Chief himself foreclosed any meaningful independent review and exposed a complaining officer to the very retaliation Plaintiffs feared.

113. Unwilling to allow those restrictions to prevent the disclosure of what they reasonably believed to be serious wrongdoing, but mindful of the threat of retaliation, Zeller and Chetaitis chose to report their concerns anonymously.

114. They submitted detailed letters directly to the Board of Commissioners raising some of the same issues identified by Mr. Irwin, and identifying other alleged misconduct, violations of departmental policy, and failures of leadership, in the hope that the Board would initiate an objective and independent investigation and take corrective action before further harm occurred.

115. The anonymous letters were constitutionally protected speech and petitioning activity addressing matters of public concern. Sending the letters was not misconduct and was not itself a legitimate basis for disciplinary action.

116. Any reliance by Defendants upon the letters themselves, or upon General Orders 1.8.5.4 or 1.8.5.51, as a purported basis for discipline would not justify Defendants' conduct; it would only confirm that Defendants punished officers for constitutionally protected speech.

117. Neither Mr. Zeller nor Mr. Chetaitis was assigned, paid, or ordinarily expected to investigate the Chief of Police, prepare complaints to the civilian Commission concerning Department leadership, petition for changes in Department leadership, or communicate alleged governmental misconduct directly to the Commission. Their anonymous complaints therefore were not made pursuant to their ordinary employment duties.

118. Neither Zeller nor Chetaitis told Irwin they were the authors of the letters at the time they were submitted.

**The Zeller Letter**

119. On or about November 6, 2025—less than two months after the murder of the three officers—the Commission received an anonymous three-page written complaint authored by Mr. Zeller. A true and correct copy of that letter is attached hereto as **Exhibit H**.

120. Mr. Zeller knew from experience that Lash would retaliate against anyone who criticized him. He hoped that by remaining anonymous, he could meet his moral duty to report wrongdoing while preserving his job and livelihood.

121. Mr. Zeller's letter reported that Lash had created a culture of fear, retaliation, favoritism, and suppression in which officers were afraid to speak out and that the officers' Association—the union responsible for protecting officers—routinely reported complaints they received from members back to Lash.

122. The letter stated that the tragic deaths of the three officers were completely preventable, that losses could have been mitigated, and that an independent investigation was needed because an internal review controlled by the responsible officials could conceal the facts.

123. The letter reported that officers were not permitted adequate time to attend Mr. Becker's funeral, even though the Pennsylvania State Police and other municipalities had offered coverage; that grieving officers and family liaisons were forced to return to work; and that officers received no adequate briefing or explanation concerning how the killings had occurred.

124. The letter also reported financial malfeasance.

125. Specifically, the letter reported that Lash had used department money to purchase a dump truck, an enclosed trailer, and other equipment for his own personal benefit or without

legitimate operational need; used Department equipment, including the dump truck and trailer, for personal purposes.

126. These allegations implicated General Order 1.8.5's restrictions concerning the misuse or misappropriation of Department property, abuse of official authority, and use of Department equipment only for its intended purpose.

127. The letter further reported that Lash ignored equipment that officers needed for their safety, permitted chronic understaffing, manipulated promotional practices, applied the department no-tattoo policy selectively in favor of a command official's relative, and imposed inconsistent discipline.

128. More broadly, the conduct reported by Mr. Zeller implicated NYCRPD's written General Orders governing tactical response, officer safety, Department property, and employee conduct, including General Orders 2.2.2, 2.1.3, and 1.8.5, as more fully alleged above.[2]

129. The letter asked the Commission to investigate, speak privately with current and former officers, protect officers from retaliation, and replace Lash and Lieutenant Anderson with new leadership.

130. On December 18, 2025, Northern York County Regional Police Association Vice President Max Ruby emailed Association members concerning a meeting scheduled for January 18, 2026.

131. On December 23, 2025, Association President Andrew Miller ("President Miller") informed the membership by email that he and Ruby had been requested to meet with the Police Commission concerning the first anonymous complaint letter.

[2] General Order 2.2.2 governed the assessment and activation of the York County QRT or another tactical unit in high-risk circumstances; General Order 2.1.3 governed protective equipment during firearms incidents and other high-risk operations; and General Order 1.8.5 prohibited, among other things, abuse of a position of authority, misappropriation of Department property, and misuse of Department equipment.

132. Later that day, Mr. Chetaitis responded by asking whether the allegations contained in the anonymous letter were accurate. He also asked that Association members be provided a copy of the letter so that other officers who had experienced similar misconduct could identify it and requested that the Association be transparent with its members about what was occurring.

133. Another officer responded that he agreed with Mr. Chetaitis's questions and concerns.

134. On December 24, 2025, Mr. Chetaitis's uncle and fellow officer, Matt Chetaitis, separately requested that the Association be transparent with its members concerning the anonymous letter and the Commission's response.

135. Between December 23, 2025, and January 18, 2026, Mr. Chetaitis's direct supervisor, Corporal Schantz, confronted Mr. Chetaitis about his email requesting information concerning the first anonymous letter.

136. Corporal Schantz asked why Mr. Chetaitis had sent the email asking to see the anonymous letter, and then stated: "Why don't you just get it off of your hard drive?"

137. Corporal Schantz's reference to Mr. Chetaitis's hard drive indicated knowledge or suspicion that Mr. Chetaitis possessed, prepared, or stored one of the anonymous complaints.

138. On January 2, 2026, Mr. Chetaitis sent another email to Association members. According to Mr. Chetaitis, three of those supervisors had been identified or criticized in the first anonymous letter.

139. President Miller responded that any Association member who wanted to review the anonymous letter could do so by meeting in person with Lash, who would personally go over the letter with the officer. President Miller did not address Mr. Chetaitis's remaining concerns.

140. This arrangement placed Lash—the principal subject of the complaints—in control of officers' access to the letter and allowed him to identify which officers expressed interest in its allegations.

**The Commission's Response to the Zeller Letter**

141. The Commission held an executive session concerning the first letter. Lash later complained to subordinate supervisors that the executive session lasted approximately three hours.

142. Lash told subordinate supervisors that he and certain members of the Commission wanted to identify and fire the first anonymous author.

