# Exhibit "A"

Outlook

## RE: First platoon

**From** David L. Lash <DLash@nycrpd.org>

**Date** Wed 9/17/2025 6:17 AM

**To** James E. Kulak <JKulak@nycrpd.org>; Brian Schantz <BSchantz@nycrpd.org>; Adam Eisenhart <AEisenhart@nycrpd.org>; Stephen McClure <SMcClure@nycrpd.org>; Tyler Zeller <TZeller@nycrpd.org>; William I. Nailor <WNailor@nycrpd.org>; Erika L. Eiker <EEiker@nycrpd.org>; Stephen E. Lebo <SLebo@nycrpd.org>; Andrew Miller <AMiller@nycrpd.org>; Noah S. Potteiger <NPotteiger@nycrpd.org>; Matthew T. Cicale <MCicale@nycrpd.org>; Robert H. Ryman <RRyman@nycrpd.org>

**Cc** Jeremy J. Neidigh <JNeidigh@nycrpd.org>; Gregg A. Anderson <GAnderson@nycrpd.org>; John C. Migatulski <JMigatulski@nycrpd.org>; Cody M. Becker <CBecker@nycrpd.org>; Mark E. Baker <MBaker@nycrpd.org>; Jack C. Asper <JAsper@nycrpd.org>; Zachary Grey <ZGrey@nycrpd.org>; Isaiah D. Emenheiser <IEmenheiser@nycrpd.org>; Jonathan A. Bailey <JBailey@nycrpd.org>

Duff also works at St. Rose of Lima School. Extra checks should be made there as well.

Dave

David L. Lash
Chief of Police
Northern York County Regional Police
One Regional Way
York, PA 17404

Dlash@nycrpd.org
717.292.0542 (office)

CLASS #278
School of Police
Staff & Command



-------- Original message --------
From: "James E. Kulak" <JKulak@nycrpd.org>
Date: 9/17/25 05:40 (GMT-05:00)
To: Brian Schantz <BSchantz@nycrpd.org>, Adam Eisenhart <AEisenhart@nycrpd.org>, Stephen McClure <SMcClure@nycrpd.org>, Tyler Zeller <TZeller@nycrpd.org>, "William I. Nailor" <WNailor@nycrpd.org>, "Erika L. Eiker" <EEiker@nycrpd.org>, "Stephen E. Lebo" <SLebo@nycrpd.org>, Andrew Miller <AMiller@nycrpd.org>, "Noah S. Potteiger"

<NPotteiger@nycrpd.org>, "Matthew T. Cicale" <MCicale@nycrpd.org>, "Robert H. Ryman" <RRyman@nycrpd.org>
Cc: "David L. Lash" <DLash@nycrpd.org>, "Jeremy J. Neidigh" <JNeidigh@nycrpd.org>, "Gregg A. Anderson" <GAnderson@nycrpd.org>, "John C. Migatulski" <JMigatulski@nycrpd.org>, "Cody M. Becker" <CBecker@nycrpd.org>, "Mark E. Baker" <MBaker@nycrpd.org>, "Jack C. Asper" <JAsper@nycrpd.org>, Zachary Grey <ZGrey@nycrpd.org>, "Isaiah D. Emenheiser" <IEmenheiser@nycrpd.org>, "Jonathan A. Bailey" <JBailey@nycrpd.org>
Subject: First platoon

Elizabeth Zumbra-1879 Haar Road, North Codorus Township, noted a truck parked on the road along side their property. Zumbra arrived home and checked her outside cameras to find Matthew Ruth (24 yoa and Zumbra's daughter's ex boyfriend) in the yard looking at the residence with binoculars. Ruth was dressed in full camouflage and carrying an AR rifle on his back. Ruth was not seen in person and it was unknown where he went after being recorded. The cameras were new and placed after the relationship ended. Officer Gartrell arrived within a few minutes of the call. The truck was still parked on the side of the road. The window was down and no one was inside. A perimeter was set up by Cpl Schantz and Officer Budner, Hackart and Gartrell. Zumbra and her family left the residence to stay with family. York County Sheriff's Office responded with a dog and drone. The area was searched without success. The vehicle was towed to the station for a warrant. Backpacks and clothing were visible inside. Ruth's phone pinged to his residence in Penn Township. Penn Township Police responded and made contact with Ruth's parents, who advised he was not at home. Officer Gartrell completing charges for a warrant for stalking, prowling and trespass. Zumbra's daughter, Julia reported someone (Ruth) had set her vehicle tires on fire in the middle of August right after she and Ruth broke up. Ruth is known to have mental health issues and can be violent. Ruth works at United Rentals-4 Interchange Place-Manchester Township. Ruth' s parents called to advised he may be there sleeping in a vehicle. The business was checked. Ruth was not located. Additional attempts are being made to locate him.

Officer Pantella located Barry Gohn sleeping in his vehicle in the 2600 block of Carlisle Road. During the investigation, Officer Pantella discovered a small vial of heroin and unknown white pills. Gohn was processed and released on the drug charges.

Kaitlin Duff- 108 Honey Locust Circle, Dover Township reported she received multiple text messages from her ex, Paul Witman after he was released from his arrest last night on firearm's charges. Duff reported an incident during the day and again at 2354 hrs. In both incidents, Duff stated she received text messages through an anonymous app stating I will come to your house and similar statements. Officer Chetaitis contacted Witman by phone. Witman claimed he has not made any contact with Duff since yesterday and has not had anyone contact her on his behalf. Due to ongoing issues, officers should make additional patrols in the area.

# Exhibit "B"

| | |
|---|---|
| | NORTHERN YORK COUNTY REGIONAL POLICE DEPARTMENT<br>**General Order 1.8.1** |
| Subject: Procedures to Follow Relating to Code of Conduct and Departmental Appearance | |
| Date of issue: 08.30.2021 | Effective Date: 08.30.2021 |
| Revisions: 07.10.2025, 02.10.2026 | Expires: Until Amended or Revoked |
| Review Date: Annual Review | Rescinds: N/A |
| PLEAC Standard(s): 1.8.1, 2.1.4 | Testing: |

This order consists of the following sections:

## I. Purpose

To provide the officers of the Northern York County Regional Police Department with a clear understanding of the agency guidelines specifying the expectations for conduct, appearance and behavior both on and off duty.

## II. Policy

All agency members shall comply with the requirements specified within this general order.

## III. Code of Conduct

A. The Northern York County Regional Police Department follows a Code of Conduct in which all employees maintain a high standard of personal integrity and ethical conduct in their relationship with other employees and community members.

B. The Northern York County Regional Police Department has adopted the Canon of Ethics (General Order 1.1.2) also known as the Law Enforcement Code of Ethics used by police agencies nationwide and issued by the International Association of Police Chiefs. All sworn personnel shall not only abide to the rules, regulations, polices, procedures, general orders and "Standards of Conduct" of this department, but shall also adhere to this prescribed "Code of Ethics" and the level of ethical behavior described within. Violation of the code may result in discipline. (PLEAC 1.8.1).

C. The department recognizes that our primary responsibility is to the communities which were serve. As stated in the Police Mission (General Order 1.1.3) Accountability is a core value. We believe that police officers conduct both on and off duty must be accountable and held to stringent standards. The rules, orders and regulations contained in the Departmental Code of Conduct are designed to serve as a professional standard governing the employees conduct. (PLEAC 1.8.1)

## IV. Personal Appearance of Uniformed Members

A. It is the policy of the Northern York County Regional Police that all members must present a neutral, uniform and well-groomed professional image to the public. Additionally, certain regulations are necessary to promote the personal safety of members of the agency. For these reasons, supervisors will ensure compliance with the requirements set forth in the following policy. (PLEAC 2.1.4)

B. This policy shall apply to all NYCRPD members wearing the police uniform, including those members who wear a modified uniform (Administrative Officers, Court Liaison Officer, Evidence Control Officer, Accident Reconstruction Officer, Range Instructor or Criminal Investigator). Officers assigned to field operations shall wear only uniforms and equipment that has been issued or approved by the department. (PLEAC 2.1.4)

C. Personal Appearance of Officers in Uniform (PLEAC 2.1.4)

1. On duty uniformed officers will be well-groomed and meet the following standards:

a) Hair will be neatly trimmed, shaped and arranged and the bulk or length of hair shall not interfere with the external design of the uniform cap or other authorized headgear. Forehead hair (bangs), ponytails, braids, etc., will not protrude from under the headband of the uniform cap or other authorized headgear. Hair shall be secured to the head in such a manner as to prevent it from hanging or swinging freely. The uniform cap will fit firmly and

comfortably around the largest part of the head. A male officers hair shall be above the collar and shall not extend over the ears.

b) A male officer's neck hair will not extend below the top edge of the uniform shirt collar nor cover any part of the ear. A female officer's neck hair will not extend below the bottom edge of the uniform shirt collar.

c) Sideburns or hair worn in front of the ears will be neatly trimmed; not extend below the lowest part of the ear; not be flared; be of even width; and end with a horizontal line.

d) Hair will not be adorned with any type of ornamentation nor be styled, sculpted or carved in radical fashions such as mohawk, punk, new wave, etc.

e) Hair color will be limited to colors that are natural to the human species or conservative artificial variations.

f) Hairpins, barrettes, hair-clips, or hair-bands should be black, dark blue, or should closely match the natural hair color so as not to be conspicuous.

g) Decorative hat pins, exposed clips and any other type of ornamentation is prohibited.

h) An officer's face will be clean-shaven. Mustaches are permissible and will be neatly trimmed; not be excessively bushy, rolled or curled. A mustache will not extend below the upper lip or beyond the outer points of the mouth.

i) A wig or hairpiece will conform to the same standards as stipulated for natural hair.

j) Members are permitted to use natural shades of make-up in moderate amounts. Brightly-colored or black lipstick is prohibited. Male officers are restricted from wearing make-up.

## D. Wearing of Jewelry while in uniform

1. Officers in uniform may wear a wristwatch and/or medical identification bracelet.

2. Engagement and/or wedding rings may be worn however, no more than a total of two (2) rings may be worn while in uniform.

a) All rings must be worn between the hand and the first finger joint.

b) No rings shall be worn on the thumb or forefinger of either hand.

c) No "multiple-finger" rings shall be worn.

3. Male officers are not permitted to wear any earring whatsoever. Female officers may wear earrings; however, they will be the non-pierced type. At no time will female officers wear earrings that extend beyond or hang from the ear lobe.

4. Officers shall not wear any neck jewelry similar to chokers or dog collars. Bracelets, brooches, or any other item of adornment not prescribed to be worn as part of the official police uniform shall not be worn.

5. Officers shall be permitted to wear a necklace representative of their faith. It shall not be visible while in uniform. Officers shall also be permitted to wear a medical ID necklace, which is intended to alert medical personnel of an existing medical condition.

6. The Department is not responsible for replacement or repair of wrist watches, rings and/or other personal items that may be worn while on duty.

## E. Body Art and Modifications

1. No body art/modification or body piercing jewelry shall be visible while in police uniform. This prohibition includes jewelry worn through a pierced ear, tongue, nose or eyebrows. Any dental ornamentation that is visible is also prohibited.

2. Visual sub-dermal or transdermal implants are prohibited, except for medical reasons. Visible branding or intentional scarring or mutilation must adhere to the tattoo policy outlined below.

a) No tattoo shall show protruding from the uniform from the base of the neck to the top of the head and from the base of the fingertips to the sleeve on the summer uniform shirt. Tattoo cover up sleeves or similar modifications will not be permitted.

## F. Fingernails

1. Fingernails shall be kept clean and neatly trimmed at all times.

2. Fingernails will not extend more than ¼ inch past the tip of the finger.

3. Fingernail polish (if worn) should be clear or a neutral color.

## G. Uniforms and Related Equipment

1. Members of the Department shall, while on duty, maintain a presentable appearance; uniforms shall be buttoned or zipped, as required, hats shall be worn (except in emergencies and/or while in the car). Officers assigned to field operations shall wear only uniforms and equipment that has been issued or approved by the Department.

2. Uniforms shall be clean and pressed; shoes shall be shined, and all equipment shall be in presentable condition.

3. Dark glasses shall not be worn inside. Sunglasses shall not be worn on top of the head or in any way other than the intended manner. Photo-chromatic glasses are permitted; however, sunglasses are not permitted for indoor use.

4. Uniforms shall be complete; no partial equipment or uniforms are permitted. When in uniform and engaged in field operations, a ballistic vest shall be worn at all times (PLEAC 2.1.3). When the Summer uniform is authorized, the T-Shirt shall be visible and of a crew neck cut. T-shirts shall be black in color when the Summer uniform is worn.

5. Shields are to be worn on the outermost garment at all times while in uniform. Embroidered badges on the uniform coats are authorized. While not in uniform, and during the course of an arrest, the shield should be displayed on the outermost garment, clearly identifying the member as a police officer. Members shall carry their identification cards at all times. Non uniformed, sworn personnel, who are engaged in field operations, shall wear a ballistic vest and have a badge visible.

6. The official Northern York County Regional Police patch shall be worn on the shoulders of all uniform shirts, sweaters, raincoats, jackets and winter coats. Any unauthorized wear or display of the official Department patch is prohibited.

