**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| THE BAZOOKA COMPANIES, LLC,<br><br>Plaintiff,<br><br>v.<br><br>LIBERTY MUTUAL FIRE INSURANCE COMPANY,<br><br>Defendant. | **JURY TRIAL DEMANDED**<br><br>Civil Action No. |

## COMPLAINT

Plaintiff The Bazooka Companies, LLC ("**Bazooka**"), by and through its undersigned attorneys, for its Complaint against Defendant Liberty Mutual Fire Insurance Company ("**Liberty**"), states and alleges as follows:

## INTRODUCTION

1. This is an insurance coverage action in which Bazooka seeks both damages from Liberty for breach of contract and declaratory relief pursuant to 28 U.S.C. § 2201. Bazooka brings this action based on Liberty's failure and refusal to pay property damage that Bazooka incurred as a result of large movement and corresponding closure, during spring and summer of 2024, of Bazooka's Ring Pop manufacturing plant located at 50 Poplar Street, Scranton, Pennsylvania 18509 (the "**Building**"), business interruption ("**BI**") losses, and the extra expenses ("**EE**") incurred to address the property damage (together, the "**Loss**"). This failure and

refusal to pay violates Liberty's coverage obligations under an insurance policy it sold to Bazooka.

2. The Building was insured by an insurance policy issued by Liberty to Bazooka for substantial premiums to protect Bazooka from, among other things, precisely the type of Losses that have occurred here. As further explained below, by the terms of its insurance policy, Liberty is obligated to pay, on an all-risk basis, for property damage, BI losses, and extra expenses that result from an insured peril.

3. Bazooka has timely submitted an insurance claim to Liberty, and Bazooka since has provided documentation and other information to Liberty demonstrating covered losses totaling between $17,704,265 and $20,834,953 (the "**Claim**"). The Claim consists of the following components: (1) property damage loss of either $2,640,953, for potential remediation of the Building, or an amount exceeding (and thus capped by) the property damage coverage limit of $5,771,139, for potential replacement of the Building (the "**Property Claim**"), (2) BI losses of $12,563,312, and (3) EE exceeding (and thus capped by) the extra-expense coverage limit of $2.5 million. The BI and EE losses are referred to together as the "**BI Claim**".

4. Liberty failed and refused to pay any amount of the Loss, in violation of its coverage obligations, and indeed, on May 19, 2025, erroneously denied that it has any coverage obligation for the Claim (the "**Denial Letter**"). Liberty has based

its denial on two policy exclusions. Liberty thus bears an immense burden to prove that those exclusions apply and, as explained below, it has not sustained that burden. *See McMillan v. State Mut. Life Assur. Co.*, 922 F.2d 1073, 1075 (3d Cir. 1990).

5. First, Liberty incorrectly claims that the Settlement/Cracking Exclusion (defined below) bars coverage. But the exclusion does not apply where, as here, the insured event at issue results from man-made rather than natural causes. *See*, *e.g.*, *Totty v. Chubb Corp*., 455 F. Supp. 2d 376, 383 (W.D. Pa. 2006). That is particularly true given that Liberty could have, but did not, even attempt to contract around this rule; it failed to define key terms in the exclusion such as "[s]ettling, cracking, shrinking," it failed to add an "anti-concurrent-causation" provision, and it failed to add a provision attempting to make the distinction between man-made and natural causes irrelevant.

6. Second, Liberty claims the Earth Movement Exclusion (defined below) applies to preclude coverage for the Loss and the Claim. Liberty relied on this exclusion *for the first time months after its original denial*, and only after Bazooka rebutted the application of the Settlement/Cracking Exclusion. And Liberty cannot tie the Loss to any portion of the definition of Earth Movement, namely: earthquake, landslide, mudflow/mudslide, or sinking or shifting of the earth (as opposed to of the Building). None of the causation reports exchanged thus far demonstrates any of

those elements, and any doubts in this regard must be resolved in favor of coverage. Thus, Liberty cannot meet its burden to show that this exclusion applies, either.

