**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

LATICIA HOAGLAND, individually and on behalf of all others similarly situated,
Plaintiff,
v.
DOES, et al.,
Defendants.

# Plaintiff's Motion to (1) Disqualify All Current and Former Judges of the Middle District of Pennsylvania and (2) Disqualify the Court System as a Whole

Plaintiff Laticia Hoagland, individually and on behalf of all others similarly situated, through counsel Paige Martineau of Susquehanna Legal Aid for Adults and Youth ("SLAAY"), moves under 28 U.S.C. § 455 and the United States Constitution for an order disqualifying all current and former judges of the United States District Court for the Middle District of Pennsylvania and disqualifying the court system as a whole, including the federal and state judicial systems.

This motion arises from the judiciary's institutional interests in adjudicating challenges to its own conduct, rules, professional-regulatory authority, disciplinary practices, privileges, and immunity doctrines; the extrajudicial conduct and statements of Chief Judge Matthew W. Brann; his unequal exercise of claimed inherent sanctioning authority; his disparate treatment of women reporting professional misconduct; and his repeated derogatory statements concerning self-represented litigants, including attorneys who must represent themselves when challenging bar associations and other powerful legal institutions.

Plaintiff also seeks the disqualification of Brann from all proceedings involving self-represented litigants, a categorical prohibition against jury service by persons connected to lawyers or judges, and declaratory and injunctive relief addressing unconstitutional court-made rules and exercises of claimed inherent judicial power.

**Relevant Facts**

1. During COVID-19 restrictions, Plaintiff Laticia Hoagland stood outside the county offices with cash in hand, attempting to pay the property taxes necessary to protect her home from sale. A security guard refused her entry because he deemed the fabric used for her face covering insufficient. Plaintiff had the money and attempted to pay; the refusal prevented her from completing the payment in person.

2. Plaintiff's home was nevertheless sold at tax sale despite her attempted payment and the access barrier imposed by governmental personnel. The injustice underlying Plaintiff's claims is the refusal to accept her attempted payment followed by the loss of her residence, rather than the dates and procedural sequence of later appeals.

3. North Penn Legal Services ("NPLS") undertook Plaintiff's representation and subsequently abandoned her when her assigned attorney departed, without obtaining leave of court or complying with the professional obligations Plaintiff maintains governed the organization's continuing

representation. Plaintiff was forced to proceed without counsel, and the Commonwealth Court ultimately affirmed the loss of her home. NPLS's Board of Directors had repeatedly received warnings that the organization was abandoning clients when individual attorneys left but failed to correct the recurring malpractice.

4. Plaintiff obtained assistance from Paige Martineau and Susquehanna Legal Aid for Adults and Youth after that abandonment. Martineau, a former NPLS employee, had exposed widespread malpractice, including the practice of leaving clients without representation when staff attorneys departed. Other defendants retaliated against Plaintiff's attorney, interfered with Plaintiff's legal representation, or perpetuated the unconstitutional and monopolistic professional structures that enabled the misconduct. These actions impaired Plaintiff's ability to investigate the failures, obtain evidence and witnesses, and pursue meaningful remedies against the responsible legal-service and judicial institutions.

5. Martineau worked within the federal judiciary between 2014 and 2017 and acquired direct knowledge of federal judicial decisionmaking, preparation of opinions and recommendations, judicial case administration, and the responsibilities of judicial officers and chambers employees.

6. During an April 2017 luncheon at Le Jeune Chef in Williamsport, Judge Matthew W. Brann praised Martineau's work drafting federal judicial

decisions, her legal competence, and her contributions to disability-related federal litigation. He encouraged her continued advancement within the judiciary.

7. Martineau informed Brann of serious concerns about Judge Gerald Cohn's chambers practices. She described circumstances in which judicial law clerks made substantive decisions concerning cases, drafted opinions without meaningful review by the assigned judge, signed judicial documents in the judge's name, concealed judicial travel and unavailability, and operated under pressures associated with judicial case-management reporting.

8. These concerns implicated the exercise of Article III judicial authority by the appointed judicial officer, the accuracy of court records, and the right of litigants to have their claims determined by the judge constitutionally entrusted with deciding them.

9. Brann instructed Martineau not to discuss those matters again. Rather than encouraging examination of the reported judicial misconduct, he discouraged further disclosure of matters directly concerning the integrity of the federal judiciary.

