**IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| MEGAN TANNER<br><br>Plaintiff,<br><br>v.<br><br>NORTHERN DAUPHIN NURSING & REHABILITATION<br><br>Defendant. | CIVIL ACTION NO.:<br><br><br><br><br><br>**JURY TRIAL DEMANDED** |

# COMPLAINT

## I. PRELIMINARY STATEMENT

1. This is an action for an award of damages, attorneys' fees, and other relief on behalf of Plaintiff, Megan Tanner ("Plaintiff Tanner"), a former employee of the Defendant, Northern Dauphin Nursing & Rehabilitation ("Defendant"), who was subjected to the Defendant's unlawful retaliation and was ultimately unlawfully discharged from her employment, as set forth herein below.

2. This action arises under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729–3733, the Pennsylvania Whistleblower Law ("PWL"), 43 P.S. §§ 1421-1428, and under the common law of the Commonwealth of Pennsylvania prohibiting the discharge of an employee in violation of a clear mandate of public policy. Plaintiff Tanner alleges that the Defendant retaliated against her for her good faith reports of wrongdoing and her refusal to participate in conduct she reasonably believed to be unlawful by threatening her employment, subjecting her to a hostile work environment, progressively stripping her of her job duties and responsibilities, and ultimately terminating her employment, all of which violated a clear mandate of the public policy of the Commonwealth of Pennsylvania.

## II. VENUE

3. The original jurisdiction of this court is invoked, and venue is proper in this judicial district, pursuant to Title 28 U.S.C. § 1331, as Plaintiff Tanner's claims are based on the FCA, 31 U.S.C. §§ 3729–3733. This court has supplemental pendent jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

4. The venue is appropriate within this judicial district, as the Defendant maintains a place of business in Dauphin County and routinely conducts transactions within this jurisdiction, which is situated within the Middle District of Pennsylvania. Furthermore, the transactions and occurrences underlying Plaintiff Tanner's claims occurred in Dauphin County, which is also within the Middle District of Pennsylvania.

## III. PARTIES

5. Plaintiff Tanner is an adult individual and citizen of Pennsylvania, residing therein at 6067 State Route 209, Lykens, Pennsylvania 17048.

6. Defendant is a corporation duly organized and existing under the laws of the Commonwealth of Pennsylvania, maintaining a place of business therein at 990 Medical Road, Millersburg, Pennsylvania 17061.

7. At all times relevant hereto, the Defendant was acting through its agents, servants, and employees, who were acting within the scope of their authority, course of employment, and under the direct control of the Defendant.

8. At all times relevant hereto, Defendant operated a long-term care nursing facility licensed by the Commonwealth of Pennsylvania, participated in the Medical Assistance and Medicare programs, and received money from public bodies, including the Commonwealth of Pennsylvania and the Centers for Medicare & Medicaid Services, to provide nursing and

rehabilitation services to its residents. The facility is a "medical facility" within the meaning of the Medical Care Availability and Reduction of Error ("MCARE") Act, 40 P.S. § 1303.302.

9. Defendant is an "employer" and Plaintiff Tanner is an "employee" within the meaning of the Pennsylvania Whistleblower Law, 43 P.S. § 1422.

## IV. BACKGROUND

### Pennsylvania Licensure and Regulatory Requirements

10. Defendant, Northern Dauphin Nursing & Rehabilitation, is a long-term care facility for the elderly community subject to the statutory and regulatory standards established by the Commonwealth of Pennsylvania. The Pennsylvania Health Care Facilities Act ("Health Care Facilities Act"), 35 P.S. §§ 448.101-448.904b, requires long-term care nursing facilities to comply with licensure and operational standards promulgated and enforced by the Pennsylvania Department of Health. *See* 35 P.S. §§ 448.802a, 448.803, 448.808(a).

11. Long-term care nursing facilities are further subject to the protections and reporting requirements of the Older Adults Protective Services Act ("OAPSA"), 35 P.S. §§ 10225.101–10225.5102.

12. Under the Health Care Facilities Act, 35 P.S. §§ 448.101–448.904b, the Pennsylvania Department of Health promulgated regulations governing the operation of health care facilities, codified at 28 Pa. Code §§ 51.1–611.57. Relevant provisions include, among other things, 28 Pa. Code § 51.3(e), requiring notification of regulatory noncompliance affecting patient safety; and 28 Pa. Code § 51.12, requiring health care facilities to maintain nondiscriminatory policies and comply with applicable federal and Pennsylvania civil rights laws.

13. Additionally, 28 Pa. Code §§ 201.1–217.1 establish the regulatory framework governing the operation of long-term care nursing facilities in Pennsylvania. Relevant provisions

include, among other things § 201.2(a) incorporating by reference the federal requirements governing long-term care facilities set forth in 42 C.F.R. pt. 483, subpt. B; § 201.14 requiring the licensee to ensure compliance with applicable laws and regulations governing the facility and resident health and safety; § 201.29 incorporating the federal resident rights under 42 C.F.R. § 483.10 and establishing additional protections under Pennsylvania law, including notice requirements before transfer and the right to receive care without discrimination based on national origin or ability to pay.

**Patient Safety and Reporting Requirements**

14. The MCARE Act mandates that a health care worker who has a reasonable belief that a serious event or incident has happened must report the incident in accordance with the established patient safety protocol of the medical facility. *See* 40 P.S. § 1303.308(a).

15. At all times relevant hereto, Plaintiff was a "health care worker," and Defendant operated a "medical facility," under the MCARE Act. *See* 40 P.S. § 1303.302. The MCARE Act also provides that a health care worker who reports a serious event or incident in accordance with the Act shall not be subject to retaliatory action for making such a report and is entitled to the protections and remedies afforded by Pennsylvania's Whistleblower Law. *See* 40 P.S. § 1303.308(c).

**Federal Medicare and Medicaid Conditions of Participation**

16. Defendant is further subject to the federal Conditions of Participation established by the Centers for Medicare & Medicaid Services ("CMS") for long-term care facilities established at 42 C.F.R. pt. 483, subpt. B. *See* 42 C.F.R. §§ 483.1–483.95. Relevant provisions include, among other things § 483.10 governing residents' rights, including dignity, care planning, admission, and transfer; § 483.12 prohibiting abuse, neglect, and exploitation; § 483.15 governing the admission,

transfer, and discharge of residents; and § 483.70(c) requiring long-term care facilities to comply with other applicable HHS regulations, including nondiscrimination on the basis of national origin.

