**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JULIE BEATTY,<br><br>*Plaintiff*,<br><br>vs.<br><br>HUNTINGDON MEATS, LLC d/b/a ARBY'S,<br><br>*Defendant*. | ) | Civil Action No.<br><br>Filed Electronically |

**COMPLAINT IN CIVIL ACTION**

Plaintiff, Julie Beatty, by and through the undersigned counsel, files the following Complaint in Civil Action against Defendant, Huntingdon Meats, LLC d/b/a Arby's, averring as follows:

**THE PARTIES**

1. Plaintiff, Julie Beatty ("Plaintiff"), is an adult individual who resides in Petersburg, Pennsylvania 16669.

2. Defendant, Huntingdon Meats, LLC d/b/a Arby's ("Defendant"), is a domestic limited liability company with a principal address of 301 State Rte. 17, Suite 802, Rutherford, New Jersey 07070. Defendant operates an Arby's franchise restaurant located at 9634 William Penn Highway, Huntingdon, Pennsylvania 16652 (the "Restaurant"). Plaintiff reported to work on a regular basis at the Restaurant.

**JURISDICTION AND VENUE**

**A. This Court Possesses Subject Matter Jurisdiction Pursuant to 28 U.S.C. § 1331.**

3. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §

1331 ("Federal Question Jurisdiction") as Plaintiff is advancing claims under the Americans with Disabilities Act of 1990 and the Americans with Disabilities Act Amendments of 2008, 42 U.S.C. § 12101, *et seq.* (the "ADA"), and the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.* (the "FLSA").

**B. The United States District Court for the Middle District of Pennsylvania is the Appropriate Venue for this Matter Pursuant to 28 U.S.C. § 1391(b).**

4. Venue is proper in the United States District Court for the Middle District of Pennsylvania (hereinafter, the "Middle District") as a substantial part of the events and omissions giving rise to Plaintiff's claims occurred within this judicial district. Therefore, venue is proper pursuant to 28 U.S.C. § 1391(b).

5. Specifically, these events and omissions occurred in Huntingdon County, Pennsylvania, where the Restaurant is located and where Plaintiff reported to work.

**C. This Court May Exercise Personal Jurisdiction Over Defendant.**

6. This Court may exercise personal jurisdiction over Defendant pursuant to 42 Pa. C.S. § 5301(a)(2), and this Court's exercise of jurisdiction comports with the Due Process Clause of the United States Constitution.

7. 42 Pa. C.S. § 5301 states: "The existence of any of the following relationships between a person and this Commonwealth shall constitute a sufficient basis of jurisdiction to enable the tribunals of this Commonwealth to exercise general personal jurisdiction over such person." 42 Pa.C.S. § 5301(a). This definition is expanded to "corporations" pursuant to 42 Pa. C.S. § 5301(a)(2) which provides:

> Corporations.-
> (i) Incorporation under or qualification as a foreign corporation under the laws of this Commonwealth.
> (ii) Consent, to the extent authorized by the consent.
> (iii) The carrying on of a continuous and systematic part of its

general business within this Commonwealth.
42 Pa. C.S. § 5301(a).

8. Defendant operates the Restaurant in Huntingdon, Pennsylvania and carries on a continuous and systematic part of its general business within the Commonwealth of Pennsylvania. Accordingly, Defendant may properly be personally brought before this Court pursuant to 42 Pa.C.S. § 5301(a)(2).

**D. Plaintiff Has Exhausted Her Administrative Remedies; Her Claims Are Properly Before This Court.**

9. Plaintiff has satisfied all procedural and administrative prerequisites under 42 U.S.C. § 2000e-5 and may now proceed to bring this action before the Court. Specifically:

a. On or about September 1, 2026, Plaintiff dually filed a charge of discrimination with the Equal Employment Opportunity Commission (the "EEOC") and the Pennsylvania Human Relations Commission at charge number 530-2026-09657 (the "EEOC Charge").

b. On September 30, 2026, the EEOC issued the Notice of Right to Sue ("RTS Notice"), affording Plaintiff 90 days within which to timely file her claims.

c. The instant Complaint is filed within the 90-day time period.

## FACTUAL BACKGROUND

10. Plaintiff began her employment with Defendant on April 29, 2024, as a crew member on a part-time basis, compensated at the rate of $12.00 per hour and working approximately 20 hours per week.

