**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **JANE DOE,**<br>Plaintiff<br><br>**v.**<br><br>**MILTON HERSHEY SCHOOL,**<br>Defendant | **Docket No.**<br><br>**JURY TRIAL DEMANDED**<br><br>Filed Electronically |

**COMPLAINT**

**AND NOW COMES** Plaintiff, Jane Doe,[1] by and through her undersigned attorneys at Strokoff & Cowden, P.C., and hereby

[1] As explained more thoroughly in the Motion to Proceed Under Pseudonym filed concurrently with this Complaint, Plaintiff wishes to bring this action pseudonymously and to have her name and address sealed. All references to Ms. Doe in the exhibits attached to this Complaint are redacted to preserve her anonymity. Ms. Doe reserves the right to amend this Complaint as necessary pending the outcome of aforesaid Motion.

brings this action against Defendant, Milton Hershey School, for violations of Title VII of the Civil Rights Act of 1964 (hereinafter "Title VII"), *as amended*, 42 U.S.C. § 2000e *et seq.*, and the Pennsylvania Human Relations Act (hereinafter "PHRA"), 43 P.S. § 951, *et seq.*, and a claim of intentional misrepresentation under Pennsylvania common law, alleging in support thereof as follows:

**PARTIES**

1. Plaintiff, Jane Doe (hereinafter "Ms. Doe"), is a married adult female over the age of 40 and a resident of the Commonwealth of Pennsylvania.[2]

2. Defendant Milton Hershey School (hereinafter "MHS") is a 501(c)(3) nonprofit organization with its principal place of business at 1201 Homestead Lane, Hershey, PA 17033.

3. MHS is a cost-free, private, coeducational home and school that provides services to pre-Kindergarten through 12th Grade students from low-income and/or resource-limited families.

4. MHS is believed and averred to continuously employ more than 15 employees.

---

[2] Ms. Doe's address is withheld pursuant to her concurrently filed motion. *See* n.1, *supra*.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

5. The preceding paragraphs are incorporated by reference as if fully set forth herein.

6. On or about July 21, 2025, Ms. Doe submitted a Complaint of Discrimination with the Pennsylvania Human Relations Commission (hereinafter "PHRC"), to be dual filed with the Equal Employment Opportunity Commission ("EEOC").

7. Ms. Doe's Complaint charged MHS with sex discrimination on the basis of marital status, and sex discrimination on the basis of marital status plus age, in violation of Title VII and the Pennsylvania Human Relations Act, 43 P.S. §§ 951–963.

8. On or about July 1, 2026, the PHRC closed Ms. Doe's case and informed her of her right to commence private civil litigation against MHS within two (2) years of closure. (A copy of the PHRC's case closure letter is attached hereto as **Exhibit A**).

9. On or about August 4, 2026, the EEOC issued a Right to Sue Letter to Ms. Doe. (A copy of Ms. Doe's Right to Sue Letter is attached hereto as **Exhibit B**).

10. Ms. Doe has exhausted her administrative remedies, and this Complaint now follows.

## JURISDICTION AND VENUE

11. The preceding paragraphs are incorporated by reference as if fully set forth herein.

12. Jurisdiction is proper under 28 U.S.C. § 1331 (relating to federal question jurisdiction).

13. Jurisdiction is also proper under 28 U.S.C. § 1367 (relating to supplemental jurisdiction).

14. Venue is proper under 28 U.S.C. § 1391 (relating to venue for civil actions brought in district courts of the United States).

## STATEMENT OF FACTS

15. The preceding paragraphs are incorporated by reference as if fully set forth herein.

16. At all times relevant, MHS maintained an Employee Handbook. MHS's Employee Handbook addresses, among other things, employee background checks and reads in relevant part:

> . . . MHS reserves the right to investigate an individual's prior employment history, personal references, and educational background, as well as any other information

> deemed relevant. MHS also reserves the right to obtain and to review an employee's criminal conviction record, child abuse history clearance, and related information, and to use such information when making employment decisions, to the extent consistent with applicable law. Volunteers and contracted staff likewise must have background checks and clearances completed prior to starting the volunteer or contracted assignment. Specifically, anyone who, in the sole discretion of MHS, may come into contact with our students will be required to supply the necessary clearances prior to any activity in which the individual may have such contact.