143. Instead of protecting the whistleblower or ensuring a genuinely independent investigation, Defendants undertook or permitted efforts to identify the author for the purpose of imposing adverse consequences.

144. Following receipt of Mr. Zeller's letter, the Commission met with representatives of the NYCRPD Officers' Association concerning the allegations and broader concerns regarding Department leadership and morale. The Commission discussed retaining an independent third-party consultant, conducting external leadership evaluations, and establishing a confidential reporting channel through which officers could raise concerns without fear of retaliation.

145. Despite discussing these measures, the Commission neither obtained an independent assessment of Department leadership nor established meaningful safeguards against retaliation, the misconduct reported by Mr. Zeller unaddressed.

146. Thereafter, Lash concluded that Mr. Zeller authored the letter.

147. Shortly after the investigation into the identity of the letter's author had begun, Lash was heard referring to Mr. Zeller as "Shakespeare," an unmistakable reference to Mr. Zeller as an "author".

148. The timing and context of the "Shakespeare" reference demonstrated that Lash knew or believed Mr. Zeller had written the detailed complaint to the Commission.

**The Chetaitis Letter**

149. On January 8, 2026, Mr. Chetaitis submitted a second anonymous letter addressing the September 17 deaths, misuse of Department funds and assets, favoritism, and other misconduct by Lash and NYCRPD leadership. A true and correct copy of the second letter is attached hereto as **Exhibit I**.

150. The second letter expressly stated that it was written by someone other than the first author and that anonymity was required because of fear of retaliation.

151. The second letter reiterated concerns regarding the detectives' deaths, the failure to secure outside coverage, officer wellness, inadequate safety equipment, favoritism, conflicts within the chain of command, manipulation of promotions and disciplinary proceedings, and Lash's threats against officers who raised complaints.

152. The conduct reported by Mr. Chetaitis likewise implicated the written NYCRPD General Orders, including General Orders 2.2.2, 2.1.3, and 1.8.5.

153. The second letter reported waste and misuse of public resources, including Lash's purchase of a vehicle costing approximately $65,000 because he disliked how his new truck rode; unused or impractical equipment purchases; inadequate patrol equipment; and refusal to correct radio-coverage deficiencies for non-operational reasons.

154. The letter reported potential conflicts of interest involving a NYCRPD lieutenant's private business with subordinate officers, scheduling decisions that benefited the business, direct supervision of a relative, and favoritism in allocating overtime details.

155. The letter reported violations of the law and the police contract related to overtime.

156. The letter reported selective discipline, including the failure to discipline a favored promotional candidate after a negligent firearm discharge injured another officer, while disfavored officers received manufactured evaluations and suspensions that impeded promotion.

157. The letter further reported that a supervisor displayed a Nazi flag inside the station, directed officers to turn off and place their body-worn cameras face down, and used an ethnic slur.

158. The letter reported that supervisors directed officers not to respond to a domestic call involving a favored Association official and that the incident was covered up.

159. The letter reported that Lash had threatened to bring his "wrath" down upon the person who made an anonymous JNET complaint and to suspend that person for thirty (30) days.

160. The letter also reported Lash's statement that he and certain members of the Commission wanted to identify and fire the first anonymous author.

161. On or about January 8, 2026, Lash told a Department supervisor that he suspected members of the Chetaitis family, Mr. Zeller, and Officer Eisenhart were responsible for the anonymous complaint or complaints concerning him.

**Lash Identifies Chetaitis as the Second Author**

162. At the January 18, 2026, Association meeting—10 days after Mr. Chetaitis submitted his letter—Sergeant Potteiger, an ally of Lash, told Mr. Chetaitis: "It's very telling that the three people who were not included in the email were named in the letter."

163. Sergeant Potteiger was referring to three of the four supervisors whom Mr. Chetaitis had excluded from his January 2 email and who had been identified or criticized in the first anonymous letter.

164. Sergeant Potteiger's statement demonstrated that Department personnel had compared Mr. Chetaitis's email distribution choices against the contents of the anonymous letters and had identified, or strongly suspected, Mr. Chetaitis as an author or source of the complaints.

165. During the same meeting, Mr. Chetaitis attempted to question President Miller about President Miller's private meeting with the Police Commission concerning the first anonymous letter.

166. Officer Nabig Sakr, an ally of Lash, responded: "Why don't you just shut the fuck up."

167. At the conclusion of the meeting, Sakr placed application packets for other police departments on a desk at the front of the room and said officers who were unhappy at NYCRPD should leave.

168. These statements conveyed that officers who questioned Lash or sought transparency concerning the anonymous complaints were unwelcome and should find employment elsewhere.

169. On February 12, 2026, at approximately 1:45 p.m., Mr. Chetaitis was speaking with Lieutenant Anderson in Anderson's office when Lash entered. Mr. Chetaitis greeted Lash and asked, "What's going on, Chief?" Lash looked at Mr. Chetaitis without responding and immediately left the room.

170. Lash's conduct was part of a broader pattern of hostility, isolation, surveillance, and selective enforcement that escalated after Mr. Chetaitis's submitted his complaints. These retaliatory acts intensified after Defendants identified Mr. Chetaitis as the author of the second anonymous letter and ultimately resulting in his termination.

**The OOR Record and Defendants' Claimed Investigation**

171. On December 23, 2025, a journalist submitted a Right-to-Know Law request for the first anonymous letter. NYCRPD produced a copy with nearly all substantive allegations redacted.

172. In the ensuing Office of Open Records appeal, Commission Chair Loretta Wilhide ("Wilhide") submitted an affidavit stating that the Commission had conducted a structured factual evaluation of each allegation, met with Department employees, consulted counsel, compared the allegations to Department policy and law, and found all allegations unfounded.

173. Wilhide's affidavit did not identify the employees interviewed, evidence reviewed, policies considered, dates of investigative acts, findings concerning each allegation, or factual basis for the "unfounded" conclusion.

174. Lash was copied on the Department's communications concerning disclosure of the complaints against him.

175. The asserted investigation did not include a genuine examination of the Code of Conduct or General Order violations reported by Plaintiffs, did not protect Plaintiffs from retaliation, and did not result in corrective action.