7. The Uniform of the Day shall be as follows:

a) Winter:

Black Service Cap with Hat Badge
Black Service Fur Cap with Hat Badge
Black Fleece Cap with NYCRPD Embroidery
Long Sleeved Shirt with Tie and Tie Tac
Long Sleeved Uniform Shirt with Embroidered NYCRPD
Mock Turtleneck or Dickey
Uniform Trouser with Brown Stripe
Standard Leather / Foot Gear
Winter Jacket (as appropriate)
Black ¼ zip Pullover (as appropriate)
Black Socks

b) Summer:

Light Weight Service Jacket (as appropriate)
Black ¼ zip Pullover (as appropriate)
Black Service Cap with Hat Badge
Short-sleeved Shirt
Uniform Trouser with Brown Stripe
Standard leather/foot gear
Solid Black Crew Neck T-Shirt
Black Socks

c) Dress (Officers):

Service Cap with Hat Badge
Long-sleeved shirt with Tie and Tie Tac
Uniform Trouser with Brown Stripe
Standard Leather Low-Cut Footwear
Service Awards
Light-Weight Jacket (as appropriate)
Black Socks

Dress (Supervisors):

Service Cap with Hat Badge
Dress blouse
Long-sleeved shirt with Tie and Tie Tac
Uniform Trouser with Brown Stripe
Standard Leather Low-Cut Footwear
Service Awards
Black Socks

If leather gear is specified to be worn with the dress blouse, the duty belt shall be limited to holster with duty weapon, and handcuff case and cuffs. This shall be worn opposite the duty weapon.

8. Training or Other Dress Requirements

a) Business:

Suit
Sports Coat, Shirt and Tie
Dress Trousers
Dress footwear
Appropriate female business attire
Dress Socks

b) Business Casual:

Dress Shirt, Without Tie
Dress Slacks (No Jeans)
Dress or Casual Footwear
(No Athletic Shoes or Boots)

c) Casual

Jeans Permitted (No Shorts)
Athletic shoes permitted

(Officers are prohibited from wearing any western wear bolo-type ties or cowboy hats).

## H. Issue and Wear of Uniform Items and Accessories

1. The shirt shall be khaki in color, tailored on a form-fitting line, with military creases. There are to be two breast pockets, permanent collar stays, badge tabs and a lined yoke. The left pocket is to contain a pen compartment. Shirts will be both long and short sleeved. The display of badges, patches, medals of recognition, chevrons, rank insignia, nameplate, whistle, and pens will be as follows:

BADGE: The badge shall be worn over the left breast pocket, pinned through the badge tabs and lined yoke.

PATCHES: The Northern York County Regional Police patch shall be worn on both sleeves of the uniform shirts, sweaters, coats, and jackets, 3/4" below the seam and centered on the sleeves.

MEDAL OF RECOGNITION: Medals of Recognition shall be worn on the left breast pocket, by sworn members below the rank of corporal, when wearing the Dress Uniform. They shall be displayed in the prescribed order of precedence (See Attachment 1.8.1) centered over the pocket button with the top edge of the medals aligned with the top of the pocket flap.

CERTIFICATION BADGES: Certification badges are badges which are awarded for successful completion of specialty training courses and subsequent assignment to specialized units. Examples include the York County Quick Response Team (QRT) and the Negotiations Response Team (NRT). Certification badges shall be worn 1/4 inch above the nameplate and centered on the military crease.

CHEVRONS: Chevrons indicating the rank of Sergeant and Corporal shall be worn 1/4" below the Northern York County Regional Police patch and centered on the sleeve on all shirts, jackets, and coats.

HONOR GUARD BADGE: Officers who are members of the Department's Honor Guard are awarded this insignia. This badge shall be worn on the right pocket of the Dress Blouse. It shall be centered between the flap button and the bottom edge of the pocket, centered on the military crease. Once awarded, these badges may be worn even after the officer's assignment to the specialized unit has ended.

RANK INSIGNIA (COLLAR): Officers rank insignia shall be worn on the collar with the outer edge of the insignia bordering the stitching on the collar.

NAMEPLATE: The nameplate shall be worn over the right breast pocket with the bottom edge of the nameplate touching the top edge of the pocket flap and centered over the button. Sergeants and above shall wear a gold in color nameplate. Corporals and below shall wear a silver in color nameplate.

WHISTLES: The whistle, when worn, shall be chrome in color (officer) or gold (supervisor) with a matching lanyard. It shall be attached to the bottom on the right epaulet with the whistle inside the right breast pocket.

PENS : Pens shall be displayed (carried) in the left breast pocket in the pen compartment. No more than two pens shall be carried in the

compartment. Pens may be black, gold or silver in color. Brightly colored pens shall not be carried in the uniform pocket.

REGIONAL POLICE TIE TAC: The tie tac shall be worn centered on the tie with the tac being an inch below the bottom edge of the pocket flaps.

2. Issue and Optional Uniform Items

a) The trouser shall be black, using a modified uniform pattern. It shall have a contrasting stripe, matching the color of the shirt. Officers, Corporals and Sergeants shall have a 3/4" stripe and the Lieutenants and Chief a 1" stripe, with a gold stripe centered within. The length of the trouser shall be such that they meet the top of the rubber heel of the shoe where the leather begins.

b) The tie is to be the traditional four-in-hand, redi-tied, the same color as the trouser with "Regional" printed on the lower left corner.

c) The winter jacket will be black with epaulets, badge patch, side zippers, two-way front zipper. The summer jacket will be the same with a reversible ANSI/ISEA 207-2006 compliant interior.

d) The raincoat is to be black with reversible reflective lining, made of 100% nylon. Both sides are to have badge tabs and access openings for pockets and/or weapons.

e) Each sworn officer shall be issued a break-away, ANSI/ISEA 207-2006 compliant vest. The vest shall be worn in those situations specified by departmental general orders.

f) Only approved items of uniform or equipment shall be worn. The Chief of Police or his designee have the final decision concerning uniform determinations.

g) Medals of Recognition and Their Order of Precedence

Medals of recognition shall be worn as previously described. They are to be displayed in the order of precedence stated below. Medals of a higher precedence shall be worn above and to the officer's right of medals having a lower precedence. The Order of Precedence is as follows:

Medal of Valor
Award of Merit
Commissioners' or Chief's Commendation

Award for Injury in the Line of Duty
Life Saving Award
Officer of the Year Award
Award for completion of FBI NA/NU SPSC/SPI AOC
PLEAC Accreditation Award
Years of Service Award
Safe Driving Award
Good Conduct Award
Advanced Certification Award
Honor Guard Award
Field Training Officer Award
Explorer Advisor Award
School Resource Officer Award
Perfect Attendance Award

h) Members wishing to wear a sweater as part of their uniform may do so under the following guidelines. The sweater must be black (V-neck) with epaulets, badge tabs, and a lined yoke for display of the Departmental Badge. The NYCRPD shoulder patch will be worn on both sleeves in accordance with existing guidelines.

i) Service Cap

A military type, peaked cap may be worn on a year-round basis in lieu of the fur pile cap. The style shall be a Modified Pershing design with these modifications:

(1) Chief - The crown shall be black in color, same as the uniform trouser; the visor strap will be a gilt-gold color; the visor will be black with gilt-gold oak leaf clusters.

(2) Lieutenants- The crown is to be the same as above with the visor strap gilt-gold in color.

(3) Sergeants- Same as the Lieutenants.

(4) Corporals- The visor strap shall be silver in color.

(5) Officers- The crown to be the same as above, visor strap and visor shall be black.

3. All uniforms and/or equipment issued are to be returned or otherwise accounted for whenever an officer leaves the employment of the Department. All items not returned or satisfactorily accounted for will be charged to the leaving employee at the replacement value.

## I. Service Weapon

1. The issued weapon shall be a .40 caliber GLOCK, Model 22. Three magazines with a 15 round capacity will be provided. Each magazine shall be loaded with 15 rounds of issued ammunition. One round will also be chambered at all times while on duty. The gun will be carried in the Tactical Condition (PLEAC 1.3.8 a).

2. The issued ammunition shall be .40 caliber by manufacturers determined by the Department (PLEAC 1.3.8 b).

3. Leather gear (basket-weave type) shall be issued and consist of a belt, holster, magazine pouches, handcuff case, baton holder, mace holder, radio holder, school card holder, bola wrap holder, and belt keepers. The duty belt shall be the Border Patrol version as is presently issued. The magazine pouch shall be worn in the vertical position. It shall be the responsibility of each officer to maintain his/her issued gear in a presentable condition at all times.

## J. Exemptions

1. Any exemption to the above stated policy shall only be permitted after written permission is received from the Chief of Police.

## V. Effective August 30, 2021

**By Order of**

**David L. Lash**
**Chief of Police**

# Exhibit “C”

| | |
|---|---|
| | NORTHERN YORK COUNTY REGIONAL POLICE DEPARTMENT<br>**General Order 1.8.5** |
| Subject: Violation of General Orders, Rules, Regulations or Directives | |
| Date of Issue: 02.21.2022 | Effective Date: 02.21.2022 |
| Revisions: | Expires: Until Amended or Revoked |
| Review Date: Annual Review | Rescinds: Police Guide Chapter 3 |
| PLEAC Standard(s): 2.3.0 | Testing: |

This order consists of the following sections:

# I. Purpose

To provide the officers of the Northern York County Regional Police Department with a clear understanding of the agency rules, regulations, general orders and directives.

# II. Policy

All agency members shall comply with the requirements specified within this general order.

# III. Rules and Regulations

### 1.8.5.1 Violation of rules

Officers shall not commit any acts or omit any acts which constitute a violation of any rule, regulation, general order, guideline, directive, memorandum, or order of the Department whether stated in this general order or elsewhere.

### 1.8.5.2 Reporting violation of rules

It shall be the duty of all members of the Department to report to the Chief any violation of this General Order, and/or other Department rule, memo, general

order, and regulation, committed by any member of this Department which may come to their attention.

### 1.8.5.3 Unbecoming conduct

Officers shall always conduct themselves, both on and off duty in such a manner as to reflect most favorably on the Department. Conduct unbecoming an officer shall include that which brings the Department into disrepute or reflects discredit upon the officer as a member of the Department or that which impairs the operation or efficiency of the Department or officer. It is not possible, nor should it be necessary to enumerate all conduct which would be unbecoming a member of the Department, but the following list may serve as some examples of unacceptable behavior:

- Violations of the law.
- Willful, or malicious violations of any person's rights under the U.S. Constitution or the laws of the Commonwealth of Pennsylvania.
- Abuse of a position of authority.
- Discriminatory administration and/or application of laws by reason of acquaintanceship or because of race, creed, color, ethnic origin, or sex.
- Being unfit to carry out responsibilities, except when sick or injured.
- Profane language in public.
- Absenteeism - excessive.
- Misappropriation of Department property.
- Removal of Department records without authorization.
- Horseplay with firearms.

### 1.8.5.4 Public statements and appearances

In carrying out the functions of the Department, a member shall direct and coordinate his efforts in such a manner as will tend to establish and maintain the highest standard of efficiency; in addition, a member is required to discharge his duties in a calm, professional manner. Members are required to assist and protect the other members of the department in the performance of their duties and shall not publicly criticize other members of the department; nor shall they demean,

ridicule or otherwise publicly criticize any of the orders or instructions issued by the supervisors or department memoranda; and when in the presence of persons from outside the department, employees shall address fellow employees by their rank or their title.

A member of the Department shall not address any public gathering, appear on radio or television or write articles or manuscripts for publication where he is identified as a member of this Department, unless authorized by the Chief nor shall a member of this Department purport to express the official policies of the Department or the Board of Commissioners without the permission of the Chief.

**1.8.5.5 Reporting for duty**

Officers of the Department shall be punctual in reporting for duty and shall not be tardy or absent from duty (or from an assignment) without proper leave or authority. They shall be properly equipped and cognizant of information required for proper performance of duty so that they may immediately assume their duties. Subpoenas shall constitute an order to report for duty under this section. Members absent, without proper excusal, for more than four (4) days shall be deemed to have resigned without permission.

**1.8.5.6 Associations**

An officer of the Department, except in the discharge of official duty, shall not knowingly associate with, or have dealings with, any person or organization, advocating, or instrumental in, fostering hatred, prejudice, or oppression against any racial, religious, or ethnic group; and shall not affiliate with, or become a member of any organization if such organization or membership would, in any way, interfere with, or prevent him from the proper performance of his duties.

Officers shall avoid regular or continuous associations or dealings with persons whom they know or should know, are persons under investigation or indictment, or who have a reputation in the community or the Department for present involvement in felonious or criminal behavior except as necessary to the performance of official duties, or where unavoidable because of other personal relationships of the officer.

Reference General Order 1.8.3 Biased Based Policing

**1.8.5.7 Impaired behavior**

A member of the Department is always a police officer while in this jurisdiction, therefore, members shall be physically and mentally fit to perform duty when

called to do so. Members observing other members who appear to be unfit to perform duty, or who appear to be acting irrationally, whether on or off duty, shall report this situation to their supervisor or officer in charge, who shall report this information to the Chief. The Chief may direct the member who appears unfit or acting irrationally, etc., to undergo medical, physical or psychological examinations. While in this jurisdiction, members observing the necessity for police action shall take such action whether on or off duty.

**1.8.5.8 Gifts, gratuities, bribes or rewards**

A member of the Department shall not directly, or indirectly, accept or solicit, directly or indirectly, any award, gratuity, bribe, reward or gift for police services (or to refrain from taking such action) either for himself or another. No contributions or subscriptions shall be made by a member of the Department to buy a present for another member of the Department, and they shall not collect or receive any monies, property or other things of value from persons for any such purpose, neither shall they circulate subscription papers, sell tickets or collect money from any person for any purpose, without permission of the Chief.

Reference General Order 1.6.1 Procedures to Follow Relating to Fiscal Management and Agency Owned Property.