7. Third, although Liberty has attempted to bolster its position on the exclusions by relying on prior minor issues of damage at the Building, that history actually supports Bazooka. The prior issues were minor and never caused a disruption comparable to the Loss here. And Bazooka appropriately and effectively addressed those prior issues such that there were no new issues between 2020 and the incident at issue in 2024, which was precipitated by a failing drainpipe that created a situation separate and apart from prior routine remediation at the Building. Critically, Liberty was the insurer for the Building during all of this multi-year period. It conducted associated inspections, and it continually renewed the coverage. And Liberty knows that the prior issues paled in comparison to the current one, and that Bazooka makes insurance claims only when they are essential, because Bazooka did not ask Liberty for any coverage in connection with the prior issues – to Liberty's benefit.

8. Bazooka thus respectfully requests that this Court: (i) award damages for breach of contract based upon Liberty's failure to pay the Claim, and (ii) declare the obligations of Liberty to pay costs that Bazooka has incurred and will continue to incur with respect to the Claim.

## THE PARTIES

9. Plaintiff Bazooka is a Delaware limited liability company with its principal place of business in New York, New York.

10. The sole member of Plaintiff Bazooka is The Bazooka Intermediate Holdco, LLC, a Delaware limited liability company with its principal place of business in New York.

11. Upon information and belief, Defendant Liberty is a corporation organized under the laws of the State of Wisconsin, with its principal place of business in the Commonwealth of Massachusetts.

## JURISDICTION

12. This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties, and because the amount in controversy exceeds $75,000, exclusive of interest, attorneys' fees and costs.

13. This Court has personal jurisdiction over Liberty because Liberty sold the Policy (defined below) to an insured that had/has a major manufacturing plant located in Scranton, Pennsylvania, and this case arises out of that property and this Policy. The Policy also contains a Pennsylvania-specific endorsement – "Pennsylvania Changes", which applies to covered property located in Pennsylvania. In addition, upon information and belief, Liberty:

a. is a licensed insurer authorized to do business in Pennsylvania;

b. regularly solicits and conducts business in Pennsylvania;

c. routinely contracts to insure risks located in Pennsylvania; and/or

d. maintains more than minimum contacts in this jurisdiction.

14. Venue of this action is properly laid in this judicial district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the Claim occurred in this judicial district, including:

a. This action involves a property insurance dispute for coverage issued to Bazooka, an entity conducting business in Scranton, Pennsylvania, for property located in Scranton, Pennsylvania;

b. As further described below, Bazooka has been a fixture in the community of Scranton, Pennsylvania for almost five decades; and

c. Liberty is (i) licensed or authorized to do business in Pennsylvania; (ii) has contracted to insure risks located in Pennsylvania; and (iii) has, within the relevant time periods, transacted business within Pennsylvania.

## BACKGROUND

15. Bazooka is an international manufacturer of confectionery products, including the Ring Pop and other candy and gum products.

16. In 1977, Bazooka opened the Ring Pop plant located at 50 Poplar Street, Scranton, Pennsylvania, to begin production of the newly invented Ring Pop product.

17. Since that time, Bazooka has been cemented in the community of Scranton, Pennsylvania.

18. After the Loss occurred, in mid-2024, Bazooka was forced to close the Building and move to a new rented facility.

19. Bazooka chose to stay in the community, retain the Scranton plant employees, and rent a facility in Scranton/Moosic, Pennsylvania, located approximately five miles south of the Building. Bazooka continues to be a "good neighbor," and local governmental officials remain pleased that Bazooka chose to keep its facility in the Scranton area. *See* Bolus, Kat, '*This is wonderful': Ring Pops factory reopens in Lackawanna County,* WVIA, March 27, 2025, https://www.wvia.org/news/local/2025-03-27/this-is-wondeful-new-candy-factory-reopens-in-lackawanna-county.