10. Martineau also reported professional misconduct involving a married male participant in the federal judicial environment. The reported conduct included improper ex parte communications with a judge concerning matters

affecting litigants who lacked notice of the communications and an opportunity to respond.

11. The ex parte conduct implicated the rights of defendants and other affected parties to impartial proceedings. Communications with a judicial decisionmaker outside the presence and knowledge of the parties can undermine the adversarial process and confer an improper advantage upon the person obtaining private access to the judge.

12. The same account included sexually inappropriate conduct directed toward women in the professional environment. Martineau reported an inappropriate inquiry concerning whether a female attorney's underwear matched her lace clothing and an inappropriate text concerning Martineau's body and skirt.

13. The reported conduct contributed to the hostile professional environment experienced by Yvonne Campbell and raised concerns affecting other women working within and around the judiciary. The conduct implicated professional dignity, equal treatment, and the ability of women to perform their work without sexualized humiliation or intimidation.

14. The man's simultaneous disregard of his marital obligations, the rights of parties affected by improper ex parte communications, and the professional rights of women formed part of the misconduct brought to Brann's attention. The violation of marital vows provides relevant context concerning the reported course of conduct; the legal and ethical objections concern improper

judicial communications, interference with litigants' rights, and sexual harassment.

15. Martineau's account identifies no comparable exercise by Brann of claimed inherent sanctioning authority against the man, no comparable restrictions on his professional communications, and no disciplinary measures equivalent to those Brann later imposed against Martineau and SLAAY.

16. Brann's response to the reported conduct bears directly upon the impartiality challenge because he later invoked broad judicial authority to regulate attorney conduct, restrict communications, prohibit subpoenas, and protect the administration of justice when a powerful bar association sought restrictions against Martineau.

17. Brann has also repeatedly invoked the saying that a lawyer representing herself or himself has a fool for a client. His recurring use of this expression disparages attorneys who proceed without independent representation.

18. The expression judges the person rather than the legal merits of the case. It assumes that an attorney's decision to represent herself demonstrates foolishness without examining the attorney's competence, circumstances, available counsel, claims, or supporting evidence.

19. An attorney pursuing claims against judges, bar associations, disciplinary authorities, or influential members of the legal profession may be unable to

obtain independent counsel even when the claims have substantial legal and factual merit.

20. Lawyers who might otherwise accept the representation may need to continue appearing before the same judges, working with the same attorneys, maintaining bar-association relationships, receiving professional referrals, and conducting business within the institutions being challenged.

21. The resulting professional conflicts and pressures can make self-representation the only practical means of pursuing relief against powerful legal institutions. A judge who repeatedly mocks self-representation creates an appearance of prejudice against the very persons whose inability to obtain separate counsel results from the profession's institutional relationships.

22. Brann's attitude toward self-representation also affects nonlawyer litigants who proceed without counsel because of poverty, unavailable legal aid, conflicts of interest, professional exclusion, or abandonment by their existing legal-services providers.

23. On February 13, 2025, Brann entered a memorandum opinion and order in bankruptcy appeal No. 4:24-cv-01307, arising from adversary proceeding No. 4:20-ap-00060. The decision referenced the transcript of an August 2, 2024 bankruptcy hearing.

24. On March 10, 2025, Bankruptcy Judge Mark J. Conway's courtroom deputy, Patricia Ratchford, contacted Martineau concerning the transcript referenced

in Brann's decision. Ratchford identified the transcript as having been docketed at Entry 249 in the underlying adversary proceeding on October 21, 2024.

25. On June 6, 2025, Brann entered an additional order addressing transcript costs under 28 U.S.C. § 753(f). When Martineau sought further transcript assistance, Chief Deputy Clerk D. Troy Sellars advised her on January 22, 2026, that the earlier authorization no longer applied because the district-court appeal had been dismissed.

26. These proceedings formed part of the continuing dispute concerning judicial control of court records, transcripts, public access to the evidentiary bases for judicial decisions, and the ability of litigants to obtain meaningful review of judicial conduct.

27. On October 3, 2025, Martineau and SLAAY commenced Martineau v. American Bar Association, No. 4:25-cv-01848, in the Middle District of Pennsylvania. The complaint asserted sixty-three counts against nineteen defendants, including claims challenging the conduct and authority of judges, bar associations, and legal-professional institutions.