**False Claims Act**

17. "The False Claims Act imposes liability on any person who 'knowingly presents or causes to be presented, [to the federal government] a false or fraudulent claim for payment or approval.'" *See* 31 U.S.C. § 3729(a)(1)(A). The term "knowing" or "knowingly" means that a person (1) has "actual knowledge of the information;" (2) "acts in deliberate ignorance of the truth or falsity of the information;" or (3) "acts in reckless disregard of the truth or falsity of the information." *See* 31 U.S.C. § 3729(b)(1). No proof of specific intent to defraud is required. *See* 31 U.S.C. § 3729(b)(1).

**Licensed Social Worker**

18. As a Licensed Social Worker ("LSW"), Plaintiff is subject to the Social Workers, Marriage and Family Therapists and Professional Counselors Act, 63 P.S. §§ 1901–1922, which establishes the qualifications and licensure requirements governing the practice of social work in Pennsylvania. Relevant provisions include, among other things § 1907(a)(2), (g)(2), establishing the educational qualifications for licensure, including a master's degree from an accredited school of social work or social welfare for a Licensed Social Worker and a bachelor's degree from an accredited social work or social welfare program for a Licensed Bachelor Social Worker; § 1920(a.1), prohibiting individuals who do not satisfy the statutory definition of a social worker from representing themselves as social workers or using titles or descriptions of services incorporating the term "social worker."

19. Social workers also face the professional licensure, practice, and ethical standards set forth in 49 Pa. Code §§ 47.1–47.80. Relevant provisions include, among other things,

§ 47.1a, establishing qualifications for supervisors; § 47.12, prescribing the requirements for licensure as a social worker; § 47.12c, establishing the qualifications for licensure as a clinical social worker; and § 47.71, addressing the ethical standards applicable to social workers.

## V. STATEMENT OF FACTS

### Plaintiff's Employment Background with Defendant

20. Plaintiff Tanner was employed by the Defendant as its Director of Social Services from on or about January 31, 2024 until her unlawful termination on or about July 21, 2026.

21. Throughout her employment with the Defendant, Plaintiff Tanner held the position of Director of Social Services and at all times maintained an exemplary job performance rating in said capacity.

22. Plaintiff Tanner was a Licensed Social Worker with an extensive professional background in Macro and Trauma-Informed Care Social Work. Plaintiff Tanner is also certified in Global Social Work, indicating a specialization in international affairs, immigration, human trafficking, and global policy.

23. As Director of Social Services, Plaintiff Tanner's responsibilities included coordinating and overseeing the admission, transfer, and discharge of residents in accordance with applicable federal and state law and regulation. This requires that any resident transfer or discharge be conducted lawfully and safely, with appropriate notice, and with the involvement of the resident and, where applicable, the resident's authorized representative.

24. Plaintiff Tanner was hired by, and initially reported to, the facility's then-Administrator. Sometime later, Defendant hired Robert Druckenmiller ("Druckenmiller" or "Administrator Druckenmiller") as the facility Administrator. Subsequently, Plaintiff Tanner

reported to Administrator Druckenmiller and worked alongside facility, regional, and corporate leadership.

**Plaintiff's Opposition to Defendant's Efforts to Unlawfully Transfer/Discharge Resident A**

25. At all relevant times, the facility provided long-term care to an incapacitated resident ("Resident A") who had resided at the facility since in or about 2021 and who was, at all relevant times, under the care and protection of a court-appointed legal guardian residing in the Commonwealth of Pennsylvania.

26. By decree of the Court of Common Pleas of Dauphin County, Orphans' Court Division, Resident A had been adjudicated totally incapacitated and a permanent plenary guardian of his person and estate had been appointed. Resident A lacked the legal capacity to consent to his own transfer or discharge, and any decision regarding his care or placement required the informed involvement and consent of his court-appointed legal guardian.

27. Over time, questions arose regarding Resident A's eligibility for Medical Assistance (Medicaid) and his immigration status. Although Resident A's immigration status remained unverified and unresolved for an extended period, Defendant's facility, regional, and corporate leadership repeatedly sought to remove Resident A from the facility based on his presumed immigration status and his perceived inability to pay for his care.[1]

28. Defendant's efforts to remove Resident A from the facility began before Plaintiff Tanner was hired. As early as 2023, Defendant's facility and regional personnel were exploring the transfer of Resident A to a long-term care facility in the State of New York. This was

[1] *See* 42 C.F.R. § 483.15(b)(1) (requiring a facility to "establish and maintain identical policies and practices regarding transfer, discharge, and the provision of service for all individuals regardless of source of payment"); *see also* 42 C.F.R. § 483.15(c)(1)(i)(E) (permitting transfer or discharge only after reasonable and appropriate notice); 42 C.F.R. § 483.70(c) (obligating long-term care facilities to comply with other applicable HHS regulations, including nondiscrimination on the basis of national origin under 45 C.F.R. pt. 80).

presumably because Defendant believed New York's Medical Assistance policies would be more favorable, as shown by Defendant's internal discussion of the amount it was not being paid for his care.

29. Beginning almost immediately upon the commencement of her employment in January 2024, Plaintiff Tanner was directed by Defendant's facility and corporate leadership to effectuate the transfer of Resident A to a facility located in the State of New York. To carry out that plan, Defendant's regional personnel contacted nursing facilities in New York to find a bed for Resident A. Defendant stated in internal correspondence that the longer Resident A remained in the facility, the more money it would have to write off.