11. When Plaintiff first began her employment, her direct supervisor was Jay Andrews ("Andrews"), Defendant's Director of Operations, and the general manager of the Restaurant was Dora Moore ("Moore").

12. After approximately two months, Plaintiff resigned because members of Moore's

family who worked at the Restaurant were engaged in misconduct.

13. In September 2024, Moore asked Plaintiff to return, representing that the offending individuals had been terminated, and Plaintiff agreed to return as the Assistant Manager (the "Position").

14. Upon her promotion to the Position, Plaintiff's rate of pay increased to $14.00 per hour, and her scheduled hours increased to 35 to 40 hours per week, although she frequently worked more than 40 hours per week.

15. Upon her return, Plaintiff reported to Moore and to Defendant's regional leader, Timothy Gaskin ("Gaskin").

16. Throughout her tenure in the Position, Plaintiff's record was exemplary. She received positive reviews and was never the subject of any disciplinary action. When Plaintiff first assumed responsibility at the Restaurant, it had failed an inspection under the prior general manager, and Plaintiff was given six weeks to remedy the deficiencies and pass the inspection, which she accomplished.

**Wage Violations**

17. At all times relevant herein, Plaintiff's duties rendered her "non-exempt" from the provisions of the FLSA and thereby eligible for an overtime rate of pay.

18. Plaintiff was compensated at a rate of $14.00 per hour, regardless of the number of hours she actually worked.

19. Therefore, each hour Plaintiff worked over 40 hours in one week should have been compensated at 1.5 times her hourly rate of pay, which equates to $21.00 per hour ("Overtime Rate of Pay").

20. Beginning on October 1, 2024, and continuing throughout the remainder of her

employment, Defendant required Plaintiff to perform substantial work off the clock and without compensation. Although Plaintiff was an hourly, non-exempt employee, Defendant demanded that she file reports for the Restaurant after clocking out, prepare employee schedules from home, remain in contact with the Restaurant following her shift, and transport deposits to the bank, all while off the clock and unpaid.

21. This uncompensated work amounted to at least six hours per week, every week, for the duration of Plaintiff's employment as Assistant Manager.

22. Plaintiff repeatedly objected that this was improper, and Defendant responded only that this was simply part of the job.

23. Each week from the week of September 23, 2024 through January 22, 2026, Plaintiff worked six hours of uncompensated time, for a total of 70 weeks and 420 hours. As Plaintiff worked 40 regular hours in each of those weeks, all 420 unpaid hours were overtime hours.

24. Therefore, Plaintiff is owed the Overtime Rate of Pay for 420 hours, in an amount equal to $8,820.00 (420 hours multiplied by the Overtime Rate of Pay of $21.00 per hour) (the "Unpaid Overtime").

**Disability Discrimination**

25. Plaintiff, at all times material, suffered from diagnosed anxiety and a panic disorder, which cause her to suffer panic attacks (the "Disability").

26. In January 2025, Plaintiff informed Gaskin that she had been diagnosed with anxiety and was suffering from panic attacks, and that his repeated screaming, yelling, and cursing were exacerbating the condition. She explained that she could not continue to work under those conditions and asked Gaskin to communicate with her in a calm and reasonable manner.

27. Throughout her tenure, Gaskin subjected Plaintiff to relentless verbal abuse. He screamed at her in front of employees, cursed at her, and texted her in a berating fashion. Conduct similar to this occurred on a near-daily basis.

28. On one occasion, Gaskin screamed in Plaintiff's face in front of employees and asked her if she was "fucking stupid" while demanding to know why she could not increase sales, stating that the Restaurant could be doing "20 fucking thousand dollars."

29. Plaintiff's husband, Sean Paul, who also worked at the Restaurant as her assistant, contacted Gaskin and asked him to stop speaking to Plaintiff in an aggressive manner. Gaskin responded that Plaintiff was being "sensitive" and that this was simply how he communicated. Gaskin made no meaningful effort to change and instead used his knowledge of Plaintiff's anxiety to manipulate and further mistreat her.

30. Having received no relief from Gaskin, Plaintiff escalated her complaint to the owner, Syed ("Syed"). Syed avoided Plaintiff's telephone calls and, when he finally answered in early July 2025, Plaintiff told him that she suffered from anxiety and panic attacks, that the treatment was unacceptable, and that she could not continue to work under those conditions. Syed took no action whatsoever and instead told Plaintiff that if she did not like it, she could put in her two weeks' notice and that she needed to do whatever she was told.