(A copy of relevant portions of MHS's Employee Handbook is attached hereto as **Exhibit C**; *see* **Exhibit C** at 10).

17. MHS's Employee Handbook establishes, as a qualification of employment, successful completion of a thorough background check process to screen applicants and employees to ensure they ". . .do not present a risk of serious harm to students, coworkers, or others." MHS's screening process includes ". . .the right to investigate an individual's prior employment history, personal references, and educational background, as well as any other information deemed relevant." (**Exhibit C** at 10).

18. MHS's Employee Handbook also contains an Equal Opportunity Statement stating, among other things, that MHS is "an equal opportunity employer and does not discriminate against

employees. . . based on. . . sex. . . [or, among other bases,] age. . ." (**Exhibit C** at 6). MHS's Employee Handbook also provides that it does not tolerate harassment on the basis of sex, including conduct constituting ". . .demeaning, negative or offensive remarks of a sexual or gender-based nature" or ". . . other conduct of a sexual or gender-based nature or using gender-based stereotypes that unreasonably interferes with an individual's work performance. . ." (**Exhibit C** at 8).

19. Ms. Doe worked for MHS as a Houseparent from 2011 to 2020.

20. As a Houseparent, Ms. Doe was responsible for providing a home-like environment for MHS's students. Specifically, her job duties required her to live in and manage a home of 8 to 12 students.

21. Per MHS's policies, MHS performed the background checks at the outset of and throughout Ms. Doe's employment as a Houseparent.

22. Ms. Doe's background check revealed no criminal history or any record of alleged or founded child abuse.

23. After approximately 9.5 years as a Houseparent, Ms. Doe resigned from MHS on October 21, 2020, to pursue employment elsewhere.

24. At the time of her resignation on October 21, 2020, MHS had taken only one personnel action against Ms. Doe for a speeding ticket she received during the 2013–2014 school year. Ms. Doe had self-reported her speeding ticket to MHS. For this, MHS issued her a warning.

25. In or around the time of her resignation from MHS, Ms. Doe separated from her then-husband. Their divorce was finalized in or about early 2021.

26. In or around February 2022, Ms. Doe married John Doe ("Mr. Doe").[3]

27. Ms. Doe petitioned to legally change her last name to Mr. Doe's last name. Ms. Doe's petition was granted in 2022 and Ms. Doe adopted Mr. Doe's last name.

28. In 2021, Mr. Doe was charged with misdemeanor crimes constituting sexual offenses against a minor.

[3] Mr. Doe's name is anonymized pursuant to Ms. Doe's Motion. *See* n.1, *supra.*

29. In 2022, Mr. Doe pleaded guilty to the aforesaid offenses and was sentenced to probation for approximately seven years. As part of the terms of his probation, Mr. Doe was required to register under Megan's Law, 42 Pa.C.S. § 9799.13, and to begin a sex offender treatment program.

30. In 2023, Mr. Doe successfully completed the aforesaid program, and his provider deemed him to be at minimal risk for re-offense.

31. Ms. Doe is not a registered sex offender, nor does she have any criminal history.

32. During Fall 2024, Ms. Doe learned that MHS was advertising an open Home Life Training Specialist position.

33. Ms. Doe was proud of her previous tenure with MHS and its students and was eager to return to service. She applied and interviewed for the open Home Life Training Specialist position in late 2024.

34. By letter dated December 16, 2024, MHS informed Ms. Doe that it selected her as a finalist for hire and gave her a tentative start date of January 21, 2025. (A copy of the aforesaid letter is attached hereto as **Exhibit D**).

35. Ms. Doe's hire was "contingent upon successful completion and passing of an extensive background check process," including FBI fingerprinting as well as criminal background, child abuse, and sexual misconduct/abuse checks. (**Exhibit D**).

36. As part of the "extensive background check process," Ms. Doe underwent a Pennsylvania Child Abuse History Clearance check. That process required Ms. Doe to disclose information about the people she lives with. Ms. Doe disclosed such information as it pertains to Mr. Doe.