176. Upon information and belief, the process focused in whole or in part on identifying and discrediting the authors rather than impartially examining Lash's conduct.

## **<u>The Zeller and Chetaitis Letters Describe Fraud, Waste, and Abuse of Public Funds and Departmental Resources</u>**

177. As detailed above in the descriptions of their respective anonymous letters, both Zeller and Chetaitis identified specific instances in which Chief Lash misused public funds, departmental personnel, equipment, and other government resources for purposes unrelated to

legitimate law-enforcement functions, including conduct they reasonably believed benefited Lash or favored individuals at taxpayer expense.

178. In addition to identifying violations of NYCRPD's General Orders and Code of Conduct, their complaints expressly raised concerns about fraud, waste, abuse of official authority, and the improper diversion of public resources.

179. These were not merely disagreements over management decisions or the exercise of supervisory discretion, but allegations of specific misconduct implicating Pennsylvania laws governing the use of public office and public property.

180. Such conduct potentially violated the Public Official and Employee Ethics Act, 65 Pa.C.S. § 1103(a), which prohibits a public official or public employee from engaging in conduct that constitutes a conflict of interest, including the use of the authority of public office for the private pecuniary benefit of the official, a member of his immediate family, or a business with which he is associated, *see* 65 Pa.C.S. § 1102 (defining "conflict of interest"), as well as criminal statutes prohibiting theft by unlawful taking, theft by deception, and failure to make required disposition of funds received and misapplication of entrusted property and property of government or financial institutions. *See* 18 Pa.C.S. §§ 3921, 3922, 3927, 4113(a).

181. Independently of whether the reported misconduct satisfied the elements of any particular criminal offense or Ethics Act violation, the specific instances of misuse of government resources described in the letters implicated the Pennsylvania Whistleblower Law's definition of "waste," which includes substantial abuse, misuse, destruction, or loss of public funds or resources. 43 P.S. § 1422.

182. Mr. Zeller and Mr. Chetaitis reported these matters in good faith, based upon information they reasonably believed to be true, for the purpose of exposing governmental

wrongdoing, protecting taxpayer resources, and securing independent oversight of misconduct they believed had been permitted to continue under Lash's leadership.

**Retaliation Against Christopher Irwin**

183. Following the submission of the anonymous complaints concerning Chief Lash and NYCRPD leadership, Lash embarked upon a sustained campaign of intimidation, humiliation, professional isolation, and adverse employment actions against Mr. Irwin, whom Lash believed was associated with, supported, or assisted the officers responsible for the complaints.

184. During a staff meeting at which Lash discussed his succession plans, Lash asked employees to indicate by a show of hands whether they expected to remain with the Department in five years. When Irwin raised his hand, Lash singled him out in front of the assembled staff, declaring: "You won't be here. Put your hand down."

185. Lash's statement conveyed to Mr. Irwin and his fellow officers that Lash had already determined that Mr. Irwin would not remain with the Department, notwithstanding Mr. Irwin's own intentions concerning his continued employment.

186. On or about November 3, 2025, Lash confronted Mr. Irwin in a hallway and directed him to stop wearing casual business attire, requiring him instead to wear either a police uniform or a suit and tie. Officers performing comparable administrative assignments remained permitted to wear casual business attire.

187. On December 3, 2025, the Department held a Christmas party at a substation. Unlike other Department personnel, Mr. Irwin was not provided the customary information concerning the event, although he independently learned of it and attended.

188. On December 8, 2025, Lash published revised testing requirements for an upcoming lieutenant's promotion. The revisions added a physical-agility component and eliminated departmental-policy material from the examination.

189. These changes particularly disadvantaged Mr. Irwin, who was the oldest prospective candidate and whose extensive experience drafting and administering the Department's policies had been a significant professional qualification.

190. On December 10, 2025, the Department announced that the examination would be administered by the same outside testing company used in the prior promotional process. Plaintiffs allege that the changes to the examination requirements were directed by Lash rather than necessitated by a change in testing vendors.

191. On December 31, 2025, while conducting a tour of Department headquarters, Lash visited every office except Irwin's, deliberately excluding him in a manner visible to other employees.

192. On January 8, 2026, Lash entered Mr. Irwin's office visibly angry and demanded: "Chris, can I ask you something that has been bothering me? With all the stuff you send back, how did you miss Zeller using a person as a human shield?"

193. Lash was referring to an incident involving Officer Zeller's arrest of a bank-robbery suspect. Mr. Irwin explained that he had never received the reports concerning that incident for review, including any use-of-force report, body-worn-camera review, or related approval request.

194. Mr. Irwin subsequently verified that the relevant materials had not been forwarded to his office. When he advised Lash of that fact, Lash responded: "Yes, Sergeant McClure is taking care of that issue."

195. Lash's accusation was unfounded because Mr. Irwin could not have identified an alleged deficiency in materials that had never been submitted to him. The confrontation further reflected Lash's hostility toward Mr. Irwin and his association of Mr. Zeller and Mr. Chetaitis.

196. On January 13, 2026, Mr. Irwin entered Lieutenant Neidigh's office and observed Neidigh reading one of the anonymous complaint letters. Neidigh immediately turned the letter face down, apparently to prevent Mr. Irwin from seeing it.

197. On January 14, 2026, Lash confronted Mr. Irwin concerning a reimbursement request Mr. Irwin had submitted to the Pennsylvania Law Enforcement Accreditation Commission ("PLEAC") for an accreditation assessment conducted earlier that month.

198. The assessment appeared on the Department's schedule. Mr. Irwin explained that, consistent with a practice followed for approximately four years, he understood the assessment to qualify as a training day because it provided information directly relevant to his responsibilities for NYCRPD's accreditation program. Mr. Irwin had performed most of the assessment work on his own time and sought reimbursement from PLEAC.

199. Lash disputed Mr. Irwin's understanding of the established practice and asserted that a secondary-employment authorization was required. Mr. Irwin offered to have the time deducted from his vacation balance, which Lash accepted. Irwin also promptly submitted a secondary-employment authorization request.