**1.8.5.9 Alcoholic beverages and drugs in police installations**

No intoxicants or drugs shall be brought into, or kept in any police building, facility or vehicles, except for official business.

**1.8.5.10 Use of tobacco**

A member of the Department, while on duty, shall not smoke cigarettes, cigars, pipes or vaping devices while conducting interviews, in places where it is prohibited, or under like conditions when smoking may be detrimental to good conduct, appearance or procedures.

**1.8.5.11 Reporting municipal litigation**

A member of the Department shall not give expert testimony against the interests of a municipality of the Northern York County Regional Police Department jurisdiction in a litigation to which a jurisdiction is a party, without first informing the Chief.

### 1.8.5.12 Endorsements and referrals

No officer shall promote, recommend or otherwise suggest the services of an undertaker, an attorney, bail bondsman, tow truck or repair service of any kind, while acting in his official capacity. EXCEPTIONS: extreme emergencies and when the suggested service is the only one available; and/or where provided by General Order 2.4.5 Procedures to Follow Concerning Towing Operations and Inventorying of Motor Vehicles.

### 1.8.5.13 Telephone

Members are required to have telephones in their residence or a cellular phone and shall immediately report any changes of telephone numbers including telephone numbers where they can be reached in emergencies.

Reference General Order 1.7.2 Procedures to Follow Relating to Change of Address, Phone Number or Status.

### 1.8.5.14 Civil suits

Members instituting civil suits or claims against a private party as the result of an incident occurring on duty, and members against who a civil suit or claim is initiated by a private party as the result of an incident occurring on duty, shall, without delay, notify the Chief in writing.

### 1.8.5.15 Meals

Officers shall be permitted to suspend patrol or other assigned activity, subject to immediate call at all times, for the purpose of having meals during their tours of duty. Whenever possible, a member on duty shall take a meal period within his/her assigned area. In the event the member wishes to take a meal period at home, outside his/her assigned area, he/she may do so, provided it is on a one-time basis and the location is within a reasonable distance and the member can respond to his/her assigned area within a short period of time. If a member wishes to take lunch breaks at his/her residence outside the assigned area, on a long-standing basis, prior approval shall be obtained from the Chief. A meal period shall not exceed three-quarters (3/4) of an hour (travel time included).

### 1.8.5.16 Duty status

Members shall not participate in any organized sports, recreational or social activity and while doing so, represent themselves as "on-duty" unless such activity was expressly approved by the Chief.

**1.8.5.17 Equipment**

Members of the Department may be assigned department owned vehicles, lockers, desks, cabinets, and cases for the mutual convenience of the department and its personnel. All personnel are advised that the retention of personal items in such containers or facilities is at the risk of the employee and the department will not be responsible for any losses. Such equipment is subject to entry and inspection without notice, even if the employee has placed a personally owned lock on department property.

**1.8.5.18 Immoral conduct**

Officers shall maintain a level of moral conduct in their personal and business affairs which is keeping with the highest standards of the law enforcement profession. Officers shall not participate in any indecent acts involving moral turpitude which impairs their ability to perform as law enforcement officers or causes the Department to be brought into disrepute.

**1.8.5.19 Unsatisfactory performance**

Officers shall maintain sufficient competency to perform their duties and assume the responsibilities of their positions. Officers shall perform their duties in a manner which will maintain the highest standards of efficiency in carrying out the functions and objectives of the Department. Unsatisfactory performance may be demonstrated by the lack of knowledge of the application of laws required to be enforced; an unwillingness, or inability to perform assigned tasks, the failure to conform to work standards established for the officer's rank, grade or position; the failure to take appropriate action on the occasion of a crime disorder, or other condition deserving police attention; or absence without leave. In addition to other indications of unsatisfactory performance, the following will be considered prima facie evidence of unsatisfactory performance: repeated poor evaluations or a written record of repeated infractions of general orders, rules and regulations, directives, orders or memoranda of the Department.

Reference General Order 1.11.01 Procedures to Follow Concerning Performance Evaluations.

**1.8.5.20 Truthfulness**

Upon the order of the Chief of Police, the Chief's designee or a superior officer, officers shall truthfully answer all questions specifically directed and narrowly related to the scope of employment and operations of the Department which may be asked of them.

Reference General Order 2.3.0 Procedures to Follow Relating to Internal Investigations Against Agency Members.

**1.8.5.21 Treatment of persons in custody**

Officers shall not mistreat persons who are in their custody or allow mistreatment by other officers. Officers shall handle such persons in accordance with law and departmental procedures / general orders.

Reference General Order 1.3.0 Procedures to Follow Relating to Use of Force and 1.8.4 Procedures and Reporting Requirements for Duty to Intervene.

**1.8.5.22 Use of force**

Officers shall not use more force in any situation than is reasonably necessary under the circumstances. Officers shall use force in accordance with the law and departmental procedures.

Reference General Order 1.3.0 Procedures to Follow Relating to Use of Force and 1.8.4 Procedures and Reporting Requirements for Duty to Intervene.

**1.8.5.23 Use of weapons**

Officers shall not use or handle weapons in a careless or imprudent manner. Officers shall use weapons in accordance with law and department procedures.

Reference General Orders 1.3.0 Procedures to Follow Relating to Use of Force, Special Order 1.3.8 Types and specifications of all lethal, less lethal weapons and ammunition authorized for use by the Northern York County Regional Police, and 1.3.15 Mission Oriented Weapons Concept.

**1.8.5.24 Arrest, search and seizure**

Officers shall not make any arrest, search or seizure which they know is not in accordance with law and/or departmental procedure.

Reference General Orders 1.2.3 Procedures to Follow Relating to Search and Seizure Without a Warrant and 1.2.4 Physical Arrest Completed with or Without a Warrant.

**1.8.5.25 Carrying firearms**

Officers shall carry firearms in accordance with law and established department procedure.

Reference General Orders 1.3.0 Procedures to Follow Relating to Use of Force and Special Order 1.3.8 Types and specifications of all lethal, less lethal weapons and ammunition authorized for use by the Northern York County Regional Police.

**1.8.5.26 Operating vehicles**

Officers shall operate official vehicles in a careful and prudent manner and shall obey all laws and departmental orders pertaining to such operation. Loss or suspension of any driving license shall be reported to the Department immediately.

Reference General Order 2.1.1 Procedures for Operation of Police Vehicles.

**1.8.5.27 Use of departmental equipment**

Officers shall utilize Departmental equipment only for its intended purpose, in accordance with established departmental procedures or general orders, and shall not abuse, damage or lose Departmental equipment. All Departmental equipment issued to officers shall be maintained in proper order.

**1.8.5.28 Departmental reports**

Officers shall submit all necessary reports on time and in accordance with established departmental procedures and general orders. Reports submitted by officers shall be truthful and complete, and no officer shall knowingly enter or cause to be entered any inaccurate, false or improper information.

Reference General Order 3.4.1 Procedures to Follow for Field Reporting and Records Management.

**1.8.5.29 Insubordination**

Officers shall promptly obey any lawful orders of a superior officer. This will include orders relayed from a superior officer by an officer of the same or lesser rank.

Reference General Orders 1.4.1 Establishment of Command Protocol and Procedures, 1.4.2 Obedience to Lawful Orders from Superior Officers and 1.4.3 Procedures to Follow Relating to Written Directives and General Orders.

**1.8.5.30 Use of alcohol on duty or in uniform**

Officers shall not consume intoxicating beverages while in uniform or on duty except in the performance of duty and while acting under proper and specific orders from a superior officer. Officers shall not appear for duty, or be on duty, while under the influence of intoxicants to any degree whatsoever, or with an odor of intoxicants on their breath.

**1.8.5.31 Sleeping on duty**

Officers shall remain awake while on duty. If unable to do so, they should report to their superior officer, who shall determine the proper course of action.

**1.8.5.32 Fictitious illness or injury reports**

Officers shall not feign illness or injury, falsely report themselves ill or injured, or otherwise deceive or attempt to deceive any official of the Department as to the condition of their health.

**1.8.5.33 Neglect of duty**

Officers shall not read, play games, watch television or movies or otherwise engage in entertainment while on duty, except as may be required in the performance of duty. They shall not engage in any activities or personal business which would cause them to neglect or be inattentive to duty.

**1.8.5.34 Leaving duty post**

Officers shall not leave their assigned duty posts/areas during a tour of duty except when authorized by proper authority.

### 1.8.5.35 Residence/name/personnel data

Officers shall reside in the Commonwealth of Pennsylvania within fifteen (15) air miles of any jurisdictional boundary line serviced by the Department. New officers shall comply within 12 months of their appointment. Change of name or other personnel information such as telephone number, marital status, number of children, military service, language skills, licenses, education or training, etc. are important to the effective administration of the department. Therefore, any change of residency, name and/or personnel data shall be reported immediately on NYCRPD form 1.

Reference General Order 1.7.1 Procedures to Follow Relating to Change of Address, Phone Number or Status.

### 1.8.5.36 Interference

Officers shall not interfere with cases being handled by other officers of the Department or by any other government agency unless:

- Ordered to do so by a superior officer, or
- The intervening officer believes beyond a reasonable doubt that a manifest injustice would result from failure to take immediate action.

Officers shall not undertake any investigation or other official action not part of their regular duties without obtaining permission from their superior officer unless the exigencies of the situation require immediate police action.

Reference General Order 1.8.4 Procedures and Reporting Requirements for Duty to Intervene

### 1.8.5.37 Possession and use of drugs

Officers shall not possess or use any controlled substances, narcotics or hallucinogens except when prescribed in the treatment of officers by a physician, or dentist. When prescribed, officers shall notify the Chief of Police immediately. In accordance with MPOETC Certification requirements, **Officers are prohibited from obtaining Medical Marihuana Cards and/or possessing or using Medical Marihuana.**

Reference General Order 4.9.1 Municipal Police Officers Education and Training Commission Certification Requirements and Supporting MPOETC Certification Documents/Agency Identification Credentials.

**1.8.5.38 Abuse of process**

Officers shall not make false accusations of a criminal or traffic charge.

**1.8.5.39 Financial disclosure**

Upon the order of the Chief or the Chief's designee, officers shall submit financial disclosure statements in accordance with department procedures in connection with a complaint in which this information is material to the investigation.

Reference General Order 2.3.0 Procedures to Follow Relating to Internal Investigations Against Agency Members.

**1.8.5.40 Conformance to laws**

Any officer shall obey all laws of the United States and any state and local jurisdiction in which the officers are present. A conviction of the violation of any law shall be prima facie evidence of a violation of this section. Officers shall report any new charges (including traffic offenses) to the Chief of Police.

**1.8.5.41 Abuse of position**

Use of Official Position or Identification - officers shall not use their official position, official identification cards or badges for personal or financial gain, for obtaining privileges not otherwise available to them except in the performance of duty or for avoiding consequences of illegal acts.

Officers shall not lend to another person their identification cards or badges or permit them to be photographed or reproduced without the approval of the Chief.

Use of Name, Photograph or Title - Officers shall not authorize the use of their names, photographs, or official titles which identify them as officers, in connection with testimonials or advertisements of any commodity or commercial enterprise, without the approval of the Chief.

**1.8.5.42 Identification**

Officers shall carry their badges and identification cards on their persons at all times, except when impractical or dangerous to their safety or to an investigation.

They shall furnish their name and identification number to any person requesting that information, when they are on duty or while holding themselves out as having an official capacity, except when the withholding of such information is necessary for the performance of police duties or is authorized by proper authority.

Reference General Order 4.9.1 Municipal Police Officers Education and Training Commission Certification Requirements and Supporting MPOETC Certification Documents/Agency Identification Credentials.

**1.8.5.43 Courtesy**

Officers shall be courteous to the public. Officers shall be tactful in the performance of their duties, shall control their tempers, and exercise the utmost patience and discretion and shall not engage in argumentative discussions even in the face of extreme provocation. In the performance of their duties, officers shall not use coarse, violent, profane or insolent language or gestures and shall not express any prejudice concerning race, religion, politics, national origin, lifestyle or similar personal characteristics.

**1.8.5.44 Requests for assistance**

When any person applies for assistance, or advice, or makes complaints or reports, either by telephone or in person, all pertinent information will be obtained in an official and courteous manner and will be properly and judiciously acted upon consistent with established departmental procedures.

Reference General Order 3.4.1 Procedures to Follow for Field Reporting and Records Management.

**1.8.5.45 Response to calls**

Officers shall respond to all calls for service in a prompt and professional manner. Calls shall be handled in person unless circumstances prevent an in-person response. Supervisors shall be made aware of calls not handled in person.

Reference General Orders 2.1.1 Procedures for Operation of Police Vehicles and 3.4.1 Procedures to Follow for Field Reporting and Records Management.

**1.8.5.46 Reporting of calls**

All Calls for service and complaints shall be recorded in the records management system by creating the appropriate report (Operations, Incident or Investigative).

In ALL cases, a daily log entry is required by the officer responding to a Complaint.

### 1.8.5.47 Dissemination of information

Officers shall treat the official business of the Department as confidential. Information regarding official business shall be disseminated only to those for whom it is intended, in accordance with established departmental procedures. Officers may remove or copy official records or reports from headquarters only in accordance with established department procedures. Officers shall not divulge the identity of persons giving confidential information except as authorized by proper authority.

### 1.8.5.48 Processing property and evidence

Property or evidence which has been discovered, gathered or received in connection with departmental responsibilities will be processed in accordance with established departmental procedures and general orders. Officers shall not convert to their own use, manufacture, conceal, falsify, destroy, remove, tamper with or withhold any property or evidence in connection with an investigation or other police action, except in accordance with established department procedures.