**THE POLICY**

20. To protect itself from the risks associated with owning and operating the Building, Bazooka purchased from Liberty a property insurance policy with Policy Number YU2-Z91-476925-053-00/5 and a policy period from October 6, 2023, to October 6, 2024 (the "**Policy**"). The Policy provides limits of liability

of: (i) $5,771,139 for property damage, (ii) $25 million for BI Loss, and (iii) $2.5 million for EE. The Policy provides coverage on an "all-risks" (rather than "named-perils") basis, meaning that it covers all risks of physical loss or damage unless the Policy clearly excludes them.

21. A copy of the Policy is attached as **Exhibit A** set out herein.

22. The Insuring Agreement states:

> **A.** Insuring Agreement
>
> Subject to all the terms and conditions of this policy, we will pay for risks of direct physical loss or damage to **covered property** as a result of an **occurrence**, unless excluded.

23. There is no dispute that the Loss falls within the Insuring Agreement.

24. The Policy also includes certain coverage exclusions, including the "**Settlement/Cracking Exclusion**", which states:

> **B. <u>GROUP B EXCLUSIONS</u>**
>
> **We** will not pay for loss or damage caused by or resulting from any of the following:
>
> ***
>
> **7.** Loss attributable to:
>
> e. Settling, cracking, shrinking, bulging or expansion of pavements, foundations, walls, floors, roofs or ceilings, retaining walls or outdoor swimming pools;
>
> ***
>
> If a **covered loss** ensues, **we** will pay for that loss.

25. The Policy also includes the "**Earth Movement Exclusion**" which states:

A. <u>**GROUP A EXCLUSIONS**</u>

> We will not pay for loss or damage caused by or resulting from any of the following, regardless of any other cause or event, including a **peril insured against**, that contributes to the loss at the same time or in any other sequence:
>
> ***
>
> **2.** **Earth movement**, whether sudden or gradual.
>
> **a.** If a loss to **covered property** by fire, theft, or explosion ensues, we will pay for that loss.
>
> **b.** This exclusion does not apply to **covered property in transit**.
>
> **c.** This exclusion does not apply to **sinkhole collapse** or **volcanic activity**.

26. The Policy states that **Earth Movement**, "whether natural or man-made, includes but is not limited to:

> 1. Earthquake;
> 2. Landslide;
> 3. Mudflow or mudslide; or
> 4. Sinking, rising or shifting of the earth."

Policy, Definition J.

27. Bazooka and Liberty dispute the applicability of the Settlement/Cracking Exclusion and of the Earth Movement Exclusion (collectively, the "**Exclusions**").

28. Bazooka has satisfied all other conditions precedent to coverage under the Policy.

## THE LOSS

29. During Summer, 2024, Bazooka experienced a malfunction of certain of its machinery at the Building. Bazooka conducted various inspections and measurements in an effort to address the malfunction.

30. Based on the referenced inspections and measurements, Bazooka determined that the machinery was unbalanced because the floor supporting it was not level, and, as a result, the machines could not operate correctly.

31. In order to investigate the levelness issues, on or about August 27, 2024, Bazooka completed a visual walkthrough of the Building with a structural engineer with Ruether+Bowen. On August 29, 2024, Ruether+Bowen reported that there were signs of damaged supports throughout the Building, and recommended that the Building be vacated.

32. Bazooka, thus, promptly shut down the Building on the evening of August 29, 2024 (the "**Closure**").

33. Bazooka immediately began working with Ruether+Bowen and ARM Group, LLC ("**ARM**"), a retained geotechnical engineer, to conduct a further investigation of the movement of the Building.

34. Further, shortly after the Closure and during the engineers' inspections, Bazooka learned that a water pipe used to collect rainwater from the roof of the Building had broken under the Building. As a result, collected roof water was

flowing and dispersing through a leak underneath the Building. ARM has cited this leak as a possible factor contributing to the movement of the Building.