28. Martineau and SLAAY sought emergency relief through applications for a temporary restraining order, preliminary injunction, partial summary judgment, and protective measures against continuing interference with their legal-services activities and constitutional litigation.

29. On October 15, 2025, Brann entered a memorandum opinion at Document 17 and an order at Document 18 dismissing the complaint without prejudice, denying ten pending motions, and requiring any amended complaint to comply with a forty-page limitation.

30. Brann's memorandum cited "Federal Rule of Criminal Procedure 8(a)(2)" while discussing the short-and-plain-statement requirement governing civil complaints. He used the civil pleading standard to dismiss an action involving numerous parties and separate claims rather than addressing their distinct factual and legal bases.

31. The October 15 ruling applied Middle District Local Rules 7.1 and 7.5 to deny eight motions for procedural noncompliance. These rulings occurred in litigation challenging the constitutional authority of courts to promulgate and enforce procedural rules restricting substantive rights.

32. On October 15, 2025, the Pennsylvania Bar Association filed an emergency motion at Document 16 seeking restrictions upon Martineau's communications with participants in the Wills for Heroes program.

33. On October 16, 2025, Martineau and SLAAY filed a sanctions motion at Document 23 challenging the Bar Association's emergency application and its asserted legal basis.

34. On October 17, 2025, Brann entered a memorandum opinion and order at Document 26 granting the Bar Association's motion and denying Martineau and SLAAY's sanctions motion.

35. Brann prohibited contact with employees of named defendants except through counsel of record, prohibited filing identifying information about Wills for Heroes participants on the public docket, and prohibited subpoenas directed to program participants pending further order.

36. Brann imposed these restrictions without conducting an evidentiary hearing. He relied upon the judiciary's asserted obligation to regulate the conduct of attorneys and parties, maintain courtroom order, prevent abuse of judicial process, and enforce professional-conduct requirements.

37. Brann invoked professional-conduct rules incorporated through Middle District Local Rule 83.23.2, including Pennsylvania Rule of Professional Conduct 4.2, and claimed inherent judicial authority to justify the restrictions.

38. Brann employed that authority to grant coercive relief benefiting the Pennsylvania Bar Association while rejecting the competing sanctions request filed by the attorney who had challenged the Association's conduct.

39. The October 17 ruling provides a direct comparison with Brann's earlier response to reports of improper ex parte communications and sexual harassment. In the earlier circumstances, he did not invoke comparable

powers to address conduct threatening litigants' procedural rights and women's professional equality. In October 2025, he used expansive regulatory authority against a female attorney criticizing judges and bar associations.

40. Also on October 17, 2025, Brann entered Document 27 dismissing a subsequent amended complaint, maintaining the forty-page restriction, and warning that another noncompliant pleading could result in dismissal with prejudice.

41. On October 31, 2025, Brann entered Document 29 modifying his earlier restrictions to permit Martineau to appear before judicial defendants and specified court personnel in unrelated proceedings and to continue representing clients in those matters.

42. The modification addressed interference with ordinary legal representation but did not resolve the constitutional objections to the original order, the restrictions on investigation and subpoenas, or the use of court-made rules and inherent judicial authority against persons pursuing claims against influential professional institutions.

43. The proceedings also implicated Brann's authority to adjudicate challenges to judicial conduct, professional regulation, and court-made rules while exercising the very powers under constitutional attack.

44. Related proceedings continued to challenge judicial recusals, pleading limitations, immunity doctrines, protected criticism, case management, and the ability of litigants to obtain jury consideration of claims against judicial and professional actors.

45. Hoagland seeks judicial relief against legal-professional institutions while relying upon counsel whose ability to represent clients has been affected by the challenged judicial actions. The resulting conflict concerns Hoagland's right to impartial adjudication, equal treatment, and effective access to her chosen legal representation.

## I. Disqualification of All Current and Former Judges of the Middle District of Pennsylvania

### A. The Appearance of Partiality Requires Disqualification

46. Section 455(a) of Title 28 provides: "Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned."

47. Section 455(b)(1) additionally requires disqualification where a judge possesses personal bias or prejudice concerning a party or personal knowledge of disputed evidentiary facts concerning the proceeding.

48. Section 455(b)(4) requires disqualification where a judge possesses a specified financial or other interest that could be substantially affected by the outcome of the proceeding.