30. Plaintiff Tanner, relying on her professional training and experience, recognized and repeatedly advised Defendant's leadership that transferring or discharging Resident A based on his presumed immigration status or inability to pay, or without the informed consent of his legal guardian, would be unlawful, violate the resident's rights, and expose the facility to liability.[2]

31. Within the first months of her employment, Plaintiff Tanner also declined the repeated demands of Defendant's regional business office that she disclose information concerning Resident A. Plaintiff Tanner advised that she was bound by the requirements of the Health Insurance Portability and Accountability Act ("HIPAA") and by the ethical and legal standards of her professional license. Instead, she offered to provide a training session on the applicable

[2] *See* 42 C.F.R. § 483.70(c) (obligating long-term care facilities to comply with other applicable HHS regulations, including nondiscrimination on the basis of national origin under 45 C.F.R. pt. 80); *see also* 28 Pa. Code § 51.12 (a)–(b) (prohibiting discrimination in health care facilities on the basis of, among other things, national origin and requiring facilities to comply with the Pennsylvania Human Relations Act and federal civil rights laws to ensure that no person is excluded from participation in, denied benefits of, or otherwise subjected to discrimination in the provision of care or services).

requirements. Defendant's regional business office asserted that its billing functions overrode her refusal.[3]

32. Plaintiff Tanner repeatedly refused to effectuate the transfer or discharge of Resident A and refused to sign any documentation approving such transfer or discharge. Each time, she explained that doing so would violate the law and regulations governing resident transfer and discharge, constitute unlawful discrimination, and disregard both the authority of the resident's legal guardian and the resident's incapacity.[4]

33. In or around March 2024, a meeting was convened by Defendant concerning the removal of Resident A. Plaintiff Tanner disputed the accuracy of Defendant's account of the efforts Defendant claimed to have made to resolve Resident A's status. Later, she independently obtained federal records of that status, which Defendant had represented were unavailable.

34. On or about April 2, 2024, regional leadership demanded that the facility transfer Resident A and indicated that they were waiting for Plaintiff Tanner to process the discharge. Plaintiff Tanner again refused, reiterating that the proposed transfer was against state and federal regulations.[5]

35. On or about June 5, 2024, and notwithstanding her exemplary performance, Plaintiff Tanner was issued a frivolous Performance Improvement Plan ("PIP"). Plaintiff Tanner believed, and avers, that the PIP was pretextual and was issued in retaliation for her continued refusal to unlawfully discharge Resident A.

---

[3] *See* 45 C.F.R. § 164.502 (establishing the general requirements governing the permitted and required uses and disclosures of protected health information by covered entities under the HIPAA Privacy Rule); *see also* 42 C.F.R. § 483.70(c) (requiring long-term care facilities to comply with the requirements governing the protection of individually identifiable health information under 45 C.F.R. pts. 160 and 164).

[4] *See* 40 P.S. § 1303.308(a) (mandating that health care workers report any "serious event or incident" pursuant to the medical facility's patient safety plan).

[5] *See* 42 C.F.R. § 483.15(b)(1) (requiring a facility to "establish and maintain identical policies and practices regarding transfer, discharge, and the provision of service for all individuals regardless of source of payment"); *see also* 42 C.F.R. § 483.15(c)(1)(i)(E) (permitting transfer or discharge only after reasonable and appropriate notice).

36. Although Plaintiff Tanner declined to sign the PIP, she attended the weekly remedial meetings that followed. Each meeting focused on discharging Resident A, and each time Plaintiff Tanner reiterated that the proposed discharge was unlawful.

**Plaintiff's Continued Reports of Unlawful Conduct and Defendant's Retaliation**

37. In or about September 2024, Plaintiff Tanner reported in writing to Defendant's leadership that a different resident of the facility had been left without visits, funds, or attention to her basic needs by her guardian for a period of years. She recommended modifying the guardianship. When Defendant's leadership declined to act, Plaintiff Tanner objected in writing, stating clearly that the facility was declining to pursue the matter for fiscal reasons and flagging a potential circumstance of neglect. Plaintiff Tanner directed the report to, and copied it to, a representative of the Area Agency on Aging ("AAA") and the Long-Term Care Ombudsman.[6]

38. Beginning in or about October 2025 and continuing thereafter, Administrator Druckenmiller began to direct and to track the discharge planning of named residents, including Resident A, without the involvement of Plaintiff Tanner as Director of Social Services.

39. On or about October 15, 2025, Plaintiff Tanner needed to initiate an involuntary emergency examination and treatment under 50 P.S. § 7302 following an incident where a resident stabbed another resident in the neck with a pen. Plaintiff Tanner had reported to Defendant that the resident was not appropriate for the facility and had been involved in other incidents.

40. On or about October 22, 2025, Plaintiff Tanner submitted an additional written report to Defendant's leadership and to the AAA and Long-Term Care Ombudsman objecting to Defendant's decision to direct corrective training solely at the Social Services department. Plaintiff

[6] *See* 35 P.S. § 10225.701 (requiring employees and administrators of facilities to report suspected abuse, neglect, exploitation, and abandonment of older adults, and prohibiting retaliation, discrimination, or intimidation against a person who makes such a report).

Tanner expressed that Defendant's decision misrepresented the applicable regulatory framework and could constitute targeted or retaliatory oversight. In that report, Plaintiff Tanner expressly invoked the federal requirements governing the freedom of residents from abuse, neglect, and retaliation; stated that she had independently created and offered trauma-informed care and de-escalation trainings for the facility's staff which had been poorly attended; and stated that the resulting gap had led directly to preventable resident and staff injuries.

41. On or about November 18, 2025, Plaintiff Tanner submitted three further written reports to Administrator Druckenmiller and the Human Resources Director. In those communications, Plaintiff Tanner reported that she was being subjected to targeted and retaliatory practices and provided formal notice of what she described as a pattern of inaccurate, indirect, and unsupported documentation concerning her, as well as efforts to create a negative paper trail. She also reported that, although she had been publicly designated as the facility's Grievance Officer, Defendant's Administrator had declined to provide her with a copy of a resident grievance concerning her. Plaintiff Tanner forwarded the second report that same evening to the AAA and Long-Term Care Ombudsman.[7]

42. In or about January 2026, Defendant sent the Social Services Coordinator (a subordinate who was not a licensed social worker) to attend a resident's court hearing in Plaintiff Tanner's place without notifying her, for which Defendant's Administrator thereafter apologized.