31. In August 2025, Gaskin resigned, and Adel ("Adel") assumed his role. Plaintiff informed Adel of her anxiety and panic disorder, described everything Gaskin had done to her, and explained how stressful the job had been and what Syed had told her.

32. While the daily screaming abated somewhat under Adel, Defendant continued to require Plaintiff to perform the same uncompensated off-the-clock work, and Plaintiff continued to be told that if she did not like it, she could put in her two weeks' notice.

33. Despite Plaintiff's repeated protests, the abusive environment, the refusal to accommodate Plaintiff's diagnosed medical conditions, and the demand that she work uncompensated hours continued into January 2026.

34. During that time, Defendant again told Plaintiff, through Adel, that if she did not like the conditions, she could put in her two weeks' notice.

35. As a result of the environment Defendant created and maintained, Plaintiff's mental health deteriorated to the point that she could no longer function as a parent, spouse, or employee, and her medical providers advised her that she could not continue in the environment.

36. As of January 22, 2026, the environment at the Restaurant had become so abhorrent that no reasonable person could continue to work under such conditions, and such severe and pervasive conduct had occurred for so long that it clearly was not going to change. To that end, Defendant constructively terminated Plaintiff as of that date.

## COUNT I
## FAILURE TO PAY OVERTIME WAGES IN VIOLATION OF THE FLSA
## 29 U.S.C. § 201, *et seq.*

37. Plaintiff incorporates the allegations contained in the paragraphs above, as if fully set forth at length herein.

38. The FLSA mandates certain minimum rates of pay for the time covered "employees" spend dedicated to workplace operations. 29 U.S.C. §§ 206, 207.

39. The FLSA establishes a heightened rate of one hundred fifty percent (150%) multiplied by the employee's base rate of pay for any hours worked in excess of 40 within a seven-day period, commonly known as "overtime" or "time and a half" pay. 29 U.S.C. § 207.

40. The FLSA defines the term "employer" expansively to include "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d).

41. In interpreting this broad phrase, the United States Court of Appeals for the Third Circuit concluded that liability for violations of the FLSA clearly attaches to the corporate entity itself, here, Defendant. *See Thompson v. Real Estate Mortg. Network*, 748 F.3d 142, 153 (3d Cir. 2014).

42. The FLSA provides several exceptions to the "overtime" rate of pay when an employee is deemed "exempt." 29 U.S.C. § 213.

43. Plaintiff's primary duties as Assistant Manager did not meet any requirements to be "exempt" from the FLSA's provisions.

44. As such, Defendant was required to compensate Plaintiff for any hours worked in excess of 40 within a seven-day period.

**A. Plaintiff Was Denied an Overtime Rate of Pay Pursuant to 29 U.S.C. § 207.**

45. At all times relevant hereto, Defendant was mandated to pay Plaintiff one hundred fifty percent (150%) of her corresponding base rate of pay for any time worked beyond 40 hours in a seven-day period. 29 U.S.C. § 207(a)(1).

46. Instead, Defendant required Plaintiff to perform substantial off-the-clock work without compensation, thereby depriving Plaintiff of the overtime wages to which she was entitled.

47. As set forth above, Plaintiff routinely and regularly worked in excess of 40 hours per week from the week of September 23, 2024 until her constructive termination on January 22, 2026.

48. Plaintiff worked at least 420 hours of overtime without being compensated at the Overtime Rate of Pay, in the amount of $8,820.00 (the "Unpaid Overtime").

49. Plaintiff repeatedly objected to Defendant's failure to pay her for this work, but Defendant responded only that this was simply part of the job.

**B. Plaintiff Is Entitled to Liquidated Damages, Attorney Fees, and Costs.**

50. 29 U.S.C. § 216(b) of the FLSA provides that when an employer violates 29 U.S.C. § 207(a)(1), an employee may collect liquidated damages in an amount equal to the amount of wages that are due and owing and, additionally, an award of attorney's fees.

51. An award of liquidated damages pursuant to the FLSA is not penal in nature, but rather, is viewed as a compensatory remedy. *Martin v. Selker Bros.*, 949 F.2d 1286, 1299 (3d Cir. 1991) (citing *Overnight Motor Transp. Co. v. Missel*, 316 U.S. 572, 583-84 (1942)).