37. MHS notified Ms. Doe that she successfully passed MHS's background check by letter dated January 13, 2025. MHS informed Ms. Doe of her official hire and start date of January 21, 2025. (A copy of the aforesaid letter is attached hereto as **Exhibit E**).

38. Per MHS policy, Ms. Doe was in a 1-year probationary employment period, and MHS would evaluate her after 90, 180, and 365 days. (*See* **Exhibit C** at 10–11).

39. Ms. Doe's 90th day of employment was April 21, 2025. Her manager and MHS's Director of Home Life Services, David Barnes, conducted a performance review at this time. (A copy

of Ms. Doe's probationary period performance review is attached hereto as **Exhibit F**).

40. Mr. Barnes gave Ms. Doe an overall performance evaluation of "satisfactory." He ended the review with the following comment: "[Ms. Doe] continues to demonstrate competence and willingness to complete task [sic] given her. She accepts coaching with a positive attitude seeks [sic] improvement." (**Exhibit F**).

41. Ms. Doe continued to dutifully serve MHS until May 22, 2025, when she received an ominous text message at 7:17 am from Mr. Barnes, stating "Hey I need you to meet me at Founders Hall[4] at 8:30. . . . In the lobby. Tell Frank you have an 8:30 meeting in HR and someone will come and get you."

42. Ms. Doe arrived as directed and was greeted by Mr. Barnes and Amy Master, MHS's Director of HR.

43. Their meeting took place in the Founders Hall HR conference room. During the meeting, Ms. Master told Ms. Doe that MHS learned that Ms. Doe's husband is a registered sex offender.

---

[4] Founders Hall is a building on MHS's campus.

44. Ms. Master informed Ms. Doe that because her husband is a registered sex offender, her employment with MHS was terminated, effective immediately.

45. Mr. Barnes explained that Ms. Doe had been an excellent employee and that her termination had nothing to do with her personally.

46. During the meeting, Mr. Barnes and Ms. Master told Ms. Doe words to the effect of "things had gotten messy." Ms. Doe, uncertain of what they meant, asked, "with the houseparents and gossip [about her marriage to Mr. Doe]?" Mr. Barnes and Ms. Master nodded their heads in agreement.

47. Ms. Doe begged to keep her job and asked if there was any way for her to avoid losing her job. Ms. Master told her "No." Ms. Master continued, explaining that Ms. Doe can tell future employers that she was never terminated/fired because MHS "looks at this as parting ways or separation."

48. Ms. Master concluded the meeting by handing Ms. Doe a termination letter. (A copy of Ms. Doe's termination letter is attached hereto as **Exhibit G**).

49. Ms. Doe's termination letter was backdated May 21, 2025, signed by Mr. Barnes, and stated that Ms. Doe had been terminated effective immediately on May 21, 2025. (**Exhibit G**).

50. Neither Mr. Barnes nor Ms. Master gave Ms. Doe any opportunity to explain or defend herself, or to otherwise avert termination of her employment.

51. On May 23, 2025, Ms. Doe returned to MHS's campus to retrieve her belongings with permission from her manager, Mr. Barnes. Mr. Barnes met her on campus and told her words to the effect of, "even knowing everything we know now, I would have still hired you. I am glad we hired you."

52. Ms. Doe's termination devastated her. In or about the week following her termination, she experienced severe emotional distress and a related episode of diaphoresis and near-syncope.

53. At all relevant times, MHS employed a similarly situated, married, younger woman, Jane Smith.[5] It is further believed and averred that Ms. Smith still works for MHS.

54. In 2023, Ms. Smith's husband, John Smith ("Mr. Smith"),[6] pled guilty to one count of Felony 3 institutional sexual assault of a minor; one count of Felony 3 unlawful contact with a minor constituting sexual offenses; one count of Felony 3 possession of child pornography; one count of Felony 3 unlawful contact with a minor in connection with child sex abuse; one count of Felony 3 corruption of minors; and one count of Misdemeanor 2 indecent assault of a person less than 16 years of age.