200. Shortly thereafter, Lash returned to Mr. Irwin's office and angrily declared: "Make sure you tell your people to put that in their third anonymous letter."

201. Mr. Irwin denied knowing who had written the anonymous letters. Lash then stormed out of the office. Mr. Irwin's secondary-employment request was never returned or acted upon.

202. Lash's express reference to "your people" and a "third anonymous letter" demonstrated that he believed Mr. Irwin was associated with the officers who had submitted complaints against him and that Lash regarded Mr. Irwin's perceived involvement with hostility.

203. Lash's statements provide direct evidence of his knowledge of the anonymous complaints and his belief that Mr. Irwin was aligned with, assisting, or supporting the officers responsible for them.

204. At a staff meeting on January 15, 2026, Lash departed from the customary order of presentations and announced: "Chris, we'll start with you."

205. After Mr. Irwin addressed several administrative matters, Lash stated: "Okay, you can go back to work. The rest of the meeting deals with patrol and doesn't concern you."

206. Lash required Irwin to leave the meeting in front of his fellow supervisors. No other supervisor had been singled out and dismissed from a staff meeting in this manner.

207. On January 28, 2026, Irwin visited Lieutenant Anderson's office. Anderson stated that he would discuss only work-related matters because "someone is trying to get him fired."

208. At the February 19, 2026, staff meeting, Lieutenant Anderson remarked that he hoped he would not be told to leave after delivering his report, demonstrating that Lash's treatment of Irwin had been noticed by other command personnel.

209. The discriminatory treatment continued during the lieutenant's promotional process. On or about February 9 through February 13, 2026, Officer Green was permitted to complete the physical portion of the promotional examination in the Department's fitness center before the designated testing date.

210. On or about February 22, 2026, the scheduled examination date, Lash removed the one-and-one-half-mile run from the examination, contrary to the previously published testing requirements.

211. Permitting one candidate to complete portions of the examination early, changing physical requirements on the day of testing, and removing departmental-policy material from the examination departed from the announced promotional process and support the inference that Lash manipulated the process to disadvantage Irwin and favor other candidates.

212. By April 16, 2026, a nonsworn records supervisor was permitted to attend staff meetings in Irwin's absence and remain for the entire meeting. This disparate treatment undermined Lash's asserted justification for excluding Irwin from the January 15 meeting.

213. On May 11, 2026, Irwin informed Lieutenant Neidigh that his therapist wanted to see him every two or three weeks for mental health treatment related to the September 17, 2025 deaths and that he intended to use sick leave for those medical appointments.

214. On May 26, 2026, Lash and Lieutenant Anderson entered Irwin's office and informed him that he would be removed from his administrative assignment and transferred to the Patrol Division.

215. In explaining the transfer, Lash stated: "You're being moved because you really pissed me off over the assessments. I'm not sure what your retirement plans are, but Noah is taking over. He will be here longer than you."

216. Lash's statement expressly attributed the transfer to his personal anger over Irwin's accreditation assessments—the same subject concerning which Lash had previously accused Irwin of association with the anonymous letter writers.

217. Lash's reference to Irwin's anticipated retirement also echoed his November 2025 declaration that Irwin would not remain with the Department.

218. The transfer stripped Irwin of the administrative responsibilities he had performed for years and removed him from the position in which he had developed substantial expertise concerning departmental policies, accreditation, and compliance.

219. On May 28, 2026, Lash confronted Mr. Irwin at his office and handed him a written directive prohibiting him from removing, destroying, or altering accreditation materials.

220. Lash accused Irwin of improperly disposing of departmental records in a shredding bin. Irwin explained that, following his involuntary transfer, he had been cleaning his office and had discarded only expired materials no longer required to be retained.

221. Lash placed the directive in Irwin's personnel file, creating an adverse employment record suggesting that Irwin had mishandled or threatened to destroy departmental materials, despite Irwin's explanation.

222. Later that day, Irwin complained to Lieutenant Eiker that Lash and Lieutenant Anderson were harassing and targeting him. Irwin described the preceding incidents and stated that he would no longer tolerate the treatment.

223. Eiker initially indicated that she could assist with patrol-related issues. She subsequently returned and asked whether Irwin wanted his complaint kept confidential. Irwin expressly declined confidentiality and directed Eiker to report the matter to the appropriate officials.

224. Despite this express complaint of harassment and retaliation, Defendants failed to undertake a meaningful investigation or implement corrective measures.

225. On June 15, 2026, Defendants restricted Irwin's access to administrative files even though he remained formally designated as the Department's Right-to-Know Law officer. The restriction interfered with his ability to perform responsibilities that had not been reassigned.

226. On June 30, 2026, Irwin received an email from Lieutenant Neidigh advising that, at Lash's direction, Irwin could no longer use sick leave for his mental health therapy appointments and would instead be required to use vacation or personal leave.

227. Other employees were permitted to use sick leave for comparable purposes. Sergeant McClure, for example, was permitted to use approximately six family-sick days notwithstanding a collective-bargaining provision permitting only two.

228. The disparate restriction on Mr. Irwin's use of sick leave was another instance of selective enforcement and adverse treatment following Lash's expressed hostility toward Irwin and his perceived association with the anonymous complaints.

229. On August 2, 2026, Mr. Irwin discovered that Defendants had restricted his access to the Department's security system, including cameras and interview-room areas to which he previously had access.

230. Defendants imposed this restriction without providing Mr. Irwin a legitimate explanation, further isolating him from administrative functions and diminishing his professional authority.

231. At an August 20, 2026, staff meeting, nonsworn personnel were again permitted to attend and remain for the entire meeting. One attendee remarked that she was afraid to speak first because she did not want to be "kicked out," an apparent reference to Lash's earlier treatment of Irwin.

232. On August 24, 2026, Mr. Irwin again complained to Lieutenant Eiker about continuing harassment at staff meetings. He stated that he would no longer attend because Lash's and Lieutenant Anderson's conduct had created an abusive and hostile working environment.

233. Mr. Irwin expressly reiterated that Lieutenant Anderson and Lash were personally responsible for the harassment. Eiker responded only: "Noted."