Reference General Order 3.5.2 Procedures to Follow for Evidence or Property Collection and Preservation.

### 1.8.5.49 Political activity

Given the power vested in police officers, the Department views the officers as individuals, who through exercise of that power, effectively make limited policy decisions in the course of exercising that authority in the field. Control over that individual policy making power, as it may be influenced by individual political views is essential. Reasonable restrictions on the active partisan political conduct of officers are necessary in order to:

1. Preserve loyalty to the administration;
2. Preserve sound, consistent personnel administrative policy generally;
3. Maintain effective discipline;
4. Maintain integrity and efficiency within the Department;
5. Avoid patronage in employment practices;
6. Avoid abuse of police authority for partisan political purposes; and
7. Avoid politically prejudiced administration of our laws.

A. Officers (in an off-duty status) shall be permitted to:

1. Register and vote in any election;
2. Express opinions as individuals privately and publicly on political issues and candidates;
3. Attend political conventions, rallies, fund-raising functions and similar political gatherings;
4. Actively engage in any non-partisan political functions;
5. Sign political petitions as individuals;
6. Place election signs on their personal real estate;
7. Make financial contributions to political organizations;
8. Serve as election judges or clerks or in a similar position to perform non-partisan duties as prescribed by state or local laws;
9. Hold membership in a political party and participate in its functions to the extent consistent with this section;
10. Otherwise participate fully in public affairs except as provided by law, to the extent that such endeavors do not impair the neutral and efficient performance of official duties or create real or apparent conflicts of interest.

B. Officers (on and off duty) are prohibited from the following conduct:

1. Using their official capacity to influence, interfere with or affect the results of an election;
2. Assuming active roles in the management, organization, or financial activities of partisan political clubs, campaigns or parties;
3. Serving as officers of partisan political parties or clubs;
4. Becoming candidates for or campaigning for a partisan elective office;
5. Soliciting votes in support of, or in opposition to, any partisan candidates;
6. Serving as delegates to a political party convention;
7. Endorsing or opposing a partisan candidate for public office in a political advertisement, broadcast, or campaign literature;
8. Initiating or circulating a partisan nominating petition;
9. Organizing, selling tickets to, or actively participating in a fund-raising function for a partisan political party or candidate;
10. Addressing political gatherings in support of, or in opposition to a partisan candidate;
11. Otherwise engaging in prohibited partisan activities;
12. Holding an elective office secured principally through partisan political activity.

C. The regulations listed above are not intended to be inclusive, but merely descriptive and shall be subject to addition, modification and interpretation by

the Administration in keeping with its policy statement in the discretion of the Chief of Police.

D. An officer or officers wishing to pursue the prohibited conduct of Subsection B shall first resign his/her commission and terminate his/her employment with the Department. Failure to do so shall entitle the Chief of Police to immediately terminate the offending officer or officers.

**1.8.5.50 Interviews and statements to outside agencies**

If at any time an officer is contacted by an outside agency and requested to provide a statement or interview in reference to the officers conduct, whether on duty or off duty, the officer will notify the Chief of Police.

Officers will advise the requesting agency to contact the Chief of Police to arrange the proper time and place for the statement or interview to be given.

**1.8.5.51 Communication with board members**

All communications for the Board of Commissioners shall emanate through the Chief of Police; members shall NOT correspond directly to the Board unless directed to do so by the Chief or the Board.

**1.8.5.52 Radio and CAD communications**

Officers shall maintain a constant way of communicating with the 911 Center. When leaving the police car, the dispatcher will be notified, and the officer will have a portable radio at his access. If unable to meet these conditions the supervisor shall be notified.

All radio and CAD messages will be consistent with department guidelines and general orders. No profane language or messages shall be transmitted by the officer.

**1.8.5.53 Enforcement Actions**

All enforcement actions under this general order shall follow the guidelines and procedures established under General Order 2.3.0 Procedures to Follow Relating to Internal Investigations Against Agency Members

IV. Effective February 21, 2022

**By Order of**

**David L. Lash**
**Chief of Police**

# Exhibit "D"

**Pennsylvania Law Enforcement Accreditation Program**

# ANNUAL
# COMPLIANCE SURVEY
# FOR ACCREDITED AGENCIES

Ongoing file maintenance is a critical part of the accreditation process. The Pennsylvania Law Enforcement Accreditation Commission requires annual reports on accreditation activities from each accredited agency. The annual report form will be provided to you by program staff. Program staff should receive these reports within 30 days of your accreditation anniversary date. If the report is not received within that 30 day period, the agency chief will be contacted by program staff and made aware of the problem. Staff will work closely with the agency chief to correct any misunderstandings to insure that the report is completed and forwarded to staff in a timely manner. If the report is not received within 30 days past the anniversary date, the Commission will be notified and a letter will be sent advising the chief of the agency and the appropriate governmental representative that if the report is not received within 30 days of the letter date, the Commission will take action to decertify the agency at its next meeting.

Any accredited agency that is unable to maintain full compliance with any of the program standards shall notify program staff within 30 days. Agency officials who have questions about standard compliance or program requirements are also expected to contact program staff. If the issues cannot be resolved by phone or through the mail, the agency's chief executive officer can request an on-site review of folders and records by program staff to help resolve any problems.

The Accreditation Commission may require chief executive officers of accredited agencies to submit documentation that clearly demonstrates the agencies' ongoing compliance with selected standards. Should the review of these selected files indicate that the agency is out of compliance, program staff will offer to meet with appropriate staff members to discuss the agencies' maintenance activities.

Agency Name: Northern York County Regional Police Department

Date of Accreditation: 05.12.2022

Date of Re-Accreditation: 05.12.2025

Annual Report No.: 02

Report Due on: 04.12.2024

**1**. What is the role of the chief executive officer in monitoring compliance with program standards at your agency? Please describe those steps that the CEO takes to ensure that officers are following procedures required for accreditation and that appropriate records are being added to program files to keep them up-to-date.

The Department is currently using PowerDMS (PowerPolicy, PowerTime and PowerReady) for accreditation purposes. The Chief monitors the Assessment and confirms that files and documents are being uploaded in a timely manner. The Accreditation Manager reviews reports, logs, and numerous files daily checking for compliance. If problems are located they are immediately brought to the attention of the Chief and addressed accordingly. The Chief also reviews patrol logs, morning reports, case reports, inquiry reports and other departmental files to verify compliance. This year the department started using PowerReady for the FTO Program and all related documents are completed in this system. PowerReady also acts as a Early Warning System for potential problematic conduct tracking discipline, use of force, accidents, pursuits and other areas of concern. The Chief has final review of all documents in this system.

**2**. Please describe any formal role that other senior staff or supervisory personnel have in ensuring that the agency is complying with all program requirements. Be sure to specify how often these individuals meet to review program requirements.

The Accreditation Manager meets frequently with the Administrative Lieutenant (Neidigh) concerning departmental training and police facility related items. Also, weekly meetings are held with the Operations Lieutenant (Anderson) and the Special Operations Lieutenant (Migatulski) to verify their assigned areas are complying with accreditation standards.

The Department also holds semiannual staff meetings with all supervisory personnel where issues of concern or compliance are discussed with members.

**3**. Is your agency accreditation manager the same person who had this role when your agency was accredited and/or when it last submitted an annual compliance survey?

Yes ☑ No ☐ If no, please provide the name and rank of the current accreditation manager.

N/A

**4**. Please describe the activities of the agency accreditation manager and, if applicable, other support personnel who are responsible for maintaining the Accreditation Program files. Please describe the steps that the individual takes to ensure that the agency can demonstrate ongoing compliance with applicable standards and how often the files are updated with supporting documentation.

The Department has assigned a full time commissioned officer as the Accreditation Manager and a full time civilian as an assistant for accreditation. The Accreditation Manager reviews all incoming reports, case files, charges, search warrants, evidence collection, patrol logs, training records, and several other departmental reports. Daily monitoring is also conducted on all missing person reports, pursuit administrative reviews, use of force reports, vehicle impound reports, Sexual Assault Kit Collection Logs, ChildLine Notification Reports, Arrest Warrants and Protection From Abuse Orders. All reports are checked for compliance with current standards. When updated documents are reviewed that show particular compliance with a standard they are added to the assessment on PowerDMS. The Manager also maintains a proof check list in addition to PowerDMS showing the date the proof was collected. The Manager also maintains charts to track all the required training for the assessment period. The PowerReady System is also monitored for FTO Training/Evaluation, Officer/Supervisor Evaluation and as a Early Warning System for potential problematic conduct.

**5**. The Accreditation Commission strongly recommends that accredited agencies conduct an annual audit 30 days prior to completing this survey to ensure that all files are complete and up-to-date. Please indicate whether or not your agency has done such an audit. If so, briefly summarize the results. Also describe any other activities that your agency conducts to monitor and enforce compliance with applicable standards.

An annual audit was conducted to ensure that all files are complete and up to date before the conclusion of the assessment period. During the audit several standards were marked Non Occurrence after a final search for proofs of compliance yielded no results. Several up to date proofs of compliance were located during the audit and added to the assessment.

The Accreditation Manager and his assistant regularly reviews reports and departmental documents to monitor and enforce compliance with standards. Supervisors also review reports and activities for personnel under their span of control to ensure compliance with PLEAC Standards.

**6**. The Accreditation Commission has adopted a policy that requests accredited agencies to report incidents of non-compliance to program staff within 30 days of the date that the agency is no longer in compliance. Please describe any procedures that you have established to ensure that this request would be met in a timely manner in the event that it should ever become necessary.

The Chief of Police, Accreditation Manager and Command Staff continuously monitor incidents to ensure compliance with current standards. If the department would become aware of non-compliance with any standard supervisory staff would formulate an action plan to remedy the problem. The issue would also be reported directly to the Chief of Police. The Accreditation Manager would then notify the Accreditation Commission within 30 days of the issue.

**7**. Is your agency currently in full compliance with all applicable standards?

Yes ☑ No ☐ If no, please provide the following information for each standard that the agency is not fully implementing:

a. The standard number;
b. Reason (s) for non-compliance;
c. The length of time for which the agency has not been in compliance; and
d. A plan and timetable for re-establishing compliance.

N/A

**8**. Have there been any instances during the past 12 months when you feel that your agency may not have been in full compliance with an applicable standard? If so, please describe the circumstances and indicate whether or not the agency is currently in compliance.

N/A

**9**. Do program files for every applicable standard include documentation which demonstrates that the agency has been in full compliance during the preceding 12 months except where indicated above? If not, do the files clearly indicate where appropriate documentation is stored or available for review?

Yes ☑ No ☐ If no, please explain.

N/A

**10**. Were there any developments during the past 12 months that had a substantial impact on the way in which your agency implemented program standards (e.g., layoffs, budget cuts, a major internal reorganization, etc.)? If so, please describe and indicate how it affected the way that your agency complied with applicable standards.

The agency had no developments during the last twelve months which had a substantial impact on the way any standards were implemented.

**11**. During the past 12 months, has your agency rewritten policies or procedures in a way that have significantly changed the manner in which you are complying with a program standard?

During the past twelve months no general orders, policies or procedures were rewritten or revised in a way that significantly changed the manner in which the agency complied with any program standard.

**12**. During the past 12 months, has your agency initiated any new services that fall within the scope of standards that were previously considered to be not applicable?

Yes☐ No☑ If yes, please describe and attach a copy of the policy that would bring your agency into compliance.

N/A

**13**. During the past 12 months, has your agency stopped using any resources (e.g., specialized vehicles) or providing certain services (e.g., polygraph tests) that would make a previously applicable standard not applicable?

No / N/A

**14**. Is there any other information pertaining to your agency's compliance with program standards that you would like to bring to the attention of the Accreditation Commission?

This is the second year that the department has been accredited. The agency has adopted more up to date policies and procedures in order to comply with the current program standards. The program also causes the department to continuously review policies ensuring that they are up to date and current. This has helped provide a more professional service to the municipalities and residents we serve.

**15**. Is your municipality self-insured?

Yes ☐ No ☑ If no, please indicate the name of your insurance carrier and whether there has been any reduction in your agency's liability insurance premiums during the last year as a result of being accredited. Where applicable, indicate how much money you saved.

The Departments Police and Public Safety Officials Liability Insurance is through Pennsylvania Insurance Risk Management Association (PIRMA). Accreditation has reduced the insurance premiums by about nine thousand dollars (9,000.00).

**16**. Please describe any instances in which your status as an accredited agency was a positive factor in dealing with the community or with lawsuits that attorneys either filed or were thinking about filing against your agency.

The accreditation program has helped improve the quality of services across the agency by identifying strengths and/or weaknesses. It has improved citizen contacts and outcomes by having up to date standards, policies and procedures. This has decreased risks and liability cases for the department.

**17.** Has this report been reviewed by the CEO of the agency?

Yes ☑ No ☐

Survey Prepared By:

Sergeant Christopher Irwin

Date: 04.05.2024

# Exhibit "E"

*Pennsylvania Law Enforcement Accreditation Commission*

# Re-Assessment Report

# Northern York County Regional Police Department

## Dover, PA

*Prepared May 5, 2025, by*

**Christian Fishel, Team Leader**

**Kris Kruzelak, Assessor**

**Richard McGarr, Assessor**

**AGENCY INFORMATION:**

Agency Assessed: Northern York County Regional Police Department

Chief of Police: Chief David Lash

Accreditation Manager: Sergeant Christopher Irwin

Agency Address: 1445 East Canal Road, Dover, PA. 17315

Agency Phone and Email: 717-292-3647; Email: dlash@nycrpd.org

Date of the assessment: April 30, 2025

Assessment Type: Reassessment by Power DMS

**ASSESSOR INFORMATION:**

Team Leader Name: Christian Fishel, (ret.)