*i) Property Damage Loss*

35. To quantify its Property Damage Loss, Bazooka retained Barry Isett & Associates, Inc. ("**BIA**") to provide a further engineering assessment and recommendations for repair or replacement of the Building. Bazooka also retained Whiting-Turner Contracting Company ("**W-T**") to provide a corresponding estimate of costs to complete the recommended repairs.

36. On February 17, 2026, Bazooka provided to Liberty the two consultant reports regarding the Property Claim to Liberty – one from BIA (the "**BIA Report**"), and one from W-T (the "**W-T Estimate**").

37. BIA performed a site visit at the Building and reviewed previous geotechnical and structural assessments of the Building, including the referenced prior incidents from 2017 to 2020 and remediation actions undertaken to correct those issues (the "**Pre-Loss Assessments**").

38. Based on its review, BIA concluded the "localized structural damage is most likely due to failure of the *stormwater drainpipe* below column E-7, and hydroconsolidation of the coal ash fill material below the footing and surrounding slab…" BIA Report, p. 4 (emphasis added).

39. Based on the recommendation of BIA, W-T conducted an analysis of options for Bazooka to either (i) remediate the Building, or (ii) build a new plant. W-T concluded that the estimated costs for each option are as follows:

| **Remediation** | **New Building** |
|---|---|
| $2,640,953 | $6,974,477 |

W-T Estimate.

*ii) Business Interruption and Extra Expense Losses*

40. Following the Closure, Bazooka could not produce product until a new facility was built or an alternate facility could be located. Bazooka quickly located an alternate facility nearby that was available for rent; Bazooka entered into a lease that was signed on October 7, 2024, but effective beginning on October 1, 2024.

41. But even with its diligence, Bazooka could not resume production immediately upon leasing the alternate facility due to various required processes. First, Bazooka had to move its entire production system, including two production lines, to the new facility – an undertaking that took until mid-November. As part of that undertaking, Bazooka had to disassemble an original 1976 line and then reassemble it at the leased facility. Second, even after all the necessary equipment was set up in the new facility, the facility had to be retrofitted around the production lines with new utilities, piping, product handling, shipping and distribution. Third,

due to the food-related nature of the business and the facility being occupied by a prior tenant, Bazooka had to super-clean the facility.

42. Due to these required processes, Bazooka did not commence production at the rental facility until February 27, 2025.

43. Indeed, even after relocation, it takes time for food processing lines to ramp up to full production. The use of a new facility required employees to be retrained, testing and quality control procedures to be completed, and equipment to be calibrated in the new environment.

44. Bazooka has not reached pre-Closure production levels.

45. Even so, the efforts that Bazooka undertook and the investments that Bazooka made benefited both Bazooka and Liberty. Without those mitigation efforts and investments, Bazooka would have experienced 18-24 months of a complete shutdown.

46. In that regard, Bazooka incurred significant expenses to lease the rental facility and to otherwise mitigate its Losses. These business expenses included, among other things, the disassembly and reassembly of production lines, rent, logistics, testing, cleaning, and retrofitting of the new facility.

47. Bazooka retained BDO to provide an estimate of the above-described BI and EE Losses. Bazooka provided an estimate of BI and EE Losses (based on actual and forecasted amounts) to Liberty on December 2, 2025 (the "**BDO**

**Estimate**"). On September 1, 2026, BDO provided a final analysis to Liberty (the "**BDO Report**"), after months of providing additional information to Liberty about the BI and EE Losses in response to Liberty's information requests. BDO provided the following conclusions regarding the total incurred BI and EE Loss through July 2025:

**Summary**
**Overall Claim**

| Description | *Schedule Reference* | Updated Total | Previous Total |
|---|---|---|---|
| Business Interruption through September 2025 | *BI-1* | $ 11,166,091 | $ 11,166,091 |
| Extra Expense | *EE-1* | 8,943,434 | 8,943,434 |
| **Total Incurred through September 2025** | | **$ 20,109,525** | **$ 20,109,525** |
| Actual Business Interruption through June 2026 (A) | *BI-3* | 955,909 | 2,428,013 |
| Estimated Business Interruption July 2026 through September 2026 (A) | *BI-3* | 441,312 | 809,338 |
| **Total Incurred through September 2026** | | **$ 21,506,746** | **$ 23,346,876** |

## THE CLAIM AND LIBERTY'S WRONGFUL DENIAL

48. On September 16, 2024, Bazooka timely notified Liberty of and tendered coverage for the Loss. Bazooka advised Liberty that it retained an engineer, namely, ARM, to evaluate the Building.

49. In response, by letters dated September 18, 2024, November 20, 2024, January 16, 2025, February 13, 2025, and April 11, 2025, Liberty reserved its rights and stated that it was waiting for the report from ARM (the "**ARM Report**") before making a coverage determination.

50. Liberty also retained its own engineer, Haag Engineering ("**Haag**"), to inspect the Building on October 22, 2024.

51. Haag issued a causation report dated November 27, 2024 (the "**Haag Report**").

52. Although Bazooka was informed that Liberty had retained Haag and that Haag had inspected the Building in October 2024, Liberty never informed Bazooka that Haag had issued a report. Instead, Liberty pressed Bazooka for the ARM Report.

53. Instead of making a coverage determination after receiving the Haag Report, Liberty waited six months, until after it obtained the ARM Report on April 2, 2025, to make its determination.

54. On May 19, 2025, Liberty issued its Denial Letter purportedly based on the findings of Haag and ARM, and exclusively relied on the Settlement/Cracking Exclusion to assert "the building has experienced settling and cracking and no ensuing direct physical loss or damage therefore there is no coverage for the sinking or cracking of the building's foundation or walls." *See* Denial Letter, p. 4.

55. The Haag Report did not provide a definitive determination of the cause of the Loss. Indeed, Liberty acknowledged in its April 11, 2025 letter that "[a]t this time [five months after receiving the Haag Report] the cause of the sinking of the foundation has not yet been determined."

56. Yet, in its Denial Letter, Liberty relied on the conclusions of Haag, but ignored evidence and conclusions supporting coverage, including evidence showing

that a broken water pipe at the Building likely contributed to the movement of the Building. More importantly, the Haag Report provided no analysis to explain the conclusion that the causes were settlement, subsidence, progressive soil consolidation, and deterioration [] that manifested over a long period of time.

57. Likewise, Liberty disregarded conclusions in the ARM Report that result in coverage. For example, akin to Haag, ARM concluded that a potential cause of Loss was a "[b]roken water line." In addition, ARM concluded that potential movement may also be attributable to "[d]ynamic vibrations from machinery," and the presence of ash material from coal mining. Furthermore, the ARM Report cites potential movement resulting from the "closure of the abandoned anthracite coal mines." Many of these identified potential causes of the Losses involve man-made conditions.

58. On July 15, 2025, Bazooka responded to the coverage denial ("**July 2025 Letter**"). Bazooka explained that Liberty did not meet its burden of establishing that the Settlement/Cracking Exclusion applies to bar coverage, particularly given the *contra proferentem* doctrine and the reasonable expectations doctrine. Bazooka highlighted that the Settlement/Cracking Exclusion does not exclude losses with man-made causes, such as the causes at issue here. Bazooka highlighted that the incident at issue does not fall within any of the components of

the Policy's Earth Movement definition and, thus, the Earth Movement Exclusion does not apply.

59. On October 1, 2025, Liberty reiterated its coverage denial, this time also relying on the Earth Movement Exclusion for the first time and asserting that the reasonable expectation doctrine does not apply because Bazooka has not shown that "Liberty somehow changed the coverage that was offered." *See* October 1, 2025 Letter, p. 10. Liberty relied heavily on the Pre-Loss Assessments to assert that there was a long-running settlement issue at the Building. *Id.*, p. 8.