49. The appearance-of-impartiality inquiry is objective. In re Kensington International Ltd., 353 F.3d 211, 220–21 (3d Cir. 2003), applies the perspective of a reasonable person informed of the relevant circumstances. In re School Asbestos Litigation, 977 F.2d 764, 776–78 (3d Cir. 1992), similarly recognizes the importance of circumstances undermining public confidence in impartial adjudication.

50. The challenged conduct extends beyond unfavorable rulings. It includes Brann's extrajudicial knowledge of judicial misconduct reports, his response to those reports, his recurring statements about self-represented litigants, and his subsequent use of judicial authority in litigation challenging judges and legal-professional institutions.

51. In Liteky v. United States, 510 U.S. 540, 555–56 (1994), the Supreme Court distinguished ordinary judicial rulings from circumstances involving sufficiently serious favoritism or antagonism to undermine fair judgment. Brann's extrajudicial statements and reported response to misconduct disclosures provide grounds for examining his impartiality independently of the merits of individual orders.

52. Brann's prior personal knowledge of Martineau's criticisms, his reaction to reports concerning the judiciary, and his later treatment of litigation brought by Martineau and SLAAY create an objectively reasonable question concerning his ability to adjudicate challenges to judicial and professional institutions without institutional favoritism.

**B. Brann's Unequal Exercise of Inherent Sanctioning Authority Violates the Constitutional Requirement of Equal Treatment**

53. The Fifth Amendment provides that no person shall "be deprived of life, liberty, or property, without due process of law." Its guarantee of due process includes an equal-protection component applicable to federal governmental action. Bolling v. Sharpe, 347 U.S. 497, 499 (1954).

54. Governmental enforcement discretion cannot be exercised for constitutionally impermissible discriminatory purposes. Yick Wo v. Hopkins, 118 U.S. 356, 373–74 (1886), addresses discriminatory administration of governmental authority, while Wayte v. United States, 470 U.S. 598, 608–10 (1985), addresses discriminatory purpose and effect in selective enforcement.

55. The Supreme Court has also rejected governmental sex classifications resting upon generalized assumptions about men and women. United States v. Virginia, 518 U.S. 515, 532–33 (1996).

56. Plaintiff challenges Brann's different responses to serious reported misconduct involving a married male participant and the subsequent protected litigation activities of Martineau, a woman attorney criticizing judges, bar associations, and professional institutions.

57. The earlier reported misconduct included improper ex parte communications with a judicial officer, interference with the procedural rights of litigants excluded from those communications, and sexually inappropriate conduct affecting Yvonne Campbell and other women.

58. The ex parte communications implicated judicial integrity and the rights of defendants to participate in proceedings affecting their interests. The reported sexual conduct implicated the ability of women to work in a professional environment free of discriminatory intimidation and humiliation.

59. Harris v. Forklift Systems, Inc., 510 U.S. 17, 21–23 (1993), recognizes that sufficiently severe or pervasive sex-based harassment can create an unlawful hostile working environment. The reported conduct affecting Campbell and other women therefore raised issues more substantial than a private disagreement concerning professional courtesy or personal relationships.

60. Brann did not invoke comparable inherent sanctioning or regulatory powers in response to those disclosures. He instead discouraged further discussion of judicial misconduct and did not impose the communications restrictions,

subpoena limitations, or disciplinary measures later employed against Martineau and SLAAY.

61. On October 17, 2025, Brann asserted that courts possess authority to regulate attorney conduct, impose order, protect judicial proceedings, and prevent misuse of legal process. He invoked those powers in granting relief requested by the Pennsylvania Bar Association.

62. Chambers v. NASCO, Inc., 501 U.S. 32, 43–46 (1991), recognizes judicial inherent sanctioning authority in defined circumstances involving abuse of judicial process. Plaintiff challenges the constitutional foundation and scope of such claimed powers and, independently, their discriminatory or arbitrary enforcement.

63. Brann's actions require comparison of the regulatory authority he claimed in October 2025 with the authority available to address the earlier misconduct reports, his knowledge of those reports, his reasons for declining intervention, and the professional relationships and sex-based considerations influencing the different responses.

64. The comparison is not confined to whether the underlying events occurred in identical proceedings. Brann's conduct reveals how he understands and exercises judicial authority when powerful professional participants are implicated, when women report misconduct, and when a woman attorney challenges the conduct of judicial and bar institutions.