**<u>The Escalating Dispute Over the Transfer of Resident A</u>**

43. Defendant's leadership continued to pressure Plaintiff Tanner to remove Resident A from the facility, including by proposing to relocate him to an on-campus apartment and, later,

---

[7] *See* 35 P.S. § 10225.701 (requiring employees and administrators of facilities to report suspected abuse, neglect, exploitation, and abandonment of older adults, and prohibiting retaliation, discrimination, or intimidation against a person who makes such a report).

to place him on an airplane and remove him from the country. Plaintiff Tanner repeatedly objected that each proposal was unlawful, lacked the legal guardian's consent, disregarded the resident's incapacity, and, in the case of the proposed removal from the country, raised serious concerns about unlawful conduct.

44. In or about late March 2026, Plaintiff Tanner learned that a petition had been filed to review Resident A's guardianship and that a court hearing was scheduled for on or about May 4, 2026.

45. During a morning leadership meeting in or about late March 2026, Administrator Druckenmiller stated, in substance, that he wanted "the whole world to know" that Resident A was "not supposed to be here." Administrator Druckenmiller added that corporate was planning on getting Resident A on a plane back "home." Plaintiff Tanner objected that disclosing the resident's status would violate the resident's privacy rights, including under HIPAA.[8]

46. On or about March 31, 2026, Plaintiff Tanner received a misdirected email chain reflecting communications among Defendant's corporate leadership and Administrator Druckenmiller concerning a plan to transfer or discharge Resident A. The email included a tentative plan to transfer Resident A to a nearby sister facility and then remove him from the country, without Plaintiff Tanner's involvement and outside the lawful discharge process. The chain bore the subject line "Illegal Citizen," and recited the amounts Defendant contended were owed for Resident A's care.

---

[8] *See* 45 C.F.R. § 164.502 (establishing the general requirements governing the permitted and required uses and disclosures of protected health information by covered entities under the HIPAA Privacy Rule); *see also* 42 C.F.R. § 483.70(c) (requiring long-term care facilities to comply with the requirements governing the protection of individually identifiable health information under 45 C.F.R. pts. 160 and 164).

47. Plaintiff Tanner reasonably believed, and avers, that Defendant's leadership sought to circumvent her precisely because she had consistently opposed the unlawful discharge of Resident A.

48. Later, regional leadership, the Business Office Director, and Administrator Druckenmiller met privately with Resident A, outside the presence of his legal guardian and of Social Services, in violation of facility protocol and the resident's rights. The next day, Administrator Druckenmiller and the Admissions Director went to Resident A's room and coerced him into agreeing to move. Administrator Druckenmiller stated that Resident A gave "all kinds of good information." When Plaintiff Tanner objected to said unlawful conduct, Administrator Druckenmiller questioned why she was "taking [the resident's] side." Plaintiff Tanner responded that it was her duty to advocate for and to protect every resident, regardless of the resident's ability to pay.[9]

49. On or about April 8, 2026, Administrator Druckenmiller directed Plaintiff Tanner to contact a local sister facility to "get the process going" for Resident A's transfer. Plaintiff Tanner refused, advising that the discharge process needed to be reviewed and that the legal guardianship had to be considered. Administrator Druckenmiller responded, in substance, that his "boss said so," and again demanded that she proceed.[10]

50. On or about April 9, 2026, Administrator Druckenmiller again directed Plaintiff Tanner to obtain Resident A's "consent" to transfer by a date certain. Plaintiff Tanner refused, explaining that she could not lawfully obtain consent from an incapacitated person.[11]

---

[9] *See* 42 C.F.R. § 483.10 ("[a] facility must treat each resident with respect and dignity" and "protect and promote the rights of the resident").

[10] *See* 42 C.F.R. § 483.10(c)(3)(i) (requiring a facility to include the resident or their representative in the care planning); *see also* 42 C.F.R. § 483.15(c)(3)(i) (requiring a facility, before transfer or discharge, to provide written notice to the resident and the resident's representative of the transfer or discharge and the reasons for the move).

[11] *See id.*

51. When Plaintiff Tanner advised that she intended to contact Resident A's legal guardian and counsel, Administrator Druckenmiller followed her into her office, closed the door, and stood in front of the door while shouting, in substance, that if Plaintiff Tanner went "behind [his] back," he would "fire" her.

52. After Plaintiff Tanner directed Administrator Druckenmiller to open the door, she telephoned Resident A's legal guardian, who confirmed that she had not been informed of, consulted regarding, or consented to any planned transfer or discharge of Resident A, and that Resident A remained incapacitated pending the scheduled court hearing.[12]

53. Later that evening, on or about April 9, 2026, Plaintiff Tanner submitted a written report to Defendant's Human Resources department detailing Administrator Druckenmiller's conduct. This included his demands that she facilitate the unlawful transfer of Resident A, his hostile and intimidating conduct, and his interference with her communications with Resident A's legal guardian.

54. On or about April 10, 2026, Plaintiff Tanner also reported the conduct to Defendant's Human Resources department by telephone.

55. On or about April 15, 2026, Plaintiff Tanner reported Defendant's conduct, including its efforts to unlawfully discharge Resident A, to the AAA.

56. On or about April 20 and April 22, 2026, Plaintiff Tanner participated in further communications with Defendant's Human Resources department, during which Defendant offered only mediation and an apology and declined to meaningfully address the broader pattern of unlawful conduct that Plaintiff Tanner had reported.

**<u>Plaintiff's Reports of Staff Abuse and Exploitation of Residents</u>**

[12] *See id.*

57. Throughout her employment, Plaintiff Tanner also reported to Defendant's leadership that staff members had engaged in intimate relationships with vulnerable residents, conduct constituting abuse and exploitation of residents, and that Defendant had failed to respond to those reports. Among other things, Plaintiff Tanner instituted formal weekly clinical supervision of the responsible Social Services Assistant in or about August 2025 addressing professional boundaries with residents; reported in December 2025 that she was documenting structural failures rather than an isolated incident and objected to those reports being reframed as an individualized misconduct complaint; and, in or about April 2026, reported a further allegation of resident abuse to Defendant's leadership shortly before Administrator Druckenmiller threatened her employment. Following these reports, Plaintiff Tanner was subjected to retaliation, including the filing of false grievances against her.[13]

58. On or about June 9, 2026, Defendant's corporate leadership, through its Director of Nursing, directed that a resident who reported being sexually assaulted undergo a repeat cognitive screening, despite the resident's prior assessment indicating that she was cognitively intact. Plaintiff Tanner completed the cognitive screening. However, she objected in writing to Defendant's Director of Nursing, Administrator, and clinical team that a cognitive screening instrument was not an appropriate evaluation upon which to rely when a resident reports a sexual assault; that trauma-informed, evidence-based screening should instead be applied to avoid bias and re-traumatization; and that the approach Defendant had directed risked contributing to the substantial number of sexual assaults that go unreported.