52. As a direct and proximate result of Defendant's conduct described hereinabove, Plaintiff has suffered tangible economic and pecuniary loss in forms including, but not limited to, the deprivation of the lawfully owed wages.

53. As Defendant violated 29 U.S.C. § 207(a)(1), it is liable to Plaintiff for liquidated damages (100% of the Unpaid Overtime), as well as reasonable attorneys' fees, costs, and expenses pursuant to 29 U.S.C. § 216(b).

WHEREFORE, Plaintiff, Julie Beatty, seeks a judgment against Defendant, Huntingdon Meats, LLC d/b/a Arby's, for willful noncompliance of the FLSA and seeks: (i) compensatory damages, including but not limited to, her Unpaid Overtime; (ii) liquidated damages equal to the amount of Unpaid Overtime; (iii) the costs of instituting this action together with reasonable attorney's fees incurred by Plaintiff; and (iv) any further legal and equitable relief as this Court may deem just and proper.

**COUNT II**
**DISABILITY DISCRIMINATION IN VIOLATION OF THE ADA**
**42 U.S.C. § 12101, *et seq.***

54. Plaintiff incorporates the allegations contained in the paragraphs above, as if fully set forth at length herein.

55. The ADA defines the term "disability" as: "(a) a physical or mental impairment that substantially limits one or more major life activities of such individual; (b) a record of such an

impairment; or (c) being regarded as having an impairment (as described in paragraph (3))." 42 U.S.C. § 12102(1).

56. The ADA further defines the term "major life activities" to include, in pertinent part, "concentrating, thinking" and the "operation of a major bodily function, including ... neurological [and] brain ... functions." 42 U.S.C. § 12102(2).

57. As averred hereinabove, the Disability causes Plaintiff to experience panic attacks.

58. Accordingly, Plaintiff possesses a "disability" pursuant to 42 U.S.C. § 12102(1).

59. To establish a *prima facie* case of discrimination under the ADA, a Plaintiff must demonstrate: (1) they are a disabled person within the meaning of the ADA; (2) they are otherwise qualified to perform the essential functions of their job, with or without reasonable accommodations by the employer; and (3) they suffered an otherwise adverse employment decision as a result of discrimination. *See McGlone v. Philadelphia Gas Works*, 17-1399, 2018 WL 2193658, at *2 (3d Cir., filed May 14, 2018) (citing *Gaul v. Lucent Techs., Inc.*, 134 F.3d 576, 580 (3d Cir. 1998)).

**A. Plaintiff Is a "Disabled Person" Pursuant to 42 U.S.C. § 12102 of the ADA.**

60. As averred hereinabove, Plaintiff possessed a "disability" under the meaning of the ADA and was correspondingly "disabled" for purposes of establishing her *prima facie* case, given the ways in which the Disability substantially impaired her major life activities.

61. Specifically, Plaintiff routinely experienced anxiety and panic attacks as a result of the Disability.

**B. Plaintiff Is a Qualified Individual Pursuant to 42 U.S.C. § 12111 of the ADA and Was Qualified to Perform the Essential Duties of Her Job.**

62. The ADA provides that a "qualified individual" is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

63. To meet this definition, Plaintiff must show she possessed "the requisite skill, experience, education and other job-related requirements of the employment position" and that she "can perform the essential functions of the position with or without reasonable accommodations." *See Skerski v. Time Warner Cable Co.*, 257 F.3d 273, 278 (3d Cir. 2001) (citing *Deane v. Pocono Med. Ctr.*, 142 F.3d 138, 145 (3d Cir. 1998)).

64. Plaintiff possessed and exercised the skill, experience, and ability needed to perform the essential functions of her role as Assistant Manager. Plaintiff's record was exemplary, she received positive reviews, and she was never the subject of any disciplinary action.

65. Indeed, when Plaintiff first assumed responsibility at the Restaurant, it had failed an inspection under the prior general manager, and Plaintiff successfully remedied the deficiencies and passed the inspection within the time she was given.

66. At all times material, Plaintiff was qualified to perform the essential duties of her position.

**C. Plaintiff Suffered an Adverse Employment Action.**

67. The Third Circuit has held that an "adverse employment action" is an action taken by an employer which is "serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." *See Storey v. Burns Int'l Sec. Servs.*, 390 F.3d 760, 765 (3d Cir. 2004).