55. The aforementioned charges involve Mr. Smith's former tenure as a part-time teacher at MHS in 2017. His survivor, an 8th Grade girl, was his student. Mr. Smith began sexually abusing her in 2017 when she was 14 and continued until the girl

---

5 "Jane Smith" is a pseudonym. Because Plaintiff has filed a Motion to Proceed Under Pseudonym after she was fired for her husband's conduct, Plaintiff wishes to extend a similar courtesy to the younger female who is similarly situated but treated differently.

6 "John Smith" is a pseudonym extended as a courtesy to Ms. Smith, pursuant to Ms. Doe's Motion. *See* n.1, n.5, *supra*.

turned 17. It is believed that all incidents of Mr. Smith's child sex abuse took place on MHS property.

56. Mr. Smith was sentenced to a two-year prison sentence.

57. Local news media reported on Mr. Smith's criminal prosecution.

58. It is believed and averred that MHS had *promoted* Ms. Smith to her current position in late 2024 or early 2025, mere months before terminating Ms. Doe for her marriage to a convicted sex offender.

59. During the administrative process before the PHRC, MHS faulted Ms. Doe for not affirmatively disclosing her *husband*'s criminal history.

60. In its Answer, MHS repeatedly and baselessly claimed, among other things, that Ms. Doe intentionally withheld information about her husband, endangered MHS's students, and negatively impacted MHS's reputation. (A copy is attached hereto as **Exhibit H**. Pursuant to Ms. Doe's Motion, exhibits attached to **Exhibit H** have been omitted. *See generally* **Exhibit H**).

61. At all relevant times, MHS did not maintain a policy requiring *any* of its employees to affirmatively disclose another person's criminal history as part of their employment.

62. Neither Mr. Barnes, Ms. Master, nor any MHS official had ever told Ms. Doe that she was terminated for failing to affirmatively disclose her husband's criminal history.

63. During her tenure at MHS, Ms. Doe never brought Mr. Doe to any MHS sponsored or related event, nor did Mr. Doe ever step foot on MHS's campus.

64. At no point did Ms. Doe take any steps to conceal, withhold, or otherwise intentionally hide information about her marriage to Mr. Doe. She cooperated with and successfully completed every background check and/or criminal history inquiry MHS required of her.

65. Ms. Doe affirmatively disclosed all information requested of her pertaining to Mr. Doe as part of the Pennsylvania Child Abuse History Clearance check.

66. At no point did Ms. Doe do anything that risked exposing MHS students to contact with or proximity to Mr. Doe.

67. MHS also claimed that because Ms. Smith had affirmatively disclosed her marriage to Mr. Smith, a convicted child sex abuser, it was able to conduct a risk assessment and that it believed Ms. Smith posed no risk to MHS or its students. (*See generally* **Exhibit H**; **Exhibit H** at ¶¶ 35, 48).

68. To date, MHS has not clarified nor explained the details of its claimed assessment of the risk posed by Ms. Smith's continued employment, given her marriage to a convicted child sex abuser.

69. MHS offered Ms. Doe no such opportunity for a risk assessment, nor any other inquiry into work accommodations that would enable Ms. Doe to maintain her employment with MHS. Instead, MHS terminated Ms. Doe because of her husband's criminal history.

70. Since her termination, Ms. Doe has and continues to suffer emotional distress, loss of income, loss of benefits, and loss of professional opportunities.

## COUNT I
## SEX/GENDER DISCRIMINATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 AND THE PENNSYLVANIA HUMAN RELATIONS ACT

71. The preceding paragraphs are incorporated by reference as if fully set forth herein.

72. Ms. Doe's protected class is sex/gender (female).

73. At all times relevant, Ms. Doe was over the age of 40.

74. Ms. Doe was eminently qualified for her position, as demonstrated by her previous 9.5 years of successful employment with MHS, her excellent 90-day performance evaluation, and comments made by Mr. Barnes and Ms. Master.