234. Despite Mr. Irwin's repeated complaints, Defendants failed to investigate the retaliation, restore his administrative responsibilities or access, correct the disparate treatment, or take effective measures to prevent further adverse conduct.

235. The actions directed against Mr. Irwin were neither isolated incidents nor ordinary exercises of managerial discretion. They formed a continuing pattern of disparate treatment, professional humiliation, exclusion, interference with advancement, removal of responsibilities, adverse personnel documentation, and restrictions on employment benefits.

236. Lash's express references to the anonymous letters, his identification of Mr. Irwin with "your people," his statements concerning Mr. Irwin's future employment, and his admission that personal anger motivated the transfer support the inference that Lash acted, at least in substantial part, because he believed Mr. Irwin was associated with or supportive of the officers reporting departmental wrongdoing.

237. The cumulative effect of these actions would deter a reasonable police officer from reporting governmental misconduct, assisting officers who made such reports, or opposing retaliatory treatment by departmental leadership.

238. Defendants' conduct constituted a continuing campaign of retaliation against Irwin based upon his actual or perceived association with the officers who had challenged Lash's leadership and reported alleged wrongdoing to the Board of Commissioners.

**Retaliation Against Tyler Zeller**

239. After Defendants identified Mr. Zeller as the first author, they subjected him to heightened scrutiny that was not imposed on comparable officers.

240. Prior to sending the anonymous letter, Mr. Zeller had never been subjected to any serious discipline.

241. In 2019, he was nominated for a Lifesaving Award after his prompt response to a motorcycle accident, during which his actions helped save the life of a woman who had sustained a severe crush injury to her leg.

242. On November 21-22, 2025, shortly after Mr. Zeller submitted his protected complaint concerning Lash and NYCRPD command, Mr. Zeller was serving as the patrol supervisor for Second Platoon when officers located a vehicle wanted in connection with the robbery of the First National Bank in Manchester Township.

243. The operation Mr. Zeller organized and supervised resulted in the apprehension of the suspected bank robber without a shot being fired and without injury to any officer, civilian, or the suspect.

244. Lash converted the incident into a basis for severe disciplinary action against Mr. Zeller.

245. In charging Mr. Zeller with disciplinary violations arising from the incident, Lash ignored information available to him, distorted the circumstances of the incident, and selectively characterized the evidence in order to manufacture a false pretext for Mr. Zeller's suspension and demotion.

246. Lash manufactured this discipline as retaliation for Mr. Zeller's good-faith complaints about Lash's misconduct and departmental wrongdoing.

247. In fact, before Lash had formally issued the disciplinary determination, Mr. Zeller learned that his demotion had already appeared in the Department's personnel system,

248. The disciplinary outcome had been predetermined by Lash and not based on legitimate facts or process.

249. On January 21, 2026, Lash issued a written determination finding that Mr. Zeller had engaged in unbecoming conduct and unsatisfactory performance and had violated Department rules. Lash imposed a thirty-six-hour suspension, and the Police Commission, acting upon the matter presented by Lash and his command staff, removed Mr. Zeller from his position as Probationary Corporal and returned him to the rank of Officer.

250. As a result of the discipline, Mr. Zeller lost rank, compensation, supervisory authority, professional standing, and advancement opportunities. He was also removed from Second Platoon, reassigned to Third Platoon under a different supervisor, directed to remove his corporal insignia, and warned that future policy violations could result in additional discipline, including termination.

251. Defendants' retaliation motive was further reflected in Mr. Zeller's performance evaluations in late November 2025, which criticized him for spreading "negativity about command staff, his supervisors, and this agency in general." This criticism concerned the same departmental leadership and alleged misconduct that Mr. Zeller had sought to bring to the Commission's attention.

252. The retaliation against Mr. Zeller continued after his January demotion. On August 5, 2026, Defendants suspended Mr. Zeller without pay for eighty-four hours on charges including neglect or violation of official duties, disobedience of orders, and conduct unbecoming an officer.

253. Like his demotion in 2025, this discipline was carried out in retaliation for his reports of wrongdoing.

254. Plaintiffs allege that Defendants elevated that minor or disputed discrepancy into severe discipline as part of the same heightened and selective scrutiny imposed after Lash identified Mr. Zeller as an anonymous complainant, while comparable conduct by officers who had not criticized Lash did not result in comparable discipline.

**Retaliation Against Logan Chetaitis**

255. After identifying Mr. Chetaitis as a source of the complaints, Lash began monitoring Mr. Chetaitis's movements through the Department's GPS tracking system in a manner not ordinarily applied to other officers.

256. As they had done with Mr. Zeller, Defendants retrieved and scrutinized Mr. Chetaitis's reports and work product, searched for purported inaccuracies, initiated investigations and disciplinary proceedings, and treated routine or immaterial matters as grounds for punishment.

257. During his seven years as an NYCRPD officer, Mr. Chetaitis's annual performance evaluations never identified any concern regarding his truthfulness, credibility, report writing, or preparation of patrol logs.

258. Following Mr. Chetaitis's complaints, Defendants subjected his work to heightened scrutiny as a pretext to manufacture accusations for any discrepancy, omission, technical error, or inconsistency they could characterize as misconduct. Defendants did not subject similarly situated officers who had not complained about Lash to comparable scrutiny.

259. On June 23, 2026, Defendants summoned Mr. Chetaitis to a meeting without advance notice that he was the subject of a formal "truthfulness investigation." The meeting was conducted by Lieutenant Eiker and Sergeant Cicale and was recorded by video and audio without

Mr. Chetaitis's prior knowledge or consent. At this pretextual investigation, Defendants lodged manufactured and false accusations as a basis to attack Mr. Chetaitis.

260. Immediately following the June 23, 2026 interview, Mr. Chetaitis was placed on paid administrative leave pending further action concerning the investigation.

261. On July 9, 2026, Lash suspended Mr. Chetaitis without pay and recommended that the Commission terminate his employment. The Commission thereafter considered Lash's recommendation and approved Mr. Chetaitis's termination, with formal written notice of termination issued on July 22, 2026.