Department / Phone: State College Police Department, (814) 234-7150

Assessor Name: Kris Kruzelak, Chief of Police

Department / Phone: Sandy Township Police Department, (814) 765-1533

Assessor Name: Richard McGarr, Captain

Department / Phone: Lehigh University Police Department, (610) 758-4200

**AGENCY PROFILE:** The Northern York County Regional Police Department provides 24-hour law enforcement services to the residents and visitors of twelve (12) municipalities in York County. The service area for the police department is 216 square miles with a population base of over 88,000 residents. The Northern York County Regional Police Department (NYCRPD) was established in 1972 comprised of four (4) municipalities remaining with the department: Dover Borough, Dover Township, Manchester Township, and Paradise Township. In 1973, the NYCRPD added the Northern York Borough. In 1983, the NYCRPD added Conewago Township. In 1991, the NYCRPD added Franklin Township. Since 2000, the department has added Heidelberg Township, Jackson Township, Manheim Township, New Salem Borough, and North Codorus Township. To provide prompt service and meet the needs of citizens over such a large expanse, the NYCRPD maintains a headquarters in Dover, PA. and a fully sustainable substation

in Spring Grove, PA. In 2024, the Department began construction on a new state of the art headquarters in Manchester Township due to open this year.

The NYCRPD is staffed by sixty-nine (69) full-time officers. The Chief of Police is David Lash, who has been employed with the Department since January of 1993. The department has three (3) Lieutenants, six (6) Sergeants, eight (8) Corporals, and the remaining Officers / Investigators serve in Patrol, Criminal Investigations, Evidence/Court Liaison, Accreditation, and as School Resource Officers. The Department has five (5) Civilian Staff Members to include an Administrative Assistant and Four (4) Support Service Associates. Patrol personnel work twelve-hour (12-hour) shifts to include 0700-1900 hours and 1900-0700 hours. The Department utilizes the services of the York County Sheriff's Office for Central Booking and the York County 911 Center for Communications Services.

The NYCRPD has a very robust presence in the county and as a law enforcement teammate with other agencies. Five (5) officers are assigned as School Resource Officers in three (3) school districts. The Department has members assigned to the York County Quick Response Team as operators and negotiators. The Department has members assigned to the District Attorney's Drug Task Force as well as the U.S. Marshal's Task Force. The Department has officers assigned to the Drone Unit. The NYCRPD has members conduct the Simulated Impaired DriviNg Experience (SIDNE) to provide a real time awareness of the effects of impaired driving. The Department participates in the Project Lifesaver Program, a service provided to track people experiencing cognitive disorders. In partnership with the Boy Scouts of America, the Department participates in the Explorer Program designed for people from 14 to 21 years of age.

The Department has the following vehicles for police services:

1. Patrol:
    - Seventeen (17) Ford Explorers
    - Two (2) Ford Taurus's
    - Three (3) Ford F-150 Trucks

2. Investigations:
    - One (1) Ford Explorer
    - One (1) Dodge Charger
    - Three (3) Ford Taurus's

3. Administration:
    - Two (2) Ford Explorers

- One (1) Ford Taurus
- One (1) Chevrolet Traverse
- Two (2) Jeep Liberties
- One (1) Chevrolet Impala
- Two (2) Ford F-150 Trucks

4. Specialty Vehicles:
   - One (1) Search and Rescue UTV
   - One (1) Ford F-550 Dump Truck

**ON SITE RE-ASSESSMENT SUMMARY:**

Up front and simply put, this re-assessment was OUTSTANDING. Our assessment team determined this experience to be a top 3 event for all of us. The file review was well organized and professional. Assessors were provided with permissions to review files over two weeks in advance and the Accreditation Manager, Sergeant Christopher Irwin, was available for contact throughout the review process. The file review was completed well prior to arrival at the department and both amendments to the policy and proof were provided for compliance. Sergeant Irwin's work is impeccable and worthy of imitation.

The team met at the Northern York County Regional Police Department Headquarters on the morning of the assessment and received a static tour led by Sgt. Irwin to satisfy Observable Proofs. During the tour, team members met with Command Staff to include Chief Lash, Lt. Neideigh, Lt. Anderson, and Lt. Migatulski. The tour included a lobby and office presentation with interactions with Administrative Assistants and Support Service Associates. Team members toured the Temporary Holding with Sgt. Irwin and received a detailed review of the arrest process. Members received a thorough presentation on the Evidence and Property System with Evidence Custodian, Mike Miller. A thorough Weapon's Display was presented by Sgt. Kyle McClure.

The tour was well organized and thorough, covering all relevant information for our team. Each department member was well versed in their presentations and discussions in their respective areas and Sgt. Irwin provided an excellent overview of the facility and the Department process. Despite the headquarters due for replacement by a new facility soon, the current facility is well maintained, organized, and clean.

After the facility tour, team members conducted ride-alongs and interviews with staff members and concluded with an exit interview. After the exit interview, team members traveled to the new police department under construction and received an in-depth tour led by Chief Lash.

The assessment team noted outstanding policies and proofs, a thorough static tour, and excellent ride-alongs, interviews and interactions with officers and staff. Team members overwhelmingly concluded this assessment to be Outstanding.

**STANDARD SUMMARY:** At the conclusion of the on-site re-assessment, it was determined that the department complied with 100 of the 137 accreditation standards. The remaining 37 standards were verified to be "Not Applicable by Function" (N/A). The agency does not have a K-9 Unit, does not provide court security, is not a college or university department, does not have a cell block, and does not staff a communications center.

**FILE MAINTENANCE AND ADJUSTED PROOFS OF COMPLIANCE:**

A total of two (2) files were returned for file maintenance or adjusted proof of compliance:

1.1.1 (CF) – File was returned to add verbiage to the directive.

2.7.8 b (RM) – File returned to adjust highlighting and move a proof. This may have occurred due to a recent Power DMS amendment to the program.

**NON – APPLICABLE STANDARDS REVIEW:**

There were thirty-seven (37) standards that were determined to be N/A by Function:

1.10.8 – The agency does not have a Canine Program (1 N/A standard).

2.2.6 – The Agency does not have an Agency Owned Canine Program (1 N/A Standard)

2.6.1 through 2.6.7 – The agency does not provide court security (7 N/A standards).

2.8.1 through 2.8.7 – The agency is not a university or college entity (7 N/A standards).

3.1.1 through 3.1.23 – The agency does not have a cell block (19 N/A standards).

3.3.2 through 3.3.3 – The agency does not operate a communications center (2 N/A standards)

**STANDARDS WAIVER REVIEW:**

There were no standard waivers requested by the agency.

**INTERVIEW WITH CHIEF DAVID LASH:**

**April 30, 2025**

**Prepared by Christian D. Fishel**

On this date, I conducted an interview with Chief David Lash. Chief Lash has been employed with the Northern York County Regional Police Department since 1993. He is a graduate of the Pennsylvania State University and completed an internship with the Pennsylvania State University Police Department in 1992. Chief Lash completed the Mercyhurst College Municipal Academy in 1992 before being hired by the Northern York Regional Police Department in January of 1993. He has served in several positions and ranks within the department to include Field Training Officer in starting in 1995, Corporal in 1999, Sergeant in 2002, Lieutenant in 2010, Deputy Chief in 2018, and Chief of Police in 2022. Chief Lash has served in several specialty positions within the department to include Crime Scene Technician, Forensic Mapping Specialist, and Department Videography. He is a 2009 graduate of the Northwestern University Command Course and is the host for the course later this year at his department. Chief Lash has also completed command courses to include the FBI Mid-Atlantic Law Enforcement Executive Development Course and Pennsylvania Chiefs of Police Command Institute for Police Executives.

Chief Lash maintains an active role in his department as well as the law enforcement community. Locally, he serves as the Vice President of the Central Pennsylvania Chiefs of Police Association. Statewide, Chief Lash has served on the Pennsylvania Chiefs of Police Executive Board and Legislative Committee. He has served on the Pennsylvania Law Enforcement Accreditation Commission. Chief Lash is the current 1st Vice President of the Pennsylvania Chiefs of Police Association and will be sworn in as the President this summer.

Chief Lash was active and involved throughout the re-assessment of the department. He is a strong advocate for community interaction and developing a partnership with the community. Chief Lash is a strong advocate for the accreditation program as well. He feels the accreditation program helps with professionalism and service with the community. Chief Lash shared with me that accreditation provides the structure and enhancement to build a culture of policing the right way. He added that the program is the gold standard for our profession.

I found Chief Lash to be a very positive leader and an excellent host. He is well respected by his officers and provides strong leadership for everyone. It was apparent throughout the process that he is an active leader, and his supervisors and officers feel confident in their team and the ability to perform their duties. As noted above, numerous department members participated in the assessment and freely shared their role in the department as well as the assessment. It is

evident the department members from top to bottom are proud of their agency and demonstrate esprit de corps.

**RIDE ALONG SUMMARY:**

**April 30, 2025**

**Prepared by Kris Kruzelak**

On Wednesday April 30, 2025 , I participated in the on-site assessment of the Northern York County Regional Police Department. As a part of this assessment, I did a ride-along with Corporal Matthew Cicale. This ride-along, lasted approximately an hour.

Prior to beginning the ride-along, I observed Cpl. Cicale wearing a department issued uniform with soft body armor. Cpl. Cicale's uniform was clean, and he appeared to be physically fit. Cpl. Cicale was operating a marked Ford F-150 and completed a detailed vehicle inspection. The vehicle was fully equipped with the standard law enforcement equipment, including Motorola MVR, BWC and LPR.

My first impression of Cpl. Cicale was a very positive one; professional in appearance and demeanor. He is a full-time officer who has been with the department for approximately 14 years. In addition to being a patrol officer, Cpl. Cicale is a firearms instructor and active shooter instructor for the department.

At the beginning of the ride-along, I learned the department is split into different zones. During the ride-along, no calls for service were received and no self-initiated cases were investigated. Cpl. Cicale showed me various parts of the regional PD's jurisdiction including farmlands, industrial complexes, retail complexes and many housing developments.

While on patrol, Cpl. Cicale and I discussed the accreditation process and how it impacts daily operations within the police department. Cpl. Cicale was very knowledgeable about the process and acknowledges its many benefits. We also discussed the benefits of the accreditation process and how it directly relates to field training officers and new hires. In addition to the way the accreditation process standardizes the training process for field training officers and probationary officers, he told me his agency utilizes more than one field training officer during a probationary officers initial training.

Cpl. Cicale and I also discussed the department's records management system (RMS). His agency recently purchased Info Share, CSI software. He stated that the transition has been positive, and the officers are accepting of the RMS with minimal complaints.

My experience at the Northern York County Regional Police Department was a positive one. The agency's command staff was professional and courteous. The officers were

supportive of the accreditation process and proud to hold the status of an accredited agency. The Northern York County Regional Police Department should serve as an example for other agencies to emulate. The importance of accreditation is apparent in that Chief Lash was very involved with the assessment team from the time we arrived until we departed. Sgt. Irwin the accreditation manager has a clear grasp and understanding of the program and is an asset to his agency and the residents that he serves.

**RIDE ALONG SUMMARY:**

**April 30, 2025**

**Prepared by Richard McGarr**

On Wednesday April 30, 2025, I conducted a ride along with Officer Anthony Gelbaugh, a seven-year veteran of the Northern York County Regional Police Department. Gelbaugh was operating a fully marked Ford Explorer outfitted with modern police equipment. Prior to our departure from the headquarters, Gelbaugh conducted a full unit inspection. He is currently assigned to patrol and was wearing his full uniform that is required for patrol.

Officer Gelbaugh provided me with a tour of the district that he was assigned to pointing out the various facilities and housing in the area. On the tour, we drove through housing areas and the small business district area. The coverage area is massive. Officer Gelbaugh explained the jurisdictional boundaries and how members of the Northern York County Regional Police Department work with members of the adjacent police departments.

During the ride along, I spoke with Officer Gelbaugh about the accreditation process. Officer Gelbaugh stated that he is familiar with accreditation and the program is good for the department. He said he does not know how policing was without accreditation because it has always been part of his career. Officer Gelbaugh stated their department handles all types of calls, domestics, thefts assaults etc. and is confident that his partners are well trained and can handle anything that they are dealt with. Officer Gelbaugh stated he likes the accreditation program and believes it is a benefit and necessary for police departments to have because it provides sound policies and direction and proper training to be able to handle anything.

The ride along lasted approximately 45 minutes and during this time there were no calls for service. All discussion relating to the accreditation program did not reveal any conflict between accreditation standards and the practices of the Northern York County Regional Police Department. Officer Gelbaugh asked me how the site visit went for us. I informed him that the visit was excellent, and the files were well organized. I told him he works for an excellent department, and he stated his partners and chief are excellent to work with. He said he gets full support from the Chief.

**SUMMARY:**

The quality and professional police service provided by the Northern York County Regional Police Department was evidenced in their facility tour, file reviews, ride-alongs, personal interviews, interactions, and conversations with agency staff. It is apparent the Department has been and continues to be dedicated to delivering top quality police services to all residents and visitors to the municipalities it serves throughout the county.