60. On December 23, 2025, Bazooka responded to Liberty's new reasonable expectation argument to explain that the reasonable expectation doctrine is not limited to situations where an insurer changes the scope of coverage from its prior policies with the policyholder. Instead, Pennsylvania courts rely on the totality of circumstances, including industry custom and practice and the parties' course of dealing, and that the test depends on the claim-specific facts.

61. Bazooka also explained that the Parties' bilateral course of dealing, which includes Liberty's years-long coverage of the Building, knowledge of the Pre-Loss Assessments, and ability to inspect the Building during underwriting of the Policy, supports application of the reasonable expectation doctrine in Bazooka's favor. As important, the items noted in the Pre-Loss Assessments were remediated

well before the inception of the Policy, and Bazooka did not make a claim for coverage regarding those issues.

62. Regardless of the disagreement as to whether there was coverage under the Policy, Bazooka continued to provide information regarding the Loss and the Claim to Liberty, subject to a non-disclosure agreement, in addition to the information that Bazooka previously provided in 2025, including:

| **Date of Submittal** | **Submittal** |
|---|---|
| January 30, 2026 | Backup documentation requested by Liberty regarding the BI Claim ("**BI Backup**"). |
| February 18, 2026 | The Parties' BI experts had a conference call during which Bazooka provided responses regarding several BI RFIs and answered additional questions from Liberty regarding the BI Claim. |
| February 27, 2026 | Supplemental BI Backup. |
| March 30, 2026 | A second supplemental set of BI Backup and backup documentation requested by Liberty regarding the Property Claim ("**Property Backup**"). |
| May 1, 2026 | A supplemental set of Property Backup. |
| June 17, 2026 | Bazooka permitted Liberty and its structural expert, Sharkey Bowers, to conduct another inspection of the Building. |
| July 6, 2026 | A supplemental set of Property Backup. |
| August 10, 2026 | The Parties' BI experts held an additional conference call during which Bazooka provided further information regarding new BI RFIs submitted by Liberty. |

| | |
|---|---|
| August 19, 2026 | Bazooka provided a final supplemental set of Property Backup. |
| August 20, 2026 | Bazooka permitted Liberty's additional newly retained engineering Firm, YA Group, to conduct another inspection of the Building and to conduct a borescope of the drainpipe. To date, Liberty has not provided any report or analysis by YA Group of its inspection. |
| September 1, 2026 | Bazooka provided a final analysis of Bazooka's Loss relating to the BI Claim, showing total incurred Loss through September 2026 of $21,506,746 ("**BI Analysis**"). With the BI Analysis, Bazooka also provided a final supplemental set of BI Backup. |

63. On September 11, 2026, Liberty finally provided to Bazooka a Foundation Settlement Evaluation Report dated August 28, 2026 from Sharkey Bowers, PE of Banyan Engineering (the "**Banyan Report**"). The Banyan Report is based on Mr. Bowers' review of documentation and his June 17, 2026 visual inspection of the Property as well as the August 20, 2026 visual inspection and drainpipe borescope conducted by YA Group. Mr. Bowers concluded that (i) the Loss was likely caused by "consolidation of the coal ash fill material", and (ii) there was a collapse of the coal mine. Banyan Report, pp. 11-14.

## BAZOOKA WAS DAMAGED DUE TO LIBERTY'S IMPROPER COVERAGE DENIAL

64. Based on the W-T Estimate and the BDO Report, Bazooka's covered Loss consists of the following: (1) Property Loss of $5,771,139 for replacement of

the Building (as capped by the Policy), (2) BI Loss of $12,563,312, and (3) EE Loss of $2,500,000 (as capped by the Policy), totaling $20,834,451.

65. To date, now months after receiving the W-T Estimate and the BDO Report, Liberty has never disputed or addressed the quantum of the Loss.