65. Plaintiff maintains that Brann protected professional insiders from comparable intervention while applying coercive judicial powers against Martineau after she exercised constitutional rights to criticize and litigate against influential legal institutions.

66. The disparity raises an objectively reasonable question concerning Brann's impartiality in cases involving sex discrimination, judicial misconduct, attorney discipline, challenges to bar associations, and constitutionally protected criticism of professional authorities.

67. Plaintiff seeks an evidentiary determination concerning the reports communicated to Brann, his knowledge and response, the treatment of Yvonne Campbell and other women, the asserted improper ex parte communications, and his subsequent selective exercise of claimed inherent disciplinary authority.

**C. Brann's Repeated Derogatory Statements Require His Recusal From All Pro Se Proceedings**

68. Brann's repeated invocation of the saying that an attorney representing herself or himself has a fool for a client constitutes an extrajudicial expression of prejudice against a defined class of litigants.

69. The statement is a classic ad hominem attack. It attacks a litigant's supposed foolishness based on the decision to proceed without counsel rather than addressing the evidence, the law, or the merits of the claims.

70. The prejudice is especially significant in litigation against judges, bar associations, disciplinary institutions, and professionally influential attorneys because the availability of independent representation is constrained by the legal profession's continuing business and professional relationships.

71. Attorneys routinely must appear before the same judges, interact with the same bar members, maintain professional goodwill, and secure client referrals through institutions that may be defendants in such litigation.

72. A lawyer asked to represent another lawyer against a judge or bar association may anticipate economic loss, retaliation, professional exclusion, reputational damage, or deterioration of relationships necessary to maintain the lawyer's practice.

73. These pressures can make independent representation practically unavailable even where the proposed claims are substantial. An attorney may therefore have no realistic alternative to representing herself or himself.

74. Brann's repeated ridicule transforms the effects of that institutional power into a derogatory judgment against the individual who attempts to challenge it. The resulting prejudice favors preservation of the legal profession's existing power structure.

75. The same appearance of partiality extends to nonlawyer pro se litigants, including persons unable to obtain counsel because of poverty, conflicts of interest, legal-aid failures, professional exclusion, or the lack of lawyers willing to challenge powerful defendants.

76. Section 455(a) does not require a litigant to prove that an unfavorable ruling resulted from subjective prejudice where the circumstances independently establish an objectively reasonable question about impartiality.

77. Plaintiff therefore demands Brann's disqualification from every proceeding involving a self-represented party, including all cases in which an attorney represents herself or himself.

**D. The Disqualification Extends to Every Current and Former Judge of the District**

78. Plaintiff challenges the entire Middle District judiciary because the litigation contests institutional practices, professional relationships, judicial rules, judicial discipline, and claimed immunity and regulatory powers shared throughout the judicial institution.

79. Judicial officers serving within the same district participate in common administrative structures, judicial governance, rules of practice, attorney regulation, judicial personnel systems, and institutional practices affecting the litigation.

80. The judiciary's role in adjudicating challenges to these practices creates an institutional appearance-of-partiality concern independent of any single judge's personal conduct.

81. Brann's involvement provides a concrete example of the problem. He exercised authority to dismiss constitutional claims challenging judicial institutions, enforce rules whose constitutionality was contested, restrict communications by the attorney bringing those claims, and adjudicate competing requests for sanctions involving an influential bar association.

82. Plaintiff maintains that a judicial institution cannot satisfy the constitutional demand for impartiality by assigning another judge within the same institution to determine the validity of the challenged practices and interests.

83. The requested disqualification includes all current district judges, senior judges, magistrate judges, bankruptcy judges, retired judges, recalled judges, transferred judges, and persons who previously served in the Middle District.

84. Former judicial service remains relevant because a former judge may subsequently exercise authority through recall, special designation, reassignment, or another judicial appointment. Plaintiff requests prohibition of such participation by every covered former judicial officer.

85. All judicial acts and exercises of judicial authority remain within the challenged conduct, including rulings, orders, sanctions, judicial recusal decisions, docket control, transcript decisions, court-access restrictions,

filing limitations, case management, and exercises of disciplinary or professional-regulatory authority.

86. Plaintiff does not concede that judicial immunity or any other judge-created doctrine renders these exercises of judicial authority immune from constitutional challenge or removes them from consideration in determining judicial impartiality.