59. Plaintiff Tanner's objection was forwarded to Administrator Druckenmiller, whose entire recorded response, nine minutes later, was to ask what the resident's cognitive score was

---

[13] *See* 40 P.S. § 1303.308(a) (mandating that health care workers report any "serious event or incident" pursuant to the medical facility's patient safety plan).

that day. Seven minutes later, Plaintiff Tanner restated her objection in writing with further clinical detail. Plaintiff Tanner reasonably believed, and avers, that the conduct she reported violated the federal requirements governing the protection of residents from abuse and the investigation of allegations of abuse.[14]

**Defendant's Intensifying Retaliation Against Plaintiff**

60. On or about April 27, 2026, Plaintiff Tanner returned from a period of paid time off ("PTO") following the incident with Administrator Druckenmiller. Rather than meaningfully address the wrongdoing Plaintiff Tanner reported, Defendant intensified a deliberate course of retaliation to marginalize Plaintiff Tanner, damage her professional reputation, and compel her to leave her employment, all while continuing to employ her.

61. Beginning no later than January 2026, and escalating markedly after Plaintiff Tanner's April 2026 reports, Defendant progressively stripped Plaintiff Tanner of the duties and responsibilities of the Director of Social Services. Defendant ceased directing work to her, excluded her from communications and the coordination of resident care, and rerouted her responsibilities to other departments and to a subordinate assistant who is not a licensed or credentialed social worker.

62. During the final weeks of Plaintiff Tanner's employment, Plaintiff Tanner was subjected to many acts of retaliation by Defendant. On or about June 19, 2026, Plaintiff Tanner advised Defendant in writing that she could not complete two residents' assessments and care plans because other staff were circumventing her.

[14] *See* 42 C.F.R. § 483.12(a)(1) (protecting residents from abuse, including sexual assault); *see also* 40 P.S. § 1303.308(a) (mandating that health care workers report any "serious event or incident" pursuant to the medical facility's patient safety plan).

63. On or about June 22, 2026, she advised Administrator Druckenmiller in writing that her department could not accurately complete social services care plans when assessments, recommendations, and interventions were occurring through parallel processes of which she was not informed, and that she had raised the issue repeatedly throughout her employment.

64. On or about June 29, 2026, she learned only by voicemail that a resident whose discharge she had been coordinating three days earlier was to be discharged the next day.

65. Defendant also permitted and directed a subordinate assistant, who had been hired in or about March 2026, to hold herself out as, to execute facility documents as, and to be designated in the facility's own electronic medical record as, the "Social Services Director" (Plaintiff Tanner's own title and licensed role) notwithstanding that the assistant is not an LSW.[15]

66. The position for which the assistant was hired was posted by Defendant as a "Social Worker" and Defendant's own electronic mail system designated her the Social Services Designee while designating Plaintiff Tanner the Social Services Director.

67. In or about late May and June 2026, Defendant caused Plaintiff Tanner's personnel and work files to be accessed and reviewed, including by an individual introduced as an outside administrator, who Plaintiff Tanner reasonably believes accessed and altered records of her. On information and belief, a representative of Defendant's Human Resources department also entered and was present in Plaintiff Tanner's office without her knowledge or consent.

[15] *See* 42 C.F.R. § 483.70(o) (requiring a facility with more than 120 beds to employ a social worker who possesses at least a bachelor's degree in social work or a related human-services field and one year of supervised social-work experience in a health care facility); *see also* 63 P.S. § 1907(a)(2), (g)(2) (establishing the degree qualifications for a social worker license in the Commonwealth of Pennsylvania, including a master's degree from an accredited school of social work or social welfare for a licensed social worker and, for a licensed bachelor social worker, a bachelor's degree from an accredited program of social work or social welfare); 63 P.S. § 1920(a.1) (making it unlawful for an individual to hold herself out as a "social worker," to use that title, or to adopt or use any title or description of services incorporating the term "social worker," without meeting the statutory definition of a social worker).

68. Beginning after her reports and continuing to the present, Defendant orchestrated and solicited false complaints against Plaintiff Tanner. This included fabricated allegations by residents that Plaintiff Tanner had engaged in professional misconduct, such as a false claim that she had coerced a resident into signing a document.

69. Defendant systematically denied Plaintiff Tanner access to complaints lodged against her. Despite her repeated requests, Defendant neither provided Plaintiff Tanner with copies of the complaints nor granted her access to Defendant's complaint portal. Moreover, although Plaintiff Tanner was publicly designated as the facility's Grievance Officer, Administrator Druckenmiller independently handled resident grievances and refused to disclose them to her. Plaintiff Tanner believes and avers that these false accusations were designed to manufacture a pretextual record against her and to undermine her professional standing and licensure.

70. Defendant, through its staff and residents, further disseminated false and disparaging statements about Plaintiff Tanner to outside case managers and community partners with whom Plaintiff Tanner had to coordinate in the performance of her duties, causing such individuals to avoid or refuse to work with her and further damaging her professional reputation and standing.

**The Court-Ordered Transfer of Resident A**

71. On or about May 11, 2026, by order entered in the Orphans' Court Division of the Court of Common Pleas of Dauphin County and filed on or about May 13, 2026, Resident A was authorized to be transferred from the facility. The Court's accompanying Findings of Fact recite that Resident A had incurred debt owing to the Defendant in excess of $330,000.00; that he had been found ineligible for Medical Assistance and had no income or resources; and that it was

proposed that he be transferred to another skilled nursing facility owned by the same company "in order to 'spread the debt', so to speak."

72. Plaintiff Tanner believes and avers that Defendant's persistent efforts to remove Resident A were financially and discriminatorily motivated, as reflected in Defendant's own stated objective.

**The Department of Health Survey, Plaintiff's Final Refusals, and Her Termination**

73. In or about July 2026, the Pennsylvania Department of Health conducted its annual survey of the facility. In connection with that survey, the facility received deficiency citations, including a citation concerning the trauma-informed care of residents, premised upon the failure to document residents' post-traumatic stress disorder on social services assessments and the failure to carry identified triggers onto residents' care plans.