68. Defendant had actual knowledge of the Disability, the conduct to which Plaintiff was subjected, and the resulting effect on the Disability, as Plaintiff reported the same to Gaskin, to the owner Syed, and to Adel.

69. Despite this knowledge, Defendant took no action to deter or correct the conduct that exacerbated the Disability.

70. As a direct result of Defendant's unchecked conduct, Plaintiff suffered severe exacerbations of the Disability that significantly interfered with her ability to perform her job responsibilities.

71. Defendant's failure to correct or deter the conduct was severe and tangible enough to affect Plaintiff's terms, conditions, and privileges of employment, and Plaintiff suffered the ultimate adverse employment action when she was constructively terminated on January 22, 2026.

**D. Plaintiff Is Entitled to Punitive Damages.**

72. A Plaintiff may recover punitive damages when they can demonstrate a Defendant "engaged in discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual." *See Godwin v. George Washington, LP*, No. 22-1066, 2022 BL 467663, at *3 (W.D. Pa. Dec. 30, 2022) (citing 42 U.S.C. § 1981a(b)(1)).

73. The terms "malice" and "reckless indifference" pertain specifically to the Defendant's knowledge that it acted in violation of federal law rather than an awareness of engaging in "discrimination." *Id.* (citing *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 535 (1999)).

74. At all times relevant herein, Defendant acted with the knowledge it was lawfully required to provide a workplace free of discrimination to individuals like Plaintiff who were statutorily protected by the ADA.

75. As a direct and proximate result of Defendant's discriminatory conduct in violation of the ADA, Plaintiff has suffered not only tangible economic loss in the form of lost back pay and benefits and lost front pay and benefits, but also substantial emotional and physical distress, embarrassment and humiliation, pain and suffering, and is entitled to compensatory damages for these injuries, in addition to the tangible economic losses she suffered and will continue to suffer.

WHEREFORE, Plaintiff, Julie Beatty, seeks a judgment against Defendant, Huntingdon Meats, LLC d/b/a Arby's, for willful noncompliance of the ADA and seeks: (i) compensatory damages, including but not limited to past and future pecuniary and non-pecuniary losses, including suffering, mental anguish, inconvenience, and loss of enjoyment of life; (ii) punitive damages in an amount to be determined at trial and in an amount sufficient to deter Defendant from engaging in future conduct of a similar nature; (iii) equitable relief in the forms of back pay and front pay; (iv) the costs of instituting this action together with reasonable attorney's fees incurred by Plaintiff; (v) pre-judgment and continuing interest as calculated by the EEOC; and (vi) any further legal and equitable relief as this Court may deem just and proper.

**COUNT III**
**HOSTILE WORK ENVIRONMENT IN VIOLATION OF THE ADA**
**42 U.S.C. § 12101, *et seq.***

76. Plaintiff incorporates the allegations contained in the paragraphs above, as if fully set forth at length herein.

77. To establish a hostile work environment claim, an employee must show that (1) the employee suffered intentional discrimination because of a protected characteristic; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected the Plaintiff; (4) the discrimination would detrimentally affect a reasonable person in like circumstances; and

(5) the existence of *respondeat superior* liability. *See Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013).

78. The severe or pervasive standard requires a totality of the circumstances approach that examines "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993).

**A. Plaintiff Suffered Intentional Discrimination Because of the Disability.**

79. As stated above, throughout the course of her employment, Plaintiff was targeted with intentional discrimination.

80. Plaintiff repeatedly explained to Gaskin, to the owner Syed, and to Adel that the conduct to which she was subjected severely exacerbated the Disability, yet no corrective action was taken.

81. Rather than accommodate Plaintiff's disclosed condition, Gaskin used his knowledge of Plaintiff's anxiety to manipulate and further mistreat her, and Defendant responded to her complaints only by telling her that she could put in her two weeks' notice.

82. Therefore, Plaintiff was intentionally targeted with the hostile and abusive conduct described herein.

**B. The Discrimination Plaintiff Endured Was Severe and Pervasive.**

83. At all times relevant hereto, the discrimination Plaintiff experienced was both "severe" and "pervasive."

84. Gaskin screamed at Plaintiff in front of employees, cursed at her, texted her in a berating fashion on a near-daily basis, and whilst in front of customers screamed in her face and asked if she was "fucking stupid."