75. Ms. Doe suffered the adverse employment action of termination of her employment.

76. Ms. Doe was terminated immediately or shortly after MHS learned of her marriage to a convicted sex offender.

77. It is believed and averred that MHS learned of Ms. Doe's marriage solely because she, like so many other women, adopted her husband's last name.

78. It is believed and averred that sexist stereotypes applied to married women contributed, at least in part, to MHS's kneejerk decision to terminate Ms. Doe.

79. It is believed and averred that MHS applied different criteria and/or factors to similarly situated married men than married women.

80. It is believed and averred that MHS would not have terminated a similarly situated man for the sole reason of being married to a convicted sex offender.

81. Ms. Smith is a substantially younger woman similarly situated to Ms. Doe.

82. At all relevant times, Ms. Smith was married to a convicted child sex abuser.

83. MHS gave Ms. Smith an opportunity to explain and/or defend herself and thereby avoid termination of her employment.

84. MHS did not give Ms. Doe the same opportunities to explain and/or defend herself as it gave to Ms. Smith.

85. It is believed and averred that MHS applied different criteria and/or factors to similarly situated married women on the basis of sexist and/or ageist stereotypes of older married women.

86. It is believed and averred that sexist and ageist stereotypes of older married women played a role in MHS's disparate treatment of Ms. Doe as compared to Ms. Smith.

87. It is believed and averred that sexist and ageist stereotypes of older married women played a role, at least in part, in MHS's decision to terminate Ms. Doe.

88. The circumstances of Ms. Doe's termination and MHS's dissembling justifications constitute "sex-plus" discrimination. *See, e.g.*, *Rosencrans v. Quixote Enters., Inc.*, 755 Fed.Appx. 139, 142 (3d Cir. 2018) (citations omitted); *see also Bryant v. Int'l Sch. Servs.*, 675 F.2d 562, 573 n.18 (3d Cir. 1982); *Weightman v. Bank of New York Mellon Corp.*, 772 F.Supp.2d 693, 701 (W.D. Pa. 2011) (holding that sex-plus theories of discrimination "allow[] employees to advance [] gender discrimination claim[s] even if all members of the gender are not discriminated against.") (citations omitted).

89. MHS terminated Ms. Doe without any legitimate, nondiscriminatory reason.

90. MHS's justification for terminating Ms. Doe is pretextual.

91. MHS's unspoken policy requiring its employees to affirmatively disclose their spouses' criminal histories, to the extent it exists, disproportionately and adversely impacts women.

92. MHS's discriminatory misconduct was malicious and/or done with reckless disregard for Ms. Doe's rights.

93. MHS's discriminatory termination of Ms. Doe violates Title VII of the Civil Rights Act of 1964 and the Pennsylvania Human Relations Act as a matter of unlawful workplace discrimination.

**COUNT II**
**AGE DISCRIMINATION IN VIOLATION OF THE PENNSYLVANIA HUMAN RELATIONS ACT**

94. The preceding paragraphs are incorporated by reference as if fully set forth herein.

95. It is believed and averred that MHS's disparate treatment of Ms. Doe was motivated, at least in part, by ageist stereotypes.

96. The circumstances of Ms. Doe's termination raise the inference that she was terminated, at least in part, because of her age.

97. MHS terminated Ms. Doe without any legitimate, nondiscriminatory reason.

98. MHS's justification for terminating Ms. Doe is pretextual.

99. MHS's discriminatory misconduct was malicious and/or done with reckless disregard for Ms. Doe's rights.

100. MHS's discriminatory termination of Ms. Doe violates the Pennsylvania Human Relations Act as a matter of unlawful workplace discrimination.

## COUNT III
## PENNSYLVANIA COMMON LAW
## INTENTIONAL MISREPRESENTATION

101. The preceding paragraphs are incorporated by reference as if fully set forth herein.

102. By letter dated December 16, 2024, MHS represented to Ms. Doe that she would be hired contingent on successful passage of the aforementioned background check process. (**Exhibit D**).

103. By letter dated January 13, 2025, MHS represented to Ms. Doe that she had successfully passed the aforementioned background check process and that her first day of work would be January 21, 2025. (**Exhibit E**).