262. The investigation was not conducted as a neutral inquiry into Mr. Chetaitis's performance. Rather, Lash and his subordinates selectively scrutinized his work, characterized disputed or commonplace log discrepancies as intentional dishonesty, and used the resulting accusations to discredit Mr. Chetaitis and create a pretext for his termination. Comparable conduct by officers who had not criticized Lash did not result in similar investigations or disciplinary action.

263. Lash ultimately relied upon the matters uncovered through this heightened scrutiny, including the alleged patrol-log and reporting discrepancies, as grounds for terminating Mr. Chetaitis's employment.

264. The real reason for the termination was not any purported dishonesty. It was retaliation for Mr. Chetaitis's good-faith complaints about Lash's misconduct and departmental wrongdoing, as demonstrated by Lash's knowledge of and hostility toward the complaints, the timing and sequence of the discipline, and the disparate treatment of other officers alleged herein.

265. Defendants' heightened scrutiny, surveillance, investigation, and ultimate termination of Mr. Chetaitis were undertaken because he reported and criticized Lash's misconduct

and departmental wrongdoing. These actions were intended to punish Mr. Chetaitis for his protected activity and deter other officers from reporting similar misconduct.

266. The timing of Defendants' actions, Lash's knowledge of Mr. Chetaitis's complaints, the unusual degree of monitoring, and the selective treatment of Mr. Chetaitis compared to similarly situated officers support the inference that the investigation and termination were motivated by retaliation rather than legitimate disciplinary concerns.

**Injury**

267. Defendants' conduct would deter an ordinary person from reporting public corruption, officer-safety failures, or misuse of public resources.

268. As a direct and proximate result, Plaintiffs have suffered or will suffer lost compensation and benefits, lost overtime and promotional opportunities, damage to their careers and reputations, emotional distress, humiliation, litigation expenses, and other economic and noneconomic harm.

269. Plaintiffs seek prospective relief necessary to stop continuing retaliation, correct their employment records, restore lost positions or opportunities, and protect them and other officers from further retaliation.

**COUNT I**
**FIRST AMENDMENT RETALIATION — SPEECH AND PETITION CLAUSES — 42 U.S.C. § 1983**
**Plaintiffs Logan Chetaitis and Tyler Zeller v. All Defendants**

270. Plaintiffs incorporate the preceding paragraphs as if fully set forth here.

271. To establish First Amendment retaliation, a public employee must show that he engaged in protected activity and that the protected activity was a substantial or motivating factor in the retaliatory action. *Gorum v. Sessoms*, 561 F.3d 179, 184 (3d Cir. 2009).

272. A public employee speaks as a citizen where the speech itself falls outside the employee's ordinary job duties. "[T]he critical question" is whether the speech is "ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Lane v. Franks*, 573 U.S. 228, 240 (2014); *see also Flora v. County of Luzerne*, 776 F.3d 169, 178–81 (3d Cir. 2015).

273. Mr. Zeller and Mr. Chetaitis spoke as citizens when, outside the ordinary police chain of command, they separately authored and caused anonymous written complaints to be delivered to the civilian governing Commission reporting violations of the Departments Code of Conduct, General Orders, and laws and regulations related to the ethics and misuse of public funds and resources.

274. Preparing anonymous complaints concerning wrongdoing by the Department and its leadership were not within Mr. Zeller's or Mr. Chetaitis's ordinary duties as police officers.[3]

275. Mr. Zeller's and Mr. Chetaitis's speech addressed matters of public concern, including the deaths of three police officers, violation of an established Code of Conduct and General Orders, misuse of public funds and Department property, and accountability within a publicly funded police department. Mr. Zeller's first letter specifically requested that the Commission independently investigate the reported misconduct and protect officers from retaliation.

276. Mr. Zeller's and Mr. Chetaitis's written complaints also constituted petitions to their civilian governing authority for redress of grievances. Through those complaints, they asked the Commission to investigate wrongdoing, correct unsafe and improper practices, prevent misuse

[3] That these communications fell outside Mr. Zeller's and Mr. Chetaitis's ordinary duties is further demonstrated by NYCRPD General Order 1.8.5.51, which provides that communications for the Board of Commissioners shall emanate through the Chief of Police, and expressly directs that Department members "shall NOT correspond directly to the Board unless directed to do so by the Chief or the Board."

of public resources, hold responsible officials accountable, and protect reporting officers from retaliation.

277. Retaliating against Mr. Zeller or Mr. Chetaitis because they sought investigation and corrective governmental action violated their rights under the Petition Clause as well as the Speech Clause of the First Amendment.

278. Mr. Zeller's and Mr. Chetaitis's interests, and the public's interest in disclosure, outweighed any legitimate governmental interest in restricting their speech, and their speech did not cause workplace disruption sufficient to justify retaliation.

279. Nor could Defendants lawfully rely upon General Order 1.8.5.4 or General Order 1.8.5.51 to prohibit or punish Mr. Zeller's and Mr. Chetaitis's communications. As applied to speech by citizens on matters of public concern, those General Orders violate the First Amendment, and any discipline imposed for violating them would itself constitute unconstitutional retaliation.

280. The existence of General Orders 1.8.5.4 and 1.8.5.51 further demonstrates that Plaintiffs' direct communications with the Commission were outside their ordinary employment duties. Defendants could not convert constitutionally protected citizen speech and petitioning into punishable employee misconduct merely because Plaintiffs bypassed a chain of command that required complaints concerning Lash to be routed through Lash himself.

281. Defendants concluded that Mr. Zeller and Mr. Chetaitis had authored the anonymous complaints and thereafter subjected them to the adverse actions alleged above because of their protected speech.

282. Mr. Zeller's and Mr. Chetaitis's protected speech was a substantial or motivating factor in those adverse actions, as demonstrated by the timing and sequence of events, Defendants'

efforts to identify the anonymous authors, statements reflecting hostility toward the complaints and their authors, and the selective scrutiny and treatment alleged above.

283. Lash personally participated in the retaliatory conduct alleged herein. The Commission participated in, authorized, ratified, or permitted the retaliation as more fully alleged in Count II.

284. Defendants would not have taken the same adverse actions against Mr. Zeller and Mr. Chetaitis absent their protected speech and petitioning activity.