**RECOMMENDATION:**

**Based on proof of fulfilling the standards set by the Pennsylvania Law Enforcement Accreditation Commission applicable to their agency, The Assessment Team unanimously recommends that the Northern York County Regional Police Department receive re-accreditation status.**

Dates Assessed: April 30, 2025

Respectfully Submitted,

Christian D. Fishel

# Exhibit “F”

| | |
|---|---|
| | NORTHERN YORK COUNTY REGIONAL POLICE DEPARTMENT |
| | **General Order 1.2.7** |
| Subject: Procedures to Follow Relating to Execution of Search Warrants on Occupied Structures or High Risk Services | |
| Date of Issue: 08.11.2021 | Effective Date: 08.11.2021 |
| Revisions: 05.15.2024 | Expires: Until Amended or Revoked |
| Review Date: Annual Review | Rescinds: N/A |
| PLEAC Standard(s): 1.2.6 | Testing: |

This order consists of the following sections:

## I. Purpose

To provide officers of the Northern York County Regional Police Department with guidance for execution of search warrants on occupied structures and high risk services.

## II. Policy

It is the policy of the Northern York County Regional Police Department to provide techniques to accomplish a thorough and legal search; respect the constitutional rights of the person(s) the warrant is being served upon; minimize the level of intrusion experienced by those who are having their premises searched; provide for the safety for all persons concerned; and establish a record of the warrant execution process.

## III. Definitions

**Body Worn Camera (BWC)**: Any video and audio recording device issued to a sworn member of the Northern York County Regional Police Department and worn on their person for the sole purpose of recording day to day investigatory interactions with the public. The Northern York County Regional Police Department has approved for use and deployed a BWC system that meets the standards published in the Pennsylvania Bulletin as required by § 5706.b.4 of the Pennsylvania Crimes Code.

**Deconfliction Report**: Members/enforcement officers shall ensure a RISSafe Event Deconfliction Form, Form SP 5-505 (NYCRPD Form #118), is completed and submitted to PACIC by email or fax to ensure officer safety due to the ongoing possibility that other law enforcement activities or operations may be occurring within the same time period, at the same location, or in close proximity to each other.

**Evidence Officer**: Member or members of the search team who are responsible for the possession, packaging, sealing, and marking of all items seized.

**Investigating Officer**: The Officer or Criminal Investigator primarily responsible for the investigation, preparing, planning, and implementing the search warrant.

**Protective Sweep**: A quick and limited search of premises incident to an arrest or service of a warrant in order to identify weapons or other dangers to officers or others. Officers must be able to articulate a reasonable basis for conducting a protective sweep.

**Search Personnel**: Police Officers and supporting personnel taking part in the execution of the search warrant.

**Search Site**: The premises to be searched, as explicitly stated in the search warrant.

**York County QRT Commander:** The commander or designee of the York County QRT who is responsible for planning and supervising tactical operations to include dynamic entry and other tasks requiring special weapons and tactically trained officers.

## IV. Procedures

### 1. Warrant Service Planning

a. The investigating officer shall advise and receive approval from his or her supervisor before serving the warrant (If the investigating officer is a member of the York County Drug Task Force, this approval can come from the DTF Commander).

b. Selection of officers to serve the warrant shall be based on the officer's prior training and experience in conducting warrant service consistent with the demands of the warrant service in question.

c. The investigating officer shall ensure the complete preparation for serving the warrant in accordance with its nature and complexity and in consultation with the District Attorney's Office if necessary. These tasks include, but are not limited to the following;

i. Gather intelligence on the target site to include the structure, immediate area surrounding the structure, and surrounding neighborhood.

ii. Assess the capabilities and backgrounds of suspects to include criminal records, history of weapons usage, and potential for violence.

iii. Determine the best date and time for warrant execution. The warrant shall be executed as soon as practicable as defined by state law.

iv. Determine equipment, team personnel, and any specialized team requirements.

v. Secure a warrant and ensure that it is thoroughly reviewed for accuracy, legal integrity, and completeness.

d. The York County QRT Commander shall be consulted whenever circumstances suggest a high risk entry, no knock warrant service, some cases of nighttime entry, or high risk services involving drugs or subjects deemed particularly dangerous.

**i. High Risk Warrant Service** – YCQRT may be requested to assist in conducting high-risk operations if there is something of a special, unusual, or emergency nature which indicates that either entry to the premises or the suspect's apprehension and arrest should be accomplished by the team, and at least one of the following exists:

1. There is a history of violence on the part of any person(s) reasonably expected to be encountered at the target.

2. There is a history of difficulty in serving warrants at the target location or on the person(s) named in the warrant.

3. There is information that weapons may be encountered.

4. The raid location is believed to be fortified in some manner.

5. The safety of an officer would be in jeopardy, without the use of the special equipment and the training the YCQRT can provide.

**ii. Procedures – Planned High Risk Warrants**

1. When at all possible, the YCQRT should be given twenty-four (24) hour notice that the team will be needed to serve a warrant, but in all cases the team will be given as much notice as possible.

2. When a decision has been made to utilize YCQRT, the YCQRT Commander or his/her designee, and the Tactical Commander or his/her designee, will determine the number of personnel necessary to execute the warrant.

3. The warrant and service of the warrant will be reviewed with the Tactical Commander or his/her designee.

4. Any assistance or intelligence required by the team to accomplish the mission based upon their evaluation and planning, shall be provided by the requesting agency.

5. Once the mission is accomplished, the premises secured, and the suspects secured, YCQRT will serve in a security capacity only, and will clear the scene as soon as possible.

**2. Preparation for Executing the Warrant**

a. The investigating officer and York County QRT Commander, where required, work cooperatively to ensure proper preparation, planning, and service of the warrant. They shall detail procedures for executing the warrant to all team members in a warrant service briefing. The plan briefing shall be conducted by both the investigating officer and tactical coordinator and will include but not necessarily be limited to the following:

i. The specific items subject to the search as defined in the warrant and any available information on their location.

ii. Information concerning the structure to be search and surroundings, to include floor plans where available, mockups, photos, and diagrams of the location identifying entrances, exits, obstructions, fortifications, garages, outlying buildings, suspect vehicles, and all other points of concern.

iii. Suspects and other occupants who may be present at the location—incorporating photos or sketches whenever possible—with emphasis on suspect threat potential, as well as the presence of

children, the elderly or others who may not be involved with suspects.

iv. A complete review of the tactical plan to include the staging area, route of approach; individual assignments for entry, search, management of evidence, custody and handling of seized vehicles, custody of prisoners, and post-execution duties such as securing the location and conducting surveillance on the site for additional suspects.

v. Personnel, resources, or armament necessary for gaining entry, safety and security of officers, or for conducting the search.

vi. If a joint agency task force operation, all officers participating in the warrant service shall be present and identified as members of the warrant service team. (On occasion based upon the operational environment QRT or DTF protocols may supersede some of the NYCRPD normal operational requirements within this directive.)

vii. Contingency plans for encountering hazardous materials, canines, booby traps, fortifications, or related hazards; measures to take in case of injury or accident, to include the nearest location of trauma or emergency care facilities.

viii. Procedures for exiting the location under emergency conditions.

b. The investigating officer's responsibilities include the following;

i. Conduct and direct the course of the investigation.

ii. Prepare a search warrant affidavit and warrant.

iii. Make a copy of the search warrant and inventory form.

iv. Obtain video and/or photographs of the target structure.

v. Obtain photographs and criminal history of all known subjects possibly at the target structure.

vi. Obtain tactical intelligence on the target structure.

vii. Make necessary drawings (floor plan, route of travel, etc.) for operational briefing.

viii. Conduct a thorough operational briefing.

ix. Liaise with Patrol Division Supervisor to acquire needed manpower.

c. The entry team shall at all times include uniformed officers who shall be conspicuously present where the warrant is served. All non-uniformed officers shall be clearly identified as law enforcement officers by a distinctive jacket or some other conspicuous indicator of officer. Uniformed officers will comply with NYCRPD Body Worn Camera Policy. Plain clothes officers are encouraged to wear BWCs.

d. All members of the search team shall wear body armor or ballistic vests.

e. Prior to execution of the warrant, the investigating officer shall attempt to determine if any circumstances have changed that make executing the search warrant undesirable at that time. Where possible, pre-search surveillance shall be conducted up to the point at which the warrant is executed.

f. The investigating officer shall make a final assessment of the warrant's accuracy in relationship to the location to be searched.

g. The investigating officer shall ensure that the entire search warrant execution process is documented until the search team leaves the premises. A written record shall be supported by photographs and, if practical, videotaping (BWC/MVR) of the entire search process. (PLEAC 1.2.6 C)

h. Deconfliction Report – Members/enforcement officers shall ensure a RISSafe Event Deconfliction Form, Form SP 5-505, is completed and submitted to PACIC by email or fax to ensure officer safety due to the ongoing possibility that other law enforcement activities or operations may be occurring within the same time period, at the same location, or in close proximity to each other.

**3. Entry Procedures**

a. Entries into residential structures shall comply with PA Rules of Criminal Procedure Rule 207 – Manner of Entry Into Premises

i. A law enforcement officer executing a search warrant shall, before entry, give, or make reasonable effort to give, notice of the officer's identity, authority, and purpose to any occupant of the premises specified in the warrant, **unless exigent circumstances require the officer's immediate forcible entry**. (PLEAC 1.2.6 a)

ii. Such officer shall await a response for a reasonable period of time after this announcement of identity, authority, and purpose, **unless exigent circumstances require the officer's immediate forcible entry.** (PLEAC 1.2.6 a)

iii. If the officer is not admitted after such reasonable period, the officer may forcibly enter the premises and may use as much physical force to effect entry therein as necessary to execute the search. (PLEAC 1.2.6 a)

b. If an advance surveillance team is at the target site, radio contact shall be made to ensure that the warrant can be served according to plan.

c. The search personnel shall position themselves in accordance with the execution plan.

d. Notification

i. **An easily identifiable police officer shall knock and notify persons inside the search site, in a voice loud enough to be heard inside the premises, that he/she is a police officer and has a warrant to search the premises, and that he/she demands entry to the premises at once.** (PLEAC 1.2.6 a)

ii. Following the knock and announce, officers shall delay entry for an appropriate period of time based on the size and nature of the target site and time of day to provide a reasonable opportunity for an occupant to respond (normally between 15 and 20 seconds). **If there is reasonable suspicion to believe that the delay would create unreasonable risks to the officers or others, inhibit the effectiveness of the investigation, or would permit the destruction of evidence, entry may be made as soon as practicable.** (PLEAC 1.2.6 a)

**4. On-Premises Activities**

a. Upon entry and achieving control of the premises by the entry team, the occupant shall be given a copy of the search warrant.

b. The supervisory officer shall ensure that a protective sweep of the site is performed immediately.

c. After the site has been secured, a photographic and/or videotape record of the premises shall be made prior to conducting the search. Search personnel shall then follow the plan that details the likely whereabouts of the items to be seized and the order of operation for conducting the search.

d. Items specified in the warrant may be searched for in places where they may reasonably be expected to be located and seized, as well as other items that are reasonably recognized as evidence.

e. An officer, designated in the plan, shall be responsible for collecting, preserving, and documenting all items seized until possession is transferred to the evidence custodian, laboratory, or other authority.

f. Cash and currency taken as evidence shall be handled as designated by department policy.

g. Officers should exercise reasonable care in executing the warrant to minimize damage to property.

    i. If damage occurs during an entry to premises that will be left vacant, and the damage may leave the premises vulnerable to security problems, arrangements shall be made to provide for and memorialize the actions to mitigate further criminal acts directed against the premises.

    ii. If damage occurs, justification for actions that caused the damage, and a detailed description of the nature and extent of the damage shall be documented. Photographs of the damage should be taken where possible and attached to the case reporting.

h. If items are taken from the search site, an itemized receipt shall be provided to the resident/occupant, or in the absence of the same, left in a conspicuous location at the site.

i. The search warrant return of service should be sent to the MDJ as soon as possible.

j. In a timely manner upon conclusion of the warrant service, the investigating officer and tactical coordinator shall conduct a debriefing of all participating officers.

k. All actions shall be properly documented within the case reporting.

**5. Other Considerations**

a. APPROACH -Typically, the initial approach to the structure will be covert, providing an advantage of surprise to the execution team.

b. IDENTIFICATION -Once they have completed the initial covert approach to the structure, members of the entry team shall wear the police badge

conspicuously on their outer garment or clothing, clearly identifying them as police.

c. DAYLIGHT EXECUTION - All search and seizure warrants will be executed during daylight hours unless operational considerations necessitate nighttime execution. Nighttime executions must be expressly authorized in the search warrant and approved by a Magisterial District Judge or Common Pleas Court Judge.

d. NO KNOCK WARRANTS - While the courts recognize specific exceptions to the Knock and Announce rule, it shall be the policy of the Northern York County Regional Police Department to knock and announce prior to any warrant service. If any officer believes that their safety is at risk by knocking and announcing the warrant, the warrant service shall be referred to the York County Quick Response Team. (PLEAC 1.2.6 b)

**6. Deviations**

a. The investigating officer may deviate from the provisions contained in this directive when any of the following apply;

i. The search warrant is being executed on a secured scene or unoccupied structure.

ii. Any necessary deviation is approved by either the Operations or Special Operations Lieutenant.