**FIRST CAUSE OF ACTION**
**FOR BREACH OF CONTRACT**

66. Bazooka incorporates by reference and restates herein the allegations of Paragraphs 1 through 65.

67. Liberty has a contractual duty to Bazooka to pay for Loss incurred by Bazooka arising out of the Claim.

68. Bazooka has paid all premiums and otherwise complied with and satisfied all other conditions precedent for coverage to apply under the Policy.

69. Liberty has breached the terms of the Policy by failing to pay the Claim.

70. As a direct and proximate result of Liberty's breach of contract, Bazooka has suffered loss (and will continue to suffer loss) in connection with amounts it has paid or incurred (and will pay and incur) on behalf of itself by depriving Bazooka of the benefits of insurance coverage to which it is entitled.

## SECOND CAUSE OF ACTION FOR DECLARATORY JUDGMENT WITH RESPECT TO LIBERTY'S OBLIGATIONS TO PAY FOR LOSS IN CONNECTION WITH THE CLAIM

71. Bazooka incorporates by reference and restates herein the allegations of Paragraphs 1 through 70.

72. Pursuant to 28 U.S.C. § 2201(a) and Federal Rule of Civil Procedure 57, an actual controversy of a justiciable nature exists between Bazooka and Liberty regarding the parties' rights and obligations under the Policy, including regarding the interpretation and applicability of: (1) the Settlement/Cracking Exclusion and (2) the definition of Earth Movement and related Earth Movement Exclusion and Earth Movement Coverage.

73. The Policy obligates Liberty to pay for the Losses incurred by Bazooka in connection with the Claim.

74. Bazooka has incurred Loss relating to the Claim, for which Bazooka is entitled, and will be entitled, to coverage under the Policy.

75. Liberty has, by its words and conduct, refused or otherwise failed to perform, and indicated that it will continue to refuse or fail to perform, its obligations to Bazooka under the Policy with respect to the Claim.

76. The issuance of declaratory relief by this Court will terminate some or all of the existing controversies between the parties.

77. Bazooka seeks a declaratory judgment against Liberty that the Exclusions do not apply and that Liberty is obligated to pay the Loss incurred by Bazooka for the Claim.

78. Pursuant to the provisions of 28 U.S.C. § 2201, Bazooka respectfully requests a declaratory judgment of Bazooka's rights and Liberty's duties, and a declaratory judgment is necessary as to Bazooka's rights and Liberty's duties, regarding the payment of Loss arising from the Claim.

## PRAYER FOR RELIEF

WHEREFORE, Bazooka respectfully requests that the Court enter a judgment:

a. With respect to the first cause of action, for damages in connection with Bazooka's Losses that Liberty has refused to pay under the Claim, in an amount in excess of $20 million and to be determined at trial;

b. With respect to the second cause of action, declaring that Liberty is obligated to pay for Loss that Bazooka incurred, and continues to incur, in connection with the Claim;

c. For pre- and post-judgment interest at the rate specified by law;

d. Awarding Bazooka its attorneys' fees and costs incurred in connection with the dispute leading to and continuing during this action; and

e. For such other, further and different relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated: October 14, 2026

*s/ James C. Oschal*

James C. Oschal, Esq. (PA 53846)
Krysti M. Oschal, Esq. (PA 336344)
Rosenn Jenkins & Greenwald LLP
1065 Highway 315, Suite 200
Wilkes-Barre, PA 18702
Telephone: 570.826.5621
Email: joschal@rjglaw.com
koschal@rjglaw.com

Barry I. Buchman, Esq. (DC 459663)*
Kathleen Repko, Esq. (PA 308775)*
Haynes Boone, LLP
888 16th Street, Suite 300
Washington, D.C. 20006
Telephone: 202.654.4500
Email: barry.buchman@haynesboone.com
kathleen.repko@haynesboone.com

**pro hac vice* application to be filed

*Attorneys for Plaintiff The Bazooka Companies, LLC*