## II. Disqualification of the Court System as a Whole

### A. The Judiciary Cannot Impartially Adjudicate the Constitutionality of Its Own Institutional Powers and Privileges

87. Plaintiff challenges the court system as a whole, encompassing the entire federal and state judicial systems, because the judiciary exercises authority over the constitutionality and enforcement of its own rules, privileges, immunity doctrines, disciplinary structures, professional-regulatory powers, and institutional conduct.

88. The structural problem arises when the judiciary is simultaneously the creator of contested rules, the beneficiary of contested privileges and immunities, the regulator of persons challenging those privileges, and the adjudicator deciding whether its own conduct violates constitutional requirements.

89. The Due Process Clause requires impartial adjudication. In In re Murchison, 349 U.S. 133, 136–39 (1955), the Supreme Court recognized the constitutional incompatibility of combining accusatory and adjudicative functions in circumstances undermining judicial neutrality.

90. In Tumey v. Ohio, 273 U.S. 510, 523 (1927), the Supreme Court invalidated a judicial arrangement involving a disqualifying financial interest. In Caperton v. A.T. Massey Coal Co., 556 U.S. 868, 883–87 (2009), the Court held that objective circumstances creating a constitutionally intolerable probability of bias required disqualification even without proof of actual subjective bias.

91. Plaintiff invokes the underlying constitutional principle that adjudicative authority cannot be exercised impartially where the adjudicator possesses a disqualifying personal or institutional interest in the outcome.

92. Plaintiff's constitutional challenges concern the legal system's authority to create and enforce rules, control entry into legal practice, discipline lawyers and judges, restrict court access, determine the scope of judicial immunity, and regulate litigation against itself.

93. These are not merely controversies concerning the correctness of particular judicial rulings. They challenge the constitutionality of the structures through which judges establish, enforce, and protect their own institutional powers.

94. Reassignment among federal judges, transfer to another federal district, designation of a judge from another circuit, or referral to a state court does not eliminate the system-wide institutional conflict challenged by Plaintiff.

95. Plaintiff challenges reliance upon a judicially created rule of necessity to authorize adjudication by an institution whose own authority is constitutionally disputed.

96. In United States v. Will, 449 U.S. 200, 213–17 (1980), the Supreme Court applied the rule of necessity to litigation concerning judicial compensation where the judiciary shared an interest in the dispute.

97. Plaintiff seeks a constitutional ruling that the judiciary cannot invoke necessity to defeat a challenge directed against the legitimacy of its own rulemaking, immunity, professional discipline, institutional accountability, and exercise of judicial power.

98. Plaintiff demands disqualification of the court system as a whole and determination of the constitutionally authorized procedure for adjudicating the underlying claims without reproducing the institutional conflict challenged in this motion.

**B. Court-Made Rules and Claimed Inherent Judicial Powers Constitute Unconstitutional Exercises of Legislative Authority**

99. Article I, Section 1 of the United States Constitution provides: "All legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives."

100. Article III, Section 1 provides that "[t]he judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish."

101. Plaintiff maintains that legislative power and judicial power are distinct constitutional functions and that Article III does not grant federal judges independent authority to enact substantive legislation.

102. Plaintiff challenges judicial creation and enforcement of rules governing civil procedure, criminal procedure, evidence, professional conduct, judicial discipline, admission to legal practice, and court administration to the extent those rules exercise legislative authority or restrict substantive constitutional rights.

103. The challenge includes both the constitutional validity of legislative delegations permitting judicial rulemaking and the judiciary's independent assertion of inherent powers as a source of substantive legal restrictions.

104. Section 2071(a) of Title 28 authorizes federal courts to prescribe rules for conducting their business only within the limits established by Congress and applicable national rules.

105. Section 2072(a) grants the Supreme Court statutory authority to prescribe general rules of practice and procedure and rules of evidence for specified federal proceedings.

106. Section 2072(b) expressly provides: “Such rules shall not abridge, enlarge or modify any substantive right.”

107. Plaintiff challenges the delegation of legislative authority to the judiciary and separately challenges judicial rules that abridge constitutional rights notwithstanding the express substantive-rights limitation imposed by Congress.

108. Plaintiff challenges extensions of judicial procedural regulation into the creation of substantive restrictions on constitutional rights.