74. Plaintiff Tanner believes and avers that those citations resulted from inaccurate or incomplete information that the Defendant provided, or failed to provide, to the surveyors, and from Defendant's own failure to implement the clinical documentation, recommendations, and care models that Plaintiff Tanner had prepared and furnished to Defendant's leadership.[16]

75. During the survey itself, Plaintiff Tanner advised Defendant's Director of Nursing in writing that she did not know the post-traumatic stress disorder diagnosis on which the surveyor's inquiry rested, that psychiatric services did not consult her, and that nursing had not asked her to review the resident's behaviors or concerns. Administrator Druckenmiller separately asked his own team where that diagnosis had come from, noting that the Department of Health had

[16] *See* 31 U.S.C. § 3729(a)(1)(A)-(B) (imposing liability for knowingly presenting a false or fraudulent claim for government payment or knowingly making or using a false statement material to such a claim); *see also* 28 Pa. Code § 201.14(h) (requiring a long-term care facility to report to the Department of Health the information requested).

described it as a recent addition. He also asked whether the facility even possessed the trauma-informed care assessment toolkit referenced in Defendant's own policy.[17]

76. On or about July 10, 2026, Administrator Druckenmiller directed Plaintiff Tanner to change a social services progress note she had authored, characterizing as "inappropriate" the portion of the note in which she documented a resident's continuing intimate relationship with the former Social Services Assistant, and proposing substitute wording. Asked twice by Plaintiff Tanner what was inappropriate about the note, Administrator Druckenmiller did not answer. Plaintiff Tanner declined to alter the resident's clinical record, advising that she was professionally obligated to document the resident's presentation accurately.[18]

77. On or about July 17, 2026, Defendant, through Administrator Druckenmiller, directed Plaintiff Tanner to attend an in-person meeting that same day to prepare a plan of correction responsive to the survey citations, and then circulated a draft plan of correction and set a deadline for its completion. Plaintiff Tanner declined to participate. In writing, Plaintiff Tanner advised Defendant that the facility had actively chosen to bypass her recommendations and treatment models; that Defendant had not furnished the Department of Health with the trainings and documentation she had prepared; that Defendant's investigations of resident matters had been harmful and were not trauma-informed; and that, having a professional obligation to practice with honesty and integrity and to promote resident rights and quality of care, she was not participating in the plan of correction.[19]

---

[17] *See* 40 P.S. § 1303.308(a) (mandating that health care workers report any "serious event or incident" pursuant to the medical facility's patient safety plan).
[18] *See id*.
[19] *See* 31 U.S.C. § 3729(a)(1)(A)-(B) (imposing liability for knowingly presenting a false or fraudulent claim for government payment or knowingly making or using a false statement material to such a claim).

78. Later that same day, on or about July 17, 2026, Plaintiff Tanner reported her concerns to the Pennsylvania Department of Health by contacting its nursing-home complaint line, and separately inquired of the Department regarding the informal dispute resolution of the survey findings. Plaintiff Tanner was advised that only the facility's administrator could initiate a request for informal dispute resolution.

79. Because of the foregoing, and throughout the period from her reports to her termination, Plaintiff Tanner was subjected to a hostile and retaliatory work environment.

80. The Defendant's escalating course of retaliation against Plaintiff Tanner culminated in the termination of her employment.

81. On or about July 21, 2026, within four days of Plaintiff Tanner's report to the Pennsylvania Department of Health, and within one day of her written refusal to participate in Defendant's plan of correction, the Defendant discharged Plaintiff Tanner from her position as Director of Social Services. Defendant's written notice of termination, signed by Administrator Druckenmiller, states that Plaintiff Tanner was being terminated "[d]ue to your refusal to do your job duties," effective immediately, and demanded the immediate return of facility property including any chart information in her possession.

82. Plaintiff believes and avers that Defendant had no legitimate business reason for these actions, including termination, and that they were taken solely in retaliation for her good-faith reporting, opposition to unlawful conduct, and participation in external investigations.

83. Plaintiff believes and avers that Defendant terminated her employment in retaliation for her protected activity under the FCA, 31 U.S.C. §§ 3729–3733, including her investigation, reporting, and opposition to conduct that she held a good-faith and objectively reasonable belief could give rise to liability under the FCA, including: Defendant's failure to

truthfully comply with the Department of Health survey, and continued submissions of claims to Medicare for services performed under unsafe and materially noncompliant conditions. Furthermore, Defendant's termination of Plaintiff Tanner contravened the retaliation protections established under the FCA, 31 U.S.C. § 3730(h)(1).

84. Plaintiff also believes and therefore avers that Defendant terminated her employment in retaliation for her good-faith reports of wrongdoing and waste, in violation of the PWL, 43 P.S. §§ 1421–1428. Independently and/or in the alternative, Plaintiff avers that her termination for reporting, investigating, and opposing conduct that threatened patient health, safety, and rights and violated applicable regulatory requirements contravened clear mandates of Pennsylvania public policy.

85. As a direct and proximate result of the Defendant's unlawful retaliation and unlawful discharge, Plaintiff Tanner has suffered, and continues to suffer, harm to her professional reputation and standing, emotional distress, embarrassment, humiliation, loss of self-esteem, mental anguish, and loss of life's pleasures, and has suffered and will continue to suffer a loss of earnings, wages, benefits, and earning capacity, the full extent of which is not known at this time.

**COUNT I**
**(Violation of the False Claims Act, 31 U.S.C. §§ 3729-3733)**
**<u>Plaintiff Tanner v. the Defendant</u>**

86. Plaintiff Tanner incorporates by reference the paragraphs of this Complaint as though fully set forth at length herein.

87. "The False Claims Act imposes liability on any person who 'knowingly presents or causes to be presented, [to the federal government] a false or fraudulent claim for payment or approval.'" 31 U.S.C. § 3729(a)(1)(A).[20]

---

[20] *See Lisenby v. Olympus Corp. of the Ams.*, No. 25-1480, 2026 WL 2237894, at *4 (3d Cir. Aug. 4, 2026).