85. Defendant's conduct was unconsented to by Plaintiff, interfered with the performance of her work duties, and persisted throughout her tenure with Defendant from October 2024 until her constructive termination in January 2026.

**C. The Discrimination Detrimentally Affected Plaintiff.**

86. As averred hereinabove, Defendant's conduct was the direct and proximate cause of the exacerbation of the Disability, causing Plaintiff to suffer anxiety and panic attacks.

87. Despite Plaintiff's attempts to deter the conduct, and despite her pleas to Syed and Adel, it persisted, and Plaintiff's mental health deteriorated to the point that she could no longer function as a parent, spouse, or employee.

88. As a direct and proximate cause of Defendant's conduct, Plaintiff was constructively terminated from her employment with Defendant and has lost wages since that time.

**D. The Discrimination Plaintiff Suffered Would Detrimentally Affect a Reasonable Person in Like Circumstances.**

89. As averred hereinabove, Defendant subjected Plaintiff to relentless verbal abuse on a near-daily basis and refused to alter its conduct even after Plaintiff disclosed that it was exacerbating her Disability.

90. Defendant took affirmative action to engage in conduct which was reasonably calculated to exacerbate the Disability and made no meaningful effort to correct it despite Plaintiff's repeated requests.

91. Any reasonable individual in Plaintiff's position who suffers from a similar Disability would find these actions hostile and abusive.

**E. *Respondeat Superior* Liability Exists Due to Defendant's Role in Facilitating the Discrimination.**

92. *Respondeat superior* liability exists in connection with a claim for a hostile work environment if: (1) the tort is committed within the scope of employment; (2) the employer was negligent or reckless in failing to train, discipline, fire or take remedial action upon notice of harassment; or (3) the offender relied upon apparent authority or was aided in commission of the tort by the agency relationship. *Murphy v. Hotwire Commc'ns, LLC*, No. 19-5901, 2020 BL 168067, at *5 (E.D. Pa. May 5, 2020) (citing *Bonenberger v. Plymouth Twp.*, 132 F.3d 20, 26 (3d Cir. 1997)).

93. At all times relevant herein, the hostile conduct was perpetuated at the Restaurant during Plaintiff's scheduled working hours and while Gaskin, and later Adel, exercised supervisory responsibilities over Plaintiff, such that the conduct occurred within the scope of employment.

94. Defendant was negligent and reckless in its failure to discipline or take remedial action upon notice of the harassment, as Plaintiff reported the conduct to Gaskin, to the owner Syed, and to Adel, yet Defendant failed to take any remedial action and instead constructively terminated Plaintiff's employment.

95. As a direct and proximate result of Defendant's conduct described hereinabove, Plaintiff has suffered not only tangible economic loss in the form of lost back pay and benefits and lost front pay and benefits, but also substantial emotional and physical distress, embarrassment and humiliation, pain and suffering, and is entitled to compensatory damages for these injuries, in addition to the tangible economic losses she suffered and will continue to suffer.

WHEREFORE, Plaintiff, Julie Beatty, seeks a judgment against Defendant, Huntingdon Meats, LLC d/b/a Arby's, for willful noncompliance of the ADA and seeks: (i) compensatory damages, including but not limited to past and future pecuniary and non-pecuniary losses, including suffering, mental anguish, inconvenience, and loss of enjoyment of life; (ii)

punitive damages in an amount to be determined at trial and in an amount sufficient to deter Defendant from engaging in future conduct of a similar nature; (iii) equitable relief in the forms of back pay and front pay; (iv) the costs of instituting this action together with reasonable attorney's fees incurred by Plaintiff; (v) pre-judgment and continuing interest as calculated by the EEOC; and (vi) any further legal and equitable relief as this Court may deem just and proper.

## JURY DEMAND

96. Plaintiff requests a trial by jury on all matters so triable.

Respectfully submitted,

**THE WORKERS' RIGHTS LAW GROUP, LLP**

Date: October 30, 2026

By: *_/s/ Brendan K. Petrick_*

Brendan K. Petrick, Esq. (Pa. I.D. No. 88968)

The Workers' Rights Law Group, LLP
Foster Plaza 10
680 Andersen Drive, Suite 230
Pittsburgh, PA 15220
Telephone: 412.910.9592
Facsimile: 412.910.7510
brendan@workersrightslawgroup.com

*Counsel for Plaintiff, Julie Beatty*