104. The Employee Handbook, and the December 16, 2024, and January 13, 2025, letters constitute MHS's representations to Ms. Doe.

105. MHS's prior representations were false, in that by firing Ms. Doe solely for her marriage to Mr. Doe, it has invoked sexist stereotypes and engaged in sex/gender discrimination.

106. MHS's prior representations were false, in that by treating Ms. Doe differently than a younger, similarly situated woman, it has engaged in age discrimination.

107. MHS's prior representations were false, in that by firing Ms. Doe for her marriage to Mr. Doe, it failed to explain that it considered Ms. Doe's husband's criminal history relevant to her employment qualifications.

108. MHS's prior representations were false, in that by firing Ms. Doe for her marriage to Mr. Doe, it failed to fully

represent its expectations and/or criteria for the background check process to Ms. Doe.

109. MHS's termination of Ms. Doe improperly and unjustifiably punishes her for the falsity of its own representations.

110. MHS knew or should have known its prior representations were false.

111. MHS's representations were designed to induce Ms. Doe into working for MHS.

112. MHS's representations led Ms. Doe to believe that she was engaging with an employer who would not discriminate against her on the basis of her sex/gender.

113. MHS's representations led Ms. Doe to believe that she was engaging with an employer who would not discriminate against her because of her age.

114. MHS's representations led Ms. Doe to believe that she had fully complied with its expectations with respect to its background check process.

115. Ms. Doe relied on MHS's representations when she decided to work for MHS.

116. Ms. Doe's reliance on MHS's representations was reasonable under the circumstances.

117. Ms. Doe's termination and subsequent damages were proximately caused by her reasonable reliance on MHS's false representations.

**WHEREFORE**, Plaintiff Jane Doe demands a jury trial and judgment in her favor and against Defendant MHS and seeks the following relief: (1) backpay, subject to applicable interest; (2) reinstatement to her position as Home Life Training Specialist or front pay in lieu thereof, subject to applicable interest; (3) compensatory damages, inclusive of damages for out-of-pocket costs and emotional pain and suffering, subject to applicable interest; (4) punitive damages, subject to applicable interest; and (5) all other relief this Honorable Court deems necessary to make Ms. Doe whole.

Respectfully submitted,
**STROKOFF & COWDEN, P.C.**

By: /s/ Catherine E. Rowe

Catherine E. Rowe
PA ID 315907
Jacob I. Toth
PA ID 338508
224 Pine Street
Harrisburg, PA 17101
Phone: (717) 233-5353
Fax: (717) 233-5806
crowe@strokoffandcowden.com
jtoth@strokoffandcowden.com
*Attorneys for Plaintiff Jane Doe*

Date: November 2, 2026

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **JANE DOE,**<br>Plaintiff<br><br>**v.**<br><br>**MILTON HERSHEY SCHOOL,**<br>Defendant | **Docket No.**<br><br>**JURY TRIAL DEMANDED**<br><br>Filed Electronically |

## VERIFICATION

I, Jane Doe, certify that the statements made in the foregoing Complaint are true and correct to the best of my knowledge, information, and belief. I understand that false statements herein are made subject to the penalties of 18 Pa.C.S. § 4904 relating to unsworn falsification to authorities.

**DATE:** November 2, 2026

/s/ Jane Doe
**Jane Doe**[7]

[7] Electronic signature provided pursuant to Ms. Doe's Motion to Proceed Under Pseudonym. Pending disposition of said Motion allowing Ms. Doe to proceed under a pseudonym, she will provide this Honorable Court with an unmasked verification form.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **JANE DOE,**<br>Plaintiff<br><br>**v.**<br><br>**MILTON HERSHEY SCHOOL,**<br>Defendant | **Docket No.**<br><br>**JURY TRIAL DEMANDED**<br><br>Filed Electronically |

**CERTIFICATE OF COMPLIANCE**

The undersigned certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

By: /s/ Jacob I. Toth

Jacob I. Toth
PA ID 338508
224 Pine Street
Harrisburg, PA 17101
Phone: (717) 233-5353
Fax: (717) 233-5806
jtoth@strokoffandcowden.com

Date: November 2, 2026