285. As a direct and proximate result of Defendants' conduct, Mr. Zeller and Mr. Chetaitis suffered the injuries described above.

**COUNT II**
**MUNICIPAL LIABILITY UNDER 42 U.S.C. § 1983**
**<u>Plaintiffs Logan Chetaitis and Tyler Zeller v. Defendant Northern York County Regional Police Commission</u>**

286. Plaintiffs incorporate the preceding paragraphs as if fully set forth here.

287. To plead a municipal liability claim under 42 U.S.C. § 1983, a plaintiff must allege that "a [local] government's policy or custom . . . inflict[ed] the injury" at issue. *Estate of Roman v. City of Newark*, 914 F.3d 789, 798 (3d Cir. 2019) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)). "Policy is made when a decisionmaker possess[ing] final authority to establish municipal policy with respect to the action issues an official proclamation, policy, or edict." *Id*. (quoting *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1480 (3d Cir. 1990)).

288. The Commission is a regional governmental body created by participating municipalities pursuant to Pennsylvania's Intergovernmental Cooperation Law and the Composite Charter of the Northern York County Regional Police Commission. The Commission is composed of representatives appointed by the participating municipalities in York County served by NYCRPD and serves as NYCRPD's governing body.

289. Under the Composite Charter, the Commission possesses final policymaking authority over NYCRPD personnel and discipline, including the authority to hire, fire, suspend, promote, demote, discipline, and otherwise manage NYCRPD employees.

290. Mr. Zeller and Mr. Chetaitis separately authored anonymous complaints that were delivered to the Commission and reported wrongdoing including violation of an established Code of Ethics, Departmental General Orders, misuse of public funds and Department property, officer-safety concerns, favoritism, conflicts of interest, and other misconduct within NYCRPD.

291. The complaints expressly placed the Commission on notice that officers feared retaliation for reporting misconduct and sought independent investigation and accountability outside the ordinary police chain of command.

292. After receiving Mr. Zeller's complaint, the Commission held an executive session concerning its allegations. Lash thereafter stated that he and certain members of the Commission wanted to identify and fire the first anonymous author.

293. Despite being placed on notice of the risk of retaliation, the Commission failed to protect the reporting officers and permitted efforts to identify the individuals responsible for the complaints.

294. The Commission thereafter purported to investigate the allegations and determined that they were unfounded. As alleged above, however, the Commission failed to conduct a genuine and independent examination of the reported wrongdoing while permitting the officers responsible for the complaints to become the targets of retaliation.

295. The Commission subsequently exercised its final personnel and disciplinary authority against Mr. Zeller by removing him from his position as Probationary Corporal and

returning him to the rank of Officer after Lash and NYCRPD command staff presented the disciplinary matter.

296. Then in August of 2026, Mr. Zeller was the victim of additional retaliation when he was suspended without legitimate basis.

297. The Commission thereafter exercised its final disciplinary authority over Mr. Chetaitis by considering Lash's recommendation for termination and terminating Mr. Chetaitis's employment after the Commission had already received complaints concerning Lash, had been warned that officers feared retaliation, and knew or had reason to know that Mr. Chetaitis had been identified as an author or supporter of those complaints.

298. The Commission's disciplinary decisions concerning Mr. Zeller and Mr. Chetaitis were therefore acts of the governmental entity's final policymaker, not merely actions of subordinate NYCRPD employees. Because the Commission possessed final policymaking authority over the discipline at issue, its decisions concerning Mr. Zeller and Mr. Chetaitis constituted acts of the municipality itself.

299. Before exercising that authority, the Commission had received the anonymous complaints, had been expressly warned that reporting officers feared retaliation, had met concerning the allegations and possible safeguards against retaliation, and knew that Lash sought to identify the complainants.

300. The Commission nevertheless approved the challenged discipline with knowledge of the protected activity and the circumstances supporting retaliatory motive. Those final policymaking decisions were a moving force behind the violations of Mr. Zeller's and Mr. Chetaitis's First Amendment rights

301. Commission members relying on Lash concluded that Mr. Chetaitis authored and participated in the complaints concerning Lash and NYCRPD leadership and permitted or ratified the retaliatory actions taken against him because of his protected activity.

302. The foregoing actions and decisions were undertaken or ratified by the Commission in the exercise of its final policymaking authority and therefore constituted official policy for purposes of § 1983.

303. The Commission's official policy was an affirmative and moving force behind the retaliation against Mr. Zeller and Mr. Chetaitis for engaging in constitutionally protected speech and caused the violations of their First Amendment rights.

304. As a direct and proximate result, Mr. Zeller and Mr. Chetaitis suffered the injuries described above.

**COUNT III**
**PENNSYLVANIA WHISTLEBLOWER LAW UNDER 43 P.S. § 1423**
**Plaintiffs v. All Defendants**

305. Plaintiffs incorporate the preceding paragraphs as if fully set forth here.

306. The Commission is a "public body" and an "employer" within the meaning of the Pennsylvania Whistleblower Law. Lash, as Plaintiffs' supervisor, a superior of their supervisors, or an agent of the Commission, is also an "employer" within the meaning of the Law. 43 P.S. § 1422.

307. The Pennsylvania Whistleblower Law provides that "[n]o employer may discharge, threaten or otherwise discriminate or retaliate against an employee" regarding the terms or conditions of employment because the employee makes a "good faith report" of "wrongdoing or waste" to the employer or an appropriate authority. 43 P.S. § 1423(a).

308. "Wrongdoing" includes a violation, other than one of a merely technical or minimal nature, of a Federal or State statute or regulation, a political-subdivision ordinance or regulation,

or "a code of conduct or ethics designed to protect the interest of the public or the employer." 43 P.S. § 1422.

309. A qualifying "code of conduct or ethics" must be embodied in a written document. *Surmacz v. Department of Public Welfare*, 612 A.2d 566, 568 (Pa. Cmwlth. 1992). The law, regulation, or written code underlying the reported wrongdoing must also "specifically define some prohibited conduct." *Sukenik v. Township of Elizabeth*, 131 A.3d 550, 556 (Pa. Cmwlth. 2016).