V. Effective August 11, 2021

**By Order of**

**David L. Lash**
**Chief of Police**

# Exhibit "G"

| | |
|---|---|
| | NORTHERN YORK COUNTY REGIONAL POLICE DEPARTMENT<br>**General Order 2.2.2** |
| Subject: Procedures to Follow Relating to Activating the York County Quick Response Team | |
| Date of Issue: 10.06.2021 | Effective Date: 10.06.2021 |
| Revisions: | Expires: Until Amended or Revoked |
| Review Date: Annual Review | Rescinds: N/A |
| PLEAC Standard(s): 2.2.2 | Testing: |

This order consists of the following sections:

# I. Purpose

To provide the officers of the Northern York County Regional Police Department with a clear understanding of the agency guidelines for the activation of the York County Quick Response Team or other Tactical Unit.

# II. Policy

All agency members shall comply with the requirements specified within this general order.

# III. Procedure

A. The Northern York County Regional Police Department recognizes the need for specialized tactical teams for high-risk events. The department has identified the York County Quick Response Team as the primary agency for our jurisdiction.

B. If the need for the Quick Response Team arises during a duty tour the on-duty supervisor shall be immediately notified of the incident. (PLEAC 2.2.2)

C. The supervisor shall respond to the incident location in order to obtain all known facts and circumstances. While enroute the supervisor will continue to receive updated information that would determine the need for the Quick Response Team. (PLEAC 2.2.2)

D. Once the supervisor has received adequate information, command notification will be made to the appropriate Command Officer. Certain serious incidents (Active Shooter, Hostage / Barricaded Suspect or Major Crime in Progress) require direct notification to the Chief of Police. (PLEAC 2.2.2)

E. After approval of the appropriate Command Officer, the supervisor shall contact York County 911 by radio or any other situationally appropriate means and request activation of the York County Quick Response Team. (PLEAC 2.2.2)

F. York 911 will provide the QRT Team Commander with contact information for the supervisor requesting activation.

G. The QRT Commander will contact the supervisor by telephone and be provided the following information;

1. Basic situation report.

2. Underlying criminal offense or precipitating situation.

3. Existence or status of search warrant, arrest warrant, 302 Warrant or other legal process.

4. Scope of threat.

5. Community or environmental factors.

6. Injuries or deaths.

7. Agency point of contact or command officer.

8. Urgency or exigent circumstances.

9. Any other information requested by the tactical team commander.

H. The supervisor shall attempt to gather the following information if know for the initial on scene briefing with the QRT Team Commander.

1. Location of staging area.

2. Command post location.

3. Any Diagram's, topographic or building information.

4. Situation update.

5. Known risk assessment.

6. Other available resources.

7. If school related, advise of the availability and usage of the Navigate Prepared System (Dover Schools, Central Schools and Northern Schools).

I. NYCRPD Incident command and protocol requirements shall be adhered to all times during the incident.

J. The supervisor will determine if any on duty QRT Members are currently working within our jurisdiction. If so, they should be relieved of normal patrol duties to respond for the QRT Call Out.

K. Supervisor Reporting Requirements – The Supervisor requesting the activation of the QRT shall document the request on the appropriate report in CSI.

L. Member Reporting Requirements - Any member of the Department belonging to the Quick Response Team shall complete an investigative report (7504 Assisting Other Agencies) in CSI after each deployment. The report shall be completed within 24 hours of the member returning to his normal duty tour.

M. Member Activation Response – When any member of the agency belonging to the Quick Response Team is notified of a deployment, they shall contact the Operations Lieutenant. The Operations Lieutenant will assess the Department's needs before granting permission for the officer to participate in the deployment.

N. If the York Country Quick Response Team is unavailable the County 911 Center will follow the established protocols for the response of additional tactical teams.

## IV. Effective October 06, 2021

**By Order of**

David L. Lash
Chief of Police

# Exhibit "H"

Commissioners,

To begin, I would like to thank you for the part you play in supporting the officers and the community at NYCRPD. I write this letter as a member of the community that is close with many of the officers. I am gravely concerned as to what I am hearing that occurs within the organization. It is my understanding that many of you do not interact with the officers on a daily basis, I believe it is important for you to understand the concerns that many of the officers are experiencing. Based on what I have been informed of, I am very angry, disappointed and as previously stated concerned for our community and the officers of NYCRPD along with their families. The recent tragic events have captivated us all. I want to be clear that this letter is not written in response to those specific events. It is written out of concerns for everything that has been transpiring for the past few years at NYCRPD.

It appears that many of the commissioners are being misled to believe what is happening within the walls of NYCRPD. Chief Dave Lash has created a culture of tyranny and oppression. Morale is lower than it has ever been and with the recent tragic loss of their brothers it has gotten even worse. Officers are afraid to speak out for fear of the repercussions. They need their jobs to pay their bills and to support their families. They are not willing to risk this to speak up. Instead they work in misery and dread each shift. I don't blame the commissioners for these issues. The blame falls on poor leadership from Dave Lash and Gregg Anderson. Hiding the truths and reality for their own personal gain.

The oppression, favoritism, and corruption runs rampant. I'm sure you are questioning whether or not these things are true, but please ask yourself why Cpl. Snyder, Cpl. Morley, and Cpl. Baumgarner really left? Why is there constant turnover at the department? Officers work their entire careers to obtain rank and recently several have just walked away. Why walk away when you work so hard to reach this milestone. I am sure Lash has made excuses and told you these officers just wanted to be closer to family or they just wanted to retire or some other excuse.The truth is even though the pay and benefits are amazing they still chose to walk away and take pay cuts to go elsewhere. Why is that? I'm sure you've been told they are just lazy or just were not a good fit, but I can honestly tell you that this is not the truth. The truth is they are sick of working under these conditions and under Lash's terrible leadership. If you don't believe me, go ask them. A multitude of great cops have been lost due to this. In a time where everyone is short staffed looking for good employees why would anyone leave a department that is top paid in the county with terrific benefits. It just doesn't make sense and you have to ask yourself why. Why would you leave a job like this and go elsewhere? It goes back to the poor leadership and working conditions.

I write to you in hope to expose the truths and to help the officers. They need it more than ever. You may be asking if things are so bad why has no one spoken up? What about the officers association? The officers association is corrupt and those who run it, report back to Lash. No one can speak up. There is no voice. Again don't believe me, take action and investigate. Ask other departments who also know the truth. There is a reason why the last two mergers went to York County Regional and not NYCRPD. The officers at other departments

speak with the officers and know how bad it is. They want nothing to do with NYCRPD which is a shame. Another example is that the officers were not allowed to attend Cody Becker's funeral. They were told to get back to work. How do you not allow officers the time to attend a fallen coworkers funeral? This is horrible especially when PSP and other municipalities were willing to cover for NYCRPD. This is an absolute disgrace and again it comes down to poor leadership. Family liaisons were also told that they needed to suck it up and work tired. This did not change until PSP had to tell them this was ridiculous. Think about how bad this is. At a time where the officers were most vulnerable they were forced to return to duty or face the consequences. Working short and having no desire to show up, forced to do one of the most dangerous jobs in the world. Ask anyone in law enforcement and they will tell you that this situation was handled completely wrong. Will an independent investigation be conducted or just an internal investigation, where the corrupt individual hides the facts? This situation was completely preventable and losses could have been mitigated. Also, why have the officers not been briefed or had any sort of discussion about the events that transpired and how they transpired? The officers deserve answers.

Since Lash has taken over he has bought equipment for his own personal gain ie. dump truck, enclosed trailer, etc..and makes excuses why the department needs it. Equipment has been purchased that never gets used by officers. One example is the virtual reality simulator that most officers have never used. Officers see these wasted funds and are extremely frustrated that the things that they could actually use are getting ignored. Lash has also created corrupt promotional testing practices that have fostered extremely poor leadership. The best and most qualified candidates do not get promoted or hired. Lash's refusal to change the tattoo policy is nothing but discrimination. The NYCRPD misses out on highly qualified candidates but makes special exceptions for Anderson's niece? The product is getting watered down exposing and creating vulnerabilities to the officers. Why are officers constantly required to work short? Patrol is constantly working short on manpower and nothing is done to fix it. Why are highly qualified candidates ignored? Do we want to create another situation where officers don't go home to their families because of Lash's ego and refusal to listen to those around him? Equipment that is vital to the officer's to do their job properly and safely is constantly broken or not working and officers have to deal with it. If something was not working for Lash it would be handled immediately without question. Why is there a double standard? Why are these issues not fixed immediately? Lash gets to drive around in a new vehicle every year while patrol rides around in cars with bad rotors, faulty/non functional equipment and there is no sense of urgency to fix it. How is this allowed to occur?

Lash's ego and refusal to listen to those around him is well known. His common response is, "My opinion is the only one that matters." The tip box has been taken down and officers were told to speak with Lash directly. How do you talk to someone that refuses to listen? Again people that speak up get ostracized and cast aside. Good leaders take criticism and advice. The commission should put the tip box backup in a non recorded location to allow officers to freely place tips in the box that can be read by the commission only, without Lash being involved.

Discipline is also another issue with NYCRPD. Discipline is not equal or fair. Lash and Anderson pick and choose who gets punished and why. Why is this allowed? Why is punishment not equal? Why is there no longer a standard that everyone is held to? Many believe it's because Gregg just chooses to ignore the problem so that he doesn't have to deal with it.

Simple things that don't cost anything can be changed to make this workplace better for the officers. Why are officers not provided the simple tools that they ask for to boost morale? It's because their voices are not heard. The corruption, tyranny, and oppression runs rampant. The officers just want to come to work in peace and not walk on eggshells. The job itself is dangerous enough and the administration should not be fostering an environment where officers are pitted against each other. It is time that the commissioners investigate and provide these officers with the leadership that they deserve. There is no path forward with Dave Lash or Gregg Anderson. The damage has been done and the only way to move forward is with fresh leadership. Lash continues to line up poor leadership for the future such as Kyle McClure, Erika Eiker, and Noah Pottieger. Each of which is not the answer. Just more of the same of poor leadership. Most officers believe that the best path forward is leadership from Chistopher Irwin, Jim Kulak, William Nailor, Steve Lebo, or a fresh voice from outside the organization.

This letter only summarizes a small amount of concerns. I hope that this letter is the catalyst for real investigations at NYCRPD. The officers need and deserve new leadership. The unchecked power and ego of Dave Lash cannot be allowed to continue. Lash is not bigger than this organization and it is time that the officers are cared for and a positive work environment is created. I can't encourage you enough to begin an investigation and speak with the officers, retired officers, and officers who have left. The truth is out there and a path forward needs to be found.

Some may say I am a coward for remaining unnamed, but the risk of officers being targeted over this letter by Lash is not a risk I am willing to take. I again urge you to take action and help the officers.They deserve to work in a non toxic work environment. Please meet with each officer if you have to and allow them to speak freely without concern of vindictive repercussions. Above all else it is time for a new Chief with fresh ideas willing to listen and foster a non toxic environment. A new start for all!

*Kindest regards and many blessings,*

*A concerned citizen*

# Exhibit "I"

To whom it may concern:

First and foremost, this letter is not being written by the same author as the previous letter. I learned of a previous letter and wanted to voice my opinion. This letter is being written as an informative overview of the actuality of Northern York County Regional Police Department. This letter is not meant to air grievances or smear any one person in the department. This letter has to be submitted anonymously due to the fear of retaliation. The desired outcome of this letter is that the recipients investigate for themselves the actual way NYCRPD is operated. It is the hope that the recipients hear from all past and present members of the department concerning these issues that are a detriment to the officers physical, emotional and mental wellbeing.

One issue that effects all law enforcement and not just NCYRPD is staffing. The department fails to hire well qualified individuals that have lower arm tattoos. When individuals come to apply to NYCRPD they are asked if they have any of these tattoos and are told not to even apply. It is unsettling to see the Lieutenant's niece at work and still have exposed tattoos. She was given the opportunity to get them removed but others are not given this fortune. She is a perfect example of a good officer with tattoos. Other potential applicants would not even be considered. Sleeves and coverups have been offered as a remedy but have been dismissed because only one opinion matters. The department has lowered its hiring standards in other areas and has taken on risks with individuals that would not be hired elsewhere but the image and perception is more important than the qualifications of the officer. These two issues are an overarching theme through this department.

This overarching theme also relates to our equipment. The perceived image and opinion of only one matters. Officers have been requesting several pieces of equipment for comfort and practicality including outer carrier vests and several options for work boots. It is a known fact that patrol officers have back/hip issues due to wearing a duty belt with 20 pounds of equipment on. The officers deserve to have equipment that is the best for them while still maintaining a professional appearance. The administrations major concern is wearing a tie clip. Officers at this department and all others laugh at the idea of the bola wrap being an effective tool on our toolbelt. This was used as clickbait for community members and got TV time but its practical use is near nonexistent. Is it a coincidence that no other departments in the area began to use this piece of equipment? Another piece of equipment that shows this overarching theme is the antennas on our patrol cars. NYCRPD officers have limited to no radio signal while on patrol in rural areas. This issue has been addressed with the administration and a remedy has been found but the new antenna does not meet the desired look. Again showcasing that appearance is more important than officer wellness.

Conflicts of interest at the department exist with no checks and balances. A lieutenant oversees officers in a special detail but also created a business with them. The officers schedules fluctuate to accommodate the Lieutenant's financial interests in the business. This same lieutenant oversees his niece directly. A patrol sergeant is given the authority to handle all of the scheduling of overtime details and has a list of people to send them to. If the overtime isn't taken by herself, she has a dedicated list of officers that as the department says " are

proactive" or who "stop cars", but as any other educated person would say, those who write a lot of tickets are favored. Like any other department, seniority or a first come first served basis does not exist. Officers work "straight overtime" details that are paid as straight time even though the officer works over 40 hours in one week. Meanwhile Chief Lash purchases a 65k SUV because he didn't like how his brand new truck rides. Again, he is only concerned about himself and does not care for the officers wellbeing.