109. Court-made rules cannot constitutionally extinguish protected speech, petitioning, access to counsel, jury-trial rights, or remedies against governmental actors merely because the judiciary considers such restrictions useful for professional regulation or administrative convenience.

110. Plaintiff challenges the use of Federal Rule of Civil Procedure 8 and related procedural rules to impose categorical limits on the number of nonfrivolous claims a litigant may present.

111. Rule 8(d)(3) permits a party to state as many separate claims or defenses as it has, regardless of consistency. Rule 18(a) permits a party to join as many claims as it has against an opposing party. Rule 20 governs permissive joinder, while Rule 21 provides that misjoinder is not a ground for dismissing an action.

112. Plaintiff challenges judicial application of those provisions in a manner that extinguishes claims rather than addressing joinder, severance, pleading clarity, and the distinct factual and legal requirements applicable to each cause of action.

113. Plaintiff also challenges court-made professional-conduct rules, including those invoked through Middle District Local Rule 83.23.2, when such rules restrict protected criticism, lawful litigation communications, investigation of misconduct, or access to witnesses and judicial process.

114. In the October 17, 2025 order, Brann invoked professional-conduct restrictions and the judiciary's asserted inherent authority to prohibit categories of communications and subpoenas. Plaintiff challenges both the constitutional foundation of that asserted power and its discriminatory enforcement.

115. The First Amendment protects freedom of speech and the right to petition the government for redress of grievances. New York Times Co. v. Sullivan, 376 U.S. 254, 269–70 (1964), recognizes the constitutional importance of

criticism of official conduct. California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508, 510–11 (1972), recognizes the right to petition governmental adjudicative institutions.

116. Plaintiff challenges rules and judicial practices that punish or restrict criticism of judges, threats of nonfrivolous litigation, preparation of judicial-misconduct complaints, witness investigation, or other protected efforts to obtain remedies against governmental and professional institutions.

117. Plaintiff further challenges judicially created immunity doctrines and asserted inherent powers that shield judicial conduct, restrict remedies, or permit courts to determine the scope of their own accountability without constitutional authorization.

118. The challenged conduct includes judicial rulings, sanctions, case management, recusal decisions, restrictions on filings or communications, transcript and record-access decisions, and other exercises of judicial authority.

119. Plaintiff requests invalidation of unconstitutional court-made rules in their entirety and an injunction against their enforcement. Plaintiff does not concede the validity of such rules merely because courts have previously recognized or enforced them.

**C. The Constitutional Right to an Impartial Jury Requires Exclusion of Persons Connected to the Legal Profession**

120. The Seventh Amendment provides that "[i]n Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved."

121. Plaintiff demands a jury composed exclusively of persons independent of the judicial and legal-professional institutions whose authority and conduct are challenged.

122. All lawyers, judges, law students, and anyone having any friendship, family relationship, or business relationship with any lawyer or judge shall be prohibited from serving on the jury in this action.

123. This prohibition encompasses every person within the identified categories, regardless of whether the person maintains a direct relationship with a named defendant or states an ability to remain impartial.

124. The categorical prohibition also excludes current and former judicial law clerks, chambers employees, court employees, and other legal-professional personnel falling within the prohibited categories or possessing the prohibited relationships.

125. Plaintiff maintains that the institutional interests challenged in this litigation create a pervasive conflict for persons who participate in, benefit from, or possess personal and professional relationships with the legal system.

126. The litigation challenges judicial authority, professional licensing, bar-association privileges, lawyer discipline, judicial immunity, professional gatekeeping, and the institutional arrangements through which lawyers and judges regulate their own conduct.

127. Plaintiff therefore seeks a jury entirely free from the professional, familial, friendship, and business relationships that could create divided loyalties when the legality of those institutions and privileges is submitted for determination.

128. In United States v. Mitchell, 690 F.3d 137, 142–49 (3d Cir. 2012), the Third Circuit addressed implied juror bias based upon familial and professional relationships, recognizing categorical treatment of certain close familial relationships while declining to presume bias from every coworker relationship.

129. Plaintiff requests a broader constitutional exclusion based upon the distinctive institutional subject matter of this litigation and challenges statutory or judicially created restrictions that would prevent enforcement of the demanded categorical prohibition.

130. No person within a prohibited category may remain eligible for jury service merely by promising impartiality. Plaintiff requests written questionnaires, examination of prospective jurors, and exclusion of every juror possessing a prohibited status or relationship.