88. The FCA protects employees, contractors, and agents who engage in protected activity from retaliation in the form of their being "discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment." 31 U.S.C. § 3730(h)(1).

89. "To state a retaliation claim under the FCA, a plaintiff must allege that [s]he (1) engaged in protected conduct, and (2) was discriminated against because of [her] protected conduct."[21] Further, the plaintiff must establish that the "employer was on notice that [s]he was engaged in protected conduct"[22] and "protected conduct was the 'but for' cause of the employer's retaliation."[23]

90. The anti-retaliation provision of the FCA includes engaging in protected conduct in "other efforts to stop 1 or more violations of" the FCA.[24] In sum, "protected conduct under the 'other efforts' prong requires a plaintiff to hold in good faith an objectively reasonable belief that his or her employer is or will violate, the FCA."[25]

91. As part of Defendant's Medicare participation agreement, the long-term residential facility is required to comply with the Medicare Conditions of Participation codified in 42 C.F.R. pt. 483. The regulations expressly provide that "the provisions of this part contain the requirements that an institution must meet to qualify to participate" in the Medicare program. 42 C.F.R. § 483.1(b).

92. By virtue of the acts described above, Plaintiff Tanner had a reasonable belief that Defendant knowingly made, used, or caused to be made or used false records and statements, and

---

[21] *See id*. at *4 (citing *DiFiore v. CSL Behring*, LLC, 879 F.3d 71, 76 (3d Cir. 2018); *Hutchins v. Wilentz, Goldman & Spitzer*, 253 F.3d 176, 184 (3d Cir. 2001)).
[22] *See id*. (citing *United States ex rel. Ascolese v. Shoemaker Constr. Co.*, 55 F.4th 188, 194-95 (3d Cir. 2022)).
[23] *See id*. at *9-10 (citing *DiFiore*, 879 F.3d at 78).
[24] *See id*. at *11 (citing *Ascolese*, 55 F.4th at 195) (quoting 31 U.S.C. § 3730(h)(1)).
[25] *See id*. at *14.

omitted material facts, to obtain United States Government payments through its participation in Medicare services.

93. Plaintiff Tanner had an objectively reasonable belief that Defendant violated the FCA by knowingly seeking and receiving government funds while falsely representing that it remained in compliance with the regulatory requirements governing its participation in those programs.

94. Throughout Plaintiff Tanner's employment, she engaged in protected activity by frequently objecting to Defendant's unlawful conduct and reporting to the AAA, the Long-Term Care Ombudsman, and the Department of Health.

95. Plaintiff Tanner also engaged in protected activity, on or about July 10, 2026, when she refused to alter a resident's clinical record at the direction of Defendant's Administrator; when she refused to participate in Defendant's response to the Department of Health's survey in a manner she reasonably believed would misrepresent to the Commonwealth the information provided to its surveyors; and when she reported her concerns to the Department of Health.

96. As a direct result, Plaintiff Tanner was terminated from her position in retaliation for repeatedly reporting said unlawful conduct.

97. As a direct result of the willful, wanton, reckless, careless, and negligent acts of the Defendant, as aforesaid, Plaintiff Tanner has suffered severe emotional and psychological distress, professional reputational damage, discomfort, embarrassment, injury, pain, and suffering.

98. As a further result of the willful, wanton, reckless, careless, and negligent acts of the Defendant, as aforesaid, Plaintiff Tanner has sustained a loss of earnings, plus loss of future earning power, plus loss of back pay and front pay, and interest thereon.

99. By reason of the willful and malicious acts of the Defendant, acting as aforesaid, Plaintiff Tanner is entitled to punitive damages in addition to compensatory damages, both of which she hereby claims of the Defendant.

**COUNT II**
**(Violation of the Pennsylvania Whistleblower Law, 43 P.S. §§ 1421-1428)**
**Plaintiff Tanner v. the Defendant**

100. Plaintiff Tanner incorporates by reference the paragraphs of this Complaint as though fully set forth at length herein.

101. The conduct Plaintiff Tanner reported to Defendant, including Defendant's failures to comply with 42 C.F.R. pt. 483 and the regulations governing nondiscrimination and the lawful transfer and discharge of residents, the rights of residents, and the protection of residents from abuse and exploitation, constituted "wrongdoing" under 43 P.S. § 1422 in that it consisted of violations of federal and state statutes and regulations that were not of a merely technical or minimal nature and that were designed to protect the interests of the public, including residents of long-term care nursing facilities.

102. Plaintiff Tanner made good faith reports of Defendant's wrongdoing to her supervisors and other representatives of Defendant, and to appropriate authorities, including: her verbal reports to Administrator Druckenmiller and other members of leadership throughout her employment; her written report of a potential circumstance of neglect in or about September 2024, copied to the AAA and Long-Term Care Ombudsman; her written report of October 22, 2025 to Defendant's leadership and to the AAA and Long-Term Care Ombudsman; her three written reports of November 18, 2025, one of which was forwarded the same evening to the AAA and Long-Term Care Ombudsman; her reports concerning the abuse and exploitation of residents in or about December 2025 and April 2026; her written report to Human Resources on or about

April 9, 2026; her report to Human Resources on or about April 10, 2026; her report to the AAA on or about April 15, 2026; her written report of June 9, 2026 concerning Defendant's response to a resident's report of sexual assault; and her report to the Pennsylvania Department of Health on or about July 17, 2026.

103. In retaliation for Plaintiff Tanner's good faith reports of wrongdoing, Defendant discriminated and retaliated against Plaintiff Tanner with respect to the terms, conditions, and privileges of her employment, in violation of 43 P.S. § 1423, by, among other things, threatening her employment, progressively stripping her of her job duties and responsibilities, subjecting her to a hostile work environment, permitting an unqualified subordinate to assume her title and role, orchestrating false complaints against her while denying her access to them, disparaging her to third parties, and ultimately terminating her employment.

104. The retaliatory conduct described herein escalated in close temporal proximity to each of Plaintiff Tanner's protected reports of wrongdoing, and was causally connected to those reports.

105. Defendant terminated Plaintiff Tanner's employment within four days of her report to the Pennsylvania Department of Health and within one day of her written refusal to participate in Defendant's plan of correction.