310. The Law separately defines "waste" to include "an employer's conduct or omissions which result in substantial abuse, misuse, destruction or loss of funds or resources belonging to or derived from Commonwealth or political subdivision sources." 43 P.S. § 1422.

311. Plaintiffs' protected reports of wrongdoing principally concerned three categories: (1) violation of Code of Ethics and General Orders; (2) refusal to investigate violations of the Code of Conduct and General Orders; and (3) misuse of Department resources, property, and equipment.

312. With respect to the misuse of Department resources, property, and equipment, Mr. Zeller and Mr. Chetaitis made good-faith reports to the Commission that public money and Department resources had been purchased, maintained, or used for unnecessary, self-serving, or personal purposes. The conduct reported implicated Pennsylvania statutes governing the misuse of government property and public office,[4] as well as NYCRPD General Order 1.8.5.27, which requires officers to use "Departmental equipment only for its intended purpose" and provides that officers "shall not abuse, damage or lose Departmental equipment." The reported conduct also

[4] *See* 18 Pa.C.S. § 4113(a) (providing that a person commits an offense if he "applies or disposes of property that has been entrusted to him as a fiduciary, or property of the government . . . in a manner which he knows is unlawful and involves substantial risk of loss or detriment to the owner of the property or to a person for whose benefit the property was entrusted"); 65 Pa.C.S. § 1103(a) ("No public official or public employee shall engage in conduct that constitutes a conflict of interest.").

implicated General Order 1.8.5.3, which identifies "abuse of a position of authority" and "misappropriation of Department property" as unacceptable conduct.

313. Such conduct also potentially violated the Public Official and Employee Ethics Act, 65 Pa.C.S. § 1103(a), which prohibits a public official or public employee from engaging in conduct that constitutes a conflict of interest, including the use of the authority of public office for the private pecuniary benefit of the official, a member of his immediate family, or a business with which he is associated, *see* 65 Pa.C.S. § 1102 (defining "conflict of interest"), as well as criminal statutes prohibiting theft by unlawful taking, theft by deception, and failure to make required disposition of funds received. *See* 18 Pa.C.S. §§ 3921, 3922, 3927.

314. As detailed herein, Defendants discharged, threatened, discriminated or took other adverse employment actions against the Plaintiffs in retaliation for the Plaintiffs reports of wrongdoing.

315. As further detailed herein, this wrongdoing involved violations of legal and ethical standards and an established Code of Conduct and General Orders.

316. Plaintiffs commenced this action within 180 days of the actionable retaliatory violations alleged herein. Plaintiffs seek relief under this Count only for actionable retaliatory conduct occurring within the statutory limitations period.

317. Plaintiffs suffered damages as a direct and proximate result of Defendants' violations of the Pennsylvania Whistleblower Law.

318. Plaintiffs are entitled to reinstatement or restoration of positions and seniority, back pay, actual damages, attorneys' fees, costs, and other relief authorized by 43 P.S. §§ 1424 and 1425.

## COUNT IV
## DECLARATORY JUDGMENT UNDER 28 U.S.C. § 2201

**Plaintiffs Tyler Zeller and Christopher Irwin v. All Defendants**

319. Plaintiffs incorporate the preceding paragraphs as if fully set forth here.

320. An actual and continuing controversy exists between Plaintiffs and Defendants concerning Plaintiffs' rights to engage in constitutionally and statutorily protected speech and reporting without retaliation and Defendants' obligations with respect to such protected conduct.

321. Mr. Zeller and Mr. Irwin remain employed and are subject to the challenged General Orders.

322. That credible threat presently chills their intended speech and petitioning. As applied to such citizen speech and petitioning on matters of public concern, General Orders 1.8.5.4 and 1.8.5.51 violate the First Amendment. Plaintiffs seek declaratory relief under 28 U.S.C. §§ 2201–2202 and prospective injunctive relief under §1983.

323. Plaintiffs seek a declaration that General Orders 1.8.5.4 and 1.8.5.51, as applied to officers' speech and petitions to the Commission on matters of public concern, are unconstitutional restraints upon speech and petitioning activity protected by the First Amendment.

324. Plaintiffs are also entitled to declaratory relief under 28 U.S.C. §§ 2201–2202 and prospective injunctive relief preventing enforcement of General Orders 1.8.5.51 and 1.8.5.4 against constitutionally protected speech and petitioning.

325. Such declaratory relief would clarify the parties' continuing legal rights and obligations and would afford Plaintiffs relief from the ongoing controversy alleged herein.

326. Plaintiffs are entitled to declaratory relief pursuant to 28 U.S.C. §§ 2201–2202 and such further relief as the Court deems just and appropriate.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully request judgment in their favor and against Defendants and the following relief:

A. A declaration that General Orders 1.8.5.4 and 1.8.5.51, as applied to officers' speech and petitions to the Commission on matters of public concern, are unconstitutional restraints upon speech and petitioning activity protected by the First Amendment.

B. Reinstatement or restoration of positions, assignments, seniority, promotional eligibility, overtime opportunities, and other employment privileges lost because of retaliation;

C. Expungement or correction of retaliatory investigations, evaluations, discipline, and related records;

D. Back pay, front pay where reinstatement is unavailable, lost benefits, lost overtime, and other economic damages;

E. Compensatory damages for emotional distress, humiliation, reputational injury, and other noneconomic harm;

F. Nominal damages for the violation of Plaintiffs' constitutional rights;

G. Punitive damages against Defendant David L. Lash;

H. Prejudgment and post-judgment interest;

I. Reasonable attorney's fees and costs under 42 U.S.C. § 1988, 43 P.S. § 1425, and other applicable law; and

J. Such other relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury on all issues so triable.

Respectfully submitted,

**BOCHETTO LENTZ HEIM, P.C.**

Date: October 13, 2026

By: */s/ George Bochetto*

George Bochetto, Esquire
Bryan R. Lentz, Esquire
Kean C. Maynard, Esquire
PA I.D. Nos. 27783, 71383, 327794
1524 Locust Street
Philadelphia, PA 19102
(215) 735-3900
gbochetto@blhlegal.com
blentz@blhlegal.com
kmaynard@blhlegal.com
*Counsel for Plaintiffs*