Officer wellness is a major concern. Nationwide, officer suicides have been a concerning trend. In 2019, 234 officers killed themselves. In 2022, 170 officers died of suicide and in 2023, 122 committed suicide. The stress and anxiety take an enormous toll on officers that we all knew when we signed up for this job. What we didn't sign up for is this administration's disregard for our wellbeing. After the UPMC shooting, while in a supervisor meeting, one patrol sergeant addressed concerns about officers immediately returning to work. Their comments were immediately dismissed by Dave Lash and were told that officers mental health concerns are not the department's problem but are the individual officers. Another example of this is when Pat Gartrell's wife came to Dave Lash and others asking for help for his alcoholism. Dave Lash did nothing to help Pat or his family. Dave Lash continues to try to take advantage of Pat as he tries to retire after working at NYCRPD for 25 years as a dedicated officer. It is very disheartening to officers to see someone that has given so much to be taken advantage of. Why would officers want to dedicate their lives to NYCRPD when they will be treated just like Pat? More recently, we lost 3 great men that dedicated their lives to their communities. After this incident, officers and their family members were suffering from their losses and needed their own time to grieve and be with their loved ones. Although departments from all around the state offered to cover NYCRPD area for the following weeks, the administration refused to do so. They only allowed a few days off after the shooting and a few days for the funeral. One officer that took off sick afterwards was ridiculed by Lash. When returning to work, the administration was only concerned about writing all the calls that were missed from when the officers were gone and "stopping cars" or writing tickets.

The state of this department has gotten so bad that the officers have gotten the FOP legal defense fund to represent them instead of the corrupt "association" and attorney Ed Paskey that Chief Lash has once called "Chicken Little" because he runs to him like his puppy dog. The President and Vice President of the association have their personal interests in mind before the officers. In their meeting with the commissioners after the previous letter, they claimed the association members had no issues. Andy Miller is testing for Sergeant and has meetings with Chief Lash weekly about association matters but never lets the association members know what is happening. In addition, Andy Miller has domestics at his house. Supervisors tell officers to not respond to the call so they can cover up his actions. Andy Miller and Max Ruby are pressured by the Chief as Ruby once said that he was intimidated by Chief when discussing contract negotiations. Andy Miller wants to be president of the association because he will do whatever Chief Lash wants on behalf of the association and in exchange, he wants to get Sergeant.

Chief Lash and the administration pick and choose who they want to discipline. Recently, an officer that is testing to be a Cpl. shot a round into the ground while

at a department qualification shoot at the range. The round struck another officer in the buttocks. This officer received no write up or discipline. This is because he is favored and the administration wants him to test for Cpl. If this was an officer they disliked, this would not be the same. An example of an officer that isn't liked is a Cpl. that received a negative evaluation. He has been a Cpl. for over 6 months and has not had any write ups or complaints. Chief Lash sent his Sergeant, Kyle Mcclure to list an abundance of fraudulent issues in his evaluation. This same Sergeant brought a WW2 Nazi flag into the station while on duty. The Sergeant brought the flag into the station in front of his platoon of officers. He told them to turn their body cameras off and to place them face down on the desks. The Sergeant then got the flag out and asked if there was any "Jap" blood on it. The timing of the current promotions are not a coincidence. They are not allowing Sergeant Kulak to take the test because he was in an motor vehicle accident while on duty. He was suspended within a years time disallowing him to test. Officers drive hundreds of miles a shift and accidents happen. This was weaponized so Kulak is not able to test. In addition, there was never and physical fitness requirements for testing until the current promotional exam. This is to compromise Sergeant Irwin from testing for Lieutenant. Is Dave Lash able to pass these physical fitness standards?

Chief Lash said before that nobody's opinion matters other than his own while at a meeting with supervisors. He is a smooth talking politician that is deceiving. A police agency should not be run by a politician that puts his own officers and public at risk to boost himself. The way Dave Lash acts in front of the media and public is not the same as the one that is running the department behind closed doors. It is very upsetting seeing Dave Lash on his media tours when officers know he doesn't care about their wellbeing. The upcoming changes and requirements for officers to see mental health professionals is nothing more than a box that he has to check off. After the letter was received, Chief Lash wanted to coalesce support for himself by inviting a special group of officers to Lt. Migatulski's retirement. Chief Lash was then asked by an officer about the invites because he was not invited. Chief Lash said that Lt. Migatulski made the list of officers he wanted there. When the officer spoke to Lt Migatulski, he was told that it was a lie and Chief Lash picked everyone. Someone that is willing to lie about such a minor thing will continue to lie about even larger issues. After an anonymous complaint of a JNET violation, Chief Lash stated that he would bring his wrath down on whoever made the complaint and suspend them for 30 days. Ask yourself, does this sound like someone that cares for his officers?

After receipt of the previous letter, Chief Lash complained about being in an executive session for 3 hours with commissioners. After the session, he advised some of his subordinate supervisors that himself and a few of the commissioners wanted an investigation done to find out who wrote the letter and to fire them. Since this was said amongst others, is Chief Lash speaking publicly about information in an executive session or is he lying?

Departed officers are not interviewed when they leave. A common excuse is that they wanted to move closer to family. In reality, these good officers leave the department due to the toxicity and issues addressed in this letter. This trend will continue where good officers leave NYCRPD and they are replaced with less qualified

officers that meet the image requirements of the administration. The hope for this letter is that the recipients formulate their own opinion regarding how NYCRPD is actually ran. Previously there was a suggestion box or as Lash called it "the bitch box". These suggestions were filtered through the administration and not all were presented. To obtain the reality of NYCRPD, the recipients of this letter need to speak to the past and present officers in an anonymous manner or a manner that allows for no retribution. Simply asking the corrupt association President and Vice President Andy Miller and Max Ruby is not enough to find the truth. Officers are willing to speak with commissioners/outsiders but are prohibited to do so by the policy. Officers are afraid to speak out as Chief Lash is trying to find out who wrote the previous letter instead of addressing the issues within the department.

"Evil is powerless if the good are unafraid"- Ronald Reagan

# Exhibit "J"

| | |
|---|---|
| | NORTHERN YORK COUNTY<br>REGIONAL POLICE DEPARTMENT<br>**General Order 2.2.4** |
| Subject: Procedures to Follow for Officer Involved Shooting Incidents | |
| Date of Issue: 09.08.2021 | Effective Date: 09.08.2021 |
| Revisions: | Expires: Until Amended or Revoked |
| Review Date: Annual Review | Rescinds: General Order 13-01 |
| PLEAC Standard(s): | Testing: |

This order consists of the following sections:

## I. Purpose

To provide the officers of the Northern York County Regional Police Department with a clear understanding of the agency guidelines and procedures that will be utilized for the investigation of officer involved shooting incidents.

## II. Policy

All agency members shall comply with the requirements specified within this general order.

## III. Definitions

**Independent Investigating Agency (IIG)**: Any agency other than the NYCRPD who will investigate and provide investigative finding relative to the incident. The selection of the IIG will be determined by the Chief of Police and the District Attorney's Office.

## IV. Procedures

A. When an incident occurs that involves a police officer firing any Department-owned firearm or approved firearm owned by the officer, as a means of deadly force the following should occur:

1. Notifications:

(a) Chief of Police – Command notification of fatal and serious bodily injury incidents during police involvement should be made directly to the Chief of Police. Any use of deadly force (including the discharge of a firearm by an officer, regardless of whether such force resulted in injury shall also require immediate command notification to the Chief of Police.

(b) Operations Lieutenant – Will be notified by the on duty Officer in Charge (OIC), their designee or the Administrative Lieutenant.

(c) Special Operations Lieutenant and Administrative Lieutenant – Will be notified by the Operations Lieutenant or the on-duty Officer in Charge (OIC) or their designee.

(d) Criminal Investigative Supervisor – Will be notified by the Special Operations or Administrative Lieutenant or their designee.

(e) County Detective – The on-duty County Detective will be notified by the Chief of Police or their designee.

2. If practical, the Chief of Police, Operations Lieutenant, Special Operations Lieutenant, and Administrative Lieutenant, as well as the Criminal Investigative Supervisor will respond to the incident scene.

B. Responsibilities:

1. Involved Officer:

a) The officer involved in the shooting, or another officer on scene shall make immediate notification to the shift supervisor/OIC.

b) Any secondary firearms discharged in the incident and the primary firearm of all officers involved in the incident are considered evidence. All involved officers shall not reload or unload the firearm that was discharged or their primary weapon. The exception to this would be any reloading which occurs during the time of imminent danger to the officer. Once the incident is secure and the imminent danger has passed, all involved firearms shall remain in the condition they were in at the conclusion of the incident.

c) Officers on scene shall secure the perimeter of the scene with crime scene tape. No one should be permitted into the secure scene pending the arrival of command personnel. The exception would be emergency medical personnel who need to enter to provide medical assistance to any injured person and any protective sweeps required by officers to ensure the scene is secure.

d) Any weapons used by the suspect during the incident shall not be moved, unless an imminent safety concern requires otherwise, or it is absolutely necessary to move the weapon in order for emergency medical personnel to render aid. If the weapon must be moved, and the situation permits, it should be photographed or its location marked, prior to being moved. Unless absolutely necessary for the safety of officers and others involved, any weapons used by the suspect shall not be manipulated in any way. They should remain in the condition they were when last handled by the suspect.

e) The involved officer(s) will be asked to provide initial details of the shooting incident to supervisors or command staff. Any questioning of the officer shall be limited to obtaining critical information relating to public safety, exigent circumstances or identifying and locating involved suspects.

1) Are you injured?
2) If you know of anyone who was injured, what is their location?
3) In what direction did you fire your weapon?
4) If any suspects are at large, what are their descriptions?
5) How long ago did they flee?
6) For what crimes are they wanted?
7) Were they armed, what weapons type?
8) Does any evidence need preserved?
9) Where is it located?
10) Did you observe any witness(es)?
11) Where are they now?

f) The officer(s) will, typically, within 72 hours, be ordered to submit their written reports for use in the Administrative (Internal) Investigation and make themselves available for further questioning, if necessary, as part of the Administrative (Internal) Investigation.

2. Officer in Charge (OIC) Responsibilities:

a) In most circumstances this will be a Sergeant or Corporal. The OIC will be responsible for the immediate scene security to preserve all potential evidence until such time as they are relieved by the Independent Investigating Agency (IIG).

b) The OIC will, as soon as practical, remove the officer(s) who fired their weapon from the immediate location of the incident. The OIC will take possession of all firearms used to include the officer's duty weapon, even if a secondary weapon was fired. The OIC shall ensure that any officer who discharged their weapon is in the company of another officer and not left alone.

c) The involved officer(s) shall not be isolated or left alone when removed from the scene. The involved officer(s) will not be placed anywhere in a vehicle that is typically used for the placement/transport of persons in custody.

d) The OIC or their designee will be responsible for notification to Command Level Officers. If the OIC has discharged a firearm they should as soon as practical remove themselves from the immediate area of the incident and surrender all weapons used, to include their duty weapon to the most senior officer at the scene. The senior officer will act as OIC until Command Staff arrives.

e) The OIC will also follow General Order 5.1.2 and preserve all BWC or MVR footage from all involved officers. The supervisor will also verify all involved officers have completed (Departmental Form #77) BWC – MVR Preservation Forms before the end of their duty tour. If the Officer is unable to complete the form it shall be completed by the supervisor.

3. Operations Lieutenant / Special Operations Lieutenant – will have the primary responsibility of conducting the on scene Administrative (Internal) Investigation. They will coordinate this effort with the IIG. The primary focus of this investigation will be for policy compliance and review of the applicable provisions of Law as they apply to the Use of Deadly Force by police officers.

a) Reference: PA Crimes Code 18 Pa C.S.A. 505 and Graham v. Connor 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed. 2d 443 (1989).

b) Additionally, they will act as the scene liaison with the District Attorney's Office and the IIG.

c) The results of their investigations should be presented in written form and submitted to the Administrative Lieutenant.

4. Administrative Lieutenant – will be responsible for reviewing the findings of the Administrative (Internal) Investigation. Upon completion of review, the Administrative Lieutenant will submit the investigative report and attach an investigative summary to the Chief of Police. The Administrative Lieutenant will identify all applicable areas of policy that apply and provide detailed information as to compliance or non-compliance of said policy.

5. Chief of Police – the Chief of Police or his designee will notify the on-duty County Detective. At that time, the request will be made for an IIG to conduct the investigation. The Agency normally requested will be the Pennsylvania State Police. Final decision will rest with the District Attorney.

a) At the conclusion of the Administrative (Internal) Investigation, the Chief of Police will review all submitted documentation by Department members, as well as the report submitted by the Administrative Lieutenant. If no issues are found concerning the application of Department policy and after the involved officer(s) has been through the debriefing process and all other officers at the scene have been through the defusing process, the Chief may return the officer(s) to full duty.

6. Officers should also follow the policy / procedures as outlined in General Order 1.3.0 Procedures to follow for Use of Force, General Order 2.2.5 Procedures to follow for Employee Care After Critical Incident, General Order 2.3.0 Procedures to follow for Internal Investigations or Complaints and General Order 5.1.2 Use of Body Worn Cameras.

7. Media – all releases of information concerning this type of incident will be made by the Chief of Police or his designee.

## V. Effective September 8, 2021

**By Order of**

**David L. Lash**
**Chief of Police**