**D. Independent Adjudication Is Necessary to Protect Constitutional Rights**

131. Plaintiff seeks an adjudicative process free from the institutional conflicts presented by the judicial system's authority over its own conduct and privileges.

132. The constitutional challenge concerns more than a particular judge's subjective willingness to act fairly. It addresses the objective relationship between the judiciary's institutional interests and the legal claims submitted for adjudication.

133. The court system exercises authority over the procedures through which constitutional challenges against judges and professional institutions are pleaded, heard, dismissed, reviewed, or submitted to juries.

134. Those procedures affect the ability of clients and attorneys to pursue relief against the very institutions that create and administer them.

135. Plaintiff maintains that due process prohibits an adjudicative system from determining the legitimacy of its own institutional powers while simultaneously exercising those contested powers to restrict challenges against itself.

136. Plaintiff requests disqualification of the court system as a whole and a constitutionally authorized means of resolving the resulting dispute without substituting ordinary judicial reassignment for the structural relief demanded.

**Relief Requested**

WHEREFORE, Plaintiff Laticia Hoagland respectfully requests that the Court enter an order:

137. Disqualifying every current and former judge of the United States District Court for the Middle District of Pennsylvania, including active, senior, magistrate, bankruptcy, retired, recalled, transferred, and formerly serving judges, from exercising judicial authority in this action.

138. Disqualifying the court system as a whole, including the entire federal and state judicial systems, and determining the constitutionally authorized means of adjudicating the underlying claims without the institutional conflicts challenged herein.

139. Disqualifying Judge Matthew W. Brann from every proceeding involving a self-represented litigant, including every proceeding involving an attorney representing herself or himself, based upon his repeated derogatory statements about such litigants and the resulting objectively reasonable appearance of prejudice.

140. Determining the constitutional consequences of Brann's unequal invocation of claimed inherent sanctioning authority against Martineau and SLAAY following his failure to employ comparable authority in response to reported ex parte misconduct and sexually inappropriate conduct affecting Yvonne Campbell and other women.

141. Declaring that judicial authority may not be exercised discriminatorily to protect professionally connected participants while imposing coercive restrictions upon women and litigants engaged in protected criticism and petitioning against judicial and bar institutions.

142. Prohibiting all lawyers, judges, law students, and every person having any friendship, family relationship, or business relationship with any lawyer or judge from serving on the jury in this action, without an exception based upon the person's assurance of impartiality.

143. Directing appropriate jury questionnaires and examination to identify and exclude every person within the prohibited categories.

144. Declaring unconstitutional court-made rules governing civil procedure, criminal procedure, evidence, professional conduct, attorney admission, judicial discipline, and judicial administration, and enjoining their enforcement as exercises of unconstitutional legislative authority or restrictions on substantive constitutional rights.

145. Declaring unconstitutional judicially created inherent powers used to restrict protected speech, petitioning, access to representation, witness investigation, subpoenas, jury trial, or remedies against judges and other governmental actors.

146. Preserving all constitutional challenges to judicial immunity and related doctrines without excluding rulings, orders, sanctions, recusals, docket

administration, judicial communications, transcripts, filing restrictions, case management, or other judicial acts from the challenged conduct.

147. Requiring preservation of the relevant judicial records, communications, orders, transcripts, disciplinary materials, and evidence concerning the reported 2017 misconduct, Brann's responses, his statements concerning self-represented litigants, and his subsequent invocation of judicial disciplinary powers.

148. Conducting an evidentiary hearing concerning disputed facts material to disqualification, including Brann's knowledge of the earlier misconduct reports, the reported ex parte communications, the hostile environment affecting Campbell and other women, Brann's repeated statements about self-represented litigants, and the constitutional significance of his later orders.

149. Prohibiting further nonemergency merits determinations and exercises of coercive authority by the challenged judicial officers pending adjudication of the recusal and disqualification demands.

150. Granting all further declaratory, injunctive, equitable, and protective relief necessary to effectuate the constitutional rights asserted in this motion.

Respectfully submitted,

/s/ Paige Martineau

Paige Martineau, Esquire

Pa. I.D. No. 325096

Susquehanna Legal Aid for Adults and Youth (SLAAY)

Telephone: 570-392-3025

Email: info@slaay.org

Counsel for Plaintiff Laticia Hoagland