106. As a direct and proximate result of Defendant's violation of the Pennsylvania Whistleblower Law, Plaintiff Tanner has sustained actual damages, including lost wages, benefits, and earning capacity, harm to her professional reputation and standing, emotional distress and other losses, and the loss of her compensation, benefits, and seniority.

107. Plaintiff Tanner is entitled to all remedies available under 43 P.S. § 1425, including reinstatement of her employment, back pay, reinstatement of any diminished or lost fringe benefits

and seniority rights, injunctive relief restraining further retaliation, actual damages, reasonable attorneys' fees and litigation costs, and a civil penalty.

**COUNT III**
**(Common Law Wrongful Discharge in Violation of Public Policy)**
**Plaintiff Tanner v. the Defendant**

108. Plaintiff Tanner incorporates by reference the paragraphs of this Complaint as though fully set forth at length herein.

109. Pennsylvania courts have recognized limited exceptions to the at-will employment doctrine. The Commonwealth of Pennsylvania recognizes a cause of action for the wrongful discharge of an at-will employee where the discharge of that employee violates a clear mandate of the public policy of the Commonwealth. [26]

110. Defendant, through its agents, servants, and employees, terminated Plaintiff Tanner's employment because she opposed and refused to acquiesce in or participate in practices that violated the regulatory requirements governing licensed long-term care facilities and violated residents' rights, and because she refused to abandon the professional obligations imposed on her as an LSW. Terminating an employee on these grounds violates the Commonwealth of Pennsylvania's clear public-policy mandates identified above.

111. Plaintiff Tanner's discharge violated clear mandates of the Commonwealth of Pennsylvania's public policy. As explained above, Plaintiff Tanner was terminated because she reported serious events or incidents involving patient health, safety, and rights. She also declined to participate in, facilitate, or sign documentation endorsing an unlawful transfer and discharge of

[26] "In sum, 'an employer (1) cannot require an employee to commit a crime, (2) cannot prevent an employee from complying with a statutorily imposed duty, and (3) cannot discharge an employee when [specifically] prohibited from doing so by statute.' Outside of those categories of our legislature's expression of public policy, a court may find a public policy exception that will sustain a wrongful termination action only if the public policy 'is so obviously for or against public health, safety, morals, or welfare that there is a virtual unanimity of opinion in regard to it.'" *See Mikhail v. Pennsylvania Org. for Women in Early Recovery*, 63 A.3d 313, 317 (Pa. Super. 2013) (internal citations omitted); *see also Greco v. Myers Coach Lines, Inc.*, 199 A.3d 426, 436 (Pa. Super. 2018).

Resident A, an incapacitated resident under the protection of a court-appointed legal guardian. She reasonably and correctly believed that such actions would contravene federal and state laws and regulations governing the rights, care, transfer, and discharge of residents in long-term care facilities. She also believed that proceeding with such actions would constitute unlawful discrimination and would ignore both the resident's incapacity and the authority of his legal guardian.

112. Plaintiff Tanner was further discharged because she refused, on or about July 10, 2026, to alter a resident's clinical record at the direction of Defendant's Administrator; because she refused to participate in Defendant's response to the Department of Health's survey in a manner she reasonably believed would misrepresent to the Commonwealth the information provided to its surveyors; and because she reported her concerns to the Department of Health.

113. As a Licensed Social Worker employed by a long-term care nursing facility, Plaintiff Tanner was bound by legal and professional duties to advocate for and to protect the residents in the facility's care, to document their care truthfully, to report suspected abuse, neglect, and exploitation of older adults,[27] and to refuse to participate in the unlawful transfer, discharge, abuse, or exploitation of residents.

114. The Defendant's conduct, as set forth above, was willful, wanton, malicious, and undertaken with reckless indifference to Plaintiff Tanner's rights, thereby entitling Plaintiff Tanner to an award of punitive damages.

115. As a direct and proximate result of the Defendant's wrongful discharge of Plaintiff Tanner in violation of public policy, Plaintiff Tanner has sustained damages, including lost wages,

---

[27] *See* 35 P.S. § 10225.701 (requiring employees and administrators of facilities to report suspected abuse, neglect, exploitation, and abandonment of older adults, and prohibiting retaliation, discrimination, or intimidation against a person who makes such a report).

benefits, and earning capacity, harm to her professional reputation and standing, emotional distress, embarrassment, humiliation, mental anguish, and loss of life's pleasures.

**RELIEF**

**WHEREFORE**, Plaintiff Tanner requests that this Court enter judgment in her favor and against Defendant and order that:

a. Defendant compensate Plaintiff Tanner with a rate of pay and other benefits and emoluments of employment, to which she would have been entitled, had she not been subjected to unlawful retaliation;

b. Defendant pay to Plaintiff Tanner back pay and reinstate any diminished or lost compensation, fringe benefits, and seniority rights under 43 P.S. § 1425, or, in the alternative, award front pay instead of reinstatement;

c. Defendant pay to Plaintiff Tanner actual damages;

d. Defendant pay to Plaintiff Tanner compensatory damages for emotional distress, embarrassment, humiliation, harm to professional reputation, and other nonpecuniary losses as allowable;

e. Defendant pay to Plaintiff Tanner punitive damages;

f. Defendant pay to Plaintiff Tanner reasonable attorneys' fees and costs of litigation under 43 P.S. § 1425;

g. Defendant pay a civil penalty under 43 P.S. § 1425; and

h. The Court award any other relief that is deemed just and proper.

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

**THE GOLD LAW FIRM, P.C.**

By: *<u>/s/ Sidney L. Gold</u>*

SIDNEY L. GOLD, ESQUIRE
PA I.D. No. 21374
1835 Market Street, Suite 515
Philadelphia, PA 19103
(215) 569-1999
sgold@discrimlaw.net
*Attorney for Plaintiff Megan Tanner*

Dated: 10/27/2026

**VERIFICATION**

I hereby verify that the statements contained in the attached **Complaint** are true and correct to the best of my knowledge, information and belief. I understand that false statements herein are made subject to the penalties of Title 18 Pa. C.S.A. §4904, relating to unsworn falsification to authorities.

DATE: 10/22/2026

Megan Tanner (Oct 22, 2026 16:24:19 EDT)

Megan Tanner, Plaintiff